UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
INSITUFORM TECHNOLOGIES, INC.,          )
                                        )
                Plaintiff,              )
                                        )
v.                                      )        CASE NO. 04-10487 GAO
                                        )
AMERICAN HOME ASSURANCE                 )
COMPANY,                                )
                                        )
                Defendant.              )
_____)

**AMERICAN HOME ASSURANCE COMPANY'S RESPONSE TO INSITUFORM'S
LOCAL RULE 56.1 RESPONSE TO AMERICAN HOME'S STATEMENT OF
UNDISPUTED FACTS AND INSITUFORM'S ADDITIONAL
<u>UNDISPUTED MATERIAL FACTS</u>**

In accordance with Local Rule 56.1, American Home Assurance Company ("American Home") hereby responds to Insituform's Local Rule 56.1 Response to American Home's Statement of Undisputed Facts and Insituform's Additional Undisputed Material Facts.

As American Home stated in its Statement of Undisputed Facts filed in connection with its motion for summary judgment, American Home does not concede all such facts to be true for purposes of trial, but instead accepts any undisputed facts as true for purposes of its Motion for Summary Judgment and with respect to Insituform's Cross-Motion for Summary Judgment. In addition, American Home does not concede that every fact included in Insituform's statement is admissible or material to any legal theory pursuant to which the Court may grant summary judgment in this case.

**AMERICAN HOME'S REPLY TO INSITUFORM'S LOCAL RULE 56.1 RESPONSE TO AMERICAN HOME'S STATEMENT OF UNDISPUTED FACTS**

5.      As a result, Insituform has incurred costs and expenses in excess of $1 million to repair and replace its own defective work (Complaint, ¶ 20.)

**INSITUFORM'S RESPONSE:**      Disputed in part as inaccurate.  Insituform has incurred recoverable costs and expenses of $7,398,299.05.  Affidavit of Chris Campos ¶ 4.

**AMERICAN HOME'S OBJECTIONS:**    Insituform improperly characterizes a statement in its own Complaint as inaccurate without moving to amend the pleading in accordance with Federal Rule of Civil Procedure 15.  Furthermore, for the reasons set forth in American Home's opposition to Insituform's cross-motion for summary judgment, Mr. Campos' expert report is not admissible as required by Fed. R. Civ. P. 56(e) and should not be considered by the Court.

**AMERICAN HOME'S REPLY:**    Disputed.  As set forth in American Home's Motion for Summary Judgment, the American Home Policy does not provide coverage for the MWRA Claim.  Furthermore, if the Court determines that the issue of damages is otherwise amenable to summary judgment, American Home respectfully requests pursuant to Fed. R. Civ. P. 56(f) that the Court refuse the application at this time or order a continuance so that American Home can conduct its noticed depositions of the individuals that Insituform has identified as knowledgeable regarding the costs Insituform allegedly incurred in connection with the MWRA Claim.

American Home further notes that Mr. Campos' conclusion as to Insituform's recoverable costs and expenses, as set forth in Paragraph 4 of his Affidavit, provides in full:

> Assuming that the American Home policy provides coverage for the MWRA claim, *and as explained and qualified in my report*, the total amount of recoverable loss is $7,398,299.05, which is Insituform's actual cost to remove and replace the installed pipe. American Home's share of the recoverable loss is $6,398,299.05,

*as explained and qualified in my report.* The opinions in my report
are based on a reasonable degree of accounting certainty.

(Emphases added.)

Among other things, Mr. Campos' expert report, attached to the affidavit, notes that Mr.
Campos "was not able to verify mobilization/demobilization hours for weeks during which the
employees worked on more than one job" (Expert Report, at 3), and that part of Insituform's
claim for certain payroll categories (id.) and equipment (id. at 4) appeared to be fixed in nature.
Mr. Campos further concluded that the MWRA Claim would not affect Insituform's fixed costs.
Mr. Campos also noted that he was not provided with any supporting documentation as to
Insituform's projected close-out costs.  (id. at 8.)

