# EXHIBIT 1

## Page 1

```
 1            UNITED STATES DISTRICT COURT
 2             DISTRICT OF MASSACHUSETTS
 3
   INSITUFORM TECHNOLOGIES, INC.,    )
 4                                   )
          Plaintiff,                 )
 5                                   )
      vs.              ) No. 04-10487 GAO
 6                                   )
   American Home ASSURANCE COMPANY,  )
 7                                   )
          Defendant.                 )
 8
 9
10         DEPOSITION OF LARRY MANGELS
11 The deposition of Larry Mangels taken before Bobbi L.
12 Hamlin, RMR, CCR, at The Law Office of Thompson Coburn
13 on November 17, 2006 commencing at 9:45 a.m.
14
              APPEARANCES:
15
   For Plaintiff:     Holland & Knight
16                    by Charles L. Philbrick
17
   For Defendant:     Nixon Peabody LLP
18                    by Kurt M. Mullen
```

## Page 2

1      Larry Mangels produced, sworn and
2 examined on behalf of the Defendant, testified and
3 deposed as follows:
4           EXAMINATION
5 BY MR. MULLEN:
6   Q. Good morning, Mr. Mangels.
7   A. Good morning.
8   Q. We introduced ourselves off the record, but
9 for the record my name is Kurt Mullen. I am an
10 attorney representing American Home Assurance Company
11 in litigation Insituform Technologies has brought
12 against American Home pending up in the federal court
13 for the District of Massachusetts. I'm to take
14 testimony for that case.
15      Could you, please, state your name for the
16 record.
17   A. Larry Mangels.
18   Q. And Mr. Mangels, are you employed with
19 Insituform Technologies?
20   A. Yes, I am.
21   Q. And have you ever been deposed before?
22   A. No.
23   Q. Okay. Let me go over some of the ground
24 rules here to get your testimony based on your personal

## Page 3

1 knowledge in connection with this case. I will ask you
2 a series of questions. If you don't understand one of
3 my questions just let me know and I'll try to rephrase
4 it.
5   A. Okay.
6   Q. Otherwise if you don't say that you don't
7 understand it I'll assume that you did understand my
8 question.
9      This isn't meant to be an endurance test.
10 So, any time you would like to take a break just let me
11 know.
12      And the only thing I do ask is, you know, if
13 there's a question pending if you could answer my
14 question and then, you know, we'll go from there.
15      The court reporter is taking down everything
16 that's being spoken today and it does have to be
17 spoken, so she can't pick up any nod of the head or --
18   A. Right.
19   Q. -- other type of gestures. So I may ask you
20 to clarify a couple points whether that was intended to
21 be some sort of a response.
22      Also, one of the more difficult things, she
23 can also only take one person speaking at a time, so
24 you know, to the extent we can let's try not to talk

## Page 4

1 over one another.
2   A. Okay.
3   Q. And also, you're represented today by Mr.
4 Philbrick?
5   A. Yes.
6   Q. He's your counsel. He may make some
7 objections to some of my questions, but unless he
8 directs you specifically not to answer my question you
9 should go ahead and answer the question I ask.
10   A. Okay.
11   Q. You understand all that?
12   A. Yes.
13      MR. MULLEN: Charles, did I miss anything?
14      MR. PHILBRICK: Probably, but I don't know
15 what.
16      MR. MULLEN: Excellent. If it comes up we can
17 all circle back.
18      BY MR. MULLEN:
19   Q. Mr. Mangels, I've asked the court reporter to
20 mark as Defendant's Exhibit 1 a document. Have you
21 seen it before?
22   A. No.
23   Q. You have not.
24      For the record it's a notice of deposition of

Page 25

1  A. Correct. Correct.
2  Q. Other than Mr. Campanile, does anyone else
3  assist you with documenting the costs for MWRA's claim
4  against American Home?
5  A. No.
6  Q. Mr. Mangels, I had hoped to introduce as my
7  first exhibit the four cost binders that we had
8  referred to earlier today that are marked ITI-AIG 1
9  through 2608. Unfortunately, I was informed prior to
10 today's deposition that these documents were not being
11 able to be sent, because of inclement weather by the
12 overnight delivery system that we selected and I
13 apologize for that.
14       I did bring down some other documents that
15 are being copied now that I'd like to show you that are
16 portions of these documents. I just don't have them
17 now. So, I did want to, you know, apologize to you
18 right now and say that I'll do the best I can to --
19 A. Okay.
20 Q. -- get testimony on these costs, so we don't
21 have to suspend the deposition and bring you back so --
22 but you're familiar with the documents in 1 to 2608
23 that are Bates prefix ITI-AIG?
24 A. Yes.

Page 26

1  Q. Okay. Is it fair to state that the material
2  that's in there provides Insituform's support for its
3  claim against American Home?
4  A. Yes.
5  Q. Okay. Mr. Mangels, the Phase I cost that
6  Insituform has presented do you know when the invoices
7  run from? When they start from?
8  A. In the general time frame is September of '04
9  -- of 03 to June, July of '04.
10 Q. Okay. I think the beginning date may
11 actually be right at the beginning of October, but do
12 you know why that date was selected?
13 A. Because we started from when we were done
14 with the initial installation.
15 Q. Do you know when Insituform began to remove
16 and replace five of the six shots in Phase I?
17 A. It was late 2003, early 2004.
18 Q. So, is it fair to say that Insituform is
19 claiming costs in connection with Phase I that predate
20 its removal and replacement of these shots?
21 A. No.
22 Q. Why is that not accurate?
23 A. I mean, I understood your question to be that
24 we were including costs from the initial installation

Page 27

1  and that is --
2  Q. I'm sorry.
3  A. Okay.
4  Q. I may have asked an unclear question.
5       You testified you believe that Insituform
6  began removing and replacing these shots in late 2004;
7  is that right?
8  A. 2003.
9  Q. 2003. I'm doing it too.
10      But Insituform has begun, started the clock,
11 so to speak, on Phase I late September early October of
12 2003; is that right?
13 A. Yes.
14 Q. So, do you know whether the cost incurred
15 late September early October until the end of 2003 when
16 it began removing and replacing this, are those costs
17 not related to the removal and replacement?
18 A. No, those costs are related to the removal
19 and replacement.
20 Q. How is that?
21 A. Before we tried to remove it all we tried to
22 repair it, that's what those costs are for. That was
23 not acceptable from my understanding.
24 Q. So, it's your understanding that the costs

Page 28

1  from, let's say the beginning of October of 2003 to
2  whenever Insituform began removal and replacement,
3  those costs were related to efforts to repair the
4  existing pipe?
5  A. Yes.
6  Q. Do you know what efforts Insituform
7  undertook?
8  A. I don't know the exact efforts.
9  Q. Do you know who would know the answer to
10 that?
11 A. I'm sure someone in our operations group
12 would.
13 Q. Now, Mr. Mangels, you had said that in
14 addition to Phase I and Phase II Insituform had further
15 organized its costs that it's seeking from American
16 Home; do you recall that?
17 A. Say that again. I'm not sure I understand
18 your question.
19 Q. Has Insituform further broken down beyond
20 Phase I and Phase II costs its categories of costs?
21 A. Yes.
22 Q. Those include payroll?
23 A. Includes labor, equipment, material, and
24 other costs.

