1

2      IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF MASSACHUSETTS
3              Case No. 04 10487 GAO
   ------------------------------------)
4  INSITUFORM TECHNOLOGIES, INC.,
5                Plaintiff,
6      vs.
7
   AMERICAN HOME ASSURANCE COMPANY,
8
                 Defendant.
9  ------------------------------------)
10
11
12
13      DEPOSITION OF CHRIS CAMPOS, CPA
14             New York, New York
15           Friday, May 11, 2007
16
17
18
19
20
21
22
23 Reported by:
   Toni Allegrucci
24 JOB NO. 194114/9968
25

**EXHIBIT**

Page 2

```
 1
 2            May 11, 2007
 3            9:34 a.m.
 4
 5      Deposition of CHRIS CAMPOS, held at
 6  the offices of Nixon Peabody, LLP, 437
 7  Madison Avenue, New York, New York,
 8  pursuant to Notice and Federal Rules of
 9  Civil Procedure, before Toni Allegrucci,
10  a Notary Public of the State of New
11  York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2 A P P E A R A N C E S:
 3
 4   HOLLAND & KNIGHT, LLP
 5   Attorneys for Plaintiff
 6       131 S. Dearborn Street  30th Flr.
 7       Chicago, Illinois 60603
 8   BY:  CHARLES L. PHILBRICK, ESQ.
 9
10   NIXON PEABODY, LLP
11   Attorneys for Defendant
12       100 Summer Street
13       Boston, Massachusetts 02110
14   BY:  GREGORY P. DESCHENES, ESQ.
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1            CAMPOS
 2  C H R I S  C A M P O S, called as a witness,
 3  having been duly sworn by a Notary Public,
 4  was examined and testified as follows:
 5  EXAMINATION BY
 6  MR. DESCHENES:
 7      Q.  State your name for the record,
 8  please.
 9      A.  Chris Campos.
10      Q.  State your business address,
11  please.
12      A.  310 Cedar Lane, Teaneck, New Jersey
13  07666.
14      Q.  Good morning, Mr. Campos.
15      A.  Good morning, sir.
16      Q.  My name is Greg Deschenes, we just
17  briefly met out in the lobby.  I represent
18  the defendant in this case, American Home
19  Assurance Company.
20          Thank you for coming in today.
21      A.  Okay.  You are welcome.
22      Q.  Appreciate it.  Could you please
23  state your full legal name for the record.
24      A.  Chris Campos.
25      Q.  What is your date of birth?
```

Page 5

```
 1            CAMPOS
 2      A.  August 17, 1929.
 3      Q.  Where do you live?
 4      A.  121 Chestnut Street,
 5  Englewood Cliffs, New Jersey.
 6      Q.  Are you currently employed?
 7      A.  Yes.
 8      Q.  By whom?
 9      A.  The firm of Campos and Stratis,
10  Professional Association.
11      Q.  Are you a principal of that firm?
12      A.  Yes, sir.
13      Q.  Are there any other principals of
14  that firm?
15      A.  There are three other shareholders.
16      Q.  How many employees are in the firm?
17      A.  In the New Jersey office,
18  approximately eight.
19      Q.  And firm wide?
20      A.  Oh, another dozen maybe.
21      Q.  Where are your other locations
22  besides New Jersey?
23      A.  Salt Lake City and Los Angeles.
24      Q.  Have you ever been deposed before,
25  sir?
```

Page 6

```
1              CAMPOS
2    A.  Yes, I have.
3    Q.  Approximately how many times?
4    A.  Over 200, over the years.
5    Q.  So you are a very experienced
6 witness, correct?
7    A.  Well, all right, you put it that
8 way, yes.
9    Q.  And what types of different cases,
10 generally speaking, have you given deposition
11 testimony?
12    A.  It's involving insurance claims or
13 litigation between corporations in which I've
14 testified, okay.
15    Q.  Yes.  Let me just give you a brief
16 review of the deposition ground rules.
17    A.  Yes, sir.
18    Q.  We are here today to get your
19 testimony and find out the opinions you have
20 in connection with this case.  I'm going to
21 ask you a series of questions.  As the Court
22 Reporter indicated before we went on the
23 record, please let me finish the question
24 before you answer; in order for the Court
25 Reporter to accurately transcribe my
```

Page 7

```
1              CAMPOS
2 questions and your answers, we must try not
3 to talk over each other.
4        Is that okay with you?
5    A.  Yes, sir.
6    Q.  You must give verbal answers, "yes"
7 or "no," rather than head nods or "um-hum,"
8 which do not show up on the transcript.
9        Is that understandable to you?
10    A.  Yes, sir.
11    Q.  If you don't understand a question,
12 please let me know and I'll try to rephrase
13 it, otherwise, if you answer I will assume
14 you understood the question.
15        Is that okay with you?
16    A.  Yes, sir.
17    Q.  You understand that you are under
18 oath, and that my client is relying on the
19 answers you give here today?
20        Do you understand that?
21    A.  Yes, I do.
22    Q.  Is there anything that would affect
23 your ability to testify fully and truthfully
24 here today?
25    A.  No, sir.
```

Page 8

```
1              CAMPOS
2    Q.  Are you on any special medications
3 that may affect your memory?
4    A.  No, sir.
5    Q.  Are you represented by counsel here
6 today?
7    A.  No.
8    Q.  Mr. Philbrick, who represents the
9 plaintiff Insituform, may make objections
10 from time to time, he looks shocked, but he
11 may, and you understand because you are an
12 experienced witness and deponent that just
13 because he makes an objection, you are
14 supposed to answer the question if you
15 understand it.
16        Is that okay with you?
17    A.  Yes.
18    Q.  Unless he instructs you not to
19 answer.  Is that okay?
20    A.  Yes, yes, sir.
21    Q.  Let me ask you a couple general
22 questions about your educational background.
23 Did you attend college?
24    A.  Yes.
25    Q.  Where?
```

Page 9

```
1              CAMPOS
2    A.  Rutgers University in New Jersey.
3    Q.  Did you graduate?
4    A.  Yes, sir.
5    Q.  When?
6    A.  1951.
7    Q.  What was your major or degree in?
8    A.  Bachelor of Science in Accounting.
9    Q.  Have you taken any post-graduate
10 courses?
11    A.  Yes, I did.
12    Q.  Where?
13    A.  Both at Rutgers and New York
14 University.
15    Q.  When?
16    A.  Shortly after I graduated
17 undergraduate school.
18    Q.  In 1951?
19    A.  Yes.
20    Q.  In what area of studies did you
21 take postgraduate level courses?
22    A.  In accounting.
23    Q.  Did you graduate from any of those
24 graduate programs?
25    A.  No, I did not.  My courses were
```

Page 10

1         CAMPOS
2 interrupted for service in the Army, and I
3 never went back.
4     Q.  So you have no advanced degrees; is
5 that correct?
6     A.  That's correct.
7     Q.  Have you taken any other
8 professional continuing education type
9 courses?
10    A.  Yes, I do.
11    Q.  Can you describe just generally
12 what those courses entailed?
13    A.  A variety of continuing
14 professional education courses that are
15 required to maintain my license, both
16 sponsored by either the American Institute of
17 CPAs, New York Society of CPAs or the
18 New Jersey Society of CPAs.
19         I took one last week on fraud,
20 okay. Whatever, I take them on business
21 valuations, I take them on litigation
22 support. When I see them, if they are of
23 interest to me or if they are things that
24 would benefit me and my practice, I sign up
25 for them.

