Page 78

1          CAMPOS

2 sir?

3     A.   Well, your presumption is that

4 someone could save $0.50 on a dollar. No,

5 I'm saying that's not part of my assignment,

6 but what I did say was, in answer to the

7 question of reasonableness, as to whether the

8 claim is reasonable, I look at it from the

9 point of whether it's reasonable or not, in

10 connection with determining whether or not

11 the claimed items represent actual costs

12 incurred, not whether they could save some

13 money by going someplace else.

14     **Q.   So is it fair to say that you**

15 **simply take those numbers that are given to**

16 **you by the insured and look at those numbers,**

17 **but you do not ask whether those numbers**

18 **could have been lower or higher, sir?**

19     A.   By using some other vendor, no.

20     **Q.   Correct.**

21     A.   That's not part of my assignment no

22 matter who I'm representing, insurance

23 company or in this particular case.

24     **Q.   Once again, talking generally, not**

25 **specifically about the facts of this case, is**

Page 79

1          CAMPOS

2 **it part of your assignment to look at whether**

3 **a party could have mitigated its costs in any**

4 **particular way?**

5     A.   Part of my assignment in general

6 covers mitigation depending on the facts and

7 circumstances in the case, yes.

8     **Q.   So you do look at whether a party**

9 **has made efforts to mitigate its loss; is**

10 **that correct, sir?**

11     A.   In certain instances that's part of

12 my assignment and/or measuring the mitigation

13 dollars.

14     **Q.   Did you do that with respect to**

15 **this particular claim?**

16     A.   No, sir. That wasn't part of my

17 assignment.

18     **Q.   You were not asked to look at**

19 **whether Insituform had mitigated its loss in**

20 **this particular case; is that correct?**

21     A.   That's correct, or whether it could

22 have.

23     **Q.   That was not part of your**

24 **assignment in this particular case; is that**

25 **correct, sir?**

Page 80

1          CAMPOS

2     A.   That's correct.

3     **Q.   Is that something you were capable**

4 **of doing in this case?**

5     A.   I don't -- I'd have to understand

6 the facts and circumstances before I could

7 answer that question, I don't know.

8     **Q.   The facts and circumstances**

9 **surrounding the claim, sir?**

10     A.   Surrounding any potential

11 mitigation efforts, okay.

12     **Q.   Okay.**

13     A.   I'd have to understand the facts

14 and circumstances relative to what the

15 potential mitigation is to determine whether

16 I would be capable of doing that, okay.

17     **Q.   But just to be clear, you were not**

18 **asked to look at any areas in which**

19 **Insituform could have mitigated its damages**

20 **in this case; is that correct, sir?**

21     A.   That's what I testified to,

22 correct.

23     (Campos Exhibit 4, document, marked

24     for identification, as of this date.)

25     **Q.   I've handed to you what's been**

Page 81

1          ·CAMPOS

2 **marked as Campos Exhibit No. 4.**

3     **Do you recognize this document?**

4     A.   I recognize the document as being a

5 letter that was apparently sent to me on

6 June 16, 2005, that was part of my file, from

7 Mr. Kelley of Insituform.

8     **Q.   Do you recall receiving this**

9 **letter?**

10     A.   Specifically no.

11     **Q.   And is this letter among the**

12 **documents from your file that have been**

13 **produced in this case?**

14     A.   Yes.

15     **Q.   Who is Mr. Kelley?**

16     A.   He was general counsel of

17 Insituform.

18     **Q.   Did you have any conversations with**

19 **Mr. Kelley prior to your receipt of this**

20 **letter?**

21     A.   I don't recall, sir.

22     **Q.   And at the last sentence of the**

23 **third paragraph, do you see where it says "as**

24 **we will be asking you to detail your findings**

25 **for Monday this week to assist in documenting**

21 (Pages 78 to 81)

Page 82

1      CAMPOS
2 the recoverable, but not yet adequately
3 documented costs. I" -- it says -- "I though
4 this package would be useful."
5      I think he meant "I thought," but
6 it says "I though."
7      Do you see that sentence sir?
8   A.  Yes.
9   Q.  Did I read it correctly?
10   A.  Yes, you did read it as "though."
11   Q.  As of June 16, 2005, which is the
12 date of this letter, were some costs not
13 adequately documented?
14   A.  Yes.
15   Q.  Do you recall generally what those
16 costs were?
17   A.  Well, when I first received the
18 claim, and the June 16th date may be before
19 or after, but I do recall the claim being as
20 high as $9 million, and it may not have been
21 the one that I got in June of '05, but
22 included in those costs were some corporate
23 overhead and some other factors that I
24 indicated would not be recoverable, and to
25 the extent that I wanted further

Page 83

1      CAMPOS
2 documentation on certain things, I requested
3 it at that point.
4   Q.  Is your memory that at that time,
5 June 2005, the claim may have been as high as
6 $9 million; is that correct, sir?
7   A.  No, that's not what my testimony
8 was. It was at some point in time it was as
9 high as 9 million. It may not have been in
10 June of '05 because it wouldn't have maybe
11 all of Phase II included at that point, but
12 what was submitted to Liberty did have, or
13 what I saw included corporate overhead of
14 over a million dollars.
15      That was one of the factors that I
16 indicated would not be recoverable under this
17 type of policy in my experience.
18   Q.  Do you recall what other costs were
19 not adequately documented at that time.
20   A.  Not off the top of my head, but
21 most of it was overhead or corporate overhead
22 of some type, and there were other
23 expenditures that, and I don't recall which
24 they were, that I wanted to see documentation
25 on rather than just the claim amount, okay.

Page 84

1      CAMPOS
2   Q.  Do you recall approximately how
3 much of those costs that, in your view, at
4 this time were not adequately documented?
5   A.  No, sir.
6   Q.  And focusing, again, on the last
7 sentence of the third paragraph, do you know
8 what Mr. Kelley means by "recoverable"?
9   A.  Well, what I thought he meant was
10 not recoverable under the terms of the policy
11 or under normal circumstances in the
12 insurance world, okay.
13   Q.  And by "policy," do you mean the
14 American Home policy?
15   A.  Yes, sir.
16   Q.  Did you play any role in
17 determining what costs were recoverable under
18 the American Home policy?
19   A.  That was the purpose of my review,
20 my critique was to determine what would be
21 recoverable, yes.
22   Q.  But you don't recall looking at any
23 specific policy language in the American Home
24 policy; isn't that correct?
25   A.  I do recall looking at the policy,

Page 85

1      CAMPOS
2 I don't recall the specifics, what page or
3 paragraph, but I do recall looking at the
4 policy, yes.
5   Q.  Do you recall anything about the
6 language of the policy at this time?
7   A.  It was a typical insurance
8 liability policy that I'm accustomed to
9 seeing in my practice.
10   Q.  What were the sources of
11 information you considered regarding this
12 case, sir?
13   A.  Well, the foundation to it was the
14 claim that was prepared by Insituform, and
15 based on the specific elements of the claim
16 there was underlying documentation that was
17 included in the binders that supported that,
18 the amounts that appeared in the summary, and
19 beyond that, to the extent that there wasn't
20 or to the extent that I had a question about
21 the recoverability of an item, I raised the
22 question to the personnel at Insituform.
23   Q.  Were you provided these documents
24 by Insituform?
25   A.  I believe they came directly from

22 (Pages 82 to 85)

Page 86

1        CAMPOS
2 Insituform, yes.
3     Q.  Okay.  And it's your testimony that
4 you received at or around the time of your
5 engagement two to four binders of material,
6 sir?
7     A.  I received several.  I received two
8 to four on a couple of occasions.  I believe
9 the first one I received only included
10 Phase I, then later on it included Phase I
11 and Phase II, but it included some things
12 that I felt were not recoverable and changes
13 were made to the claim from the 9 million
14 down to the 7 million that's part of, that's
15 referred to in my report.
16        And most of that reduction was due
17 to the comments that I made with respect to
18 recoverability of elements of the claim.
19     Q.  Do you know whether the material
20 that was provided to you was identical to the
21 material that was provided to Liberty Mutual?
22     A.  I do not know whether it was
23 identical.  It was represented to me that it
24 was, at the early stages, what was provided
25 to Liberty Mutual, and I believe that the

Page 87

1        CAMPOS
2 dollars that I saw, the total dollars matched
3 the total dollars referred to in some Liberty
4 communications.
5     Q.  Do you understand that Insituform
6 has also submitted an insurance claim to
7 Liberty Mutual with regard to this claim?
8     A.  I'm sorry, I didn't hear the
9 question.
10     Q.  Let me repeat it.  Do you
11 understand that Insituform has also submitted
12 an insurance claim to Liberty Mutual
13 concerning the MWRA claim?
14     A.  I thought that's what -- I'm
15 confused, I thought that's what we were
16 talking about.
17     Q.  We are.
18     A.  They submitted the claim to
19 Liberty Mutual in an amount, I don't recall,
20 but it's in my work, in my file, about
21 $6 million or something like that, but I
22 think it only included Phase I.
23     Q.  And you understand when I say the
24 "MWRA claim," we're talking about the
25 Massachusetts Water Resources Authority?

