CAMPOS

**Q. No, I mean with respect to just mobilization and demobilization hours?**

A. I thought that's the same question as the one before, I don't know the total amount, but it would be some small part of $800,000.

**Q. Which was --**

A. $730,000.

**Q. Okay. Let me just make sure I understand where you are reading from. What page are you on?**

A. Page two of eight.

**Q. "Two of eight." You just read from?**

A. The field-gross pay total of 704,845 and the wet-out gross pay of 24,997 would be something shy of $730,000 and that's once a small part of that would be mobilization, demobilization for working on more than one job.

**Q. Okay. Turning to page three. On page three this is where, and you've testified about this previously, where you state that certain categories of claim costs**

CAMPOS

**were fixed in nature, and that the remediation project would not have resulted in any incremental change in fixed costs.**

**Do you see that on page three?**

A. I remember the statement, but what paragraph are you on, sir.

**Q. It's the fourth full paragraph at the end?**

MR. PHILBRICK: What page?

MR. DESCHENES: Page three of eight.

A. Yes. It's next to the last sentence of the fourth paragraph.

**Q. Do you see that?**

A. Yes.

**Q. You also state here that neither Insituform nor yourself formed a fixed variable analysis of the payroll or equipment burden.**

**Do you see that?**

A. Yes, sir.

**Q. Then when you turn to the summary of your opinion on page eight, you also flag this as an issue?**

**CAMPOS**

A. That's right, and I identified the total universe in one of the schedules that I gave you just before lunch, totaling $117,000.

**Q. We'll get to the specifics of if, but I'm just trying to lay a foundation here.**

A. Well, I just want to identify it for the record.

**Q. We'll get to it, sir. On the summary page of the last page, you also flagged this as an issue.**

A. Yes, sir.

**Q. In the first full paragraph of your summary, last two sentences you say, "however, as stated above there's some claim costs which appear to be fixed in nature. The reparation project would not result in any incremental charges for the fixed costs."**

**Did I read that correctly?**

A. Yes.

**Q. Now, is it your opinion that these fixed costs are not probably chargeable to American Home in this lawsuit?**

A. Or to any claim, yes.

CAMPOS

**Q. Okay. So the fixed portion of the claim will not be recoverable in this case; is that correct, sir?**

A. Yes, and I've quantified that earlier today, yes.

**Q. Turning to payroll burden itself, on page two.**

A. Yes.

**Q. I had some questions about that. Which categories of payroll burden would you consider to be fixed in nature?**

A. The category of fringe benefits would possibly include certain fixed items, not all, all of the others are variable.

**Q. So of the categories listed on this table, or these tables I should say, because there's both a table for field-payroll and wet-out payroll, correct?**

A. Yes.

**Q. The only category which in your opinion is fixed is the fringe benefits; is that correct?**

A. That has a portion of that category that could be fixed.

CAMPOS

**Q. Okay.**

A. Not all fixed.

**Q. What about let me ask you specifically about "general liability."**

**Do you see that, sir?**

A. Yes.

**Q. As apart of its labor costs Insituform has included costs on general liability in Workers' Compensation Insurance; is that correct?**

A. Yes.

**Q. And what does "general liability" refer to?**

A. The general liability policy.

**Q. And that's a general liability policy that covers the entire company; isn't that correct?**

A. Yes.

**Q. For all regions?**

A. I assume so.

**Q. For all projects?**

A. For all work they do, yeah.

**Q. Do you consider that to be a fixed cost?**

CAMPOS

A. No, sir.

**Q. Why don't you consider that to be a fixed cost?**

A. Because the premium is based on payroll, so it's an incremental cost.

**Q. How is the premium based on payroll, by the number of hours worked or the amount of employees that the company has?**

A. By the dollar payroll.

**Q. "Dollar payroll." And the Workers' Compensation policy, that also covers the entire company; is that correct?**

A. Yes, sir.

**Q. And it covers all the employees of the company; is that correct?**

A. Yes, sir.

**Q. Again, do you consider that to be a fixed cost or variable cost?**

A. Variable cost.

**Q. Why do you consider that to be a variable cost, sir?**

A. Because Workers' Compensation insurance is always predicated on payroll.

**Q. And in both instances in this case,**

CAMPOS

**did you go and check and verify that the premiums were based on the total amount of payroll dollars?**

A. On the general liability I looked at the policy and on Workers' Comp. it's my experience, my understanding that it's based on payroll, and every policy that I've seen in my 40 plus years, it's always based on payroll.

**Q. Do you have any knowledge as to who has the Workers' Compensation?**

A. What's that?

**Q. Strike that, bad question.**

**Do you know who the Workers' Comp. carrier is, sir?**

A. No, sir.

**Q. Turning to equipment burden, which is on page three.**

A. Yes, sir.

**Q. Which categories of equipment burden, in your opinion, are fixed in nature, sir?**

A. Which are "fixed" you said?

**Q. Yes.**

CAMPOS

A. Leasing, depreciation and leased vehicles.

**Q. What about on the last bullet there, taxes?**

A. Taxes and licenses.

**Q. Are also considered fixed, sir?**

A. Yes, and yes.

**Q. What is "equipment depreciation," sir?**

A. Depreciation taken on equipment.

**Q. And you'd consider that to be in the fixed cost category; is that correct, sir?**

A. In this instance, yes, based on testimony that it is straight line depreciation, which is the depreciation is written off over specific number of years. Not all equipment depreciation is fixed.

**Q. Sometimes equipment depreciation can be done on a variable basis?**

A. Yes.

**Q. As opposed to fixed?**

A. Yes, it can.

**Q. But in this case it was done**

CAMPOS

**straight line over five to seven years?**

A. Yes, that's my understanding. That's what I considered "fixed."

**Q. And that's because the claim doesn't affect the equipment depreciation one way or the other; is that correct?**

A. The use of the equipment doesn't affect it, that's just the life of the equipment.

**Q. Right. And you also mentioned taxes and licenses as a fixed cost; is that correct?**

A. Yes.

**Q. I think you testified that leasing and maintaining the warehouse would also be considered a fixed cost, sir?**

A. Yes.

**Q. And is it because Insituform would have to pay for the rent regardless of whether the MWR claim existed?**

A. Yes.

**Q. Now, turning to the analysis that you've provided to me today -- we should just mark this as an exhibit, if that's okay with**

CAMPOS

**counsel?**

MR. PHILBRICK: Absolutely. Did you make copies?

MR. DESCHENES: Yeah, I did.

MR. PHILBRICK: Great.

(Campos Exhibit 11, document, marked for identification, as of this date.)

**Q. Have you had a chance to look at Exhibit No. 11?**

A. Yes, sir.

**Q. Now, at the top of the page there's title to the document, "Equipment Burden."**

**Do you see that, sir?**

A. Yes.

**Q. "Re: Insituform."**

**Did you prepare this document, sir?**

A. It was prepared by Ms. Siri under my direction.

**Q. Okay. And at the top of the document there are a series of numbers for parts and supplies, depreciation, equipment lease rental, taxes, licenses and insurance, other costs and then a total.**

CAMPOS

**Do you see those numbers?**

A. Yes.

**Q. Can you tell me where those numbers, where they came from?**

A. From the budget for that area, I believe for the year 2003 or 4, the total budget.

**Q. I'm sorry, are you finished?**

A. Yes.

**Q. Oh, I'm sorry. It came from a total budget, were those actual costs incurred or?**

A. Budgeted costs for the year is my recollection.

**Q. Did you ever see whether the budgeted costs matched up with the actual costs?**

A. Not for this specific exercise.

**Q. Okay. And can you describe for me what it is that you are attempting to calculate on this sheet?**

A. The percentage of the total expenditures for equipment burden that were fixed as opposed to variable.

CAMPOS

**Q. So at the top, all of those numbers are the total costs for equipment burden?**

A. Yes.

**Q. Based on a budgeted number for 2003 or 2004?**

A. Yes, sir.

**Q. And then there's a subcategory called "fixed;" is that correct?**

A. Yes, yes.

**Q. And there are three categories listed there, one for depreciation, another for equipment, lease rental and then taxes, licenses and insurance; is that correct, sir?**

A. Yes.

**Q. And then a total for fixed.**

**Do you see that?**

A. Yes.

**Q. Then one line down it says "fixed as a percentage of total." How did you arrive at that percentage, 53.26?**

A. By taking the $796,649 and dividing it by the 1,495,762.

**Q. The one number doesn't match up perfectly and that's the number for equipment**

CAMPOS

**lease rental. Do you see how the numbers at the top, it's $414,410 and then under fixed it's $393,626?**

A. Yes.

**Q. Can you explain for me why there are different numbers used there?**

A. There were certain subcategories within the general category of equipment, lease rental, one of which was a category for about $21,000 that was a variable expense and that's why it wasn't included among the fixed.

