# EXHIBIT

# A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| INSITUFORM TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 04 10487 GAO |
| | ) | |
| AMERICAN HOME ASSURANCE | ) | |
| COMPANY, | ) | Jury Demanded |
| | ) | |
| Defendant. | ) | |

### INSITUFORM'S INITIAL DISCLOSURE

Plaintiff Insituform Technologies, Inc. ("Insituform"), by its counsel,

makes the following disclosure pursuant to Rule 26(a) of the Federal Rules of Civil

Procedure.

A.    Insituform identifies the following individuals believed to have

discoverable information that Insituform may use to support its claims:

| Witness | Address/Phone No. | Information /Subject Matter |
|---|---|---|
| Juanita M. Britton | 175 Water Street, 22nd Floor New York, New York 10038 (212) 458-3725 | AIG Claims Representative: American Home Denials |
| Margaret Hoeler | Unknown | AIG Claims Representative: Insituform Notice of Claim. |
| Barry Schnurman | Last know address: Three City Place Drive Suite 900 St. Louis, MO 63141 (314) 432-05000 | Former Lockton Employee: Notice of Claim |
| Lawrence Butler | 702 Spirit 40 Park Drive Chesterfield, MO 63005 (636) 530-8000 | Insituform Risk Manager: Insurance Policies and Notice of Claim |



| Witness | Address/Phone No. | Information /Subject Matter |
|---|---|---|
| Lynn Osborn | 702 Spirit 40 Park Drive<br>Chesterfield, MO 63005<br>(636) 530-8000 | Insituform Engineer: MWRA<br>Contract and EBBS Project |
| Richard Baxter | 702 Spirit 40 Park Drive<br>Chesterfield, MO 63005<br>(636) 530-8000 | Insituform Engineer: MWRA<br>Contract and EBBS Project |

B.    Insituform possesses the following the documents at 702 Spirit 40 Park Drive, Chesterfield, Missouri 63005 that it may use to support its claims:  American Home policy BE 3206923 and Liberty Mutual policy RG2641004218033 and related underwriting documentation; the MWRA EBBS Contract and Insituform communications with Liberty Mutual and American Home regarding the Claim.

C.    Insituform has suffered monetary damages as a result of: American Home's breach of its duty to indemnify Insituform.  While Insituform has sustained covered losses in excess of American Home's attachment point, the amount of the loss is still not known as the repair and replacement is ongoing.  As a consequence of American Home's wrongful denial, Insituform has had to book the entire loss against earnings, thereby artificially driving down its fourth quarter earnings for 2003. Those damages, are not yet computed due to incomplete information.

D.    Not Applicable.

INSITUFORM TECHNOLOGIES, INC.

By:_____

Stanley A. Martin
Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700

Of counsel

Charles L. Philbrick
Holland & Knight LLP
131 S. Dearborn St., 30th Fl.
Chicago, IL 60603-5547
(312) 263-3600

Dated:  May 4, 2004

# 1832367_v2

**CERTIFICATE OF SERVICE**
I hereby certify that on this day a true copy of
the above document was served upon the
attorney of record for each party by mail/hand.

Date: May 4, 2004

# EXHIBIT

# B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

INSITUFORM TECHNOLOGIES, INC.,    )
                                  )
            Plaintiff,            )
                                  )
v.                                )        CASE NO. 04-10487 GAO
                                  )
AMERICAN HOME ASSURANCE           )
COMPANY,                          )
                                  )
            Defendant.            )

## DEFENDANT AMERICAN HOME ASSURANCE COMPANY'S
## SECOND REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to Fed. R. Civ. P. 26 and 34, defendant American Home Assurance Company ("American Home") hereby requests that Plaintiff Insituform Technologies, Inc. ("Insituform") produce for inspection, copying and examination all documents and other tangible items that are in the possession, custody, or control of Insituform and are responsive to the following requests. Pursuant to Fed. R. Civ. P. 34(b), within thirty (30) days after being served with these requests, Insituform is also required to serve upon American Home written responses to these requests.

## DEFINITIONS AND INSTRUCTIONS

The following definitions and instructions apply to all document requests:

1.      The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

2.      The term "concerning" means referring to, describing, evidencing, or constituting.

- 2 -

3.      The term "document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Fed. R. Civ. P. 34(a). A draft or non-identical copy is a separate document within the meaning of this term.

4.      The term "person" is defined as any natural person or any business, legal, or governmental entity or association.

5.      The terms "Insituform," "you," and "yours" mean Plaintiff Insituform Technologies, Inc., including its officers, directors, employees, agents, representatives, and any person acting on its behalf.

6.      The term "American Home" means Defendant American Home Assurance Company, including its officers, directors, employees, agents, representatives, and any person acting on its behalf.

7.      The term "Liberty Mutual" means Liberty Mutual Insurance Company, including its officers, directors, employees, agents, representatives, and any person acting on its behalf.

8.      The term "Complaint" means the Complaint filed by Insituform against American Home in this action.

9.      The term "American Home Policy" means the excess umbrella liability policy, Policy No. BE 3206923, issued by American Home to Insituform for the period July 1, 2003 to July 1, 2004, as alleged in Paragraph 11 of the Complaint.

10.      The term "Liberty Mutual Policy" means the primary comprehensive general liability policy, Policy No. RG2-641-004218-033, issued by Liberty Mutual to Insituform for the period July 1, 2003 to July 1, 2004, as alleged in Paragraph 9 of the Complaint.

11.     The term "MWRA Claim" means the claim made by the Massachusetts Water Resources Authority ("MWRA") against Insituform to repair and replace the defective liner, as alleged in Paragraphs 1 and 19 of the Complaint.

12.     The singular shall include the plural, and the plural shall include the singular.

13.     "And" and "or" shall be construed as disjunctive or conjunctive as the context requires.

14.     Your responses to these interrogatories are subject to the requirements of supplementation contained in Fed. R. Civ. P. 26(e)(2).

15.     Unless otherwise specified, the time period encompassed by this set of document requests shall be from January 1, 2003 to the present.

16.     If you maintain that any responsive document has been destroyed, please identify the document and state the date of destruction, the reason, and by whom the document was destroyed.

17.     If any documents are redacted or are not produced based on a claim of privilege or any other grounds, identify the document or information being withheld or redacted and the basis for the privilege or other grounds with sufficient particularity to permit American Home to move compel production (without redactions) of such documents, including but not limited to the author, recipient, subject matter, document type and number of pages.

## REQUESTS

1.     All documents concerning communications that Insituform submitted to or filed with the United States Securities and Exchange Commission concerning MWRA Contract #6840, the MWRA Claim or this litigation, including but not limited to Annual Reports to stockholders, 10-K, 10-Q and 8-K reports, and proxy statements.

- 4 -

2.  Insituform's Annual Reports, Stockholder Letters, Financial Highlights, and Financial Reviews for the years 2003 through the present.

3.  All documents concerning communications between Insituform and its accounting firm or auditors concerning MWRA Contract #6840, the MWRA Claim or this litigation.

4.  All documents concerning communications between Insituform and institutional investors, financial analysts or shareholders concerning MWRA Contract #6840, the MWRA Claim or this litigation.

