Page 53

1  Phase I?
2      A.  Yes.
3      Q.  And that's Insituform's cost for Phase I of
4  this MWRA project?
5      A.  Yes.
6      Q.  And moving over one column to the right
7  $2,123,145.39 is that Insituform's cost for Phase II of
8  the MWRA project?
9      A.  Yes.
10     Q.  And the third and final column, $7,398,299.05
11  what does that represent?
12     A.  That's our total actual cost for this
13  project.
14     Q.  So, Phase I plus Phase II?
15     A.  Yes.
16     Q.  Okay.  Do you know what Insituform is seeking
17  as against American Home of that $7,398,299.05?
18     A.  I don't know the exact amount.
19     Q.  I'd to ask you to turn to what's behind tab
20  A.
21         And tab A for the record comprises ITI-AIG
22  three through seven.  That's just tab A.  There are sub
23  parts to that that I'm not referring to at this time.
24         MR. PHILBRICK: Counsel, if you would like

Page 54

1  refer to those designations as Bates three through
2  seven I would have to objection.
3         MR. MULLEN: Understood and appreciated.
4         There may be some other documents from other
5  productions I may be introducing, when that bridge
6  comes we'll cross it appropriately.
7         MR. PHILBRICK: We'll be specific.
8         MR. MULLEN: Excellent.
9         BY MR. MULLEN:
10     Q.  Mr. Mangels, you were testifying earlier
11  about the different types of labor costs, pay type
12  100.  There's also a pay type 101 that Insituform is
13  seeking; is that right?
14         MR. PHILBRICK: Object to the form of the
15  question.
16         Witness may answer if he can.
17         THE WITNESS: Yes.
18         BY MR. MULLEN:
19     Q.  Do you know what that signifies, represents?
20     A.  No.
21     Q.  Are there any documents that would refresh
22  your recollection?
23         MR. PHILBRICK: Objection to the form.
24         Witness may answer if he can.

Page 55

1         THE WITNESS: I don't know.
2         BY MR. MULLEN:
3      Q.  Do you know what I mean when I say refresh
4  your recollection, Mr. Mangels?
5      A.  Yes.
6      Q.  Okay.  And I just mean is there a document
7  that you would look at that would help to refresh your
8  recollection?
9      A.  I don't know of one.
10         MR. PHILBRICK: He said he didn't know, so
11  nothing in the world would refresh his recollection.
12         MR. MULLEN: I apologize, Charlie.  I was just
13  explaining what I meant by refresh his recollection.  I
14  wasn't attempting to ask the witness again.
15         BY MR. MULLEN:
16     Q.  Mr. Mangels, I'd like you to turn to page
17  three, which is Bates labeled, under the gross pay
18  section, the second full paragraph.  Could I ask you to
19  read that, please?
20         MR. PHILBRICK: Into the record?
21         MR. MULLEN: To yourself.
22         MR. PHILBRICK: Oh.
23         THE WITNESS: Okay.
24         BY MR. MULLEN:

Page 56

1      Q.  Do you know whether that describes pay type
2  101 --
3      A.  Yes, it does.
4      Q.  -- that Insituform is claiming?
5      A.  Yes, it does.
6      Q.  And what is pay type 101?
7      A.  It's for additional incentive for performing
8  certain duties.
9      Q.  And it's an incentive program --
10     A.  Yes.
11     Q.  -- for certain jobs?
12     A.  Yes.
13     Q.  Do you know why an incentive type program is
14  necessary for Phase I or Phase II?
15     A.  It was to compensate them for going down into
16  the pipe.
17     Q.  Do you know whether an incentive program was
18  necessary for that type of work?
19     A.  No, I don't.
20     Q.  Do you know who would know the answer to that
21  question?
22     A.  The operations group.
23     Q.  Mr. Mangels, could I ask you to turn to page
24  40, which is behind tab A 1.

14 (Pages 53 to 56)

Page 57

1    And I'll note for the record that tab A 1 of
2  Defendant's Exhibit 3 only contains page 40, although
3  the initial binder contained, I believe, pages nine
4  through 40.
5    Mr. Mangels, can you, please, identify what
6  is page 40?
7    A. It's a table report out of our JD Edwards
8  system.
9    Q. And is this for field labor for Phase I of
10  the project?
11    A. (No response.)
12    Q. Says it at the top of the document.
13    Does it say at the top of the document that
14  this is field labor from pay period 10/1/03 through
15  3/31/05?
16    A. Yes.
17    Q. Do you believe those are the dates for Phase
18  I of the project?
19    A. Yes.
20    Q. And are the columns listed at the top of
21  document page number 40 the columns comprising labor
22  costs?
23    A. From column gross pay through payroll burden.
24    Q. What does payroll burden do?

Page 58

1    A. It's various items. We use another schedule
2  that supports that. That might be in the regular
3  package.
4    Q. Do you know whether it represents the general
5  liability amount, the worker's comp, the employer
6  payroll tax, and the fringe benefits?
7    A. Yes.
8    Q. Can you identify any of the components of
9  payroll burden as fixed costs?
10    A. In theory general liability and worker's comp
11  could be considered fixed costs.
12    Q. What about the employer payroll tax?
13    A. That is a variable cost.
14    Q. And what comprises the employer payroll tax?
15    A. It's the taxes the company has to withhold or
16  that the company has to pay to the governing authority.
17    Q. That includes the state and federal
18  government?
19    A. Yes.
20    Q. And what do fringe benefits represent?
21    A. That will be 401 K, medical insurance,
22  vacation, holiday pay.
23    Q. And this is the company's contribution to
24  those things?

Page 59

1    A. Yes.
2    Q. Could any of those be considered to be fixed
3  costs?
4    A. I don't believe so.
5    Q. Do you know whether there's a difference of
6  opinion? Do you know whether Mr. Campos identified any
7  of these as fixed costs?
8    A. I do not know that.
9    MR. PHILBRICK: You've got to wait for him to
10  finish his questions, Mr. Mangels.
11    THE WITNESS: Okay.
12    BY MR. MULLEN:
13    Q. Do you know whether Mr. Campos identified
14  employer payroll tax or any aspects of it as a fixed
15  cost?
16    A. No, I do not.
17    Q. Going across document page 40, there's also
18  an equipment burden column that's addressed separately
19  in Insituform's plan; is that right?
20    A. Yes.
21    Q. Okay. We'll about that later.
22    And Mr. Mangels, staying on page 40, do you
23  know whether the total at the bottom, the totals that
24  are listed, are the total amounts paid for Phase I of

Page 60

1  this project for the field labor?
2    A. Yes.
3    Q. Okay. So, that's for general liability
4  $25,846.23?
5    A. Yes.
6    Q. And for worker's comp $33,762.63?
7    A. Yes.
8    Q. Okay. Mr. Mangels, do you know what pay type
9  150 represents?
10    A. Overtime pay.
11    Q. Do you know how that is calculated?
12    A. It's 50 percent of base pay.
13    Q. So, 150 percent overall?
14    A. Yes.
15    Q. And in some instances might it not be quite
16  150 percent based on various contributions, such as
17  pension or 401 K?
18    A. Yes.
19    Q. And Mr. Mangels, I'd like you to turn to what
20  is behind tab A 5, which is document page number 357.
21  Is document page number 357 -- what does it represent?
22    A. It's the fringe benefit piece.
23    Q. And that's for field labor on that page; is
24  that right?

15 (Pages 57 to 60)

LARRY MANGELS    NOVEMBER 17, 2006

Page 61

1      A.  Field labor fringe benefits, yes.
2      Q.  And the next page, 358, is wet-out fringe
3   benefits?
4      A.  Yes.
5      Q.  I'd like you to turn to tab B, which is
6   document page numbers 359 to 362.  Take as much time as
7   you need to look through that.
8      A.  Okay.
9      Q.  Mr. Mangels, what do those pages represent?
10     A.  It's a description of our equipment burden
11  and expendable supply costs.
12     Q.  Your expendable and supply costs are though,
13  do you know whether they're categorized labor later in
14  the subject contract or third party invoices?
15     A.  I believe they're included with the equipment
16  cost.
17     Q.  Let's turn to equipment burden first.  Are
18  the items running from the bottom of page 359 through
19  the top of page 60 generally the components of
20  equipment burden?  And I'll read them into the record
21  separately.
22     A.  Yes.
23     Q.  So those include number one, labor costs for
24  the maintenance of the warehouse and yard?

Page 62

1      A.  Yes.  That is right.
2      Q.  Number two, parts and supplies used to
3   maintain, repair, and run Insituform's equipment,
4   including external repair services in the field to run
5   the vehicles.
6      A.  Yes.
7      Q.  Number three, equipment depreciation.
8      A.  Yes.
9      Q.  And that's straight-line depreciation --
10     A.  Yes.
11     Q.  -- that we discussed earlier?
12     A.  Yes.
13     Q.  Number four, the cost of any leased vehicles
14  and equipment not used in a specific project.
15     A.  Yes.
16     Q.  Number five, cost of leasing and maintaining
17  the warehouse and yard space.
18     A.  Yes.
19     Q.  Is that right?
20     A.  Yes.
21     Q.  Number six on page 360, taxes, license fees,
22  and insurance costs directly relating to the
23  equipment.
24     A.  Yes.

Page 63

1      Q.  And then there's another cost category, which
2   includes miscellaneous supplies used in production; is
3   that correct?
4      A.  Yes.
5      Q.  And that's inventoried and used as needed?
6      A.  Yes.
7      Q.  So, that's for all the northeast region?  Is
8   that for all the northeast region?
9      A.  Not what was is included in our cost for this
10  job.  Is that what you're asking?
11     Q.  I'm asking are the other costs simply for
12  MWRA project or is it calculated based on all of --
13     A.  It's calculated based on all the whole entire
14  region.
15     Q.  Is the same true for the next bullet point
16  under the cost of safety related equipment such as hard
17  hats, gloves, goggles, and masks?
18     A.  Yes.
19     Q.  And tab B, this is the equipment burden and
20  expendable supply costs for Phase I; is that right?
21     A.  Yes.
22     Q.  Okay.  And could I ask you to look at tab F,
23  page numbers 1940 through 1943.
24     A.  Okay.

