# EXHIBIT 8

# Holland+Knight

Tel   312 263 3600
Fax  312 578 6666

Holland & Knight LLP
131 South Dearborn Street, 30th Floor
Chicago, IL 60603-5517
www.hklaw.com

Charles L. Philbrick
312 715 5834
charles.philbrick@hklaw.com

December 24, 2007

**Electronic and Regular Mail**
Gregory P. Deschenes
Kurt M. Mullen
Nixon Peabody LLP
100 Summer Street
Boston, MA 02110

> Re:  *Insituform Technologies, Inc. v. American Home Assurance Company*
> Case No. 04 10487 GAO

Dear  Kurt and Greg:

Enclosed are additional documents being produced by Insituform:

Calculation Of Negative Financial Covenants (I00434)
Senior Note Covenant Amendments (I00435)
Washington Post Business Section Article August 21, 2005 (I00436 to I00439)
Fees In Conjunction With Debt Amendment (I00440)
Insituform 10-K 2004 (I00442 to I00509)
Summary of AIG Impact (I00510 to I00513)

I00441 has been intentionally left bank.  The 10-K will come in hard copy only.

Campos & Stratis' production is also supplemented with production of the CPA Code Of Professional Conduct (C&S 0128 to 0137).

Yours very truly,

*Charles L. Philbrick*

Charles L. Philbrick

CLP/mp
cc:  Stanley Martin (with enclosures)
Enclosures

# 5019968_v1

*Instituform Technologies, Inc.*
*Calculation of Negative Financial Covenants*
*12/31/04*
*$110 Million Senior Notes*

*The calculation of this covenant was changed with the March 16, 2005 amendment*

**Section 10.2    Fixed Charges Coverage Ratio**

| | | |
|---|---|---|
| Net Income (on a rolling four quarter basis) | | 597 |
| Deduct/Add | Gains/Losses on Disposals of Fixed Assets | **314** |
| | Federal, State and Other Income Taxes | (835) |
| Plus: | Total Consolidated Depreciation and Amortization | 19,438 |

| Consolidated Fixed Charges | | |
|---|---|---|
| Rent Expense | | 21,345 |
| Interest Expense | | 9,305 |

| | | | |
|---|---|---|---|
| **Consolidated Income Available for Fixed Charges** | 50,164 | 52,105 | (1,941) |
| Consolidated Fixed Charges (Rent + Interest) | 30,650 | 30,650 | |
| Ratio | 1.64 | 1.70 | 1.70 |

| | | |
|---|---|---|
| Accepted Ratio (Minimum) | | 1.70 |
| Cushion (Shortfall) | $ | (1,941) |

Covenants Q404 Fixed Charge.xls

I 00434

**Senior Note Covenant Amendments**

**$110 Million**

|  | March 2004 Amendment |  | March 2005 Amendment |
|---|---|---|---|
| Fixed Charge Coverage Ratio |  |  |  |
|  | not less than: |  | not less than: |
| 3/31/2004 | 1.25 | 3/31/2005 | 1.25 |
| 6/30/2004 | 1.2 | 6/30/2005 | 1.25 |
| 9/30/2004 | 1.2 | 9/30/2005 | 1.50 |
| 12/31/2004 | 1.7 | 12/31/2005 | 1.75 |
| 3/31/2005 | 1.7 | 3/31/2006 | 2.00 |
| thereafter | 2.5 | 6/30/2006 | 2.00 |
|  |  | thereafter | 2.25 |

| Limitation on Consolidated Indebtedness |  |  |  |
|---|---|---|---|
|  |  | 3/31/2005 | 4.25 |
|  |  | 6/30/2005 | 4.00 |
|  |  | 9/30/2005 | 4.00 |
|  |  | thereafter | 3.00 |

The March 2005 Amendment changed the Fixed Charge Coverage Ratio calculation along with ratios and added the Limitation on Consolidated Indebtedness

**$65 Million**

|  | March 2004 Amendment |  | March 2005 Amendment |
|---|---|---|---|
| Fixed Charge Coverage Ratio |  |  |  |
|  | not less than: |  | not less than: |
| 3/31/2004 | 1.25 | 3/31/2005 | 1.25 |
| 6/30/2004 | 1.2 | 6/30/2005 | 1.25 |
| 9/30/2004 | 1.2 | 9/30/2005 | 1.50 |
| 12/31/2004 | 1.7 | 12/31/2005 | 1.75 |
| 3/31/2005 | 1.7 | 3/31/2006 | 2.00 |
| thereafter | 2 | 6/30/2006 | 2.00 |
|  |  | thereafter | 2.50 |

| Consolidated Leverage Ratio | not greater than: |  | not greater than: |
|---|---|---|---|
| 3/31/2004 | 5 | 3/31/2005 | 4.25 |
| 6/30/2004 | 6.25 | 6/30/2005 | 4.00 |
| 9/30/2004 | 6.25 | 9/30/2005 | 4.00 |
| 12/31/2004 | 4 | thereafter | 3.00 |
| 3/31/2005 | 4 |  |  |
| thereafter | 3.25 |  |  |

Senior Note Covenant Amendments.xls

I 00435

# ⊨ The Washington Post ⊨

# BUSINESS

SUNDAY, AUGUST 21, 2005



I 00436

# AIG's Other Reputation

## Some Customers Say the Insurance Giant Is Too Reluctant to Pay Up

By Dean Starkman
*Washington Post Staff Writer*

When his pickup truck developed engine trouble a few years ago, Anthony A. Stankus filed a claim under an auto warranty he had bought from a unit of insurance giant American International Group Inc.

Soon the Phoenix consultant got his answer: Claim denied.

Most policyholders would have left it at that. But Stankus sued — and won a rare look at the internal claims-handling practices at the world's largest insurance company.

As it turns out, AIG was losing more than $210 million on auto-warranty claims, provoking the ire of the company's longtime chairman and chief executive, Maurice R. "Hank" Greenberg, according to court documents. As a result, in mid-1999, a newly installed team at AIG's auto-warranty division began to reject thousands of claims — including half of the claims that its own contractor, a claims-handling company, recommended be paid, according to court papers. Stankus's claim was among them.

Any modification to a car could be used as a reason to reject, Richard John Jr., a former senior vice president of the claims-handling company, Mechanical Breakdown Administrators Inc. of Scottsdale, Ariz., testified — even installing manufacturer-approved new tires or, in Stankus's case, a trailer hitch. When John protested, he said an AIG official told him, " 'We are losing X number of million dollars a year on these programs, and we've got to do something.' "

AIG has declined to discuss individual lawsuits. But Charles R. Schader, AIG's senior vice president for claims, said the company never denies claims to boost profitability. He said that — allowing for an occasional mistake — AIG pays legitimate claims promptly and gets few complaints.

"If we didn't pay claims, including the large ones, we'd be out of business," Schader said.

These days AIG is on the defensive. New York Attorney General Eliot L. Spitzer has accused the New York insurance behemoth, Greenberg and another top former official of engaging in a "pattern of fraud" against investors and regulators since at least the 1980s, concocting sham transactions to falsely boost reserves, hiding control of offshore insurance companies, disguising underwriting losses as investment losses and more.

Federal prosecutors, meanwhile, are probing whether AIG and other insurers misused a specialized financial product that makes public companies' books look better — all to fool investors.

But the loudest complaints about AIG over the years have come not from investors but from AIG customers. Consumer advocates, former customers and their lawyers gripe that AIG has routinely flouted its obligations under state insurance laws to pay legitimate claims promptly and has abused the legal system in fights with customers who sue.

Metro-Goldwyn-Mayer Studios Inc., for instance, accused an AIG unit of "pulling the rug" out from under a policy to defend the studio against lawsuits on the eve of a critical trial over ownership of the James Bond movie franchise. The two sides settled at the end of 2002 after a California state court judge found that the AIG unit had wrongfully dropped the coverage.

Eugene R. Anderson, a New York policyholders' lawyer and longtime AIG nemesis, says the company's business strategy is simple: "Just say no."

Surprisingly little information is available about claims-handling in the $1.3 trillion property and casualty insurance industry.

See CLAIMS, F7, Col. 3

ILLUSTRATION BY JOHN UELAND FOR THE WASHINGTON POST

# AIG Defends Its Claims-Handling Record

**CLAIMS,** *From F1*

Under a patchwork system of state regulation, companies are not required to disclose how frequently they deny claims, the reasons for doing so or how often they are sued by customers for failing to pay legitimate claims promptly.

Certainly, AIG isn't the only target of insurance industry critics, who say problems in claims handling are increasing generally. They point to cases in which courts have found that insurers committed systemic claims-handling abuses or used improper legal tactics to grind down customers who sue.

Last year, the U.S. Court of Appeals for the 9th Circuit in San Francisco upheld a federal magistrate who wrote that UnumProvident Corp. had implemented a "company-wide scheme to terminate expensive disability claims to increase profits." The trial judge in the case, U.S. Magistrate Judge James Larson, in a 2002 ruling cited evidence that, beginning in the mid-1990s, the Chattanooga, Tenn., benefits insurer convened "roundtable" meetings, usually held after hours, to target expensive claims for termination, with each executive bringing a "Top 10" list based on the size of the payout.

The judge found that the company impeded Joan Hangarter, a Marin County, Calif., chiropractor, in the pursuit of her claims through, among other things, a document-shredding program. The ruling upheld $5 million in punitive damages awarded to her.

A UnumProvident spokeswoman said the company strongly disagrees with the courts' ruling and denies wrongfully turning down the claim, as well as the existence of improper "roundtable" meetings, a shredding program or systemic problems, generally. She pointed to an examination report on the company's claims-handling practices overseen by the insurance commissioners of Massachusetts, Maine and Tennessee that found only "areas of concern," but no violations of law or claims regulations.

Also last year, the California Supreme Court upheld an $8.5 million award, including $5 million in punitive damages, against Allstate Insurance Co., finding that the Northbrook, Ill., company "exploited its knowledge" of a couple's "perilous financial condition" to drag out a homeowner's

claim and force a settlement. The court said the trial turned up evidence that Allstate's offer of $7,000 for the house's contents — the couple had claimed $45,000 — "conformed to a standard amount it used to minimize its payouts in similar cases."

An Allstate spokesman said the company was "disappointed" with that verdict. "We're focused on delivering a superior customer experience," he said, adding that the company is obligated to investigate some claims to keep costs down for other policyholders.

Robert Hartwig, chief economist for the Insurance Information Institute, a Washington trade group, strongly disagrees that disputes between insureds and insurers are growing and says the industry is no more at odds with customers than are other industries. Hartwig said U.S. insurers sometimes fight policyholders because an increasingly sophisticated plaintiffs' bar has worked to broaden coverage of asbestos, mold, pollution and other liabilities in ways never contemplated by insurers. Unforeseen liabilities — and related claims handling — have sunk dozens of insurers in recent years, including Kemper, Reliance and other familiar names, industry defenders say.

But AIG has long stood out. Five times as large as its nearest competitor, it is also the industry's most successful and influential company. AIG shares have returned a stunning 4,800 percent over the past three decades, far better than its peers and five times better than the Dow Jones industrial average. Its many innovations — from new products to claims handling — have been widely imitated, insurance brokers and competitors say.

The company's unique and admittedly hard-nosed culture is a legacy of Greenberg, who took over as chief executive in 1967 and was famous for stressing discipline in underwriting — the ability to collect more in premiums than is paid in claims — while other insurers relied on investments. "If you don't make a profit in your basic business, which is underwriting, you won't make a profit for very long," Greenberg said in a 1992 Crain's Business Insurance article.

Unlike the rest of the industry, AIG has turned an underwriting profit nearly every year during the past 25 years and in 2003 posted its best-ever performance, paying out only 92.43 cents in claims and expenses for every $1 in premiums, far below the industry average of 99.6, the industry's lowest mark in years.

Greenberg recently resigned under pressure from state and federal probes of the company's accounting practices. A spokesman for Greenberg's lawyers declined to comment.

AIG officials point out that the company's underwriting record has come from its lower operating expenses, not claims, which, they note, are sometimes near or even above industry averages.

Litigation over the years has offered glimpses into the company's tightfisted culture. In a 2001 affidavit, a former claims supervisor in AIG's San Francisco office alleged in an employment case that beginning in 1983 or 1984, AIG adopted what employees called a "slow-pay" system for claims.

Robert Cook, a supervisor from 1978 to 1985, said that under an AIG "check-retention policy," checks owed insureds, vendors and others were simply locked in a safe until payees complained. Cook said AIG created an internal form to keep track of complaints. Even then, Cook said, he had to cajole the regional manager, Robert C. Davidson, with special "buzzwords" to convey the urgency of the complaint.

Other slow-pay techniques, Cook said: using second-class mail, writing checks for West Coast claimants on East Coast banks and making executives rewrite reports "again and again for no reason." Cook died in 2003. The employment case was settled. Davidson, in a brief interview, said the policy "came from New York, and all we did was implement it, even though we didn't appreciate it." He declined to comment further.