## AMERICAN HOME'S RESPONSE TO INSITUFORM'S
## ADDITIONAL UNDISPUTED MATERIAL FACTS

### The MWRA Claim

1.      Insituform was subcontracted by D'Allessandro Corp. to rehabilitate
approximately 5,400 feet of brick sewer owned by the MWRA.  Affidavit of Tom Porzio ¶ 2
("Porzio Affidavit ¶ __").

    **RESPONSE:**          Undisputed.

2.      The MWRA host pipe was unusual in that it was an inverted egg-shape with the
larger radius at the bottom and the smaller radius at the top, and it was located 20 to 30 feet
below ground level with substantial ground water pressure and infiltration.  Porzio Affidavit ¶ 3.

    **RESPONSE:**          Undisputed.

3.      MWRA's engineer, Jacobs Civil Engineering ("Jacobs"), specified certain design
and materials criteria for the CIPP.  The design was based on a circular pipe with an equivalent
diameter of approximately 40 inches.  Insituform initially submitted a proposal to D'Allessandro

suggesting a thicker design based on a non-circular design assumption. Additionally, Insituform suggested a resin that differed from the specified materials in that it had higher design values (i.e., is stronger) and better cure properties in the presence of groundwater. As the proposed design method and materials were not accepted by Jacobs, Insituform submitted a proposal for the installation that incorporated the design criteria specified by Jacobs. Ultimately Jacobs approved Insituform's submission. Porzio Affidavit ¶ 4.

      **RESPONSE:**      Disputed in part as inaccurate. Insituform and D'Allessandro had ultimate responsibility for the design of the CIPP liner. The CIPP portion of MWRA Contract #6840 (Section 02713) provided, among other sections, that "[t]he Contractor shall conduct a thorough review of the Pre-Installation Television Inspection videos to determine the ovality and other conditions that may affect the design or installation of the liner into the host conduit. These factors should be given appropriate consideration in the Design" (§ 1.04(A)(3) (ITI-AIG 009273), that "[t]he Contractor shall verify prior to fabricating the liner tube the existing internal dimensions of each of the host conduits to be rehabilitated by CIPP lining, and submit sizes to the Authority for review" (§ 1.05(B)(1)(f)) (ITI-AIG 009274), and that "[t]he liner shall be fabricated to a size that, when installed, will neatly fit into the internal shape of the host conduit without wrinkles. Allowance shall be made for longitudinal and circumferential stretching during insertion. All dimensions shall be verified by the Contractor prior to construction" (§ 2.01(A)(5)) (ITI-AIG 009278). (Ex. A to the Affidavit of Kurt M. Mullen (the "Mullen Aff."), submitted herewith.)

      By letter dated May 15, 2003, Mr. Porzio submitted to D'Allessandro a summary that proposed a beam design rather than the circular design noted in the original specification because measurements of the pipe showed the bottom to have a relatively "flat" curve. (Ex. B to Mullen

Aff., at ITI-AIG 005602.)  Insituform noted, however, that "[u]sing engineering judgement, different engineers may come to different conclusions about thickness that will serve the needs of the MWRA.  Therefore, we are certainly open to additional discussion with you and the Engineer/Owner."  (Id.)  Insituform also noted in its letter that because it originally "designed and estimated the thickness based on circular assumptions, which is the default method commonly used by engineers," it was requesting an additional $96,665.80 for the proposed beam design.  (Id.)

Apparently in response to Insituform's general discussions of a beam design, Jacobs stated in an e-mail dated May 14, 2003 to D'Allessandro that "unless there is some strong basis for utilizing a beam design approach, the use of a circular design approach is acceptable. *As always though, it is still the responsibility of [Insituform]/D'Allessandro to provide the design and the Certificate of Design*."  (Ex. C to Mullen Aff., at ITI-AIG 005598.) (emphasis added).  There is no evidence in the record that the contract amount was increased at that time by the requested $96,665.80.  It is undisputed that Insituform later proposed a circular design, which was accepted.  It also is undisputed that Insituform was aware of the shape of the pipe as of May 2003.