Page 29

1    MR. MULLEN: Okay. I think now might be a
2 time to take a good quick break and just check on the
3 status of those documents.
4    WHEREUPON, THE PARTIES TOOK A SHORT BREAK, SUBSEQUENT
5    TO WHICH THE FOLLOWING PROCEEDINGS WERE MADE OF RECORD:
6    BY MR. MULLEN:
7    Q. Mr. Mangels, I've asked the court reporter to
8 mark as Defendant's Exhibit 2 a May 22d, 2006 letter
9 from Chris Campos to Mr. Philbrick.
10    MR. MULLEN: Charlie, I should let you know
11 that I took this from your filings for your
12 cross-motion for summary judgment. And I note that it
13 goes up to page 10 of 16.
14    MR. PHILBRICK: Okay.
15    MR. MULLEN: The other documents were Mr.
16 Campos' CV and list of cases that he's testified in.
17    MR. PHILBRICK: Oh, I see.
18    MR. MULLEN: So, that's where the discrepancy
19 comes from in that.
20    BY MR. MULLEN:
21    Q. I'd like you to take a look at that. Take as
22 much time as you need.
23    A. Okay.
24    Q. Have you seen this report before?

Page 30

1    A. Yes.
2    Q. What is it?
3    A. It's a report prepared by someone that
4 reviewed our claim.
5    Q. And that's Chris Campos?
6    A. Yes.
7    Q. Okay. How many times have you seen this
8 report?
9    A. Once.
10    Q. And when was that?
11    A. Couple weeks ago.
12    Q. Okay. What was the reason for your reviewing
13 the report a couple weeks ago?
14    A. Just to understand what Mr. Campos has said
15 in his report. I had never seen it before.
16    Q. And what is your understanding of Mr. Campos'
17 role with respect to this litigation?
18    A. He reviewed our claim.
19    Q. And checked certain costs as it --
20    A. Yes. Yes.
21    Q. And what is your understanding of Mr. Campos'
22 background?
23    A. I don't know much about him. He's a CPA.
24    Q. Do you know whether he's an expert on

Page 31

1 trenchless technology?
2    A. I don't know that.
3    Q. Okay. Or the costs associated with
4 trenchless technology?
5    A. I don't know.
6    Q. Okay. And do you know whether Mr. Campos was
7 asked to analyze whether Insituform's claim against
8 American Home was reasonably related to the
9 remediation?
10    A. I don't know that as fact.
11    Q. Do you have an opinion on that?
12    A. That seems reasonable to me.
13    Q. Do you know whether Mr. Campos was asked to
14 evaluate whether Insituform's costs were too high or
15 too low?
16    A. I don't know that.
17    Q. Have you ever spoken with Mr. Campos?
18    A. I was on one phone call with him.
19    Q. And when was that?
20    A. It was this summer some time.
21    Q. Summer of 2006?
22    A. Yes.
23    Q. Was it a conference call?
24    A. Yes.

Page 32

1    Q. Who else was on that call?
2    A. I know Nick Campanile was on there. Bob
3 Kelley. That's all I know for sure.
4    Q. Can't remember anybody else?
5    A. (Indicated no.)
6    Q. And who's Mr. Kelley?
7    A. He's an attorney for Insituform.
8    Q. An in-house attorney?
9    A. Yes.
10    Q. And do you know Mr. Kelley's responsibilities
11 with respect to Insituform's claim against American
12 Home?
13    A. He has been working with our outside
14 counsel. I don't know his entire involvement, though.
15    Q. And what was discussed during that conference
16 call?
17    A. It was -- the costs that were developed for
18 our claim was discussed.
19    Q. Do you recall Mr. Campos stating that some of
20 the costs in this claim should not be included in the
21 claim?
22    A. He had concerns with some of the fixed costs.
23    Q. What do you mean by fixed costs?
24    A. Costs that we would incur even if we wouldn't

8 (Pages 29 to 32)

Page 33

1  have done a particular job. Costs that are there no
2  matter what.
3      Q. Which fixed costs did Mr. Campos identify as
4  having concerns about?
5      A. It was mainly in the equipment area.
6      Q. And that's the equipment burden portion of --
7      A. Yes.
8      Q. -- Insituform's claim?
9         Do you know whether he had expressed more of
10 a concern as to Phase I or Phase II?
11     A. I don't know that.
12     Q. And do you know which fixed costs he had
13 concerns about, which specific fixed costs?
14     A. No, I don't.
15     Q. What is a variable cost?
16     A. Variable cost is a cost that you will only
17 incur if you do another unit of production.
18     Q. So, in the context of Insituform's claim
19 against American Home is it fair to say that a variable
20 cost is -- what would be an example of a variable cost?
21     A. Variable cost. An example would be the tube,
22 the cost of the tube.
23     Q. In the sense that you are making another
24 tube?

Page 34

1      A. We're making a tube that is specific for that
2  job that we're using on that job.
3      Q. More generally, a variable cost would be one
4  that Insituform is spending only because it has to do
5  work on the MWRA claim; is that right?
6      A. Yes.
7      Q. In layman's terms?
8      A. Right.
9      Q. Is there another description you prefer?
10     A. No. No.
11     Q. Did Insituform do a fixed versus variable
12 cost comparison for equipment burden?
13     A. No.
14     Q. It didn't do one at all to the best of your
15 knowledge?
16     A. No.
17     Q. Would it be possible for Insituform to do
18 that type of comparison?
19     A. It would be difficult and subjective.
20 Anything is possible though.
21     Q. What would make it difficult?
22     A. Identifying what is fixed and what is
23 variable in the equipment area.
24     Q. Do you know whether Insituform and Mr. Campos

Page 35

1  had differing conclusions as to what was a fixed cost?
2      A. No, I don't know.
3      Q. Do you know who would know that?
4      A. No.
5      Q. Did you ever send or receive any e-mails from
6  Mr. Campos?
7      A. No.
8      Q. Were you ever copied on any e-mails sent or
9  received from Mr. Campos?
10     A. I don't believe so.
11     Q. Do you know how costs were submitted to Mr.
12 Campos for his analysis?
13     A. Yes.
14     Q. How were they?
15     A. I mean, the four binders were given to him.
16     Q. Do you know if he reviewed any other
17 documents?
18     A. I don't know.
19     Q. And do you know whether there were any memos
20 memorializing this conference call?
21     A. No, I don't believe there was.
22     Q. Do you recall taking any notes during the
23 conference call?
24     A. I probably took notes. I usually do that.

Page 36

1      Q. Do you keep those notes?
2      A. Sometimes I do.
3         MR. MULLEN: Mr. Philbrick, I'd like to
4  request Mr. Mangels' notes on this conference call.
5         MR. PHILBRICK: Why?
6         MR. MULLEN: Because I believe that they are
7  relevant with discovery of admissible evidence.
8         MR. PHILBRICK: You haven't established any
9  foundational basis for me to produce them.
10        MR. MULLEN: I've made my request on the
11 record.
12        MR. PHILBRICK: Okay. I'll take it under
13 advisement.
14        MR. MULLEN: Thank you.
15        BY MR. MULLEN:
16     Q. Do you know whether Mr. Campos expressed any
17 concerns about other fixed costs in other areas being
18 included in the MWRA claim?
19     A. Oh, I believe he may have had some concerns
20 in the payroll burden area.
21     Q. What did Insituform do in response to Mr.
22 Campos concerns with that, if you know?
23     A. Nothing.
24     Q. They didn't take any fixed costs out?

9 (Pages 33 to 36)

Page 37

1   A.  No.
2   Q.  So, those costs are still in the claim?
3   A.  If they're fixed.
4   Q.  When you say if they're fixed, is there some
5   room for subjectivity on what's a fixed cost and what's
6   a variable cost with respect to labor?
7   A.  Yes.
8   Q.  In what way?
9   A.  Specifically in the worker's comp and general
10  liabilities area I believe there is some subjectivity
11  there.
12  Q.  Now, Insituform as part of its labor costs is
13  including costs for general liability and worker's
14  comp; is that correct?
15  A.  Yes.
16  Q.  Okay.  And what does general liability refer
17  to?
18  A.  It's general liability insurance.
19  Q.  So, Insituform's general liability insurance
20  policy?
21  A.  Yes.
22  Q.  And is that the policy that covers the entire
23  company?
24  A.  Yes.