Page 11

1         CAMPOS
2     Q.  You mentioned that you have to take
3 these courses in order to maintain your
4 license; is that correct?
5     A.  Yes.
6     Q.  Can you tell me what the
7 requirements are for maintaining your license
8 in New Jersey?
9     A.  It's X number of hours over a three
10 year period, it varies by state. My
11 secretary keeps a record of them, when I came
12 back last week I gave her the certificate
13 with the four hours and, you know, when it
14 gets close to the deadline I, you know,
15 several months before the deadline I look to
16 see to make sure I comply.
17    Q.  Understood. Have you taken any
18 continuing education courses in the area of
19 accounting for pipe rehabilitation companies?
20    A.  I have not. I don't recall ever
21 seeing one.
22    Q.  Have you ever taken any continuing
23 education courses on costs related to pipe
24 rehabilitation or trenchless technology?
25    A.  No, again, I have not taken one in

Page 12

1         CAMPOS
2 that specific field, nor have I ever seen one
3 of those offered specifically for pipe.
4     Q.  Okay. What is your current
5 occupation?
6     A.  Well, I'm a Certified Public
7 Accountant and I'm president of Campos and
8 Stratis, a Professional Association.
9     Q.  How long have you been a Certified
10 Public Accountant?
11    A.  Five years.
12    Q.  Since 1957?
13    A.  Actually since in 1956 I think, a
14 few more years.
15    Q.  Beginning after you left, was it
16 the Army?
17    A.  Yes.
18    Q.  After you left the Army and you
19 graduated from college, could you please tell
20 me generally about your employment history?
21    A.  Actually I was employed by a firm
22 then known as Ernst & Ernst.
23    Q.  Is that after you left the Army?
24    A.  No. I was working for them upon
25 graduation, even in an internship program

Page 13

1         CAMPOS
2 during my senior year.
3     Q.  Can I just stop you and ask you
4 when that was?
5     A.  1951. And then I was taking the
6 graduate courses at night, I was interrupt --
7 my work for Ernst & Ernst was interrupted in
8 April of '52 to go to the Army, for two
9 years, where I was in the Army Audit Agency,
10 and I returned to Ernst & Ernst in 1954.
11    Q.  And after you returned to
12 Ernst & Ernst in 1954, what was your position
13 then?
14    A.  I was a staff accountant, and
15 worked my way up to the point where I was a
16 partner when I left in 19-- late 1968, early
17 1969.
18    Q.  And where did you work for
19 Ernst & Ernst, was it in New York City?
20    A.  At first it was New York City and
21 then it was the Newark office. I was one of
22 a group of six that opened the Newark office
23 for Ernst.
24    Q.  And when was that?
25    A.  '56, something like that.

Page 14

```
 1              CAMPOS
 2    Q.  You mentioned that you started out
 3 as a staff accountant and worked your way up
 4 to partner; is that correct?
 5    A.  Yes.
 6    Q.  At Ernst & Ernst?
 7    A.  Yes, sir.
 8    Q.  When did you become partner at
 9 Ernst & Ernst?
10    A.  In 1968.
11    Q.  While you were at Ernst & Ernst,
12 what were your duties and responsibilities?
13    A.  I was on the audit staff, so I
14 conducted and supervised audits of
15 corporations and, at the same time, I was one
16 of a few who were involved in business
17 interruption insurance claims on behalf of
18 our clients, and defensive product liability
19 claims.
20    Q.  While you were with Ernst & Ernst,
21 did you specialize in any one industry or
22 another?
23    A.  No.  I worked on a variety of
24 industries.
25    Q.  So for instance, you did not
```

Page 15

```
 1              CAMPOS
 2 specialize in the area of construction, the
 3 construction industry; is that correct?
 4    A.  First of all, if I may put it on
 5 the record, we accountants cannot claim we
 6 "specialize" in anything because otherwise it
 7 would be a self-proclamation of a specialty.
 8 We don't have specialties like doctors do,
 9 okay.
10        So basically you might say, did I
11 limit my practice to, and the answer is no, I
12 did not, but I did work on construction
13 claims, okay.
14    Q.  Okay.  Let me take a step back.  I
15 didn't mean by using the term "specialized"
16 as a term of art, like a doctor.
17    A.  Okay.  Right.
18    Q.  I meant "focused" by "specialized,"
19 but let me just rephrase it.
20        Did you focus your practice on
21 construction industry claims?
22    A.  No, but construction was part of my
23 practice.
24    Q.  Okay.
25    A.  And just, I just wanted the record,
```

Page 16

```
 1              CAMPOS
 2 I don't want to say that I "specialize"
 3 because the profession frowns on it.
 4    Q.  I understand your concern.  You
 5 mentioned conducting and supervising audits
 6 of corporations, you also mentioned working
 7 on business interruption insurance claims and
 8 defensive products liability claims.
 9    A.  Yes, sir.
10    Q.  Can you tell me what involvement,
11 while you were at Ernst & Ernst, did you have
12 in working on business interruption insurance
13 claims?
14    A.  Well, insurance companies would
15 hire us, and specifically a partner that I
16 worked for at the time, and me, as opposed to
17 the rest of the people in the firm, to
18 represent them in analyzing insurance claims
19 presented by insureds for property damage and
20 business interruption.
21    Q.  So did that work involve working as
22 an expert consultant in evaluating damages
23 claims?
24    A.  It really involved, in most
25 instances, being a consultant.  In very few
```

Page 17

```
 1              CAMPOS
 2 cases did it go to court, okay.
 3    Q.  I was going to ask.  You were
 4 anticipating what I was going to ask.
 5    A.  No, I'm sorry, I wasn't.  In other
 6 words, in the majority of cases it didn't go
 7 to court, okay, it was resolved between the
 8 two parties, okay.
 9    Q.  Right.  So you were retained in
10 these cases by insurance companies?
11    A.  Yes, sir.
12    Q.  For the most part?
13    A.  Yes, sir.
14    Q.  Did you do any work while you were
15 in Ernst & Ernst in the business interruption
16 insurance area for policyholders or insureds?
17    A.  No, sir.
18    Q.  And you also mentioned defense of
19 products liability claims?
20    A.  Yes, sir.
21    Q.  What was your involvement in the
22 defense of products liability claims while
23 you were at Ernst & Ernst?
24    A.  An insurance company hired me in
25 particular, as a matter of reference from
```

Page 18

1          CAMPOS
2 some other office referred them to me, to
3 defend them in cases where they were involved
4 in litigation in a products liability claim.
5     Q. What kind of services would you
6 provide in the defense of a products
7 liability claim?
8     A. Review and analyze the claim made.
9 Most of those cases were involving defending
10 Westinghouse, who was an insured of the
11 insurance company, not solely, but many of
12 them, okay.
13     Q. And what were you analyzing in
14 those cases?
15     A. The claim that was made by the
16 electric utility or whoever was involved.
17 There are a lot of electric utility cases
18 where they were claiming that they bought a
19 generating unit that was supposed to generate
20 800 megawatts, and was only generating 600,
21 they would be making a claim for damages for
22 the difference between the two, and I would
23 be involved in analyzing those claims, okay.
24     Q. Understood. So your involvement in
25 analyzing those claims was analyzing the

Page 19

1          CAMPOS
2 damages of those claims; is that correct,
3 sir?
4     A. The damages, yes.
5     Q. And you mentioned, I believe, that
6 you left Ernst & Ernst in 1969; is that
7 correct?
8     A. Early 1969, yes.
9     Q. Okay. Before you left
10 Ernst & Ernst you became a Certified Public
11 Accountant; is that correct?
12     A. Yeah, sometime before, yeah.
13     Q. What year did you become a CPA?
14     A. I think in 1956.
15     Q. Can you tell me what you had to do
16 in order to become a CPA?
17     A. Well, you had to, before you could
18 sit before the CPA exam, in those days you
19 had to have certain courses, college courses,
20 in auditing, accounting, commercial law,
21 etc., as a foundation for your sitting, and
22 you would sit for a two and a half day
23 examination, four parts, and you'd have
24 successfully passed those four parts and then
25 you also needed to have two or three years, I

Page 20

1          CAMPOS
2 can't recall exactly, of experience with an
3 accounting firm before you could become a CPA
4     MR. DESCHENES: Off the record.
5     (Off-the-record discussion held.)
6     Q. You left Ernst & Ernst in 1969 and,
7 at that time, what did you do then?
8     A. I started an accounting firm called
9 Chris Campos CPA.
10     Q. And is that the same firm that you
11 are president of and shareholder of today?
12     A. Yes. It's the predecessor to, yes.
13     Q. Today do you specialize in any
14 area -- strike that, because I know you don't
15 like the word "specialize."
16     Do you focus today on any area of
17 accounting?
18     A. Well, first, we do not do
19 conventional accounting; we do not do audits,
20 do not do taxes. We are involved only in
21 insurance claims or litigation support or
22 involved in lawsuits on behalf of
23 corporations or individuals.
24     So all of our work is what they now
25 call "forensic accounting," which we were