Page 88

1        CAMPOS
2     A.  Yes.  But since you inserted that,
3 I thought maybe you had some other -- I
4 wanted to make sure I got the record
5 straight.
6     Q.  Right.  And I may use that term
7 "MWRA claim" throughout this deposition, I
8 just want to make sure we understand we're
9 talking about the same thing?
10     A.  Agreed.
11     Q.  Okay.  Did you understand that
12 Liberty Mutual provided the primary coverage
13 in this case?
14     A.  The underlying coverage, yes.
15     Q.  And do you understand that
16 American Home provided excess coverage?
17     A.  Yes, sir.
18     Q.  Did you have any personal
19 involvement in submitting the claim to
20 Liberty Mutual?
21     A.  No, sir.
22     Q.  Were you provided with a summary of
23 the costs submitted to Liberty Mutual?
24     A.  I was given binders and I was told
25 it represented what was provided to

Page 89

1        CAMPOS
2 Liberty Mutual, and the total tied in to what
3 Liberty Mutual referred to.
4     Q.  Did you have any issues or concerns
5 with the costs that were submitted to
6 Liberty Mutual?
7        MR. PHILBRICK:  Objection, asked
8     and answered.  The witness may answer
9     again.
10     A.  I did, yes.
11     Q.  Can you tell me what your issues
12 and concerns were?
13     A.  There was corporate overhead
14 included in there that, I commented on, would
15 not be recoverable.
16     Q.  Can you think of any other issues
17 or concerns that you had with the costs that
18 were submitted to Liberty Mutual?
19     A.  Well, there were some fixed
20 expenses that were included in certain
21 categories of the claim that I felt would not
22 be recoverable.  Essentially it would be the
23 same comments I have in my report and as they
24 apply to the Liberty Mutual claim, they would
25 be the same.

23 (Pages 86 to 89)

Page 90

1          CAMPOS
2    Q.  You mentioned the same comments
3 that you made in your report, are you
4 referring to the report that you prepared in
5 this case with regard to the claim against
6 American Home?
7    A.  Yes, sir.
8    Q.  Can you tell me what documents you
9 considered in this case in formulating your
10 opinions?
11        MR. PHILBRICK:  Objection, asked
12    and answered.  The witness may answer
13    again.
14    A.  I reviewed ultimately the four
15 large binders that had the claim and
16 supporting documentation to it that I
17 reviewed, along with the two policies.  I
18 looked at, I believe, an affidavit from
19 Mr. Kelley relative to the Liberty Mutual
20 policy or settlement.
21        I looked at a motion that was
22 prepared by yourself, I think, or your firm
23 relative to the issues in this case.  I
24 requested certain information from
25 Insituform, and obtained it.

Page 91

1          CAMPOS
2    Q.  What kind of information did you
3 request from Insituform?
4    A.  Information with respect to
5 attempting to analyze the elements of the
6 burden or overhead to determine fixed versus
7 variable.  There was an ongoing process.
8        As I said, I looked at a couple of
9 other binders before and my critique was
10 ongoing, and as I was critiquing Insituform
11 was making changes, majority of them
12 downward, in arriving at the four ultimate
13 binders that were produced in this case.
14    Q.  Okay.  Do you have copies in your
15 office of the binders that were originally
16 given to you in this case?
17    A.  I may have, yeah.
18    Q.  Do those binders include costs as
19 you've testified to that were excluded from
20 the claim that was ultimately presented in
21 this case?
22    A.  Claim costs, yeah.
23    Q.  Okay.  You've testified about a
24 bunch of different categories of materials
25 and documents that you considered in

Page 92

1          CAMPOS
2 formulating your opinion in this case.  Can
3 you think of any other documents or materials
4 that you considered in formulating your
5 opinions in this case?
6    A.  Deposition transcripts of
7 Mr. Mangels and Mr. Porzio and related
8 exhibits.  I can't recall anything else off
9 the top of my head as I sit here today.
10    Q.  Did you review the deposition
11 transcripts of Mr. Mangels and Mr. Porzio?
12    A.  Yes, sir.
13    Q.  As well as the related exhibits?
14    A.  Yes.
15    Q.  Did Insituform ever fail to provide
16 you with any documents or information that
17 you requested?
18    A.  I wouldn't say they "failed to
19 provide me."  What happened was, I guess I
20 was dealing with Mr. Campanile who left the
21 firm, left Insituform, and he was the person
22 who was my contact to get information,
23 there's only one area that, very minor area
24 of where there may be some fixed expense
25 included in the claim that I didn't get

Page 93

1          CAMPOS
2 information on, that sort of fell through the
3 cracks, but not that it was a refusal to give
4 me the information, okay, as time passed it
5 just didn't happen, okay.
6    Q.  Okay.  Is your investigation now
7 complete?
8    A.  No, it's still ongoing.  There's
9 still some areas that we're working on right
10 now.
11    Q.  If it's not complete, what else do
12 you plan to do?
13    A.  Well, with respect to the closeout
14 costs, for example, I'm expecting Mr. Mangels
15 to provide me with underlying documentation
16 for the estimates that are included in the
17 claim, and I expect I might have that within
18 a week, and preliminary indications are that
19 the estimated claim closeout costs of, I
20 believe, were 240,000, might come down to
21 slightly over 200,000.
22        Another area we're working on is
23 trying to determine the costs before
24 December 31st and after December 31st, and do
25 a quantitative analysis and then do a

24 (Pages 90 to 93)

Page 94

1         CAMPOS
2 qualitative analysis, from an operational
3 point of view, to determine what costs were
4 incurred prior to this date and after this
5 date for Phase I.
6     Q.  Are you talking about December 31st
7 of 2003, sir?
8     A.  Yes, sir.  Sorry.
9     Q.  So you are trying to go back and
10 look at what costs were incurred prior to
11 December 31st, 2003 and what costs were
12 incurred after that date with respect to
13 Phase I repairs; is that correct, sir?
14     A.  Yes.
15     Q.  Why are you doing that?
16     A.  At the request of counsel, based on
17 some of the written documentation that I've
18 seen in this case, okay.  We're in the
19 process of doing that quantitatively and then
20 from a qualitative point of view, operational
21 point of view to determine, to answer
22 counsel's question, okay.
23     Q.  Sure.  Sir, did you request to do
24 that analysis of looking at the costs prior
25 to and after December 31, 2005?

Page 95

1         CAMPOS
2     A.  You mean me as opposed counsel?
3     Q.  Yes.  Did that come from your
4 initiative or did they ask you to do that?
5     A.  It was a conversation that was
6 held, me and counsel, with respect to I think
7 it was one of your motions, and reading that,
8 what evolved was a joint effort of doing this
9 together, okay.
10     Q.  I see.  You mentioned in your
11 answer in analyzing the costs prior to and
12 after December 31, 2003, doing both a
13 quantitative analysis and a qualitative
14 analysis from an operational point of view;
15 is that correct, sir?
16     A.  Yes.
17     Q.  Can you tell me what it means to do
18 a quantitative analysis?
19     A.  Just adding up the numbers of the
20 invoices before and after, looking at the
21 invoices themselves, not the date it was
22 paid, not the date of the invoice, but the
23 date that the service was performed or the
24 product was received or whatever, and then
25 discuss this with operational personnel

Page 96

1         CAMPOS
2 becomes the qualitative analysis, and those
3 are just terms that I thought of as I sit
4 here today.
5     Q.  Okay.  Well, you anticipated my
6 next question which is, what is a
7 "qualitative" analysis?
8     A.  Looking, talking to the operational
9 people and getting their opinions as to the
10 type of expenditure.
11     Q.  Getting their opinions about what?
12     A.  The type of expenditure and how it
13 fits into the policy terminology, along with
14 interpretation from counsel.
15     Q.  In other words, to examine the type
16 of expenditure and why it was incurred?
17     A.  I guess --
18     Q.  Is that a fair statement?
19     A.  From that point of view, yeah.
20     Q.  Up until this day, has a
21 qualitative analysis ever been done on this
22 claim by you?
23     A.  I'm not doing the qualitative
24 analysis on this.  I'm doing this -- someone
25 else -- from an operational point of view of

Page 97

1         CAMPOS
2 the company would be doing this, okay.  The
3 quantitative analysis I've done, and I've
4 done a qualitative analysis from the point of
5 view that I've determined what's recoverable
6 or not recoverable, even though I may capture
7 certain amounts, I may qualitatively decide
8 that it's not recoverable, and I've critiqued
9 that and commented on that in my report.
10     Q.  Let me just make sure I understand.
11 Prior to going back and doing this analysis
12 concerning the December 31, 2003 date, okay,
13 my question is, when you put together your
14 report in this case did you personally, not
15 Insituform, did you personally go and
16 interview personnel to determine why certain
17 costs were incurred?
18     A.  Interview which personnel?
19     Q.  Any personnel at Insituform?
20     A.  Well, I interviewed Insituform
21 personnel not to determine why they were
22 incurred -- well, it's in a sense why they
23 were incurred, but also how they were
24 incurred and how they were captured.
25     Q.  So is the answer to my question