**Q. Okay. And then once you arrive at your percentage, explain to me how you calculated the number at the bottom there, $280,846.10?**

A. I took the total equipment burden that's included in the summary of my report, the last page, of $527,311.49 and multiplied it by --

**Q. You are referring now to the summary on page nine of your report, right, that's where you got that number?**

A. Of schedule one, which would be the

CAMPOS

ninth page, yes, and that's where I got the number, multiplied it by the 53 percent to arrive at $280,846.10, which I believe is the fixed portion of the equipment burden.

**Q. And is it your opinion that the claim that has been made against American Home in this case of, I'm just going to use round numbers here because it's a little bit easier, of $6.4 million should be reduced by this amount $280,846.10?**

A. Yes, sir.

**Q. Under the category "equipment lease rental," on Exhibit No. 11.**

A. Yes.

**Q. Does that include the amount of rent for the warehouse, as well?**

A. If I recall correctly, there was no amount in the budget for the warehouse, okay, or for any warehouse.

**Q. No amount in what budget, sir?**

A. The budget from which this information was derived that I testified to earlier.

**Q. Okay. Do you have that document,**

CAMPOS

**the budget?**

A. It's part of the production.

MR. PHILBRICK: That would be a "yes."

A. It would be part of the documents that were produced with a CNS Bate stamp.

MR. DESCHENES: Off the record for a moment.

(Off-the-record discussion held.)

**Q. Can you show me among the documents what you are referring to when you say "budget"?**

A. Yes, sir. It's CNS 103.

**Q. Do you mind if I walk over and just look over your shoulder?**

A. No, sir.

**Q. And it's your testimony that the amount of money spent on renting the warehouse is not part of this budget; is that correct, sir?**

A. There's a category for this. It talks about facility costs and so forth, zero in here. So if it's not in the burden, it's not in the claim the way I would look at it,

CAMPOS

okay, unless somebody shows me differently okay.

**Q. So it's your testimony that the amount of rent for the warehouse facility in Charlton, Massachusetts is not part of the claim presently; is that correct?**

A. Not part of the equipment burden calculation, right.

**Q. And, therefore, not part of the claim of costs that Insituform is seeking against American Home; is that correct?**

A. That's my understanding, yes.

**Q. Easy enough. Let's turn to the other document that you were good enough to provide me before the break, and mark it as Exhibit 12.**

**(Campos Exhibit 12, document, marked for identification, as of this date.)**

A. Yes, sir.

**Q. Have you had a chance to look at Exhibit 12?**

A. Yes, sir.

**Q. Can you describe what Exhibit 12 is**

CAMPOS

**for me, sir?**

A. It is the various elements of fringe benefit, fringe benefits that are part of a claim that are summarized on page two of eight of my report, under field payroll, 110,199 total, and under wet-out payroll of 7,118, the total of those two equals the 117,317 -- 316.78 that's on Exhibit 12.

**Q. So this document, Exhibit No. 12, just provides much more detail for those numbers; is that correct, sir?**

A. It's the detail that's part of the claim, that the numbers that appear on Exhibit 12 came from the four binders here.

**Q. Okay. And it is your -- well, let me ask it, is it your opinion that some of these costs would be considered fixed in nature?**

A. Some of them may be considered fixed. The auto for company car would be considered fixed, but there's no dollar amount there.

**Q. Okay.**

A. With respect to the others, without

CAMPOS

knowing exactly how the expenditure is incurred and without making an assumption, it would be unfair to say it's either fixed or variable. For example, the 401K matching to me would be a variable. The contribution to the union --

**Q. Can I just stop you and ask why you would consider that to be a variable?**

A. Based on payroll.

**Q. "Based on payroll"?**

A. Right.

**Q. You are assuming that these people wouldn't be working in some other capacity, the same level of hours?**

A. Well, the company would match their contribution based on a salary that they made, they may be not working or they may not be making this kind of money, but it's a variable expense no matter what, just like payroll taxes would be variable.

With regard to contribution of a union pension and welfare, if that's predicated on a dollar amount per hour, that would be a variable. When you get to the

CAMPOS

medical plans and life insurance plans, if you are talking about what happens in firms like a firm or an accounting firm, that would be fixed, but when you are talking about union workers, it could be based on hours worked.

And it would be unfair for me to just assume one way or another without getting into all of the details, and the same would be true with vacation holiday pay, etc., but when I step back and look at it, and look at the entire amount and say it's a little over 1 percent of the claim, is it worth the effort of going through this and analyzing it, in my opinion, no.

**Q. Okay. And I understand you don't think it's worth the effort and why you think that but, just so the record is clear, no analysis has been done to date of variable versus fixed costs for the items on Exhibit 12; is that correct?**

A. That's correct.

**Q. Okay. Going back to your report, turning to -- let me just ask one other**

CAMPOS

**cleanup question. Are there any other items in the claim that you would consider to be fixed in nature and, therefore, not recoverable in this lawsuit, other than what you've previously testified to?**

A. Potentially fixed would be the fringe benefits, a portion of which could be potentially fixed, there are no other items in the claim that are of a fixed nature.

**Q. Okay. Page four of your report, there is a table at the top.**

**Do you see that, sir?**

A. Yes, sir.

**Q. It's a table of different hourly rates for equipment.**

**Do you see that?**

A. Equipment burden?

**Q. Yes.**

A. Yes.

**Q. And there appears to be an $8 difference in the hourly rates used for New England and California after March 1st of '04.**

**Do you see that?**

CAMPOS

A. Yes.

**Q. Then you state on page four, a few paragraphs down, "I tested the equipment burden and determined that the rates were correctly applied to the hours worked."**

**Do you see that statement?**

A. Yes.

**Q. Where did these rates come from?**

A. The claim documentation.

**Q. Okay. Did they come from Insituform?**

A. They were part of the work order, part of the job order that had the rates were charged to the job order based on the accounting system in place at the time.

**Q. Understood. I'm just trying to find out whether these numbers came from Insituform?**

A. Yeah, yes.

**Q. "Yes," okay. And do you understand why there is that difference between New England and California of $8?**

A. There was some testimony on that by I think Mr. Porzio on why there's a

CAMPOS

difference between the rates and bringing in people to get the work done, okay.

**Q. I understand. I'm asking your understanding of it though. Do you --**

A. Go ahead.

**Q. Go ahead.**

A. I understand it's predicated on the deposition testimony.

**Q. As part of your retention and engagement in this case, did you test or evaluate the rates themselves?**

A. These aren't rates paid to people, these are hourly rates to apply to equipment burden.

**Q. I understand.**

A. And whatever I've done is set forth in these paragraphs below, okay, and what happens is I've done the testing that appears in the paragraphs on page four of my report.

**Q. Well, I guess what I'm asking is, did you form any opinion as to whether these rates are too high or too low or have any opinion about that?**

A. They are what they were, and they

CAMPOS

were charged to the claim. I see the New England crew's, the labor rate went -- the burden rate went down $9 after March 1st of '04. They were what they were.

**Q. Separate and apart from Mr. Porzio's testimony, do you have any understanding as to why the California crew was used on this job?**

A. In situations like this, it's my experience you mobilize the people using the term not in the sense of mobilization and demobilization, but you bring in people to get the work done as expeditiously as possible from wherever you can, based on where they are.