5.  All documents concerning communications between Insituform and experts who Insituform retained concerning MWRA Contract #6840, the MWRA Claim or this litigation.

AMERICAN HOME ASSURANCE COMPANY,

By its attorneys,

Gregory P. Deschenes (BBO # 550830)
Gregg A. Rubenstein (BBO # 639680)
Nixon Peabody LLP
100 Summer Street
Boston, MA 02110-2131
(617) 345-1000

Dated: May 25, 2006

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for the other party by mail on May 25, 2006.

Gregory P. Deschenes

# EXHIBIT

# C



Page 1

```
 1          UNITED STATES DISTRICT COURT
 2          DISTRICT OF MASSACHUSETTS
 3
    INSITUFORM TECHNOLOGIES, INC.,    )
 4                                    )
            Plaintiff,                )
 5                                    )
       vs.            ) No. 04-10487 GAO
 6                                    )
    American Home ASSURANCE COMPANY,  )
 7                                    )
            Defendant.                )
 8
 9
10          DEPOSITION OF LARRY MANGELS
11   The deposition of Larry Mangels taken before Bobbi L.
12   Hamlin, RMR, CCR, at The Law Office of Thompson Coburn
13   on November 17, 2006 commencing at 9:45 a.m.
14
            APPEARANCES:
15
     For Plaintiff:      Holland & Knight
16                    by Charles L. Philbrick
17
     For Defendant:      Nixon Peabody LLP
18                    by Kurt M. Mullen
19
20
21
22
23
24
```

Page 2

```
 1        Larry Mangels produced, sworn and
 2   examined on behalf of the Defendant, testified and
 3   deposed as follows:
 4            EXAMINATION
 5   BY MR. MULLEN:
 6      Q.  Good morning, Mr. Mangels.
 7      A.  Good morning.
 8      Q.  We introduced ourselves off the record, but
 9   for the record my name is Kurt Mullen. I am an
10   attorney representing American Home Assurance Company
11   in litigation Insituform Technologies has brought
12   against American Home pending up in the federal court
13   for the District of Massachusetts. I'm to take
14   testimony for that case.
15        Could you, please, state your name for the
16   record.
17      A.  Larry Mangels.
18      Q.  And Mr. Mangels, are you employed with
19   Insituform Technologies?
20      A.  Yes, I am.
21      Q.  And have you ever been deposed before?
22      A.  No.
23      Q.  Okay. Let me go over some of the ground
24   rules here to get your testimony based on your personal
```

Page 3

```
 1   knowledge in connection with this case. I will ask you
 2   a series of questions. If you don't understand one of
 3   my questions just let me know and I'll try to rephrase
 4   it.
 5      A.  Okay.
 6      Q.  Otherwise if you don't say that you don't
 7   understand it I'll assume that you did understand my
 8   question.
 9        This isn't meant to be an endurance test.
10   So, any time you would like to take a break just let me
11   know.
12        And the only thing I do ask is, you know, if
13   there's a question pending if you could answer my
14   question and then, you know, we'll go from there.
15        The court reporter is taking down everything
16   that's being spoken today and it does have to be
17   spoken, so she can't pick up any nod of the head or --
18      A.  Right.
19      Q.  -- other type of gestures. So I may ask you
20   to clarify a couple points whether that was intended to
21   be some sort of a response.
22        Also, one of the more difficult things, she
23   can also only take one person speaking at a time, so
24   you know, to the extent we can let's try not to talk
```

Page 4

```
 1   over one another.
 2      A.  Okay.
 3      Q.  And also, you're represented today by Mr.
 4   Philbrick?
 5      A.  Yes.
 6      Q.  He's your counsel. He may make some
 7   objections to some of my questions, but unless he
 8   directs you specifically not to answer my question you
 9   should go ahead and answer the question I ask.
10      A.  Okay.
11      Q.  You understand all that?
12      A.  Yes.
13        MR. MULLEN: Charles, did I miss anything?
14        MR. PHILBRICK: Probably, but I don't know
15   what.
16        MR. MULLEN: Excellent. If it comes up we can
17   all circle back.
18        BY MR. MULLEN:
19      Q.  Mr. Mangels, I've asked the court reporter to
20   mark as Defendant's Exhibit 1 a document. Have you
21   seen it before?
22      A.  No.
23      Q.  You have not.
24        For the record it's a notice of deposition of
```

ESQUIRE DEPOSITION SERVICES, LLP - ST.LOUIS
314.621.6173    888.462.2780

Page 5

1  Larry Mangels signed by me for September 15th and we're
2  -- signed on September 15th, I apologize, and we're
3  here today. Do you know whether we're here today in
4  response to that notice, Mr. Mangels?
5      A. I'm sorry, say it --
6      Q. I'm sorry. Do you know whether we're here
7  today in response to the notice?
8      A. No, I don't.
9      MR. PHILBRICK: Objection to the foundation,
10  but we are, indeed, here on behalf of your notice of
11  deposition.
12      BY MR. MULLEN:
13      Q. Mr. Mangels, I'd like just to direct your
14  attention to the caption of the case, which is up at
15  the top, Insituform Technologies versus American Home,
16  just to restate what I stated earlier, I'm going to be
17  asking you questions in connection with that case. Do
18  you understand that?
19      A. Yes.
20      Q. I want to ask you some questions about what
21  you did to prepare for today's deposition. What did
22  you do to prepare for today's deposition?
23      A. I, basically, looked at the four volumes of
24  documentation that support the financial claim of

Page 6

1  Insituform.
2      Q. Now, are you referring to the four binders
3  which are labeled ITI-AIG 1 through 2608?
4      A. Yes.
5      Q. Did you do anything else to prepare for
6  today's deposition?
7      A. No.
8      Q. Did you look at any other documents?
9      A. No.
10      Q. Did you meet with anyone in preparation for
11  your deposition?
12      A. I met with Mr. Philbrick yesterday.
13      Q. Okay. And how long did you meet with Mr.
14  Philbrick for?
15      A. Probably around three or four hours.
16      Q. And was anyone else with you at your
17  deposition, sir, --
18      A. No.
19      Q. -- preparation meeting?
20      And the only documents you looked at were the
21  documents ITI-AIG 1 to 2608?
22      A. Yes.
23      Q. Okay. Did you go to college, Mr. Mangels?
24      A. Yes, I did.

Page 7

1      Q. And where did you go?
2      A. Graduated undergraduate from Southwest
3  Missouri State University.
4      Q. And when did you graduate from there?
5      A. 1979.
6      Q. What was your degree in?
7      A. Accounting.
8      Q. Bachelor of science?
9      A. Bachelor of science in accounting.
10      Q. What did you do after leaving college?
11      A. I went to work for the State of Missouri in
12  the Division of Family Services for two years as an
13  auditor.
14      Q. And what were your responsibilities as an
15  auditor?
16      A. I was just staff auditor going out auditing
17  nursing home and people that were getting federal and
18  state money.
19      Q. You did that from 1979 to --
20      A. Around 1981. Then I went to work for
21  Continental Baking Company.
22      Q. And what did you do for Continental?
23      A. Accounting supervisor in the beginning. I
24  was with them for 14 years.