Page 64

1      Q.  Is this the equipment and expendable supplies
2   narrative for Phase II?
3      A.  Yes.
4      Q.  Is the narrative different in any way between
5   Phases I and II?
6          MR. PHILBRICK: Objection, form.
7          BY MR. MULLEN:
8      Q.  Do you know?
9          MR. PHILBRICK: Witness may answer if he can.
10         THE WITNESS: I don't know if they're exactly
11  the same or not.
12         BY MR. MULLEN:
13     Q.  Do you know, Mr. Mangels, whether there are
14  any costs included under equipment burden or
15  expendables and supplies?  By costs I mean categories
16  of costs for Phase II that are not in Phase I?
17     A.  There are none.
18     Q.  Mr. Mangels, I apologize, we're doubling back
19  a bit on some of things you testified about earlier.
20         Could you identify any fixed costs in
21  equipment and facility cost center that is listed on
22  page 359 and page 360?
23     A.  Well, as we talked earlier the equipment
24  depreciation and maybe the lease on the maintenance and

16 (Pages 61 to 64)

Page 65

1  yard could be considered fixed in nature.
2      Q.  What about the labor costs for the
3  maintenance of the warehouse and yard?
4      A.  That could be considered fixed in nature.
5  That doesn't consider the actual costs for the job.
6      Q.  What about number two, the parts and
7  supplies?
8      A.  I believe that's more variable in the field.
9      Q.  Would that be keyed to the MWRA project or
10 not?
11     A.  Could be.  If they needed specific supplies
12 for that job they would go out and buy that.
13     Q.  In those instances where they went out and
14 bought specific supplies was that charged?  Do you know
15 whether that's included in the Phase I and Phase II
16 costs for equipment burden or --
17     A.  Are we talking about number two on --
18     Q.  Yes, sir.
19     A.  Okay.  But I think that deals with the
20 equipment, right?
21     Q.  It states parts and supplies used to
22 maintain, repair, and run our equipment, including
23 external repair services in the field to run our
24 vehicles.

Page 66

1      A.  Right.  So, can you ask your question again?
2      Q.  Sure.  Well, let me ask this question:  How
3  is equipment burden calculated?
4      A.  Equipment burden is a set rate per labor hour
5  so we know what your budgeted costs are, we know what
6  your budgeted labor hours are, we calculate a budgeted
7  labor rate or equipment rate.
8      Q.  Now, is that rate listed for Phase I on page
9  360 at the bottom?
10     A.  Yes.
11     Q.  For wet-out $32.50?
12     A.  Yes.
13     Q.  New England crews have two different rates.
14 Through February 28th of '04 it's $35?
15     A.  Yes.
16     Q.  And after March 1st of '04 $26?
17     A.  Yes.
18     Q.  And for Benicia, California $34?
19     A.  Yes.
20     Q.  Do you know why that last category is listed?
21     A.  We had people from our Benicia, California
22 location work on this job.
23     Q.  And they were charged at a different rate
24 than the New England crew?

Page 67

1      A.  Yes.
2      Q.  Do you know why that is?
3      A.  They have a higher equipment cost rate in
4  California.
5      Q.  So, it was based on their California
6  equipment cost rate?
7      A.  Yes.
8      Q.  And the New England crew rate was based on
9  New England equipment cost rate?
10     A.  Yes.
11     Q.  And is this the same equipment burden rate --
12 let's do it that way.  Is the New England equipment
13 cost rate the same equipment burden for the entire New
14 England region?
15     A.  Yes.
16     Q.  And the Benicia rate is that the same rate
17 for its region?
18     A.  Yes.
19     Q.  What region is that?
20     A.  The west.
21     Q.  And Mr. Mangels, those rates didn't increase
22 or decrease depending on the MWRA claim; is that right?
23     A.  The rates did not increase or decrease.
24 Actual equipment cost may have increased or decreased,

Page 68

1  but the rates did not change.
2      Q.  So, wouldn't that be considered to be a fixed
3  cost?
4      A.  No.
5      Q.  Why not?
6      A.  Because we had to have our crews out on that
7  job site working when they could have been somewhere
8  else generating revenue.
9      Q.  You would have been charging them the same
10 rate, is that right though, depending on whatever
11 project they were working on?
12     A.  Yes.
13     Q.  Mr. Mangels, turning back to page 359, number
14 four, under equipment and facility cost center.
15     A.  What page?
16     Q.  359 under tab behind tab B.
17     A.  Okay.
18     Q.  The cost of any leased vehicles and equipment
19 not used on specific project.  Is that a fixed cost?
20 Could that be considered to be a fixed cost?
21     A.  Yes.
22     Q.  Do you consider it to be a fixed cost?
23     A.  In theory, yes, that's a fixed cost.
24     Q.  Turning to page 360, number six, the taxes,

17 (Pages 65 to 68)

LARRY MANGELS    NOVEMBER 17, 2006

Page 69

1  license fees, and insurance costs directly relating to
2  the equipment; is that a fixed cost?
3       A.  Yes.
4       Q.  Either of the items listed in number seven,
5  the other costs category on that page, are they fixed
6  costs?
7       A.  Safety equipment could or could not be a
8  fixed cost. The more work you do the more supplies
9  you're going to need, so that's just a variable.
10      Q.  What about miscellaneous supplies used in
11 production?
12      A.  Same thing. If you don't do any work you
13 don't need the supplies. So, if you do you need the
14 supplies.
15      Q.  But that was built into the equipment burden
16 rate?
17      A.  Yes.
18      Q.  That's at the bottom of page 360 for Phase I?
19      A.  Yes.
20      Q.  And Phase 2 at the bottom of page 1941 behind
21 tab F?
22      A.  Yes.
23      Q.  The other costs category on page 360, and I'm
24 talking about the second bullet point, the costs of

Page 70

1  safety equipment, such as hard hats, gloves, goggles
2  and masks, how is that different from the expendables
3  and supplies costs that's listed on page 359?
4       A.  Where is that at on 359?
5       Q.  Page 359, which is also behind tab B.
6       A.  Okay.
7       Q.  What is the expendables and supplies cost?
8       MR. PHILBRICK: He's asking to you tell him
9  where on page 359 references expendables and supplies.
10      BY MR. MULLEN:
11      Q.  It's under the second full paragraph that's
12 bulleted -- that's not bulleted, but it's bold and
13 underlined, expendables and supplies costs.
14      A.  Oh, here. Okay. It's very similar.
15      Q.  Anyhow, did Insituform categorize and
16 calculate the expendables and supplies costs listed on
17 the second full paragraph of page 359?
18      A.  Based on our actual cost over a period of
19 time we've developed an hourly rate and that's charged
20 to the job based on an hourly rate of $6 an hour.
21      Q.  And what does that $6 an hour include?
22      A.  Includes the expense and supply cost, the
23 actual costs that we incur for those supplies.
24      Q.  Things like gloves, goggles, and --

Page 71

1       A.  Supplies.
2       Q.  -- supplies?
3       A.  Right.
4       Q.  And is that $6 an hour per employee?
5       A.  Per hour.
6       Q.  Per hour per employee?
7       A.  Yes.
8       Q.  Is that company wide?
9       A.  We use that process. That rate may vary
10 slightly between areas, because we try to get our
11 actual cost charged into the jobs.
12      Q.  So, it varies depending on region?
13      A.  Yes.
14      Q.  But within the region it's uniform?
15      A.  Yes.
16      Q.  And in this case its $6 per employee per
17 hour?
18      A.  Six dollars per hour, correct.
19      Q.  Do you know whether Insituform calculated its
20 -- how many supplies it actually used for either
21 Phase I or Phase 2 of the MWRA project that's
22 expendable supplies?
23      A.  We did not.
24      Q.  So, it could be higher or lower than the $6

Page 72

1  per hour?
2       A.  Yes.
3       Q.  And turning to page 360, the other costs
4  category, the second bullet, the cost of safety
5  equipment, now you testified that that's similar to the
6  expendables and supplies costs that are listed on page
7  359?
8       A.  Right.
9       Q.  In the other costs category is that built
10 into the equipment burden rate that's on the bottom of
11 page 360?
12      A.  Yes.
13      Q.  For Phase I?
14      A.  Yes.
15      Q.  And for Phase 2, tab F, page 1941?
16      A.  Yes.
17      Q.  Number seven there is also built into the
18 rate at the bottom?
19      A.  Yes.
20      Q.  Mr. Mangels, do you know whether Mr. Campos
21 had any questions about the "includability" of certain
22 fixed costs in Insituform's claims against American
23 Home?
24      A.  I believe he did have some.