## Choosing a Company: Check the History

J. Robert Hunter, insurance director for the Consumer Federation of America, the Washington-based advocacy group, says that, for individuals, finding an insurance company that handles its claims well is tricky and mostly a matter of learning a company's reputation in the marketplace. Hunter recommends that insurance buyers first check Consumer Reports magazine, which periodically publishes policyholder surveys on claims-handling, and then find the number of complaints lodged against a particular carrier on the Web site of the National Association of Insurance Commissioners, naic.com.

Those with better reputations in consumer lines, he said, include United Services Automobile Association, a San Antonio company that serves mainly military personnel; Geico, or Government Employees Insurance Co., the Berkshire Hathaway Inc. unit based in Washington; Chubb Inc., a Warren, N.J., insurer that caters mostly to a higher-end clientele; and regional carriers, including NJM Insurance Group, based in West Trenton, N.J., and Erie Insurance Group, based in Erie, Pa.

— Dean Starkman

---

In part, AIG's reputation comes from its massive size and its unique business model — taking on the most complex risks in the most far-flung parts of the globe. It insures theme parks, liquor makers, contractors in Iraq, industrial companies with big pollution exposure, even executives at risk of kidnapping.

Schader says AIG's reputation of being tough on policyholders' claims is unwarranted. He says AIG over the years has bulked up its claims-handling expertise and now has fewer disputes with customers, not more, and that only a handful — far less than one-tenth of 1 percent — of the 800,000 claims now pending against the company involve actual bad-faith suits brought by customers.

And the number of policyholder lawsuits against the company is dwarfed, AIG says, by thousands of examples of exceptional claims-handling service it performs. In one instance, when an iron beam fell from a crane at a Sacramento construction site three years ago, seriously injuring a worker, the crane's owner, Maxim Crane Works LP, turned to AIG, which last year paid out $12.5 million under an excess-casualty policy. "They wrote the check and were very good about it," said Ron Marmo, a vice president with the Bridgeville, Pa., crane-rental company.

Claims that do end in litigation, though, are often hard-fought. AIG's policyholders routinely wage years-long court fights to learn how the insurer handled similar claims and to obtain seemingly mundane claims documents, such as company training manuals for claims handlers.

This spring a federal judge in Indianapolis issued a rare sanctions order against an AIG unit for unfairly blocking discovery in a case brought by a manufacturer whose environmental claim was denied. U.S. District Judge Richard Young wrote that the insurer's lawyers made "unwarranted" objections and gave instructions not to answer 539 times during the 284-page deposition of an AIG unit executive.

Most of AIG's squabbles with customers are settled and the terms kept secret. That also happened two years ago when RSR Corp., a Dallas smelting company, settled an environmental claim with an AIG unit and other insurers. "It took 13 years," says William Brewer, a Dallas lawyer for RSR. "They're shameless."

But in 2000, a case did go to trial, and a federal court jury in Hartford awarded corporate giant United Technologies Inc. $16 million in punitive damages, later reduced to $13 million, against an AIG unit, finding it had handled another environmental claim in bad faith.

In a decision upholding the award, U.S. District Judge Janet Bond Arterton wrote that the AIG unit had "shunted" UTC's claims into "limbo," a "netherworld of non-processing," and simply didn't respond for years, asking for more and more information while it "investigated" the claim. When UTC finally sued for an answer, the claim was denied.

The "obvious" motive was to hold onto the money as long as possible, she wrote. "Delay . . . would naturally result in defendant's retaining control over huge sums with the resulting investment-profit benefit," she wrote.

AIG's Schader points out, "We have 10,000 people handling claims. Are there cases where people go over the line? People make mistakes." He added, "It's our objective to have very, very few of those."

*Staff researcher Richard Drezen contributed to this report.*

**Fees in conjunction with Debt Amendment**
**Fourth Quarter 2004**

**Chapman and Cutler**

| | |
|---|---:|
| 1/26/2005 | 1,380 |
| 3/18/2005 | 30,764 |
| 9/26/2005 | 1,675 |
| | **33,819** |

**SPP Capital Partners**

| | |
|---|---:|
| 2/28/2005 | 25,000 |
| 3/31/2005 | 177,696 |
| | **202,696** |

**Bryan Cave**

| | |
|---|---:|
| 3/31/2005 | **13,500** |

**I 00440**

Intentionally Left Blank

I 00441

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

## FORM 10-K

ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934

**For the fiscal year ended December 31, 2004**

Commission file number 0-10786

## Insituform Technologies, Inc.

(Exact name of registrant as specified in its charter)

| Delaware | 13-3032158 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| 702 Spirit 40 Park Drive Chesterfield, Missouri | 63005 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **636-530-8000**

Securities registered pursuant to Section 12(b) of the Act: **None**

Securities registered pursuant to Section 12(g) of the Act:

| Title of each class | Name of each exchange on which reported |
|---|---|
| Class A Common Shares, $.01 par value | The Nasdaq Stock Market |
| Preferred Stock Purchase Rights | The Nasdaq Stock Market |

Indicate by a check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes [ **X** ]  No [   ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (Section 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   [   ]

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act) Yes [ **X** ]  No [   ]

State the aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant as of June 30, 2004: $435,104,298

Indicate the number of shares outstanding of each of the registrant's classes of common stock as of the latest practicable date:  Class A common shares, $.01 par value, as of March 1, 2005:  26,811,355 shares

### DOCUMENTS INCORPORATED BY REFERENCE

As provided herein, portions of the documents below are incorporated by reference:

| Document | Part – Form 10-K |
|---|---|
| Registrant's Proxy Statement for the 2005 Annual Meeting of Stockholders | Part III |

I 00442

PART I

Item 1. Business

**Forward-Looking Information**

This Annual Report on Form 10-K contains various forward-looking statements (as such term is defined in the Private Securities Litigation Reform Act of 1995) that are based on information currently available to the management of Insituform Technologies, Inc. and on management's beliefs and assumptions. When used in this document, the words "anticipate," "estimate," "believes," "plans," and similar expressions are intended to identify forward-looking statements, but are not the exclusive means of identifying such statements. Such statements are subject to risks and uncertainties. The Company's actual results may vary materially from those anticipated, estimated or projected due to a number of factors, such as the competitive environment for the Company's products and services, the availability of raw materials used in the Insituform® cured-in-place-pipe ("Insituform CIPP") process, increased competition upon expiration of the Company's patents or the inadequacy of one or more of its CIPP process patents to protect its operations, the geographical distribution and mix of the Company's work, the ability of the Company to attract business at acceptable margins, foreseeable and unforeseeable issues in projects that make it difficult or impossible to meet projected margins, the timely award or cancellation of projects, political circumstances impeding the progress of work, the Company's ability to remain in compliance with its financial covenants, the regulatory environment, the outcome of the Company's pending litigation and other factors set forth in reports and other documents filed by the Company with the Securities and Exchange Commission from time to time. The Company does not assume a duty to update forward-looking statements. Please use caution and do not place reliance on forward-looking statements.

**General**

Insituform Technologies, Inc. is a worldwide company specializing in trenchless technologies to rehabilitate, replace, maintain and install underground pipes. The Company has three principal operating segments: rehabilitation, tunneling and Tite Liner. These segments have been determined primarily based on the types of products sold by each segment, and each is regularly reviewed and evaluated separately. While the Company uses a variety of trenchless technologies, the Insituform® CIPP process contributed 69.2% and 65.5% of its revenues in 2004 and 2003, respectively. The tunneling segment has grown through organic growth combined with a business acquisition in 2002.

Revenues are generated by the Company and its subsidiaries operating principally in the United States, Canada, the United Kingdom, the Netherlands, France, Belgium, Spain, Switzerland and Chile, and include product sales and royalties from several joint ventures in Europe, and unaffiliated licensees and sub-licensees throughout the world. The United States remains the Company's single largest market, representing 81.0% of total revenue in 2004. See Note 15 to the Company's Consolidated Financial Statements contained in this report for additional segment information and disclosures.

The Company was incorporated in Delaware in 1980, under the name Insituform of North America, Inc. The Company was originally formed to act as the exclusive licensee of the Insituform CIPP Process in most of the United States. When the Company acquired its licensor in 1992, the name of the Company was changed to Insituform Technologies, Inc. As a result of its successive licensee acquisitions, the Company's business model has evolved from licensing technology and manufacturing materials to performing the entire Insituform CIPP Process and other trenchless technologies itself.

As used in this Annual Report on Form 10-K, the terms "Company" and "Insituform Technologies" refer to the Company and, unless the context otherwise requires, its direct and indirect

Wholly-owned subsidiaries. For certain information concerning the Company by industry segment and by

I 00443

each geographic area, see Note 15 of the Notes to the Company's Consolidated Financial Statements.

The Company's website is www.insituform.com. The Company makes available on this website under "Investor Relations – SEC," free of charge, its annual report on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K (and amendments to those reports) as soon as reasonably practicable after the Company electronically files such material with, or furnishes it to, the Securities and Exchange Commission. In addition, the Company's Code of Ethics for its Chief Executive Officer, Chief Financial Officer and senior financial employees, its Business Code of Conduct applicable to its officers, directors and employees, its Corporate Governance Guidelines, and its Board committee charters are available, free of charge, on this website. These documents will be made available, free of charge, to any stockholder requesting them.

**Technologies**

Pipeline System Rehabilitation

The Insituform CIPP Process for the rehabilitation of sewers, pipelines and other conduits utilizes a custom-manufactured tube, or liner, made of a synthetic fiber. After the tube is saturated (impregnated) with a thermosetting resin mixture, it is installed in the host pipe by various processes and the resin is then hardened, usually by heating it using various means, forming a new rigid pipe within a pipe.

Pipebursting is a trenchless method for replacing deteriorated or undersized pipelines. A bursting head is propelled through the existing pipeline, fracturing the host pipe and displacing the fragments outward, allowing a new pipe to be pulled in to replace the old line. Pipes can be replaced size-for-size or upsized.

Microtunneling is a trenchless method of drilling a new tunnel from surface operated equipment. Microtunneling is typically used for gravity sewers at depths greater than 15 feet, in congested areas, where unstable ground conditions exist, where construction is below the water table, or where contamination zones are present.

Sliplining is a method used to push or pull a new pipeline into an old one. With segmented sliplining, short segments of pipe are joined to form the new pipe. For gravity sewer rehabilitation, these short segments can often be joined in a manhole or access structure, eliminating the need for a large pulling pit.

The Insituform ArmorGRiP™ Process uses a proprietary product to rehabilitate large diameter sanitary or storm sewers. A proprietary process is used to construct fiberglass reinforced panels to custom size and thickness. The panels are individually placed in the sewer and the seams are sealed.

See "Patents and Licenses" below for information concerning these technologies and the Company's NuPipe Process and Thermopipe process.

Tunneling

Tunneling typically encompasses the construction of man-entry sized pipelines with access through vertical shafts. From the vertical shaft, a tunnel is constructed using a steerable, locally controlled tunnel boring machine. Pipe is typically installed after the tunnel is constructed.

I 00444

Tite Liner Process

The Company's Tite Liner® ("Tite Liner") process is a method of lining new and existing pipe with a corrosion and abrasion resistant polyethylene pipe.

**Rehabilitation Activities**

The Company's rehabilitation activities are conducted principally through installation and other construction operations performed directly by the Company or its subsidiaries. In those areas of the world in which the Company's management believes it would not be desirable for the Company to capitalize on its trenchless processes directly, the Company has granted licenses to unaffiliated companies. As described under "Ownership Interests in Operating Licensees and Project Joint Ventures" below, the Company also has entered into joint ventures from time to time to capitalize on its trenchless rehabilitation processes. Under these contractual joint venture relationships, work is bid by the joint venture entity and subcontracted to the joint venture partners or to third parties. The joint venture partners are primarily responsible for their subcontracted work, but both joint venture partners are liable to the customer for all of the work. Revenue and associated costs are recorded using percentage-of-completion accounting for the Company's subcontracted portion of the total contract only.

The Company's principal rehabilitation activities are conducted in North America directly by the Company or through subsidiaries. The Company holds the Insituform CIPP Process rights for the United States and Canada. In North America, the Company offers the Insituform CIPP Process throughout the United States and in Canada. Significant pipebursting rehabilitation activities have been conducted in the southeastern and southwestern regions of the United States by the Company.

North American rehabilitation operations, including research and development, engineering, training and financial support systems, are headquartered in Chesterfield, Missouri. Tube manufacturing and processing facilities for North America were maintained in seven locations, geographically dispersed throughout the United States and Canada during 2004. During the first quarter of 2004, the Company closed its tube manufacturing facility in Memphis, Tennessee, and transferred its tube manufacturing operations to the Company's existing facilities in Batesville, Mississippi.

Outside North America, the Company conducts Insituform CIPP Process rehabilitation operations through subsidiaries in the United Kingdom, France, Spain, the Netherlands, Switzerland and Belgium. Through one of its French subsidiaries, Video Injection S.A., acquired in 1998, the Company utilizes multifunctional robotic devices, developed by Video Injection, in connection with the inspection and repair of pipelines.

European operations are headquartered in Rueil Malmaison, France, a suburb of Paris, with principal regional facilities located in the United Kingdom, France, Spain, the Netherlands, Switzerland and Belgium.