4.      The installation of the CIPP began on August 13, 2003 and was completed on September 8, 2003.  Porzio Affidavit ¶ 5.

**RESPONSE:**        Undisputed.

5.      Visual inspections of the installation revealed fins or wrinkles protruding toward the center of the pipe.  The fins or wrinkles were intermittent, generally running in a longitudinal direction, and appeared in every quadrant of the geometry.  Insituform trimmed the fins or

wrinkles at the direction of Jacobs after indicating a concern about compromising the integrity of the laminate with regard to leakage. Porzio Affidavit ¶ 6.

**RESPONSE:**        Undisputed as to the presence of fins and wrinkles. Disputed as to the remainder of the statement. After receiving notification in August 2003 of the presence of fins and wrinkles, Mr. Porzio responded by letter dated August 22, 2003 to D'Allessandro (Ex. D to Mullen Aff., at ITI-AIG 003470), attaching a letter dated August 22, 2003 from Rick Baxter, P.E. of Insituform to Mr. Porzio (id., at ITI-AIG 003471-3476). Of relevance to this Paragraph 5, Mr. Baxter proposed trimming the fins to "be about a half to ¾ -inch tall," (ITI-AIG 003472) and attached a wrinkle and fin removal procedure (ITI-AIG 003475). Mr. Porzio's cover letter to D'Allessandro specifically referred to this wrinkle and fin removal procedure and stated that Insituform was "prepared to begin executing the attached procedure as soon as this weekend." (ITI-AIG 003470.)

6.        On October 31, 2003, the MWRA notified Insituform that the installation failed to meet the contract specifications and that the job was rejected due to leakage and that remediation was necessary. Porzio Affidavit ¶ 7. American Home Response to Insituform First Set of Requests to Admit ¶ 8.

**RESPONSE:**        Disputed as incomplete. American Home stated in its Response No. 8 to Insituform's First Set of Requests to Admit, in relevant part, that:

> American Home admits that Jacobs Civil Inc. sent a letter dated October 31, 2003 to Jon D'Allessandro, President, D'Allessandro Corp., stating in part that Jacobs Civil Inc.'s "observations indicate the [CIPP] liner with the repairs made to it does not meet the Contract Document requirements and is therefore unacceptable at this time." Responding further, American Home states that the content of this letter speaks for itself.

A copy of the October 31, 2003 letter (D 07522-7527) is attached as Exhibit E to Mullen Aff. American Home further notes that, in addition to leaks, the letter provides that Jacobs observed, among other things, "[v]oids between the CIPP liner and host pipe" at different locations "as indicated by tapping with a hammer (hollow sound). The depth of these voids needs to be determined as these lead to reduced cross-section and reduced flow capacity of the sewer. Concerns of possible buckling must also be addressed" (id., at D 07522). Jacobs also observed "[s]everal soft areas in the liner" (id., at D 07523).

7.    Insituform tried various remedies to remediate the defects of the installation, including remedies such as testing the materials and repairing areas where samples were removed; grouting the annulus; proposal of epoxy repairs; and proposal of spray-applied polyurethane. Porzio Affidavit ¶ 8.

**RESPONSE:**    Undisputed.

8.    Notwithstanding the efforts to remediate the defects, the pipe continued to leak due mainly to the larger than expected annulus. The size of the annulus also caused other concerns about the integrity of the pipe to be raised. Porzio Affidavit ¶ 9.

**RESPONSE:**    Undisputed as to the fact that the pipe continued to leak. Disputed as to the assertions that the leak was "due mainly to the larger than expected annulus" and that the "size of the annulus also caused other concerns about the integrity of the pipe to be raised."

Assuming that the "annulus" refers to the space between the original MWRA pipe and the installed CIPP, American Home disputes the implication that the size of the annulus turned out to be "larger than [Insituform] expected."