Page 38

1   Q.  For all regions?
2   A.  Yes.
3   Q.  And for all projects?
4   A.  Yes.
5   Q.  Okay.  Isn't that a fixed cost?
6   A.  In total it is, yes.
7   Q.  I mean, put another way, regardless of
8   whether Insituform had the MWRA claim or did not it
9   would still have its general liability insurance policy
10  cost; isn't that right?
11  A.  If we wouldn't have had that particular job,
12  yeah.  Yeah, that's just one job.  That's true.
13  Q.  What is worker's compensation?
14  A.  It's insurance.
15  Q.  Sorry.  That was a vague question.
16      Insituform is claiming worker's compensation
17  as part of the MWRA claim; is that correct?
18  A.  Yes.
19  Q.  What are those costs associated with?
20  A.  Costs for worker's compensation.
21  Q.  And that's the worker's compensation policy
22  that covers all employees of the company?
23  A.  Yes.
24  Q.  For a given year or whatever the term of

Page 39

1   your --
2   A.  Yeah.
3   Q.  -- policy is?
4   A.  Right.
5   Q.  And I'd like to ask you the same questions
6   with respect to general liability.  Regardless of
7   Insituform's work for the MWRA it would still have its
8   worker's compensation policy; is that correct?
9   A.  That's true.
10  Q.  And would that policy premium be the same?
11  A.  I would imagine so, but I -- yes.
12  Q.  Would the policy premium or general liability
13  be the same regardless of whether it worked on the MWRA
14  claim?
15  A.  I don't know that for sure.
16  Q.  Do you have any reason to doubt that it would
17  be different?
18  A.  No.
19  Q.  Is equipment depreciation a fixed cost in the
20  abstract?
21  A.  Yes.
22  Q.  Is equipment depreciation included in
23  Insituform's coverage claim against American Home?
24  A.  Yes.

Page 40

1   Q.  Same type of questions I asked you with
2   respect to general liability and worker's compensation,
3   let me ask this question first:  What is equipment
4   depreciation?
5   A.  It's an accounting method that takes the life
6   when you pay for a vehicle and spreads it over the life
7   of the vehicle.
8   Q.  And this is done for tax reasons?
9   A.  It's done for accounting reasons and tax
10  reasons.
11  Q.  Oh, okay.  And how is equipment depreciation
12  calculated?
13  A.  On a straight line method over five or seven
14  years.
15  Q.  So meaning, for instance, if it were a five
16  year depreciation it would be depreciated 20 percent a
17  year?
18  A.  Yes.
19  Q.  And seven years would be some smaller
20  fraction then?
21  A.  Yes.
22  Q.  Okay.  So, is it fair to say that Insituform
23  was depreciating its equipment regardless of whether it
24  had the MWRA claim?

10 (Pages 37 to 40)

Page 41

1   A. Yes.
2   Q. And Insituform, I believe it's in payroll
3   burden, is also including its equipment insurance; is
4   that correct?
5   A. That's in the equipment burden.
6   Q. And taxes on the equipment?
7   A. Yes.
8   Q. Would that include things like registration
9   of the vehicles and --
10  A. Yes.
11  Q. Do you know whether it would include anything
12  else?
13  A. (No response.)
14  Q. Anything else falling under the category of
15  taxes?
16  A. No.
17  Q. Would Insituform have incurred those costs
18  regardless of the MWRA claim?
19  A. Yes.
20  Q. Wouldn't that be a fixed cost?
21  A. But there is a cost of having just a vehicle
22  out on the job site working everyday.
23  Q. Mr. Mangels, is it fair to say that if there
24  was the MWRA claim that equipment would be somewhere

Page 42

1   else on another project --
2   A. Yes.
3   Q. -- hopefully?
4       And Insituform would continue to be incurring
5   those costs?
6   A. Yes.
7   Q. Do you know whether Mr. Campos had any
8   concern with including those type of equipment costs in
9   Insituform's claim against American Home?
10  A. I don't know the specifics of his issues.
11  Q. Do you know who might?
12  A. I don't know.
13  Q. Would it be possible for Insituform to
14  calculate the amount of depreciation that's currently
15  in its equipment burden cost against American Home?
16  A. Yes.
17  Q. Is it possible for it to calculate its
18  insurance for this equipment in its claim?
19  A. Yes.
20  Q. Same question with respect to taxes?
21  A. Yes.
22  Q. So, it's possible to calculate that as well?
23  A. (Indicated yes.)
24  Q. Does Insituform's equipment burden claim also

Page 43

1   include an aspect with respect to its warehouse?
2       That's an unclear question. Let me see if I
3   can ask a clearer one.
4       Is Insituform also claiming as part of its
5   cost against American Home any costs related to the
6   operation of its warehouse in the northeast?
7   A. Yes.
8   Q. What are those costs?
9   A. Rent for the facility.
10  Q. Do you know where that facility is?
11  A. Charlton, Massachusetts.
12  Q. It's not in East Boston?
13  A. No.
14  Q. Do you know how far Charlton is from East
15  Boston?
16  A. I don't know the exact mileage. It's between
17  50 and a hundred miles.
18  Q. Did Insituform rent this warehouse
19  specifically for the MWRA project?
20  A. No.
21  Q. Do you know whether it still has that
22  warehouse?
23  A. Yes.
24  Q. So, regardless of whether it had the MWRA

Page 44

1   claim or not would Insituform still keep that
2   warehouse?
3   A. Yes.
4   Q. And it would still pay rent on it?
5   A. Yes.
6   Q. Would it still pay, barring any increase in
7   rent, the same amount of rent regardless of whether it
8   had the MWRA claim?
9   A. Yes.
10  Q. Isn't that a fixed cost?
11  A. Yes.
12  Q. Mr. Mangels, I'd like you to turn to page two
13  of Defendant's Exhibit 2, which is Mr. Campos' letter
14  to Mr. Philbrick.
15      Mr. Mangels, I'd actually like you to turn to
16  page three of Mr. Campos' letter and I'd like to
17  discuss the portion that deals with payroll. And in
18  particular the second full paragraph of this page.
19      Do you know whether Insituform's claim
20  against American Home -- let me ask this: How is labor
21  calculated?
22  A. That's a very vague question.
23  Q. Would you like me to --
24  A. Yeah.

11 (Pages 41 to 44)

Page 45

1  Q. Insituform's claim includes wet-out labor; is
2  that correct?
3  A. In Phase I, yes, that's correct.
4  Q. In Phase I.
5     What is wet-out labor?
6  A. It's the labor associated in our wet-out
7  centers with impregnating the tube with the resin
8  before it goes out to the job site.
9  Q. And where is that done generally?
10 A. It's done in one of our wet-out facilities.
11 Q. And how many wet-out facilities does
12 Insituform have?
13 A. Seven.
14 Q. Do you happen to know which wet-out facility
15 was used for Phase I of the MWRA project?
16 A. I believe it was Lamont, Illinois.
17 Q. Illinois.
18    And do you know how gross pay was calculated
19 or is that something we should look at the other
20 documents? Do you know how gross pay was calculated?
21 A. For wet-out?
22 Q. For wet-out.
23 A. Just their hourly rate times the number of
24 hours they worked.

Page 46

1  Q. And do you know where the gross rate category
2  for wet-out labor -- is that the amount that they were
3  paid, the employees?
4  A. Yes.
5  Q. So, there's no profit built into that?
6     Let me ask this question: Lawyers, for
7  instance, are paid a certain rate, but their clients
8  are billed another rate. Do you know whether that's --
9  is that true for Insituform's calculation of gross pay?
10 A. That's not true.
11 Q. Okay. It's directly the money that was paid?
12 A. Yes.
13 Q. Okay. Now, for non-wet-out labor for Phase I
14 Insituform identified three pay types: Pay tape 100,
15 101, and 150; is that right?
16 A. Yes.
17 Q. What does code 100 represent?
18 A. That's regular pay.
19 Q. And are there different components of code
20 100? Was there a base pay, for instance, base yard
21 pay?
22 A. There's a base pay, yes.
23 Q. And what does that signify?
24 A. It's their regular hourly wage.