Page 21

1          CAMPOS
2 doing before they coined the term.
3     Q. Why did you leave Ernst & Ernst in
4 1969?
5     A. Two opportunities presented
6 themselves to me, I was not seeking them, but
7 they were proposed to me, and also Ernst, in
8 those days, was not interested in the
9 insurance claims and I was the only one who
10 was willing to extend himself and put the
11 extra time and effort into the insurance
12 claim.
13     At the beginning of the year each
14 of us had a list of clients with an estimated
15 number of hours that you'd spend with each
16 client, then you'd have the insurance company
17 with a question mark, so you never knew how
18 many hours it was going to be, when it was
19 going to be, I was the only one willing to do
20 that, they weren't interested in that and
21 then when these two opportunities presented
22 themselves I embarked on my own.
23     Q. And you mentioned in one of your
24 previous answers that your firm, the Campos
25 firm, does not focus on traditional areas of

6 (Pages 18 to 21)

Esquire Deposition Services
1-866-619-3925

Page 22

CAMPOS

1
2  accounting, but focuses instead in forensic
3  accounting or consulting work in the
4  litigation area, has that always been true
5  from 1969 to the present day?
6      A.  Yes, sir.
7      Q.  And is "forensic accounting" also
8  referred to sometimes as "investigative
9  accounting"?
10     A.  We used to call it "investigative
11 accounting" before they coined the term, yes.
12     Q.  Well, I noticed in your written
13 materials it refers to it as "investigating
14 accounting," so I may use that term; is that
15 fair?
16     A.  Yes, sir.
17     Q.  So you have been working in the
18 field of investigative accounting for 30 --
19 at least in your own firm, for about 38
20 years; is that correct?
21     A.  My own firm.
22     Q.  Before that, at Ernst & Ernst, part
23 of your practice was also in the field of
24 investigative accounting; is that correct?
25     A.  Yes, sir.

Page 23

CAMPOS

1
2      Q.  Could you briefly describe, and I
3  think you've done this probably a little bit
4  in previous answers but let me ask you again,
5  what generally your firm does in the field of
6  investigative accounting, what kind of work
7  do you do?
8          MR. PHILBRICK:  Currently?
9          MR. DESCHENES:  Currently.
10     A.  We're engaged in all cases to
11 evaluate damages. If we're working for the
12 defendant, evaluate damages that have been
13 presented to determine whether they are
14 reasonable; or if we're working for a
15 plaintiff, in most instances we're called
16 upon to prepare a claim and to assert the
17 damages, okay.
18         So basically that's our
19 involvement, it's in the quantification of
20 the claim.
21     Q.  You mentioned preparing a damages
22 claim in your answer. Do you do work in any
23 other area involving insurance claims; in
24 other words, do you ever provide any expert
25 services in issues involving liability?

Page 24

CAMPOS

1
2      A.  You mean --
3      Q.  Do you understand what I mean by
4  that question?
5      A.  I want to make sure I understand
6  it.
7      Q.  All right.
8      A.  In other words, in every issue
9  there's a question of liability and a
10 question of quantum.
11     Q.  Correct.
12     A.  We rarely get involved in the
13 liability unless it's accountants malpractice
14 or something along those lines, okay.
15     Q.  Let me just ask a follow-up
16 question and make it crystal clear. When I
17 referred to "liability," I mean does your
18 firm ever get involved in analyzing whether
19 there is coverage under a policy?
20     A.  No, sir.
21     Q.  Your firm's role is strictly in
22 the, as you called it, the quantification of
23 damages; is that correct, sir?
24     A.  Yes, sir.
25     Q.  And you mentioned in one of your

Page 25

CAMPOS

1
2  previous answers that when you are retained
3  by a defendant often times you will be asked
4  to determine whether the damages of costs are
5  reasonable; is that correct, sir?
6      A.  Yes, sir.
7      Q.  And when you are retained by a
8  plaintiff you will prepare a damages claim
9  for the plaintiff; is that correct, sir?
10     A.  In most cases, yes.
11     Q.  Is part of your role when you are
12 retained by a plaintiff in an insurance claim
13 to determine whether their damages are
14 reasonable?
15     A.  Well, when we present a claim we
16 present it objectively and determine that it
17 is reasonable stated in order to present it,
18 yes, when we prepare it, yes.
19     Q.  So when you prepare a damages claim
20 for a plaintiff, you typically will look at
21 whether the damages are reasonable in the
22 claim; is that correct, sir?
23     A.  That's right.
24     Q.  And do you do that in all cases?
25     A.  Yes, sir.

Page 26

```
1         CAMPOS
2    Q. Now, I won't use the term
3  "specialty" again because I know that causes
4  problems but, as I understand it, the focus
5  on your practice today is on the evaluation
6  of insurance claims; is that correct, sir?
7    A. And litigation.
8    Q. And other types of litigation?
9    A. Oh, yeah.
10   Q. Can you tell me what other types of
11 litigation, and I'm talking about currently,
12 I'm not going back in ancient history?
13   A. Sure, sure. Currently, although
14 there may be insurance involved, presently
15 hired by the defense in a subrogation action.
16 Again, involved in its a four-year
17 anniversary the other day of a case involving
18 a shareholder dispute, between a former
19 president of a company, who is a minority
20 shareholder, and the corporation that he
21 worked for, okay.
22        Get involved in, got one pending
23 case that's involved with an architect
24 malpractice case, so those are cases, the
25 kind of cases that I get involved in, and
```

Page 27

```
1         CAMPOS
2  occasionally marital disputes, not too many
3  but occasionally. In other cases where loss
4  of profits are being claimed by a corporation
5  because of some action of the alleged
6  wrongdoing, we get involved in that kind of
7  thing, okay.
8    Q. Today what percentage of your cases
9  involve insurance claims versus non-insurance
10 matters?
11   A. Today, as we sit here today, the
12 insurance is a minor part of it, you go back
13 a year ago, Hurricane Katrina or whatever, it
14 was a big part of it, okay. Who knows, after
15 hurricane season starts, it may be a bigger
16 percentage again.
17   Q. Hopefully not, or maybe in your
18 case hopefully yes.
19      MR. PHILBRICK: Hopefully not.
20   We're all in the same boat there.
21   Q. Today, as we sit here today, it's
22 not a big percentage of your practice, but
23 what you are saying, in years past, depending
24 what you are doing it might be a larger
25 percentage; is that fair?
```

Page 28

```
1         CAMPOS
2    A. Over the years it was a larger
3  percentage, yes.
4    Q. Okay. Do you currently belong to
5  any professional societies or associations?
6    A. Yes, sir.
7    Q. Can you tell me what professional
8  societies or associations you belong to?
9    A. The American Institute of CPAs, the
10 New York State Society of CPAs and the
11 New Jersey Society of CPAs. There may be one
12 or two other. I think Pennsylvania at one
13 point, but I may have dropped out, I don't
14 know, but New York and the New Jersey are the
15 two that I'm involved in.
16   Q. Are you a member of any other
17 professional groups or associations?
18   A. Not actively. Over the years I
19 have been, but not -- I was a member of the
20 Certified Fraud Examiners for a while, but I
21 dropped out; as a condition of continued
22 membership you had to write articles for them
23 so they could publish them for a profit, and
24 I decided I didn't want any part of that,
25 okay.
```

Page 29

```
1         CAMPOS
2    Q. Understood. Any other professional
3  memberships that you can think of?
4    A. There were several others over the
5  years, but I'm not active in them anymore,
6  okay.
7    Q. Can you remember what those were?
8    A. Not off the top of my head. I know
9  that some of them were involved with some
10 publications that on the editorial advisory
11 board on those, but again, I'm not active
12 with those anymore.
13   Q. Do you currently hold any
14 professional licenses or designations?
15   A. Yes. Certified Public Accountant,
16 yes.
17   Q. In what states are you a Certified
18 Public Accountant?
19   A. New York, New Jersey, Pennsylvania,
20 Florida, Illinois. I was certified in a few
21 other states, but I think over the years I've
22 dropped out, like Texas, Puerto Rico and a
23 few others, okay. Louisiana for sure.
24   Q. You are currently licensed there,
25 sir?
```

Esquire Deposition Services
1-866-619-3925

Page 30

1  CAMPOS
2  A. Yes, sir.
3  Q. Do you have any other professional
4  licenses or designations, other than what
5  you've testified to?
6  A. No, sir.
7  Q. Have you published any articles or
8  papers in your professional area?
9  A. Yes, I have.
10  Q. Have you authored any articles on
11  topics related to the pipe rehabilitation
12  industry?
13  A. Not that specific, no, sir.
14  Q. Have you ever authored any articles
15  on topics related to damages claims in the
16  construction industry?
17  A. Did you say "profits"?
18  Q. No. I said "damages claims in the
19  construction industry."
20  A. Oh, I thought -- okay. Maybe get
21  the whole sentence again, please.
22  (Record read.)
23  Q. Have you ever authored any articles
24  related to topics to damages claims in the
25  construction industry?