25 (Pages 94 to 97)

Page 98

CAMPOS

1
2 "yes," you did perform that analysis --
3    A.   Yes, yes.
4    Q.   -- prior to looking at updating the
5 damages figure based on the December 31, 2003
6 date?
7    A.   Prior to issuing my report?
8    Q.   Prior to issuing your report?
9    A.   Yes, sir.  And there's one further
10 aspect that one of the comments in my report
11 was with respect to some fixed expense that's
12 included in there, I've quantified that and
13 identified a dollar amount for that.
14    Q.   And it's your testimony that work
15 is completed, sir?
16    A.   With respect to?
17    Q.   Fixed costs?
18    A.   For one element of it, of the
19 claim.  There's another element of it that
20 has not been complete that could include some
21 fixed costs, I don't know how much, if any,
22 okay.
23    Q.   And you testified that you've
24 quantified that with regard to one of the
25 elements --

Page 99

CAMPOS

1
2    A.   Yes.
3    Q.   -- is that correct, sir?
4    A.   Yes.
5    Q.   Is there in any kind of
6 documentation?
7    A.   Yes.
8    Q.   What kind?
9    A.   One piece of paper that I have in
10 my bag.
11    Q.   Okay.
12       MR. PHILBRICK:  Do you want me to
13    get it?
14       MR. DESCHENES:  Yeah, at a break.
15    You don't need to do it now.
16       MR. PHILBRICK:  Okay.
17    Q.   Is that the area that you testified
18 to previously about fixed costs falling
19 through the cracks?
20    A.   No, not really, not that area.
21 There's another area that I just testified to
22 that is a small amount, that could include
23 some fixed cost.  That is a total universe of
24 fringe benefits, that may include some fixed
25 costs, I don't know.

Page 100

CAMPOS

1
2    Q.   What area is that, sir?
3    A.   Fringe benefits.
4    Q.   "Fringe benefits"?
5    A.   Yes.
6    Q.   And is that a part of the labor
7 burden or equipment burden or both?
8    A.   Payroll burden.
9    Q.   "Payroll burden."
10    A.   It is an insignificant part of the
11 claim.
12    Q.   Is that the part that has been
13 already quantified by you, the payroll
14 burden, fringe benefits?
15    A.   I've quantified the universe of
16 what could be, could include fixed, yes, I've
17 quantified that.  But what I testified
18 earlier that says on a piece of paper, that's
19 the fixed burden that I've quantified and
20 identified as part of the equipment burden.
21    Q.   Okay.
22    A.   And in that instance I'm -- that
23 would reduce the claim by a certain dollar
24 amount.
25    Q.   Understood.  So just to clarify,

Page 101

CAMPOS

1
2 the part that you've quantified, and we can
3 look at this document at some point, if
4 counsel wants to provide it, but the part
5 that you've already quantified is the fixed
6 cost related to equipment burden; is that
7 correct?
8    A.   I believe that's it, yes.
9    Q.   And are you still working on the
10 fixed costs with respect to the payroll
11 burden?
12    A.   No, I'm not.
13    Q.   You are not?
14    A.   The total amount is as we
15 accountants would look at it, an
16 insignificant amount, and as an insurance
17 adjuster would look at it, it's an
18 insignificant amount relating to the total
19 claim.
20    Q.   And for that reason you are not
21 still working on that figure; is that
22 correct, sir?
23    A.   No, that's right.
24    Q.   Okay.  What is your understanding,
25 sir, as to why you are going back and

26 (Pages 98 to 101)

Page 102

1      CAMPOS
2 analyzing the costs prior to and after
3 December 31, 2003?
4      A.  Based on as I said earlier, a
5 motion that you had submitted to the court
6 and discussions with Mr. Philbrick,
7 subsequent to my reviewing that.
8      Q.  And what did Mr. Philbrick tell you
9 about that issue?
10     A.  He requested that we attempt to
11 quantify.
12     Q.  Did he tell you why?
13     A.  Other than the motion -- he didn't
14 tell me why, no.
15     Q.  Okay.  And you referred to the
16 "motion," what is it about the motion is your
17 understanding about the costs prior to
18 December 31, 2003?
19     A.  Your motion referred to certain
20 conditions, and I don't want to testify to
21 them and use terminology that may conflict
22 with the specifics of your motion, but that
23 motion referred to policy language, if I
24 remember correctly, and with respect to I'll
25 use the term loosely, don't hold me to this,

Page 103

1      CAMPOS
2 "repair costs," "replacement," so forth, and
3 it was based on that motion, that my reading
4 of it and discussions with Mr. Philbrick led
5 us jointly to conclude that we should do
6 this, okay, and that's what I've done.
7      Q.  And by doing this, doing this
8 analysis of the costs incurred prior to
9 December 31, 2003, are you looking at whether
10 those costs are not recoverable, in other
11 words, under the policy?
12     A.  I'd have to look.  I'm at the point
13 where I don't know the answer to that
14 question until there's an operational review
15 of it, okay.
16     Q.  Okay.  But is that the reason why
17 you are looking at it?
18     A.  It could be, I don't know.  I don't
19 know the legalities of it.
20        MR. DESCHENES:  Off the record.
21        (Lunch recess taken 11:58.)
22    A F T E R N O O N   S E S S I O N
23        (Time noted:  12:49 p.m.)
24 C H R I S   C A M P O S,   resumed and
25 testified as follows:

Page 104

1      CAMPOS
2 EXAMINATION BY (Cont'd.)
3 MR. DESCHENES:
4      Q.  I think where we were before we
5 broke was, I was asking you questions about
6 what further investigation you planned to do
7 in this case, and you testified about a few
8 things.
9        Is there anything else you can
10 recall that you plan to do in terms of
11 further investigation in order to testify as
12 an expert in this case?
13     A.  Nothing further than what I
14 testified before the break.
15     Q.  And you testified before the break
16 about performing both a quantitative and
17 qualitative analysis of costs incurred prior
18 to December 31, 2003; is that correct?
19     A.  Having performed the quantitative
20 analysis, the qualitative analysis is going
21 to follow with the operational people.
22     Q.  Okay.  My question was, have you
23 completed the quantitative part of the
24 analysis?
25     A.  I think it's been done, yes.

Page 105

1      CAMPOS
2      Q.  Okay.  And do you have any
3 knowledge or information about the amount of
4 costs that were incurred prior to
5 December 31, 2003?
6      A.  No.  My partner was doing this
7 under my direction, as late as yesterday, and
8 I did not review it, I do not know.
9      Q.  Besides the things that you've
10 testified to prior to the break, have you now
11 done everything you need to do in order to
12 formulate your opinions in this case?
13     A.  Yes, I believe so.
14     Q.  And subject to the things that you
15 mentioned prior to the break, are your
16 opinions now complete and final?
17     A.  Yes.
18     Q.  Did you review any treatises or
19 journals in formulating your opinions in this
20 case?
21     A.  No, I did not.
22     Q.  Did you review the MWRA contract
23 documents in formulating your opinions in
24 this case?
25     A.  I reviewed the contract, but I

27 (Pages 102 to 105)

CAMPOS

2 wouldn't say that I did it to formulate my
3 opinions. I reviewed the contract to
4 understand it, that's all.
5    Q. So I understand, you are not
6 relying on the contract for any of your
7 opinions in this case; is that correct?
8    A. Not that I can recall, no, sir.
9    Q. Okay. But you looked at the MWRA
10 contract; is that your testimony?
11    A. Yes.
12    Q. And did you interview any
13 Insituform personnel in order to formulate
14 your opinions in this case?
15    A. Yes.
16    Q. Can you tell me who you
17 interviewed?
18    A. Mr. Nick Campanile.
19    Q. Can you spell his last name?
20    A. C-A-M-P-A-N-I-L-E.
21    Q. And my understanding is he is no
22 longer with the company; is that correct?
23    A. That's my understanding.
24    Q. When did you interview
25 Mr. Campanile?

CAMPOS

2    A. Before I issued my report and
3 during the course of my work.
4    Q. Was he your primary contact with
5 Insituform when you were working on your
6 engagement?
7    A. Yes, sir.
8    Q. Did you interview anybody else from
9 Insituform in formulating your opinions?
10    A. Well, during the course of my work,
11 I believe I had a conference call with
12 Mr. Campanile, and other personnel at
13 Insituform, I don't recall specifically their
14 names, okay.
15    Q. And this was a conference call
16 with, I take it, more than Mr. Campanile on
17 the line; is that correct?
18    A. Yes, sir.
19    Q. And at this time you cannot
20 remember who else participated in that call;
21 is that correct?
22    A. That's correct.
23    Q. And was this before or after your
24 report was issued?
25    A. I believe it was before.