It may be you find yourself in a situation where you have someone that's ten, twenty miles away or a couple hundred miles away, but they are occupied on a different project, you can't pull them off the project to get the work done, so you bring them from wherever they are available, and that's what I assume happened here.

**Q. Okay. Do you have any opinion**

CAMPOS

**about whether it was proper in this particular claim to charge California rates as opposed to New England rates after March 1st of 2004?**

A. It was not part of my assignment to look at that, and I have no opinion.

**Q. You have no opinion one way or the other on that?**

A. Those, these are the rates that were in effect. The burden rates were in effect by the corporation and they are what they are. I have no opinion as to whether they are too high or too low.

**Q. Okay. Turning to page three of your report, sir.**

A. Yes.

**Q. It says in the second full paragraph that -- I'm sorry, strike that.**

**On the third paragraph it says that "different rates were used for the same employee."**

**Do you see that?**

A. Yes.

**Q. And in terms of payroll rates**

CAMPOS

**Insituform used different rates depending on whether the work was yard work, on-site work or mobilization, demobilization; is that correct?**

A. Yes.

**Q. Do you know why Insituform uses different rates for those activities?**

A. They were set forth in tab A. When I questioned this, I was given the explanation that they were using different rates based on the work that they did and I was referred to tab A, and there's where these differences are addressed by Insituform.

**Q. And are those rates, rates that they pay their employees in salary?**

A. It's my understanding.

**Q. They are not the rates that they charge their customers?**

A. They don't charge their customer on a cost plus basis, most of the work that they do for their customers are on a fixed price.

**Q. That's what I'm asking.**

A. Well, it's a fixed price so they

CAMPOS

charge their customer based on an estimate of what it would cost them to do the work, and add to it overhead and profit in the billing. But they don't say that, or like I would or you would, so many hours at a billing rate, that's not the way they operate normally.

**Q. That's what I'm trying to find out by asking the question. What I'm trying to determine is this is the amount they actually had to pay their employees in payroll?**

A. Yes.

**Q. As opposed to an amount they charged their customer?**

A. That's correct.

**Q. From the binders it also seems there's a page ITI AIG 000003 in the cost binders, that refers to paying employees premiums of 100 or $50 a day.**

**Do you recall that, sir?**

A. The payment of a premium, yes.

**Q. From the documents it looks like this amount amounted to about $36,000 and some change. Did you make any inquiries, sir, as to why Insituform paid a premium to**

CAMPOS

**its employees?**

A. I understood from only what I gathered from deposition testimony, okay, and discussions with Insituform personnel.

**Q. Well, did you have any understanding as to why this premium was necessary prior to reviewing the deposition transcripts in this case?**

A. In discussions with Nick, yes.

**Q. Okay. What did he tell you about why it was necessary to pay a premium?**

A. If I remember correctly, we're talking about the work being done 30 feet below ground and so forth, okay.

**Q. Do you know whether Insituform ordinarily charges its customers such premiums?**

A. It's built into their pricing structure.

**Q. I'm asking in other jobs, do you know whether Insituform customarily pays such premiums and passes that cost along to its customers?**

A. Well, again, they don't -- they do

CAMPOS

it on a fixed price so, therefore, it's included in their estimated fixed price, they pay their employees that, but it's built into their costs.

**Q. Well, let me ask you it differently then. Do you know whether Insituform has paid premiums such as 100,000 -- $100 or $50 per day to its employees on other jobs?**

A. It's my understanding that they did.

**Q. That they customarily do that?**

A. That's my understanding on similar jobs, what I might call my own terminology, "hazard duty pay," okay.

**Q. And who told you that?**

A. Told me what?

**Q. That they customarily pay premiums to their employees on other jobs?**

A. Nick Campanile.

**Q. Okay. Now, in looking at the cost documentation, it looks like D'Allessandro, it looks like D'Allessandro charged approximately $900,000 on its labor for Phases I and II?**

CAMPOS

A. When you say "pages one and two"?

**Q. "Phases I and II."**

A. Oh, "Phases I and II." What was the amount of money, sir?

**Q. $900,000?**

A. Okay.

**Q. And it also appears that Insituform had agreed to pay D'Allessandro a cost plus 15 percent for Phase I, and costs plus 9 percent for Phase II.**

A. Yes, sir.

**Q. Is that correct?**

A. That's my understanding, my recollection.

**Q. Do you know why Insituform didn't negotiate that lower rate for Phase I work?**

A. No, I do not know it, but normally you end up paying costs plus ten and ten, which would be more than 15 percent or more than 9.

**Q. Well, did you make any inquiry of Insituform as to why they didn't get the lower rate for Phase II?**

A. What lower rates?

CAMPOS

**Q. For Phase I? Excuse me, I misspoke.**

A. No, I do not.

**Q. Okay.**

A. But as I said earlier, it's lower than the normal rate of 10 for overhead and 10 for profit. That's what's normally charged by a contractor, 10 plus 10.

**Q. Do you know what other efforts were made to reduce D'Allessandro's labor costs in this case?**

A. No, sir.

**Q. Did you make any inquiry in that regard?**

A. No, sir.

**Q. Do you know what tasks D'Allessandro performed in the reparation project?**

A. Without specific reference to the documents, I don't recall.

**Q. Do you know whether Insituform could have used some of its own employees to perform some of this labor at a reduced rate?**

A. I understand there was an issue

CAMPOS

about that that was raised by, but they didn't have the personnel available and borrowed personnel from other geographic areas, plus the fact that D'Allessandro was accustomed to doing this, and was right up their alley, and on the one hand you might have saved the dollar and cost you 10 somewhere else.

**Q. In formulating your opinions in this case, did you make any inquiry in that regard?**

A. No, I did not, sir.

**Q. Okay. In your report there's mention of future estimated costs of $264,000, which is on page, it's toward the end, "closeout costs," on page seven?**

A. Yes, sir.

**Q. At the time that your report was prepared, there was no supporting documentation for these costs; is that correct, sir?**

A. That's correct, they were estimates.

**Q. And do you know what the basis of**

CAMPOS

**those estimates were?**

A. No, I do not.

**Q. Do you have any opinions about whether this number is supportable or not?**

A. This is a number that I understand from Mr. Mangels, he will be furnishing underlying documents to support this sometime within the next week.

**Q. And do you have any knowledge, I think you might have given a number earlier today, do you have any knowledge as to what the costs actually were for closeout?**

A. His ballpark number totaled 261,000 -- I'm sorry, $201,000.

**Q. Okay. So the actual closeout costs, based on your understanding, are somewhat less than the projected costs; is that correct, sir?**

A. Yes, sir.

**Q. It also appears from the cost documentation that a lot of money was spent on bypass pumping costs. Do you recall that?**

A. I recall references to that, yes.

**Q. Based on my calculations, you may**

CAMPOS

**not agree with me, it was somewhere around the neighborhood of 1.4 million for Phase I and about $300,000 for Phase II; is that correct?**

A. I don't know, sir. I don't recall, nor did I identify that in my report as being bypass costs.

**Q. Okay. You made no effort to try to just track that one individual cost?**

A. To identify bypass itself, no, sir.

**Q. Okay. Do you know what efforts were made by Insituform to mitigate those costs?**

A. Which costs?

**Q. The bypass costs?**

A. No, sir.

**Q. Do you know whether Insituform explored buying the pumps outright rather than just leasing them?**

A. I don't believe they did, but I don't recall specifically, okay.

**Q. Now, it appears that Phase II pumping was less expensive than Phase I pumping; is that correct, sir?**

CAMPOS

A. Pumping.

**Q. Yes, the bypass pumping costs were less for Phase II than Phase I?**

A. Again, I didn't identify the bypass as a separate lineup. In the documents that I have, it wasn't identified that way so I can't answer you off the top of my head or by reference to my report.

**Q. And as part of your engagement in this case, did you make any inquiry as to Insituform's efforts to reduce the costs of bypassing pumps?**

MR. PHILBRICK: Objection, asked and answered. The witness may answer it again.