Page 8

1      Q. So, up until about 1995?
2      A. Yeap. Yes.
3      Q. And what did do you as an accounting
4  supervisor?
5      A. Managed several -- several different areas,
6  was either accounts receivable or route accounting area
7  or cost accounting area.
8      Q. And did your job ever change?
9      A. Yeah, I had -- I held several different jobs
10  at Continental Baking over those 14 years from
11  accounting supervisor to capital analyst to bakery
12  controller to division accounting manager in the end.
13      Q. I'm sorry, what was the last position that
14  you had?
15      A. Division accounting manager.
16      Q. And what did you do as division accounting
17  manager?
18      A. Worked with the bakery controllers in that
19  particular division, helped them with the reporting,
20  sat in if we were short a controller. I would go out
21  and serve as the controller in the bakery.
22      Q. How many controllers did you oversee?
23      A. It varied, but it was probably from four to
24  six.

2 (Pages 5 to 8)

Page 9

1    Q.  And where did you go from Continental Baking?
2    A.  I went to work for Ralston Purina, their
3    international division.
4    Q.  And what did you do in the international
5    division at Ralston Purina?
6    A.  I was financial analyst for about six months
7    and then that division spun off to a company named Agri
8    Brands International and I was there for three years as
9    the director of corporate accounting.
10    Q.  So, that's through about 1998?
11    A.  Through 2001.  From '98 to 2001, I guess.
12    Q.  I'm sorry.  Might be bit of a gap there.
13    A.  It was three years.  So, I was at Continental
14    till '98.
15    Q.  '98?
16    A.  Yeah.
17    Q.  I apologize to the extent that my adding up
18    the numbers may have thrown you off a bit.
19        And what did you do for Agri Brands
20    International?
21    A.  Director of corporate accounting.
22    Q.  And what did that entail?
23    A.  That entailed all the internal reporting
24    associated with that company, management reporting,

Page 10

1    supervised four accounting people in the accounting
2    department.
3    Q.  And where did you go from Agri Brands
4    International?
5    A.  To Insituform Technologies.
6    Q.  And that was in 2001?
7    A.  2001, yes.
8    Q.  And what was your position at Insituform?
9    A.  Started there as an area controller.
10    Q.  What does an area controller do?
11    A.  Responsible for all the contracting and
12    finance for a particular area of the country.  I had
13    the southeast portion of the United States.
14    Q.  Is that called the southeast area?
15    A.  It was back then.  I mean, we've restructured
16    since then, but it was the southeast back then.
17    Q.  And at that time how many different areas did
18    Insituform have?
19    A.  Six.
20    Q.  And what were those areas?
21    A.  Southeast, southwest, west, Canada, midwest,
22    and north.
23    Q.
24    A.  It was either north or northeast, I forgot

Page 11

1    what we called it, but --
2    Q.  And how long were you an area controller?
3    A.  Around two years.
4    Q.  Okay.  And what did you do after that?
5    A.  I was director of finance for North America,
6    which is my current role.
7    Q.  And what does the direct of finance for North
8    America's job entail?
9    A.  Currently there's three area controllers that
10    report in to me.  We're responsible for the financial
11    reporting, safeguarding of the assets, working with the
12    operations team.
13    Q.  Okay.  And what are the three area
14    controllers?  What are the three areas?
15    A.  What are they?  Okay.  There's the west, the
16    south, and the north.
17    Q.  And how many people do you oversee in your
18    position?
19    A.  Direct reports?  There's five direct reports.
20    Q.  And these are the five of the three area
21    controllers?
22    A.  Three area controllers, a manufacturing
23    controller, and a financial analyst.
24    Q.  And who's your supervisor, Mr. Mangels?

Page 12

1    A.  I report to the corporate controller.
2    Q.  And who is that?
3    A.  David Martin.
4    Q.  Has the person you report to ever changed?
5        Well, let's take it this way:  Since you've
6    been the director of finance has the person you've
7    reported to ever changed?
8    A.  Yes, David Martin was -- I did not report to
9    David when I first took the role.
10    Q.  How long have you been reporting to Mr.
11    Martin since?
12    A.  It's been two years.
13    Q.  Okay.  And who was it prior to that?
14    A.  I think one time I reported right to the CFO.
15    Q.  And who is that?
16    A.  Back then it was a gentleman named Joe White.
17    Q.  All right.  Mr. Mangels, what is Insituform
18    in the business of?
19    A.  We are in the business for rehabing
20    underground sewer pipes and storm drains.
21    Q.  Anything else?
22    A.  We also have a tunneling division that they
23    create new tunnels, drill new tunnels, and another
24    division United Pipe Laying Services, that relines the

3 (Pages 9 to 12)

LARRY MANGELS    NOVEMBER 17, 2006

Page 13

1  inside of gas and oil pipes.
2  　　Q.  Mr. Mangels, you mentioned earlier your
3  undergraduate degree.  Do you have any other degrees?
4  　　A.  Yes, I have an MBA.
5  　　Q.  And when did you get that?
6  　　A.  1988.
7  　　Q.  And where did you get that from?
8  　　A.  St. Louis University.
9  　　Q.  And what is that degree in, did you say?
10  　　A.  MBA with an emphasis in finance.
11  　　Q.  I apologize.
12  　　　　And did you get that going part time?
13  　　A.  At night, right.
14  　　Q.  Okay.  Mr. Mangels, we're here today to
15  discuss Insituform's work for the East Boston branch
16  sewer.  What's your understanding of that project?
17  　　A.  With?
18  　　Q.  What is your understanding of what Insituform
19  initially was responsible for doing?
20  　　A.  We were to rehab -- I -- I don't know the
21  exact -- it was around 5,000 feet of pipe in Boston.
22  　　Q.  And do you know the owner?  Who owned that
23  pipe?
24  　　A.  No.

Page 14

1  　　　　Do I personally know him or --
2  　　Q.  Did you understand it was for the
3  Massachusetts Water Resources Authority?
4  　　A.  Yes.
5  　　Q.  Okay.  This was pursuant to contract number
6  6840.  Do you know that?
7  　　A.  I don't know that.
8  　　Q.  Is it okay if I refer to the Massachusetts
9  Water Resources Authority as the MWRA?
10  　　A.  Yes.
11  　　Q.  How did you become aware of Insituform
12  working for the MWRA?
13  　　A.  I'm sure it came up in discussions early on,
14  you know.  I heard that we had problems on a job in
15  Boston.
16  　　Q.  So, the first time you heard about it was
17  when there were problems on this job in Boston?
18  　　A.  Yeah.
19  　　Q.  Okay.  Were you involved at all in preparing
20  the initial bid for this work?
21  　　A.  No.
22  　　Q.  Is that part of your job responsibility for
23  other projects, preparing bids?
24  　　A.  No.