18 (Pages 69 to 72)

Page 73

1    Q. Do you know whether he thought that those
2  costs should be included in the claim?
3    A. I don't know for sure.
4    Q. So, you don't know for sure whether he
5  thought those costs should be included or should not
6  be?
7    A. I don't know which costs he thought should or
8  shouldn't be.
9    Q. And I apologize if I asked you this earlier
10  today, did Insituform perform a fixed versus variable
11  cost assessment for equipment burden for either Phase I
12  or II?
13    A. No.
14    Q. They did not?
15    A. No.
16    Q. Do you know why not?
17    A. We did not, because we have our actual cost
18  built into the jobs, what was charged the jobs.
19    Q. And do you know whether Mr. Campos was asked
20  to do a fixed versus variable cost analysis for Phase I
21  or Phase II?
22    A. I do not know that.
23    Q. Mr. Mangels, I'd like you to turn to tab C,
24  which is document number 363 through 364. Take as much

Page 74

1  time as you need to look that over.
2    A. Okay.
3    Q. Okay. What is the document at page 363 to
4  364 represent?
5    A. It's an overview of how we charge material
6  cost to the job.
7    Q. And that's for Phase I?
8    A. Yes.
9    Q. Do you know whether the same methodology was
10  used for Phase 2?
11    A. Different method was used.
12    Q. Okay. Let's go to Phase II just so we can
13  discuss that. That's behind tab G, at pages 1944 to
14  1945.
15      What was the methodology used for Phase 2 to
16  establish materials?
17    A. We change our wet-out accounting method to a
18  standard cost system in Phase II.
19    Q. I didn't think there was any wet-out for
20  Phase 2?
21    A. Oh, yeah, you still have wet-out account.
22  You still have to wet-out the tube.
23    Q. Okay.
24    A. There's --

Page 75

1    Q. How did Insituform calculate tube material
2  costs for Phase I?
3    A. It's for the manufacturing side. It's based
4  on standard costs. And for wet-out it was -- labor and
5  material were charged directly to the job.
6    Q. And the difference in Phase II you said that
7  wet-out --
8    A. Wet-out is on a standard cost basis.
9    Q. And the manufacturing remains on a standard
10  cost basis?
11    A. Yes. Yes.
12    Q. So, for Phase II the same cost basis was used
13  for manufacturing and wet-out; is that right?
14    A. Yes. Well, yeah.
15    Q. And that's standard cost?
16    A. Right. We've adjusted for actual cost in
17  there though.
18    Q. What is standard cost accounting?
19    A. Standard costs?
20    Q. Generally.
21    A. You develop a standard material cost times a
22  standard rate of trying to predict what your costs are
23  going to be, something that you can measure against.
24    Q. And how do you determine the standard

Page 76

1  material cost?
2    A. Determine how much material you're going to
3  use in the process.
4    Q. How is that forecasted? Is it forecasted at
5  the beginning of the year? Is it forecasted by
6  project, on a project basis?
7    A. At the beginning of the year.
8    Q. So, the material cost is forecast at the
9  beginning of year for all the material that's to be
10  used?
11    A. It's budgeted.
12    Q. Budgeted?
13    A. Right.
14    Q. How is the standard rate determined?
15    A. The standard -- exactly what do you mean by
16  standard rate?
17    Q. How do you determine the standard rate in
18  standard cost accounting?
19    A. Are we talking manufacturing or wet-out?
20    Q. Manufacturing.
21    A. Okay.
22    Q. Sorry.
23    A. The standard rate is based, on depending upon
24  the tube size and, you know, how much felt you're going

19 (Pages 73 to 76)

Page 77

1  to use, times the standard felt price, including the
2  labor to make that tube.
3      Q.  And is that also estimated at the beginning
4  of the year?
5      A.  Yes.
6      Q.  Forecast through the year?
7      A.  Yes.
8      Q.  How is it determined for wet-out?
9      A.  Phase II?
10     Q.  Phase II?
11     A.  Same basic method.
12     Q.  Okay.  As a general matter is there variation
13  between standard cost and actual cost?
14     A.  Yes.
15     Q.  For Phase I do you know what that variation
16  was?
17     A.  I don't know exact dollar.
18     Q.  Do you know the percentage?
19     A.  I don't know the percentage.  It's in the
20  documentation.
21     Q.  I don't know that I saw that.
22     A.  Actual cost was lower than standard cost.
23     Q.  Does Insituform's claim against American Home
24  include the standard cost or the actual cost?

Page 78

1      A.  The actual cost.
2      Q.  Is that true for materials and the labor?
3      A.  Yes.
4          MR. PHILBRICK:  How do you know that?
5          THE WITNESS:  Page 1946.
6          BY MR. MULLEN:
7      Q.  And that's behind tab F?
8      A.  Behind --
9          MR. PHILBRICK:  You've done weird things
10  here.  Hold on.  Time out.
11         BY MR. MULLEN:
12     Q.  Mr. Mangels, I believe you just testified
13  that Insituform's claims against American Home is based
14  on its actual costs and not its standard costs; is that
15  correct?
16     A.  Yes.
17     Q.  Is that true for both Phase I and Phase II?
18     A.  Yes.
19     Q.  And what do you base that on?
20     A.  I don't see the documents in this package.  I
21  don't see the documents in this package.
22         MR. PHILBRICK:  Can you explain?
23         BY MR. MULLEN:
24     Q.  What document?  Yeah.

Page 79

1      A.  I mean, we've adjusted for -- from standard
2  to actual in our cost billed up.
3      Q.  For this claim?
4      A.  Yes.
5          MR. PHILBRICK:  Do you mind if I interrupt for
6  just a second?
7          There was a question where you were asked how
8  do you know if standard costs were over actual and you
9  looked at a piece of paper.
10         THE WITNESS:  Well, yeah, but that's not this
11  paper.  I was wrong.
12         MR. PHILBRICK:  Okay.  Thank you.
13         Sorry to interrupt your deposition.
14         MR. MULLEN:  Not at all.
15         BY MR. MULLEN:
16     Q.  Mr. Mangels, the reason I'm a little confused
17  is it seems to me that Insituform's summary for Phase I
18  which is at page 363 to 364 behind tab C, I don't see
19  any reference to the calculation being based on actual
20  cost and believe that the same is true for what's
21  behind tab G at 1944 to 1945.  So, --
22         MR. PHILBRICK:  Are you done?
23         MR. MULLEN:  There was a question.  There was
24  a question in this somewhere.

Page 80

1          MR. PHILBRICK:  Well, it hasn't come yet.
2          MR. MULLEN:  It's coming.
3          BY MR. MULLEN:
4      Q.  So my question is:  What's your conclusion
5  that actual costs were charged based on?
6      A.  Page 364, second paragraph.
7      Q.  The second full paragraph at the top of the
8  page?
9      A.  Yes.  They're issued work order actual
10  quantities.  Standard cost.  We have our actual
11  quantities.
12     Q.  Now, does that just cover materials?
13     A.  Yes.
14     Q.  Is labor for Phase I -- did that continue to
15  be billed at the standard cost?
16     A.  At the standard rate.
17     Q.  The standard rate, I'm sorry?
18     A.  Yes.
19     Q.  And can the standard rate be different than
20  the actual rate?
21     A.  Yes.
22     Q.  Do you know whether the standard rate was
23  different than the actual rate with respect to Phase I?
24     A.  I don't know for sure.

20 (Pages 77 to 80)

Page 81

1    Q.  Could that be calculated?
2    A.  Yes.
3    Q.  Do you know whether the standard rate was
4  higher for Phase I than the actual rate for labor?
5    A.  I don't know.
6    Q.  What about with respect to Phase II do you
7  know whether the standard rate was used for labor?
8    A.  Yes.
9    Q.  And it was used?
10    A.  Yes.
11    Q.  Do you know whether it was different than the
12  actual rate?
13    A.  I don't know.
14    Q.  But that also could be calculated?
15    A.  Yes.
16    Q.  What would you need to do to calculate that?
17    A.  Look at each individual work order.
18    Q.  For the different shots that comprised either
19  Phase I or Phase II?
20    A.  Yes.
21    Q.  Does Insituform have that material, those
22  invoices --
23    A.  Yes.
24    Q.  -- or how does the work come in for

Page 82

1  materials?
2    A.  How does --
3    Q.  How does the manufacturing facility know how
4  much to make?
5    A.  They receive an order from the field
6  operations group.
7    Q.  And Insituform still has those orders?
8    A.  Yes.
9    Q.  For Phase I and for Phase II?
10    A.  Yes.
11    Q.  Now, is there also an overhead component of
12  the materials cost?
13    A.  Yes.
14    Q.  What does the overhead represent?
15    A.  Represents the indirect labor for the
16  facility, the cost of the facility, supplies.
17    Q.  Are those fixed costs?
18    A.  Yes, but we have adjusted for that.
19    Q.  For both Phase I and for Phase II?
20    A.  Yes.
21    Q.  So, just so the record is clear, the actual
22  overhead cost for Phase I and Phase II is reflected in
23  the material that Insituform has submitted?
24    A.  Yes.

Page 83

1    Q.  Unfortunately, Mr. Mangels, I don't think
2  that I had copied that information in Defendant's
3  Exhibit 3 for Phase I.  Could I ask you to look behind
4  tabs G 1 and G 2.  G 1 is document number 1946 through
5  1947 and G 2 is 1986 through 1987.  And could you,
6  please, tell me whether the actual costs are listed on
7  either one of those and then we'll go through where
8  exactly they're listed.
9    A.  The actual cost is listed on page 1946.
10    Q.  And that's behind tab G 1 for the record.
11        Would you, please, walk me through how that's
12  a component of that starting with material.  What
13  material is?
14    A.  Material is the cost of the material used in
15  the process, felt, thread to sew it, and polyurethane
16  backing on.
17    Q.  And then that's the actual cost for this
18  project?
19    A.  Yes.
20    Q.  Okay.  What does the scrap column represent?
21    A.  Scrap that we have associated in the
22  production process.
23    Q.  Is that just left over material?
24    A.  Yes.

Page 84

1    Q.  And that's the actual cost?
2    A.  Yes.
3    Q.  What does the direct labor represent?
4    A.  The labor cost associated with producing the
5  tube.
6    Q.  And for this column on page 1946 is that the
7  actual labor or is that standard cost?
8    A.  That's the actual hours that the -- at the
9  standard cost.
10    Q.  The actual hours at the standard cost?
11    A.  Yes.
12    Q.  Okay.  The next column set up, labor, what
13  does that represent?
14    A.  It's the time that it takes to get the line
15  ready to produce that particular tube in labor cost.
16    Q.  Okay.  And is that at the standard cost?
17    A.  Actual hours at the standard cost.
18    Q.  Okay.  What does labor variable overhead
19  signify?
20    A.  That is our overhead charge associated with
21  this tube or these tubes.
22    Q.  And this is the variable cost?
23    A.  (No response.)
24    Q.  How is it calculated?  I'm sorry.