**Tunneling Activities**

The Company conducts tunneling, microtunneling and a range of pipe system rehabilitation services throughout the United States directly and through its wholly-owned subsidiary, Affholder, Inc.

**Tite Liner Activities**

Tite Liner Process operations are conducted in the United States through the Company's United Pipeline Systems division. Worldwide Tite Liner Process operations are headquartered in the United States. Outside the United States, Tite Liner Process installation activities are conducted through operating subsidiaries in Chile and Canada.

I 00445

Most of the Company's installation operations are project-oriented contracts for municipal entities. The contracts are usually obtained through competitive bidding or negotiations and require performance at a fixed price. The profitability of these contracts depends heavily upon the competitive bidding environment, the Company's ability to estimate costs accurately and the Company's ability to effectively manage and execute project performance. Project estimates may prove to be inaccurate due to unforeseen conditions or events. A substantial portion of the work on any given project may be subcontracted to third parties at a significantly lower profitability level to the Company than work directly performed by the Company. Also, proper trenchless installation requires expertise that is acquired on the job and through training. The Company, therefore, provides ongoing training and appropriate equipment to its field installation crews.

The overall profitability of the Company's installation operations is influenced not only by the profitability of specific project contracts, but also by the volume and timing of projects so that the installation operations are able to operate at, or near, capacity.

The Company is required to carry insurance and provide bonding in connection with certain installation projects and, accordingly, maintains comprehensive insurance policies, including workers' compensation, general and automobile liability, and property coverage. The Company believes that it presently maintains adequate insurance coverage for all installation activities. The Company has also arranged bonding capacity for bid, performance and payment bonds. Typically, the cost of a performance bond is less than 1% of the contract value. The Company and certain of its subsidiaries are required to indemnify the surety companies for any payments the sureties are required to make under the bonds and to hold them harmless from and against all claims, damages and expenses which they may sustain in connection with any bond. The indemnification obligations are secured by unperfected liens on the assets of the Company and those subsidiaries which are parties to the applicable indemnification agreement.

The Company generally invoices its customers as work is completed. Under ordinary circumstances, collection from municipalities in the United States is made within 60 to 90 days of billing. In most cases, 5% to 15% of the contract value is withheld by the owner pending satisfactory completion of the project.

## Licensees

The Company has granted licenses for the Insituform CIPP Process, covering exclusive and non-exclusive territories, to licensees who provide pipe repair and rehabilitation services throughout their respective licensed territories. At December 31, 2004, the Insituform CIPP Process was licensed to nine unaffiliated licensees and 13 unaffiliated sublicensees in Europe and Asia. The licenses generally grant to the licensee the right to utilize the know-how and the patent rights (where they exist) relating to the subject process, and to use the Company's copyrights and trademarks.

The Company's licensees generally are obligated to pay a royalty at a specified rate, which in many cases is subject to a minimum royalty payment. After the September 5, 2003 acquisition of Insituform East, Inc., there were no unaffiliated domestic licensees. Any improvements or modifications a licensee may make in the subject process during the term of the license agreement become the property of the Company or are licensed to the Company. Should a licensee fail to meet its royalty obligations or other material obligations, the Company may terminate the license. Licensees, upon prior notice to the Company, may generally terminate the license for any reason. The Company may vary the agreement used with new licensees according to prevailing conditions.

The Company acts as licensor under arrangements with approved installers relating to the use of the Thermopipe® ("Thermopipe") Process in the United Kingdom and elsewhere on a non-exclusive basis.

## Ownership Interests in Operating Licensees and Project Joint Ventures

I 00446

The Company, through its subsidiary, Insituform Holdings (UK) Limited, holds one-half of the equity interest in Insituform Rohrsanierungstechniken GmbH, the Company's licensee of the Insituform CIPP Process in Germany. Insituform Rohrsanierungstechniken also conducts Insituform CIPP Process operations in Austria, the Czech Republic, Slovakia and Hungary. The remaining interest in Insituform Rohrsanierungstechniken is held by Per Aarsleff A/S, a Danish contractor. The joint venture partners have rights-of-first-refusal in the event either party determines to divest its interest.

The Company, through its subsidiary, Insituform Technologies Limited, holds one-half of the equity interest in Insituform Environmental Techniques Limited, the Company's licensee of the Insituform CIPP Process in Ireland. The remaining interest is held by Environmental Techniques Limited, an Irish contractor. The joint venture partners have rights-of-first-refusal in the event the other party determines to divest its interest.

The Company, through its subsidiary, INA Acquisition Corp., holds one-half of the equity interest in Insituform Italia Srl, the Company's licensee of the Insituform CIPP Process in Italy. The remaining interest is held by Per Aarsleff A/S. On January 18, 2005, the quotaholders (stockholders) of Insituform Italia approved the liquidation of the Italian joint venture, as the joint venture was no longer financially viable. During the life of the joint venture, the Company incurred losses of $2.8 million and contributed cash of $2.5 million to the joint venture. During the most recent fiscal year, the Company incurred a $0.5 million loss from the joint venture and contributed cash to the joint venture in the amount of $0.8 million. The Company does not expect to incur any material losses going forward as the joint venture is in liquidation. The Company expects liquidation costs of approximately $0.2 million, which have been accrued at December 31, 2004.

The Company has entered into several contractual joint ventures in order to develop joint bids on contracts for its pipeline rehabilitation business and for its tunneling operations. Typically, the joint venture entity holds the contract with the owner and subcontracts portions of the work to the joint venture partners. As part of the subcontracts, the partners usually provide bonds to the joint venture. The Company could be required to complete its joint venture partner's portion of the contract if the partner is unable to complete its portion and a bond is not available. The Company continues to investigate opportunities for expanding its business through such arrangements.

## Marketing

The marketing of the Company's rehabilitation technologies is focused primarily on the municipal wastewater markets worldwide, which the Company expects to remain the largest part of its business for the foreseeable future. To help shape decision-making at every step, the Company uses a multi-level sales force structured around target markets and key accounts, focusing on engineers, consultants, administrators, technical staff and elected officials. The Company also produces sales literature and presentations, participates in trade shows, conducts national advertising and executes other marketing programs for the Company's own sales force and those of unaffiliated licensees. The Company's unaffiliated licensees are responsible for marketing and sales activities in their respective territories. See "Licensees" and "Ownership Interests in Operating Licensees and Project Joint Ventures" above for a description of the Company's licensing operations and for a description of investments in licensees.

The Company offers its Tite Liner Process worldwide to industrial customers to line new and existing pipelines.

The Company bids on tunneling projects in selected geographical markets in the United States.

No customer accounted for more than 10% of the Company's consolidated revenues during the years ended December 31, 2004, 2003 and 2002, respectively.

6

I 00447

## Contract Backlog

| Backlog | December 31, | |
|---|---|---|
| | 2004 | 2003 |
| | (In millions) | |
| Rehabilitation | $190.4 | $111.8 |
| Tunneling | 129.3 | 89.3 |
| Tite Liner | 8.6 | 7.0 |
| Total | $328.3 | $208.1 |

Contract backlog is management's expectation of revenues to be generated from received, signed, uncompleted contracts whose cancellation is not anticipated at the time of reporting. Contract backlog excludes any term contract amounts for which there is not specific and determinable work released and projects where the Company has been advised that it is the low bidder, but not formally awarded the contract.

## Product Development

The Company, by using its own laboratories and test facilities as well as outside consulting organizations and academic institutions, continues to develop improvements to its proprietary processes, including the materials used and the methods of manufacturing and installing pipe. During the years ended December 31, 2004, 2003 and 2002, the Company spent $2.9 million, $2.0 million and $2.0 million, respectively, on research and development related activities, including engineering.

## Manufacturing and Suppliers

The Company maintains its North American Insituform CIPP Process liner manufacturing facility in Batesville, Mississippi. An additional facility located in Memphis, Tennessee, was shut down in the first quarter of 2004. The Company spent $5.8 million in 2003 and $4.1 million in 2004 to complete the additions, modifications, upgrades and revisions to its manufacturing facility in Batesville. In Europe, Insituform Linings Plc., a majority-owned subsidiary, manufactures and sells Insituform CIPP Process liners from its plant located in Wellingborough, United Kingdom. The Company holds a 75% interest in Insituform Linings, and Per Aarsleff holds the remainder. These interests are subject to rights-of-first-refusal held by the Company and Per Aarsleff in the event of proposed divestiture.

Although raw materials used in the Company's Insituform CIPP Process products are typically available from multiple sources, the Company's historical practice has been to purchase materials from a limited number of suppliers. The Company maintains its own felt manufacturing facility at its Insitutube® manufacturing facility in Batesville. Substantially all of its fiber requirements are purchased from one source, but the Company believes alternate vendors are readily available.

Although the Company has worked with one vendor to develop a uniform and standard resin in North America, the Company has begun to diversify the supply base among other major companies to further ensure ongoing material availability. The Company currently is working to finalize a multi-year contract with its primary resin supplier. The Company's existing resin supply contract expired on December 31, 2004, but has been extended by three separate amendments through March 31, 2005. The Company believes that the new resin contract should be finalized and executed by March 31, 2005. In the event the new contract is not executed by such date, the Company will seek an additional amendment to the existing contract.

The Company believes that the sources of supply for its Insituform CIPP Process operations in both North America and Europe are adequate for its needs. The Company's pricing of raw materials is subject to fluctuations in the underlying commodity prices.

7

The Company has a third party contractual commitment for the manufacture and supply of Thermopipe® ("Thermopipe") Process products to the Company through 2005.

The Company sells Insituform CIPP Process liners and related products to certain licensees pursuant to fixed-term supply contracts. Under the arrangements assumed in connection with the acquisition of the Thermopipe Process and under subsequent arrangements, the Company also furnishes Thermopipe Process products to its approved installers.

The Company manufactures certain equipment used in its corrosion and abrasion protection operations.

## Patents and Licenses

As of December 31, 2004, the Company held 59 patents in the United States relating to the Insituform CIPP Process, the last of which will expire in 2022. As of December 31, 2004, the Company had 11 patents pending in the United States that relate to the Insituform CIPP Process.

The Company has obtained patent protection in its principal overseas markets covering various aspects of the Insituform CIPP Process. The specifications and/or rights granted in relation to each patent will vary from jurisdiction to jurisdiction. In addition, as a result of differences in the nature of the work performed and in the climate of the countries in which the work is carried out, not every licensee uses each patent, and the Company does not necessarily seek patent protection for all of its inventions in every jurisdiction in which it does business.

There can be no assurance that the validity of the Company's patents will not be successfully challenged. The Company's business could be adversely affected by increased competition upon expiration of the patents or if one or more of its Insituform CIPP Process patents were adjudicated to be invalid or inadequate in scope to protect the Company's operations. The Company believes, however, that, in either case, its long experience with the Insituform CIPP Process, its continued commitment to support and develop the Insituform CIPP Process, the strength of its trademark, and its degree of market penetration, should enable the Company to continue to compete effectively in the pipeline rehabilitation market.

The Company holds 12 patents issued in the United States covering either the NuPipe Process or materials used in connection with the NuPipe Process. The Company also holds similar NuPipe Process (or related material) patents in 14 other countries. The NuPipe Process entails the manufacture of a folded thermoplastic replacement pipe that is heated at the installation site to make it flexible enough to be inserted into an existing conduit. The Company is no longer seeking NuPipe Process business.

The Company holds two patents issued in the United States and nine patents outside of the United States relating to the Thermopipe Process for rehabilitating pressurized potable water and other aqueous fluid pipes.

The Company holds a small number of patents relating to its corrosion and abrasion protection business. The Company believes that the success of its Tite Liner Process business, operated through its United Pipeline Systems division, depends primarily upon its proprietary know-how and its marketing and sales skills.

The Company's pipebursting operations are performed under a royalty-bearing, non-exclusive license from Advantica, Inc. The license terminates upon expiration of the underlying patent, which expires on April 19, 2005. In 2004, the Company paid $0.9 million to Advantica under the license.

8

I 00449

## Competition

The markets in which the Company operates are highly competitive. Most of the Company's products, including the Insituform CIPP Process, face direct competition from competitors offering similar or equivalent products or services. In addition, customers can select a variety of methods to meet their pipe installation and rehabilitation needs, including a number of methods the Company does not offer.

Most of the Company's installation operations are either project-oriented or term contracts for municipal entities that are obtained through competitive bidding or negotiations. Most competitors are local or regional companies, and may be either specialty trenchless contractors or general contractors. There can be no assurance as to the success of the Company's trenchless processes in competition with these companies and alternative technologies for pipeline rehabilitation.

## Seasonality

The Company's operations can be affected by severe weather. The effects of weather are most notable between quarters of any given year. Typically, the summer months yield the strongest operational results, while the first quarter is normally weaker due to weather. Unusually severe weather in any area with a large project, or a significant number of smaller jobs, can cause short-term anomalies in operational performance. Only the tunneling segment is relatively immune to weather-induced variability in operating results. For the past five years, seasonal variation in work performed has not had a material effect on the Company's consolidated results of operations.