As set forth in American Home's Response No. 3 to Insituform's Additional Undisputed Facts, Insituform knew of the shape of the pipe by, at the latest, May 2003. Furthermore, on July

17, 2003, again <u>before</u> Insituform's installation of the CIPP, D'Allessandro notified Jacobs of a

"changed condition" with respect to the project and sought additional money from the MWRA.

(Ex. F to Mullen Aff.)  In support, D'Allessandro forwarded a letter dated July 16, 2003 from

Mr. Porzio proposing that portions of the existing pipe be grouted to provide for a more circular

shape.  (<u>Id.</u>)  On July 18, 2003, Jacobs concluded that the request was without merit.  (Ex. G to

Mullen Aff.)  In particular, Jacobs noted that Insituform:

> [V]erified the existing dimensions of the [existing sewer] on April
> 30, 2003 and again on May 28, 2003.  These inspections were
> performed in a timely manner in which the information could have
> been, and should have been, incorporated into the design of the
> CIPP in accordance with the Contract Specifications . . . .  As such,
> any delays or additional expenses that may be incurred as a result
> of not properly obtaining or utilizing the existing dimensions
> information will be solely at the expense of D'Allessandro Corp.
> and/or its subcontractors.

(<u>Id.</u>, at 2.)  Jacobs also invited D'Allessandro to more formally submit for review and approval

any proposal so that it could "be considered part of the base Contract Work" if D'Allessandro

(and, presumably, Insituform) concluded that further action was required.  (<u>Id.</u>, at 1.)  There are

no documents showing that D'Allessandro and/or Insituform took Jacobs up on its invitation.

As to the effect of the annulus on the integrity of the pipe, Insituform informed Jacobs

during and after the CIPP installation (and, indeed, after MWRA rejected Insituform's work) that

the originally installed CIPP was structurally sound.  In particular, after receiving notification in

August 2003 of the presence of fins and wrinkles, Mr. Porzio responded by letter dated August

22, 2003 to D'Allessandro Corp. (Ex. D to Mullen Aff., at ITI-AIG 003470), which attached a

letter dated August 22, 2003 from Mr. Baxter to Mr. Porzio (<u>id.</u>, at ITI-AIG 003471-3476).  Of

relevance to this Response, Mr. Porzio stated that:

> [P]lease understand that additional "wrinkles" and/or "fins" should
> be expected in remaining installations on this project.  To the

> extent that host pipe geometry and configuration vary on balance
> with physical limitations of the CIPP process, some irregularity in
> the final product is naturally expected as we strive to meet all of
> the requirements of the specifications and Owner's expectations.

(Id., at ITI-AIG 003470.)  Mr. Baxter's letter to Mr. Porzio stated, among other things, that: (1) "[f]ins are more cosmetic in nature since they do not adversely impact the structural performance of the wall.  Fins are never designed to be in the CIPP, but when they occur fins offer some degree of a stiffening effect, which only adds to the beam stiffness of the pipe" (id., at ITI-AIG 003471); (2) Insituform "do[es] not anticipate the CIPP lined pipe to restrict the flow capacity relative to the host brick sewer even with the remaining fins and/or folds/wrinkles within the pipe" (id., at ITI-AIG 003472-3473); and (3) "[i]n review, the fins and/or folds/wrinkles within the CIPP are more of a cosmetic blemish or an aesthetics problem than a source to affect the pipe's performance" (id., at ITI-AIG 003473).

On October 14, 2003, more than one month after the CIPP was completed, Mr. Baxter again informed Jacbos and MWRA that the CIPP was structurally sound based on the testing of CIPP samples.  (Ex. H to Mullen Aff., at ITI-AIG 003517.)  Among other issues, Mr. Baxter noted that:

> The samples were taken within areas that contained CIPP defects.
> The test lab used these sample plates to evaluate the integrity of the
> CIPP within the host pipe.  The test lab cut the individual
> specimens near the anomaly and tested the specimens that could be
> most rapidly machined and prepared for testing.  No defects were
> within the specimens tested; however, they were adjacent to or
> within two inches of the anomaly.  The specimens were tested to
> quantify the defect's impact upon the composite.  The specimens
> adjacent to the defects do not exhibit a deleterious effect on the
> pipe performance.  *Small pipe imperfections do not create
> structural failures*.  Since the sample test results produced
> compliant test results, *the flaws in the CIPP did not and will not
> affect the pipe's performance*.