Page 47

1  Q. Was there another rate as well for work that
2  they did while on site?
3  A. There's a prevailing wage in the state of
4  Massachusetts.
5  Q. And how is that calculated?
6  A. That's set by the state.
7  Q. And so, it's part of a public work contract
8  you have to pay that rate?
9  A. Yes. Yes.
10 Q. What were mobilization and demobilization
11 charged at?
12 A. Their regular hourly wages.
13 Q. The base yard rate, I believe that's called?
14 A. Yes.
15 Q. Okay. And what is mobilization?
16 A. That's the time spent to get the crew from
17 the yard to the job site.
18 Q. And what is demobilization?
19 A. Get from the job site back to the yard.
20 Q. How did Insituform calculate mobilization and
21 demobilization?
22 A. Based on the time spent getting from the yard
23 to the job site, the number of hours.
24 Q. How did Insituform determine what that was?

Page 48

1  A. The crew superintendent makes that decision.
2  Q. And do the underlying employees have to fill
3  out a time sheet or --
4  A. The crew superintendent fills out the time
5  sheet.
6  Q. For the entire crew?
7  A. Yes.
8  Q. And do you know how many people are on a
9  crew?
10 A. It varies by job.
11 Q. Do you know for the MWRA claim?
12 A. I do not know that.
13 Q. Do you know what the variations in crew
14 size --
15 A. It could be from three to 12.
16 Q. Okay. Let's turn to page three of Mr.
17 Campos' letter to Mr. Philbrick. And I'll read this
18 into the record: "I was able to verify the hours for
19 work done on site. I was also able to verify the
20 mobilization/demobilization hours for weeks in which
21 the employees worked on only job number 160214. For
22 those weeks the total hours reflected in the "check
23 detail" section of the certified payroll registers
24 equated the total hours worked on site plus the hours

Page 49

for mobilization/demobilization. However, I was not able to verify mobilization/demobilization hours for weeks during which the employees worked on more than one job. This is due to the fact that the total hours reflected in the "check detail" section of the certified payroll registers included hours for all jobs worked on the site (Not just job number 160214) as well as all mobilization/demobilization hours for all jobs. In any event, for those weeks, the total hours included in the "check detail" was greater than the hours claimed for project number 160214."

    Mr. Mangels, do you know whether Mr. Campos is saying that the hours Insituform's employees were working only on Phase I the check registers reflected all the hours including mobilization and demobilization?

A. I don't know that.

Q. Okay. Now, what is the check detail section that Mr. Campos is referring to?

A. That is a report that we use in when filing certified payrolls to the state of Massachusetts.

Q. Is that an electronic form? Is it something you fill out?

A. It's a report that comes out of our

Page 50

accounting system.

Q. And what accounting system is that?

A. JD Edwards.

Q. Is that an in-house accounting --

A. Yes.

Q. -- system?

A. Yes.

Q. Run by Oracle?

A. Yes.

Q. Is it fair to say that the numbers from the JD Edwards system are only as good as the numbers that are put into them initially?

A. Yes.

Q. Mr. Mangels, how was information inputted into the JD Edwards system?

A. It varies depending on what is being inputted.

Q. Okay. And how was it put in for the MWRA or Phase I of the MWRA claim?

A. Are you speaking payroll or everything?

Q. Good question. Everything.

A. Well, it varies. Payroll is done through time sheets, input through time sheets into the system.

Page 51

Subcontract cost is inputted through the payable or payable system.

    Equipment is done through the payable system, unless it's depreciation, which is done through the fixed asset -- automated fixed asset entry.

Q. What is it, the payable system?

A. Yes.

Q. What is that?

A. It's our accounts payable system that we use to process invoices.

Q. And these are invoices you receive from anybody?

A. Yes.

Q. Okay. Mr. Mangels, do you know how mobilization and demobilization was calculated for times when people were working on multiple projects over the course of the day not just the MWRA project?

A. No, I don't.

Q. Do you know whether it would be possible to calculate the hours that were specifically spent mobilizing or demobilizing?

A. No.

Q. And just to go back, mobilization and demobilization is charged at the base yard rate?

Page 52

A. Yes.

Q. Thank you.

MR. MULLEN: Let's take five or 10 minutes.

WHEREUPON, THE PARTIES TOOK A SHORT BREAK, SUBSEQUENT TO WHICH THE FOLLOWING PROCEEDINGS WERE MADE OF RECORD:

BY MR. MULLEN:

Q. Mr. Mangels, I've asked the court reporter to mark as Defendant's Exhibit 3 portions of the four cost binders that Insituform has produced to American Home in this matter.

    I'll, again, apologize that the four full binders themselves seem to be lost in transit somewhere, because of inclement weather, but fortunately that is the best I could do on short notice.

    Can I ask you to turn to page ITI-AIG 2. Mr. Mangels, could you, please, describe what this document is?

A. This is a total accumulation of our actual cost on the EBBS Boston job.

Q. And this includes both Phase I and Phase II?

A. Yes.

Q. And if I go to the very bottom of the page the total section does that reflect $5,275,153.66 for

13 (Pages 49 to 52)

Page 61

1  A. Field labor fringe benefits, yes.
2  Q. And the next page, 358, is wet-out fringe
3  benefits?
4  A. Yes.
5  Q. I'd like you to turn to tab B, which is
6  document page numbers 359 to 362. Take as much time as
7  you need to look through that.
8  A. Okay.
9  Q. Mr. Mangels, what do those pages represent?
10 A. It's a description of our equipment burden
11 and expendable supply costs.
12 Q. Your expendable and supply costs are though,
13 do you know whether they're categorized labor later in
14 the subject contract or third party invoices?
15 A. I believe they're included with the equipment
16 cost.
17 Q. Let's turn to equipment burden first. Are
18 the items running from the bottom of page 359 through
19 the top of page 60 generally the components of
20 equipment burden? And I'll read them into the record
21 separately.
22 A. Yes.
23 Q. So those include number one, labor costs for
24 the maintenance of the warehouse and yard?

Page 62

1  A. Yes. That is right.
2  Q. Number two, parts and supplies used to
3  maintain, repair, and run Insituform's equipment,
4  including external repair services in the field to run
5  the vehicles.
6  A. Yes.
7  Q. Number three, equipment depreciation.
8  A. Yes.
9  Q. And that's straight-line depreciation --
10 A. Yes.
11 Q. -- that we discussed earlier?
12 A. Yes.
13 Q. Number four, the cost of any leased vehicles
14 and equipment not used in a specific project.
15 A. Yes.
16 Q. Number five, cost of leasing and maintaining
17 the warehouse and yard space.
18 A. Yes.
19 Q. Is that right?
20 A. Yes.
21 Q. Number six on page 360, taxes, license fees,
22 and insurance costs directly relating to the
23 equipment.
24 A. Yes.

Page 63

1  Q. And then there's another cost category, which
2  includes miscellaneous supplies used in production; is
3  that correct?
4  A. Yes.
5  Q. And that's inventoried and used as needed?
6  A. Yes.
7  Q. So, that's for all the northeast region? Is
8  that for all the northeast region?
9  A. Not what was is included in our cost for this
10 job. Is that what you're asking?
11 Q. I'm asking are the other costs simply for
12 MWRA project or is it calculated based on all of --
13 A. It's calculated based on all the whole entire
14 region.
15 Q. Is the same true for the next bullet point
16 under the cost of safety related equipment such as hard
17 hats, gloves, goggles, and masks?
18 A. Yes.
19 Q. And tab B, this is the equipment burden and
20 expendable supply costs for Phase I; is that right?
21 A. Yes.
22 Q. Okay. And could I ask you to look at tab F,
23 page numbers 1940 through 1943.
24 A. Okay.