Page 31

1  CAMPOS
2  A. I may have, but I don't recall.
3  I've done a lot of work in the construction
4  industry, I'd have to do some research to
5  answer that question.
6  Q. Okay. Maybe you can take a look at
7  your CV at the break, and we can turn back to
8  that at some point.
9  MR. DESCHENES: Let's mark this as
10  the first exhibit.
11  (Campos Exhibit 1, document, marked
12  for identification, as of this date.)
13  A. Sir, my year and a half working for
14  the Army Audit Agency, I was doing, I was
15  auditing cost plus fixed fee contracts, for
16  construction contractor and for an architect
17  engineer, that was all I was doing at the
18  time.
19  Q. Okay. Did you just get that on the
20  record, that answer, okay. The Court
21  Reporter has marked Exhibit 1, which I've
22  handed to you, I ask you to take a moment to
23  review it and then I'll ask you a question.
24  A. Yes, sir.
25  Q. Is that exhibit in front of you

Page 32

1  CAMPOS
2  your curriculum vitae?
3  A. Yes.
4  Q. Does it accurately reflect your
5  education, training and professional
6  experience that you've previously testified
7  about?
8  A. Yes, sir.
9  Q. Is there anything in here that you
10  would like to update or change?
11  A. With respect to the publications,
12  as it sets forth in the first sentence, these
13  are the publications preceding ten years, and
14  says prior.
15  Q. Right.
16  A. This is I do not believe a complete
17  list of what I've done over the years, okay.
18  And these were the articles that were
19  published in magazines or mainly outside
20  publications. In addition to that I authored
21  articles that were given at seminars that
22  either my firm conducted or I was part of
23  that some organization conducted.
24  Q. With those qualifications in mind,
25  is this Exhibit 1 true and complete today?

Page 33

1  CAMPOS
2  A. Yes.
3  Q. Mr. Campos, is it fair to say that
4  your area of expertise is primarily in the
5  area of accounting?
6  A. Yes.
7  Q. Is it fair to say that your area of
8  expertise is limited to accounting?
9  A. I think no. I think it's business
10  in general, accounting and specific. I've
11  had experience in the business world, it's
12  not just limited to the accounting aspects.
13  Q. Are there any other areas where you
14  would consider yourself qualified as an
15  expert to testify?
16  A. There may be, but I can't off the
17  top of my head come up with one right now.
18  Q. Do you consider yourself qualified
19  as an expert on trenchless or cured in place
20  pipe technology?
21  A. No, sir. Not that specific, no.
22  Q. Do you consider yourself an expert
23  on costs associated with trenchless
24  technology?
25  A. With respect to costs in general,

Page 34

1      CAMPOS
2 which would include trenchless technology and
3 other technologies.
4    Q.  So is the answer to that question
5 "yes" --
6    A.  Yes.
7    Q.  -- you do consider yourself an
8 expert in the area of cost associated with
9 trenchless technology?
10   A.  Yes, as a subpart of costs, as a
11 general category.
12   Q.  But you do not consider yourself an
13 expert on trenchless or cured in place
14 technology; is that correct?
15   A.  That's right. I answered that
16 question earlier, I think.
17   Q.  Right. Do you consider yourself
18 qualified as an expert to testify about the
19 repairs made to the pipeliner in this case?
20   A.  With respect to the out-of-pocket
21 costs involved in this case, whether they
22 were repair or replacement, whatever they
23 might be, yes.
24   Q.  Okay. My question was slightly
25 different than that, and that is this, do you

Page 35

1      CAMPOS
2 consider yourself qualified as an expert to
3 testify and give opinions about the kind of
4 repairs that were required to be made to the
5 pipeliner in this case?
6    A.  The kind of repairs?
7    Q.  That's correct.
8    A.  Not the kind, no; the
9 quantification of such out-of-pocket costs,
10 yes.
11   Q.  Right. My question goes to, do you
12 consider yourself qualified as an expert to
13 talk about the methodology of how they went
14 about repairing the pipe in this case?
15   A.  No, sir.
16   Q.  And you have no opinion one way or
17 the other about whether the methods they used
18 in repairing this pipe were good, bad or
19 indifferent; is that correct?
20   A.  The scientific or technical
21 methods, I have no opinion on that, no.
22   Q.  Do you have any professional
23 designations in the field of evaluating
24 damages, sir?
25   A.  No. I'm not aware that there are

Page 36

1      CAMPOS
2 any specific designations of that sort.
3    Q.  And you are not a lawyer; is that
4 correct?
5    A.  No, sir, I'm not a lawyer.
6    Q.  And you don't consider yourself
7 qualified to give legal opinions; is that
8 correct?
9    A.  That's correct, and I don't give
10 them.
11   Q.  Fair enough. Have you ever been
12 disqualified as an expert in any case?
13   A.  No, sir.
14   Q.  Have you ever been precluded from
15 offering opinion testimony in any case?
16   A.  No, sir.
17      MR. DESCHENES: Off the record for
18   a moment.
19      (Recess taken 10:16 until 10:21.)
20   Q.  Before we took that brief break, I
21 was asking you some questions about your
22 areas of expertise. Do you recall that?
23   A.  Yes, sir.
24   Q.  And I asked you whether
25 specifically your area of expertise was

Page 37

1      CAMPOS
2 limited to accounting, and I believe you
3 answered that it was not, that you also
4 consider yourself an expert in business, as
5 well; is that correct?
6    A.  Yes.
7    Q.  Can you tell me what areas of
8 business you feel that you believe that you
9 are qualified as an expert in?
10   A.  Well, I think the best way I can
11 answer that is depending on the specific
12 circumstance as it arises, I can determine
13 that, okay.
14      When I first left Ernst I worked
15 for four, five year period as a chief
16 financial officer of American Stock Exchange
17 Company and had my accounting practice at the
18 time, so I was involved in the business
19 world, and while I was with Ernst & Ernst in
20 the business world, so I got to know and get
21 involved in things that I'm, you know,
22 familiar with and, I would say, in certain
23 areas would be an expert in, but I would want
24 to see the facts and circumstances behind
25 each one before I say that I'm able to opine

10 (Pages 34 to 37)

Page 38

```
1            CAMPOS
2  on something, okay. I won't do that in the
3  broad sense, okay.
4      Q. Understood. So by your previous
5  answer you didn't mean to say that you
6  consider yourself an expert in the business
7  of any field; is that correct, sir?
8      A. Of a particular industry you mean?
9      Q. Yes.
10     A. No. Although I have, as I said,
11 done a lot of work in many industries and I
12 would consider myself an expert in certain
13 facets of the industry, okay, of that
14 particular industry, okay.
15     Q. Okay. Fair enough. You mentioned
16 just something in your answer that I didn't
17 get in previous questions, and that is, any
18 other jobs that you may have had; you
19 mentioned you were a chief financial officer
20 for a company, for five years, for a company
21 after you left Ernst & Ernst, when was that?
22     A. At the same time I was doing my
23 accounting practice. It was in Teaneck,
24 New Jersey.
25     Q. What was the name of the company?
```

Page 39

```
1            CAMPOS
2      A. It was called The Garcia Company,
3  G-A-R-C-I-A, Corporation, Sporting Goods
4  company that was a distributor and
5  manufacturer, fishing tackle, skis, rifles,
6  tennis equipment, you name it, okay.
7      Q. And you were the chief financial
8  officer of that company from 1969 to 1947; is
9  that correct?
10     A. Not the entire time. I was
11 assistant treasurer and then became
12 treasurer. I was on the board of directors.
13     Q. So you were employed by this
14 company, the Garcia Corporation, from 1969 to
15 1974, in the capacities that you just
16 testified to?
17     A. 1975, yeah. And when I said
18 earlier about "opportunities," I was asked by
19 them to join them and help them go public.
20 They were an Ernst client, that was one of
21 the opportunities that presented itself.
22     Q. Okay. Are there any other --
23 strike that. I asked you questions about
24 your employment history. Are there any other
25 jobs that you've had from 1969 on, that you
```