CAMPOS

2    Q. Did you interview any other
3 personnel from Insituform in order to
4 formulate your opinions in this case?
5    A. I had some conversations with
6 Mr. Kelley, but they weren't in connection
7 with necessarily with my opinion, maybe some
8 clarifications or some questions that I had,
9 but essentially most of the substantive
10 questions were with Campanile.
11    Q. Do you recall what you discussed
12 with Mr. Kelley in your conversations with
13 him?
14    A. No, I do not.
15    Q. Did you take any notes of those
16 conversations?
17    A. No.
18    Q. And Mr. Campanile was your primary
19 contact at Insituform, when you had
20 conversations with him and interviewed him,
21 what kind of questions did you ask him?
22    A. In most instances it was to get
23 behind the claim amounts to support them, and
24 to question their includibility in the claim,
25 these questions along the lines of the fixed

CAMPOS

2 versus the variable type of expenses, to get
3 the actual costs incurred.
4    Q. As part of your engagement, did you
5 investigate Insituform's efforts to mitigate
6 its damages?
7    A. I think you asked me that question
8 earlier, the answer is no.
9    Q. Okay. Did you make any inquiry of
10 anybody at Insituform in that regard?
11    A. No.
12    Q. According to your report, the data
13 on the schedules was downloaded from
14 Insituform's JD Edwards System; is that
15 correct?
16    A. That's my understanding.
17    Q. What is the "JD Edwards System"?
18    A. It's a software system.
19    Q. Is it a software system for
20 accounting specifically?
21    A. Accounting for costs is what I
22 understand.
23    Q. Sir, in formulating your opinions,
24 were you ever given direct access to this
25 internal software program?

28 (Pages 106 to 109)

Page 110

1       CAMPOS
2    A.   No.  I was given access to the
3  output.
4    Q.   Okay.  Did you ever ask for
5  internal access to the software program?
6    A.   I don't believe I did.
7    Q.   Is it fair to say that the numbers
8  from the JD Edwards System are only as good
9  as the numbers that are put into the system
10 initially?
11   A.   That's I guess a fair statement
12 with respect to any computer software system.
13   Q.   And before the break I think you
14 testified that Insituform itself was
15 responsible for putting together the package
16 of costs initially; is that correct?
17   A.   Yes, sir.
18   Q.   And do you have any understanding
19 as to who put that package together
20 initially?
21      MR. PHILBRICK:  I'm going to
22   object, asked and answered.  The witness
23   may answer again.
24   A.   I believe it was Mr. Campanile or
25 people under his direction.

Page 111

1       CAMPOS
2    Q.   Okay.
3    A.   Or possibly even Mr. Kelley under
4  his direction.
5    Q.   Sure.  So you got the package of
6  materials from Insituform, did you have any
7  direct involvement in putting that package
8  together initially?
9    A.   No, sir.  I think I've testified to
10 that, I did not put it together.
11   Q.   Right.  In other cases, do you ever
12 go in and put together the damages documents
13 right from the beginning?
14   A.   Yes.  You know, it's part of my
15 assignment to do that, yes.
16   Q.   Okay.  And in this particular case
17 with regard to Insituform, did you ever
18 perform any audit of the numbers that were
19 given to you by Insituform?
20   A.   Well, the use of the word "audit"
21 can be misconstrued.  I did a review and
22 analysis, and you might in the generic sense
23 refer to it as an "audit" of the
24 documentation, to satisfy myself as to the
25 reasonableness of the data, the accuracy of

Page 112

1       CAMPOS
2  the data and its includibility.
3    Q.   Okay.  Did you ever go on-site and
4  look at their numbers on-site and look at
5  their documentation on-site to verify that
6  the numbers are the same?
7    A.   When you say "on-site"?
8    Q.   At their place of business?
9    A.   Well, they have a couple places of
10 business.  I did not go to any of the
11 locations, no.
12   Q.   Is it fair to say then that you
13 relied on the documents that were provided to
14 you from Insituform in formulating your
15 opinions?
16   A.   I used those documents as a
17 foundation for my audit and review, I didn't
18 rely on them blindly.  I audited them, made
19 changes to them.
20      As I testified to earlier, there
21 were substantial changes to the documents
22 before the claim was finally submitted, and
23 even that which was submitted I critiqued and
24 questioned the includibility of some items as
25 set forth in my report.

Page 113

1       CAMPOS
2    Q.   Do you know whether anybody besides
3  Nick Campanile was involved in assembling the
4  costs that were given to you?
5    A.   As I testified earlier, it could
6  have been other people under his direction.
7    Q.   Do you know?  I guess I'm asking if
8  you have any knowledge about the identity?
9    A.   I believe there were, but I don't
10 know who, okay.
11   Q.   Did you work with Larry Mangels at
12 all in terms of your engagement?
13   A.   I believe he may have been in a
14 conference call that I had with, and recently
15 with him in connection with documenting the
16 closeout costs.
17   Q.   Did you consult at all with
18 Tom Porzio?
19   A.   No, not that I can recall.  Unless
20 he was on a conference call.
21   Q.   Did you consult with anybody else
22 at Insituform in formulating your opinions in
23 this case?
24      MR. PHILBRICK:  Objection, asked
25   and answered.  The witness may answer

29 (Pages 110 to 113)

**Esquire Deposition Services**
**1-866-619-3925**

Page 114

1          CAMPOS
2    again.
3    A.  Other than Mr. Campanile and
4 possibly Mr. Mangels and what I may have
5 testified to, none that I can recall.
6        MR. DESCHENES:  Let's mark this as
7    the next.
8        (Campos Exhibit 5, document, marked
9    for identification, as of this date.)
10   Q.  Are you ready to go?
11   A.  Yes, sir.
12   Q.  Okay.  I would like to refer you to
13 what has been marked as Exhibit No. 5.
14       Do you recognize this document?
15   A.  The basic document, yes, I
16 recognize it.
17   Q.  And what is it?
18   A.  It's my report of May 22nd to
19 Mr. Philbrick on this matter.
20   Q.  And is that your signature on
21 page eight of the report?
22   A.  Yes, it is.
23   Q.  Did you draft this report, sir?
24   A.  The initial draft may have been by
25 Ms. Siri, with my changes or we did it

Page 115

1          CAMPOS
2 together, I don't recall.
3    Q.  Was anybody else involved in the
4 preparation of the report?
5    A.  No, sir.
6    Q.  Were there any prior drafts of this
7 report, Exhibit No. 5?
8    A.  Well, there would be working drafts
9 leading to this that may have had
10 typographical errors or changes that had to
11 be made for clarification purposes, this is
12 the final version.
13   Q.  Do you know how many previous
14 drafts there were?
15   A.  No, I do not.  And I do not
16 maintain drafts, otherwise I'd need a
17 warehouse.
18   Q.  Well, you anticipated what I was
19 going to ask you.  Do you still have those
20 drafts today?
21   A.  No, sir, and it's the policy for
22 the reason I stated, otherwise I would need a
23 warehouse to store everything.
24   Q.  Sure.  So it's your practice and
25 procedure to destroy prior drafts of a

Page 116

1          CAMPOS
2 report; is that correct?
3    A.  That's correct, sir.
4    Q.  And that's not something counsel
5 told you to do; is that correct?
6    A.  That's not something counsel or
7 anyone told me to do, that's our firm policy.
8    Q.  Okay.  According to page one of
9 your report, it states that, and I'm at the
10 last sentence of the fifth paragraph, it says
11 that your opinions are based on two things,
12 four claim binders, your review of the four
13 claim binders, and discussions with
14 Insituform's management.
15       Do you see that?
16   A.  Yes, sir.
17   Q.  Is that correct?
18   A.  Yes, sir.
19   Q.  On the table in front of us here
20 are four binders.  I will represent to you
21 they are copies of binders that were produced
22 to us by counsel, Mr. Philbrick, in this case
23 and I just ask you to take a moment, I'm not
24 going to ask you to study these binders
25 because it would take too much time, but if

Page 117

1          CAMPOS
2 you could take a look at the binders and
3 identify for me, after looking at the
4 binders, whether these are the four claim
5 binders that are referenced in your report?
6    A.  By a quick review of the beginning
7 and ending pages of the binders, it appears
8 to be the four claim binders that I reviewed
9 and are the basis for my opinion.
10   Q.  And the four claim binders that are
11 referenced in your report; is that correct,
12 sir?
13   A.  Yes, sir.
14       MR. DESCHENES:  Why don't we do
15   this, Charlie, and mark these as 6A, B,
16   C and D, does that make sense?
17       MR. PHILBRICK:  That would be fine.
18       MR. DESCHENES:  Okay.  Can we do
19   that, Court Reporter?
20       (Campos Exhibits 6A through 6D,
21   documents, marked for identification, as
22   of this date.)
23   Q.  Okay.  We've now marked the four
24 claim binders 6A, 6B, 6C and 6D,
25 corresponding with binders 1, 2, 3 and 4

30 (Pages 114 to 117)

Page 118

1      CAMPOS
2 respectively.
3        Did you rely on any other documents
4 that you reviewed in order to formulate your
5 opinions, besides 6A through 6D?
6      A.  Yes.  There were documents in my
7 claim -- in my working paper file that were
8 produced and Bates numbered, that were
9 produced to you, I relied on some of those.
10      Q.  Okay.  Can you identify based on
11 your memory right now what those documents
12 are, sir?
13      A.  The specific documents?
14      Q.  Yes, the specific documents that
15 you relied upon in reaching your opinions in
16 this case?
17      A.  There were some claim summaries,
18 there were some budgeted expenses that were
19 used to establish standard rates, among other
20 documents that I cannot recall the specifics
21 of, but they're part of the production.
22      Q.  Now, turning to Exhibit 5, which I
23 think is still in front of you, sir, which is
24 your report in this case.
25      A.  Yes, sir.