A. I think you asked that earlier, but you used the word "mitigate" instead, and the answer is still the same, no.

MR. DESCHENES: Exhibit 13.

(Campos Exhibit 13, document, marked for identification, as of this date.)

A. Yes, sir.

**Q. I've handed to you what's opinion**

CAMPOS

**marked as Campos Exhibit No. 13.**

**Do you recognize this document, sir?**

A. I recognize what it is.

**Q. What is it?**

A. It's a letter from Mr. Kelley to Mr. Philbrick, Mr. Martin and myself.

**Q. Do you recall receiving this letter?**

A. No.

**Q. It appears to be among the documents that are produced from your file in this case?**

A. It was.

**Q. In the second paragraph it states, "I will call Chris Campos to explain a couple of details which did not address some of his concerns."**

**Do you see that?**

A. Yes.

**Q. What were those concerns, sir?**

A. I don't recall, I don't know what he is talking about.

**Q. Okay. Do you recall whether**

CAMPOS

**Mr. Kelley called you to explain why Insituform did not address your concerns?**

MR. PHILBRICK: Object to form. The witness may answer if he can.

A. I don't recall, sir.

**Q. Do you recall any discussions at any time with Mr. Kelley about the fact that some of your concerns were not addressed?**

A. No, I don't recall any conversations, but the fact that some of the comments that I made with respect to fixed versus variable and some of the comments I had made earlier, and ultimately in my May 22, 2006 report were not taken care of.

I presume this may be what he was talking about, I don't know.

**Q. Do you know whether Insituform was paid the full contract price for its original work on this project?**

A. I recall some reference to that, but I don't recall whether they were or not.

**Q. And would that fact whether they were paid full contract price or not have any affect on your opinions in this case?**

CAMPOS

A. No, sir.

**Q. Now, do you recall when the Phase I repairs began?**

A. I believe as set forth in my report, I didn't memorize it, but the work was performed from October 2003, beginning then.

**Q. Do you know how long the Phase I repairs took to complete?**

A. According to the reference in my report, it's through June 2004.

**Q. Between October 2003 and January 2004, had Insituform removed and replaced any of the liner?**

A. I don't recall whether they removed and replaced any of the liner specifically by that date.

**Q. During that three-month period, sir?**

A. I don't recall, sir.

**Q. Are you aware of the amount of costs that were incurred between October 2003 and January 2004?**

A. No, sir.

CAMPOS

**Q. Is that the inquiry that you mentioned that you were doing earlier -- strike that.**

**Is that the inquiry, the analysis you are performing that you testified to earlier today?**

A. It would be through December 31, 2003.

**Q. Trying to figure out and quantify the amount of costs that were incurred prior to December 31, 2003?**

A. Through that date, yes.

**Q. Do you know whether that relates to the fact that the pipe was not actually removed and replaced until after that date?**

A. I don't recall the specifics, sir, okay.

**Q. Do you recall any explanation for why you were asked to perform that analysis?**

A. I think as I testified earlier, there was some reference here --

MR. PHILBRICK: Before you go to it, give him your best recollection. If he wants to ask you to look at it that's

CAMPOS

another story.

A. The motion that you had filed is what I testified earlier, and I think that's my understanding of a discussion regarding that with Mr. Philbrick led to this.

**Q. Okay. You are referring to American Home's motion for summary judgment, sir?**

A. American Home's motion supplemental memorandum in the support of its opposition to Insituform's cross motion for summary judgment.

**Q. Okay. As a result of that did Mr. Philbrick ask you to form this analysis of costs that were incurred prior to December 31, 2003?**

A. I believe that it was a joint understanding, yes.

**Q. Okay.**

MR. DESCHENES: I'm not going to mark this because it's already been marked in Porzio, I'm just going to ask him a couple questions about it.

MR. PHILBRICK: Fine.

CAMPOS

**Q. Have you ever seen this document before, sir?**

A. I don't recall, sir.

**Q. Just for the record, it's a letter dated May 11, 2004 from Thomas Porzio to John D'Allessandro and the subject matter of the letter is "notice of completion of ITI work," and it's been previously marked in Mr. Porzio's deposition as Exhibit No. 15.**

A. To supplement my answer, I notice before you even said it that it was Porzio's exhibit and I may have seen it in reading his deposition.

**Q. Okay. According to this letter, the Phase I repairs were completed on May 11, 2004. Do you see that?**

A. That's what the first paragraph says, yes.

**Q. And do you know whether after the Phase I repairs were completed whether the bypass was removed and the pipe was put into use?**

A. No, sir.

**Q. Did you make any inquiry in terms**

CAMPOS

**of whether the pipe was used in calculating the damages in this case?**

A. No, sir.

**Q. Do you know whether Insituform made any delay cost request in connection with its Phase I work?**

A. To D'Allessandro or to whom?

**Q. To the MWRA through D'Allessandro?**

A. I don't recall.

**Q. Let me just show you a couple of documents that have also been previously marked Porzio Exhibit 16 and 17.**

A. Yes, sir.

**Q. Have you had a chance to look at Porzio Exhibit 16 and Porzio Exhibit 17?**

A. I've looked at 16, the letter, which is DO 8812 Bates No'd.

**Q. That's the letter dated June 4, 2004?**

A. Yes, from Insituform.

**Q. From Tom Porzio to John D'Allessandro.**

A. Correct.

**Q. Concerning the delay cost request?**



CAMPOS

A. I'm sorry?

**Q. Do you see the reference there to, the subject matter is "delay cost request"?**

A. Yes, I see that. And with respect to 17, essentially a one-page document which is a letter from D'Allessandro to the construction coordinator at MWRA, dated June 8, 2004, four days after Exhibit 16.

**Q. And that's a letter, looks like from Brian Albert of D'Allessandro to Michael DelPrete of the MWRA; is that correct?**

A. Yes.

**Q. It's been previously marked as Porzio Exhibit No. 17. With respect to both of these documents, sir, Porzio Exhibit No. 16 and Porzio Exhibit No. 17, have you ever seen these documents before?**

A. I believe I may have seen them in reading Porzio's exhibit, yes -- Porzio's deposition transcript, yes.

**Q. Did you see these documents before preparing your report, dated May 22, 2006?**

A. No. I think the depositions were



CAMPOS

taken before that date.

**Q. They were?**

A. Yeah, so I couldn't have seen it before I wrote my report.

**Q. Well, I was just asking whether --**

A. No.

**Q. -- you might have reviewed these documents in connection with preparing your report?**

A. No.

MR. PHILBRICK: Objection to form.

**Q. Based on the June 4th letter, which is part of Exhibit No. 16, it appears that Insituform requests that additional compensation.**

**Do you see that?**

A. Yes.

**Q. In the amount of approximately $79,000 roughly.**

**Do you see that?**

A. Yes, sir.

**Q. Do you know whether the MWRA granted this request, sir?**

A. No, I do not.



CAMPOS

**Q. Do you know whether these costs are included in the costs Insituform is seeking in this lawsuit against American Home?**

A. I would have to, in order to answer that question properly, I would have to analyze Exhibit 1 which is attached to the June 4th letter and trace those amounts to the claim documentation before I could honestly answer that question.

**Q. Now, if Insituform received additional compensation in the amount of $79,000, would that affect any of your opinions in terms of the amount recoverable against American Home in this case?**

A. Only if the elements that comprise the additional compensation are in the claim and they weren't reduced for some reason or another, it might have an affect.

**Q. If, in other words, the costs of $79,000 are included in the claim that's been presented to American Home and they have received additional, Insituform had received additional compensation in that amount, it may have an affect on your opinions in this**

CAMPOS

**case; is that correct?**

A. May have, yes.

**Q. How would it affect your opinions?**

A. How may it affect my opinion, as I said earlier, if these amounts are in the claim, and as I look at Exhibit 1, which is marked Exhibit 1 which is part of Porzio's Exhibit 16, I see a 10 percent factor added, that's not a factor that's in the claim.

In order to answer that correctly I would have to trace these amounts to the claim documentation to see, number one, that they are in there; and, number two, that there was in fact a reimbursement that was made by MWRA directly to Insituform or indirectly to Insituform.