Page 15

1  　　Q.  Do you know how bids for sewer pipe
2  rehabilitation are undertaken?
3  　　A.  I know they have an estimating program that
4  the estimators and project managers work together on
5  developing the estimate, but that's the extent of my
6  knowledge.
7  　　Q.  Does your department have any involvement --
8  　　A.  No.
9  　　Q.  Do you understand that Insituform for this
10  project was a subcontractor?
11  　　A.  Yes.
12  　　Q.  And do you know who it was a subcontractor
13  for?
14  　　A.  D'Allessandro.
15  　　Q.  And it's your understanding that Insituform
16  was responsible for -- could you say, again, what your
17  understanding -- what Insituform --
18  　　A.  We were to reline a little over 5,000 feet of
19  new sewer pipe -- sewer or storm water, I'm not sure
20  which it was.
21  　　Q.  And do you know whether Insituform was going
22  to reline that using cured in-place piping?
23  　　A.  Yes.
24  　　Q.  And is that also referred to as CIPP?

Page 16

1  　　A.  Yes.
2  　　Q.  What is cured in-place piping?
3  　　A.  It's a combination of felt -- we take fiber,
4  make it into a felt, and then impregnate it with resin
5  and chemicals.
6  　　Q.  And then?
7  　　A.  And then it's actually cured, put into the
8  pipe and cured in place.  That's why --
9  　　Q.  And then do you know how that's done?
10  　　A.  Technically, no.  Layman's terms the resin
11  has chemicals in it that are heat activated.  When it
12  reaches a certain temperature the resin hardens.
13  　　Q.  And what's the end result?
14  　　A.  It's a pipe inside of a pipe.  Very hard
15  plastic pipe inside of a pipe.
16  　　Q.  And do you know what the advantages are of
17  CIPP?
18  　　A.  It's cost effective versus digging up a pipe
19  and replacing it.
20  　　Q.  Trenchless technology?
21  　　A.  Yes.
22  　　Q.  Do you know what Insituform's initial bid was
23  for the MWRA project?
24  　　A.  It was right around one million dollars.

4 (Pages 13 to 16)

Page 17

1    Q.  Do you know if it was $1,475,000?
2    A.  That sounds close.  I don't know the exact
3  number, but --
4    Q.  Mr. Mangels, do you know what type of profit
5  margin was built into Insituform's bid?
6    A.  I do not know that answer.
7    Q.  Do you know whether Insituform was paid the
8  full contract price for its work on that project?
9    A.  Yes.
10    Q.  The initial one million dollars?
11    A.  Right.
12    Q.  Give or take?
13    A.  Yes.
14    Q.  And it was?
15    A.  Yes.
16    Q.  Okay.  And you testified earlier that you're
17  personally not involved in putting together a bid for
18  this type of work?
19    A.  Correct.
20    Q.  Do you know who was responsible for putting
21  together the bid for this?
22    A.  I don't know who put it together.
23    Q.  Okay.  But in general you testified that it's
24  an estimator?

Page 18

1    A.  I'm sure it was the estimator and the project
2  manager in New England.  I just don't know who that was
3  though.
4    Q.  And do you know whether there's any person
5  within Insituform that they need to get approval from
6  or what's the process for the initial estimate being
7  put together in New England?
8      MR. PHILBRICK: I'm going to object to
9  foundation.
10      The witness may answer if he can.
11      THE WITNESS: Projects over a hundred thousand
12  dollars have to be approved by corporate.
13      BY MR. MULLEN:
14    Q.  Do you know who in corporate in 2000 --
15  December 2002 had to approve the project like that?
16    A.  Doug Thomas.
17    Q.  And what was Mr. Thomas' role at that time?
18    A.  He was a vice president in reviewing all
19  projects over a hundred thousand dollars.
20    Q.  Do you know if Mr. Thomas is still at
21  Insituform?
22    A.  Yes, he is.
23    Q.  And do you know his current position?
24    A.  Still in the same role.

Page 19

1    Q.  Mr. Mangels, do you know whether today the
2  bid process is any different than it was in late
3  December 2002?
4    A.  I don't know the answer to that.
5    Q.  Do you know who would know the answer to
6  that?
7    A.  Can I ask for clarification?  When you say
8  bid, do you mean the estimate process.
9    Q.  The estimate process, I'm sorry.
10    A.  Okay.  Doug Thomas.
11    Q.  Mr. Mangels, do you know whether the bid
12  process varies by region or is that something that's
13  standard within the company for all regions?
14    A.  I don't know the answer to that.
15    Q.  Okay.  Do you have any understanding about
16  the state of the pipe rehabilitation market in December
17  2002?
18    A.  No.
19    Q.  Don't know whether it was a tight market or a
20  soft market?
21    A.  I -- I don't know that, no.
22    Q.  Do you know who would know the answer to
23  that?
24    A.  Probably somebody in our sales and marketing

Page 20

1  group.  I don't know.
2    Q.  What region of Insituform is Boston in?
3    A.  The northeast.
4    Q.  And do you know whether the northeast region
5  for rehabilitation piping was a softer type market in
6  December 2002?
7    A.  I don't know.
8    Q.  Do you know whether the strength of
9  Insituform's business pipe for rehabilitation varies by
10  region?
11      Put another way, do you know if they're
12  stronger in some regions of the country than others?
13    A.  Yes.
14    Q.  Do you know what regions they're strong in?
15      MR. PHILBRICK: The question calls for a yes
16  or no answer.
17      THE WITNESS: No.
18      BY MR. MULLEN:
19    Q.  Do you know what regions they're weak in?
20    A.  No.
21    Q.  And do you know what regions they were either
22  strong or weak in late 2002?
23    A.  No.
24    Q.  Do you know who might know the answer to that

ESQUIRE DEPOSITION SERVICES, LLP - ST.LOUIS
314.621.6173    888.462.2780

Page 21

1  question?
2      A.  No.
3      Q.  Mr. Mangels, do you know how many sales reps
4  Insituform employed in late December 2002?
5      A.  No.
6      Q.  Do you know whether Insituform had
7  approximately doubled its sales force for pipe
8  rehabilitation since that time?
9      MR. PHILBRICK: Excuse me, could you read back
10  that question, please.
11  WHEREUPON, THE PREVIOUS QUESTION WAS READ BACK BY THE
12  COURT REPORTER.
13      MR. PHILBRICK: Okay.  Witness may answer if
14  he can.
15      THE WITNESS: No, I don't know.
16      BY MR. MULLEN:
17      Q.  Turning to the MWRA project itself, do you
18  know when Insituform began installing the liner?
19      A.  It was in the summer of 2003.
20      Q.  And do you know when the liner was finished?
21      A.  It was late summer or early fall of 2003.
22      Q.  And do you know that the MWRA rejected
23  Insituform's work?
24      A.  Yes.

Page 22

1      Q.  Do you know when that was?
2      A.  I don't know the exact date, no.
3      Q.  Do you know generally when it was?
4      A.  I'm sure it was in the fall or early winter
5  of 2003.
6      Q.  And Mr. Mangels, most of my questions today
7  are going to address the cost documentation and the
8  cost associated with the claim that Insituform is
9  bringing against American Home.
10      Did your responsibilities as director of
11  finance include responsibility for the cost that
12  Insituform claims that it's incurred with this
13  contract?
14      A.  I oversee that area, yes.
15      Q.  And for clarity, the contract I was referring
16  to is the MWRA contract.
17      Is there someone more directly involved?
18      A.  The controller for the northeast was more
19  involved.
20      Q.  You said that person recently changed?
21      A.  He is no longer with the company.
22      Q.  And who was that person?
23      A.  Nick Campanile.
24      Q.  Is that C-A-M-P-A-N-I-L-E?