21 (Pages 81 to 84)

Page 85

1    A.  It's applied at a percentage of labor cost.
2    Q.  A percentage of the standard labor cost?
3    A.  Yes.
4    Q.  But is it the actual hours?
5    A.  Actual hours at the standard, yeah.  Right.
6    Q.  Okay.  And what does the reference column
7  signify?
8    A.  That ties back to the supporting
9  documentation in the four binders.  That is the Bates
10  page.
11    Q.  Should have asked you this question weeks
12  ago.
13        And just in the interest of completeness the
14  document number on the far left side of 1946 what does
15  that signify?
16    A.  That is just an internal documentation of our
17  JD Edwards system.
18    Q.  And the description column?
19    A.  That's the description column in JD Edwards.
20    Q.  Turn to page 1947, which is also behind tab G
21  1, what does this document signify?
22    A.  This breaks out our fixed and hourly or fixed
23  and variable cost in the manufacturing facility in
24  total.

Page 86

1    Q.  Isn't Insituform including fixed costs in its
2  claim against American Home or manufacturing overhead
3  as reflected on 1947?
4    A.  We have adjusted the fixed cost out.
5    Q.  So, it's only the variable cost?
6    A.  Yes.
7    Q.  Mr. Mangels turning to document number 1986,
8  which is behind tab number G 2, what does this document
9  identify?
10    A.  It's the wet-out resin cost for the job.
11    Q.  This is for Phase II?
12    A.  Yes, I believe so.
13    Q.  And you said for Phase II on wet-out what was
14  the material -- how is the cost determined?  Is it
15  standard or actual?
16    A.  For --
17    Q.  For Phase II?
18    A.  It was standard.
19    Q.  Okay.  And was that at the standard rate?
20    A.  Yes, but we adjusted it.  That's what this
21  page represents.
22    Q.  Okay.
23    A.  We adjusted to the actual cost for Phase II.
24    Q.  For labor and material or just for material?

Page 87

1    A.  This says material.
2    Q.  But it's the standard rate for labor on
3  wet-out?
4    A.  Yes.
5    Q.  And that could differ from the actual rate?
6    A.  Yes.
7    Q.  And the actual rate would be ascertainable?
8    A.  Yes.
9    Q.  And I'm sorry, for Phase I wet-out how was
10  wet-out determined?  Is it actual labor?
11    A.  It was.  The actual labor was charged
12  directly to the job.
13    Q.  And how was material calculated?
14    A.  The actual material was charged directly to
15  the job.
16  WHEREUPON, THE PARTIES BROKE FOR LUNCH. SUBSEQUENT TO
17  WHICH THE FOLLOWING PROCEEDINGS WERE MADE OF RECORD:
18        BY MR. MULLEN:
19    Q.  Mr. Mangels, I'd like to turn to Insituform's
20  subcontractor and third party invoices.
21    A.  Okay.
22    Q.  Now, are those reflected for Phase I behind
23  tab D, including tabs one through nine?
24    A.  Yes.

Page 88

1    Q.  And for Phase II are those located at tab H
2  between tabs one through eight?
3    A.  Yes.
4    Q.  And it looks to me that most of the
5  categories in Phase I and Phase II were the same,
6  although it looks as if there was a field office
7  expense as for Phase I, which is at D 6.  Do you know
8  whether that's correct?
9    A.  That looks correct.
10    Q.  Do you know why Insituform didn't have a
11  field office or Phase II of the project?
12    A.  I don't -- no, I don't know.
13    Q.  Do you know who might know?
14    A.  No.
15    Q.  Whoever is in operations for the project
16  maybe?
17    A.  Yes.
18    Q.  Mr. Mangels, what are the totals for the
19  different categories that are at for Phase I, D 1
20  through D 9, and for Phase II, H 1 through H 8; what
21  are those based on?
22    A.  Actual costs for that job.
23    Q.  And did you receive invoices for those?
24    A.  Yes.

22 (Pages 85 to 88)

Page 89

1    Q.  And you paid those invoices?
2    A.  Yes.
3    Q.  Do you know how Insituform paid for those
4    invoices?
5    A.  By check.
6    Q.  Do you know if that's true in all instances?
7    A.  I don't know if it's true in all.
8    Q.  Okay.  How else could they have paid?
9    A.  I don't know.  I mean, it's got to be by
10   check or could be electronic.
11   Q.  Do you know whether Insituform attempted to
12   negotiate a price for its vendors in Phase I?
13   A.  No.
14   Q.  Okay.  Do you know whether they attempted to
15   negotiate a price for Phase II?
16   A.  No.
17   Q.  Okay.  Who would know the answer to those
18   questions?
19   A.  The operations group.
20   Q.  Okay.  Turning to the expendables and
21   supplies category for Phase II, which is behind tab H 3
22   at document number 2133.
23        And I'll apologize, again, Mr. Mangels, that
24   the full binders aren't here.

Page 90

1         Defendant's Exhibit 3 contains only 2133,
2    although I believe that there may have been other
3    invoices originally in section H 3.
4         Is this the expendables and supplies
5    category?
6    A.  A portion of the cost -- actual cost you see
7    here is for expendables and supplies.
8    Q.  I'd like to go through the invoices or the
9    line items that start at invoice date 6/30/05.  Let's
10   take the first one, 6/30/05, on page 2133.  Let's take
11   the second one, actually, also on 6/30/05.  What does
12   this signify?
13   A.  That's the charge for expendables and
14   supplies at the $6 hourly rate.
15   Q.  Okay.  And is the same true for all the
16   vendors that are listed as FASTR?
17   A.  Yes.
18   Q.  And can you explain to me what the last
19   column, the last line item is dated 2/10/05, which the
20   vendor is over allocated consumable costs?
21   A.  That's our adjustment to the actual cost for
22   being over allocated on our expendables and supplies.
23   Q.  Now, was Insituform over allocated for Phase
24   II for the entire region?

Page 91

1    A.  Yes.
2    Q.  And there was a percentage reduction?
3    A.  Yes.
4    Q.  Okay.  And that's explained?  Is that
5    explained?
6    A.  It's in the documentation.
7    Q.  Okay.  Can I ask you to look at Defendant's
8    Exhibit 2, which is Mr. Campos' report at the bottom of
9    page six and the top of page seven.  And by the bottom
10   of page six I do mean the beginning of the last
11   paragraph through the continuation of that paragraph on
12   page seven.
13   A.  Okay.
14   Q.  Do you know if Mr. Campos lays out the proper
15   over allocation for Phase II?
16   A.  Yes.
17   Q.  Okay.  And he does?
18   A.  Yes.
19   Q.  Going back to page six under the heading
20   expendables and supplies, the fourth full paragraph,
21   paragraph that begins as stated above, does Mr. Campos
22   provide the correct over allocation amount for Phase I?
23   A.  Yes.
24   Q.  2.25 percent?

Page 92

1    A.  Yes.
2    Q.  And that over allocation -- was reduction for
3    Phase I and Phase II, was that taken in the entire
4    north region?
5    A.  That was taken on this project adjusting for
6    over allocation for the entire region.
7    Q.  Just so I'm clear, for Phase I 2.25 percent
8    was reduced for expendable supplies over the entire
9    northeast region?
10        MR. PHILBRICK:  Objection.  Mischaracterizes
11   his testimony.
12        The witness may answer if he can.
13        THE WITNESS:  It was an adjustment we made to
14   the actual cost on this particular project.
15        BY MR. MULLEN:
16   Q.  Oh, okay.  I'm sorry.  I was unclear.
17   A.  Okay.
18   Q.  Going back to tab H 3, on page 2133, the line
19   items reading Tom Porzio expense report, Exp Rept; what
20   do those signify?
21   A.  That is costs associated with Mr. Porzio's
22   working on the Boston job.
23   Q.  Okay.  And those are his actual costs?
24   A.  Those are his actual costs.

23 (Pages 89 to 92)

Page 93

1    Q.  And I apologize, Mr. Mangels, I don't have
2   the similar summary sheet for expendables and supplies
3   for Phase I.  It just wasn't included in the
4   materials.
5       I would, however, like to turn to Phase I
6   behind tab D 9, which is subcontractors and
7   consultants.  The numbers for this read 1784 through
8   1833.  And I'll represent to you that these are all the
9   pages of subcontractor and consultant costs that were
10  behind tab D 9 in the binder that was produced to us.
11      Mr. Mangels, could I ask to you take a look
12  at document number 1784, which was the first page.
13   A.  Okay.
14   Q.  And what do the costs there signify?
15   A.  Represents our actual costs that we paid to
16  subcontractors and consultants for the Boston job EBBS.
17   Q.  Are the numbers under the current submission
18  column the actual costs?
19   A.  Yes.
20   Q.  And that adds up to at the bottom
21  $3,327,153.85; is that right?
22   A.  Yes.
23   Q.  And that's also the same number that's under
24  the column total documentation submitted to date?

Page 94

1    A.  Yes.
2    Q.  And now that I know the reference column
3   refers to the Bates number.  Excellent.
4       I'm going to be asking you some questions
5   about the individual invoices that are listed under tab
6   D 9.  So, I think that the easiest thing to do would be
7   to keep document number 1784 to one side, because I'll
8   ask you to refer back to that on some of the invoices.
9       And I'd like to start with document number
10  1785, which for the record appears to be an invoice
11  from the D'Allessandro Corporation, invoice number
12  23-03-1.
13      Mr. Mangels, for Phase I do you have an
14  understanding of Insituform's relationship with
15  D'Allessandro?
16   A.  They performed work for us in rehabing some
17  of the pipe and they are also the general contractor on
18  the job.
19   Q.  Do you know that originally Insituform was
20  D'Allessandro' subcontractor?
21   A.  Yes.
22   Q.  At some point during Phase I did that
23  relationship change?
24   A.  I don't know that.