## Employees

As of December 31, 2004, the Company had 2,445 employees. Certain of the Company's subsidiaries and divisions are parties to collective bargaining agreements covering an aggregate of 436 employees. The Company generally considers its relations with its employees to be good.

## Government Regulation

The Company is required to comply with all applicable United States federal, state and local, and all foreign statutes, regulations and ordinances. In addition, the Company's installation and other operations have to comply with various relevant occupational safety and health regulations, transportation regulations, code specifications, permit requirements, and bonding and insurance requirements, as well as with fire regulations relating to the storage, handling and transporting of flammable materials. The Company's manufacturing facilities, as well as its installation operations, are subject to state and national environmental protection regulations, none of which presently have any material effect on the Company's capital expenditures, earnings or competitive position in connection with the Company's present business. However, although the Company's installation operations have established monitoring programs and safety procedures relating to its installation activities and to the use of solvents, further restrictions could be imposed on the manner in which installation activities are conducted, on equipment used in installation activities and on the use of solvents or the thermosetting resins used in the Insituform CIPP Process.

The use of both thermoplastics and thermosetting resin materials in contact with drinking water is strictly regulated in most countries. In the United States, a consortium led by NSF International, under arrangements with the United States Environmental Protection Agency, establishes minimum requirements for the control of potential human health effects from substances added indirectly to water via contact with

treatment, storage, transmission and distribution system components, by defining the maximum permissible concentration of materials which may be leached from such components into drinking water, and methods for testing them. In April 1997, the Insituform PPL® liner was certified by NSF for use in drinking water systems, followed in April 1999 by NSF certification of the Insituform RPP® liner for such use. The Thermopipe product also has NSF approval. NSF assumes no liability for use of any products, and NSF's

I 00450

arrangements with the EPA do not constitute the EPA's endorsement of NSF, NSF's policies or its standards. Dedicated equipment is needed in connection with use of these products in drinking water applications. The Company does not expect material revenues from its proprietary products for drinking water pipe rehabilitation at least through 2005.

Item 2. Properties

The Company's executive offices are located in Chesterfield, Missouri, a suburb of St. Louis, at 702 Spirit 40 Park Drive. The executive offices are leased from an unaffiliated party through May 31, 2006. The Company owns its tunneling offices, research and development and training facilities in Chesterfield.

The Company owns a liner fabrication facility and a contiguous felt manufacturing facility in Batesville, Mississippi. The Company's recently closed manufacturing facility in Memphis, Tennessee, is located on land sub-leased from an unaffiliated entity for an initial term of 40 years expiring on December 31, 2020. The Company is evaluating its options with respect to this property. Insituform Linings, a majority-owned subsidiary, owns certain premises in Wellingborough, United Kingdom, where its liner manufacturing facility is located.

The Company owns or leases various operational facilities in the United States, Canada, Europe and Latin America.

The foregoing facilities are regarded by management as adequate for the current requirements of the Company's business.

Item 3. Legal Proceedings

In the third quarter of 2002, an accident on an Insituform CIPP Process project in Des Moines, Iowa resulted in the death of two workers and the injury of five workers. The Company fully cooperated with Iowa's state OSHA in the investigation of the accident. Iowa OSHA issued a Citation and Notification of Penalty in connection with the accident, including several willful citations. Iowa OSHA proposed penalties of $808,250. The Company challenged Iowa OSHA's findings, and in the fourth quarter of 2003, an administrative law judge reduced the penalties to $158,000. In the second quarter of 2004, the Iowa Employment Appeal Board reinstated many of the original penalties, ordering total penalties in the amount of $733,750. The Company is vigorously opposing the citations and, in connection therewith, filed a notice of appeal with the Iowa district court. On February 4, 2005, the Iowa district court heard oral arguments from the Company and the Employment Appeal Board regarding the appeal.

In July 2004, three separate civil actions were filed in the Iowa district court of Polk County with respect to the Des Moines accident. The first complaint, filed by family members and the Estate of Brian Burford on July 7, 2004, named the Company, Insituform Technologies USA, Inc. (a wholly owned subsidiary of the Company), the City of Des Moines and 15 current or former employees of the Company as defendants. The two other actions, filed on July 6, 2004 by (1) family members and the Estate of Daniel Grasshoff and (2) Michael Walkenhorst, James E. Johnson and Linda Johnson, named the City of Des Moines and the 15 current or former employees of the Company as defendants, but did not name the Company or Insituform USA as defendants. The complaints filed with respect to Messrs. Burford and Grasshoff alleged wrongful death, negligence, gross negligence and civil conspiracy. The complaint filed with respect to Messrs. Walkenhorst and Johnson alleged gross negligence and civil conspiracy. The Company believes that the allegations in each of the complaints are without merit and that the workers' compensation statutes provide the exclusive remedy to the plaintiffs for the deaths and injuries that occurred as a result of the Des Moines accident. The Company intends to vigorously defend the actions. Each complaint seeks unspecified damages, including punitive damages.

The Company is involved in certain other litigation incidental to the conduct of its business and

I 00451

affairs. Management, after consultation with legal counsel, does not believe that the outcome of any such other litigation will have a material adverse effect on the consolidated financial condition, results of operations or cash flows of the Company.

Item 4. Submission of Matters to a Vote of Security Holders

There were no matters submitted during the quarter ended December 31, 2004 to a vote of our stockholders, through the solicitation of proxies or otherwise.

Item 4A. Executive Officers of the Registrant

The executive officers of the Company, and their respective ages and positions with the Company, are as follows:

| Name | Age at February 1, 2005 | Position with the Company |
| --- | --- | --- |
| Thomas S. Rooney, Jr. | 45 | President and Chief Executive Officer |
| Christian G. Farman | 46 | Senior Vice President and Chief Financial Officer |
| Thomas W. Vaughn | 53 | Senior Vice President and Chief Operating Officer |
| David F. Morris | 43 | Vice President, General Counsel and Secretary |

Thomas S. Rooney, Jr. has been President of the Company since April 2003, and Chief Executive Officer of the Company since July 2003. From April 2003 to July 2003, Mr. Rooney was the Company's Chief Operating Officer. From 2000 until he joined the Company, Mr. Rooney was Senior Vice President and Regional Manager for Gilbane Building Company.

Christian G. Farman has been Chief Financial Officer of the Company since December 2003 and a Senior Vice President since January 2005. From December 2003 to January 2005, Mr. Farman was a Vice President of the Company. From February 2003 to April 2003, Mr. Farman served as Chief Operating Officer of the National Audubon Society. From prior to 1998 until 2001, Mr. Farman was Chief Financial Officer of Vivendi North America (previously Anjou International). Mr. Farman joined Vivendi North America in 1989 as Controller, and was promoted to Vice President in 1992, Chief Financial Officer in 1995, and Executive Vice President in 1999. From 1979 to 1989, Mr. Farman was an auditor with Price Waterhouse (now known as PricewaterhouseCoopers LLP) in New York. Mr. Farman is a certified public accountant.

Thomas W. Vaughn has been Senior Vice President and Chief Operating Officer of the Company since August 2004. From May 1999 to February 2004, Mr. Vaughn served as Chief Operating Officer of Williams Group International.

David F. Morris has been Vice President, General Counsel and Secretary of the Company since January 2005. From March 1993 until January 2005, Mr. Morris was with the law firm of Thompson Coburn LLP, St. Louis, Missouri, most recently as a partner in its corporate and securities practice areas. Mr. Morris also served as Senior Vice President, Associate General Counsel and Secretary of Unified Financial Services, Inc., a diversified financial services company, from December 1999 to March 2004.

I 00452

**PART II**

Item 5. Market for Registrant's Common Equity and Related Stockholder Matters

(a)    The Company's class A common shares, $.01 par value ("Common Stock"), are traded on the Nasdaq Stock Market under the symbol "INSU."  The following table sets forth the range of quarterly high and low sales prices commencing after December 31, 2002, as reported on The Nasdaq Stock Market. Quotations represent prices between dealers and do not include retail mark-ups, mark-downs or commissions.

| Period | High | Low |
|---|---|---|
| **2004** | | |
| First Quarter | $ 19.40 | $ 15.00 |
| Second Quarter | 18.08 | 14.50 |
| Third Quarter | 19.70 | 15.72 |
| Fourth Quarter | 24.72 | 18.53 |
| | | |
| **2003** | | |
| First Quarter | $ 17.43 | $ 12.11 |
| Second Quarter | 18.00 | 12.73 |
| Third Quarter | 19.00 | 14.76 |
| Fourth Quarter | 18.34 | 13.53 |

As of March 1, 2005, the number of holders of record of the Company's Common Stock was 855.

Holders of Common Stock are entitled to receive dividends as and when they may be declared by the Company's Board of Directors.  The Company has never paid a cash dividend on the Common Stock. The Company's present policy is to retain earnings to provide for the operation and expansion of its business.  However, the Company's Board of Directors will review the Company's dividend policy from time to time and will consider the Company's earnings, financial condition, cash flows, financing agreements and other relevant factors in making determinations regarding future dividends, if any.  Under the terms of certain debt arrangements to which the Company is a party, the Company is subject to certain limitations on paying dividends.  See "Management's Discussion and Analysis of Financial Condition and Results of Operations – Liquidity and Capital Resources – Financings."

**Equity Compensation Plan Information**

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights[1] (a) | Weighted-average exercise price of outstanding options, warrants and rights (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 1,709,358 | $21.46 | 1,036,369 |
| Equity compensation plans not approved by security holders | — | n/a | — |
| Total | 1,709,358 | $21.46 | 1,036,369 |

(1)    The number of securities to be issued upon exercise of outstanding options, warrants and rights includes 1,650,558 stock options and 58,800 deferred stock units outstanding at December 31, 2004.

I 00453

Item 6. Selected Financial Data

The selected financial data set forth below has been derived from the Company's consolidated financial statements contained in "Item 8. Financial Statements and Supplementary Data" of this Annual Report on Form 10-K, and previously published historical financial statements not included in this Annual Report on Form 10-K. The selected financial data set forth below should be read in connection with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the Company's consolidated financial statements, including the footnotes, contained in this report.

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2004[1] | 2003[2] | 2002[2,3,4] | 2001[2,3,4] | 2000[2,4] |
| | (In thousands, except per share amounts)(Unaudited) | | | | |
| INCOME STATEMENT DATA: | | | | | |
| Revenues | $542,598 | $487,272 | $480,358 | $445,310 | $409,434 |
| Operating income | 8,178 | 21,591 | 50,183 | 46,765 | 62,966 |
| Income from continuing operations | 597 | 4,628 | 28,560 | 24,940 | 34,906 |
| Loss from discontinued operations | – | (1,103) | (5,869) | (72) | – |
| Net income | 597 | 3,525 | 22,691 | 24,868 | 34,906 |
| Basic earnings per share: | | | | | |
| Income from continuing operations | 0.02 | 0.17 | 1.08 | 0.94 | 1.41 |
| Loss from discontinued operations | – | (0.04) | (0.22) | – | – |
| Net income | 0.02 | 0.13 | 0.86 | 0.94 | 1.41 |
| Dilutive earnings per share: | | | | | |
| Income from continuing operations | 0.02 | 0.17 | 1.07 | 0.93 | 1.37 |
| Loss from discontinued operations | – | (0.04) | (0.22) | – | – |
| Net income | 0.02 | 0.13 | 0.85 | 0.92 | 1.37 |
| BALANCE SHEET DATA: | | | | | |
| Unrestricted cash and cash equivalents | $ 93,246 | $ 93,865 | $ 71,401 | $ 70,387 | $ 62,523 |
| Working capital, net of unrestricted cash | 61,637 | 73,535 | 52,829 | 68,332 | 51,945 |
| Current assets | 268,868 | 277,273 | 252,651 | 259,767 | 201,008 |
| Property, plant and equipment | 90,846 | 75,667 | 71,579 | 68,547 | 70,226 |
| Total assets | 508,821 | 508,360 | 473,013 | 463,622 | 354,974 |
| Current maturities of long-term debt and line of credit | 15,778 | 16,938 | 49,360 | 35,218 | 18,023 |
| Long-term debt, less current maturities | 96,505 | 114,323 | 67,014 | 88,853 | 98,217 |
| Total liabilities | 217,338 | 227,726 | 198,965 | 211,940 | 187,327 |
| Total stockholders' equity | 289,836 | 279,169 | 272,618 | 250,127 | 165,290 |

(1)     See "Management's Discussion and Analysis of Financial Condition and Results of Operations – Results of Operations – Tunneling Segment – Summary" for a description of issues experienced during 2004.

(2)     The Company has completed various acquisitions that have been accounted for under the purchase method of accounting, including Insituform Metropolitan, Inc. in 2000, Insituform Belgium N.V. in 2000, Kinsel Industries, Inc. in 2001, Elmore Pipe Jacking, Inc. in 2002, Sewer Services, Ltd. in 2003, Video Injection (remaining third party interest) in 2003, Insituform East in 2003, and Ka-Te Insituform (remaining interest) in 2003.