(Id., at ITI-AIG 003517 (emphases added).)

Insituform made the same representations even after MWRA rejected Insituform's work. By letter dated January 13, 2004, Thomas S. Rooney, Jr., Insituform's President and CEO, wrote directly to Michael J. Hornbrook, Chief Operating Officer of the MWRA, in connection with a meeting between the parties held on January 8, 2004.  (Ex. I to Mullen Aff., at ITI-AIG 012227-12228)  Of relevance to this Response No. 8, Mr. Rooney wrote that:

> A group of experts from our Landover and St. Louis offices flew to Boston on Friday, January 9, and inspected the pieces of Insitupipe that have already been removed from a portion of the sewer ([S]hot 6), the methods being proposed for the repairs, and through a TV and actual physical inspection of the pipe, the condition of the remaining portion of the liner in the upstream sections of the EBBS Project.  While this is the same group of people that have been involved in the prior technical discussions on this project, this time they were challenged to examine with particular attention the need for replacement of the entire liner, or whether your installation requirements can be met by a combination of spot repairs and replacement of Shot 6.

> The group has now reported back to me that *the condition of the liner, as evidenced by the above inspections, and the results of the various independent tests conducted earlier in the investigation currently indicate that the liner is structurally sound.*  We intend to continue this process of critical evaluation as we proceed with the repairs to ensure that the entire project meets our requirements and your specifications for structural integrity at its completion. . . .

> *Finally, we wish to clarify our belief, buttressed by the tests, studies, and analyses that we have performed to date, that replacement of Shot 6 and appropriate spot repairs in the remainder of the liner will meet the MWRA's specifications for this project in an acceptable manner, while resulting in a safer and less disruptive completion than the replacement of the entire liner.*

(Id., at ITI-AIG 012227-12228) (emphases added).

9.    The pipe showed leakage through the liner at the trimmed fins as well as other areas.  Porzio Affidavit ¶ 10.

**RESPONSE:**    Undisputed.

10.    Attempts at remedying the installation failed.  MWRA insisted that 4,500 feet of the 5,400 feet of pipe installed by Insituform be removed and replaced.  Porzio Affidavit ¶ 11.

**RESPONSE:**        Undisputed.

11.    An independent engineering [firm], Haley & Aldrich, was retained to evaluate the original installation in light of the contractual specifications and to analyze the repair requirements, submittals and processes.  Porzio Affidavit ¶ 12.

**RESPONSE:**        Disputed in part as inaccurate.  It appears that Insituform retained Haley & Aldrich after the completion of the CIPP so that Insituform's proposed repairs could be stamped by a Massachusetts Licensed Professional Engineer as required by the MWRA Contract.

Section 02713 of MWRA Contract #6840 provided in §§ 1.05(B)(3)(a) that:

> Prior to the fabrication of CIPP liner, the Contractor shall submit a Certificate of Design for the CIPP liner proposed.  The Certificate of Design shall be signed by a Licensed Professional Engineer for the preparation of the design calculations, and the Licensed Professional Engineer shall be registered to practice in the Commonwealth of Massachusetts.

(Ex. A to Mullen Aff., at ITI-AIG 009275.)

The retention agreement entered into between Insituform and Haley & Aldrich, dated December 9, 2003, stated that Haley & Aldrich would provide "independent" checks as to Insituform's proposed repair designs, based on "input parameters provided by [Insituform] or others as appropriate."  (Ex. J to Mullen Aff., at ITI-AIG 012863.)  Haley & Aldrich anticipated in its retention letter that among its "deliverables for this project will be a series of letters documenting our independent checks of Insituform's design calculations which will be stamped by a Professional Engineer registered in the Commonwealth of Massachusetts . . . ."  (Id.)  It is undisputed that one of the signatories to the retention letter on behalf of Haley & Aldrich, Brian

C. Dorwart, P.E., had, while at another firm, stamped Insituform's pre-installation design proposals.  (Ex. K to Mullen Aff., at ITI-AIG 005611, 005619.)  In essence, Mr. Dorwart was being asked to review repairs to a design he previously approved.