Page 64

1  Q. Is this the equipment and expendable supplies
2  narrative for Phase II?
3  A. Yes.
4  Q. Is the narrative different in any way between
5  Phases I and II?
6     MR. PHILBRICK: Objection, form.
7     BY MR. MULLEN:
8  Q. Do you know?
9     MR. PHILBRICK: Witness may answer if he can.
10    THE WITNESS: I don't know if they're exactly
11 the same or not.
12    BY MR. MULLEN:
13 Q. Do you know, Mr. Mangels, whether there are
14 any costs included under equipment burden or
15 expendables and supplies? By costs I mean categories
16 of costs for Phase II that are not in Phase I?
17 A. There are none.
18 Q. Mr. Mangels, I apologize, we're doubling back
19 a bit on some of things you testified about earlier.
20    Could you identify any fixed costs in
21 equipment and facility cost center that is listed on
22 page 359 and page 360?
23 A. Well, as we talked earlier the equipment
24 depreciation and maybe the lease on the maintenance and

16 (Pages 61 to 64)

Page 65

1  yard could be considered fixed in nature.
2      Q.  What about the labor costs for the
3  maintenance of the warehouse and yard?
4      A.  That could be considered fixed in nature.
5  That doesn't consider the actual costs for the job.
6      Q.  What about number two, the parts and
7  supplies?
8      A.  I believe that's more variable in the field.
9      Q.  Would that be keyed to the MWRA project or
10 not?
11     A.  Could be.  If they needed specific supplies
12 for that job they would go out and buy that.
13     Q.  In those instances where they went out and
14 bought specific supplies was that charged?  Do you know
15 whether that's included in the Phase I and Phase II
16 costs for equipment burden or --
17     A.  Are we talking about number two on --
18     Q.  Yes, sir.
19     A.  Okay.  But I think that deals with the
20 equipment, right?
21     Q.  It states parts and supplies used to
22 maintain, repair, and run our equipment, including
23 external repair services in the field to run our
24 vehicles.

Page 66

1      A.  Right.  So, can you ask your question again?
2      Q.  Sure.  Well, let me ask this question:  How
3  is equipment burden calculated?
4      A.  Equipment burden is a set rate per labor hour
5  so we know what your budgeted costs are, we know what
6  your budgeted labor hours are, we calculate a budgeted
7  labor rate or equipment rate.
8      Q.  Now, is that rate listed for Phase I on page
9  360 at the bottom?
10     A.  Yes.
11     Q.  For wet-out $32.50?
12     A.  Yes.
13     Q.  New England crews have two different rates.
14 Through February 28th of '04 it's $35?
15     A.  Yes.
16     Q.  And after March 1st of '04 $26?
17     A.  Yes.
18     Q.  And for Benicia, California $34?
19     A.  Yes.
20     Q.  Do you know why that last category is listed?
21     A.  We had people from our Benicia, California
22 location work on this job.
23     Q.  And they were charged at a different rate
24 than the New England crew?

Page 67

1      A.  Yes.
2      Q.  Do you know why that is?
3      A.  They have a higher equipment cost rate in
4  California.
5      Q.  So, it was based on their California
6  equipment cost rate?
7      A.  Yes.
8      Q.  And the New England crew rate was based on
9  New England equipment cost rate?
10     A.  Yes.
11     Q.  And is this the same equipment burden rate --
12 let's do it that way.  Is the New England equipment
13 cost rate the same equipment burden for the entire New
14 England region?
15     A.  Yes.
16     Q.  And the Benicia rate is that the same rate
17 for its region?
18     A.  Yes.
19     Q.  What region is that?
20     A.  The west.
21     Q.  And Mr. Mangels, those rates didn't increase
22 or decrease depending on the MWRA claim; is that right?
23     A.  The rates did not increase or decrease.
24 Actual equipment cost may have increased or decreased,

Page 68

1  but the rates did not change.
2      Q.  So, wouldn't that be considered to be a fixed
3  cost?
4      A.  No.
5      Q.  Why not?
6      A.  Because we had to have our crews out on that
7  job site working when they could have been somewhere
8  else generating revenue.
9      Q.  You would have been charging them the same
10 rate, is that right though, depending on whatever
11 project they were working on?
12     A.  Yes.
13     Q.  Mr. Mangels, turning back to page 359, number
14 four, under equipment and facility cost center.
15     A.  What page?
16     Q.  359 under tab behind tab B.
17     A.  Okay.
18     Q.  The cost of any leased vehicles and equipment
19 not used on specific project.  Is that a fixed cost?
20 Could that be considered to be a fixed cost?
21     A.  Yes.
22     Q.  Do you consider it to be a fixed cost?
23     A.  In theory, yes, that's a fixed cost.
24     Q.  Turning to page 360, number six, the taxes,

17 (Pages 65 to 68)

Page 69

1  license fees, and insurance costs directly relating to
2  the equipment; is that a fixed cost?
3     A. Yes.
4     Q. Either of the items listed in number seven,
5  the other costs category on that page, are they fixed
6  costs?
7     A. Safety equipment could or could not be a
8  fixed cost. The more work you do the more supplies
9  you're going to need, so that's just a variable.
10    Q. What about miscellaneous supplies used in
11 production?
12    A. Same thing. If you don't do any work you
13 don't need the supplies. So, if you do you need the
14 supplies.
15    Q. But that was built into the equipment burden
16 rate?
17    A. Yes.
18    Q. That's at the bottom of page 360 for Phase I?
19    A. Yes.
20    Q. And Phase 2 at the bottom of page 1941 behind
21 tab F?
22    A. Yes.
23    Q. The other costs category on page 360, and I'm
24 talking about the second bullet point, the costs of

Page 70

1  safety equipment, such as hard hats, gloves, goggles
2  and masks, how is that different from the expendables
3  and supplies costs that's listed on page 359?
4     A. Where is that at on 359?
5     Q. Page 359, which is also behind tab B.
6     A. Okay.
7     Q. What is the expendables and supplies cost?
8        MR. PHILBRICK: He's asking to you tell him
9  where on page 359 references expendables and supplies.
10       BY MR. MULLEN:
11    Q. It's under the second full paragraph that's
12 bulleted -- that's not bulleted, but it's bold and
13 underlined, expendables and supplies costs.
14    A. Oh, here. Okay. It's very similar.
15    Q. Anyhow, did Insituform categorize and
16 calculate the expendables and supplies costs listed on
17 the second full paragraph of page 359?
18    A. Based on our actual cost over a period of
19 time we've developed an hourly rate and that's charged
20 to the job based on an hourly rate of $6 an hour.
21    Q. And what does that $6 an hour include?
22    A. Includes the expense and supply cost, the
23 actual costs that we incur for those supplies.
24    Q. Things like gloves, goggles, and --

Page 71

1     A. Supplies.
2     Q. -- supplies?
3     A. Right.
4     Q. And is that $6 an hour per employee?
5     A. Per hour.
6     Q. Per hour per employee?
7     A. Yes.
8     Q. Is that company wide?
9     A. We use that process. That rate may vary
10 slightly between areas, because we try to get our
11 actual cost charged into the jobs.
12    Q. So, it varies depending on region?
13    A. Yes.
14    Q. But within the region it's uniform?
15    A. Yes.
16    Q. And in this case its $6 per employee per
17 hour?
18    A. Six dollars per hour, correct.
19    Q. Do you know whether Insituform calculated its
20 -- how many supplies it actually used for either
21 Phase I or Phase 2 of the MWRA project that's
22 expendable supplies?
23    A. We did not.
24    Q. So, it could be higher or lower than the $6

Page 72

1  per hour?
2     A. Yes.
3     Q. And turning to page 360, the other costs
4  category, the second bullet, the cost of safety
5  equipment, now you testified that that's similar to the
6  expendables and supplies costs that are listed on page
7  359?
8     A. Right.
9     Q. In the other costs category is that built
10 into the equipment burden rate that's on the bottom of
11 page 360?
12    A. Yes.
13    Q. For Phase I?
14    A. Yes.
15    Q. And for Phase 2, tab F, page 1941?
16    A. Yes.
17    Q. Number seven there is also built into the
18 rate at the bottom?
19    A. Yes.
20    Q. Mr. Mangels, do you know whether Mr. Campos
21 had any questions about the "includability" of certain
22 fixed costs in Insituform's claims against American
23 Home?
24    A. I believe he did have some.