Page 40

```
1            CAMPOS
2  have not testified to today?
3      A. No, sir.
4      Q. How frequently have you testified
5  as an expert witness?
6      A. It varies. I don't recall when the
7  last one was, it was a couple months ago.
8  More in the past than now, you know, but I
9  have scheduled a deposition next week
10 sometime -- next month sometime. There may
11 be others, it will come up as the cases
12 approach trial.
13     Q. You've testified more in the past
14 than now as an expert witness; is that
15 correct?
16     A. On a more frequent basis.
17     Q. "On a more frequent basis." How
18 much of your revenue is derived from being
19 retained as an expert in litigation?
20     A. It's less than 50 percent. I don't
21 know percentage-wise, but it's less than 50
22 percent.
23     Q. Was it more in the past?
24     A. No. It wasn't more in the past, it
25 was just there were more, more cases you
```

Page 41

```
1            CAMPOS
2  know.
3      Q. Do you typically testify as an
4  expert for one side, for only one side?
5      A. No, sir.
6      Q. And by that, you understand I'm
7  talking about plaintiff or defendant?
8      A. I understand. I do not typically
9  testify for either the defendant or the
10 plaintiff.
11     Q. Or let me rephrase that. In the
12 context of an insurance claim, which is what
13 we are talking about here today, do you only
14 testify for policyholders?
15     A. No, sir.
16     Q. You also testify on behalf of
17 insurance companies; is that correct?
18     A. Yes, sir.
19     Q. In the context of insurance
20 litigation; is that correct, sir?
21     A. That's correct. Just last year,
22 testified two or three times in connection
23 with first-party property claims, yes,
24 resulting from 9/11 and resulting from
25 hurricanes.
```

11 (Pages 38 to 41)

Esquire Deposition Services
1-866-619-3925

## Page 42

CAMPOS

Q. Do you recall what insurance companies retained you in the 9/11 and hurricane claim cases?
A. It was Hartford I believe, okay, and Sorema was another one.
Q. How do you spell that?
A. S-O-R-E-M-A. Hartford on a couple occasions.
Q. For both 9/11 and hurricane claims?
A. Yes. I guess years ago, when I was in college my professor told me that don't try to remember everything, but just know where to go to get the information, so I don't try to cram my mind with all these facts, but I know where to go to get it, but those are the two that that come to mind, but there's others, okay.
Q. That's fair enough. I'm just asking for your best memory here today.
Have you ever turned down a proposed engagement, sir?
A. Yes.
Q. When was the last time you turned down a proposed engagement?

## Page 43

CAMPOS

A. About two weeks ago, I was asked to do something by an insurance consultant and I didn't want to do it, okay, and I referred it to someone else, okay.
Q. Is the reason why you didn't want to do it is because you felt you could not give the opinion that they were seeking in that case?
A. No, no. It was he was representing a policyholder and I didn't want to represent the policyholder, okay.
Q. All right. Understood. The 9/11 claims and hurricane claims that you testified about involving first-party property damage, in both categories were you retained to testify about damages?
A. Yes, principally. Also profits, business interruption.
Q. So in both categories, "both categories," 9/11 claims and hurricane claims, they were business interruption cases; is that correct?
A. Business interruption, but there were elements of property damage also now

## Page 44

CAMPOS

that I recall, okay, and I get involved in both.
Q. And who was your client in this case?
A. Mr. Philbrick through Insituform.
Q. How are you being compensated in this case?
A. On an hourly basis.
Q. Is your arrangement in writing?
A. I believe so.
Q. Do you recall whether it was reduced to some sort of written engagement, sir?
A. I said I believe it was.
Q. Okay. And you are charging an hourly rate; is that correct, sir?
A. Yes, sir.
Q. Do you charge a different hourly rate depending on the kind of work that you are doing?
A. Either on the kind -- not the kind of work, but where a particular client might charge slightly different rates, okay.
Q. Well, what I was driving at before

## Page 45

CAMPOS

is, do you charge a different rate for testifying versus doing document review?
A. No, sir.
Q. You charge the same rate for both activities, sir?
A. My activity, yes.
Q. What rate are you charging Insituform in this case?
A. I believe it's 300 an hour.
Q. Is anybody else from your firm also involved in this engagement?
A. Yes.
Q. Who is that?
A. A young woman by the name of Meghan, M-E-G-H-A-N, Siri, S-I-R-I, Callen, C-A-L-L-E-N, the middle name is her maiden name and she was married in the past year, so.
Q. Her last name is, again, I'm sorry?
A. Callen, C-A-L-L-E-N.
Q. Is she also a CPA?
A. Yes, sir.
Q. How long has she been with your firm?

Page 46

1  CAMPOS
2  A. Ten years, eleven years, something
3 like that.
4  Q. Is she a partner?
5  A. Yes.
6  Q. And what rate is she charging
7 Insituform for her work?
8  A. I do not recall. It's in the $150,
9 $175 rate.
10  Q. Do you charge a different rate for
11 testifying at trial than depositions?
12  A. No, sir.
13  Q. Do you know how much you've charged
14 for your fees to date in this case?
15  A. No, I do not.
16  Q. Do you know what your projected
17 fees and work will be in this case going
18 forward?
19  A. No, no, I do not, okay.
20  Q. And are you being paid for your
21 testimony here today?
22  A. I'm being paid for my time.
23  Q. Okay. What are you being paid?
24  A. At the hourly rate that I just
25 testified to.

Page 47

1  CAMPOS
2  Q. Do you have any interest in the
3 outcome of this litigation?
4  A. No, sir.
5  Q. Are you being paid or compensated
6 in any other way for your time here today,
7 other than what you previously testified to?
8  A. Just my time, that's all.
9  Q. At $300 an hour?
10  A. Yes, sir.
11  Q. Approximately how often have you
12 been deposed in the last five years?
13  A. Either deposed or testified at
14 trial, I'd say maybe 30 times or so, maybe
15 more.
16  Q. And the 30 times would include both
17 deposition testimony and trial testimony,
18 sir?
19  A. Yes, sir.
20  Q. Do you have any understanding today
21 of the breakdown between trial testimony and
22 deposition testimony in the last five years?
23  A. No, I don't. Most of it is
24 deposition testimony.
25  Q. And of those cases, do any of them

Page 48

1  CAMPOS
2 involve insurance?
3  A. Oh, yes.
4  Q. Approximately how many cases
5 involve insurance?
6  A. Well, either directly or
7 indirectly, the majority of the cases would
8 involve insurance.
9  Q. And in the last five years, have
10 you testified in any cases that involved
11 issues similar to the issues in this case?
12  A. Well, when I say -- when you say
13 "issues in this case," I look at the issues
14 I'm involved in as the quantification itself
15 and, yes, I have testified as to the
16 quantification of what I will call
17 "out-of-pocket expenditures."
18  Q. Did any of the cases in the last
19 five years involve a claim involving pipe
20 rehabilitation like this case?
21  A. I don't recall any, no. I can't
22 recall.
23  Q. Did any of the cases that you've
24 testified in the last five years involve
25 quantification of out-of-pocket expenditures

Page 49

1  CAMPOS
2 in a construction claim?
3  A. I'm trying to recall, I was
4 involved in a construction, in a corporation
5 that was in a construction business, trying
6 to recall whether it was out-of-pocket costs
7 or not, I don't recall. I have one case
8 that's pending, the one that I told you about
9 that was a malpractice case, that one of the
10 qualifications they were seeking was someone
11 who had construction experience, and I met
12 that qualification and I was engaged by three
13 defendants in that case.
14  Q. You said the malpractice case, is
15 that the architectural malpractice case you
16 testified to previously?
17  A. Yeah, the case is just starting,
18 okay.
19  Q. Do you remember the name of it?
20  A. Well, the plaintiff is
21 David Anthony Construction Company, okay,
22 it's venued in New Jersey.
23  Q. New Jersey Superior Court?
24  A. As I said, the case is started, I
25 assume it's the Superior Court.