Page 119

1      CAMPOS
2      Q.  Do you intend to offer any expert
3 opinions in this case beyond what is
4 described in this report?
5      A.  Not that I'm aware of, I don't plan
6 to, no, sir.
7      Q.  So all of the opinions that you
8 plan to give in this case are contained in
9 Exhibit 5, which is your May 22nd report; is
10 that correct?
11      A.  With the one caveat of the
12 adjustment that I guess was referred to just
13 before lunch, where I've calculated the fixed
14 expense and the material burden, that would
15 be in my opinion a reduction of the claim and
16 as I look at it, the finalization of the
17 closeout costs.
18      Q.  Okay.  With those two pieces in
19 mind, which I think you testified to is the
20 equipment burden and the reduction of the
21 claim as a result of the equipment burden,
22 and the finalization of the closeout costs,
23 do you plan to offer any other opinions in
24 this case other than what is contained in
25 your report?

Page 120

1      CAMPOS
2      A.  No, not that as I sit here today
3 I'm aware of.
4      Q.  Do you plan to make any further
5 reductions to the claim in this case?
6      A.  I do not plan to make any further
7 reductions or any other changes up or down.
8      Q.  Okay.
9        MR. DESCHENES:  Let's mark this
10      next one 7.
11        (Campos Exhibit 7, document, marked
12      for identification, as of this date.)
13      Q.  Are you all set, sir?
14      A.  Yes, sir.
15      Q.  Mr. Campos, I would like you to
16 refer to what's opinion marked as Campos
17 Exhibit No. 7.
18        Do you recognize that document?
19      A.  Yes, I do.
20      Q.  What is it?
21      A.  It's my affidavit in this case,
22 dated September 6, 2006.
23      Q.  Is that your signature on the
24 second page?
25      A.  Yes, sir.

Page 121

1      CAMPOS
2      Q.  Who prepared this affidavit, sir?
3      A.  I don't recall, but whoever
4 prepared it, I read it and satisfied myself
5 as to its accuracy and executed it.
6      Q.  Well, let me ask you it
7 differently.  Did you prepare this affidavit?
8      A.  I don't recall, sir.
9      Q.  But you reviewed the affidavit for
10 its accuracy before signing it; is that
11 correct?
12      A.  Obviously I did, yes, sir.
13      Q.  And did you make any changes to the
14 affidavit before signing it?
15      A.  I don't recall.
16      Q.  And you signed this affidavit under
17 the pains and penalties of perjury.
18        Do you see that?
19      A.  Yes, sir.
20      Q.  Can you turn to paragraph four?
21      A.  Yes, sir.
22      Q.  Let me just read it into the
23 record.  It says "assuming that the
24 American Home policy provides coverage for
25 the MWRA claim, and as explained and

31 (Pages 118 to 121)

Page 122

CAMPOS

2 qualified in my report, the total amount of
3 recoverable loss is $7,398,299.05, which is
4 Insituform's actual cost to remove and
5 replace the installed pipe; American Home's
6 share of the recoverable loss is
7 $6,398,299.05 as explained and qualified in
8 my report. The opinions in my report are
9 based on a reasonable degree of accounting
10 certainty."
11       Did I read that correctly, sir?
12    A. Yes.
13    Q. Do you still believe, sir, that the
14 statement in paragraph four is true and
15 accurate today?
16    A. It's the basis of it is true and
17 accurate. As I said, subject to the comments
18 in my report and subject to the adjustment
19 that I mentioned prior to the lunch break,
20 which would reduce the claim by that amount
21 of that adjustment.
22    Q. Okay. That is not still your
23 opinion today that Insituform is entitled to
24 recover $6,399,299.05 from American Home in
25 this case and not a penny less; is that

Page 123

CAMPOS

2 correct, sir?
3    A. Not 6.398 million, but 6.398
4 minus -- you have my schedule -- I think it's
5 $380,000, and minus an adjustment for the
6 closeout cost of some 60 some thousand
7 dollars.
8    Q. And are there any other adjustments
9 you would like to make to the total cost that
10 Insituform is claiming in this case?
11    A. No, sir, there's nothing of any
12 significant nature that has to be adjusted.
13    Q. And I think you testified before
14 that in connection with your opinion, you
15 made no analysis about whether the
16 American Home policy provide any coverage in
17 this case; is that correct?
18    A. That is not my area of expertise,
19 coverage.
20    Q. Right.
21    A. Nor am I qualified or licensed to
22 do that.
23    Q. So in reaching your conclusions,
24 you just assumed that the policy would
25 provide coverage; is that correct?

Page 124

CAMPOS

2    A. That's correct, and I've so stated,
3 I believe as you read in my affidavit, that's
4 what I stated.
5    Q. Well, let me ask you something else
6 about your affidavit. You say "as explained
7 and qualified in my report."
8       Do you see that?
9    A. Yes.
10    Q. What did you mean by that
11 statement?
12    A. As to that, that modifies the
13 recoverable loss. In my report I indicated
14 there was some fixed expense in there and, as
15 I testified earlier, I believe now that has
16 to be adjusted downward, and I also said in
17 my report that the estimates, that the
18 closing costs are estimates of future costs,
19 and I have not reviewed any supporting
20 documentation to date.
21    Q. Well, sir, when you signed the
22 affidavit, you believed that those fixed
23 costs were not properly includable in the
24 claim at that time, didn't you?
25    A. Yes, and I was in the process of

Page 125

CAMPOS

2 analyzing those at the time, okay.
3    Q. Yeah, I understand. So at the time
4 you signed the affidavit, isn't it true, sir,
5 that you did not believe that Insituform was
6 entitled to the full amount of the
7 $6,398,299.05 that's listed in your
8 affidavit?
9       MR. PHILBRICK: Well, his affidavit
10    doesn't say --
11       MR. DESCHENES: You can object.
12       MR. PHILBRICK: No, you are arguing
13    with the witness. His affidavit doesn't
14    say that, I object to form.
15       MR. DESCHENES: Off the record.
16       (Off-the-record discussion held.)
17       (Record read.)
18    A. When I signed the affidavit, as I
19 said in my affidavit, it was that amount as
20 explained and qualified in my report and I
21 explained and qualified that there was
22 amounts that had to come out, and I have
23 brought those amounts forward voluntarily
24 myself and reduced the claim this morning, so
25 yes, they are entitled to 3 million --

32 (Pages 122 to 125)

**Esquire Deposition Services**
**1-866-619-3925**

Page 126

1        CAMPOS
2 6.398 million minus the areas that were
3 explained in my report.
4    Q.   Well, let me ask you this. In your
5 report, does it quantify the amount of money
6 for fixed expenses that you think are not
7 includable in this claim?
8    A.   It doesn't quantify it, it
9 identifies the area and I put that in my
10 report, that some adjustment has to be made
11 is what my report says.
12    Q.   I understand.
13    A.   Any reasonable person would look at
14 the two and understand that it's that minus
15 any adjustment that's necessary.
16    Q.   All right. My question is just
17 simply this, your report does not quantify
18 that adjustment; is that correct, sir?
19    A.   And I responded and testified that
20 it did not quantify it at the time.
21    Q.   Okay.
22    A.   But it identified the issue.
23    Q.   The category?
24    A.   Of fixed expense.
25    Q.   Okay. Do you want to qualify your

Page 127

1        CAMPOS
2 opinions in this case in any other way?
3    A.   In any other way other than the
4 fixed amount of the burden and the adjustment
5 that's necessary to finalize the closeout
6 costs, that is it. I also have said in my
7 report that there's the possibility of some
8 fixed in the payroll burden, the total
9 universe of which is $117,000, with in my
10 opinion is insignificant as an accountant,
11 and as someone involved in insurance
12 adjustments, it's insignificant in a
13 $7 million claim.
14        And I do not know whether what
15 part, if any, of the 117,000 would be fixed,
16 okay, unless a detailed analysis was made of
17 that.
18    Q.   And that has not been done to date;
19 is that correct, sir?
20    A.   It has not been done and is not
21 intended to be done based on the
22 immateriality of the amount.
23    Q.   Do you plan to qualify your opinion
24 at all based on the other analysis you
25 testified about this morning, which is the

Page 128

1        CAMPOS
2 analysis of the costs that were incurred
3 prior to December 31, 2003?
4    A.   My report will not, the total
5 dollars will not change, they would be just
6 categorized in different areas, that becomes
7 a coverage issue that I am not going to be
8 involved in a coverage area, okay.
9    Q.   So is the answer to my question
10 that "no," you don't plan, you, do not plan
11 to change the numbers based on your analysis
12 of what costs were incurred prior to
13 December 31, 2003; is that correct?
14    A.   As I sit here today, I do not plan.
15    Q.   Sir, you have no personal knowledge
16 about how and why the repair and remediation
17 costs were incurred in this case; is that
18 correct?
19    A.   Other than what I've read in the
20 documentation, I have no personal knowledge,
21 no. I wasn't involved, I wasn't there at the
22 time.
23    Q.   And you were not asked as part of
24 your engagement to investigate that; is that
25 correct?