**Q. But you would agree, if it's Insituform was already paid by MWRA for this work, it would not be appropriate for Insituform to seek compensation from American Home in this amount; is that correct?**

A. If as I said earlier, if these amounts are in fact in the claim in their

CAMPOS

entirety.

**Q. Okay. Fair enough. Let's turn to the next document that was also marked in Mr. Porzio's deposition and in Mr. Mangels deposition, so I won't mark it again unless necessary. I suspect you've never seen this before.**

**For the record, this is a letter dated March 31, 2006, from Thomas Porzio to T.J. Shea, D'Allessandro Corp., "Re: Change of Order Request," and it's been previously marked in the Porzio deposition as Exhibit 21 and in the Mangels deposition as Exhibit 5.**

MR. PHILBRICK: Do you have a copy that shows the Bate stamp at the bottom of the page, mine cuts it off?

MR. DESCHENES: It's kind of cut off generally, but it say it was ITI AIG I believe 009840.

Does that correspond with yours?

MR. PHILBRICK: That just tells me where. It's fine. Mine the code is cut off, I can't see.

A. Yes, sir.

CAMPOS

**Q. Have you had a chance to look at this document that has been marked as Porzio Exhibit 21 and Mangels Exhibit 5?**

A. Yes.

**Q. Do you recognize this document, sir?**

A. Not specifically, no, other than most likely saw it as part of the exhibit to the transcripts.

**Q. Under the subject line, it says "change order request."**

**Do you see that?**

A. Yes.

**Q. Do you know what happened as a result of this request?**

A. No.

**Q. Do you have any information about how much money was spent on this repair that's described in this letter?**

A. No, there's no quantification in the letter.

**Q. No.**

A. And I'm not aware of what was spent, if any, okay.

CAMPOS

**Q. And I assume you don't know whether this amount was included in the cost Insituform is seeking in this lawsuit against American Home; is that correct?**

A. That's correct. This is dated March 31, 2006. That's correct.

**Q. Did anyone at Insituform bring this to your attention?**

A. Not that I can recall.

**Q. If Insituform had received additional compensation in response to this request, would that fact affect any of your opinions in this case?**

A. Insituform was looking for a change order under the contract. Again, if these amounts were in the claim and if they received compensation for it then it could possibly affect my opinion.

**Q. How would it affect your opinion?**

A. If the item was in the claim and they got paid for it, it may reduce the claim, I don't know without looking at all the facts, all the circumstances behind this, okay.

CAMPOS

**Q. Okay. Done with that. What did you do to prepare for your deposition today?**

A. I met with Mr. Philbrick yesterday, spoke with Mr. Mangels over the phone, and included in part of the meeting with Mr. Philbrick was my partner Mehgan Siri, who was sitting in on parts of it, only parts of it, not all of it, and reviewed some of the documents and my report.

**Q. Do you recall which documents you reviewed?**

A. I recall reviewing the production, CNS production and basically my report.

**Q. And do you recall how long you met with Mr. Philbrick?**

A. Four, five hours.

**Q. And that was yesterday?**

A. Yesterday. And I think I also looked at Mr. Kelley's affidavit and American Home's motion.

**Q. Do you recall looking at any other documents in preparation for your deposition?**

A. I don't believe there were any others. On the table were the deposition

CAMPOS

transcripts, but I'm not sure I referred to them yesterday.

**Q. And did you have any other prior meetings with Mr. Philbrick prior to your deposition?**

A. I think we may have met several weeks ago in anticipation of my then deposition, looking at the similar documents.

**Q. Okay. Do you recall what it is you discussed?**

A. You know, just preparation for the deposition, you know, tell the truth, nothing but the truth, period.

**Q. You mentioned a conversation with Mr. Mangels. What is it that you discussed with Mr. Mangels?**

A. When he might come up with the actual costs and documentation underlying the closeout costs that we referred to earlier.

**Q. Did you discuss with him any other issues related to the case?**

A. No, sir.

**Q. Did you discuss with him the issues related to fixed versus variable costs?**

CAMPOS

A. No, sir, no other issues is what I answered.

**Q. Okay.**

MR. DESCHENES: Let me just take a few moments and see if I have any follow-up questions, Charlie, but I think I'm about done.

(Recess taken 3:16 until 3:21.)

MR. DESCHENES: From the witness's testimony it appears that Mr. Campos was provided with some binders early on in which he ferreted out certain cost items he testified about, you know, going from $9 million to $7 million.

What I don't think we have, Charlie, is the original cost information that he had in doing his analysis and ferreted out certain cost items and I would request that on the record. I can follow-up in a letter to you, as well.

The other piece of information I'd request on the record is if there is a written agreement, engagement letter of

CAMPOS

any kind between either Insituform and Mr. Campos, or your office and Mr. Campos, I'd ask for a copy of that.

MR. PHILBRICK: You already asked for that.

MR. DESCHENES: I know, I know.

MR. PHILBRICK: And you also asked for an update of his been deposed stuff, as well.

MR. DESCHENES: Yeah, I asked for that, his list of cases, I asked for an update on that, as well. And obviously to the extent Mr. Campos is going to supplement his opinion, it sounds like he is going to supplement his opinion in some fashion, we reserve the right to call him back and ask questions about supplemental aspects of his opinion.

With that, I am done.

MR. PHILBRICK: I have no questions.

-o0o-

(Whereupon, the deposition of CHRIS CAMPOS, CPA, was concluded at

CAMPOS

3:23 p.m.)

________________________

CHRIS CAMPOS, CPA

Subscribed and sworn to before me this ____ day of __________, 2007.

____________________________________

CERTIFICATE

STATE OF NEW YORK )

: ss.

COUNTY OF NEW YORK )

I, Toni Allegrucci, a Notary Public within and for the State of New York, do hereby certify:

That CHRIS CAMPOS, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 23rd day of May, 2007.

________________________

TONI ALLEGRUCCI

INDEX

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| CHRIS CAMPOS | MR. DESCHENES | 4 |

INFORMATION REQUESTS

DIRECTIONS:

RULINGS:

TO BE FURNISHED:

REQUESTS: 53, 108, 209

MOTIONS:

EXHIBITS

| CAMPOS EXHIBITS | DESCRIPTION | FOR ID. |
|---|---|---|
| Exhibit 1 | Document | 31 |
| Exhibit 2 | Document | 52 |
| Exhibit 3 | Document | 65 |
| Exhibit 4 | Document | 80 |
| Exhibit 5 | Document | 114 |
| Exhibit 6A - 6D | Document | 117 |
| Exhibit 7 | Document | 120 |
| Exhibit 8 | Document | 136 |
| Exhibit 9 | Document | 147 |
| Exhibit 10 | Document | 150 |
| Exhibit 11 | Document | 167 |

EXHIBITS CONT'D:

| CAMPOS EXHIBITS | DESCRIPTION | FOR ID. |
|---|---|---|
| Exhibit 12 | Document | 173 |
| Exhibit 13 | Document | 191 |