Page 23

1      A.  Yes.
2      Q.  And he was the controller for the northeast
3  region?
4      A.  Yes.
5      Q.  And when did Mr. Campanile leave the company?
6      A.  In August of 2006.
7      Q.  And how long had he been with Insituform; do
8  you know?
9      A.  Just under three years.
10      Q.  So, from approximately fall 2003?
11      A.  Yes.
12      Q.  And would Mr. Campanile's responsibilities
13  have included gathering the cost for the MWRA claim
14  since the beginning?
15      A.  Yes.
16      Q.  And Mr. Campanile reported to you?
17      A.  Yes.
18      Q.  Do you have a controller for the northeast
19  region now?
20      A.  No.
21      Q.  Still an open position?
22      A.  No, we've consolidated under another
23  controller for the north.  It's the north area now.
24      Q.  What territory was within Mr. Campanile's

Page 24

1  responsibility as northeast controller?
2      A.  Essentially, northeast section of the United
3  States from Virginia on north over through Ohio.
4      Q.  So, Mr. Mangels, your job as director of
5  finance includes overseeing cost documentation?
6      Does it include cost documentation?
7      A.  Yes.
8      Q.  What method have you used to organize these
9  costs?
10      A.  For this particular --
11      Q.  For this claim, I'm sorry.
12      A.  Okay.  We've, essentially, isolated costs for
13  labor, materials, equipment, and subcontract.
14      Q.  And that's been broken into two phases?
15      A.  Two phases, yes.
16      Q.  Okay.  And do you have any understanding of
17  what occurred in Phase I?
18      A.  We replaced, I believe five -- five of the
19  six shot segments in Phase I.
20      Q.  And do you have any understanding of what
21  occurred in Phase II?
22      A.  Replaced the last segment.
23      Q.  The shot that hadn't been replaced in Phase
24  I?

6 (Pages 21 to 24)

Page 25

1    A.  Correct.  Correct.
2    Q.  Other than Mr. Campanile, does anyone else
3  assist you with documenting the costs for MWRA's claim
4  against American Home?
5    A.  No.
6    Q.  Mr. Mangels, I had hoped to introduce as my
7  first exhibit the four cost binders that we had
8  referred to earlier today that are marked ITI-AIG 1
9  through 2608.  Unfortunately, I was informed prior to
10  today's deposition that these documents were not being
11  able to be sent, because of inclement weather by the
12  overnight delivery system that we selected and I
13  apologize for that.
14    I did bring down some other documents that
15  are being copied now that I'd like to show you that are
16  portions of these documents.  I just don't have them
17  now.  So, I did want to, you know, apologize to you
18  right now and say that I'll do the best I can to --
19    A.  Okay.
20    Q.  -- get testimony on these costs, so we don't
21  have to suspend the deposition and bring you back so --
22  but you're familiar with the documents in 1 to 2608
23  that are Bates prefix ITI-AIG?
24    A.  Yes.

Page 26

1    Q.  Okay.  Is it fair to state that the material
2  that's in there provides Insituform's support for its
3  claim against American Home?
4    A.  Yes.
5    Q.  Okay.  Mr. Mangels, the Phase I cost that
6  Insituform has presented do you know when the invoices
7  run from?  When they start from?
8    A.  In the general time frame is September of '04
9  -- of 03 to June, July of '04.
10    Q.  Okay.  I think the beginning date may
11  actually be right at the beginning of October, but do
12  you know why that date was selected?
13    A.  Because we started from when we were done
14  with the initial installation.
15    Q.  Do you know when Insituform began to remove
16  and replace five of the six shots in Phase I?
17    A.  It was late 2003, early 2004.
18    Q.  So, is it fair to say that Insituform is
19  claiming costs in connection with Phase I that predate
20  its removal and replacement of these shots?
21    A.  No.
22    Q.  Why is that not accurate?
23    A.  I mean, I understood your question to be that
24  we were including costs from the initial installation

Page 27

1  and that is --
2    Q.  I'm sorry.
3    A.  Okay.
4    Q.  I may have asked an unclear question.
5    You testified you believe that Insituform
6  began removing and replacing these shots in late 2004;
7  is that right?
8    A.  2003.
9    Q.  2003.  I'm doing it too.
10    But Insituform has begun, started the clock,
11  so to speak, on Phase I late September early October of
12  2003; is that right?
13    A.  Yes.
14    Q.  So, do you know whether the cost incurred
15  late September early October until the end of 2003 when
16  it began removing and replacing this, are those costs
17  not related to the removal and replacement?
18    A.  No, those costs are related to the removal
19  and replacement.
20    Q.  How is that?
21    A.  Before we tried to remove it all we tried to
22  repair it, that's what those costs are for.  That was
23  not acceptable from my understanding.
24    Q.  So, it's your understanding that the costs

Page 28

1  from, let's say the beginning of October of 2003 to
2  whenever Insituform began removal and replacement,
3  those costs were related to efforts to repair the
4  existing pipe?
5    A.  Yes.
6    Q.  Do you know what efforts Insituform
7  undertook?
8    A.  I don't know the exact efforts.
9    Q.  Do you know who would know the answer to
10  that?
11    A.  I'm sure someone in our operations group
12  would.
13    Q.  Now, Mr. Mangels, you had said that in
14  addition to Phase I and Phase II Insituform had further
15  organized its costs that it's seeking from American
16  Home; do you recall that?
17    A.  Say that again.  I'm not sure I understand
18  your question.
19    Q.  Has Insituform further broken down beyond
20  Phase I and Phase II costs its categories of costs?
21    A.  Yes.
22    Q.  Those include payroll?
23    A.  Includes labor, equipment, material, and
24  other costs.

7 (Pages 25 to 28)

Page 29

1    MR. MULLEN: Okay. I think now might be a

2    time to take a good quick break and just check on the

3    status of those documents.

4    WHEREUPON, THE PARTIES TOOK A SHORT BREAK, SUBSEQUENT

5    TO WHICH THE FOLLOWING PROCEEDINGS WERE MADE OF RECORD:

6    BY MR. MULLEN:

7    Q.  Mr. Mangels, I've asked the court reporter to

8    mark as Defendant's Exhibit 2 a May 22d, 2006 letter

9    from Chris Campos to Mr. Philbrick.

10    MR. MULLEN: Charlie, I should let you know

11    that I took this from your filings for your

12    cross-motion for summary judgment. And I note that it

13    goes up to page 10 of 16.

14    MR. PHILBRICK: Okay.

15    MR. MULLEN: The other documents were Mr.

16    Campos' CV and list of cases that he's testified in.

17    MR. PHILBRICK: Oh, I see.

18    MR. MULLEN: So, that's where the discrepancy

19    comes from in that.

20    BY MR. MULLEN:

21    Q.  I'd like you to take a look at that. Take as

22    much time as you need.

23    A.  Okay.

24    Q.  Have you seen this report before?

Page 30

1    A.  Yes.

2    Q.  What is it?

3    A.  It's a report prepared by someone that

4    reviewed our claim.