Page 95

1    Q.  Okay.  But for Phase I did D'Allessandro back
2   charge Insituform for certain costs?
3    A.  Yes.
4    Q.  Do you know what those costs were?  What
5   components those costs represented?
6    A.  I don't know the details of them.  I mean,
7   they're in the invoices.
8    Q.  Okay.
9    A.  There's labor and other bypassing costs.
10   Q.  You're not personally familiar with the
11  costs?
12   A.  No.
13   Q.  Okay.  Mr. Mangels, on page 1785 the
14  typewritten total amount is $290,582.75; is that right?
15   A.  Yes.
16   Q.  And on page 1784 for invoice number 23-03-01,
17  which is line item one on that first cover page?
18   A.  Right.
19   Q.  Is that the same amount that's listed there?
20   A.  Yes.
21   Q.  Two hundred ninety thousand five hundred
22  eighty-two dollars seventy-five cents?
23   A.  Yes.
24   Q.  Okay.  Mr. Mangels, I'd like to direct your

Page 96

1   attention back to page 1785.  There are a couple of
2   handwritten notes.
3       Would you agree that the firsthand written
4   note that I'll direct your attention to, which is
5   circled, reads 11/20 or 25/03, paid $200,000 W slash 0,
6   retainage and W slash 0 delay.  Would you agree with it
7   says that?
8    A.  Yes.
9    Q.  And there appears to be a signature
10  underneath that.  Do you know whose signature that is?
11   A.  I do not know the signature.
12   Q.  Okay.  And would you also agree that to the
13  left of that outside the circling it says voucher
14  $290,582.75 pay only underneath that $200,000?
15   A.  That's what it says.  And we do not pay the
16  full amount, because of retainage that's what the W
17  slash 0 means without retainage.
18   Q.  Do you know if the W slash O signifies that
19  retainage wasn't taken out?
20   A.  Retainage was taken out in our payment to
21  D'Allessandro.
22   Q.  What is retainage?
23   A.  Retainage is money held back to ensure future
24  performance.

24 (Pages 93 to 96)

Page 97

1    Q.  At some point does that retainage get paid?
2    A.  Absolutely, without a doubt.
3    Q.  I needed to put it on the record, but it was
4    my suspicion.
5        And when is retainage paid?
6    A.  When the project is complete or when the
7    contractor has met certain milestones.
8    Q.  Mr. Mangels, I'd like you to take a look from
9    page 1784 through 1833.  And I'd like you to see
10   whether there are any check stubs at all for payments
11   to D'Allessandro.
12   A.  No.
13       MR. MULLEN:  Okay.  Charlie, I just want to
14   ask on the record if we could get check stubs or
15   canceled checks for all the payments that are reflected
16   in that.  I understand in some instances maybe it was
17   paid electronically or whatever other method.
18       MR. PHILBRICK:  Okay.  I'll take it under
19   advisement.
20       MR. MULLEN:  Thank you.
21       BY MR. MULLEN:
22   Q.  So, Mr. Mangels, is it fair to say that at
23   some point Insituform paid D'Allessandro for invoice
24   number 23-03-01 $200,000 the amount that included

Page 98

1    retainage or the amount with retainage taken out?
2    A.  Yes.
3    Q.  And then is it also true that at some later
4    time they paid the balance of $90,582.75?
5    A.  Yes.
6    Q.  Okay.  I just like to go through some of the
7    other D'Allessandro invoices and ask you whether the
8    same is true for those as well.
9        Before I go to the D'Allessandro invoices
10   could I ask you to turn to page number 1787.
11       And for the record that appears to be an
12   invoice from the New England Pipe Cleaning Company
13   Division, invoice number 6306, dated November 24,
14   2003.
15       Mr. Mangels, is it true that the total due at
16   the bottom in typewritten is $61,069.50?
17   A.  Yes.
18   Q.  Okay.  And there's also handwritten note on
19   that one dated 11/25/03 that says pay $50,000 ASAP W
20   slash 0 retainage; is that right?
21   A.  Yes.
22   Q.  And does it appear to you to have the same --
23   that document has the same signature as appeared on
24   document number 1785?

Page 99

1        MR. PHILBRICK:  Objection.  Foundation.
2        Witness may answer if he can.
3        THE WITNESS:  It looks similar.
4        BY MR. MULLEN:
5    Q.  Okay.  Turning to document 1784, second line
6    item, the invoice that reads 6306, New England Pipe
7    Cleaning, the amount listed is the $61,069.50?
8    A.  Yes.
9    Q.  Does the difference between the $61,000 and
10   change, $61,069.50, and the $50,000, do you know
11   whether that difference of somewhere north of $11,000
12   signifies retainage?
13   A.  Yes.
14   Q.  Okay.  And at some point Insituform paid New
15   England Pipe Cleaning Company Division the $11,069.50?
16   A.  Yes.
17   Q.  Mr. Mangels, I'd like you to turn to document
18   1789, which I'll identify for the record as appears to
19   be an invoice from D'Allessandro Corporation number
20   23-03-02, December 22d, 2003.  Same questions, Mr.
21   Mangels, there's $290,217.22 is typewritten; is that
22   right?
23   A.  Yes.
24   Q.  Is there also a handwritten notation that

Page 100

1    says in part pay only $200,000?
2    A.  Yes.
3    Q.  Okay.  If you refer back to document 1784,
4    invoice number 23-03-02 does that provide the full
5    $290,217.22 --
6    A.  Yes.
7    Q.  -- as Insituform's actual cost for that
8    invoice?
9    A.  Yes.
10   Q.  And there's the same difference in retainage
11   that you testified about earlier?
12   A.  Yes.
13   Q.  Mr. Mangels, I'd like you to turn to document
14   number 1792.  Actually, I'm sorry, document number
15   1791, which appears to carry over to 1792.
16       For the record I'll identify that that
17   appears to be a letter from Dennis P. Sullivan, P. E.,
18   of the National Water Main Cleaning Company.
19       Do you see that --
20   A.  Yes.
21   Q.  -- document?
22       On document 1792 there's a handwritten note
23   dated 1/28/03 that says okay to pay $29,000 W slash O
24   retainage ASAP.  Do you see that?

25 (Pages 97 to 100)

Page 101

1    A.  Yes.
2    Q.  Okay.  Now, on page 1784 -- let me do this
3  first, you see on page 1791, says on the third line
4  down in the subject:  Change Order #8-Pressure Inject
5  Brick Pipe At Liner Termination.
6    A.  Yes.
7    Q.  Now, going back to 1784 does it appear to you
8  that the fifth line item down, invoice 01/12/04,
9  invoice number eight, is payment for that same invoice?
10    A.  Yes.
11    Q.  Okay.  Now, I notice the amount there is
12  $29,000; is that right?
13    A.  Yes.
14    Q.  Mr. Mangels, can you explain to me was there
15  any retainage taken out for that invoice?
16    A.  No.
17    Q.  But page 1792, the handwritten note, gives
18  the same W slash O retainage, which I thought meant
19  retainage was taken out?
20    A.  We paid the $29,000 without withholding
21  retainage.
22    Q.  Okay.  And $29,000 was the actual cost?
23    A.  Yes.
24    Q.  And that was the amount that Insituform paid?

Page 102

1    A.  Yes.
2    Q.  If you would turn to document 1794 appears to
3  be invoice from Haley and Aldrich, invoice number
4  602588.
5    Mr. Mangels, do you see that the typewritten
6  amount for that is $15,237.22?
7    A.  Yes.
8    Q.  And there appears to be a handwritten note
9  dated 1/19/04.  Is seems to me to read okay to pay 100
10  percent without retainage.
11    A.  Yes.
12    Q.  Do you see that?
13    A.  Yes.
14    Q.  Going back to page 1784 do you see the sixth
15  line item down?
16    A.  Yes.
17    Q.  The one that reads invoice number 602588,
18  Haley and Aldrich?
19    A.  Right.
20    Q.  Do you think that's the same amount relating
21  to the same invoice as is on page 1794?
22    A.  Yes.
23    Q.  And the amount paid is $15,237.22; is that
24  right?

Page 103

1    A.  Right.
2    Q.  And it doesn't appear that retainage was
3  actually taken out; is that correct?
4    A.  Correct.
5    Q.  I ask you to turn to page 1795, appears to be
6  an invoice from D'Allessandro Corporation number
7  23-03-3.
8    Mr. Mangels, would you agree that the
9  typewritten note at the bottom is $295,838.34?
10    A.  Yes.
11    Q.  And there is a handwritten note dated January
12  26th, 2003 that appears to me to state okay to pay
13  $250,000 ASAP?
14    A.  Yes.
15    Q.  Do you know if retainage was included in that
16  amount, Mr. Mangels or subtracted from that amount?
17    A.  It was subtracted from that amount.
18    MR. PHILBRICK:  From what amount?
19    THE WITNESS:  To arrive at the 250 it was
20  subtracted from the 295 to arrive at the 250.
21    BY MR. MULLEN:
22    Q.  Okay.
23    A.  Is that what you asked?
24    MR. PHILBRICK:  That's not what he asked, but

Page 104

1  that's what you said.
2    Okay.  Sorry to interrupt.
3    MR. MULLEN:  Thank you for the clarification.
4    BY MR. MULLEN:
5    Q.  But $295,838.34 is the actual amount that
6  Insituform paid in for invoice number 23-03-3?
7    A.  Yes.
8    Q.  I only have five of these left, so hopefully
9  there's some light at the end of the tunnel.
10    Could I ask to you look at documents numbered
11  1797 and 1798?
12    A.  Yes.
13    Q.  For the record, it appears that this is an
14  invoice from D'Allessandro Corporation number 23-03-4.
15    On 1797 you see that the typewritten amount
16  is $432,668.58?
17    A.  Yes.
18    Q.  On page 1798 do you see where it has
19  handwritten 3/1/04 pay $350,000 ASAP W slash O
20  retainage?
21    A.  Yes.
22    Q.  Did Insituform end up paying a total of
23  $432,668.58 --
24    A.  Yes.