(3)     Results include a pre-tax intangible asset impairment charge of $3.5 million in 2002 and pre-tax restructuring charges of $2.5 million and $4.1 million in 2002 and 2001, respectively.

(4)     Effective January 1, 2002, the Company adopted SFAS 142, "Goodwill and Other Intangible Assets," and ceased amortizing purchased goodwill.

I 00454

Item 7.  Management's Discussion and Analysis of Financial Condition and Results of Operations

**Recent Developments**

During 2004, the tunneling segment incurred operating losses stemming from lower-than-expected performance on a number of projects with negative gross margin adjustments on one large tunneling project in Chicago in the amount of $11.0 million, $7.3 million of which occurred in the fourth quarter. During the third quarter of 2004, the Company recorded a downward adjustment to the gross margin on this project of $3.7 million. See further discussion in " – Results of Operations – Tunneling Segment."

As a result of the net loss incurred in the fourth quarter of 2004, the Company was out of compliance with one of its covenants related to the Company's various debt agreements as of December 31, 2004. The Company has successfully negotiated amendments to such agreements, which are explained later in the discussion contained in " -- Liquidity and Capital Resources – Financings" and Note 16 to the Company's Consolidated Financial Statements contained in this report.

**Results of Operations**

Consolidated

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2004 | 2003 | 2002 |
| | (Dollars in thousands) | | |
| Revenues | $542,598 | $487,272 | $480,358 |
| Gross profit | 99,499 | 102,658 | 125,622 |
| Gross profit margin | 18.3% | 21.1% | 26.2% |
| Operating expenses | 91,321 | 81,067 | 75,439 |
| Operating income | 8,178 | 21,591 | 50,183 |
| Operating income percentage | 1.5% | 4.4% | 10.4% |

2004 Compared to 2003

Consolidated revenues from continuing operations increased 11.4% in 2004 compared to 2003. The Company experienced revenue growth in each of its three principal operating segments, reflecting increased market penetration through successful sales efforts and acquisitions. Increased gross profit in both the rehabilitation and Tite Liner segments resulted from higher revenues, but was offset by decreased margins in the tunneling segment as explained further below. While most of the North American rehabilitation regions experienced improved revenues and gross profit, two of the regions fell short of the prior year as a result of competitive pressures and project delays.  Adverse effects of changes in the performance of tunneling are discussed below.

Operating expenses increased $10.3 million in 2004 compared to 2003, but increased to 16.8% as a percentage of revenue in 2004 compared to 16.6% in 2003. The full year impact of acquisitions completed in 2003 increased operating expenses by $3.9 million, including amortization of intangibles of $0.6 million. The Company also added personnel for the redevelopment of the sales force and project management of approximately $2.0 million. The Company experienced increased professional fees of $1.7 million, along with costs of $1.0 million associated with the implementation of regulations pursuant to the Sarbanes-Oxley Act of 2002. The Company also incurred costs related to the implementation of certain strategic initiatives, most notably, logistics improvements and sales and business development training of $1.4 million.

I 00455

2003 Compared to 2002

The effects of acquisitions in 2003 and 2002 added $22.2 million of revenues in 2003. Gross profit decreased $23.0 million in 2003 compared to 2002 while gross profit margins decreased from 26.2% in 2002 to 21.1% in 2003. Two major North American rehabilitation regions performed significantly below historical levels due to heightening competition, lower pricing and lower market activity. Revenues and gross profit fell by $18.8 million and $17.4 million, respectively, from 2002 in these regions. In addition, the Company recorded $5.1 million (pre-tax) in estimated costs associated with removing and reinstalling an Insituform CIPP Process liner in Boston, Massachusetts. The Company's pipebursting activities in the southeast United States declined in 2003 due primarily to the loss of unreleased term contract backlog. The gross profit decline in this activity was $11.4 million.

Operating expenses increased in 2003 compared to 2002. Tunneling operating expenses increased by $1.9 million in 2003 as a result of recording a reserve of $0.8 million in claims for certain change orders that were considered uncollectible at the end of 2003 and $0.8 million primarily related to adding critical project management personnel to support revenue growth. Corporate expenses in 2003 included $1.6 million in severance recorded for changes in executive management. Bad debt expense increased by $1.5 million and adjustments to the Company's insurance reserves based on deteriorating experience and updated actuarial information added $3.7 million in expense. Various acquisitions during the year added $1.3 million of expenses, which consisted primarily of compensation. Operating expenses in 2002 included $6.0 million related to one-time charges for restructuring and impairment recorded in 2002.

Rehabilitation Segment

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2004 | 2003 | 2002 |
| | (Dollars in thousands) | | |
| Revenues | $409,408 | $366,690 | $377,674 |
| Gross profit | 94,305 | 84,215 | 101,766 |
| Gross profit margin | 23.0% | 23.0% | 26.9% |
| Operating expenses | 77,173 | 69,750 | 66,559 |
| Operating income | 17,132 | 14,465 | 35,208 |
| Operating income percentage | 4.2% | 3.9% | 9.3% |

*Revenues*

Rehabilitation revenues increased $42.7 million, or 11.6%, in 2004 compared to 2003. Full-year impact of acquisitions completed in 2003 represents $20.3 million of this increase. Revenue growth in certain North American CIPP regions added $34.7 million for the year. This growth is attributable to strong backlog at the end of 2003, strong order levels in 2004, crew growth to support sales levels and increased large-diameter work. Excluding acquisitions, European rehabilitation revenue increased $5.4 million as a result of stronger performance in the Netherlands and France as well as positive currency translation impacts. Offsetting these increases were decreases in two North American CIPP regions and manufacturing totaling $17.7 million resulting from lower order levels, client work-release delays and, to a lesser extent, the effect of four hurricanes, which occurred during the year.

Rehabilitation revenues decreased $11.0 million, or 2.9%, in 2003 compared to 2002. The decline in revenue was due primarily to reduced activity approximating $18.8 million in two major regions in North American rehabilitation attributable to lower backlog due to less market activity, and reduced pricing derived from increased competition and lower municipal spending. Pipebursting and other rehabilitation operations suffered a $4.5 million decline in 2003 primarily due to the loss of unreleased term contract backlog on a major contract and lower demand. Acquisitions in both North America and Europe contributed $7.0 million to rehabilitation revenues. One large job in the Netherlands and stronger activity in Europe during the second half of 2003 added approximately $7.5 million in revenues.

I 00456

*Gross Profit*

Gross profit in the rehabilitation segment increased $10.1 million, or 12.0%, in 2004 compared to 2003 while gross margin percentages remained stable. The full-year effect of acquisitions completed in 2003 accounted for a $3.7 million increase to gross profit. Certain North American CIPP regions and manufacturing added $13.4 million in gross profit through higher revenue and improved field productivity. Excluding acquisitions, European gross profit increased $1.9 million attributable to currency translation and increased margins in France. Offsetting these increases, certain North American rehabilitation regions realized $8.9 million lower gross profit in 2004 compared to 2003 primarily as a result of the factors which follow. Significant margin erosion was experienced in pipebursting work due to competition and lower pricing, while related pipebursting revenue decreased only marginally in 2004 compared to 2003. Gross profit on pipebursting decreased $4.1 million in 2004 compared to 2003. The remaining $4.8 million decline in gross profit was due to a combination of factors. The Company experienced a continued trend of higher healthcare costs in 2004 compared to 2003. Other factors included weather-related effects, work-release delays and, in certain regions, price competition. In addition, the rehabilitation segment experienced increases in raw material costs, particularly resin, fuel and fiber costs, related to commodity pricing fluctuations. These unfavorable incremental costs were offset by manufacturing and logistics savings as a result of the implementation of strategic operational initiatives.

Rehabilitation gross profit decreased $17.6 million, or 17.2%, in 2003 compared to 2002. Gross profit declined $17.4 million in two North American CIPP regions due to lower activity. As noted earlier, the Company also experienced a loss of $5.1 million related to the removal and reinstallation of an Insituform CIPP Process liner in Boston, Massachusetts. The Company's pipebursting and other rehabilitation operations also suffered $11.4 million in gross profit declines related to lower volume from reduced backlog. These decreases were partially offset by increases in other North American CIPP regions, which contributed $12.0 million in additional gross profit over 2002. The Company experienced higher costs related to casualty, workers compensation and healthcare insurance caused by increased claims and cost of premiums in 2003 of approximately 25%. Gross profit in Europe increased 36.8%, or $4.3 million, in 2003 compared to 2002 due to a slight increase in gross profit margins coupled with volume growth in substantially all operations in the United Kingdom and Switzerland.

*Operating Expenses*

Operating expenses increased 10.6%, or $7.4 million, in 2004 compared to 2003. The full-year effect of acquisitions completed in 2003 added $3.3 million of operating expenses. In addition to acquisitions, the Company continued to experience increasing healthcare costs in 2004 compared to 2003. In the first quarter of 2005, the Company modified its employee benefits structure in an effort to reduce the impact of increasing healthcare costs. All rehabilitation regions experienced increased operating expenses due to the implementation of certain strategic initiatives including, but not limited to, the redevelopment of a sales and business development force, improved logistics, product innovation and operational excellence. The implementation of these initiatives required additional Company personnel as well as significant consulting costs. Operating expenses as a percentage of revenues remained relatively stable at 18.9% in 2004 compared to 19.0% in 2003.

In 2003, operating expenses in the rehabilitation segment increased 4.8% compared to 2002. In 2003, the Company recorded $1.6 million in severance costs after changes in the Company's senior management. The Company increased its insurance reserves due to higher premiums and actuarial analyses, which indicated increased cost of claims. The Company recorded an additional $1.5 million in bad debt expense, as previously noted. Acquisitions during the year added $1.3 million of expenses, consisting primarily of compensation. These increases were partially offset by a $6.0 million decrease as one-time charges for restructuring and impairment recorded in 2002 did not recur in 2003. Operating expenses as a percentage of revenues increased to 19.0% in 2003 compared to 17.6% in 2002, primarily due to severance and increases to certain allowance accounts.

I 00457

Tunneling Segment

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2004 | 2003 | 2002 |
| | *(Dollars in thousands)* | | |
| Revenues | $108,729 | $100,020 | $86,297 |
| Gross profit | (3,128) | 11,946 | 18,260 |
| Gross profit margin | (2.9)% | 11.9% | 21.2% |
| Operating expenses | 10,080 | 7,990 | 6,095 |
| Operating income (loss) | (13,208) | 3,956 | 12,165 |
| Operating income (loss) percentage | (12.1)% | 4.0% | 14.1% |

*Summary*

As a result of the issues encountered during the latter part of 2004 as described below, management, in concert with outside resources, performed a comprehensive project-by-project review of all the work in the tunneling segment during the fourth quarter of 2004 and the early part of 2005. As a result of this review, the estimated costs to complete and related margins on the ongoing tunneling projects were evaluated and adjusted accordingly.

Results in the tunneling segment were disappointing in 2004. The segment suffered significant negative gross margin adjustments on one large tunneling project in Chicago during the year, primarily in the fourth quarter. The total gross adjustment during the year on this project was $11.0 million, $7.3 million of which was incurred in the fourth quarter. During the third quarter of 2004, the Company recorded a downward adjustment to the gross margin on this project of $3.7 million. These negative gross margin adjustments stem primarily from additional labor and related overhead costs principally due to delays and issues encountered while completing concrete finishing work. In addition, the project suffered from higher-than-anticipated material costs related to inflationary increases in concrete and steel pricing. This project had been essentially on target with previous estimates until the later stages. These stages involved lining of the tunnels with concrete and steel. These activities took place primarily during the second half of 2004 and will continue to the completion of the project. This project was approximately 83% complete as of December 31, 2004, and based on the latest projections, should be completed by late 2005.

There were also unexpected job costs on a number of other tunneling projects during the fourth quarter caused by higher-than-expected material costs and unfavorable labor productivity issues. Additionally, several projects incurred costs related to changed or differing site conditions, which will likely have associated claims, which may benefit future periods. Approximately $4.6 million of costs incurred in 2004 were related to probable claims to be pursued. As discussed below in " – Critical Accounting Policies," claims are recognized only when realization is reasonably assured. These claims are being aggressively pursued, but, as in most cases, will take some time to negotiate or litigate before being finalized and there is currently limited visibility on what amounts would be ultimately recoverable by the Company. There were favorable resolutions to several older claims in 2004 which resulted in $1.7 million of favorable impact.

Management also is responding to the issues experienced in the tunneling segment and recently made several key changes. The Company's Senior Vice President and Chief Operating Officer, Thomas W. Vaughn, is now located at the tunneling business headquarters and will have direct responsibility for all aspects of the operations for the foreseeable future. The Company also has taken a number of steps to regain profitability in this segment, by upgrading and adding necessary project and cost control management, refocusing the risk identification and mitigation processes, and improving the bid selection process. In addition, the Company has retained an expert in claims management to pursue the active claims, and to implement a more proactive program within the organization for claims management.

I 00458

*Revenues*

Tunneling revenues increased $8.7 million, or 8.7%, in 2004 compared to 2003 due to an increased level of backlog that was acquired during the second half of 2003 and the early part of 2004. Large projects in Chicago, Sacramento, Oxnard and Charleston generated a significant portion of revenue in 2004.