12.    Plans were made to remove and replace the 4,500 feet of the installation ("Phase 1"), which began in October 3, 2003.  The Phase 1 removal and reinstallation was completed in May 2004.  The inspection and testing of the reinstallation was completed May 8, 2004.  Porzio Affidavit ¶ 13.

**RESPONSE:**    Disputed as to the start of the removal and replacement of 4,500 feet of the installation.  This removal and replacement began no earlier than mid-January 2004.  (Ex. I to Mullen Aff., at ITI-AIG 012227-12228) (proposing removal of Shot 6 and spot repairs to the rest of the liner).  Undisputed as to the remainder of the statement.

13.    In the first quarter of 2005, the entire installation was inspected.  It was then determined that the segment of pipe not removed and replaced in Phase 1 was also damaged.  In fact, the pipe had failed in at least two locations and was leaking at other locations.  Porzio Affidavit ¶ 14.

**RESPONSE:**    Undisputed.

14.    MWRA rejected the remaining 900 feet of the original installation and demanded that it be removed and replaced ("Phase 2").  Porzio Affidavit ¶ 15.

**RESPONSE:**    Undisputed.

15.    Phase 2 work was performed from June through September of 2005.  Porzio Affidavit ¶ 16.

**RESPONSE:**    Undisputed.

16.     The buckles in the original installation were caused by using the wrong design thickness and by using a resin material with lower physical and other properties for the installation conditions and environment.  The fins, wrinkles, and leaks resulted from a design and fabrication of a liner for a circular pipe, not the inverted egg shape involved.  Porzio Affidavit ¶ 17.

**RESPONSE:**          Disputed.  As to the portion of this statement regarding the design, as indicated in Response No. 3 to Insituform's Additional Undisputed Facts, Insituform and D'Allessandro were responsible for the CIPP design.

As to the portion of this statement regarding the fins, wrinkles and leaks, as indicated in Response No. 8 to Insituform's Additional Undisputed Facts, Insituform informed Jacobs during the CIPP installation that wrinkles and fins were "cosmetic" and did not affect CIPP integrity. (Ex. D to Mullen Aff., at ITI-AIG 003470-3476.)  Insituform maintained that the CIPP pipe was structurally sound long after it completed the work.  (Exs. H, at ITI-AIG 003517, and I, at Ex. I, at ITI-AIG 012227-12228, to Mullen Aff.)

When, by letter dated May 20, 2005, Mr. Porzio informed D'Allessandro that Insituform believed even prior to the construction that "the original design specified was not the appropriate design for this shape pipe, with the result that the thickness and factor of safety were too low for the conditions of this installation in a variable, asymmetrical, noncircular shaped pipe," (Ex. L to Mullen Aff., at ITI-AIG 011777), Jacobs promptly corrected the historical record.  By letter dated May 24, 2005 to D'Allessandro, Jacobs stated, in relevant part, that:

> First, I think you should caution Mr. Porzio that such untrue and unwarranted assertions without any substantiation are counterproductive to a good working relationship and may even rise to the level of actionable defamation.

> Second, the Contract Documents are clear that it is the
> responsibility of the contractor and its subcontractor to provide the
> design for the CIPP liner.
>
> Third, [Insituform] replaced 4,500 feet of liner in 2003/2004 due to
> manufacturing and installation problems summarized to us by
> [Insituform] as recently as June 2004 after the relining was
> completed.  The current problem liner was part of the original
> lining installed before September 15, 2003 that was not removed
> and relined.  At the time of the relining, [Insituform] never
> indicated that the design specification was flawed in any manner
> and we resent the contrary implication contained in [Insituform]'s
> letter.