18 (Pages 69 to 72)

Page 77

1 to use, times the standard felt price, including the
2 labor to make that tube.
3    Q. And is that also estimated at the beginning
4 of the year?
5    A. Yes.
6    Q. Forecast through the year?
7    A. Yes.
8    Q. How is it determined for wet-out?
9    A. Phase II?
10   Q. Phase II?
11   A. Same basic method.
12   Q. Okay. As a general matter is there variation
13 between standard cost and actual cost?
14   A. Yes.
15   Q. For Phase I do you know what that variation
16 was?
17   A. I don't know exact dollar.
18   Q. Do you know the percentage?
19   A. I don't know the percentage. It's in the
20 documentation.
21   Q. I don't know that I saw that.
22   A. Actual cost was lower than standard cost.
23   Q. Does Insituform's claim against American Home
24 include the standard cost or the actual cost?

Page 78

1    A. The actual cost.
2    Q. Is that true for materials and the labor?
3    A. Yes.
4       MR. PHILBRICK: How do you know that?
5       THE WITNESS: Page 1946.
6       BY MR. MULLEN:
7    Q. And that's behind tab F?
8    A. Behind --
9       MR. PHILBRICK: You've done weird things
10 here. Hold on. Time out.
11      BY MR. MULLEN:
12   Q. Mr. Mangels, I believe you just testified
13 that Insituform's claims against American Home is based
14 on its actual costs and not its standard costs; is that
15 correct?
16   A. Yes.
17   Q. Is that true for both Phase I and Phase II?
18   A. Yes.
19   Q. And what do you base that on?
20   A. I don't see the documents in this package. I
21 don't see the documents in this package.
22      MR. PHILBRICK: Can you explain?
23      BY MR. MULLEN:
24   Q. What document? Yeah.

Page 79

1    A. I mean, we've adjusted for -- from standard
2 to actual in our cost billed up.
3    Q. For this claim?
4    A. Yes.
5       MR. PHILBRICK: Do you mind if I interrupt for
6 just a second?
7       There was a question where you were asked how
8 do you know if standard costs were over actual and you
9 looked at a piece of paper.
10      THE WITNESS: Well, yeah, but that's not this
11 paper. I was wrong.
12      MR. PHILBRICK: Okay. Thank you.
13      Sorry to interrupt your deposition.
14      MR. MULLEN: Not at all.
15      BY MR. MULLEN:
16   Q. Mr. Mangels, the reason I'm a little confused
17 is it seems to me that Insituform's summary for Phase I
18 which is at page 363 to 364 behind tab C, I don't see
19 any reference to the calculation being based on actual
20 cost and believe that the same is true for what's
21 behind tab G at 1944 to 1945. So, --
22      MR. PHILBRICK: Are you done?
23      MR. MULLEN: There was a question. There was
24 a question in this somewhere.

Page 80

1       MR. PHILBRICK: Well, it hasn't come yet.
2       MR. MULLEN: It's coming.
3       BY MR. MULLEN:
4    Q. So my question is: What's your conclusion
5 that actual costs were charged based on?
6    A. Page 364, second paragraph.
7    Q. The second full paragraph at the top of the
8 page?
9    A. Yes. They're issued work order actual
10 quantities. Standard cost. We have our actual
11 quantities.
12   Q. Now, does that just cover materials?
13   A. Yes.
14   Q. Is labor for Phase I -- did that continue to
15 be billed at the standard cost?
16   A. At the standard rate.
17   Q. The standard rate, I'm sorry?
18   A. Yes.
19   Q. And can the standard rate be different than
20 the actual rate?
21   A. Yes.
22   Q. Do you know whether the standard rate was
23 different than the actual rate with respect to Phase I?
24   A. I don't know for sure.

Page 81

1  Q. Could that be calculated?
2  A. Yes.
3  Q. Do you know whether the standard rate was
4  higher for Phase I than the actual rate for labor?
5  A. I don't know.
6  Q. What about with respect to Phase II do you
7  know whether the standard rate was used for labor?
8  A. Yes.
9  Q. And it was used?
10 A. Yes.
11 Q. Do you know whether it was different than the
12 actual rate?
13 A. I don't know.
14 Q. But that also could be calculated?
15 A. Yes.
16 Q. What would you need to do to calculate that?
17 A. Look at each individual work order.
18 Q. For the different shots that comprised either
19 Phase I or Phase II?
20 A. Yes.
21 Q. Does Insituform have that material, those
22 invoices --
23 A. Yes.
24 Q. -- or how does the work come in for

Page 82

1  materials?
2  A. How does --
3  Q. How does the manufacturing facility know how
4  much to make?
5  A. They receive an order from the field
6  operations group.
7  Q. And Insituform still has those orders?
8  A. Yes.
9  Q. For Phase I and for Phase II?
10 A. Yes.
11 Q. Now, is there also an overhead component of
12 the materials cost?
13 A. Yes.
14 Q. What does the overhead represent?
15 A. Represents the indirect labor for the
16 facility, the cost of the facility, supplies.
17 Q. Are those fixed costs?
18 A. Yes, but we have adjusted for that.
19 Q. For both Phase I and for Phase II?
20 A. Yes.
21 Q. So, just so the record is clear, the actual
22 overhead cost for Phase I and Phase II is reflected in
23 the material that Insituform has submitted?
24 A. Yes.

Page 83

1  Q. Unfortunately, Mr. Mangels, I don't think
2  that I had copied that information in Defendant's
3  Exhibit 3 for Phase I. Could I ask you to look behind
4  tabs G 1 and G 2. G 1 is document number 1946 through
5  1947 and G 2 is 1986 through 1987. And could you,
6  please, tell me whether the actual costs are listed on
7  either one of those and then we'll go through where
8  exactly they're listed.
9  A. The actual cost is listed on page 1946.
10 Q. And that's behind tab G 1 for the record.
11     Would you, please, walk me through how that's
12 a component of that starting with material. What
13 material is?
14 A. Material is the cost of the material used in
15 the process, felt, thread to sew it, and polyurethane
16 backing on.
17 Q. And then that's the actual cost for this
18 project?
19 A. Yes.
20 Q. Okay. What does the scrap column represent?
21 A. Scrap that we have associated in the
22 production process.
23 Q. Is that just left over material?
24 A. Yes.

Page 84

1  Q. And that's the actual cost?
2  A. Yes.
3  Q. What does the direct labor represent?
4  A. The labor cost associated with producing the
5  tube.
6  Q. And for this column on page 1946 is that the
7  actual labor or is that standard cost?
8  A. That's the actual hours that the -- at the
9  standard cost.
10 Q. The actual hours at the standard cost?
11 A. Yes.
12 Q. Okay. The next column set up, labor, what
13 does that represent?
14 A. It's the time that it takes to get the line
15 ready to produce that particular tube in labor cost.
16 Q. Okay. And is that at the standard cost?
17 A. Actual hours at the standard cost.
18 Q. Okay. What does labor variable overhead
19 signify?
20 A. That is our overhead charge associated with
21 this tube or these tubes.
22 Q. And this is the variable cost?
23 A. (No response.)
24 Q. How is it calculated? I'm sorry.