13 (Pages 46 to 49)

Page 50

```
1           CAMPOS
2    Q. And you've been recently engaged in
3 testify in this case?
4    A. Yes.
5    Q. And in part you were engaged, you
6 believe, because of your construction
7 industry experience?
8    A. It was definitely a condition. The
9 one attorney who recommended me asked me
10 questions, and I gave him -- I sent him a
11 letter, I believe, telling him my experience,
12 starting back in the Army audit Agency days,
13 and other construction cases that I've worked
14 on over the years.
15   Q. Have you produced a report in that
16 case yet, sir?
17   A. No. It hasn't even started yet.
18   Q. So I assume you haven't testified
19 in that case yet?
20   A. Oh, no.
21   Q. Of the 30 some-odd cases that
22 you've testified in, in the last five years,
23 what percentage of those cases did you
24 testify on behalf of an insurance company?
25   A. I don't really quantify my cases
```

Page 51

```
1           CAMPOS
2 that way, but I would estimate that it would
3 be somewhere between 30 and 50 percent, okay.
4    Q. The same question, what percentage
5 of cases in the last five years have you
6 testified on behalf of policyholders in an
7 insurance claim or litigation?
8    A. I would say maybe 15, 20 percent.
9    Q. You mentioned your partner
10 Ms. Callen was involved in this particular
11 case; is that correct?
12   A. Yes, sir.
13   Q. Can you tell me what her role has
14 been in this particular case?
15   A. She assisted me in all aspects of
16 the case and worked under my direct
17 supervision.
18   Q. Does she also testify from time to
19 time as an expert witness in cases?
20   A. On a few instances, yes.
21   Q. Do you know how many hours she's
22 put into this engagement?
23   A. No, sir.
24   Q. Is there any way you could
25 determine that?
```

Page 52

```
1           CAMPOS
2    A. My records in my office, yeah.
3    Q. And relatively speaking, you may
4 not know the answers, but has she put in more
5 time into this matter than you or less time?
6    A. She would most likely more time
7 than me.
8       MR. DESCHENES: Let's mark this
9    next.
10      (Campos Exhibit 2, document, marked
11   for identification, as of this date.)
12   Q. Mr. Campos, could I direct your
13 attention to what has been marked as Campos
14 Exhibit 2, and just ask you to take a moment
15 to review that document, and I'll ask you
16 some questions, sir.
17   A. Yes, sir.
18   Q. Do you recognize that document?
19   A. Yes, I do.
20   Q. What is it?
21   A. It's the cases in which I've
22 testified at trial or been deposed in the
23 last four years.
24   Q. Was this list accurate and complete
25 at the time it was created?
```

Page 53

```
1           CAMPOS
2    A. Yes, sir, to the best of my
3 knowledge.
4    Q. I believe this list was a part of a
5 production in May of 2006. Has this been
6 updated since May of 2006?
7    A. It should have been, yes. May
8 2006?
9    Q. Well, that's the date of your
10 report.
11   A. Okay. I believe there have been
12 depositions since then but, if are not here,
13 they should be updated in the office.
14      MR. DESCHENES: Okay. Charlie, if
15   it's not too much trouble, could I get
16   an updated list from Mr. Campos.
17      MR. PHILBRICK: Sure.
18      MR. DESCHENES: And also, I would
19   like to request the agreement that he's
20   made in his written engagement with your
21   firm.
22      MR. PHILBRICK: I will take that
23   under advisement. I would assume it's
24   already in the production that you have.
25      MR. DESCHENES: It's not. I don't
```

14 (Pages 50 to 53)

Page 54

```
 1            CAMPOS
 2    think it is. I went through his -- we
 3    don't need to have a prolonged
 4    discussion on the record, but I didn't
 5    find it in the documents produced to us.
 6       A.  I said I believe so. If it is,
 7 I'll get it.
 8       Q.  Sure. That's up to your counsel,
 9 he's taken it under advisement. I just want
10 to make the request on the record.
11           Do you have transcripts of your
12 testimony in all of these cases that are
13 listed here?
14       A.  I would have or should have with
15 respect to the depositions, not necessarily
16 with respect to trial testimony.
17       Q.  Okay. It appears to list about 30
18 cases here. Can you tell me what cases
19 involve trial testimony?
20       A.  Well, I believe Weiss versus Ferro,
21 PSG versus SKW Real Estate.
22       Q.  You are just reading from the first
23 page, right?
24       A.  From the caption.
25       Q.  The caption on the first --
```

Page 55

```
 1            CAMPOS
 2       A.  On the first column.
 3       Q.  We're on the first page though,
 4 right?
 5       A.  Yes, sir.
 6       Q.  Okay.
 7       A.  Egber versus Egber.
 8       Q.  All three of those cases involve
 9 trial testimony, sir?
10       A.  Yes, sir. To the best of my
11 recollection, yes. I'm not sure about the
12 other two on the first page.
13       Q.  Okay. Moving on to the second
14 page.
15       A.  Second page, when you get down --
16 I'm not sure of the ones preceding the one
17 I'm going to testify as to now, RSR
18 Corporation versus AIU Insurance was trial
19 testimony. Estate of James Bastek was trial
20 testimony. Swan International, I think was
21 trial.
22       Q.  Before you go on to the next page,
23 sir.
24       A.  Yes, sir.
25       Q.  You mentioned the "RSR Corporation"
```

Page 56

```
 1            CAMPOS
 2 case.
 3       A.  Yes.
 4       Q.  And in that case there's an
 5 insurance company mentioned.
 6       A.  Yes.
 7       Q.  "AIU Insurance Company"?
 8       A.  Yes.
 9       Q.  Did you testify in that case on
10 behalf of the insurance company or
11 policyholder?
12       A.  Insurance company.
13       Q.  And what was the nature of that
14 case?
15       A.  It was a claim for environmental
16 cleanup and my role was evaluating the
17 damages.
18       Q.  It was a super fund type case?
19       A.  In a sense, yes.
20       Q.  Your role was evaluating the
21 remediation cost claim by the policyholder?
22       A.  Yes, on behalf of AIU. Next page.
23       Q.  One more question about the AIU
24 case. Was part of your role in evaluating
25 whether the remediation costs were reasonable
```

Page 57

```
 1            CAMPOS
 2 and necessary?
 3       A.  Well, reasonable yes, necessary,
 4 yes. There's another one of those cases for
 5 that particular attorney, that's pending
 6 right now.
 7       Q.  You are talking about another case
 8 for Robert E. Rider at Jackson and Campbell,
 9 sir?
10       A.  Yes, he was representing insurance
11 companies and I believe including an AIG
12 company, okay.
13       Q.  Okay.
14       A.  I don't recall the first two,
15 whether I testified at trial or not, but I
16 know --
17       Q.  We're on to the third page, are we
18 not, sir?
19       A.  Third page, where it says "Solution
20 F" on top?
21       Q.  Yes. I just want the record to be
22 clear.
23       A.  Yes. The Liverpool Club Corp.
24 Versus Wausau.
25       Q.  You believe that case involved
```

15 (Pages 54 to 57)

Esquire Deposition Services
1-866-619-3925

Page 58

1         CAMPOS
2 trial testimony?
3     A.  Yes, sir.
4     Q.  And in that case did you testify on
5 behalf of --
6     A.  Liverpool.
7     Q.  Let me back up, ask you what was
8 the nature of that case, if you recall?
9     A.  I don't recall the specifics of the
10 case, but I did testify on behalf of
11 Liverpool Club, okay.
12     Q.  Against Wausau Insurance Company?
13     A.  Yes, sir, in a limited role, okay.
14     Q.  Anything else in terms of trial
15 testimony on that page?
16     A.  I'm trying to recall, sir. I don't
17 believe any more trial testimony.
18     Q.  On page three?
19     A.  On page three, on the last page,
20 the only other trial testimony that I can
21 recall being trial testimony was the
22 Mount Nittany Inn case, next to the last one.
23     Q.  What did that case involve?
24     A.  It involved the Hotel Mount Nittany
25 Inn making a claim against, I think it was a