Page 129

1        CAMPOS
2    A.   That's correct, that's not part of
3 my assignment to investigate the causes.
4    Q.   Now, you were also not asked to
5 analyze whether the costs are reasonably
6 related to the remediation; is that correct?
7        MR. PHILBRICK:  Object to form.
8    The witness may answer if he can.
9    A.   I think you asked me that question
10 before. I was not asked to do that in my
11 assignment.
12    Q.   Okay. That's what I'm trying to
13 establish. And so in this case you have no
14 opinion about whether the costs are
15 reasonably related to the remediation; is
16 that correct?
17        MR. PHILBRICK:  Objection to form.
18    The witness may answer if he can.
19    A.   I have no opinion as to whether
20 they are reasonably related other than the
21 collection of the data under a work order
22 that was related to the remediation, and that
23 it was put together and collected under a
24 work order, which the procedures of
25 Insituform were that once you set up a work

33 (Pages 126 to 129)

Page 130

1          CAMPOS
2 order, that everything should be charged to
3 that work order, or a "job number" let me
4 call it, instead of a "work order."
5    Q.  But as part of your charge, you
6 weren't asked to do that analysis; is that
7 correct, sir?
8    A.  To do which analysis?
9    Q.  Whether the costs are reasonably
10 related to the remediation?
11    MR. PHILBRICK: Objection to form.
12    The witness may answer.
13    A.  I think I answered that question,
14 yes, it was not part of my assignment.
15    Q.  And you were also not asked to
16 analyze whether the costs are reasonable and
17 necessary; is that correct, sir?
18    A.  That's correct.  Reasonable from
19 the point of view of an insurance claim, yes,
20 but not that they were necessary or not.
21 There was an assumption on my part, as I
22 testified several times, that the costs were
23 collected under a job number and once the job
24 number was created, in connection with this
25 job, that the costs would be collected

Page 131

1          CAMPOS
2 accordingly.
3    Q.  You were not asked to make any kind
4 of independent evaluation about whether such
5 damage figures are too high or too low; is
6 that correct, sir?
7    A.  I think you've asked me that
8 question before, I was not asked to make that
9 kind of determination, no, sir.
10    Again, I saw no incentive for
11 someone to charge more money into the claim
12 and pay it out to someone else, there's no
13 incentive for that.
14    Q.  Now, how do you know whether
15 something is reasonable if you do not look at
16 whether it could have been done in a cheaper,
17 less costly way from the perspective of an
18 insurance company, which is I think how you
19 qualified that?
20    A.  The work that's done, if for some
21 reason somebody blindly accepted an
22 overcharge from a vendor in a claim against
23 American Home, for purposes of just putting
24 it into the American Home claim, then the
25 next time they deal with the same vendor they

Page 132

1          CAMPOS
2 are going to get overcharged.  There's no
3 incentive in the real business world to do
4 that.
5    Someone may question it from the
6 point of view of second guessing, but in the
7 real world and in the course of trying to get
8 an assignment and this project done as
9 quickly as possible, you do not blindly just
10 say -- you use people that you are used to
11 working with, that you are used to knowing
12 that their numbers are accurate; I own a
13 building, I get a call from my secretary two
14 days ago, we have something to do, who should
15 I talk to, talk to so and so, they are
16 reasonable.  I don't get five quotes on it.
17    Q.  All right.  Well, let me ask you
18 the question a different way.  When you use
19 the term "reasonable," let me ask you this,
20 "reasonable" as compared to what?
21    A.  Consists of what?
22    Q.  No.  When you use the term
23 "reasonable" --
24    A.  Yes.
25    Q.  -- "reasonable" as compared to

Page 133

1          CAMPOS
2 what?
3    A.  They are "reasonable" with respect
4 to out-of-pocket costs that were incurred in
5 connection with the work that was done.  To
6 me, once you've done that and it's
7 reasonable, the Insituform incurs the
8 expense, pays it to a third-party and doesn't
9 benefit, if there's a $0.10 overcharge they
10 don't benefit from it, they would not want
11 the $0.10 overcharge or $0.50 overcharge
12 because they are going to get stuck with that
13 when they are dealing with that vendor in the
14 future.
15    So it's reasonable when you are
16 dealing with vendors that you've dealt with
17 before, to incur a charge and pay that charge
18 and continue that relationship.
19    Q.  I didn't mean to interrupt you.  As
20 part of your engagement in this case, you did
21 not go out and make any comparisons of costs
22 with other vendors; is that correct, sir?
23    A.  I did not make a comparison with
24 other vendors, if such a comparison was able
25 to be made retroactively.

34 (Pages 130 to 133)

Page 134

1              CAMPOS
2     Q.  Okay.  Well, I'm simply inquiring
3  as to what you did and didn't do in
4  formulating your opinion in this case?
5     A.  And I've responded that I believe.
6     Q.  That you did not do that; is that
7  correct, sir?
8     A.  I did not do that and I qualified
9  by saying if such an analysis would be
10 possible on a retroactive basis and be
11 accurate on a retroactive basis.
12    Q.  Okay.
13    A.  You go to a vendor and you say, can
14 you do something for me and the job is done,
15 he'll lowball it.
16    Q.  Well, are you saying that such an
17 analysis couldn't be done?
18    A.  Realistic, in retrospect?
19    Q.  Yeah.
20    A.  In retrospect it couldn't be done
21 and be accurate and be reasonable to rely on
22 it.  If I tell somebody, give me an estimate,
23 the job's been done already, give me an
24 estimate as to what you would have charged me
25 for, what is he going to do, he is going to

Page 135

1              CAMPOS
2  give me a lowball estimate, that lowball
3  estimate isn't really what he could have
4  charged two years earlier when the case was
5  going on.
6         It's not something that's worth
7  while engaging in.
8     Q.  I understand your opinion about
9  incentives, but let me ask you a different
10 question.  From the perspective of an
11 insurance company, okay, that has to pay a
12 claim, based on your testimony, if someone
13 went out, just hypothetically, and accepted
14 the first bid proposal, and ended up paying
15 an exorbitant amount for that work, is the
16 insurance company required to pay that claim?
17    A.  It all depends on was the insurance
18 company able to come in and assist in getting
19 it done cheaper or not, or whether they just
20 sat back and relied on somebody to do this,
21 and assuming there was an exorbitant amount
22 paid as to how someone would define that in
23 retrospect, okay, second guessing.  It's not
24 as simple as all that.
25    Q.  I'm just probing to find out, you

Page 136

1              CAMPOS
2  understand.
3        MR. DESCHENES:  Let me turn to the
4    next exhibit.
5     A.  Situations like that, the insurance
6  company quite often is involved in the
7  adjustment and in reviewing the costs that
8  are incurred, and why American Home, if they
9  didn't do that, why they didn't do that, I
10 don't know.
11    Q.  Are you saying, sir, that if
12 American Home was not involved, as you said,
13 in the adjustment of the claim, it has no
14 right to come in and analyze whether the
15 costs are reasonable or not?
16    A.  I didn't say that, but at that
17 point your question, their right to second
18 guess something that they could have taken
19 care of had they adjusted the loss in an
20 ongoing basis, okay, normally they go in and
21 attempt to try to assist the insured in
22 mitigating the loss.  That's what the
23 adjustment process is all about.
24        MR. DESCHENES:  Let's turn to the
25    next exhibit, Exhibit 8.

Page 137

1              CAMPOS
2        (Campos Exhibit 8, document, marked
3    for identification, as of this date.)
4     A.  Yes, sir.
5     Q.  You've probably never seen the
6  cover page, which is a letter to Kurt Mullen
7  who is an associate in my office, from
8  Charles Philbrick, but attached to this are
9  some notes, also you probably haven't seen,
10 but let me ask you, have you ever seen these
11 notes before that are attached to the cover
12 letter?
13    A.  No, sir, I don't believe I have.
14    Q.  Do you recall this conference call
15 that is identified in the notes on July 25,
16 2006?
17    A.  I recall a conference call, the
18 specific date of which I do not recall, but I
19 do recall a conference call with the parties.
20    Q.  Do you recall who participated in
21 the call?
22    A.  Well, I see --
23        MR. PHILBRICK:  Wait a second.
24    Objection.  You need to answer the
25    question without regard to the document.