**A**

**ability** 7:23
**able** 37:25 133:24 135:18
**Absolutely** 167:3
**accepted** 131:21 135:13
**access** 109:24 110:2,5
**accountant** 12:7,10 13:14 14:3 19:11 29:15,18 63:19 67:23 74:25 127:10
**accountants** 15:5 24:13 101:15
**accountant's** 140:14
**accounting** 9:8 9:22 11:19 19:20 20:3,8 20:17,19,25 22:2,3,7,9,11 22:14,18,24 23:6 33:5,8 33:10,12 37:2 37:17 38:23 109:20,21 122:9 176:4 178:16
**accounts** 145:11
**accuracy** 111:25 121:5 121:10
**accurate** 52:24 122:15,17 132:12 134:11,21
**accurately** 6:25 32:4
**accustomed** 85:8 188:6
**action** 26:15 27:5 211:17
**active** 29:5,11
**actively** 28:18
**activities** 45:6 182:8
**activity** 45:7 140:16,20,25 141:12,14
**actual** 69:22 70:19 74:22 75:13 76:2 77:16 78:11 109:3 122:4 143:12,23 144:3,7,8,11 144:14,18,18 144:20 145:6 145:7,10 146:24 147:8 168:12,17 189:16 207:19
**add** 183:4
**added** 202:9
**adding** 95:19
**addition** 32:20
**additional** 154:5,10 200:15 201:12,17,23 201:24 205:12
**address** 4:10 192:18 193:3
**addressed** 182:14 193:9
**adequately** 67:20 82:2,13 83:19 84:4 148:16
**adjusted** 123:12 124:16 136:19 145:22 150:18
**adjuster** 74:5 101:17
**adjusters** 74:9 74:14
**adjustment** 119:12 122:18,21 123:5 126:10 126:15,18 127:4 136:7 136:13,23 145:24,25
**adjustments** 123:8 127:12 144:5
**advanced** 10:4
**advisement** 53:23 54:9
**advisory** 29:10
**affect** 7:22 8:3 166:6,9 193:25 201:13,19,25 202:4,5 205:13,19,20
**affidavit** 90:18 120:21 121:2 121:7,9,14,16 124:3,6,22 125:4,8,9,13 125:18,19 206:20
**Agency** 13:9 31:14 50:12
**ago** 27:13 40:7 42:11 43:2 132:14 140:8 207:8
**agree** 70:9 190:2 202:18
**agreed** 88:10 186:9
**agreement** 53:19 208:25
**ahead** 179:6,7
**AIG** 57:11 138:24 141:16 142:2 142:5,5 183:17 203:20
**AIU** 55:18 56:7 56:22,23
**AJM** 61:3
**Albert** 199:11
**alleged** 27:5 59:19
**Allegrucci** 1:23 2:9 211:7,23
**alley** 188:7
**alternative** 76:22
**American** 1:7 4:18 10:16 28:9 37:16 61:11 68:3,22 69:5,14 71:2 72:4,5 84:14 84:18,23 88:16 90:6 121:24 122:5 122:24 123:16 131:23,24 136:8,12 142:6 160:24 171:8 173:12 196:8,10 201:4,15,22 202:22 205:5 206:21
**amount** 83:25 87:19 98:13 99:22 100:24 101:14,16,18 105:3 122:2 122:20 125:6 125:19 126:5 127:4,22 135:15,21 150:17,20 155:15 158:6 163:9 164:3 171:11,16,19 171:21 172:19 173:5 174:23 175:24 176:13 183:10,13,23 186:5 194:22 195:11 200:19 201:12,14,24 202:22 205:3
**amounted** 150:12 183:23
**amounts** 85:18 97:7 108:23 125:22,23 201:8 202:6 202:12,25 205:17
**analysis** 93:25 94:2,24 95:13 95:14,18 96:2 96:7,21,24 97:3,4,11 98:2 103:8 104:17,20,20 104:24 111:22 123:15 127:16,24 128:2,11 130:6,8 134:9 134:17 145:10,16 146:23,23 154:6,10,11 159:19 166:23 176:20 195:5 195:20 196:15 208:19
**analyze** 18:8 63:18 91:5 129:5 130:16 136:14 201:7
**analyzing** 16:18 18:13 18:23,25,25 24:18 60:5

75:4 95:11 102:2 125:2 176:16
**ancient** 26:12
**and/or** 67:21 79:12
**Angeles** 5:23
**anniversary** 26:17
**answer** 6:24 7:13 8:14,19 15:11 23:22 31:5,20 34:4 37:11 38:5,16 60:4 65:6 78:6 80:7 89:8 90:12 94:21 95:11 97:25 103:13 109:8 110:23 113:25 128:9 129:8,18 130:12 137:24 142:25 143:19 144:23 191:8 191:15,19 193:5 197:11 201:5,10 202:11
**answered** 34:15 37:3 89:8 90:12 110:22 113:25 130:13 141:24 146:10 191:15 208:3
**answers** 7:2,6 7:19 21:24 23:4 25:2 52:4
**Anthony** 49:21
**anticipated** 96:5 115:18
**anticipating** 17:4
**anticipation** 207:8
**anybody** 45:11 107:8 109:10 113:2,21 115:3 155:25 156:5
**anymore** 29:5 29:12
**apart** 162:8 180:6
**apologize** 149:15
**apparently** 81:5
**appear** 69:25 160:17 174:14
**appeared** 85:18 143:5
**appears** 54:17 66:15 69:22 117:7 177:21 179:19 186:8 189:21 190:23 192:12 200:14 208:11
**applied** 178:6
**apply** 89:24 179:14
**Appreciate** 4:22
**approach** 40:12
**appropriate** 202:20
**approximate** 145:2
**approximately** 5:18 6:3 47:11 48:4 62:22 84:2 148:21 157:18 185:24 200:19
**April** 13:8
**architect** 26:23 31:16
**architectural** 49:15
**area** 9:20 11:18 15:2 17:16 20:14,16 22:4 23:23 30:8 33:4,5,7 34:8 36:25 72:25 92:23,23 93:22 99:17 99:20,21 100:2 123:18 126:9 128:8 150:11 168:6
**areas** 21:25 33:13 36:22 37:7,23 80:18 93:9 126:2 128:6 148:7 188:5
**arguing** 125:12
**arises** 37:12
**Army** 10:2 12:16,18,23 13:8,9 31:14 50:12
**arrangement** 44:10
**arrive** 169:21 170:14 171:4
**arriving** 91:12
**art** 15:16
**articles** 28:22 30:7,10,14,23 32:18,21
**asked** 25:3 36:24 39:18 39:23 43:2 50:9 63:14 67:10,17,18 67:25 69:3,4 69:7,11,18,20 70:10,13,15 74:2 76:24 79:18 80:18 89:7 90:11 109:7 110:22 113:24 128:23 129:4 129:9,10 130:6,15 131:3,7,8 141:23 148:7 191:14,17 195:20 209:5 209:8,11,12
**asking** 36:21 42:20 73:2 81:24 104:5 113:7 179:4 179:21 182:24 183:9 184:21 200:6
**aspect** 98:10
**aspects** 33:12 51:15 209:19
**assembling** 113:3
**assert** 23:16
**assignment** 76:14,20 77:4 77:6,8,12,17 78:5,21 79:2 79:5,12,17,24 111:15 129:3 129:11 130:14 132:8 181:6
**assist** 63:16 64:20 81:25 135:18 136:21
**assistant** 39:11
**assisted** 51:15
**associate** 137:7 139:20
**associated** 33:23 34:8
**Association** 5:10 12:8
**associations** 28:5,8,17
**assume** 7:13 49:25 50:18 53:23 162:21 176:9 180:24 205:2
**assumed** 123:24
**assuming** 121:23 135:21 175:13
**assumption** 130:21 175:3
**Assurance** 1:7 4:19 68:23
**asterisked** 142:16
**attached** 137:8 137:11 201:7
**attempt** 102:10 136:21
**attempting** 91:5 168:21
**attend** 8:23
**attention** 52:13 71:3 76:10 205:9
**attorney** 50:9 57:5 74:5
**attorneys** 3:5 3:11 74:10,15
**audit** 13:9 14:13 31:14 50:12 111:18 111:20,23 112:17
**audited** 112:18
**auditing** 19:20 31:15
**audits** 14:14 16:5 20:19
**August** 5:2
**author** 141:19
**authored** 30:10 30:14,23 32:20
**Authority** 87:25
**auto** 174:21