5    Q.  And that's Chris Campos?

6    A.  Yes.

7    Q.  Okay. How many times have you seen this

8    report?

9    A.  Once.

10    Q.  And when was that?

11    A.  Couple weeks ago.

12    Q.  Okay. What was the reason for your reviewing

13    the report a couple weeks ago?

14    A.  Just to understand what Mr. Campos has said

15    in his report. I had never seen it before.

16    Q.  And what is your understanding of Mr. Campos'

17    role with respect to this litigation?

18    A.  He reviewed our claim.

19    Q.  And checked certain costs as it --

20    A.  Yes. Yes.

21    Q.  And what is your understanding of Mr. Campos'

22    background?

23    A.  I don't know much about him. He's a CPA.

24    Q.  Do you know whether he's an expert on

Page 31

1    trenchless technology?

2    A.  I don't know that.

3    Q.  Okay. Or the costs associated with

4    trenchless technology?

5    A.  I don't know.

6    Q.  Okay. And do you know whether Mr. Campos was

7    asked to analyze whether Insituform's claim against

8    American Home was reasonably related to the

9    remediation?

10    A.  I don't know that as fact.

11    Q.  Do you have an opinion on that?

12    A.  That seems reasonable to me.

13    Q.  Do you know whether Mr. Campos was asked to

14    evaluate whether Insituform's costs were too high or

15    too low?

16    A.  I don't know that.

17    Q.  Have you ever spoken with Mr. Campos?

18    A.  I was on one phone call with him.

19    Q.  And when was that?

20    A.  It was this summer some time.

21    Q.  Summer of 2006?

22    A.  Yes.

23    Q.  Was it a conference call?

24    A.  Yes.

Page 32

1    Q.  Who else was on that call?

2    A.  I know Nick Campanile was on there. Bob

3    Kelley. That's all I know for sure.

4    Q.  Can't remember anybody else?

5    A.  (Indicated no.)

6    Q.  And who's Mr. Kelley?

7    A.  He's an attorney for Insituform.

8    Q.  An in-house attorney?

9    A.  Yes.

10    Q.  And do you know Mr. Kelley's responsibilities

11    with respect to Insituform's claim against American

12    Home?

13    A.  He has been working with our outside

14    counsel. I don't know his entire involvement, though.

15    Q.  And what was discussed during that conference

16    call?

17    A.  It was -- the costs that were developed for

18    our claim was discussed.

19    Q.  Do you recall Mr. Campos stating that some of

20    the costs in this claim should not be included in the

21    claim?

22    A.  He had concerns with some of the fixed costs.

23    Q.  What do you mean by fixed costs?

24    A.  Costs that we would incur even if we wouldn't

8 (Pages 29 to 32)

Page 33

1  have done a particular job. Costs that are there no
2  matter what.
3      Q.  Which fixed costs did Mr. Campos identify as
4  having concerns about?
5      A.  It was mainly in the equipment area.
6      Q.  And that's the equipment burden portion of --
7      A.  Yes.
8      Q.  -- Insituform's claim?
9          Do you know whether he had expressed more of
10  a concern as to Phase I or Phase II?
11      A.  I don't know that.
12      Q.  And do you know which fixed costs he had
13  concerns about, which specific fixed costs?
14      A.  No, I don't.
15      Q.  What is a variable cost?
16      A.  Variable cost is a cost that you will only
17  incur if you do another unit of production.
18      Q.  So, in the context of Insituform's claim
19  against American Home is it fair to say that a variable
20  cost is -- what would be an example of a variable cost?
21      A.  Variable cost. An example would be the tube,
22  the cost of the tube.
23      Q.  In the sense that you are making another
24  tube?

Page 34

1      A.  We're making a tube that is specific for that
2  job that we're using on that job.
3      Q.  More generally, a variable cost would be one
4  that Insituform is spending only because it has to do
5  work on the MWRA claim; is that right?
6      A.  Yes.
7      Q.  In layman's terms?
8      A.  Right.
9      Q.  Is there another description you prefer?
10      A.  No. No.
11      Q.  Did Insituform do a fixed versus variable
12  cost comparison for equipment burden?
13      A.  No.
14      Q.  It didn't do one at all to the best of your
15  knowledge?
16      A.  No.
17      Q.  Would it be possible for Insituform to do
18  that type of comparison?
19      A.  It would be difficult and subjective.
20  Anything is possible though.
21      Q.  What would make it difficult?
22      A.  Identifying what is fixed and what is
23  variable in the equipment area.
24      Q.  Do you know whether Insituform and Mr. Campos

Page 35

1  had differing conclusions as to what was a fixed cost?
2      A.  No, I don't know.
3      Q.  Do you know who would know that?
4      A.  No.
5      Q.  Did you ever send or receive any e-mails from
6  Mr. Campos?
7      A.  No.
8      Q.  Were you ever copied on any e-mails sent or
9  received from Mr. Campos?
10      A.  I don't believe so.
11      Q.  Do you know how costs were submitted to Mr.
12  Campos for his analysis?
13      A.  Yes.
14      Q.  How were they?
15      A.  I mean, the four binders were given to him.
16      Q.  Do you know if he reviewed any other
17  documents?
18      A.  I don't know.
19      Q.  And do you know whether there were any memos
20  memorializing this conference call?
21      A.  No, I don't believe there was.
22      Q.  Do you recall taking any notes during the
23  conference call?
24      A.  I probably took notes. I usually do that.

Page 36

1      Q.  Do you keep those notes?
2      A.  Sometimes I do.
3          MR. MULLEN: Mr. Philbrick, I'd like to
4  request Mr. Mangels' notes on this conference call.
5          MR. PHILBRICK: Why?
6          MR. MULLEN: Because I believe that they are
7  relevant with discovery of admissible evidence.
8          MR. PHILBRICK: You haven't established any
9  foundational basis for me to produce them.
10          MR. MULLEN: I've made my request on the
11  record.
12          MR. PHILBRICK: Okay. I'll take it under
13  advisement.
14          MR. MULLEN: Thank you.
15          BY MR. MULLEN:
16      Q.  Do you know whether Mr. Campos expressed any
17  concerns about other fixed costs in other areas being
18  included in the MWRA claim?
19      A.  Oh, I believe he may have had some concerns
20  in the payroll burden area.
21      Q.  What did Insituform do in response to Mr.
22  Campos concerns with that, if you know?
23      A.  Nothing.
24      Q.  They didn't take any fixed costs out?

9 (Pages 33 to 36)

LARRY MANGELS    NOVEMBER 17, 2006

Page 37

1    A.  No.
2    Q.  So, those costs are still in the claim?
3    A.  If they're fixed.
4    Q.  When you say if they're fixed, is there some
5   room for subjectivity on what's a fixed cost and what's
6   a variable cost with respect to labor?
7    A.  Yes.
8    Q.  In what way?
9    A.  Specifically in the worker's comp and general
10   liabilities area I believe there is some subjectivity
11   there.
12    Q.  Now, Insituform as part of its labor costs is
13   including costs for general liability and worker's
14   comp; is that correct?
15    A.  Yes.
16    Q.  Okay.  And what does general liability refer
17   to?
18    A.  It's general liability insurance.
19    Q.  So, Insituform's general liability insurance
20   policy?
21    A.  Yes.
22    Q.  And is that the policy that covers the entire
23   company?
24    A.  Yes.