26 (Pages 101 to 104)

Page 105

1    Q.  -- for this invoice?
2    A.  Yes.
3        MR. PHILBRICK: You've got to let him finish.
4        BY MR. MULLEN:
5    Q.  Turn to page number 1800.  This is
6  D'Allessandro invoice number 23-03-5.
7        Same questions, Mr. Mangels, do you see at
8  the bottom typewritten number $513,033.45?
9    A.  Yes.
10   Q.  And is that the amount that Insituform ended
11 up paying in satisfaction of invoice 23-03-5?
12   A.  Yes.
13   Q.  Do you also see the handwritten note that
14 says 4/8/04 okay to pay $450,000 at ASAP?
15   A.  Yes.
16   Q.  And does the difference between the
17 $513,033.45 and the $450,000 represent the retainage
18 that was withheld?
19   A.  Yes.
20   Q.  I ask you to turn to document number 1805.
21       For the record this is appears to be an
22 invoice from the Field Safety Corporation, invoice
23 number 2210.
24       Mr. Mangels, total invoice amount typewritten

Page 106

1  at the bottom $23,596.38; is that right?
2    A.  Yes.
3    Q.  Is there a handwritten note dated 3/30/04
4  that states okay to pay $20,000?
5    A.  Yes.
6    Q.  Okay.  I'd like you to turn back to page
7  1804, in particular the second line item reading under
8  the column invoice number; do you see where it says
9  2210?
10   A.  Yes.
11   Q.  Do you think that relates to the same invoice
12 on page 1805?
13   A.  Yes.
14   Q.  Okay.  The last column, amount paid, doesn't
15 that read $20,000?
16   A.  Yes.
17   Q.  On page 1784 I ask you to look at the 12th
18 line item down.  That's invoice number 2210 for the
19 Field Safety Corporation.  Do you see that?
20   A.  Yes.
21   Q.  See the amount is $23,596.23?
22   A.  Yes.
23   Q.  Not $20,000?
24   A.  Yes.

Page 107

1    Q.  Do you know why there's a disparity in this
2  number, Mr. Mangels?
3    A.  I don't know why.
4        MR. MULLEN: Charlie, I just again ask if
5  there was a --
6        BY MR. MULLEN:
7    Q.  Let me ask this question, Mr. Mangels:  Do
8  you think Insituform actually paid $23,596.38 for that
9  invoice?
10   A.  I don't know for that particular invoice.
11       MR. PHILBRICK: Where is the disparity?
12       MR. MULLEN: The disparity, Charlie, is
13 between the 12th line item --
14       MR. PHILBRICK: On the summary?
15       MR. MULLEN: On the summary.
16       MR. PHILBRICK: In the beginning as opposed to
17 the invoice itself?
18       MR. MULLEN: As opposed to the handwritten
19 notes on the invoice, which is document number 1805 and
20 as opposed to --
21       BY MR. MULLEN:
22   Q.  Is this a check stub on 1804, Mr. Mangels?
23   A.  Yes.
24       MR. MULLEN: -- as opposed to the second

Page 108

1  number down on the check stub.
2        MR. PHILBRICK: What?  I don't understand.
3  You know, it's your dep.  I mean, --
4        MR. MULLEN: All I am asking is if there is an
5  additional payment that it be produced.
6        MR. PHILBRICK: For the $3,596?
7        MR. MULLEN: That's right.
8        MR. PHILBRICK: Okay.
9        MR. MULLEN: It appears to me that there's a
10 disparity.
11       MR. PHILBRICK: Why?  I mean haven't we been
12 parading through a bunch of partial payments that were
13 not a hundred percent, because of retainage.
14       MR. MULLEN: Charlie, that's what I am
15 asking.  That's exactly the question I'm asking.  If it
16 is retainage I'm just asking for some evidence that
17 there was retainage paid.
18       MR. PHILBRICK: Okay.  Well, did you ask him?
19       MR. MULLEN: I believe I did.
20       MR. PHILBRICK: Okay.
21       BY MR. MULLEN:
22   Q.  Mr. Mangels, do you know if there was
23 retainage taken out for invoice number 2210?
24   A.  I don't know for a fact that there was.

27 (Pages 105 to 108)

Page 109

1    Q. Mr. Mangels, could I ask you to turn to page
2  1814, which for the record appears to be an invoice
3  from National Water Main Cleaning Company, invoice
4  number 6491.
5        Mr. Mangels, do you see the handwritten note
6  on the bottom left of that page that reads 5/13 EBBS
7  job not billable?
8    A. Yes.
9    Q. Do you see that? Do you know what that
10 signifies?
11   A. Yes, that is not a billable item on the
12 contract to EBBS on our part.
13   Q. And when you say it's not a billable item
14 under the contract, what does that mean?
15   A. It's not one of the bid tabs on the contract
16 with EBBS, the specific cleaning.
17   Q. So, does that mean that it's not part of the
18 contract?
19   A. No, that's not what it means.
20   Q. I'm sorry, I'm confused.
21   A. It means we can't bill this as a line item to
22 EBBS.
23   Q. What would it be billed to?
24   A. It's just part of our cost.

Page 110

1    Q. It's part of the MWRA claim against American
2  Home?
3    A. Yes. Yes.
4    Q. I think this is the last retainage questions
5  I have for Phase I, Mr. Mangels.
6        Could I ask you to turn to page 1824?
7    A. Okay.
8    Q. This is, for the record, appears to be an
9  invoice from the D'Allessandro Corporation invoice
10 number 23-03-7.
11       See the typewritten total at the bottom
12 $347,571.23?
13   A. Yes.
14   Q. Do you see the handwritten note that's
15 circled that reads 6/9/04 okay to pay $250,000 ASAP?
16   A. Yes.
17   Q. Okay. It's the full amount that Insituform
18 paid for invoice number 23-03-7, actually the
19 $347,571.23, the charge?
20   A. Yes.
21   Q. Mr. Mangels, do you know whether
22 D'Allessandro charged Insituform any overhead in profit
23 for the Phase I portion of the work it did?
24   A. I don't know.

Page 111

1    Q. Okay. Who would be the best person to ask
2  that?
3    A. Probably D'Allessandro. I mean, I don't know
4  of anybody in our company that would know that.
5    Q. I'm just asking whether they charged an
6  overhead in profit and what that amount was?
7    A. Look at an invoice, that's the only place I
8  would know to see if it is.
9    Q. And if, for example, we looked at page 1786,
10 which appears to be part of invoice that starts on
11 1785, number 23-03-1, turn to page 1786. Do you see at
12 the bottom it says overhead and profit?
13   A. Yes.
14   Q. And says 15 percent?
15   A. Yes.
16   Q. Does that appear to be to be calculated on
17 the entire subtotal?
18   A. Yes.
19   Q. But you don't know if Insituform tried to
20 negotiate a more favorable rate?
21   A. I don't know that.
22   Q. Okay. Who would know the answer to that?
23   A. The operations group.
24   Q. Mr. Mangels, I know it hasn't been a very

Page 112

1  long time, but would you like to take a break?
2    A. No, I'm fine.
3    Q. Okay.
4        MR. MULLEN: Charlie, you okay?
5        MR. PHILBRICK: I'm fine.
6        BY MR. MULLEN:
7    Q. Okay. Mr. Mangels, for Phase I of the MWRA
8  claim do you know who provided the bypass pumping? Do
9  you know whether there was bypass pumping, first off?
10   A. Yes, there was bypass pumping.
11   Q. Do you know who provided that?
12   A. D'Allessandro.
13   Q. Do you know whether D'Allessandro
14 subcontracted that out?
15   A. I don't know that.
16   Q. And do you know if Insituform tried to
17 negotiate a more favorable rate on bypass pumping?
18   A. I don't know.
19   Q. Okay. Would someone in operations know that?
20   A. Yes.
21   Q. For Phase II do you know who performed the
22 bypass pumping?
23   A. I don't know.
24   Q. And you don't know whether it was the same

28 (Pages 109 to 112)

Page 113

1  person --
2      A.  I --
3      Q.  -- organization that did it for Phase I?
4      A.  I don't know.
5      Q.  Okay. Mr. Mangels, did you testify earlier
6  that the W slash 0 retainage meant with retainage or
7  without retainage?
8      A.  I believe it means without retainage.
9      Q.  Okay. Do you know if there's a difference
10 between without retainage and no retainage?
11     A.  I don't know.
12     Q.  Okay. The reason I ask is turning to behind
13 tab H 8 is a document numbered 2501 through 2607.
14     MR. MULLEN: Charlie, I'll represent that
15 these are all of the documents that were originally in
16 tab H 8 as produced by Insituform.
17     BY MR. MULLEN:
18     Q.  Could I ask you to look at page 25?
19     Let me ask you to look at two things. First
20 let's just set aside page 2501. What is page 2501?
21     A.  It's the actual cost incurred by Insituform
22 on the Boston job for subcontractors and consultants.
23     Q.  Is this a summary page of the costs?
24     A.  Yes.

Page 114

1      Q.  And the invoices are located in the remainder
2  of tab H 8?
3      A.  Yes.
4      Q.  I'll ask you to turn to document number
5  2572.
6      A.  Okay.
7      Q.  See where it says next to the typewritten
8  total $185,919.78?
9      A.  Say that again.
10     Q.  Do you see the total -- the typewritten total
11 at the bottom of the --
12     A.  Yeah.
13     Q.  -- totals column?
14     A.  Yes.
15     Q.  Reads $185,919.78?
16     A.  Yes.
17     Q.  Okay. And then underneath there's a
18 handwritten note saying ADJ. I presume that means
19 adjustment, $15,285.18. Do you see that?
20     A.  Yes.
21     Q.  For a total of $170,634.60?
22     A.  Yes.
23     Q.  Okay. Do you see handwritten note dated
24 8/15/05? Says okay to pay 100 percent (no retainage)

Page 115

1  this week?
2      A.  Yes.
3      Q.  Okay. I'm sorry and this invoice number is
4  dated 2303-1 W, just for the record.
5      Mr. Mangels, do you know if Insituform's
6  actual cost was $170,634.60?
7      A.  Yes.
8      Q.  Okay. And do you know whether any retainage
9  was taken out?
10     A.  No retainage was taken out.
11     Q.  Okay. So that may be different than without
12 retainage?
13     A.  Yes.
14     Q.  Do you know whether it is different than --
15     A.  I don't know.
16     Q.  Mr. Mangels, I'd like you to turn to tab I in
17 the binder, which is document number 2608. Do you know
18 what this document represents, Mr. Mangels?
19     A.  It's our project close out cost for the EBBS
20 project.
21     Q.  Now, were there any invoices to support those
22 close out costs?
23     A.  Not at this point in time.
24     Q.  And so are these estimated close out costs?