Tunneling revenues increased $13.7 million, or 15.9%, in 2003 compared to 2002. High productivity on several jobs contributed significantly to tunneling revenues during 2003.

*Gross Profit*

Due to the issues described previously, tunneling recorded a loss at the gross profit line of $3.1 million compared to gross profit of $11.9 million in 2003. The gross profit margin similarly fell to (2.9)% in 2004 compared to 11.9% in 2003. It is expected that lower gross margins may continue into 2005 due to the reduction of estimated margins, although positive, on a number of in-process contracts in the tunneling segment, which will be completed throughout the year.

Tunneling gross profit decreased $6.3 million, or 34.6%, in 2003 compared to 2002. Gross profit margins decreased to 11.9% in 2003 compared to 21.2% in 2002. The decrease in gross profit and gross profit margin was due primarily to issues encountered on projects acquired as a result of the acquisition of Elmore Pipe Jacking, Inc. in 2002.

*Operating Expenses*

Operating expenses increased 26.2% in 2004 compared to 2003 as a result of adding project management and other support staff. Operating expenses as a percentage of revenue were 9.3% in 2004 compared to 8.0% in 2003.

Operating expenses increased 29.8% in 2003 compared to 2002. Expenses in 2003 reflected a full year of operations of the acquisition of Elmore Pipe Jacking, Inc. that was completed in May of 2002. Operating expenses as a percentage of revenue was 8.0% in 2003 compared to 7.1% in 2002.

*Operating Income (Loss)*

Tunneling generated an operating loss in 2004 compared to an operating margin of 4.0% in 2003. The issues described in the summary above caused this earnings' reversal in 2004. As stated previously, the Company is responding to the operational issues in the tunneling segment.

Operating income decreased 67.5% in 2003 compared to 2002 due to lower gross profit and higher operating expenses, as described above.

<u>Tite Liner Segment</u>

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | **2004** | **2003** | **2002** |
| | *(Dollars in thousands)* | | |
| Revenues | $24,461 | $20,562 | $16,387 |
| Gross profit | 8,322 | 6,497 | 5,596 |
| Gross profit margin | 34.0% | 31.6% | 34.1% |
| Operating expenses | 4,068 | 3,327 | 2,786 |
| Operating income | 4,254 | 3,170 | 2,810 |
| Operating income percentage | 17.4% | 15.4% | 17.1% |

*Revenues*

I 00459

Tite Liner® revenues increased $3.9 million, or 19.0%, in 2004 compared to 2003. A solid workload in the United States and Canada fueled much of the revenue growth. In addition, a favorable closeout of a foreign project boosted revenue in 2004 compared to 2003.

Tite Liner® revenues increased $4.2 million, or 25.5%, in 2003 compared to 2002. Tite Liner® revenues responded to higher oil prices in 2003, which created greater demand for Tite Liner® products.

*Gross Profit*

Gross profit rose $1.8 million, or 28.1%, in 2004 compared to 2003 while the gross profit margin increased to 34.0% in 2004 compared to 31.6% in 2003. The previously mentioned completion of certain projects as well as favorable results in the United States and Canada combined to positively impact gross profit and gross profit margin in the Tite Liner segment during 2004.

Gross profit increased $0.9 million, or 16.1%, in 2003 compared to 2002. However, gross profit margin slipped to 31.6% in 2003 compared to 34.1% in 2002. Gross profit was higher in 2003 due to higher volume, but gross profit margin was lower due to the completion of a significant higher-margin project in South America in 2002. In addition, a large lower-margin project that was begun in 2003 contributed to the segment's overall lower gross profit margin.

*Operating Expenses*

Operating expenses increased 22.2% in 2004 compared to 2003, but remained relatively stable as a percentage of revenue.

Operating expenses were $3.3 million in 2003 compared to $2.8 million in 2002, but remained relatively stable as a percentage of revenue at 15.4% in 2003 compared to 17.1% in 2002.

<u>Restructuring and Asset Impairment Charges</u>

During the third quarter of 2003, the Company reversed $0.3 million in reserves, which were recorded in prior years and are described in the following paragraphs.

In the third quarter of 2002, the Company recorded a pre-tax restructuring charge of $2.5 million, which related to severance costs, asset write-downs, lease cancellations, and certain fixed asset disposals. The remaining unused portion of this restructuring charge of $0.3 million was reversed into income in the third quarter of 2003.

During the third quarter of 2002, the Company determined that certain patent, trademark, license and non-compete assets had become impaired due to business decisions and other circumstances. The impact of the impairment charge in 2002 was $3.5 million ($2.2 million after tax).

I 00460

Other Income/Expense

Interest expense increased $1.1 million to $9.3 million in 2004 compared to $8.2 million in 2003 due to the following factors:

| (In millions) | Impact In 2004 |
|---|---|
| Full year of Series 2003-A Notes (placed April 24, 2003) | $1.1 |
| Increased interest rates due to debt amendments on March 12, 2004 | 0.7 |
| Deferred fees writeoff due to debt Amendments | 0.2 |
| Additional deferred fees amortization | 0.1 |
| Debt principal amortization - Series A Notes | (1.0) |
| Total | $1.1 |

See " – Liquidity and Capital Resources – Financings" under this Item 7 for further discussion of debt instruments and related amendments.

Interest expense increased $0.3 million to $8.2 million in 2003 compared to $7.9 million in 2002. This was due primarily to the placement of $65.0 million of Senior Notes, Series 2003-A, on April 24, 2003 at a rate of 5.29% per annum.

Other income was $1.2 million in 2004 compared to other expense of $1.3 million in 2003. Interest income, a component of other income, was $1.4 million in 2004 compared to $1.5 million in 2003. Other expense in 2003 included $1.4 million in losses on disposals of assets and a $1.1 million reserve for notes receivable.

Other expense was $1.3 million in 2003 compared to other income of $3.1 million in 2002. Other income in 2002 included a $1.2 million gain on the sale of a real estate investment, while 2003 included losses of $1.4 million on sales and disposals of certain assets and the previously noted $1.1 million reserve for certain notes receivable related to the prior year sale of discontinued operations and recorded in continuing operations in the fourth quarter of 2003. Interest income decreased to $1.5 million in 2003 compared to $1.9 million in 2002 due to lower interest rates in 2003.

Income Taxes

The 2004 income tax benefit of $0.8 million relates primarily to the benefit of state net operating losses generated in 2004, the benefit of Federal motor fuels excise tax credits and the increased benefit of patent amortization in relation to pre-tax income.

The Company's deferred tax assets in excess of deferred tax liabilities were $3.9 million, net of a $5.0 million valuation allowance. Deferred tax assets include $3.2 million in foreign tax credit carryforwards which begin expiring in 2011 and $2.7 million in Federal, state and foreign net operating loss carryforwards (NOLs), net of applicable valuation allowances.

The Company provides for U.S. income taxes, net of available foreign tax credits, on earnings of consolidated international subsidiaries that the Company plans to remit to the U.S. The Company does not provide for U.S. income taxes on the remaining earnings of these subsidiaries, as the Company expects to reinvest these earnings overseas or the Company expects the taxes to be minimal based upon available foreign tax credits.

I 00461

The American Jobs Creation Act, which was signed into law in October 2004, creates a temporary incentive for U.S. corporations to repatriate accumulated income earned abroad by providing an 85% dividends received deduction for certain dividends from controlled foreign corporations. The deduction is subject to a number of limitations and uncertainty remains as to how to interpret numerous provisions in the American Jobs Creation Act. As such, the Company has not determined whether, and to what extent, to repatriate foreign earnings.

See Note 12 to the Company's Consolidated Financial Statements contained in this report for additional information regarding taxes on income.

Minority Interest and Equity in Earnings (Losses) of Affiliated Companies

Minority interest in net income principally relates to the 25% interest in the net income of Insituform Linings Plc held by Per Aarsleff A/S, a Danish contractor.

Equity earnings relate to two 50%-owned joint ventures in Europe, Insituform Rohrsanierungstechniken GmbH, the Company's German joint venture, and Insituform Italia Srl, the Company's Italian joint venture. The German joint venture generated $0.3 million in equity earnings, but was offset by losses at Insituform Italia of $0.5 million, which resulted in an overall equity loss of $0.2 million in 2004. In 2003, the German joint venture accounted for $1.2 million in equity earnings, while the Company's share of Insituform Italia's losses were $1.6 million. On January 18, 2005, the quotaholders of Insituform Italia approved the liquidation of the Italian joint venture, and no further losses are expected from the joint venture in 2005. Another 50% owned joint venture in Ireland, Insituform Environmental Techniques Limited, had not commenced operations at December 31, 2004.

Discontinued Operations

During the fourth quarter of 2001, the Company decided to sell certain operations that were not consistent with the Company's strategy of providing trenchless rehabilitation and tunneling services. The Company completed the sale of these operations during 2002. Revenues from discontinued operations were $0 in 2004, $2.6 million in 2003 and $22.6 million in 2002. Loss from discontinued operations was $0 in 2004, $1.1 million in 2003 and $5.9 million in 2002. The lower activity in discontinued operations in 2003 was due to the winding down of discontinued operations.

**Critical Accounting Policies**

Discussion and analysis of the Company's financial condition and results of operations are based upon the Company's consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States. The preparation of these financial statements requires the Company to make estimates and judgments that affect the reported amount of assets and liabilities, revenues and expenses, and related disclosure of contingent assets and liabilities at the financial statement dates. Actual results may differ from these estimates under different assumptions or conditions.

Some accounting policies require the application of significant judgment by management in selecting the appropriate assumptions for calculating financial estimates. By their nature, these judgments are subject to an inherent degree of uncertainty. The Company believes that its critical accounting policies are limited to those described below. For a detailed discussion on the application of these and other accounting policies, see Note 2 to the Company's Consolidated Financial Statements contained in this report.

Revenue Recognition – Percentage-of-Completion Method

The Company recognizes revenues and costs as construction and installation contracts progress using the percentage-of-completion method of accounting, which relies on total expected contract revenues

I 00462

and estimated total costs. Under this method, estimated contract revenues and resulting gross profit margin are recognized based on actual costs incurred to date as a percentage of total estimated costs. The Company follows this method since reasonably dependable estimates of the revenues and costs applicable to various elements of a contract can be made. Since the financial reporting of these contracts depends on estimates, which are assessed continually during the term of these contracts, recognized revenues and gross profit are subject to revisions as the contract progresses to completion. Total estimated costs, and thus contract gross profit, are impacted by changes in productivity, scheduling, and the unit cost of labor, subcontracts, materials and equipment. Additionally, external factors such as weather, customer needs, customer delays in providing approvals, labor availability, governmental regulation and politics also may affect the progress and estimated cost of a project's completion and thus the timing of revenue recognition and gross profit. Revisions in profit estimates are reflected in the period in which the facts that give rise to the revision become known. When current estimates of total contract costs indicate that the contract will result in a loss, the projected loss is recognized in full in the period in which the loss becomes evident. Revenues from change orders, extra work, variations in the scope of work and claims are recognized when realization is reasonably assured, and at estimated recoverable amounts.

Many of the Company's contracts provide for termination of the contract at the convenience of the customer. If a contract were terminated prior to completion, the Company would typically be compensated for progress up to the time of termination and any termination costs. In addition, many contracts are subject to certain completion schedule requirements with liquidated damages in the event schedules are not met as the result of circumstances that are within the Company's control. Losses on terminated contracts and liquidated damages have historically not been significant.

Retainage

Many of the contracts under which the Company performs work contain retainage provisions. Retainage refers to that portion of revenue earned and billed by the Company but held for payment by the customer pending satisfactory completion of the project. Unless reserved, the Company assumes that all amounts retained by customers under such provisions are fully collectible. Retainage on active contracts is classified as a current asset regardless of the term of the contract. See Note 2 to the Company's Consolidated Financial Statements contained in this report regarding classification of current assets and current liabilities.

Goodwill Impairment

Under Statement of Financial Accounting Standards 142, "Goodwill and Other Intangible Assets," the Company assesses recoverability of goodwill on an annual basis or when events or changes in circumstances indicate that the carrying amount of goodwill may not be recoverable. Factors that could potentially trigger an impairment review include (but are not limited to):

- significant underperformance of a segment or division relative to expected, historical or projected future operating results;
- significant negative industry or economic trends; and
- significant changes in the strategy for a segment or division.

In accordance with the provisions of SFAS 142, the Company calculates the fair value of its reporting units and compares such fair value to the carrying value of the reporting unit to determine if there is any indication of goodwill impairment. The Company's reporting units consist of North American rehabilitation, European rehabilitation, tunneling and Tite Liner. To calculate reporting unit fair value, the Company utilizes a discounted cash flow analysis based upon, among other things, certain assumptions about expected future operating performance. The Company typically engages a third party valuation expert to assist in estimating reporting unit fair value. Estimates of discounted cash flows may differ from actual cash flows due to, among other things, changes in economic conditions, changes to business models, changes in the Company's weighted average cost of capital or changes in operating performance. An

22

I 00463

impairment charge will be recognized to the extent that the implied fair value of the goodwill balances for each reporting unit is less than the related carrying value.