(Ex. M to Mullen Aff., at ITI-AIG 010052.)

### Liberty Mutual's Investigation of the MWRA Claim

17.     Liberty Mutual investigated the MWRA Claim to determine whether Insituform

was entitled to coverage under the Liberty Mutual policy no. RG2-641-004218-033 (the "Liberty

Mutual Primary Policy").  Supplemental Affidavit of Robert Kelley ¶ 1, Ex. A [footnote

omitted].

**RESPONSE:**          Undisputed.

18.     Attached as Exhibit A to the Supplemental Affidavit of Robert Kelley is a

genuine copy of Liberty Mutual's December 10, 2004 correspondence to Insituform concerning

its investigation of the MWRA claim.  Supplemental Kelley Affidavit ¶ 1, Ex. A.

**RESPONSE:**          Undisputed.

19.     Following its investigation, Liberty Mutual concluded that the MWRA claim

"appears to involve 'an error in the design, prescription, manufacture, blending, mixing or

compounding [your work].'"  Supplemental Kelley Affidavit ¶ 1, Ex. A; American Home

Response to Insituform First Set of Requests to Admit ¶ 14.

**RESPONSE:**          Undisputed.

20.    Liberty Mutual concluded that "there is coverage under the [Contractor's Rework Coverage Amendment] Endorsement for [the MWRA] claim."  Supplemental Kelley Affidavit ¶ 1, Ex. A; American Home Response to Insituform First Set of Requests to Admit ¶ 15.

**RESPONSE:**        Disputed in part as incomplete.  It is undisputed that the December 10, 2004 letter attached to Mr. Kelley's Supplemental Affidavit contains the quoted language.  The letter also provides, in relevant part, that Liberty Mutual "ha[s] determined that there is a *potential* of coverage in this matter," (at 1) (emphasis added) and that "Liberty Mutual does not intend to wa[i]ve any provision, exclusion or condition [of] the policy that it has issued.  Liberty Mutual specifically reserves all rights and defenses under the policy of insurance and applicable law and any action taken by Liberty Mutual during its handling of this claim should not be interpreted as a waiver or estoppel to assert any such right.  If Liberty Mutual becomes aware of any other policy provisions, exclusions or conditions that may be applicable, Liberty Mutual reserves it[s] rights to later assert these provisions, exclusions or conditions."  (At 3.)

21.    After a review of all the invoices submitted by Insituform, Liberty Mutual concluded that it would pay the full limit of $1 million available under the Contractor Rework Endorsement.  Supplemental Kelley Affidavit ¶ 2, Ex. B.

**RESPONSE:**        Undisputed that Liberty Mutual concluded that it would pay the full limit of $1 million available under the Contractor Rework Endorsement, subject to a $250,000 deductible.  Supplemental Kelley Affidavit ¶ 2

22.    Liberty Mutual paid its full limit of liability under the Liberty Mutual Primary Policy for the MWRA Claim, so that the MWRA Claim has pierced the American Home umbrella limit of liability.  Supplemental Kelley Affidavit ¶ 2, Ex. B.

**RESPONSE:**           Undisputed that Liberty Mutual paid its full limit of liability under the Liberty Mutual Primary Policy for the MWRA Claim.  Disputed that the MWRA Claim has pierced the American Home umbrella limit of liability, as there is no coverage under the American Home Policy for the MWRA Claim for the reasons stated in American Home's Motion for Summary Judgment.

23.    Attached as Exhibit B of the Supplemental Affidavit of Robert Kelley is a genuine copy of Liberty Mutual check numbers A0-80195880 and A0-8019420 in the amounts of $650,000 and $350,000 respectively.  Supplemental Kelley Affidavit ¶ 2, Ex. B.

**RESPONSE:**           Undisputed.

### American Home's Investigation of the MWRA Claim

24.    American Home could have but chose not to participate in Liberty Mutual's investigation of the MWRA Claim.  American Home Response to Insituform First Set of Requests to Admit ¶ 21.