21 (Pages 81 to 84)

### Page 85

1    A. It's applied at a percentage of labor cost.
2    Q. A percentage of the standard labor cost?
3    A. Yes.
4    Q. But is it the actual hours?
5    A. Actual hours at the standard, yeah. Right.
6    Q. Okay. And what does the reference column
7  signify?
8    A. That ties back to the supporting
9  documentation in the four binders. That is the Bates
10 page.
11   Q. Should have asked you this question weeks
12 ago.
13       And just in the interest of completeness the
14 document number on the far left side of 1946 what does
15 that signify?
16   A. That is just an internal documentation of our
17 JD Edwards system.
18   Q. And the description column?
19   A. That's the description column in JD Edwards.
20   Q. Turn to page 1947, which is also behind tab G
21 1, what does this document signify?
22   A. This breaks out our fixed and hourly or fixed
23 and variable cost in the manufacturing facility in
24 total.

### Page 86

1    Q. Isn't Insituform including fixed costs in its
2  claim against American Home or manufacturing overhead
3  as reflected on 1947?
4    A. We have adjusted the fixed cost out.
5    Q. So, it's only the variable cost?
6    A. Yes.
7    Q. Mr. Mangels turning to document number 1986,
8  which is behind tab number G 2, what does this document
9  identify?
10   A. It's the wet-out resin cost for the job.
11   Q. This is for Phase II?
12   A. Yes, I believe so.
13   Q. And you said for Phase II on wet-out what was
14 the material -- how is the cost determined? Is it
15 standard or actual?
16   A. For --
17   Q. For Phase II?
18   A. It was standard.
19   Q. Okay. And was that at the standard rate?
20   A. Yes, but we adjusted it. That's what this
21 page represents.
22   Q. Okay.
23   A. We adjusted to the actual cost for Phase II.
24   Q. For labor and material or just for material?

### Page 87

1    A. This says material.
2    Q. But it's the standard rate for labor on
3  wet-out?
4    A. Yes.
5    Q. And that could differ from the actual rate?
6    A. Yes.
7    Q. And the actual rate would be ascertainable?
8    A. Yes.
9    Q. And I'm sorry, for Phase I wet-out how was
10 wet-out determined? Is it actual labor?
11   A. It was. The actual labor was charged
12 directly to the job.
13   Q. And how was material calculated?
14   A. The actual material was charged directly to
15 the job.
16 WHEREUPON, THE PARTIES BROKE FOR LUNCH. SUBSEQUENT TO
17 WHICH THE FOLLOWING PROCEEDINGS WERE MADE OF RECORD:
18     BY MR. MULLEN:
19   Q. Mr. Mangels, I'd like to turn to Insituform's
20 subcontractor and third party invoices.
21   A. Okay.
22   Q. Now, are those reflected for Phase I behind
23 tab D, including tabs one through nine?
24   A. Yes.

### Page 88

1    Q. And for Phase II are those located at tab H
2  between tabs one through eight?
3    A. Yes.
4    Q. And it looks to me that most of the
5  categories in Phase I and Phase II were the same,
6  although it looks as if there was a field office
7  expense at for Phase I, which is at D 6. Do you know
8  whether that's correct?
9    A. That looks correct.
10   Q. Do you know why Insituform didn't have a
11 field office or Phase II of the project?
12   A. I don't -- no, I don't know.
13   Q. Do you know who might know?
14   A. No.
15   Q. Whoever is in operations for the project
16 maybe?
17   A. Yes.
18   Q. Mr. Mangels, what are the totals for the
19 different categories that are at for Phase I, D 1
20 through D 9, and for Phase II, H 1 through H 8; what
21 are those based on?
22   A. Actual costs for that job.
23   Q. And did you receive invoices for those?
24   A. Yes.

Page 113

1  person --
2   A.  I --
3   Q.  -- organization that did it for Phase I?
4   A.  I don't know.
5   Q.  Okay. Mr. Mangels, did you testify earlier
6  that the W slash 0 retainage meant with retainage or
7  without retainage?
8   A.  I believe it means without retainage.
9   Q.  Okay. Do you know if there's a difference
10 between without retainage and no retainage?
11  A.  I don't know.
12  Q.  Okay. The reason I ask is turning to behind
13 tab H 8 is a document numbered 2501 through 2607.
14      MR. MULLEN: Charlie, I'll represent that
15 these are all of the documents that were originally in
16 tab H 8 as produced by Insituform.
17      BY MR. MULLEN:
18  Q.  Could I ask you to look at page 25?
19      Let me ask you to look at two things. First
20 let's just set aside page 2501. What is page 2501?
21  A.  It's the actual cost incurred by Insituform
22 on the Boston job for subcontractors and consultants.
23  Q.  Is this a summary page of the costs?
24  A.  Yes.

Page 114

1   Q.  And the invoices are located in the remainder
2  of tab H 8?
3   A.  Yes.
4   Q.  I'll ask you to turn to document number
5  2572.
6   A.  Okay.
7   Q.  See where it says next to the typewritten
8  total $185,919.78?
9   A.  Say that again.
10  Q.  Do you see the total -- the typewritten total
11 at the bottom of the --
12  A.  Yeah.
13  Q.  -- totals column?
14  A.  Yes.
15  Q.  Reads $185,919.78?
16  A.  Yes.
17  Q.  Okay. And then underneath there's a
18 handwritten note saying ADJ. I presume that means
19 adjustment, $15,285.18. Do you see that?
20  A.  Yes.
21  Q.  For a total of $170,634.60?
22  A.  Yes.
23  Q.  Okay. Do you see handwritten note dated
24 8/15/05? Says okay to pay 100 percent (no retainage)

Page 115

1  this week?
2   A.  Yes.
3   Q.  Okay. I'm sorry and this invoice number is
4  dated 2303-1 W, just for the record.
5       Mr. Mangels, do you know if Insituform's
6  actual cost was $170,634.60?
7   A.  Yes.
8   Q.  Okay. And do you know whether any retainage
9  was taken out?
10  A.  No retainage was taken out.
11  Q.  Okay. So that may be different than without
12 retainage?
13  A.  Yes.
14  Q.  Do you know whether it is different than --
15  A.  I don't know.
16  Q.  Mr. Mangels, I'd like you to turn to tab I in
17 the binder, which is document number 2608. Do you know
18 what this document represents, Mr. Mangels?
19  A.  It's our project close out cost for the EBBS
20 project.
21  Q.  Now, were there any invoices to support those
22 close out costs?
23  A.  Not at this point in time.
24  Q.  And so are these estimated close out costs?

Page 116

1   A.  They were when this package was put together,
2  yes.
3   Q.  And I believe this package was dated April
4  13th of 2006. Does that sound right to you?
5   A.  (No response.)
6   Q.  Some time around April 20, '06?
7   A.  Yes. Yes.
8   Q.  Okay. And the number there is $264,000?
9   A.  Yes.
10  Q.  Okay. Do you know whether Insituform has
11 actually incurred close out costs of $264,000?
12  A.  I don't know that.
13  Q.  Okay. Do you know whether it's incurred any
14 close out costs?
15  A.  It has incurred some.
16  Q.  What close out costs has it incurred?
17  A.  I don't know the details of it.
18  Q.  Okay.
19      MR. MULLEN: Charlie, again, I just ask for
20 update on close out costs.
21      MR. PHILBRICK: Taken under advisement.
22      MR. MULLEN: Appreciate it.
23      BY MR. MULLEN:
24  Q.  And do you know whether it's above or below

29 (Pages 113 to 116)

Page 117

1 $264,000?
2   A. I don't know. I believe it's below.
3   Q. Okay.
4       MR. MULLEN: Charlie, I'd like to take a break
5 for a few minutes, go over my notes. There are a
6 couple of other topics I'd like to hit, but I just want
7 to --
8       MR. PHILBRICK: What are you talking about at
9 in terms of time frame?
10      MR. MULLEN: I have to say within the hour.
11      MR. PHILBRICK: Okay.
12 WHEREUPON, THE PARTIES TOOK A SHORT BREAK, SUBSEQUENT
13 TO WHICH THE FOLLOWING PROCEEDINGS WERE MADE OF RECORD:
14      BY MR. MULLEN:
15   Q. Mr. Mangels, just going back briefly to third
16 party and subcontractor invoices, do you know whether
17 D'Allessandro's labor was a portion of the Phase II
18 costs?
19   A. I don't know without looking at the invoice.
20   Q. Okay. Well, let's do that.
21      MR. PHILBRICK: Which one do you want to do?
22 I've got 1786.
23      MR. MULLEN: I don't want to be pinned down to
24 anything. Let me find a favorite.