Page 59

1         CAMPOS
2 subrogation claim, and I was representing the
3 defendant.
4     Q.  Who was the defendant in that case?
5     A.  Well, Swartz Fire and Safety and
6 possibly Richard Benner, but I definitely
7 represented the defendant.
8     Q.  Do you remember what the case was
9 about?
10     A.  It was a fire that occurred, and
11 they were suing to recover the loss of
12 profits and some of the out-of-pocket
13 expenditures.
14     Q.  Were they suing a defendant they
15 believe that was responsible for causing the
16 fire?
17     A.  That was their claim, yes.
18     Q.  And your engagement involved
19 quantifying the alleged damages in the case?
20     A.  Yes, sir.
21     Q.  In that case you were
22 representing -- you were retained by
23 defendant; is that correct?
24     A.  Yes, sir.
25     Q.  And what was your role in

Page 60

1         CAMPOS
2 quantifying the damages in that case?
3         MR. PHILBRICK:  Object to form.
4     The witness may answer if he can.
5     A.  Looking at, analyzing the damages
6 that were claimed to determine if they were
7 reasonable.
8     Q.  Anything else?
9     A.  Reasonable and necessary.
10     Q.  Okay.
11     A.  That's essentially it, okay.
12     Q.  Did the remaining cases, we've been
13 through this entire list, involve your
14 deposition testimony only?
15     A.  To the best of my recollection,
16 sir, yes.
17     Q.  Of these cases listed on Exhibit 2,
18 which cases involved insurance coverage
19 claims?
20     A.  Page two, the RSR Corporation case
21 was definitely insurance.
22     Q.  Okay.
23     A.  Swan International was, I believe,
24 a captive insurance company.
25     Q.  And that's on page two, as well?

Page 61

1         CAMPOS
2     A.  The bottom of page two, yes, sir.
3 The Liverpool case on page three, the AJM
4 Meat Packing case on page three, the
5 Traveler's case on page three, Double O Meat
6 Market case on page four, St. Paul case on
7 page four, Lava Trading on page four,
8 Mount Nittany Inn and the Landec Corporation
9 versus Sorema on page four.
10     Q.  There's Sorema. On page four, at
11 the top, you mention the All American
12 Insurance Company case?
13     A.  Yes.
14     Q.  In that case were you retained by
15 the insurance company or the policyholder?
16     A.  Insurance company.
17     Q.  And in the Lava Trading case, were
18 you retained by the insurance company or the
19 policyholder to testify?
20     A.  The insurance company, by Hartford.
21     Q.  And in the Landec Corporation
22 versus Sorema, you were retained there also
23 by Sorema; is that correct?
24     A.  Yes, sir.
25     Q.  Did any of the cases listed here

16 (Pages 58 to 61)

Page 62

```
 1             CAMPOS
 2  involve the valuation of damages for
 3  construction cost?
 4      A.  Solely construction costs or
 5  construction company, none that I can recall,
 6  but there would be in several of these cases,
 7  there would be property damage, out-of-pocket
 8  expenditures that would have been incurred,
 9  that I was involved in quantifying.
10      Q.  Okay.  And by "property damage
11  expenditures," are you talking about costs to
12  repair property damage, sir?
13      A.  Repair or replace, yes.
14      Q.  Did any of the cases listed here
15  involve costs related to repair and
16  replacement of a pipeliner?
17      A.  I don't believe so.
18      Q.  Have you ever testified before in
19  any case at any time about the costs related
20  to repair and replacement of a pipeliner?
21      A.  I don't recall, sir.
22      Q.  Approximately do you know how many
23  damages reports you've produced in the last
24  five years?
25      A.  I would estimate in the last five
```

Page 63

```
 1             CAMPOS
 2  years over 80, over 100, somewhere in there.
 3      Q.  Okay.
 4      A.  That I was involved in personally,
 5  okay.
 6      Q.  Understood.  When were you first
 7  contacted about this case?
 8      A.  I believe in either late May or
 9  early June of 2005.
10      Q.  Who contacted you?
11      A.  Mr. Philbrick.
12      Q.  Do you recall what he said in the
13  first conversation with you?
14      A.  Well, he asked me to -- that he had
15  a case that he wondered whether I could
16  assist him in, in which his client had
17  prepared a claim, and that my job was to
18  analyze and review the claim from the point
19  of view of an accountant experienced in
20  working on behalf of insurance companies, to
21  see whether it was reasonable, reasonably
22  stated.
23      Q.  Do you recall what he told you
24  about the case at that time, and I'm talking
25  about the initial contact?
```

Page 64

```
 1             CAMPOS
 2      A.  Well, I think he described the
 3  background of the case and that it would
 4  involve out-of-pocket costs, you know.
 5      Q.  What did he tell you about the
 6  factual background of the case?
 7      A.  You know, involving the pipe in
 8  Massachusetts and so forth, what was set
 9  forth in the first couple of paragraphs of my
10  report.
11      Q.  Did he explain any of the legal
12  issues in the case?
13      A.  Not that I can recall, no.
14      Q.  Do you recall whether he said
15  anything else to you about the case in your
16  initial conversation with him?
17      A.  I don't recall.
18      Q.  And what did you say in response in
19  terms of being retained in the case?
20      A.  That I believe I could assist him.
21      Q.  Did you make any notes of your
22  conversation with Mr. Philbrick?
23      A.  I don't believe I did, no.
24      Q.  In your practice do you typically
25  make notes of telephone conversations, sir?
```

Page 65

```
 1             CAMPOS
 2      A.  Not normally other than, you know,
 3  the name of the person who might call and the
 4  telephone number, not any substantive notes,
 5  no.
 6      Q.  I take it from your answer, it's
 7  not your practice to do memos to the file of
 8  telephone conversations?
 9      A.  No, sir, it's not my practice.
10      Q.  As a result of this initial
11  contact, were you retained as an expert
12  witness in this case?
13      A.  Yes, sir.
14      Q.  By whom were you retained?
15      A.  By Insituform, Mr. Philbrick.
16          MR. DESCHENES:  Let's mark this
17     next, Exhibit 3.
18          (Campos Exhibit 3, document, marked
19     for identification, as of this date.)
20      Q.  Sir, you've been handed what has
21  been marked as Campos Exhibit 3, and I ask
22  you to take a moment to review the document
23  and then I'll ask you questions.
24      A.  Yes, sir.
25      Q.  Do you recognize this document,
```

Page 66

1  CAMPOS
2 sir?
3    A.  Yes.
4    Q.  What is it?
5    A.  It's a letter from Mr. Philbrick to
6 me, dated June 7, 2005, thanking me for
7 returning his call, and confirming that he
8 has retained me as a consulting expert in
9 connection with the above captioned lawsuit.
10   Q.  Do you recall receiving this
11 letter, sir?
12   A.  Yes, sir.
13   Q.  And is this among the documents
14 from your file produced in this case?
15   A.  It appears as though it is, yes.
16   Q.  And you know that from looking at
17 the Bate Stamp No. down in the bottom
18 right-hand corner, sir?
19   A.  Yes, sir.
20   Q.  And this letter is dated June 7,
21 2005, and Mr. Philbrick says to you, in the
22 first line, "thank you for returning my call
23 this morning."
24       Was this on or about the first
25 conversation -- strike that.

Page 67

1  CAMPOS
2      Does this letter memorialize when
3 you had your first conversation with
4 Mr. Philbrick?
5    A.  Well, this, I believe this is the
6 first, but it could have been the second, I
7 don't know. I believe I opened the file the
8 next day, okay.
9    Q.  And after being retained as an
10 expert what, if anything, were you asked to
11 do?
12   A.  Well, I was provided with
13 Insituform's claim submission, which were
14 several three or four binders, maybe only two
15 binders, something like that, of the claim
16 submission, voluminous documents, and I was
17 asked to review them.
18   Q.  Were you asked to review the claim
19 documents to ensure that the claim costs were
20 adequately supported by documentation?
21   A.  By documentation and/or reasonable
22 in the context of an insurance claim and from
23 the viewpoint of an accountant who normally
24 represents insurance companies.
25   Q.  Were you asked to determine what

Page 68

1  CAMPOS
2 costs would be recoverable under the
3 American Home policy?
4    A.  I don't know specifically whether
5 the word "recoverable" was part of the
6 conversation, but by inference, yes.
7    Q.  And you mentioned that you were
8 provided with Insituform's claim submission
9 which was two to four binders of documents,
10 sir?
11   A.  Yes, I believe it was a couple of
12 binders of documents, yes.
13   Q.  And did you have any understanding
14 about where those documents came from?
15   A.  I understood they came from
16 Insituform, that Insituform personnel had
17 prepared them.
18   Q.  Did you have any understanding that
19 Insituform had prepared those documents for
20 submission to another insurance company?
21   A.  To, when you say "another"?
22   Q.  Other than my client, American Home
23 Assurance Company.
24   A.  I understood that they had prepared
25 it for submission to both insurance

Page 69

1  CAMPOS
2 companies, as I understood it.
3    Q.  And I asked you about whether you
4 were asked to look at whether the costs were
5 recoverable under the American Home policy,
6 and you said that those words weren't used,
7 but by inference that's what you were asked
8 to do; is that correct, sir?
9    A.  I wasn't sure whether that specific
10 word was used, but by inference that's what I
11 was asked to do, yes.
12   Q.  How did you go about determining
13 whether the costs were recoverable under the
14 American Home policy?
15   A.  By reviewing the documentation that
16 was submitted in a manner that I would do if
17 I were representing a carrier.
18   Q.  Were you asked to look at the
19 specific policy language, sir?
20   A.  No, I was not asked to look at the
21 specific policy language, other than the
22 reference to actual costs that appears in the
23 policy.
24   Q.  And in what policy does that
25 language appear, sir?