35 (Pages 134 to 137)

Page 138

```
1              CAMPOS
2     A.   I do not recall all of the people
3  who were in the conference call.  I know
4  Nick Campanile was, I was and Mangels was.  I
5  don't recall of any others, okay.
6     Q.   Okay.  And as counsel instructed,
7  looking at this document, does that refresh
8  your recollection as to who participated in
9  the call?
10    A.   Well, it says Mr. Philbrick and
11 Mr. Kelley participated in the call along
12 with Mehgan Siri.  I do not recall their
13 participating in the call, but they may have.
14    Q.   Do you recall what the purpose of
15 the call was?
16    A.   No, sir.
17    Q.   On the second page of the document,
18 of the notes which is Bate stamp IOO 159.
19        Do you see that at the bottom?
20    A.   Yes.
21    Q.   It states under "Campos," do you
22 see where I am, about midway down the page?
23    A.   Yes.
24    Q.   It states "AIG will have issues
25 with payroll burden and equipment burden,
```

Page 139

```
1              CAMPOS
2  fixed costs is included in the calculation."
3        Do you see that?
4     A.   Yes.
5     Q.   Do you recall making that statement
6  during the conference call?
7     A.   No, but I did make this statement
8  in my report which preceded the conference
9  call.
10    Q.   Do you recall raising concerns
11 about fixed costs in this conference call?
12    A.   Not specifically the conference
13 call, but I do recall raising the issue of
14 fixed costs at different times to
15 Mr. Campanile.
16    Q.   This conference call took place, as
17 you mentioned, after your report was issued;
18 is that correct, sir?
19    A.   Based on the date of the letter to
20 your associate, and the date of the notes, it
21 is after my -- it's two months after my
22 report.
23    Q.   Okay.  Do you recall stating that
24 some of the costs in this claim should not be
25 included?
```

Page 140

```
1              CAMPOS
2     MR. PHILBRICK:  Could you read the
3  question back, please.
4     (Record read.)
5     MR. PHILBRICK:  Objection to form.
6     A.   I do not recall that as a matter of
7  the -- as part of the conference call, but as
8  I testified a few minutes ago, I had raised
9  that issue in my report and at different
10 times to Mr. Campanile.
11    Q.   Understood.  We've been throwing
12 around some terms like "fixed costs."  Can
13 you tell me what a "fixed cost" is from an
14 accountant's perspective?
15    A.   "Fixed cost" is a cost that you
16 would incur regardless of the activity that's
17 involved.
18    Q.   Or regardless of the claim which we
19 have at issue in this case; is that correct?
20    A.   Well, the claim or the activity
21 underlying the claim.
22    Q.   What is considered a "variable
23 cost"?
24    A.   One that would vary according to
25 the activity, according to the volume.
```

Page 141

```
1              CAMPOS
2     Q.   And in the context of this claim
3  what would be an example of a "variable
4  cost"?
5     A.   Could be supplies.  In the event
6  you had depreciation, it was based on hours
7  of usage, that would be a variable cost.
8  Materials, if they were part of the overhead.
9     Q.   In the context of this claim, what
10 would be an example of a fixed cost?
11    A.   Rent.  Insurance that doesn't vary
12 with activity.  Salaries of foremen or
13 supervisors.  Again, an expense that does not
14 vary with activity.
15    Q.   Now, according to these notes where
16 you say that "AIG will have issues with
17 payroll burden be and equipment burden," do
18 you see that?
19    A.   That is what the author of these
20 notes interpreted of the conference, yes.
21    Q.   Do you recall making that
22 statement?
23    MR. PHILBRICK:  Objection, asked
24 and answered.
25    A.   I don't recall making the specific
```

36 (Pages 138 to 141)

Page 142

1          CAMPOS
2 statement that AIG will have issues with, I
3 most likely indicated that shouldn't be part
4 of the claim. I wouldn't have referred to
5 AIG per se because AIG is the parent company,
6 as I understand, of American Home. That's
7 someone else's interpretation, okay.
8     Q. Why shouldn't it be part of the
9 claim in your opinion?
10    A. Parts of the payroll burden and
11 parts of the equipment burden, the fixed
12 portion of it as set forth in my report I say
13 should not be part of the claim, which is the
14 second bullet point under my name, well, part
15 if you count the bullet points as being
16 asterisked as part of the first.
17        And I note that the person who
18 signed, made these notes, says he needs to
19 get a copy of my report, my report would have
20 spelled those out.
21    Q. Do you know what happened as a
22 result of raising this concern with
23 Insituform?
24        MR. PHILBRICK: Object to form.
25        The witness may answer if he can.

Page 143

1          CAMPOS
2    A. Well, as I testified earlier, what
3 happened was sometime after this
4 Mr. Campanile resigned or was no longer with
5 Insituform, my primary contact, this appeared
6 my report had already gone out, nothing else
7 was done until recently in preparation for my
8 deposition where I quantified the judgment
9 that I testified earlier.
10    Q. On the same page there's also a
11 comment, that says "material cost that's
12 standard, what is difference between actual
13 and standard?"
14        Do you see that?
15    A. Yes.
16    Q. Do you recall making that statement
17 during the conference call?
18        MR. PHILBRICK: Objection to form.
19        The witness may answer if he can.
20    A. Not specifically that statement per
21 se, but reference to the fact that standards
22 were used and that there could be, that there
23 would be a difference between actual and
24 standard either up or down.
25    Q. Did Insituform ever provide you

Page 144

1          CAMPOS
2 with that information, the difference between
3 actual and standard?
4    A. Some of that was provided and
5 adjustments were made prior to this meeting
6 in my May 22nd report, okay. With respect to
7 the material, it's the actual material is in
8 the claim, the actual labor hours are in the
9 claim at a standard rate per hour or per unit
10 of material.
11        That could vary from actual. My
12 experience is when the standards are set they
13 are set to bring them within a percentage or
14 two plus or minus of the actual so, again,
15 it's an immaterial item.
16        Nothing was done, but it's not
17 material in my opinion. We're talking about
18 actual units of material use and actual hours
19 and the rates are standard.
20    Q. Do you know whether actual costs
21 are higher or lower than standard costs?
22        MR. PHILBRICK: Objection to form.
23        The witness may answer if he can.
24    A. They could be in either direction
25 but, as I testified, when they are set they

Page 145

1          CAMPOS
2 are set to approximate each other. And the
3 standards are universally used by many, many
4 companies in order to charge items during the
5 year rather than trying to figure out what
6 the actual cost is, and they are set with a
7 view toward being as close to actual as
8 possible.
9    Q. Well, in this particular case, have
10 you done any analysis of actual costs versus
11 standard accounts?
12    A. For certain elements of the claim,
13 not for the material costs, material section
14 here.
15    Q. Okay. Which elements of the claim
16 did you do that analysis for, sir?
17    A. Set forth in my report.
18    Q. Can you take a look at your report,
19 and let me know?
20    A. Well, in connection with the
21 equipment burden, the burden itself was put
22 in and adjusted Phase I by 2.25 percent and
23 Phase II by 8.82 percent downward, $10,000
24 adjustment for Phase II and a $9,600
25 adjustment for Phase I.

37 (Pages 142 to 145)

Page 146

```
1              CAMPOS
2    Q.  What page are you reading from,
3 sir?
4    A.  Page four of eight, in the second
5 paragraph under Phase I and the second
6 paragraph under Phase II.
7    Q.  This is under the subsection of
8 "equipment," sir?
9    A.  Yes, sir.
10      MR. PHILBRICK:  Have you answered
11   the question?
12      THE WITNESS:  Yes.
13      MR. PHILBRICK:  You are reading
14   your report as if you were going to say
15   something more.
16      MR. DESCHENES:  I didn't want to
17   interrupt him.
18      MR. PHILBRICK:  When you are done
19   would you just close up the report so
20   that we all understand.
21    A.  That's it.
22    Q.  So just so I'm clear then, that
23 sort of analysis was done for, the analysis
24 of actual versus standard cost was done for
25 the equipment burden, but was not done for
```

Page 147

```
1         CAMPOS
2 materials; is that correct?
3    A.  For the rate in the materials.
4    Q.  Right.
5    A.  For the burden it was done, okay.
6    Q.  Okay.
7    A.  So we understand each other, the
8 materials and the labor are actual units.
9 The only thing that's a standard is the rate
10 itself.
11   Q.  Understood.
12      MR. DESCHENES:  Let's mark this
13   next as Exhibit 9.
14      (Campos Exhibit 9, document, marked
15   for identification, as of this date.)
16    A.  Yes, sir.
17    Q.  Sir, you've been handed what's been
18 marked as Campos Exhibit No. 9.
19      Do you recognize this document?
20    A.  It's a letter, yes.
21    Q.  What is it?
22    A.  It's a letter I sent to
23 Mr. Philbrick, dated July 22, 2005.
24    Q.  And is that your signature on the
25 second page?
```