**available** 155:13 180:23 188:3
**Avenue** 2:7
**aware** 35:25 119:5 120:3 194:22 204:24
**a.m** 2:3

**B**

**B** 117:15
**Bachelor** 9:8
**back** 10:3 11:12 15:14 26:12 27:12 31:7 50:12 58:7 94:9 97:11 101:25 135:20 140:3 157:6,16 176:12,24 209:18
**background** 8:22 64:3,6
**bad** 35:18 164:14
**bag** 99:10
**ballpark** 189:14
**based** 72:11 74:11,13 75:17 85:15 94:16 98:5 102:4 103:3 116:11 118:10 122:9 127:21,24 128:11 135:12 139:19 141:6 152:14 156:20 163:5 163:7 164:3,7 164:9 165:15 169:5 175:10 175:11,17 176:6 178:15 180:15 182:12 183:2 189:17,25 200:13
**basic** 114:15
**basically** 15:10 23:18 206:14
**basis** 40:16,17 44:9 117:9 122:16 134:10,11 136:20 165:21 182:22 188:25
**Bastek** 55:19
**Bate** 66:17 138:18 172:7 203:16
**Bates** 118:8 198:18
**began** 194:4
**beginning** 12:15 21:13 111:13 117:6 194:7
**behalf** 14:17 20:22 41:16 50:24 51:6 56:10,22 58:5 58:10 63:20 74:25
**believe** 19:5 32:16 37:2,8 42:5 44:11,15 45:10 50:6,11 53:4,11 54:6 54:20 57:11 57:25 58:17 59:15 60:23 62:17 63:8 64:20,23 67:5 67:7 68:11 71:5,22,22 85:25 86:8,25 90:18 93:20 101:8 105:13 107:11,25 110:6,24 113:9,13 122:13 124:3 124:15 125:5 134:5 137:13 151:21 156:16 168:7 171:4 190:21 194:5 196:18 199:20 203:20 206:24
**believed** 124:22
**belong** 28:4,8
**benefit** 10:24 133:9,10 174:4
**benefits** 99:24 100:3,4,14 150:14 161:13,22 174:4 177:8
**Benner** 59:6
**best** 37:10 42:20 53:2 55:10 60:15 195:24
**better** 151:23
**beyond** 85:19 119:3
**bid** 135:14
**big** 27:14,22
**bigger** 27:15
**billing** 183:4,6
**binders** 67:14 67:15 68:9,12 85:17 86:5 88:24 90:15 91:9,13,15,18 116:12,13,20 116:21,24 117:2,4,5,7,8 117:10,24,25 152:7 153:4,5 174:15 183:16,18 208:12
**birth** 4:25
**bit** 23:3 171:10
**blindly** 112:18 131:21 132:9
**blood** 211:17
**board** 29:11 39:12
**boat** 27:20
**borrowed** 188:4
**Boston** 3:13
**bottom** 61:2 66:17 138:19 170:16 203:16
**bought** 18:18
**break** 31:7 36:20 99:14 104:14,15 105:10,15 110:13 122:19 154:16 173:16
**breakdown** 47:21
**Brian** 199:11
**brief** 6:15 36:20
**briefly** 4:17 23:2
**bring** 144:13 180:13,22 205:8
**bringing** 179:2
**broad** 38:3
**broke** 104:5
**brought** 125:23
**budget** 168:6,8 168:12 171:19,21,22 172:2,13,20
**budgeted** 118:18 168:14,17 169:5
**building** 132:13
**built** 184:19 185:4
**bullet** 142:14 142:15 165:4
**bunch** 91:24
**burden** 91:6 100:7,7,8,9 100:14,19,20 101:6,11 119:14,20,21 127:4,8 138:25,25 141:17,17 142:10,11 145:21,21 146:25 147:5 154:12,12 159:20 161:7 161:11 164:18,22 167:14 168:24 169:3 170:18 171:5 172:24 173:8 177:18 178:5 179:15 180:4 181:11
**business** 4:10 10:20 14:16 16:7,12,20 17:15 33:9,11 37:4,8,18,20 38:6 43:19,22 43:24 49:5 112:8,10 132:3
**buying** 190:19
**bypass** 189:23 190:8,11,16 191:3,5 197:22
**bypassing** 191:13

**C**

**C** 3:2 4:2,2 103:24,24 117:16 211:2

211:2
**calculate** 157:9 168:22
**calculated** 119:13 157:12 170:16
**calculating** 198:2
**calculation** 139:2 149:7 149:21 173:9
**calculations** 189:25
**California** 177:23 178:23 180:8 181:3
**call** 20:25 22:10 48:16 65:3 66:7,22 107:11,15,20 113:14,20 130:4 132:13 137:14,17,19 137:21 138:3 138:9,11,13 138:15 139:6 139:9,11,13 139:16 140:7 143:17 185:14 192:17 209:18
**called** 4:2 20:8 23:15 24:22 39:2 169:9 193:2
**Callen** 45:16 45:21 51:10
**Campanile** 92:20 106:18 106:25 107:12,16 108:10,18 110:24 113:3 114:3 138:4 139:15
140:10 143:4 185:20
**Campbell** 57:8
**capable** 80:3 80:16
**capacities** 39:15
**capacity** 175:14
**caption** 54:24 54:25
**captioned** 66:9
**captive** 60:24
**capture** 97:6
**captured** 97:24
**car** 174:21
**care** 136:19 193:15
**carrier** 69:17 164:16
**cases** 6:9 17:2 17:6,10 18:3 18:9,14,17 23:10 25:10 25:24 26:24 26:25 27:3,8 40:11,25 42:4 43:23 47:25 48:4,7,10,18 48:23 50:13 50:21,23,25 51:5,19 52:21 54:12,18,18 55:8 57:4 60:12,17,18 61:25 62:6,14 111:11 209:12
**categories** 43:16,20,21 89:21 91:24 158:25 161:11,16 164:21 169:11
**categorized** 128:6
**category** 34:11
126:23 161:13,21,24 165:13 170:9 170:10 171:13 172:22
**causes** 26:3 129:3
**causing** 59:15
**caveat** 119:11
**Cedar** 4:12
**certain** 19:19 37:22 38:12 79:11 83:2 89:20 90:24 97:7,16 100:23 102:19 145:12 152:8 153:18 158:25 161:14 170:8 208:13,19
**certainty** 122:10
**certificate** 11:12
**certified** 12:6,9 19:10 28:20 29:15,17,20 156:20
**certify** 211:9,15
**chance** 167:10 173:22 198:15 204:2
**change** 32:10 128:5,11 159:4 183:24 203:11 204:12 205:15
**changes** 86:12 91:11 112:19 112:21 114:25 115:10 120:7 121:13
**charge** 44:19
44:24 45:2,5 46:10 130:5 131:11 133:17,17 145:4 181:3 182:20,21 183:2
**chargeable** 160:23
**charged** 46:13 130:2 134:24 135:4 156:23 178:15 180:2 183:14 185:23 187:9
**charges** 160:19 184:17
**charging** 44:16 45:8 46:6
**Charles** 3:8 137:8
**Charlie** 53:14 117:15 156:7 208:7,17
**Charlton** 173:6
**cheaper** 76:21 131:16 135:19
**check** 164:2
**Chestnut** 5:4
**Chicago** 3:7
**chief** 37:15 38:19 39:7
**Chris** 1:13 2:5 4:9,24 20:9 192:17 209:25 210:5 211:10 212:4
**circumstance** 37:12
**circumstances** 37:24 79:7 80:6,8,14 84:11 205:24
**cited** 157:6
**City** 5:23 13:19 13:20
**Civil** 2:9
**claimant** 74:20 75:10
**claimed** 27:4 60:6 78:11
**claiming** 18:18 123:10
**claims** 6:12 14:17,19 15:13,21 16:7 16:8,13,18,23 17:19,22 18:23,25 19:2 20:21 21:9 23:23 26:6 27:9 30:15,18 30:24 41:23 42:10 43:14 43:14,21,22 60:19
**clarification** 75:6 115:11
**clarifications** 108:8
**clarify** 100:25 153:17
**cleanup** 56:16 177:2
**clear** 24:16 57:22 80:17 146:22 176:19
**client** 7:18 21:16 39:20 44:4,23 63:16 68:22
**clients** 14:18 21:14
**Cliffs** 5:5
**close** 11:14 145:7 146:19
**closeout** 93:13 93:19 113:16 119:17,22 123:6 127:5 188:17 189:13,16 207:20