Page 38

1    Q.  For all regions?
2    A.  Yes.
3    Q.  And for all projects?
4    A.  Yes.
5    Q.  Okay.  Isn't that a fixed cost?
6    A.  In total it is, yes.
7    Q.  I mean, put another way, regardless of
8   whether Insituform had the MWRA claim or did not it
9   would still have its general liability insurance policy
10   cost; isn't that right?
11    A.  If we wouldn't have had that particular job,
12   yeah.  Yeah, that's just one job.  That's true.
13    Q.  What is worker's compensation?
14    A.  It's insurance.
15    Q.  Sorry.  That was a vague question.
16    Insituform is claiming worker's compensation
17   as part of the MWRA claim; is that correct?
18    A.  Yes.
19    Q.  What are those costs associated with?
20    A.  Costs for worker's compensation.
21    Q.  And that's the worker's compensation policy
22   that covers all employees of the company?
23    A.  Yes.
24    Q.  For a given year or whatever the term of

Page 39

1   your --
2    A.  Yeah.
3    Q.  -- policy is?
4    A.  Right.
5    Q.  And I'd like to ask you the same questions
6   with respect to general liability.  Regardless of
7   Insituform's work for the MWRA it would still have its
8   worker's compensation policy; is that correct?
9    A.  That's true.
10    Q.  And would that policy premium be the same?
11    A.  I would imagine so, but I -- yes.
12    Q.  Would the policy premium or general liability
13   be the same regardless of whether it worked on the MWRA
14   claim?
15    A.  I don't know that for sure.
16    Q.  Do you have any reason to doubt that it would
17   be different?
18    A.  No.
19    Q.  Is equipment depreciation a fixed cost in the
20   abstract?
21    A.  Yes.
22    Q.  Is equipment depreciation included in
23   Insituform's coverage claim against American Home?
24    A.  Yes.

Page 40

1    Q.  Same type of questions I asked you with
2   respect to general liability and worker's compensation,
3   let me ask this question first:  What is equipment
4   depreciation?
5    A.  It's an accounting method that takes the life
6   when you pay for a vehicle and spreads it over the life
7   of the vehicle.
8    Q.  And this is done for tax reasons?
9    A.  It's done for accounting reasons and tax
10   reasons.
11    Q.  Oh, okay.  And how is equipment depreciation
12   calculated?
13    A.  On a straight line method over five or seven
14   years.
15    Q.  So meaning, for instance, if it were a five
16   year depreciation it would be depreciated 20 percent a
17   year?
18    A.  Yes.
19    Q.  And seven years would be some smaller
20   fraction then?
21    A.  Yes.
22    Q.  Okay.  So, is it fair to say that Insituform
23   was depreciating its equipment regardless of whether it
24   had the MWRA claim?

10 (Pages 37 to 40)

Page 41

1    A. Yes.
2    Q. And Insituform, I believe it's in payroll
3  burden, is also including its equipment insurance; is
4  that correct?
5    A. That's in the equipment burden.
6    Q. And taxes on the equipment?
7    A. Yes.
8    Q. Would that include things like registration
9  of the vehicles and --
10    A. Yes.
11    Q. Do you know whether it would include anything
12  else?
13    A. (No response.)
14    Q. Anything else falling under the category of
15  taxes?
16    A. No.
17    Q. Would Insituform have incurred those costs
18  regardless of the MWRA claim?
19    A. Yes.
20    Q. Wouldn't that be a fixed cost?
21    A. But there is a cost of having just a vehicle
22  out on the job site working everyday.
23    Q. Mr. Mangels, is it fair to say that if there
24  was the MWRA claim that equipment would be somewhere

Page 42

1  else on another project --
2    A. Yes.
3    Q. -- hopefully?
4      And Insituform would continue to be incurring
5  those costs?
6    A. Yes.
7    Q. Do you know whether Mr. Campos had any
8  concern with including those type of equipment costs in
9  Insituform's claim against American Home?
10    A. I don't know the specifics of his issues.
11    Q. Do you know who might?
12    A. I don't know.
13    Q. Would it be possible for Insituform to
14  calculate the amount of depreciation that's currently
15  in its equipment burden cost against American Home?
16    A. Yes.
17    Q. Is it possible for it to calculate its
18  insurance for this equipment in its claim?
19    A. Yes.
20    Q. Same question with respect to taxes?
21    A. Yes.
22    Q. So, it's possible to calculate that as well?
23    A. (Indicated yes.)
24    Q. Does Insituform's equipment burden claim also

Page 43

1  include an aspect with respect to its warehouse?
2      That's an unclear question.  Let me see if I
3  can ask a clearer one.
4      Is Insituform also claiming as part of its
5  cost against American Home any costs related to the
6  operation of its warehouse in the northeast?
7    A. Yes.
8    Q. What are those costs?
9    A. Rent for the facility.
10    Q. Do you know where that facility is?
11    A. Charlton, Massachusetts.
12    Q. It's not in East Boston?
13    A. No.
14    Q. Do you know how far Charlton is from East
15  Boston?
16    A. I don't know the exact mileage.  It's between
17  50 and a hundred miles.
18    Q. Did Insituform rent this warehouse
19  specifically for the MWRA project?
20    A. No.
21    Q. Do you know whether it still has that
22  warehouse?
23    A. Yes.
24    Q. So, regardless of whether it had the MWRA

Page 44

1  claim or not would Insituform still keep that
2  warehouse?
3    A. Yes.
4    Q. And it would still pay rent on it?
5    A. Yes.
6    Q. Would it still pay, barring any increase in
7  rent, the same amount of rent regardless of whether it
8  had the MWRA claim?
9    A. Yes.
10    Q. Isn't that a fixed cost?
11    A. Yes.
12    Q. Mr. Mangels, I'd like you to turn to page two
13  of Defendant's Exhibit 2, which is Mr. Campos' letter
14  to Mr. Philbrick.
15      Mr. Mangels, I'd actually like you to turn to
16  page three of Mr. Campos' letter and I'd like to
17  discuss the portion that deals with payroll.  And in
18  particular the second full paragraph of this page.
19      Do you know whether Insituform's claim
20  against American Home -- let me ask this:  How is labor
21  calculated?
22    A. That's a very vague question.
23    Q. Would you like me to --
24    A. Yeah.

11 (Pages 41 to 44)

Page 45

1    Q.   Insituform's claim includes wet-out labor; is
2    that correct?
3    A.   In Phase I, yes, that's correct.
4    Q.   In Phase I.
5    What is wet-out labor?
6    A.   It's the labor associated in our wet-out
7    centers with impregnating the tube with the resin
8    before it goes out to the job site.
9    Q.   And where is that done generally?
10   A.   It's done in one of our wet-out facilities.
11   Q.   And how many wet-out facilities does
12   Insituform have?
13   A.   Seven.
14   Q.   Do you happen to know which wet-out facility
15   was used for Phase I of the MWRA project?
16   A.   I believe it was Lamont, Illinois.
17   Q.   Illinois.
18   And do you know how gross pay was calculated
19   or is that something we should look at the other
20   documents?  Do you know how gross pay was calculated?
21   A.   For wet-out?
22   Q.   For wet-out.
23   A.   Just their hourly rate times the number of
24   hours they worked.