Page 116

1      A.  They were when this package was put together,
2  yes.
3      Q.  And I believe this package was dated April
4  13th of 2006. Does that sound right to you?
5      A.  (No response.)
6      Q.  Some time around April 20, '06?
7      A.  Yes. Yes.
8      Q.  Okay. And the number there is $264,000?
9      A.  Yes.
10     Q.  Okay. Do you know whether Insituform has
11 actually incurred close out costs of $264,000?
12     A.  I don't know that.
13     Q.  Okay. Do you know whether it's incurred any
14 close out costs?
15     A.  It has incurred some.
16     Q.  What close out costs has it incurred?
17     A.  I don't know the details of it.
18     Q.  Okay.
19     MR. MULLEN: Charlie, again, I just ask for
20 update on close out costs.
21     MR. PHILBRICK: Taken under advisement.
22     MR. MULLEN: Appreciate it.
23     BY MR. MULLEN:
24     Q.  And do you know whether it's above or below

29 (Pages 113 to 116)

Page 117

1   $264,000?
2       A.  I don't know.  I believe it's below.
3       Q.  Okay.
4           MR. MULLEN: Charlie, I'd like to take a break
5   for a few minutes, go over my notes.  There are a
6   couple of other topics I'd like to hit, but I just want
7   to –
8           MR. PHILBRICK: What are you talking about at
9   in terms of time frame?
10          MR. MULLEN: I have to say within the hour.
11          MR. PHILBRICK: Okay.
12  WHEREUPON, THE PARTIES TOOK A SHORT BREAK, SUBSEQUENT
13  TO WHICH THE FOLLOWING PROCEEDINGS WERE MADE OF RECORD:
14          BY MR. MULLEN:
15      Q.  Mr. Mangels, just going back briefly to third
16  party and subcontractor invoices, do you know whether
17  D'Allessandro's labor was a portion of the Phase II
18  costs?
19      A.  I don't know without looking at the invoice.
20      Q.  Okay.  Well, let's do that.
21          MR. PHILBRICK: Which one do you want to do?
22  I've got 1786.
23          MR. MULLEN: I don't want to be pinned down to
24  anything.  Let me find a favorite.

Page 118

1           MR. PHILBRICK: They're all the same.
2           MR. MULLEN: Then why 1786?
3           MR. PHILBRICK: Because it's the first one.
4           MR. MULLEN: Is it the one you opened up?
5           MR. PHILBRICK: It's the first one.
6           BY MR. MULLEN:
7       Q.  Okay.  I was going to pick an earlier one.
8   Let's meet in the middle at 2579, which is behind tab
9   number H 8.
10      A.  Okay.
11      Q.  Can I direct your attention to under the
12  description -- the heading that reads labor.
13          For the record I'll say this appears to be a
14  D'Allessandro Corporation invoice, invoice number
15  2303-3 W.
16          Let's direct your attention to the header
17  reading labor for weeks ending, underneath there are
18  three line items 8/20/2005, 8/27/2005, and 9/3/2005.
19  Do you see that?
20      A.  Yes.
21      Q.  Okay.  And it appears that the rate in the
22  second column for those three is $91,700.07.  Do you
23  see that?
24      A.  Yes.

Page 119

1       Q.  And the next column is reads 0H, which I
2   assume stands for overhead and profit at nine percent.
3   Do you see that?
4       A.  Yes.
5       Q.  And the total in the next column is
6   $99,953.08.  Do you see that?
7       A.  Yes.
8       Q.  Mr. Mangels, do you know whether Insituform
9   ever considered hiring its own laborers to do the work
10  that D'Allessandro is doing for Phase II?
11      A.  I don't know that.
12      Q.  Who would know that?
13      A.  The operations group.
14      Q.  Okay.  Mr. Mangels, do you know whether
15  Insituform built any profit into its Phase I or Phase
16  II work?
17      A.  I'm not sure exactly what you mean by that.
18      Q.  Does its claim against American Home,
19  Insituform's claim against American Home, is it
20  intended to calculate only its actual costs?
21      A.  Yes, it's only actual costs.
22      Q.  So, there's not intended to be any sort of
23  profit built into any of the line items?
24      A.  That is a correct statement.

Page 120

1       Q.  Mr. Mangels, are you involved in any way with
2   Insituform obtaining general liability insurance
3   coverage?
4       A.  No.
5       Q.  Do you make any projections for its insurance
6   costs?
7       A.  No.
8       Q.  Have you ever been involved in obtaining
9   insurance on behalf of Insituform?
10      A.  No.
11      Q.  Insurance meaning general liability
12  insurance?
13      A.  No.
14      Q.  Okay.  Have you ever had a discussion with
15  anyone at Insituform regarding Insituform's efforts to
16  reduce its insurance costs?
17      A.  Yeah, that's discussed.
18      Q.  In what context is that discussed?
19      A.  We pay a lot for insurance.  Let's get it
20  reduced.
21      Q.  Do you know if Insituform has taken any steps
22  to reduce the amount that it pays for insurance?
23      A.  Through our proven safety record, yes.
24      Q.  And what is involved in your safety?

30 (Pages 117 to 120)

Page 121

1    A.  Are you speaking general liability
2  insurance --
3    Q.  Yes.
4    A.  -- specifically here?
5    Q.  General liability or property.
6    A.  I mean, general liability the way to reduce
7  insurance is to have less claims.
8    Q.  Fair enough.
9      Do you know that Insituform tries to reduce
10  the number of claims?
11    A.  Less issues out in the field.
12    Q.  Would safety be on one of those issues?
13    A.  Not on general liability.
14    Q.  I'm sorry?
15    A.  Not on general liability insurance.
16    Q.  What factors would reduce claims in general
17  liability insurance?
18    A.  Having less back ups, sewer back ups.
19    Q.  Anything else?
20    A.  Not that I'm aware of.
21    Q.  Would improved design have any effect,
22  improved proposed design, do you know?
23    A.  I don't know that.
24    Q.  Do you know whether Liberty Mutual Insurance

Page 122

1  Company has covered the MWRA claim?
2    A.  They have covered their portion of it.
3    Q.  Were you involved with presenting
4  Insituform's claim to Liberty Mutual?
5    A.  No.
6    Q.  Did you prepare any of the cost documentation
7  that went to Liberty Mutual?
8    A.  I did not prepare it, no.
9    Q.  Do you know who did?
10    A.  Nick Campanile.
11    Q.  Mr. Mangels, the court reporter has marked as
12  Defendant's Exhibit 4 a two page a document that is
13  labeled C & S 73 through C & S 74.
14      MR. MULLEN:  And Charlie, I'll represent to
15  you this was part of the production --
16      MR. PHILBRICK:  Uh-huh.
17      MR. MULLEN:  -- that you made on behalf of Mr.
18  Campos.
19      MR. PHILBRICK:  Yeah.
20      BY MR. MULLEN:
21    Q.  Mr. Mangels, I'd like to direct your
22  attention to, it appears to me that this is an e-mail
23  dated July 18th, 2005 from Mr. Campanile to Mr.
24  Campos.  And it appears that it forwards an e-mail also

Page 123

1  dated July 18th, 2005 from Mr. Campanile to Mr.
2  Campos.
3      Turning to the second e-mail at the bottom,
4  the one that is forwarded, do you see your name listed
5  as a CC?
6    A.  Yes.
7    Q.  And that's the third name down under the
8  CC --
9    A.  Yes.
10    Q.  -- listing?
11    A.  Yes.
12    Q.  Do you recall receiving this e-mail?
13    A.  No, I don't.
14    Q.  I'd like to direct your attention to the
15  third full paragraph down, starts on page one, goes on
16  to page two, which is C & S 73 to C & S 74.  In
17  particular it states, "Also we compared the actual
18  costs of the materials used in our manufacturing and
19  wet-out processes and found that the variances -- and
20  found the variances to be minor and therefore, not
21  calculated given our immediate time constraints."
22      Mr. Mangels, does this refresh your
23  recollection as to whether Insituform conducted an
24  analysis of the actual versus standard cost for

Page 124

1  manufacturing and wet-out processes?
2    A.  No, it doesn't.
3    Q.  But does it appear from that that one was
4  conducted?
5    A.  Yes.
6    Q.  Mr. Mangels, I've asked the court reporter to
7  mark as Defendant's Exhibit 5 a letter dated March
8  31st, 2006 from Thomas Porzio, who is identified in the
9  letter as a senior product manager of Insituform
10  Technologies to TJ Shea, D'Allessandro Corporation.
11  It's Bates stamped number ITT-AIG 9840.
12      Mr. Mangels, do you know who Mr. Porzio is?
13    A.  Yes.
14    Q.  Who is Tom Porzio?
15    A.  He was the project manager on the EBBS
16  project.
17    Q.  And do you know whether he was in that
18  capacity on March 31st of 2006?
19    A.  Yes.
20    Q.  Now, he's no longer with Insituform; is that
21  correct?
22    A.  Correct.
23    Q.  Have you ever seen this letter, Mr. Mangels?
24    A.  No, I have not.

31 (Pages 121 to 124)

Page 125

1    Q.  Okay.  The letter appears to state, Mr.
2  Mangels, that Insituform lined or replaced a portion of
3  an approximately 20 foot portion of a 15 inch service
4  pipe.  Do you know whether that was originally included
5  in the MWRA contract, the relining or replacement of
6  that pipe?
7    A.  I do not know.
8    Q.  Do you know who would know?
9    A.  The operations group.
10    Q.  Do you know whether Insituform as part of its
11  claim for costs against American Home is including any
12  costs associated with the relining or replacement of
13  the pipe indicated in Defendant's 5?
14    A.  I don't know for sure.
15    Q.  Do you think that it is?
16    A.  I don't know.
17    Q.  Who would know the answer to that?
18    A.  The operations group.
19    Q.  Mr. Mangels, I've asked the court reporter to
20  mark as Defendant's 6 a February 22d, 2006 e-mail from
21  Bob Kelley to who I presume is Mr. Campos.  It's
22  stamped C & S 0005.
23       Have you ever seen this e-mail, Mr. Mangels?
24    A.  No, I have not.