Deferred Income Tax Assets

The Company provides for estimated income taxes payable or refundable on current year income tax returns, as well as the estimated future tax effects attributable to temporary differences and carryforwards, in accordance with the Statement of Financial Accounting Standards 109, "Accounting for Income Taxes." SFAS 109 also requires that a valuation allowance be recorded against any deferred tax assets that are not likely to be realized in the future. The determination is based on the ability of the Company to generate future taxable income and, at times, is dependent on management's ability to implement strategic tax initiatives to ensure full utilization of recorded deferred tax assets. Should management not be able to implement the necessary tax strategies, the Company may need to record valuation allowances for certain deferred tax assets, including those related to foreign income tax benefits. Significant management judgment is required in determining the provision for income taxes, deferred tax assets and liabilities and any valuation allowances recorded against net deferred tax assets.

Long-Lived Assets

Property, plant and equipment, goodwill and other identified intangibles (primarily licenses, covenants not-to-compete and patents) are recorded at cost and, except for goodwill, are amortized on a straight-line basis over their estimated useful lives. Changes in circumstances such as technological advances, changes to the Company's business model or changes in the Company's capital strategy can result in the actual useful lives differing from the Company's estimates. If the Company determines that the useful life of its property, plant and equipment or its identified intangible assets should be shortened, the Company would depreciate or amortize the net book value in excess of the salvage value over its revised remaining useful life, thereby increasing depreciation or amortization expense.

Long-lived assets, including property, plant and equipment, and other intangibles, are reviewed by the Company for impairment annually or whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Factors the Company considers important which could trigger an impairment review include:

- significant underperformance in a region relative to expected historical or projected future operating results;
- significant changes in the use of the assets of a region or the strategy for the region;
- significant negative industry or economic trends;
- significant decline in the Company's stock price for a sustained period; and
- market capitalization is significantly less than net book value.

Such impairment tests are based on a comparison of undiscounted cash flows to the recorded value of the asset. The estimate of cash flow is based upon, among other things, assumptions about expected future operating performance. The Company's estimates of undiscounted cash flow may differ from actual cash flow due to, among other things, technological changes, economic conditions, changes to its business model or changes in its operating performance. If the sum of the undiscounted cash flows (excluding interest) is less than the carrying value, the Company recognizes an impairment loss, measured as the amount by which the carrying value exceeds the fair value of the asset.

I 00464

Allowance for Doubtful Accounts

Management makes estimates of the uncollectibility of the Company's accounts receivable. Management evaluates specific accounts where the Company has information that the customer may be unwilling or unable to pay the receivable in full. In these cases, the Company uses its judgment, based on the best available facts and circumstances, and records a specific allowance for that customer against amounts due in order to reduce the receivable to the amount that is expected to be collected. The specific allowances are re-evaluated and adjusted as additional information is received that impacts the amount allowed for. After all reasonable attempts to collect the receivable have been explored, the receivable is written off against the allowance. Based on the information available, the Company believes that the allowance for doubtful accounts as of December 31, 2004 was adequate. However, no assurances can be given that actual write-offs will not exceed the recorded allowance.

## Liquidity and Capital Resources

Cash and Cash Equivalents

|  | December 31, | |
|---|---|---|
|  | 2004 | 2003 |
|  | (In thousands) | |
| Cash and equivalents | $93,246 | $93,865 |
| Restricted cash – in escrow | $ 1,705 | $ 1,524 |
| Restricted cash – held as collateral | – | 4,602 |
| Total restricted cash | $ 1,705 | $ 6,126 |

Restricted cash held in escrow relates to deposits made as escrow for release of retention on specific projects performed for municipalities and state agencies. Restricted cash held as collateral related to deposits posted as collateral for a casualty insurance policy. In the first quarter of 2004, the Company issued letters of credit to satisfy this requirement, and the restricted cash balance of $4.6 million was released.

At December 31, 2004, the Company had an unrestricted cash and equivalents balance of $93.2 million compared to $93.9 million at December 31, 2003. This position was achieved after $35.2 million in capital expenditures and $19.0 million in debt repayments in 2004. The Company also received $9.1 million in tax refunds and $3.6 million from the exercise of stock options in 2004. The Company expects to use these funds for a variety of purposes including working capital to fund growth, capital and operating expenses, research and development of new products, and development of new markets.

Cash Flows from Operations

The Company's primary source of cash is operations, which provided $42.6 million in 2004 compared to $31.9 million provided by continuing operations in 2003. Changes in working capital provided $15.5 million in 2004 compared to $5.2 million in 2003. Cash received from customers increased in 2004 compared to 2003 as evidenced by increased revenues and a lower accounts receivable balance. These factors coupled with an increase in accounts payable and accrued expenses were partially offset by increases in retainage and costs and estimated earnings in excess of billings (unbilled receivables). Unbilled receivables arise when costs are incurred and revenue recognized before billings can be issued to the customer. Much of the unbilled balance relates to projects in the early stages of construction that have to reach a certain stage of completion before progress billings can be issued. Another significant factor in working capital changes in 2004 was the receipt of $9.1 million in tax refunds in the first quarter.

Depreciation increased by $2.0 million compared to 2003 due to increased capital expenditures and consequently higher depreciation costs. Amortization expense increased $0.3 million primarily due to

24

I 00465

amortization of intangibles acquired with Insituform East, Inc. in September 2003. Amortization of Insituform East intangibles was $0.6 million in 2004.

Continuing operations contributed $31.9 million in operating cash flow in 2003 compared to $25.6 million in 2002. After discontinued operations, operating cash flows were $37.0 million in 2003 compared to $26.5 million in 2002. Operating cash flow in 2003 primarily consisted of earnings before depreciation and amortization combined with changes in working capital. Operating cash flow in 2002 primarily consisted of earnings before depreciation and amortization offset by cash used to invest in working capital.

Cash Flows from Investing Activities

Cash used in investing activities includes $35.2 million of capital expenditures in 2004 compared to $19.9 million of capital expenditures in 2003. Major capital expenditures included approximately $4.1 million for expansion and upgrade of the Company's manufacturing facility in Batesville, Mississippi. Other significant additions included equipment necessary for new crews and ongoing replacement or renewal of aging equipment. The Company received $1.9 million from the disposal of fixed assets in 2004 compared to $1.4 million in 2003. Capital expenditures are expected to continue at an elevated level into 2005 as the Company continues to replace older, less efficient equipment and expand crew capacity. In addition to capital expenditures, the Company invested $0.8 million in its fifty-percent owned joint venture in Italy in 2004. In January 2005, the quotaholders (stockholders) of the joint venture approved the joint venture's liquidation, as the joint venture was no longer financially viable. No further cash contributions to the joint venture are anticipated.

Cash used in investing activities in 2003 consisted primarily of $19.9 million in capital expenditures and $7.8 million in acquisitions. The acquisitions included Insituform East in September 2003 and Ka-Te Insituform in November 2003. Investing activities in 2002 included $21.8 million in capital expenditures and $8.5 million used in the acquisition of Elmore Pipe Jacking, Inc. These cash uses were partially offset by proceeds received from the sale of assets and businesses, mostly related to the sale of certain businesses that were part of the Company's discontinued operations.

Cash Flows from Financing Activities

Cash flows from financing activities were primarily debt repayments of $19.0 million in 2004. In 2003, payments on long-term debt and lines of credit were $50.2 million, but were offset by the issuance of Senior Notes, Series 2003-A in the amount of $65.0 million. Debt repayments in 2004 primarily consisted of a normal scheduled principal amortization of $15.7 million of the Series A Senior Notes and the repayment of the Company's $3.0 million Euro note. Debt repayments were $20.9 million in 2002, but were partially offset by net borrowings on the Company's line of credit of $10.2 million.

Total debt, including current maturities, was $112.3 million at December 31, 2004 compared to $131.3 million at December 31, 2003. The balance at the end of 2004 principally consisted of $47.1 million of Series A Senior Notes, which have principal amortization payments of $15.7 million due in 2005, 2006 and 2007, and $65.0 million of Series 2003-A Senior Notes, which are due in full in 2013. Interest is payable on the Senior Notes semiannually. See " – Financings" for a further discussion of debt.

During 2004, the Company received $3.6 million in cash from the exercise of employee stock options compared to $0.4 million in 2003 and $2.5 million in 2002. The Company did not purchase treasury stock in 2004, but purchased $1.6 million and $5.2 million in treasury stock during 2003 and 2002, respectively.

Other Changes in Financial Condition

Net accounts receivable were $78.7 million and $90.8 million at December 31, 2004 and 2003, respectively. The decrease in accounts receivable was partially offset by an increase in retainage and costs

I 00466

and estimated earnings in excess of billings (unbilled receivables). During 2004, the Company achieved improved cash collections, lowering its days' sales outstanding to 90 days at December 31, 2004 compared to 100 at December 31, 2003. The calculation of days' sales outstanding includes retainage and unbilled receivables.

Prepaid expenses and other assets increased by $2.0 million primarily due to tax refund receivables recorded in the fourth quarter of 2004 partially offset by the previously mentioned receipt of $9.1 million in tax refunds, which were recorded as a receivable at December 31, 2003.

<u>Financings</u>

See Notes 9 and 16 to the Company's Consolidated Financial Statements contained in this report for additional information regarding the Company's financings.

As a result of the net loss incurred in the fourth quarter of 2004, the Company was out of compliance with the fixed charges coverage ratio under its Series A Senior Notes as of December 31, 2004. The actual fixed charges coverage ratio at December 31, 2004 was 1.64 to 1.0 as compared with the required minimum fixed charges coverage ratio under the Series A Senior Notes of 1.7 to 1.0 at December 31, 2004. The default under the Series A Senior Notes resulted in a cross-default under the Series 2003-A Senior Notes and the bank line of credit facility with Bank of America. On March 16, 2005, the Series A Senior Note holders, and the Series 2003-A Senior Note holders waived the default and cross-default as of December 31, 2004, and amended the debt covenants under the Series A and the Series 2003-A Senior Notes. The bank also waived the cross-default as of December 31, 2004 and agreed to incorporate the amended debt covenants of the Series A Senior Notes and the Series 2003-A Senior Notes into its credit facility. The Company expects to maintain covenant compliance with respect to the amended covenants throughout 2005 and beyond.

Effective March 16, 2005, the Company agreed to increase the interest rate on the Series A Senior Notes from 7.88% per annum to 8.88% per annum and to increase the interest rate on the Series 2003-A Senior Notes from 5.29% per annum to 6.54% per annum, to obtain the default and cross-default waivers and less restrictive financial covenants. The Company also paid its creditors approximately $240,000 in fees for the waivers and amendments. The Company will expense financing costs of $0.5 million in the first quarter of 2005 related to these amendments. The table below sets forth the new covenants, which were effective on March 16, 2005:

I 00467

| Description of Covenant | Fiscal Quarter | Amended Covenant[2, 3] |
|---|---|---|
| **$110 million 8.88% Senior Notes, Series A, due February 14, 2007 and $65 million 6.54% Senior Notes, Series 2003-A, due April 24, 2013** | | |
| Fixed charge coverage ratio[1] | First quarter 2005 | No less than 1.25 to 1.0 |
| | Second quarter 2005 | No less than 1.25 to 1.0 |
| | Third quarter 2005 | No less than 1.50 to 1.0 |
| | Fourth quarter 2005 | No less than 1.75 to 1.0 |
| | First quarter 2006 | No less than 2.00 to 1.0 |
| Ratio of consolidated indebtedness to EBITDA[1] | First quarter 2005 | No greater than 4.25 to 1.0 |
| | Second quarter 2005 | No greater than 4.00 to 1.0 |
| | Third quarter 2005 | No greater than 4.00 to 1.0 |
| | Fourth quarter 2005 | No greater than 3.00 to 1.0 |
| | First quarter 2006 | No greater than 3.00 to 1.0 |
| Consolidated net worth[1] | First quarter 2005 and each quarter thereafter | No less than $260 million plus 50% of net income after December 31, 2004 on a cumulative basis |
| Consolidated indebtedness to consolidated capitalization[1] | First quarter 2005 and each quarter thereafter | No greater than 0.45 to 1.0 |

---

(1)   The ratios are calculated as defined in the Note Purchase Agreements, as amended, which have been incorporated into the Company's Annual Report on Form 10-K for the year ended December 31, 2004 as exhibits 10.2 and 10.3.

(2)   The ratios for each quarter are based on rolling four-quarter calculations of profitability. The loss in the fourth quarter of 2004 will have a negative impact on the ratios through the third quarter of 2005.

(3)   The line of credit facility with Bank of America has incorporated the amended covenants for the Series A Senior Notes and the Series 2003-A Senior Notes into the line of credit agreement. See Note 9 to the Company's Consolidated Financial Statements contained in this report for additional information regarding the credit facility.