**OBJECTION:**           This fact is not supported by admissible evidence as required by Fed. R. Civ. P. 56(e) and should not be considered by the Court.

**RESPONSE:**           Disputed.  As American Home stated in Response No. 21 to Insituform's First Set of Requests to Admit, "American Home admits that it did not participate in Liberty Mutual's investigation of the MWRA Claim.  Otherwise, denied."

### Insituform's Damages

25.    Insituform's actual costs to remove and replace the original installation is $7,398,299.05.  Affidavit of Chris Campos ¶ 4.

**OBJECTION:**    As set forth in American Home's response to Insituform's cross-motion for summary judgment as to Insituform's costs, this fact is not supported by admissible evidence as required by Fed. R. Civ. P. 56(e) and should not be considered by the Court.

**RESPONSE:**    If the Court determines that the issue of damages is otherwise amenable to summary judgment, American Home respectfully requests pursuant to Fed. R. Civ. P. 56(f) that the Court refuse the application at this time or order a continuance so that American Home can conduct its noticed depositions of the individuals that Insituform has identified as knowledgeable regarding the costs allegedly incurred in connection with the MWRA Claim.

American Home further notes that Mr. Campos' conclusion as to Insituform's recoverable costs and expenses, as set forth in Paragraph 4 of his Affidavit, provides in full:

> *Assuming that the American Home policy provides coverage* for the MWRA claim, *and as explained and qualified in my report*, the total amount of recoverable loss is $7,398,299.05, which is Insituform's actual cost to remove and replace the installed pipe. American Home's share of the recoverable loss is $6,398,299.05, *as explained and qualified in my report*.  The opinions in my report are based on a reasonable degree of accounting certainty.

(Emphases added.)

Among other things, Mr. Campos' expert report, attached to the affidavit, notes that Mr. Campos "was not able to verify mobilization/demobilization hours for weeks during which the employees worked on more than one job" (Expert Report, at 3), and that part of Insituform's claim for certain payroll categories (id.) and equipment (id.) appeared to be fixed in nature.  Mr. Campos further concluded that the MWRA Claim would not affect Insituform's fixed costs.  Mr. Campos also noted that he was not provided with any supporting documentation as to Insituform's projected close-out costs.  (id.)

26.     American Home's share of the loss is $6,398,299.05.  Affidavit of Chris Campos ¶ 4.

**OBJECTION:**     As set forth in American Home's response to Insituform's cross-motion for summary judgment as to Insituform's costs, this fact is not supported by admissible evidence as required by Fed. R. Civ. P. 56(e) and should not be considered by the Court.

**RESPONSE:**     Disputed.  As set forth in American Home's Motion for Summary Judgment, the American Home Policy does not provide coverage for the MWRA Claim. Furthermore, if the Court determines that the issue of damages is otherwise amenable to summary judgment, American Home respectfully requests pursuant to Fed. R. Civ. P. 56(f) that the Court refuse the application at this time or order a continuance so that American Home can conduct its noticed depositions of the individuals that Insituform has identified as knowledgeable regarding the costs allegedly incurred in connection with the MWRA Claim.

As indicated in its Response No. 25, American Home further notes that Mr. Campos' expert opinion was qualified, and American Home incorporates that portion of its Response No. 25 herein by reference.

Respectfully submitted,

AMERICAN HOME ASSURANCE COMPANY,

By its Attorneys,


/s/ Gregory P. Deschenes
Gregory P. Deschenes (BBO #550830)
gdeschenes@nixonpeabody.com
Gregg A. Rubenstein (BBO #639680)
grubenstein@nixonpeabody.com
Kurt M. Mullen (BBO #651954)
kmullen@nixonpeabody.com
NIXON PEABODY LLP
100 Summer Street
Boston, Massachusetts  02110
(617) 345-1000
(617) 345-1300 (facsimile)

Dated:  September 21, 2006


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on September 21, 2006.


/s/ Gregory P. Deschenes
Gregory P. Deschenes