Page 118

1       MR. PHILBRICK: They're all the same.
2       MR. MULLEN: Then why 1786?
3       MR. PHILBRICK: Because it's the first one.
4       MR. MULLEN: Is it the one you opened up?
5       MR. PHILBRICK: It's the first one.
6       BY MR. MULLEN:
7    Q. Okay. I was going to pick an earlier one.
8 Let's meet in the middle at 2579, which is behind tab
9 number H 8.
10   A. Okay.
11   Q. Can I direct your attention to under the
12 description -- the heading that reads labor.
13      For the record I'll say this appears to be a
14 D'Allessandro Corporation invoice, invoice number
15 2303-3 W.
16      Let's direct your attention to the header
17 reading labor for weeks ending, underneath there are
18 three line items 8/20/2005, 8/27/2005, and 9/3/2005.
19 Do you see that?
20   A. Yes.
21   Q. Okay. And it appears that the rate in the
22 second column for those three is $91,700.07. Do you
23 see that?
24   A. Yes.

Page 119

1    Q. And the next column is reads OH, which I
2 assume stands for overhead and profit at nine percent.
3 Do you see that?
4    A. Yes.
5    Q. And the total in the next column is
6 $99,953.08. Do you see that?
7    A. Yes.
8    Q. Mr. Mangels, do you know whether Insituform
9 ever considered hiring its own laborers to do the work
10 that D'Allessandro is doing for Phase II?
11   A. I don't know that.
12   Q. Who would know that?
13   A. The operations group.
14   Q. Okay. Mr. Mangels, do you know whether
15 Insituform built any profit into its Phase I or Phase
16 II work?
17   A. I'm not sure exactly what you mean by that.
18   Q. Does its claim against American Home,
19 Insituform's claim against American Home, is it
20 intended to calculate only its actual costs?
21   A. Yes, it's only actual costs.
22   Q. So, there's not intended to be any sort of
23 profit built into any of the line items?
24   A. That is a correct statement.

Page 120

1    Q. Mr. Mangels, are you involved in any way with
2 Insituform obtaining general liability insurance
3 coverage?
4    A. No.
5    Q. Do you make any projections for its insurance
6 costs?
7    A. No.
8    Q. Have you ever been involved in obtaining
9 insurance on behalf of Insituform?
10   A. No.
11   Q. Insurance meaning general liability
12 insurance?
13   A. No.
14   Q. Okay. Have you ever had a discussion with
15 anyone at Insituform regarding Insituform's efforts to
16 reduce its insurance costs?
17   A. Yeah, that's discussed.
18   Q. In what context is that discussed?
19   A. We pay a lot for insurance. Let's get it
20 reduced.
21   Q. Do you know if Insituform has taken any steps
22 to reduce the amount that it pays for insurance?
23   A. Through our proven safety record, yes.
24   Q. And what is involved in your safety?

30 (Pages 117 to 120)

Page 129

1  in connection with the original project?
2  A. No.
3  Q. Okay. Are there any documents that you can
4  think of that would refresh your recollection?
5  A. No.
6  Q. Have you taken any courses or professional
7  training seminars on recovery from an insurance
8  company?
9  A. No, I have not.
10     MR. MULLEN: Charlie, I think I'd like a few
11 minutes again to go over my notes. I think I am pretty
12 close.
13 WHEREUPON, THE PARTIES TOOK A SHORT BREAK, SUBSEQUENT
14 TO WHICH THE FOLLOWING PROCEEDINGS WERE MADE OF RECORD:
15     BY MR. MULLEN:
16 Q. Mr. Mangels, do you know generally whether it
17 can be more cost efficient to purchase equipment if
18 it's going to be used long term as opposed to renting
19 it?
20 A. I don't know that without getting into the
21 details of it.
22 Q. Okay. I want to ask you a couple of
23 questions on Mr. Campos' report, which is marked as
24 Defendant's Exhibit 2.

Page 130

1  I'll apologize in advance if any of these
2  questions are similar to the ones I asked this
3  morning. I just want to make sure for clarity of the
4  record that I ask them.
5     The first portion of Mr. Campos' report
6  dealing with payroll, directing your attention to page
7  three, the fifth paragraph, which is the last paragraph
8  above the equipment burden section of this report, I'll
9  read from the second sentence down, "I analyzed the
10 claimed payroll burden and determined that some of the
11 categories of payroll burden are fixed in nature.
12 Therefore, the reparation project could not result in
13 any incremental charges for the fixed expenses.
14 Neither Insituform nor I have performed a fixed versus
15 variable analysis of the payroll burden."
16    Do you know whether Mr. Campos is correct
17 that Insituform had not produced a fixed versus
18 variable analysis of the payroll burden?
19 A. That's true.
20 Q. And that's for both Phase I and Phase II?
21 A. Yes.
22 Q. Would such an analysis be possible of fixed
23 versus variable?
24 A. It's subjective in nature.

Page 131

1  Q. And is that because as you testified earlier
2  today that there can be a difference of opinion as to
3  what constitutes fixed costs?
4  A. Yes.
5  Q. Under the equipment burden section, page four
6  of Mr. Campos' report in the last full paragraph above
7  the materials - tube and resin section, it states in
8  part, reading from the second sentence down, "However,
9  in my opinion, some of the expenses included in the
10 equipment burden are fixed in nature and, therefore,
11 the reparation project would not result in any
12 incremental charges for the fixed expenses. Neither
13 Insituform nor I have prepared a fixed versus variable
14 analysis equipment burden."
15    Mr. Mangels, do you know whether Mr. Campos
16 is correct that Insituform did not compare a fixed
17 versus variable analysis for equipment burden?
18 A. That's true.
19 Q. Is that for both Phase I and Phase II?
20 A. Yes.
21 Q. Same question I asked with respect to
22 payroll: Why is that?
23 A. It's subjective in nature.
24    MR. MULLEN: Mr. Mangels, I really do

Page 132

1  appreciate your time today. These are all the
2  questions I have at this time.
3     As I mentioned at the outset of the
4  deposition, I wasn't able to receive all of the
5  information, all the cost binders marked ITI-AIG 1
6  through 2608 due to circumstances that were beyond my
7  control and I apologize for that. For that reason I
8  wasn't able to question you on all the documents that I
9  wanted to. And for that reason, you know, I'm
10 suspending today's deposition and reserving the right
11 to bring you back to ask you about those documents that
12 I wasn't able to question you about earlier today.
13    Thank you very much for your time again.
14    And I don't know if Mr. Philbrick has any
15 questions for you.
16    MR. PHILBRICK: I do not have any questions,
17 but I would like to state on the record that it's my
18 understanding that counsel was unable to receive
19 documentation as a result of his vendor being unable to
20 deliver it here today, nevertheless it's our position
21 that this deposition has been taken, it's completed,
22 and it's done. Okay.
23    MR. MULLEN: Understood.
24    MR. PHILBRICK: Thank you.

33 (Pages 129 to 132)