18 (Pages 66 to 69)

Page 70

CAMPOS

1
2  A. I think I looked at the Liberty
3  policy but, again, I don't interpret
4  policies, you've got to be licensed to do
5  that and I'm not licensed to interpret
6  policies, but by custom and practice I know
7  what's to be included in a claim of this
8  sort, okay.
9  Q. But you would agree that as part of
10 your retention here, you were not asked to
11 look at whether there was coverage under the
12 policy; is that correct?
13  A. I was not asked to determine
14 whether there was any coverage under the
15 policy. If I were asked to do that, I would
16 decline to do it because I'm not qualified to
17 do that. I'm not licensed to do that.
18  Q. Understood. And you testified you
19 looked at the words "actual cost" in the
20 Liberty Policy, you remember looking at that;
21 is that correct, sir?
22  A. Yes.
23  Q. Do you recall focusing in on any
24 other language in either the Liberty Mutual
25 policy at issue in this case or the

Page 71

CAMPOS

1
2  American Home policy involved in this case?
3  A. Later on my attention was focused
4  to the reference to the Liberty policy when I
5  read, I believe, one of your memoranda or
6  cross motion, or whatever, where you refer to
7  policy language, and at that point when I
8  read that I referred to the policy.
9  Q. Okay. And do you recall
10 specifically what policy language you were
11 referred to?
12  A. It was where the insureds are
13 entitled to recover the lesser of two
14 specific repairs. I don't know the specific
15 language off the top of my head, but it
16 referred to the policy with respect to the
17 memorandum that you prepared and I was
18 focused in, in that instance, to the policy,
19 okay.
20  Q. You are referring to the Liberty
21 policy, once again, are you not, sir?
22  A. Yes, I believe. Yes, I believe
23 that was the memoranda that referred to that
24 policy, yes.
25  Q. Okay. Then is it fair to say as

Page 72

CAMPOS

1
2  part of your engagement in this case, you
3  have not focused at all on any of the
4  language in the American Home policy?
5  A. No. I looked at the American Home
6  policy but, again, I don't interpret the
7  policies. My focus is on quantifying and my
8  custom and practice, I know what should be
9  included in a claim of this sort without
10 reference to the specific wording, okay.
11  Q. So it's your testimony that based
12 on your 45 years of experience and your
13 knowledge of custom and practice, that you
14 can determine what claim should be
15 recoverable under a policy without regard to
16 the policy language?
17  A. In general the liability policies
18 and property policies, once I know the type
19 of policy that's involved, I can tell what
20 elements of expense are recoverable or not
21 recoverable, when you are trying to indemnify
22 someone for their out-of-pocket expenditures,
23 okay, and that's what I focus in on when I
24 look at this particular claim, I focused in
25 on that area.

Page 73

CAMPOS

1
2  Q. All I'm asking you, sir, though is
3  that you can do that without regard to the
4  specific policy language; is that correct?
5  A. Without the specific policy
6  language, as long as, as I testified, I know
7  the type of policy that's involved, and
8  unless there's some specific wording in the
9  policy that negates whatever I've learned in
10 the past 45 years, then that's what should be
11 recoverable.
12  Q. Okay. And I think you mentioned a
13 couple times in your previous responses that
14 you were looking at this claim from the
15 viewpoint of someone who represents insurance
16 companies; is that correct?
17  A. Yes.
18  Q. And you've also testified about
19 custom and practice and what's to be included
20 in a claim and what's not to be included in a
21 claim; is that correct, sir?
22  A. Yes, sir.
23  Q. And is that in any kind of written
24 document?
25  A. No, sir. It's been part of my

Page 74

CAMPOS

1
2 practice, I'm asked many times to, at a
3 deposition or trial, to interpret the policy,
4 I do not interpret the policy, that's left to
5 either a licensed adjuster or to an attorney
6 who are licensed to interpret the policies.
7      But when I, over the years, when
8 I've worked with the policies, I know from
9 dealing with adjusters and insurance
10 companies and attorneys what's to be included
11 and not included based on custom and
12 practice.
13   Q.  Okay. Can you tell me based on
14 your experience of working with adjusters and
15 attorneys, what is to be included in a claim
16 such as this in terms of custom and practice
17 then?
18   A.  The direct out-of-pocket
19 expenditures, to properly indemnify the
20 claimant and to exclude any overhead factors
21 that include fixed expenditures and, in
22 essence, recovering the actual costs
23 incurred. And when I said that I was hired
24 to look at it from the point of view of an
25 accountant that's worked on behalf of

Page 75

CAMPOS

1
2 insurance companies, I did not put the claim
3 together, the claim was put together and I
4 was analyzing the claim that had already been
5 compiled.
6   Q.  Thank you for the clarification.
7 The four things that you just mentioned, the
8 elements being "direct out-of-pocket
9 expenses," I think you also testified to
10 "properly indemnify the claimant," "exclude
11 any overhead factors that include fixed
12 expenditures," and then the fourth thing you
13 testified to was "recovering the actual costs
14 incurred."
15      Can you think of anything else that
16 should be included in a claim like this, or
17 excluded, based on custom and practice in the
18 industry as you understand it?
19   A.  Not off the top of my head as I sit
20 here today. That's essentially it. That's
21 the majority of the elements that should be
22 included.
23   Q.  Just talking generally now, not
24 about the specific facts of this case, when
25 you are talking about, you testified about

Page 76

CAMPOS

1
2 recovering the actual costs incurred, do you
3 typically look at whether those costs are
4 reasonable and necessary?
5   A.  I look at them, I look at the
6 documentation. I don't determine and can't
7 determine whether they are, let's say,
8 whether somebody could have saved $0.10 by
9 going someplace else, that's not the focus of
10 my attention, whether I'm representing an
11 insurance company or, in this particular
12 case, critiquing a claim prepared by a
13 policyholder. That's not part of my
14 assignment, okay.
15   Q.  So it is not part -- strike that.
16      We're just talking generally, not
17 about the specific facts of this case.
18   A.  I understand.
19   Q.  In an engagement it is not part of
20 your assignment to determine whether costs
21 could have been saved by using a cheaper
22 alternative method; is that correct, sir?
23   A.  That's correct, or whether as you
24 asked the question earlier, whether they are
25 necessary, that is usually not something that

Page 77

CAMPOS

1
2 I get involved in as to whether they are
3 necessary or not necessary. That's not part
4 of my assignment.
5   Q.  Okay. Is it fair to say, sir, that
6 it's not part of your assignment to look at
7 whether the costs are reasonable or not?
8   A.  It is -- no. Part of my assignment
9 is to determine whether they were reasonable
10 vis-a-vis indemnifying a person for their
11 out-of-pocket expenditures, that part of it
12 is part of my assignment.
13      And the reasonableness is what I
14 testified earlier, the things that you just
15 mentioned, make sure it doesn't include items
16 that are not part of the actual expenditures.
17   Q.  But as part of your assignment, you
18 already testified that you don't look at
19 whether something could be done in a less
20 expensive way; is that correct, sir?
21   A.  Whether or not they could save
22 $0.10 by going someplace else, yes.
23   Q.  Or $0.50?
24   A.  Yes.
25   Q.  On the dollar; is that correct,

20 (Pages 74 to 77)