Page 148

```
1              CAMPOS
2    A.  Yes, it is.
3    Q.  And do you recall sending this
4 letter to Mr. Philbrick?
5    A.  Yes.
6    Q.  According to this letter, you were
7 asked to identify which areas of the claim
8 that have been supported and which require
9 further documentation, correct?
10    A.  Yes.
11    Q.  And as of this date, according to
12 your letter there were incurred costs
13 totaling $6,654,922; is that correct?
14    A.  Yes.
15    Q.  And as of this date, you found that
16 the claim components that were adequately
17 supported totaled $4,664,820.
18      Do you see that?
19    A.  Yes.
20    Q.  Meaning that you found
21 approximately $2 million of costs that were
22 unsupported at this time; is that correct?
23    A.  Yes, sir.
24    Q.  And on the second page, if you will
25 turn to the second page.
```

Page 149

```
1              CAMPOS
2    A.  Yes.
3    Q.  Where it states, "I understand that
4 the $434,907 of ITI labor includes both
5 direct labor and overhead, I have not been
6 provided with the details of the overhead
7 calculation, however, it is the fixed portion
8 of the overhead that will not be
9 recoverable."
10      Did I read that correctly?
11    A.  Okay.  I didn't know where you
12 were.  You are in the last full paragraph,
13 right?
14    Q.  I am in the last full paragraph.  I
15 apologize for not letting you know where I
16 was.
17      Do you see that statement in your
18 letter?
19    A.  Yes.
20    Q.  Were you ever provided with the
21 details of the overhead calculation?
22    A.  Well, this was an ongoing exercise
23 and this letter was dated July, which is ten
24 months before my final report and I was
25 provided with the details of the Insituform
```

38 (Pages 146 to 149)

Page 150

1     CAMPOS
2 labor that might have totaled some other
3 number as time went on, you know.
4     Q.  As a result of receiving that
5 information, did you make a reduction for the
6 fixed portion of the overhead, sir?
7     A.  Of the labor?
8     Q.  Yes.
9     A.  No.  Only as set forth in my May
10 report of 2006.  I think the only thing that
11 still remained open was the area that I
12 testified earlier, which was what amounted to
13 $117,000 in the final claim.
14     Q.  Which was the fringe benefits; is
15 that correct, sir?
16     A.  Yes, yes.  Potentially 117.
17     Q.  But that amount has not been
18 adjusted down because I think it's
19 inconsequential; is that correct, sir?
20     A.  It's an immaterial amount, yes.
21        MR. DESCHENES:  Let's mark this
22     next.
23        (Campos Exhibit 10, document,
24     marked for identification, as of this
25     date.)

Page 151

1        CAMPOS
2     A.  It's about one and a half percent
3 of the claim, something like that.
4        Yes, sir.
5     Q.  Have you had an opportunity to
6 review Exhibit No. 10?
7     A.  Yes.
8     Q.  Do you recognize this document?
9     A.  Yes.
10     Q.  What is it?
11     A.  It's an e-mail From Mr. Kelley to
12 me, dated February 22, 2006 which was part of
13 my production to you.
14     Q.  And do you recall receiving this
15 e-mail from Mr. Kelley?
16     A.  Yes.
17     Q.  And this is among the documents you
18 produced in this case; is that correct?
19     A.  Yes.
20     Q.  In the fourth paragraph of the
21 e-mail, Mr. Kelley states that "we believe
22 that with your tutelage from the last year
23 the claim is now both better organized and
24 justifiable than the last time around."
25        Do you see that?

Page 152

1        CAMPOS
2     A.  Yes.
3     Q.  Do you know what Mr. Kelley is
4 referring to here when he says "the last time
5 around"?
6     A.  It was an ongoing process of
7 looking at binders like this and my comments
8 and recommendations that certain items be
9 removed and, as I testified earlier, I think
10 I saw a claim of 9 million that ultimately
11 got down to 7 million, and that includes both
12 phases, but the elements were included in
13 Phase I and Phase II, so those are the
14 elements that were taken out by them based on
15 my comments.
16     Q.  By using the term "last time
17 around," he is referring to your last review
18 of the cost documentation, sir?
19     A.  Yes.
20        MR. PHILBRICK:  Objection to form,
21     foundation.
22     Q.  I'm trying to find out if he has
23 any understanding of what he means by "last
24 time around"?
25        MR. PHILBRICK:  His understanding.

Page 153

1        CAMPOS
2        MR. DESCHENES:  Right.
3     A.  My understanding would be the last
4 time I looked at the binders that were given
5 to me, that preceded the binders that were
6 now going to be sent to me.
7     Q.  What were the problems with whether
8 the claim was justifiable in the past?
9     A.  As I indicated, the significant
10 problems were the inclusion of different
11 overheads in the claim that I told them were
12 not properly includable in the claim and
13 which they took out, which was part of the
14 $9 million that I talked about.
15     Q.  Also included among the problems,
16 was fixed costs one of the items?
17     A.  Let me clarify something.  There
18 were certain line items that were the entire
19 items should come out.
20     Q.  Understood.
21     A.  There were other items that I
22 commented upon and said that included in that
23 line item, a portion of this should come out,
24 and the initial stages of taking the
25 9 million down were the line items that were

39 (Pages 150 to 153)

Page 154

1    CAMPOS
2 100 percent should come out, they didn't
3 include some of the items that a portion of
4 the line items should be taken out.
5        That required an additional
6 analysis to be made which had not been done,
7 and as I set forth in my report that neither
8 I nor Insituform had performed that.
9    Q.  Okay.  When you are talking about
10 an "additional analysis," are you talking
11 about the fixed versus variable analysis for
12 equipment burden and payroll burden, sir?
13    A.  Yes.
14    Q.  Okay.  We're done with that.
15        MR. DESCHENES:  All right.  Let's
16    take a quick break.
17        (Recess taken 1:59 until 2:06.)
18    Q.  I'm going to ask you some questions
19 about your report itself, sir.  Do you have
20 that handy in that pile there, to your right?
21 It's Exhibit No. 5.
22    A.  Yes, sir.
23    Q.  First, turning to page three which
24 is under the section "payroll."
25    A.  Yes.

Page 156

1    CAMPOS
2        MR. PHILBRICK:  I'm going to object
3    to form.  You've got to specify what
4    efforts by Insituform, what efforts by
5    Campos.  You can't just say anybody.
6        MR. DESCHENES:  I think you can say
7    "objection," Charlie, and that's it.
8    Q.  Do you understand the question,
9 sir?
10    A.  Let me have the question again.
11    Q.  Sure.  Do you know what efforts
12 were made by anyone to verify the hours spent
13 on mobilization and demobilization?
14        MR. PHILBRICK:  Objection to form,
15    compound, vague.
16    A.  I don't believe anyone took an
17 effort to verify them, but the gathering
18 process of the information was such that, in
19 my opinion, substantiated the hours, they
20 were based on the certified payroll
21 registers, the supervisors review, creation
22 of the time sheets, and the fact that the
23 hours charged to this job were less than the
24 total hours paid to the employees.  That was
25 in my opinion reasonably stated.

Page 155

1    CAMPOS
2    Q.  On page three.  Second full
3 paragraph indicates that you were unable to
4 verify mobilization, demobilization hours for
5 weeks during which Insituform's employees
6 worked on more than one job.
7        Do you see that?
8    A.  Yes.
9    Q.  That is correct, sir?
10    A.  Yes.
11    Q.  Can you explain to me why you could
12 not confirm those hours?
13    A.  I did not have available to me the
14 time sheets and that would have taken an
15 inordinate amount of time to look at various
16 time sheets for all the individuals, the time
17 sheets of which were prepared by the
18 supervisors, that is why I did not do that,
19 okay.
20    Q.  Can you tell me what efforts were
21 made to document those hours?
22    A.  What I --
23        MR. PHILBRICK:  Objection to form.
24    By whom?
25        MR. DESCHENES:  Anybody.

Page 157

1    CAMPOS
2    Q.  Have you made any efforts since
3 your report to verify hours spent on
4 mobilization and demobilization, sir?
5    A.  No, I did not, for the reasons I
6 cited; I would have had to go back to a
7 multitude of time sheets and I don't think it
8 would have been worth the effort.
9    Q.  Was it possible to calculate the
10 hours that were specifically spent mobilizing
11 or demobilization?
12    A.  They were already calculated.
13    Q.  And to verify that?
14    A.  Now, to verify it, if someone
15 thought that the collection of the data was
16 incorrect, you would have to go back to
17 various time sheets in order to do that.
18    Q.  Do you know approximately how many
19 hours are involved for a mobilization and
20 demobilization?
21    A.  Not off the top of my head, I do
22 not know.
23    Q.  Do you know what the total cost is
24 at issue, sir?
25    A.  Well, the total payroll costs.

40 (Pages 154 to 157)