**closing** 124:18
**Club** 57:23 58:11
**CNS** 172:7,14 206:14
**code** 203:23
**coined** 21:2 22:11
**collected** 129:23 130:23,25
**collection** 129:21 157:15
**college** 8:23 12:19 19:19 42:12
**column** 55:2
**come** 33:17 40:11 42:17 93:20 95:3 125:22 135:18 136:14 153:19,23 154:2 178:9 178:11 207:18
**coming** 4:20
**comment** 143:11
**commented** 89:14 97:9 153:22
**comments** 86:17 89:23 90:2 98:10 122:17 152:7 152:15 193:12,13
**commercial** 19:20
**communicati...** 87:4
**Comp** 164:6,15
**companies** 11:19 16:14 17:10 41:17 42:3 57:11 63:20 67:24 69:2 73:16 74:10 75:2 145:4
**company** 1:7 4:19 17:24 18:11 21:16 26:19 37:17 38:20,20,25 39:2,4,8,14 49:21 50:24 56:5,7,10,12 57:12 58:12 60:24 61:12 61:15,16,18 61:20 62:5 68:20,23 76:11 78:23 97:2 106:22 131:18 135:11,16,18 136:6 142:5 162:17 163:9 163:13,16 174:21 175:16
**compared** 132:20,25
**comparison** 133:23,24
**comparisons** 133:21
**compensated** 44:7 47:5
**compensation** 162:10 163:12,23 164:12 200:16 201:12,17,24 202:21 205:12,18
**compiled** 75:5
**complete** 32:16,25 52:24 93:7,11 98:20 105:16 194:10
**completed** 98:15 104:23 197:16,21
**completion** 197:8
**comply** 11:16
**components** 148:16
**compound** 156:15
**comprise** 201:16
**computer** 110:12
**concern** 16:4 142:22
**concerning** 87:13 97:12 198:25
**concerns** 89:4 89:12,17 139:10 192:19,22 193:3,9
**conclude** 103:5
**concluded** 209:25
**conclusions** 123:23
**condition** 28:21 50:8
**conditions** 102:20
**conducted** 14:14 32:22 32:23
**conducting** 16:5
**conference** 107:11,15 113:14,20 137:14,17,19 138:3 139:6,8 139:11,12,16 140:7 141:20 143:17
**confirm** 155:12
**confirming** 66:7
**conflict** 102:21
**confused** 87:15
**connection** 6:20 41:22 66:9 78:10 108:6 113:15 123:14 130:24 133:5 145:20 198:6 200:9
**consider** 33:14 33:18,22 34:7 34:12,17 35:2 35:12 36:6 37:4 38:6,12 161:12 162:24 163:3 163:18,21 165:12 175:9 177:3
**considered** 85:11 90:9 91:25 92:4 140:22 165:7 166:4,17 174:18,20,22
**Consists** 132:21
**construction** 15:2,3,12,21 15:22 30:16 30:19,25 31:3 31:16 49:2,4 49:5,11,21 50:6,13 62:3 62:4,5 199:8
**consult** 113:17 113:21
**consultant** 16:22,25 43:3
**consulting** 22:3 66:8
**contact** 63:25 65:11 92:22 107:4 108:19 143:5
**contacted** 63:7 63:10
**contained** 119:8,24
**context** 41:12 41:19 67:22 141:2,9
**continue** 133:18
**continued** 28:21
**continuing** 10:8,13 11:18 11:22
**contract** 105:22,25 106:3,6,10 193:19,24 205:16
**contractor** 31:16 187:9
**contracts** 31:15
**contribution** 175:6,17,22
**Cont'd** 104:2 213:2
**conventional** 20:19
**conversation** 63:13 64:16 64:22 66:25 67:3 68:6 95:5 207:15
**conversations** 64:25 65:8 81:18 108:5 108:12,16,20 193:11
**coordinator** 199:8
**copies** 91:14 116:21 167:4
**copy** 142:19 203:15 209:4
**corner** 66:18

**Corp** 57:23 203:11
**corporate** 82:22 83:13 83:21 89:13
**corporation** 26:20 27:4 39:3,14 49:4 55:18,25 60:20 61:8,21 181:12
**corporations** 6:13 14:15 16:6 20:23
**correctly** 82:9 102:24 122:11 149:10 160:20 171:18 178:6 184:13 202:11
**correspond** 203:21
**corresponding** 117:25
**cost** 31:15 34:8 56:21 62:3 70:19 99:23 101:6 122:4 123:6,9 140:13,15,15 140:23 141:4 141:7,10 143:11 145:6 146:24 152:18 157:23 162:25 163:4 163:6,19,19 163:20,22 165:13 166:12,17 182:22 183:3 183:17 184:23 185:21 186:9 188:8 189:21 190:10 198:6 198:25 199:4 205:3 208:13 208:17,19
**costly** 131:17
**counsel** 8:5 54:8 81:16 94:16 95:2,6 96:14 101:4 116:4,6,22 138:6 167:2
**counsel's** 94:22
**count** 142:15
**COUNTY** 211:5
**couple** 8:21 40:7 42:8 64:9 68:11 73:13 86:8 91:8 112:9 180:19 192:17 196:24 198:11
**course** 107:3 107:10 132:7
**courses** 9:10 9:21,25 10:9 10:12,14 11:3 11:18,23 13:6 19:19,19
**court** 1:2 6:21 6:24 17:2,7 31:20 49:23 49:25 102:5 117:19
**cover** 137:6,11
**coverage** 24:19 60:18 70:11,14 88:12,14,16 121:24 123:16,19,25 128:7,8
**covers** 79:6 162:17 163:12,15
**CPA** 1:13 19:13 19:16,18 20:3 20:9 45:22 209:25 210:5
**CPAs** 10:17,17 10:18 28:9,10 28:11
**cracks** 93:3 99:19
**cram** 42:15
**created** 52:25 130:24
**creation** 156:21
**crew** 180:8
**crew's** 180:3
**critique** 84:20 91:9
**critiqued** 97:8 112:23
**critiquing** 76:12 91:10
**cross** 71:6 196:12
**crystal** 24:16
**cured** 33:19 34:13
**current** 12:4
**currently** 5:6 23:8,9 26:11 26:13 28:4 29:13,24
**curriculum** 32:2
**custom** 70:6 72:8,13 73:19 74:11,16 75:17
**customarily** 184:22 185:12,18
**customer** 182:21 183:2 183:14
**customers** 182:20,23 184:17,24
**cut** 203:18,23
**cuts** 203:17
**CV** 31:7
**C-A-L-L-E-N** 45:17,21
**C-A-M-P-A-N...** 106:20

**D**

**D** 117:16 212:2
**damage** 16:19 43:16,25 62:7 62:10,12 131:5
**damages** 16:22 18:21 19:2,4 23:11,12,17 23:21 24:23 25:4,8,13,19 25:21 30:15 30:18,24 35:24 43:17 56:17 59:19 60:2,5 62:2 62:23 80:19 98:5 109:6 111:12 198:3
**data** 109:12 111:25 112:2 129:21 157:15
**date** 4:25 31:12 46:14 52:11 53:9 65:19 80:24 82:12 82:18 94:4,5 94:12 95:21 95:22,23 97:12 98:6 114:9 117:22 120:12 124:20 127:18 137:3 137:18 139:19,20 147:15 148:11,15 150:25 167:9 173:20 176:20 191:23 194:18 195:13,16 200:2
**dated** 66:6,20 120:22 147:23 149:23 151:12 197:6 198:19 199:8 199:24 203:10 205:6
**David** 49:21
**day** 19:22 22:5 26:17 67:8 96:20 183:19 185:9 210:8 211:21
**days** 19:18 21:8 50:12 132:14 199:9
**deadline** 11:14 11:15
**deal** 131:25
**dealing** 74:9 92:20 133:13 133:16
**dealt** 133:16
**Dearborn** 3:6
**December** 93:24,24 94:6 94:11,25 95:12 97:12 98:5 102:3,18 103:9 104:18 105:5 128:3 128:13 195:8 195:12 196:17
**decide** 97:7
**decided** 28:24
**decline** 70:16
**defend** 18:3
**defendant** 1:8 3:11 4:18 23:12 25:3 41:7,9 59:3,4 59:7,14,23