Page 46

1    Q.   And do you know where the gross rate category
2    for wet-out labor -- is that the amount that they were
3    paid, the employees?
4    A.   Yes.
5    Q.   So, there's no profit built into that?
6    Let me ask this question:  Lawyers, for
7    instance, are paid a certain rate, but their clients
8    are billed another rate.  Do you know whether that's --
9    is that true for Insituform's calculation of gross pay?
10   A.   That's not true.
11   Q.   Okay.  It's directly the money that was paid?
12   A.   Yes.
13   Q.   Okay.  Now, for non-wet-out labor for Phase I
14   Insituform identified three pay types:  Pay tape 100,
15   101, and 150; is that right?
16   A.   Yes.
17   Q.   What does code 100 represent?
18   A.   That's regular pay.
19   Q.   And are there different components of code
20   100?  Was there a base pay, for instance, base yard
21   pay?
22   A.   There's a base pay, yes.
23   Q.   And what does that signify?
24   A.   It's their regular hourly wage.

Page 47

1    Q.   Was there another rate as well for work that
2    they did while on site?
3    A.   There's a prevailing wage in the state of
4    Massachusetts.
5    Q.   And how is that calculated?
6    A.   That's set by the state.
7    Q.   And so, it's part of a public work contract
8    you have to pay that rate?
9    A.   Yes.  Yes.
10   Q.   What were mobilization and demobilization
11   charged at?
12   A.   Their regular hourly wages.
13   Q.   The base yard rate, I believe that's called?
14   A.   Yes.
15   Q.   Okay.  And what is mobilization?
16   A.   That's the time spent to get the crew from
17   the yard to the job site.
18   Q.   And what is demobilization?
19   A.   Get from the job site back to the yard.
20   Q.   How did Insituform calculate mobilization and
21   demobilization?
22   A.   Based on the time spent getting from the yard
23   to the job site, the number of hours.
24   Q.   How did Insituform determine what that was?

Page 48

1    A.   The crew superintendent makes that decision.
2    Q.   And do the underlying employees have to fill
3    out a time sheet or --
4    A.   The crew superintendent fills out the time
5    sheet.
6    Q.   For the entire crew?
7    A.   Yes.
8    Q.   And do you know how many people are on a
9    crew?
10   A.   It varies by job.
11   Q.   Do you know for the MWRA claim?
12   A.   I do not know that.
13   Q.   Do you know what the variations in crew
14   size --
15   A.   It could be from three to 12.
16   Q.   Okay.  Let's turn to page three of Mr.
17   Campos' letter to Mr. Philbrick.  And I'll read this
18   into the record:  "I was able to verify the hours for
19   work done on site.  I was also able to verify the
20   mobilization/demobilization hours for weeks in which
21   the employees worked on only job number 160214.  For
22   those weeks the total hours reflected in the "check
23   detail" section of the certified payroll registers
24   equated the total hours worked on site plus the hours

ESQUIRE DEPOSITION SERVICES, LLP - ST.LOUIS
314.621.6173    888.462.2780

Page 49

1  for mobilization/demobilization. However, I was not
2  able to verify mobilization/demobilization hours for
3  weeks during which the employees worked on more than
4  one job. This is due to the fact that the total hours
5  reflected in the "check detail" section of the
6  certified payroll registers included hours for all jobs
7  worked on the site (Not just job number 160214) as well
8  as all mobilization/demobilization hours for all jobs.
9  In any event, for those weeks, the total hours included
10  in the "check detail" was greater than the hours
11  claimed for project number 160214."
12      Mr. Mangels, do you know whether Mr. Campos
13  is saying that the hours Insituform's employees were
14  working only on Phase I the check registers reflected
15  all the hours including mobilization and
16  demobilization?
17      A.  I don't know that.
18      Q.  Okay.  Now, what is the check detail section
19  that Mr. Campos is referring to?
20      A.  That is a report that we use in when filing
21  certified payrolls to the state of Massachusetts.
22      Q.  Is that an electronic form?  Is it something
23  you fill out?
24      A.  It's a report that comes out of our

Page 50

1  accounting system.
2      Q.  And what accounting system is that?
3      A.  JD Edwards.
4      Q.  Is that an in-house accounting --
5      A.  Yes.
6      Q.  -- system?
7      A.  Yes.
8      Q.  Run by Oracle?
9      A.  Yes.
10      Q.  Is it fair to say that the numbers from the
11  JD Edwards system are only as good as the numbers that
12  are put into them initially?
13      A.  Yes.
14      Q.  Mr. Mangels, how was information inputted
15  into the JD Edwards system?
16      A.  It varies depending on what is being
17  inputted.
18      Q.  Okay.  And how was it put in for the MWRA or
19  Phase I of the MWRA claim?
20      A.  Are you speaking payroll or everything?
21      Q.  Good question.  Everything.
22      A.  Well, it varies.  Payroll is done through
23  time sheets, input through time sheets into the
24  system.

Page 51

1      Subcontract cost is inputted through the
2  payable or payable system.
3      Equipment is done through the payable system,
4  unless it's depreciation, which is done through the
5  fixed asset -- automated fixed asset entry.
6      Q.  What is it, the payable system?
7      A.  Yes.
8      Q.  What is that?
9      A.  It's our accounts payable system that we use
10  to process invoices.
11      Q.  And these are invoices you receive from
12  anybody?
13      A.  Yes.
14      Q.  Okay.  Mr. Mangels, do you know how
15  mobilization and demobilization was calculated for
16  times when people were working on multiple projects
17  over the course of the day not just the MWRA project?
18      A.  No, I don't.
19      Q.  Do you know whether it would be possible to
20  calculate the hours that were specifically spent
21  mobilizing or demobilizing?
22      A.  No.
23      Q.  And just to go back, mobilization and
24  demobilization is charged at the base yard rate?

Page 52

1      A.  Yes.
2      Q.  Thank you.
3      MR. MULLEN:  Let's take five or 10 minutes.
4  WHEREUPON, THE PARTIES TOOK A SHORT BREAK, SUBSEQUENT
5  TO WHICH THE FOLLOWING PROCEEDINGS WERE MADE OF RECORD:
6      BY MR. MULLEN:
7      Q.  Mr. Mangels, I've asked the court reporter to
8  mark as Defendant's Exhibit 3 portions of the four cost
9  binders that Insituform has produced to American Home
10  in this matter.
11      I'll, again, apologize that the four full
12  binders themselves seem to be lost in transit
13  somewhere, because of inclement weather, but
14  fortunately that is the best I could do on short
15  notice.
16      Can I ask you to turn to page ITI-AIG 2.  Mr.
17  Mangels, could you, please, describe what this document
18  is?
19      A.  This is a total accumulation of our actual
20  cost on the EBBS Boston job.
21      Q.  And this includes both Phase I and Phase II?
22      A.  Yes.
23      Q.  And if I go to the very bottom of the page
24  the total section does that reflect $5,275,153.66 for

13 (Pages 49 to 52)