Page 126

1    Q.  I'd like to direct your attention to the
2  fourth line, fourth full paragraph, specifically the
3  sentence that reads: "While we believe that with your
4  tutelage from last year the claim is both now better
5  organized and justifiable than the last time around, we
6  nonetheless would request a complete review as well as
7  review for format - i.e., is this something that the
8  reviewer can quickly understand for purpose of
9  adjusting the claim?"
10       Mr. Mangels, do you know whether Mr. Campos
11  prior to February 22d, 2006 had indicated that the MWRA
12  claim was somehow not justifiable?
13    A.  No, I don't know that.
14    Q.  Do you know who would know the answer to
15  that?
16    A.  No, I would not.
17    Q.  Mr. Kelley is in the in-house legal
18  department in Insituform; is that right?
19    A.  Yes.
20    Q.  Mr. Mangels, I've asked the court reporter to
21  mark as Defendant's Exhibit 7 and April letter dated
22  April 20, 2006, which appears to be from Mr. Kelley to
23  Mr. Philbrick, Stan Martin, law firm of Holland and
24  Knight and Mr. Campos.

Page 127

1       Have you ever seen this letter before?
2    A.  No, I have not.
3    Q.  I'd like to direct your attention to two
4  paragraphs.  The first is the second full paragraph
5  which states, "I will call Chris Campos to explain a
6  couple of details which did not address some of his
7  concerns."
8       Do you know whether Mr. Kelley is referring
9  to the costs that Insituform has submitted to American
10  Home for coverage in this action?
11    A.  I don't know what he's referring to there.
12    Q.  Okay.  Let me turn your attention to the next
13  paragraph, which reads, "Insituform did a better job
14  for the 2005 rework by keeping records of hours of use
15  and in any case most equipment was rented for that
16  rework effort.  Thus the 2005 equipment costs should be
17  reasonable representative."
18       Do you know whether Mr. Campos had ever
19  raised any concerns that the Phase I equipment costs
20  claimed by Insituform were not reasonably
21  representative of its costs?
22    A.  I do not know that.
23    Q.  Do you know what Mr. Kelley's referring to
24  when he says that Insituform did a better job in the

Page 128

1  2005 rework by keeping records of hours of use?
2    A.  No, I do not.
3    Q.  Do you know with respect to Phase I whether
4  Insituform purchased any equipment for the Phase I work
5  and then sold it back at the end?
6    A.  We did not do that.
7    Q.  Same question with respect to Phase II:  Do
8  you know whether Insituform purchased any equipment for
9  the Phase II work and then sold it back at the end?
10    A.  Can you define equipment?  I mean, that's a
11  pretty broad -- I mean, is there limits on that or --
12    Q.  Did Insituform purchase anything in
13  connection with the Phase II remediation that it sold
14  back at the end of its work?
15    A.  Not that I am aware of.
16    Q.  Do you know anyone who would know the answer
17  to that question?
18    A.  It would have to be the operations group.
19    Q.  Okay.  Mr. Mangels, have you ever had any
20  discussions with anyone at Insituform regarding
21  Insituform's original bid for the MWRA project?
22    A.  No.
23    Q.  Have you ever had any discussions with anyone
24  at Insituform regarding the initial design for the CIPP

32 (Pages 125 to 128)

## Page 129

1  in connection with the original project?

2      A. No.

3      Q. Okay. Are there any documents that you can

4  think of that would refresh your recollection?

5      A. No.

6      Q. Have you taken any courses or professional

7  training seminars on recovery from an insurance

8  company?

9      A. No, I have not.

10      MR. MULLEN: Charlie, I think I'd like a few

11  minutes again to go over my notes. I think I am pretty

12  close.

13  WHEREUPON, THE PARTIES TOOK A SHORT BREAK, SUBSEQUENT

14  TO WHICH THE FOLLOWING PROCEEDINGS WERE MADE OF RECORD:

15      BY MR. MULLEN:

16      Q. Mr. Mangels, do you know generally whether it

17  can be more cost efficient to purchase equipment if

18  it's going to be used long term as opposed to renting

19  it?

20      A. I don't know that without getting into the

21  details of it.

22      Q. Okay. I want to ask you a couple of

23  questions on Mr. Campos' report, which is marked as

24  Defendant's Exhibit 2.

## Page 130

1      I'll apologize in advance if any of these

2  questions are similar to the ones I asked this

3  morning. I just want to make sure for clarity of the

4  record that I ask them.

5      The first portion of Mr. Campos' report

6  dealing with payroll, directing your attention to page

7  three, the fifth paragraph, which is the last paragraph

8  above the equipment burden section of this report, I'll

9  read from the second sentence down, "I analyzed the

10  claimed payroll burden and determined that some of the

11  categories of payroll burden are fixed in nature.

12  Therefore, the reparation project could not result in

13  any incremental charges for the fixed expenses.

14  Neither Insituform nor I have performed a fixed versus

15  variable analysis of the payroll burden."

16      Do you know whether Mr. Campos is correct

17  that Insituform had not produced a fixed versus

18  variable analysis of the payroll burden?

19      A. That's true.

20      Q. And that's for both Phase I and Phase II?

21      A. Yes.

22      Q. Would such an analysis be possible of fixed

23  versus variable?

24      A. It's subjective in nature.

## Page 131

1      Q. And is that because as you testified earlier

2  today that there can be a difference of opinion as to

3  what constitutes fixed costs?

4      A. Yes.

5      Q. Under the equipment burden section, page four

6  of Mr. Campos' report in the last full paragraph above

7  the materials - tube and resin section, it states in

8  part, reading from the second sentence down, "However,

9  in my opinion, some of the expenses included in the

10  equipment burden are fixed in nature and, therefore,

11  the reparation project would not result in any

12  incremental charges for the fixed expenses. Neither

13  Insituform nor I have prepared a fixed versus variable

14  analysis equipment burden."

15      Mr. Mangels, do you know whether Mr. Campos

16  is correct that Insituform did not compare a fixed

17  versus variable analysis for equipment burden?

18      A. That's true.

19      Q. Is that for both Phase I and Phase II?

20      A. Yes.

21      Q. Same question I asked with respect to

22  payroll: Why is that?

23      A. It's subjective in nature.

24      MR. MULLEN: Mr. Mangels, I really do

## Page 132

1  appreciate your time today. These are all the

2  questions I have at this time.

3      As I mentioned at the outset of the

4  deposition, I wasn't able to receive all of the

5  information, all the cost binders marked ITI-AIG 1

6  through 2608 due to circumstances that were beyond my

7  control and I apologize for that. For that reason I

8  wasn't able to question you on all the documents that I

9  wanted to. And for that reason, you know, I'm

10  suspending today's deposition and reserving the right

11  to bring you back to ask you about those documents that

12  I wasn't able to question you about earlier today.

13      Thank you very much for your time again.

14      And I don't know if Mr. Philbrick has any

15  questions for you.

16      MR. PHILBRICK: I do not have any questions,

17  but I would like to state on the record that it's my

18  understanding that counsel was unable to receive

19  documentation as a result of his vendor being unable to

20  deliver it here today, nevertheless it's our position

21  that this deposition has been taken, it's completed,

22  and it's done. Okay.

23      MR. MULLEN: Understood.

24      MR. PHILBRICK: Thank you.

Page 133

1    C E R T I F I C A T E
2
3    STATE OF MISSOURI
4    COUNTY OF ST. LOUIS
5
6        I, BOBBI L. HAMLIN, a Certified Shorthand
7    Reporter and Notary Public in and for the State of
8    Missouri, do hereby certify that the foregoing
9    transcript of the deposition of Larry Mangels, having
10    been duly sworn, on Friday, November 17th, 2006, is
11    true and accurate to the best of my knowledge, skill
12    and ability.
13        IN WITNESS WHEREOF, I have hereunto set my
14    hand and seal this 18th day of November, 2006.
15
16
17        Bobbi L. Hamlin
18        Notary Public--CCR, RMR
19        #084-002797
20
21    My commission expires:
22    June 26, 2009
23
24

Page 135

1    UNITED STATES DISTRICT COURT
     DISTRICT OF MASSACHUSETTS
2
     INSITUFORM TECHNOLOGIES, INC.,    )
3                                      )
         Plaintiff,    )
4                      )
         vs.           ) No. 04-10487 GAO
5                      )
     American Home ASSURANCE COMPANY,  )
6                      )
         Defendant.    )
7
8
9        I, Larry Mangels being first duly sworn, on oath
10    say that I am the deponent in the aforesaid deposition
11    taken on the 17th day of November, 2006; that I have
12    read the foregoing transcript of my deposition,
13    consisting of pages 1 through 134 inclusive, and affix
14    my signature to same.
15
16
17        Deponent's Name
18
19    Subscribed and sworn to
20    Before me this   day of
21        ,2006.
22
23        Notary Public
24    blh

Page 134

1        KEEFE REPORTING COMPANY
         Certified Shorthand Reporters
2        11 North 44th Street
         Belleville, Illinois 62226
3        618-277-0190
4    November 18, 2006
5    Charles L. Philbrick
     Holland & Knight
6    131 South Dearborn Street
     30th Floor
7    Chicago, IL 60603
8    Case:    Insituform v. American Home, 04-10487 GAO
     Deponent:    Larry Mangels
9    Date taken:  November 17, 2006
10    Dear Mr. Philbrick:
11    Enclosed is your copy of the deposition transcript,
     along with the original signature page and errata
12    sheet.
13    Pursuant to the rules of court in the matter, please
     have the deponent read the transcript and sign the
14    signature page before a notary public.
15    If any corrections/changes are to be made, please TYPE
     or PRINT them on the attached errata sheet, giving the
16    page and line number, desired correction/change, and
     reason.
17
     Please arrange for accomplishment of same and
18    transmittal back to our office within 28 days of
     receipt of this letter.
19
     Sincerely,
20
21
     Bobbi L. Hamlin, CSR, RMR
22    KEEFE REPORTING COMPANY
23
24

34 (Pages 133 to 135)