These agreements also obligate the Company to comply with other restrictive covenants that, among other things, place limitations on operations and sales of assets by the Company or its subsidiaries, and limit the ability of the Company to incur secured indebtedness and liens. Such agreements also obligate the Company's subsidiaries to provide guarantees to the holders of the Senior Notes if guarantees are given by them to certain other lenders.

In the third quarter of 2004, the Company repaid its Euro Note of €2.4 million (US $3.0 million) in full. The Euro Note's scheduled maturity was in 2006. The premium paid to the creditor for early extinguishment was not material.

The Company believes it has adequate resources and liquidity to fund future cash requirements and debt repayments for at least the next twelve months with cash generated from operations, existing cash balances, additional short- and long-term borrowing and the sale of assets.

**Disclosure of Financial Obligations and Commercial Commitments**

The Company has entered into various financial obligations and commitments in the course of its ongoing operations and financing strategies. Financial obligations are considered to represent known future cash payments that the Company is required to make under existing contractual arrangements, such as debt and lease agreements. These obligations may result from both general financing activities as well as from

27

I 00468

commercial arrangements that are directly supported by related revenue-producing activities. Commercial commitments represent contingent obligations of the Company, which become payable only if certain pre-defined events were to occur, such as funding financial guarantees. See Note 14 to the Company's Consolidated Financial Statements contained in this report for further discussion.

The Company has entered into several contractual joint ventures in order to develop joint bids on contracts for its installation business and for tunneling operations. In these cases, the Company could be required to complete the joint venture partner's portion of the contract if the partner were unable to complete its portion. The Company would be liable for any amounts for which the Company itself could not complete the work and for which a third party contractor could not be located to complete the work for the amount awarded in the contract. While the Company would be liable for additional costs, these costs would be offset by any related revenues due under that portion of the contract. The Company has not experienced material adverse results from such arrangements. Based on these facts, the Company currently does not anticipate any future material adverse impact on its consolidated financial position, results of operations or cash flows.

The following table provides a summary of the Company's financial obligations and commercial commitments as of December 31, 2004 (in thousands). This table includes cash obligations related to principal outstanding under existing debt arrangements and operating leases.

**Payments Due by Period**

| Cash Obligations[1] | Total | 2005 | 2006 | 2007 | 2008 | 2009 | Thereafter |
|---|---|---|---|---|---|---|---|
| Long-term debt | $112,283 | $15,778 | $15,795 | $15,710 | $ – | $ – | $65,000 |
| Interest on long-term debt | 40,070 | 7,221 | 5,823 | 4,425 | 4,251 | 4,251 | 14,099 |
| Line of credit facility[2] | – | – | – | – | – | – | – |
| Operating leases | 43,923 | 13,687 | 9,747 | 8,186 | 6,958 | 3,384 | 1,961 |
| Total contractual cash obligations | $196,276 | $36,686 | $31,365 | $28,321 | $11,209 | $7,635 | $81,060 |

(1)    Cash obligations herein are not discounted. See Notes 9 and 14 to the Company's Consolidated Financial Statements contained in this report regarding long-term debt and commitments and contingencies, respectively.

(2)    As of December 31, 2004, there was no borrowing balance on the credit facility and therefore there is no applicable interest rate as the rates are determined on the borrowing date. The available balance was $13.0 million, and the commitment fee was 0.40%. The remaining $12.0 million was used for non-interest bearing letters of credit, the majority of which were collateral for insurance. The Company generally uses the credit facility for short-term borrowings and discloses amounts outstanding as a current liability. See Note 16 to the Company's Consolidated Financial Statements contained in this report regarding refinancing of the line of credit facility.

**Off-Balance Sheet Arrangements**

The Company uses various structures for the financing of operating equipment, including borrowing, operating and capital leases, and sale-leaseback arrangements. All debt, including the discounted value of future minimum lease payments under capital lease arrangements, is presented in the consolidated balance sheet. The Company's commitments under operating lease arrangements were $43.9 million at December 31, 2004. The Company also has exposure under performance guarantees by contractual joint ventures and indemnification of its surety. However, the Company has never experienced any material adverse effects to its consolidated financial position, results of operations or cash flows relative to these arrangements. All foreign joint ventures are accounted for using the equity method. The Company has no other off-balance sheet financing arrangements or commitments. See Note 14 to the Company's Consolidated Financial Statements contained in this report regarding commitments and contingencies.

I 00469

**Effects of Transactions With Related and Certain Other Parties**

Affholder, Inc., the Company's wholly-owned subsidiary that comprises the tunneling segment, owns, or leases under long-term operating leases with third-party leasing companies, several pieces of tunneling equipment, including cranes and tunnel boring machines. From time to time for specific projects, Affholder will lease additional equipment from a variety of sources. During 2004, Affholder leased four cranes and two tunnel boring machines from A-Y-K-E Partnership. A-Y-K-E is a partnership that is controlled by Robert W. Affholder, a member of the Company's board of directors. During the year ended December 31, 2004, Affholder paid A-Y-K-E $460,000 pursuant to equipment leases. This amount represents 8.6% of all lease payments made by Affholder during 2004 and 2.1% of all lease payments made by the Company in 2004. The cranes and tunnel boring machine that are currently under lease are leased under separate lease agreements on terms that are substantially similar to, or better than, those otherwise available to Affholder in the market. The leases are terminable upon 30 days' prior notice by either party. During 2004, A-Y-K-E leased equipment only to Affholder. At Affholder's discretion, Affholder may sublease the equipment to third parties and retain any profit generated from the sublease.

**New Accounting Pronouncements**

For a discussion of new accounting pronouncements, see Note 2 to the Company's Consolidated Financial Statements contained in this report.

Item 7A. Quantitative and Qualitative Disclosures about Market Risk

**Market Risk**

The Company is exposed to the effect of interest rate changes, foreign currency and commodity price fluctuations. Due to the immateriality of potential impacts from changes in these rates, the Company does not use derivative contracts to manage these risks.

Interest Rate Risk

The fair value of the Company's cash and short-term investment portfolio at December 31, 2004 approximated carrying value. Given the short-term nature of these instruments, market risk, as measured by the change in fair value resulting from a hypothetical 10% change in interest rates, is not material.

The Company's objectives in managing exposure to interest rate changes are to limit the impact of interest rate changes on earnings and cash flows and to lower overall borrowing costs. To achieve these objectives, the Company maintains fixed rate debt. The fair value of the Company's long-term debt, including current maturities and the amount outstanding on the line of credit facility, approximated its carrying value at December 31, 2004. Market risk was estimated to be $3.1 million as the potential increase in fair value resulting from a hypothetical 10% decrease in the Company's debt specific borrowing rates at December 31, 2004.

Foreign Exchange Risk

The Company operates subsidiaries, and is associated with licensees and affiliates operating solely in countries outside of the United States, and in currencies other than the U.S. dollar. Consequently, these operations are inherently exposed to risks associated with fluctuation in the value of the local currencies of these countries compared to the U.S. dollar. At December 31, 2004, the Company's holdings in financial instruments denominated in foreign currencies were immaterial.

I 00470

## Commodity Risk

The Company has exposure to the effect of changes in commodity pricing related to a variety of raw materials and activities that the Company purchases and utilizes in its operating activities, including resin, fiber, pipe and fuel. During the year, the Company experienced increases in costs related to unfavorable changes in commodity prices, which have been discussed in this Item 7. The Company manages this risk by entering into agreements with suppliers, when possible, to mitigate the effects of fluctuations in the underlying commodity markets.

I 00471

Item 8. Financial Statements and Supplementary Data

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

Management's Report on Internal Control Over Financial Reporting.................................32

Report of Independent Registered Public Accounting Firm........................................................33

Consolidated Statements of Income for the Years
    ended December 31, 2004, 2003 and 2002.......................................................................35

Consolidated Balance Sheets, December 31, 2004 and 2003 ........................................................36

Consolidated Statements of Stockholders' Equity for the Years
    ended December 31, 2004, 2003 and 2002.......................................................................37

Consolidated Statements of Cash Flows for the Years
    ended December 31, 2004, 2003 and 2002.......................................................................38

Notes to Consolidated Financial Statements.........................................................................39

I 00472

## Management's Report on Internal Control Over Financial Reporting

The Company's management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f).

Under the supervision and with the participation of company management, including the Chief Executive Officer and Chief Financial Officer, an evaluation was performed of the effectiveness of the Company's internal control over financial reporting as of the year ended December 31, 2004. In performing this evaluation, management employed the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in *Internal Control – Integrated Framework*.

Based on the criteria set forth in *Internal Control – Integrated Framework*, management, including the Company's Chief Executive Officer and Chief Financial Officer, has concluded that the Company's internal control over financial reporting was effective as of December 31, 2004.

Company management does not expect that its system of internal control over financial reporting and procedures will prevent all misstatements due to inherent limitations. Therefore, management's assessment provides reasonable, but not absolute, assurance that misstatements will be prevented and/or detected by the established internal control and procedures over financial reporting.

Our management's assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2004 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which appears herein.


/s/ Thomas S. Rooney, Jr.
Thomas S. Rooney, Jr.
President and Chief Executive Officer


/s/ Christian G. Farman
Christian G. Farman
Senior Vice President and Chief Financial Officer

I 00473

### Report of Independent Registered Public Accounting Firm

To the Board of Directors and the Stockholders of Insituform Technologies, Inc.:

We have completed an integrated audit of Insituform Technologies, Inc.'s 2004 consolidated financial statements and of its internal control over financial reporting as of December 31, 2004 and audits of its 2003 and 2002 consolidated financial statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Our opinions, based on our audits, are presented below.

Consolidated financial statements

In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of income, stockholders' equity and cash flows present fairly, in all material respects, the financial position of Insituform Technologies, Inc. and its subsidiaries at December 31, 2004 and 2003, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2004 in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit of financial statements includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

Internal control over financial reporting

Also, in our opinion, management's assessment, included in Management's Report on Internal Control Over Financial Reporting, that the Company maintained effective internal control over financial reporting as of December 31, 2004 based on criteria established in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), is fairly stated, in all material respects, based on those criteria. Furthermore, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2004, based on criteria established in *Internal Control - Integrated Framework* issued by the COSO. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express opinions on management's assessment and on the effectiveness of the Company's internal control over financial reporting based on our audit. We conducted our audit of internal control over financial reporting in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. An audit of internal control over financial reporting includes obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we consider necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and

I 00474

expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements.  Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ PricewaterhouseCoopers LLP

PricewaterhouseCoopers LLP

St. Louis, Missouri
March 16, 2005

I 00475

**Insituform Technologies, Inc. and Subsidiaries**
**Consolidated Statements of Income**
**For the Years Ended December 31, 2004, 2003 and 2002**
*(In thousands, except per share amounts)*

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| REVENUES | $542,598 | $487,272 | $480,358 |
| COST OF REVENUES | 443,099 | 384,614 | 354,736 |
| GROSS PROFIT | 99,499 | 102,658 | 125,622 |
| OPERATING EXPENSES | 89,385 | 79,733 | 68,049 |
| AMORTIZATION EXPENSE | 1,936 | 1,595 | 1,433 |
| RESTRUCTURING CHARGES (Note 5) | – | (261) | 2,458 |
| IMPAIRMENT CHARGE (Note 6) | – | – | 3,499 |
| OPERATING INCOME | 8,178 | 21,591 | 50,183 |
| OTHER (EXPENSE) INCOME: |  |  |  |
|   Interest expense | (9,305) | (8,235) | (7,911) |
|   Other (Note 11) | 1,212 | (1,274) | 3,055 |
| TOTAL OTHER EXPENSE | (8,093) | (9,509) | (4,856) |
| INCOME BEFORE TAXES ON INCOME | 85 | 12,082 | 45,327 |
| TAX (BENEFITS) ON INCOME (Note 12) | (835) | 6,809 | 17,451 |
| INCOME BEFORE MINORITY INTERESTS, EQUITY IN EARNINGS (LOSSES) AND DISCONTINUED OPERATIONS | 920 | 5,273 | 27,876 |
| MINORITY INTERESTS | (107) | (211) | (150) |
| EQUITY IN EARNINGS (LOSSES) OF AFFILIATED COMPANIES | (216) | (434) | 834 |
| INCOME FROM CONTINUING OPERATIONS | 597 | 4,628 | 28,560 |
| LOSS FROM DISCONTINUED OPERATIONS, net of tax benefits of $0, $702 and $3,674, respectively (Note 4) | – | (1,103) | (5,869) |
| NET INCOME | $ 597 | $ 3,525 | $ 22,691 |
| EARNINGS PER SHARE: |  |  |  |
|   Basic: |  |  |  |
|     Income from continuing operations | $ 0.02 | $ 0.17 | $ 1.08 |
|     Loss from discontinued operations | – | (0.04) | (0.22) |
|     Net income | $ 0.02 | $ 0.13 | $ 0.86 |
|   Diluted: |  |  |  |
|     Income from continuing operations | $ 0.02 | $ 0.17 | $ 1.07 |
|     Loss from discontinued operations | – | (0.04) | (0.22) |
|     Net income | $ 0.02 | $ 0.13 | $ 0.85 |

The accompanying notes are an integral part of the consolidated financial statements.

I 00476