**Insituform Technologies, Inc. and Subsidiaries**
**Consolidated Balance Sheets – As of December 31, 2004 and 2003**
*(In thousands, except share information)*

|  | 2004 | 2003 |
|---|---|---|
| CURRENT ASSETS: | | |
| Cash and cash equivalents | $ 93,246 | $ 93,865 |
| Restricted cash | 1,705 | 6,126 |
| Receivables, net | 78,665 | 90,814 |
| Retainage | 25,655 | 24,902 |
| Costs and estimated earnings in excess of billings | 34,789 | 27,853 |
| Inventories | 13,339 | 12,935 |
| Prepaid expenses and other assets | 21,469 | 19,515 |
| Assets held related to discontinued operations | – | 1,263 |
| Total current assets | 268,868 | 277,273 |
| PROPERTY, PLANT AND EQUIPMENT, less accumulated depreciation | 90,846 | 75,667 |
| OTHER ASSETS: | | |
| Goodwill | 131,540 | 131,613 |
| Other assets | 17,567 | 23,807 |
| Total other assets | 149,107 | 155,420 |
| Total assets | $508,821 | $508,360 |
| CURRENT LIABILITIES: | | |
| Current maturities of long-term debt and line of credit | $ 15,778 | $ 16,938 |
| Accounts payable and accrued expenses | 85,398 | 82,670 |
| Billings in excess of costs and estimated earnings | 12,809 | 8,495 |
| Liabilities related to discontinued operations | – | 1,770 |
| Total current liabilities | 113,985 | 109,873 |
| LONG-TERM DEBT, less current maturities | 96,505 | 114,323 |
| OTHER LIABILITIES | 6,848 | 3,530 |
| Total liabilities | 217,338 | 227,726 |
| MINORITY INTERESTS | 1,647 | 1,465 |
| COMMITMENTS AND CONTINGENCIES (Note 14) | – | – |
| STOCKHOLDERS' EQUITY: | | |
| Preferred stock, undesignated, $.10 par – shares authorized 2,000,000; none outstanding | – | – |
| Common stock, $.01 par – shares authorized 60,000,000; shares issued 29,100,419 and 28,815,669; shares outstanding 26,742,955 and 26,458,205 | 291 | 288 |
| Unearned restricted stock | (1,226) | (412) |
| Additional paid-in capital | 138,695 | 133,794 |
| Retained earnings | 198,925 | 198,328 |
| Treasury stock, at cost – 2,357,464 shares | (51,596) | (51,596) |
| Accumulated other comprehensive income (loss) | 4,747 | (1,233) |
| Total stockholders' equity | 289,836 | 279,169 |
| Total liabilities and stockholders' equity | $508,821 | $508,360 |

The accompanying notes are an integral part of the consolidated financial statements.

I 00477

## Insituform Technologies, Inc. and Subsidiaries
## Consolidated Statements of Stockholders' Equity
## For the Years Ended December 31, 2004, 2003 and 2002
*(In thousands, except number of shares)*

| | Common Stock | | Unearned Restricted Stock Compensation | Additional Paid-In Capital | Retained Earnings | Treasury Stock | Accumulated Other Comprehensive Income (Loss) | Total Stockholders' Equity | Comprehensive Income |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | | | |
| BALANCE, December 31, 2001 | 28,571,158 | $286 | — | $129,651 | $172,112 | $(44,563) | $(7,359) | $250,127 | |
| Net income | — | — | — | — | 22,691 | — | — | 22,691 | $22,691 |
| Issuance of common stock upon exercise of options, including income tax benefit of $654 | 205,280 | 2 | — | 3,169 | — | — | — | 3,171 | — |
| Common stock repurchased | — | — | — | — | — | (5,182) | — | (5,182) | — |
| Foreign currency translation adjustment | — | — | — | — | — | — | 1,811 | 1,811 | 1,811 |
| Total comprehensive income | — | — | — | — | — | — | — | — | $24,502 |
| BALANCE, December 31, 2002 | 28,776,438 | $288 | — | $132,820 | $194,803 | $(49,745) | $(5,548) | $272,618 | |
| Net income | — | — | — | — | 3,525 | — | — | 3,525 | $ 3,525 |
| Issuance of common stock upon exercise of options, including income tax benefit of $42 | 39,231 | — | — | 472 | — | — | — | 472 | — |
| Restricted stock issued (See Note 10) | — | — | $ (993) | 993 | — | — | — | — | — |
| Amortization and forfeitures of restricted stock | — | — | 581 | (491) | — | — | — | 90 | — |
| Common stock repurchased | — | — | — | — | — | (1,851) | — | (1,851) | — |
| Foreign currency translation Adjustment | — | — | — | — | — | — | 4,315 | 4,315 | 4,315 |
| Total comprehensive income | — | — | — | — | — | — | — | — | $ 7,840 |
| BALANCE, December 31, 2003 | 28,815,669 | $288 | $ (412) | $133,794 | $198,328 | $(51,596) | $(1,233) | $279,169 | |
| Net income | — | — | — | — | 597 | — | — | 597 | $ 597 |
| Issuance of common stock upon exercise of options, including income tax benefit of $382 | 284,750 | 3 | — | 3,959 | — | — | — | 3,962 | — |
| Restricted stock issued (See Note 10) | — | — | (1,469) | 1,469 | — | — | — | — | — |
| Amortization and forfeitures of restricted stock | — | — | 655 | (527) | — | — | — | 128 | — |
| Foreign currency translation adjustment | — | — | — | — | — | — | 5,980 | 5,980 | 5,980 |
| Total comprehensive income | — | — | — | — | — | — | — | — | $ 6,577 |
| BALANCE, December 31, 2004 | 29,100,419 | $291 | $(1,226) | $138,695 | $198,925 | $(51,596) | $ 4,747 | $289,836 | |

The accompanying notes are an integral part of the consolidated financial statements.

I 00478

**Insituform Technologies, Inc. and Subsidiaries**
**Consolidated Statements of Cash Flows**
**For the Years Ended December 31, 2004, 2003 and 2002**
*(In thousands)*

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| CASH FLOWS FROM OPERATING ACTIVITIES: | | | |
| Net income | $ 597 | $ 3,525 | $ 22,691 |
| Loss from discontinued operations | – | 1,103 | 5,869 |
| Income from continuing operations | 597 | 4,628 | 28,560 |
| Adjustments to reconcile net income to net cash provided by operating activities, excluding the effects of acquisitions – | | | |
| Depreciation | 17,502 | 15,521 | 14,397 |
| Amortization | 1,936 | 1,595 | 1,433 |
| (Gain) loss on sale of assets/investment | 610 | 1,375 | (1,225) |
| Write-off of debt issuance costs | 226 | – | – |
| Change in restricted cash related to operating activities | (181) | 2,461 | 277 |
| Reserve for notes receivable | – | 1,090 | – |
| Other | 4,922 | 1,912 | 227 |
| Asset impairment and restructuring charge | – | (261) | 5,957 |
| Deferred income taxes | 1,481 | (1,624) | (4,364) |
| Changes in operating assets and liabilities, net of purchased businesses (Note 13) | 15,464 | 5,157 | (19,657) |
| Net cash provided by operating activities of continuing operations | 42,557 | 31,854 | 25,605 |
| Net cash provided by operating activities of discontinued operations | – | 5,192 | 853 |
| Net cash provided by operating activities | 42,557 | 37,046 | 26,458 |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | | |
| Capital expenditures | (35,195) | (19,929) | (21,782) |
| Proceeds from sale of fixed assets | 1,904 | 1,365 | 10,503 |
| Proceeds from sale of investment | – | – | 1,920 |
| Net proceeds from sale of businesses (discontinued operations) | – | – | 5,430 |
| Purchases of businesses, net of cash acquired | – | (7,776) | (8,459) |
| Other investing activities | (844) | – | (960) |
| Net cash used by investing activities | (34,135) | (26,340) | (13,348) |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | | |
| Proceeds from issuance of common stock | 3,580 | 430 | 2,517 |
| Purchases of treasury stock | – | (1,597) | (5,182) |
| Proceeds from long-term debt | – | 65,112 | – |
| Principal payments on long-term debt and lines of credit, net | (18,978) | (50,224) | (10,692) |
| Changes in restricted cash related to financing activities | 4,602 | (4,602) | – |
| Deferred financing costs paid | (633) | (867) | – |
| Net cash provided by/(used in) financing activities | (11,429) | 8,252 | (13,357) |
| EFFECT OF EXCHANGE RATE CHANGES ON CASH | 2,388 | 3,506 | 1,261 |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | (619) | 22,464 | 1,014 |
| CASH AND CASH EQUIVALENTS, beginning of year | 93,865 | 71,401 | 70,387 |
| CASH AND CASH EQUIVALENTS, end of year | $ 93,246 | $ 93,865 | $ 71,401 |
| | | | |
| SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION: | | | |
| Cash paid for – | | | |
| Interest | $ 8,501 | $ 7,696 | $ 7,828 |
| Income taxes (refunded) paid | (5,117) | 10,307 | 17,591 |
| NONCASH INVESTING AND FINANCING ACTIVITIES: | | | |
| Noncompete liability recovered in settlement | $ 919 | $ – | $ – |
| Notes receivable on sale of discontinued operations | – | – | 5,000 |
| Note payable recovered in settlement | – | (5,350) | – |
| Accrued interest recovered in settlement | – | 557 | – |
| Treasury stock recovered in settlement | – | 254 | – |

The accompanying notes are an integral part of the consolidated financial statements.

I 00479

**Insituform Technologies, Inc. and Subsidiaries**
**Notes to Consolidated Financial Statements**

1.    DESCRIPTION OF BUSINESS:

Insituform Technologies, Inc. (a Delaware corporation) and subsidiaries (collectively, the "Company") is a worldwide provider of proprietary trenchless technologies for the rehabilitation and improvement of sewer, water, gas and industrial pipes. The Company's primary technology is the Insituform® process, a proprietary cured-in-place pipeline rehabilitation process (the "Insituform CIPP Process"). Pipebursting is a non-proprietary trenchless method of dilating and replacing an old pipeline with a new high-density polyethylene pipe. The microtunneling process is a non-proprietary method of drilling a new tunnel from surface operated equipment. Sliplining is a non-proprietary method used to push or pull a new pipeline into an old one. The Company's Tite Liner ("Tite Liner") process is a proprietary method of lining new and existing pipe with a corrosion and abrasion resistant polyethylene pipe. The Company also engages in tunneling used in the installation of new underground services.

2.    SUMMARY OF ACCOUNTING POLICIES:

Principles of Consolidation

The consolidated financial statements include the accounts of the Company, its wholly owned subsidiaries and its majority owned subsidiaries, the most significant of which is a 75%-owned United Kingdom subsidiary, Insituform Linings Plc. For contractual joint ventures, the Company recognizes revenue, costs and profits on its portion of the contract using percentage-of-completion accounting. All significant intercompany transactions and balances have been eliminated. Certain prior period amounts have been reclassified to conform to current presentation.

Accounting Estimates

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

I 00480

Stock-Based Compensation

At December 31, 2004, the Company had two active stock-based compensation plans, which are described in Note 10. The Company applies the recognition and measurement principles of Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees," and related Interpretations in accounting for those plans. The Company recorded after-tax, stock-based compensation expense of $0.4 million and $0.2 million related to restricted stock and deferred stock units (See Note 10) in 2004 and 2003, respectively. There was no stock-based compensation expense in 2002 net income as all options granted during those years had an exercise price equal to the market value of the underlying common stock on the date of the grant. The following table illustrates the effect on net income and earnings per share if the Company had applied the fair value recognition provisions of SFAS 123, "Accounting for Stock-Based Compensation," to stock-based compensation (in thousands, except share data):

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| Net income – as reported | $ 597 | $ 3,525 | $ 22,691 |
| Add: Total stock-based compensation expense included in net income, net of related tax effects | 416 | 223 | – |
| Deduct: Total stock-based compensation expense determined under fair value method for all awards, net of related tax effects | (2,093) | (3,259) | (6,080) |
| Pro-forma net income (loss) | $ (1,080) | $ 489 | $ 16,611 |
| Basic earnings (loss) per share: |  |  |  |
| As reported | $ 0.02 | $ 0.13 | $ 0.86 |
| Pro-forma | (0.04) | 0.02 | 0.63 |
| Diluted earnings (loss) per share: |  |  |  |
| As reported | $ 0.02 | $ 0.13 | $ 0.85 |
| Pro-forma | (0.04) | 0.02 | 0.62 |

In 2004, the Company issued 54,000 options to employees that included an accelerated vesting provision. These options became fully vested in December 2004. Additional after-tax expense of $0.2 million related to this vesting provision is included in the pro-forma table above. The accelerated vesting provision avoids future compensation expense the Company would have recognized under SFAS 123(R), which will become effective in the third quarter of 2005. SFAS 123(R) is more fully described in "New Accounting Pronouncements" later in this footnote.

For SFAS 123 disclosure purposes, the weighted average fair value of stock options is required to be based on a theoretical option-pricing model such as the Black-Scholes method. In actuality, because the Company's stock options are not traded on an exchange and are subject to vesting periods, the disclosed fair value represents only an approximation of option value based solely on historical performance.

For SFAS 148 disclosure purposes, the stock-based compensation expense recorded in the determination of reported net income is disclosed in the above table. The pro-forma stock-based compensation expense includes the recorded expense and expense related to stock options that was determined using the fair value method.

Revenues

Revenues include construction and installation revenues that are recognized using the percentage-of-completion method of accounting in the ratio of costs incurred to estimated final costs. Contract costs include all direct material and labor costs and those indirect costs related to contract performance, such as indirect labor, supplies, tools and equipment costs. Since the financial reporting of these contracts depends on estimates, which are assessed continually during the term of these contracts,

I 00481

recognized revenues and profit are subject to revisions as the contract progresses to completion. Revisions in profit estimates are reflected in the period in which the facts that give rise to the revision become known. When estimates indicate that a loss will be incurred on a contract on completion, a provision for the expected loss is recorded in the period in which the loss becomes evident. At December 31, 2004 and 2003, the Company had provided $0.7 million and $4.7 million for expected losses on contracts. The 2003 loss provision included $4.1 million for additional costs related to the removal and reinstallation of an Insituform CIPP Process liner in Boston, Massachusetts. There were no significant loss contracts at December 31, 2004. Revenues from change orders, extra work, variations in the scope of work and claims are recognized when realization is reasonably assured, and at estimated recoverable amounts.

Research and Development

The Company expenses research and development costs as incurred. Research and development costs of $2.9 million, $2.0 million and $2.0 million for the years ended December 31, 2004, 2003 and 2002, respectively, are included in operating expenses in the accompanying consolidated statements of income.

Taxes on Income

The Company provides for estimated income taxes payable or refundable on current year income tax returns as well as the estimated future tax effects attributable to temporary differences and carryforwards, based upon enacted tax laws and tax rates, and in accordance with Statement of Financial Accounting Standards 109, "Accounting for Income Taxes." SFAS 109 also requires that a valuation allowance be recorded against any deferred tax assets that are not likely to be realized in the future.

Earnings Per Share

Earnings per share have been calculated using the following share information:

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| Weighted average number of common shares used for basic EPS | 26,649,030 | 26,470,587 | 26,533,541 |
| Effect of dilutive stock options, stock appreciation rights, restricted stock and deferred stock units (Note 10) | 161,450 | 150,105 | 198,221 |
| Weighted average number of common shares and dilutive potential common stock used in diluted EPS | 26,810,480 | 26,620,692 | 26,731,762 |

Classification of Current Assets and Current Liabilities

The Company includes in current assets and current liabilities certain amounts realizable and payable under construction contracts which may extend beyond one year. The construction periods on projects undertaken by the Company generally range from one to 24 months.

Cash and Cash Equivalents

The Company classifies highly liquid investments with original maturities of 90 days or less as cash equivalents. Recorded book values are reasonable estimates of fair value for cash and cash equivalents. Restricted cash consists of payments from certain customers placed in escrow in lieu of retention in case of potential issues regarding future job performance by the Company. Restricted cash is similar to retainage and is therefore classified as a current asset, consistent with the Company's policy on retainage.

Beginning in 2004, and for all periods presented in this report, restricted cash is presented separately on the consolidated balance sheets and changes in restricted cash are presented on the consolidated statements of

cash flows according to the purpose for which the restricted cash is held (i.e., operating, investing or financing activity).

I 00482

Retainage

Many of the contracts under which the Company performs work contain retainage provisions. Retainage refers to that portion of revenue earned by the Company but held for payment by the customer pending satisfactory completion of the project. Unless reserved, the Company assumes that all amounts retained by customers under such provisions are fully collectible. Retainage on active contracts is classified as a current asset regardless of the term of the contract. Retainage is generally collected within one year of the completion of a contract, although collection can take up to two years in Europe. Retainage due after one year was approximately $3.2 million and $1.1 million at December 31, 2004 and 2003, respectively.

Allowance for Doubtful Accounts

Management makes estimates of the uncollectibility of accounts receivable and retainage. The Company records an allowance for the greater of historical percentages applied against aged balances, or specific accounts to reduce receivables, including retainage, to the amount that is expected to be collected. The specific allowances are reevaluated and adjusted as additional information is received. After all reasonable attempts to collect the receivable or retainage have been explored, the account is written off against the allowance.

Inventories

Inventories are stated at the lower of cost (first-in, first-out) or market. Actual cost is used to value raw materials and supplies. Standard cost, which approximates actual cost, is used to value work-in-process, finished goods and construction materials. Standard cost includes direct labor, raw materials, and manufacturing overhead based on expected production.

Long-Lived Assets

Property, plant and equipment, and other intangibles are recorded at cost and are amortized on a straight-line basis over their estimated useful lives. Intangible assets are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable based on estimated undiscounted future cash flows. If impairment is indicated, the asset is written down to its fair value. See Notes 6 regarding intangible asset impairment in 2002.

Goodwill

Prior to 2002, the Company amortized goodwill over periods of 15 to 25 years on the straight-line basis. SFAS 142, which was adopted by the Company on January 1, 2002, provides that goodwill should not be amortized, but shall be tested for impairment annually, or more frequently if circumstances indicate potential impairment. The Company recognized no amortization expense in 2004, 2003 or 2002, nor was any goodwill identified as being impaired based on management's impairment analyses performed during 2004, 2003 and 2002. See Note 8 regarding acquired intangible assets and goodwill.

Treasury Stock

Treasury stock is accounted for at acquisition cost.

I 00483

Foreign Currency Translation

Results of operations for foreign entities are translated using the average exchange rates during the period. Current assets and liabilities are translated to U.S. dollars using the exchange rates in effect at the balance sheet date, and the related translation adjustments are reported as a separate component of stockholders' equity.

New Accounting Pronouncements

In December 2004, the FASB issued SFAS No. 123 (R), "Share-Based Payment." This Statement revises the measurement, valuation and recognition of financial accounting and reporting standards for stock-based employee compensation plans contained in SFAS No. 123, "Accounting for Stock-Based Compensation." The new rules require companies to expense the value of employee stock options and similar share-based compensation awards based on fair value recognition provisions. The new principles become effective in the third quarter of 2005. The adoption of SFAS 123 (R) by the Company on July 1, 2005 will cause the Company to expense the fair value of its employee stock options, the impact of which is currently disclosed in its financial statements on a pro-forma basis. While an assessment of the effects of SFAS 123(R) has not been completed, the Company disclosed after tax equity-based compensation expense of $2.1 million in 2004, $3.3 million in 2003 and $6.1 million in 2002, on a pro-forma basis. Any unvested equity-based compensation instruments will be expensed beginning in the third quarter of 2005. Pro-forma expense related to such instruments disclosed in the first two quarters of 2005 will be recorded as expense in the third quarter of 2005.

In January 2003 (as revised December 2003), the FASB issued Interpretation No. 46, "Consolidation of Variable Interest Entities" ("FIN 46"). FIN 46 clarifies the application of Accounting Research Bulletin No. 51, "Consolidated Financial Statements," for certain entities in which equity investors do not have the characteristics of a controlling financial interest or do not have sufficient equity at risk for the entity to finance its activities without additional subordinated financial support from other parties. FIN 46 requires that variable interest entities, as defined, should be consolidated by the primary beneficiary, which is defined as the entity that is expected to absorb the majority of the expected losses, receive the majority of the gains or both. FIN 46 requires that companies disclose certain information about a variable interest entity created prior to February 1, 2003. FIN 46 was effective for the Company on January 1, 2004. The adoption of FIN 46 did not have a material impact on the Company's consolidated financial position or results of operations.

3.    BUSINESS ACQUISITIONS:

In November 2003, the Company acquired the remaining interest in Ka-Te Insituform AG for approximately $2.2 million. Ka-Te Insituform did not have a material impact on 2003 operations.

Effective September 5, 2003, the Company acquired the business and certain assets of Insituform East, Inc. for $5.5 million. An option to purchase certain additional assets was included in the acquisition, which the Company exercised for $0.6 million. The purchase resulted in intangible assets of $4.0 million recorded as licenses, purchased backlog and customer relationships. The Insituform East acquisition added $2.7 million in revenues and $0.1 million of operating income from September 5, 2003 through December 31, 2003.

In July 2003, the Company purchased the remaining third party minority interest in Video Injection S.A. The purchase price was $0.5 million and resulted in $0.3 million of additional goodwill.

In June 2003, the Company completed the acquisition of the business of Sewer Services Limited. The acquisition, with a price of $0.4 million, resulted in an increase of $0.1 million in goodwill. Sewer Services had revenues of $2.5 million after the acquisition in 2003.

In May 2002, the Company acquired the business and certain assets and liabilities of Elmore Pipe Jacking,

I 00484

Inc. for approximately $12.5 million. The purchase resulted in goodwill of $8.9 million. The Elmore operations provided revenues of $20.7 million and operating income of $1.0 million in the period after acquisition in 2002.

The 2003 and 2002 acquisitions are not considered material individually or in the aggregate. As a result, pro-forma information has not been presented.

4.    DISCONTINUED OPERATIONS:

During the fourth quarter of 2001, the Company decided to sell certain operations that were not consistent with the Company's strategy of providing trenchless rehabilitation and tunneling services. The Company completed the sale of these operations during 2002, with net proceeds of approximately $5.4 million. Discontinued operations were substantially resolved in 2003.

At December 31, 2004, there were no assets or liabilities related to discontinued operations. As of December 31, 2003 and 2002, assets related to discontinued operations totaled $1.3 million and $7.9 million, respectively, and included $0.1 million and $0.7 million of unbilled receivables, respectively. Assets related to discontinued operations also included $0.6 million in retainage receivables, $0.2 million of trade receivables, and $0.4 million of fixed assets at December 31, 2003. Liabilities related to discontinued operations totaled $1.8 million and $3.3 million at December 31, 2003 and 2002, respectively. Revenues from discontinued operations were $0 in 2004, $2.6 million in 2003 and $22.6 million in 2002. Loss from discontinued operations was $0 in 2004, $1.1 million in 2003 and $5.9 million in 2002. The lower activity in discontinued operations in 2003 was due to the winding down of discontinued operations.

5.    RESTRUCTURING:

In the third quarter of 2002, the Company recorded a pre-tax restructuring charge of $2.5 million, which was related to severance costs, asset write-downs, lease cancellations, and certain fixed asset disposals. The remaining unused portion of this restructuring charge of $0.3 million was reversed into income in the third quarter of 2003.

6.    INTANGIBLE ASSET IMPAIRMENT:

During the third quarter of 2002, the Company determined that certain patent, trademark, license and non-compete assets had become impaired due to business decisions and other circumstances. The impact of the impairment charge in 2002 was $3.5 million ($2.2 million after tax).

7.    SUPPLEMENTAL BALANCE SHEET INFORMATION (in thousands):

Allowance for Doubtful Accounts

Activity in the allowance for doubtful accounts is summarized as follows for the years ended December 31:

|                              | 2004    | 2003    | 2002    |
|------------------------------|---------|---------|---------|
| Balance, at beginning of year | $3,008 | $2,175  | $2,208  |
| Charged to expense            | 1,143  | 2,027   | 503     |
| Write-offs and adjustments    | (74)   | (1,194) | (536)   |
| Balance, at end of year       | $4,077 | $3,008  | $2,175  |

In the fourth quarter of 2003, the Company increased its allowance for doubtful accounts by $0.6 million in accordance with the Company's bad debt policy.

I 00485

Costs and Estimated Earnings on Uncompleted Contracts

Costs and estimated earnings on uncompleted contracts consisted of the following at December 31:

|  | 2004 | 2003 |
|---|---|---|
| Costs incurred on uncompleted contracts | $ 451,549 | $ 360,897 |
| Estimated earnings to date | 68,485 | 89,078 |
| Subtotal | 520,034 | 449,975 |
| Less – Billings to date | (498,054) | (430,617) |
| Total | $ 21,980 | $ 19,358 |
| Included in the accompanying balance sheets: |  |  |
| Costs and estimated earnings in excess of billings | $ 34,789 | $ 27,853 |
| Billings in excess of costs and estimated earnings | (12,809) | (8,495) |
| Total | $ 21,980 | $ 19,358 |

Costs and estimated earnings in excess of billings represent work performed which either due to contract stipulations or lacking contractual documentation needed, could not be billed. Substantially all unbilled amounts are expected to be billed and collected within one year.

Inventories

Inventories are summarized as follows at December 31:

|  | 2004 | 2003 |
|---|---|---|
| Raw materials and supplies | $ 1,885 | $ 1,392 |
| Work-in-process | 3,006 | 3,246 |
| Finished products | 822 | 1,932 |
| Construction materials | 7,626 | 6,365 |
| Total | $ 13,339 | $ 12,935 |

Property, Plant and Equipment

Property, plant and equipment consisted of the following at December 31:

|  | Estimated Useful Lives (Years) | 2004 | 2003 |
|---|---|---|---|
| Land and land improvements |  | $ 9,894 | $ 9,822 |
| Buildings and improvements | 5 – 40 | 27,638 | 24,807 |
| Machinery and equipment | 4 – 10 | 102,781 | 114,628 |
| Furniture and fixtures | 3 – 10 | 13,194 | 12,106 |
| Autos and trucks | 3 – 10 | 33,344 | 5,203 |
| Construction in progress |  | 8,320 | 7,761 |
| Subtotal |  | 195,171 | 174,327 |
| Less – Accumulated depreciation and amortization of leasehold improvements |  | (104,325) | (98,660) |
| Total |  | $ 90,846 | $ 75,667 |

45

I 00486

In the fourth quarter of 2003, the Company reduced the carrying value of its fixed assets by $0.8 million as determined by its impairment analyses and related assessments.

Other Assets

Other assets are summarized as follows at December 31:

|  | 2004 | 2003 |
|---|---|---|
| Investment in affiliates | $ 6,375 | $ 5,498 |
| License agreements | 2,463 | 2,721 |
| Customer relationships | 1,646 | 1,767 |
| Non-compete agreements | 1,450 | 2,069 |
| Patents and trademarks | 1,297 | 1,660 |
| Deferred income taxes | – | 5,251 |
| Purchased backlog | – | 388 |
| Other | 4,336 | 4,453 |
| Total | $17,567 | $23,807 |

Accounts Payable and Accrued Expenses

Accounts payable and accrued expenses consisted of the following at December 31:

|  | 2004 | 2003 |
|---|---|---|
| Accounts payable – trade | $50,657 | $49,047 |
| Estimated casualty and healthcare liabilities | 15,049 | 10,620 |
| Job costs | 9,534 | 8,592 |
| Compensation and bonus | 6,640 | 6,246 |
| Interest | 2,256 | 2,523 |
| Job loss reserves | 715 | 4,653 |
| Warranty | 547 | 989 |
| Total | $85,398 | $82,670 |

In the fourth quarter of 2003, the Company increased its reserves for self-insurance and healthcare costs by $3.7 million to reflect recent Company experience regarding increasing claim costs and updated actuarial information. In the fourth quarter of 2003, the Company recorded a loss job provision of $4.1 million to remove and reinstall an Insituform CIPP Process liner in Boston.

Casualty Insurance and Healthcare Reserves

The Company obtains actuarial estimates of its liabilities on a quarterly basis and adjusts its reserves accordingly. Net increases (decreases) to these reserves in 2004 (in millions) were:

|  | Reserves | |
|---|---|---|
|  | Casualty Insurance | Healthcare Benefits |
| Balances at December 31, 2003 | $ 8.9 | $ 1.7 |
| First quarter | 0.9 | 0.4 |
| Second quarter | 0.8 | 0.3 |
| Third quarter | 1.7 | (0.4) |
| Fourth quarter | 0.3 | 0.4 |
| Year ended December 31, 2004 | 3.7 | 0.7 |
| Balances at December 31, 2004 | $12.6 | $ 2.4 |

I 00487

8.    ACQUIRED INTANGIBLE ASSETS AND GOODWILL:

In June 2001, the FASB issued SFAS 142, "Goodwill and Other Intangible Assets," which required that an intangible asset that is acquired shall be initially recognized and measured based on its fair value. This statement also provided that certain intangible assets deemed to have an indefinite useful life, such as goodwill, should not be amortized, but be tested for impairment annually, or more frequently if circumstances indicate potential impairment. The Company adopted SFAS 142 on January 1, 2002, at which time amortization of goodwill ceased and a transitional impairment test was performed. The annual impairment test for goodwill was performed in the fourth quarter of 2004 and 2003, respectively. Management retained an independent party to perform a valuation of the Company's reporting units, which consist of North American rehabilitation, European rehabilitation, tunneling and Tite Liner, and determined that no impairment of goodwill existed.

Changes in the carrying amount of goodwill for the year ended December 31, 2004 were as follows (in thousands):

|  | Rehabilitation | Tunneling | Total |
|---|---|---|---|
| Balance as of December 31, 2003 | $122,693 | $ 8,920 | $131,613 |
| Foreign currency adjustment | (73) | -- | (73) |
| Balance as of December 31, 2004 | $122,620 | $ 8,920 | $131,540 |

Intangible assets were as follows (in thousands):

|  | As of December 31, 2004 | |
|---|---|---|
|  | Gross Carrying Amount | Accumulated Amortization |
| Amortized intangible assets: |  |  |
| Patents and trademarks | $ 13,943 | $(12,646) |
| License agreements | 4,803 | (2,340) |
| Non-compete agreements | 4,737 | (3,287) |
| Customer relationships | 1,797 | (151) |
| Total | $ 25,280 | $(18,424) |

| Aggregate amortization expense: |  |
|---|---|
| For the year ended December 31, 2004 | $   1,936 |

| Estimated amortization expense: |  |
|---|---|
| For year ending December 31, 2005 | $   1,302 |
| For year ending December 31, 2006 | 1,135 |
| For year ending December 31, 2007 | 706 |
| For year ending December 31, 2008 | 447 |
| For year ending December 31, 2009 | 338 |

I 00488

9.    LONG-TERM DEBT AND LINE OF CREDIT FACILITY:

Long-term debt and line of credit consisted of the following at December 31 (in thousands):

|  | 2004 | 2003 |
|---|---|---|
| 7.88% Senior Notes, Series A, payable in $15,715 annual installments beginning February 2001 through 2007, with interest payable semiannually | $ 47,140 | $ 62,855 |
| 5.29% Senior Notes, Series 2003-A, due April 24, 2013 | 65,000 | 65,000 |
| Line of credit facility | -- | -- |
| 5.5% bank term loan, €5.7 million, payable in seven equal annual installments through July 2006, with interest payable quarterly, repaid in September 2004 | -- | 3,052 |
| Other notes, including capital leases, interest rates from 5.0% to 10.5% | 143 | 354 |
| Subtotal | 112,283 | 131,261 |
| Less -- Current maturities | (15,778) | (16,938) |
| Total | $ 96,505 | $114,323 |

Principal payments required to be made for each of the next five years and thereafter are summarized as follows (in thousands):

| Year | Amount |
|---|---|
| 2005 | $ 15,778 |
| 2006 | 15,795 |
| 2007 | 15,710 |
| 2008 | -- |
| 2009 | -- |
| Thereafter | 65,000 |
| Total | $112,283 |

At December 31, 2004 and 2003, the estimated fair value of the Company's long-term debt was approximately $109.1 million and $131.3 million, respectively. Fair value was estimated using market rates for debt of similar risk and maturity.

Senior Notes

The Series A Senior Notes may be prepaid at the Company's option on a pro rata basis with the Series 2003-A Senior Notes, in whole or in part, at any time, together with a make-whole premium, and upon specified change in control events each holder has the right to require the Company to purchase its Senior Notes without any premium. The Series 2003-A Senior Notes may be prepaid at the Company's option on a pro rata basis with the Series A Senior Notes, in whole or in part, at any time, together with a make-whole premium. Upon specified change in control events each holder has the right to require the Company to purchase its Senior Notes, Series 2003-A, without any premium.

These agreements obligate the Company to comply with certain financial ratios and restrictive covenants that, among other things, place limitations on operations and sales of assets by the Company or its subsidiaries, and limit the ability of the Company to incur secured indebtedness and liens. Such agreements also obligate the Company's subsidiaries to provide guarantees to the holders of the Senior Notes if guarantees are given by them to certain other lenders.

The Company was not in compliance with one of its debt covenants at December 31, 2004 under the Series A Senior Notes. See Note 16 for amendments obtained related to covenant violations.

I 00489

### Line of Credit Facility

The Company has a credit facility with Bank of America which provides a borrowing capacity of $25 million, any portion of which may be used for the issuance of standby letters of credit. On March 16, 2005, the bank executed a waiver of a cross-default that had occurred as of December 31, 2004 when a covenant under the Series A Senior Note was not met. See Note 16 for amendments obtained related to covenant violations. The bank also agreed to be subject to the same restrictive covenants as the Series A Senior Notes and the Series 2003-A Senior Notes starting in the first quarter of 2005 and for each quarter thereafter. The bank also requires the Company to maintain an unrestricted cash balance of at least $50 million. The line of credit facility matures on March 31, 2006.

Under the line of credit facility, the Company pays a commitment fee equal to 0.5% per annum on the unborrowed balance at the end of each fiscal quarter. The Company will pay a letter of credit fee of 2.50% per annum on the aggregate stated amount for each letter of credit that it has issued and outstanding at the end of each fiscal quarter. Any loan under the line of credit facility will bear interest at the rate equal to the Bank of America prime rate (5.25% at December 31, 2004).

At December 31, 2004, $12.0 million in letters of credit were issued and outstanding as collateral for the benefit of certain of the Company's insurance carriers. There were no other outstanding borrowings under the line of credit facility at December 31, 2004, resulting in $13.0 million in available borrowing capacity under the line of credit facility as of that date.

### 10.    STOCKHOLDERS' EQUITY:

### Stock Option Plans

The 2001 Employee Equity Incentive Plan ("Employee Incentive Plan") provides for the granting to employees of stock-based awards, including (a) stock appreciation rights, (b) restricted shares of common stock, (c) performance awards, (d) stock options and (e) stock units. The maximum number of shares of common stock that currently may be issued under the Employee Incentive Plan is 2,000,000. The Employee Incentive Plan is administered by the Compensation Committee of the Board of Directors, which determines the eligibility, timing, pricing, amount, vesting and other terms and conditions of awards, including stock option awards. The Company accounts for options granted under this plan in accordance with APB 25. The exercise price of each option issued under the Employee Incentive Plan equals the closing market price of the Company's stock on the date of grant and, therefore, the Company makes no charge to earnings with respect to these options. Stock options, issued under the Employee Incentive Plan, generally vest over three years (with 25% vesting upon grant) and have an expiration date of five to ten years after the date of grant.

The Company granted 65,000 restricted shares of common stock to executives and key employees during 2004 and 57,300 restricted shares were granted in 2003. The restrictions on grants of restricted stock expire three years after the grant date, provided that employment continues through the restriction period. Restricted stock expense is recorded based on the stock price on the date of grant and recorded ratably throughout the restriction period. At December 31, 2004, there were 73,600 shares of restricted stock outstanding, and the Company had recorded $0.1 million in after-tax compensation expense during 2004, net of the effect of forfeitures. At December 31, 2003, there were 28,400 shares of restricted stock outstanding and the Company had recorded $0.1 million in compensation expense, net of the effect of forfeitures. There were no restricted stock grants or related compensation expense in 2002.

The 2001 Non-Employee Director Equity Incentive Plan ("Non-Employee Director Incentive Plan"), administered by the Board of Directors, provides for the granting of stock options and deferred stock units to non-employee directors. The total number of shares of common stock available for issuance under the Non-Employee Director Incentive Plan is 200,000. Under the terms of the Non-Employee Director Incentive Plan, each non-employee director receives a stock option to purchase shares of common stock

I 00490

and/or deferred stock units each year on the date of the Annual Meeting of Stockholders (or promptly thereafter, as determined by the Board), provided that such director continues to be a non-employee director following such Annual Meeting. The purchase price per share of common stock for which each option is exercisable is the fair market value per share of common stock on the date the option is granted. Each option granted under the Non-Employee Director Incentive Plan is fully vested and exercisable immediately, and expires not later than ten years from the date of the grant. Each deferred stock unit represents the obligation of the Company to transfer one share of common stock to the non-employee director at a future date and is fully vested at grant. The Board, based on the recommendation of the Compensation Committee, granted deferred stock units to each of the Company's non-employee directors in 2003 and 2004 under the Non-Employee Director Incentive Plan.

The Company granted an aggregate of 31,300 and 27,500 deferred stock units to its Board of Directors, excluding the Company's Chief Executive Officer, in 2004 and 2003, respectively. Following termination of the director's service on the Company's board due to death or a change in control, or six months after termination of the director's service for any other reason, shares of the Company's common stock equal to the number of deferred stock units reflected on the director's account, will be distributed. A director may, while serving on the Company's board, elect to defer the distribution date in annual installments over a period up to five years, beginning in the year following termination of service on the board. The Company recorded compensation expense of $0.5 million in 2004 and $0.4 million in 2003 related to deferred stock unit grants. There were no deferred stock unit grants or related compensation expense during 2002.

Under the 1992 Employee Stock Option Plan and Director Stock Option Plan, the Company was authorized to grant options to its employees and directors not to exceed 2,850,000 and 1,500,000 shares of common stock, respectively. No options have been granted under the Employee Stock Option Plan or the Director Stock Option Plan since the adoption of the Employee Incentive Plan and the Non-Employee Director Incentive Plan. As of December 31, 2004, 699,729 options granted under the Employee Plan and the Director Plan remained outstanding.

In accordance with SFAS 123, the Company has estimated the fair value of each option grant using the Black-Scholes option-pricing model and has included in Note 2 a table illustrating the effect on net income and earnings per share had the Company applied the fair value recognition provisions. The following weighted average assumptions were used for the grants in 2004, 2003 and 2002, respectively: expected volatility of 60%, 61% and 64%; risk-free interest rates of 4.3%, 3.0% and 3.8%; expected lives of five, six and six years; and no dividends. The following tables summarize information about options outstanding at December 31, 2004:

| Range of Exercise Price | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| | Number Outstanding | Weighted Average Remaining Contractual Life | Weighted Average Exercise Price | Number Exercisable | Weighted Average Exercise Price |
| $4.00 to $10.00 | 59,315 | 2.9 years | $ 8.75 | 59,315 | $ 8.75 |
| $10.00 to $20.00 | 604,413 | 5.5 years | 14.54 | 299,068 | 14.31 |
| $20.00 and above | 986,830 | 5.2 years | 26.47 | 845,803 | 27.21 |
| | 1,650,558 | | | 1,204,186 | |

I 00491

| | 2004 | | 2003 | | 2002 | |
|---|---|---|---|---|---|---|
| | Shares | Weighted Average Exercise Price | Shares | Weighted Average Exercise Price | Shares | Weighted Average Exercise Price |
| Options outstanding, beginning of year | 2,264,139 | $22.23 | 2,150,969 | $23.59 | 1,857,302 | $22.50 |
| Granted | 417,389 | 16.95 | 371,515 | 12.84 | 676,471 | 23.88 |
| Exercised | (283,948) | 12.61 | (39,231) | 11.09 | (205,280) | 12.26 |
| Forfeited | (747,022) | 23.99 | (219,114) | 21.27 | (177,524) | 25.99 |
| Options outstanding, end of year | 1,650,558 | 21.46 | 2,264,139 | 22.23 | 2,150,969 | 23.59 |
| Options exercisable, end of year | 1,204,186 | 23.09 | 1,780,230 | 22.82 | 1,442,413 | 22.28 |
| Weighted average fair value of options granted | $10.44 | | $7.53 | | $14.26 | |

At December 31, 2004, 947,669 and 88,700 shares of common stock were reserved for granting of awards pursuant to Employee Incentive Plan and the Non-Employee Director Incentive Plan, respectively.

Shareholders' Rights Plan

In February 2002, the Company's Board of Directors adopted a Shareholders' Rights Plan. Pursuant to the Shareholders' Rights Plan, the Board of Directors declared a dividend distribution of one preferred stock purchase right for each outstanding share of the Company's common stock, $.01 par value, payable to the Company's stockholders of record as of March 13, 2002. Each right, when exercisable, entitles the holder to purchase from the Company one one-hundredth of a share of a new series of voting preferred stock, designated as Series A Junior Participating Preferred Stock, $0.10 par value, at an exercise price of $116.00 per one one-hundredth of a share.

The rights will trade in tandem with the common stock until 10 days after a "distribution event" (i.e., the announcement of an intention to acquire or the actual acquisition of 20% or more of the outstanding shares of common stock), at which time the rights would become exercisable. Upon exercise, the holders of the rights (other than the person who triggered the distribution event) will be able to purchase for the exercise price, shares of common stock (or the common stock of the entity which acquires the company) having the then market value of two times the aggregate exercise price of the rights. The rights expire on March 12, 2012, unless redeemed, exchanged or otherwise terminated at an earlier date.

11.    OTHER INCOME (EXPENSE):

Other income (expense) was comprised of the following for the years ended December 31 (in thousands):

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Interest income | $1,397 | $ 1,507 | $1,898 |
| Gain (loss) on sale/disposal of assets | (610) | (1,375) | 1,225 |
| Reserve for notes receivable | – | (1,090) | – |
| Other | 425 | (316) | (68) |
| Total | $1,212 | $(1,274) | $3,055 |

During the fourth quarter of 2003, the Company reserved $1.1 million in notes receivable from the purchaser of certain discontinued operations.

During 2002, the Company disposed of a real estate investment acquired in a prior year for proceeds of $1.9 million and a gain of $1.2 million, included in the table above.

I 00492

12.    TAXES ON INCOME:

Income (loss) from continuing operations before taxes on income was as follows for the years ended December 31 (in thousands):

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| Domestic | $(8,310) | $ 4,097 | $38,464 |
| Foreign | 8,395 | 7,985 | 6,863 |
| Total | $   85 | $12,082 | $45,327 |

Provisions (benefits) for taxes on income from continuing operations consisted of the following components for the years ended December 31 (in thousands):

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| Current: |  |  |  |
| Federal | $ (6,778) | $ 3,342 | $ 15,578 |
| Foreign | 4,274 | 4,007 | 3,935 |
| State | 188 | 1,084 | 2,302 |
| Subtotal | (2,316) | 8,433 | 21,815 |
| Deferred: |  |  |  |
| Federal | 2,735 | (1,581) | (3,705) |
| Foreign | (713) | (56) | (247) |
| State | (541) | 13 | (412) |
| Subtotal | 1,481 | (1,624) | (4,364) |
| Total tax provision | $ (835) | $ 6,809 | $ 17,451 |

Income tax (benefit) expense differed from the amounts computed by applying the U.S. federal income tax rate of 35% to income (loss) before income taxes, equity in income (loss) of joint ventures and minority interests as a result of the following (dollars in thousands):

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| Income taxes at U.S. federal statutory tax rate | $   30 | $4,229 | $15,864 |
| Increase (decrease) in taxes resulting from: |  |  |  |
| State income taxes, net of federal income tax benefit | (229) | 305 | 1,597 |
| Amortization of intangibles | (616) | (700) | (700) |
| Effect of foreign income taxes | (126) | (96) | 220 |
| Valuation allowance on net operating loss carryforwards (NOL) | 100 | 747 | – |
| Non-deductible meals and entertainment | 668 | 1,626 | 179 |
| Federal motor fuels excise tax credit | (686) | – | – |
| Other | 24 | 698 | 291 |
| Total (benefits) taxes on income | $(835) | $6,809 | $17,451 |
|  |  |  |  |
| Effective tax rate | (982.4)% | 56.4% | 38.5% |

In 2003, the Company determined that additional taxes were required to be paid related to the Company's meals and entertainment tax deductions.

I 00493

Net deferred taxes consisted of the following at December 31 (in thousands):

|  | 2004 | 2003 |
|---|---|---|
| Deferred income tax assets: | | |
| Foreign tax credit carryforwards | $ 3,234 | $ 3,046 |
| Net operating loss carryforwards | 7,686 | 5,479 |
| Accrued expenses | 9,291 | 8,106 |
| Other | 1,560 | 1,514 |
| Total gross deferred income tax assets | 21,771 | 18,145 |
| Less valuation allowance | (5,014) | (4,107) |
| Net deferred income tax assets | 16,757 | 14,038 |
| Deferred income tax liabilities: | | |
| Property, plant and equipment | $(8,849) | $(6,021) |
| Other | (4,043) | (2,766) |
| Total deferred income tax liabilities | (12,892) | (8,787) |
| Net deferred income tax assets | $ 3,865 | $ 5,251 |

The Company's tax assets and liabilities, netted by taxing location, are in the following captions in the balance sheet (in thousands):

|  | 2004 | 2003 |
|---|---|---|
| Current deferred income tax assets, net | $ 6,878 | $  — |
| Noncurrent deferred income tax assets (liabilities), net | (3,013) | 5,251 |
|  | $ 3,865 | $ 5,251 |

The Company's deferred tax assets at December 31, 2004 include $7.7 million in Federal, state and foreign net operating loss carryforwards. These NOLs include $2.0 million, which if not used will expire between the years 2005 and 2024, and $5.7 million that has no expiration. The Company also has foreign tax credit carryforwards of $3.2 million, which will begin to expire in 2011.

For financial reporting purposes, a valuation allowance of $5.0 million has been recognized, to reduce the deferred tax assets related to certain state and foreign net operating loss carryforwards, for which it is more likely than not that the related tax benefits will not be realized, due to uncertainties as to the timing and amounts of future taxable income.

Management has reviewed the Company's historical levels of taxable income, estimates of future taxable income, and expiration periods of net operating loss carryforwards and has concluded that it is more likely than not that the net deferred tax assets of $3.9 million at December 31, 2004 will be realized.

13.    CHANGES IN OPERATING ASSETS:

The following are the cash flow effects of changes in operating assets, excluding the effect of acquisitions and divestitures (in thousands):

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| Receivables, net, retainage and costs and estimated earnings in excess of billings | $ 4,460 | $1,614 | $ (9,921) |
| Inventories | (404) | (200) | 1,313 |
| Prepaid expenses and other assets | 2,818 | (4,605) | (2,414) |
| Accounts payable and accrued expenses | 8,590 | 8,348 | (8,635) |
| Total | $15,464 | $5,157 | $(19,657) |

I 00494

14.    COMMITMENTS AND CONTINGENCIES:

Leases

The Company leases a number of its administrative operations facilities under noncancellable operating leases expiring at various dates through 2020. In addition, the Company leases certain construction, automotive and computer equipment on a multi-year, monthly or daily basis. Rental expense in 2004, 2003 and 2002 was $21.3 million, $17.6 million and $18.6 million, respectively. Rental expense paid to a related party was $460,000, $510,000 and $600,000 for the years ended December 31, 2004, 2003 and 2002, respectively.

At December 31, 2004, the future minimum lease payments required under the noncancellable operating leases were as follows (in thousands):

| Year | Minimum Lease Payments |
|------|------------------------|
| 2005 | $13,687 |
| 2006 | 9,747 |
| 2007 | 8,186 |
| 2008 | 6,958 |
| 2009 | 3,384 |
| After 2009 | 1,961 |
| Total | $43,923 |

Litigation

In the third quarter of 2002, an accident on an Insituform CIPP Process project in Des Moines, Iowa resulted in the death of two workers and the injury of five workers. The Company fully cooperated with Iowa's state OSHA in the investigation of the accident. Iowa OSHA issued a Citation and Notification of Penalty in connection with the accident, including several willful citations. Iowa OSHA proposed penalties of $808,250. The Company challenged Iowa OSHA's findings, and in the fourth quarter of 2003, an administrative law judge reduced the penalties to $158,000. In the second quarter of 2004, the Iowa Employment Appeal Board reinstated many of the original penalties, ordering total penalties in the amount of $733,750. The Company is vigorously opposing the citations and, in connection therewith, filed a notice of appeal with the Iowa district court. On February 4, 2005, the Iowa district court heard oral arguments from the Company and the Employment Appeal Board regarding the appeal.

In July 2004, three separate civil actions were filed in the Iowa district court of Polk County with respect to the Des Moines accident. The first complaint, filed by family members and the Estate of Brian Burford on July 7, 2004, named the Company, Insituform Technologies USA, Inc. (a wholly owned subsidiary of the Company), the City of Des Moines and 15 current or former employees of the Company as defendants. The two other actions, filed on July 6, 2004 by (1) family members and the Estate of Daniel Grasshoff and (2) Michael Walkenhorst, James E. Johnson and Linda Johnson, named the City of Des Moines and the 15 current or former employees of the Company as defendants, but did not name the Company or Insituform USA as defendants. The complaints filed with respect to Messrs. Burford and Grasshoff alleged wrongful death, negligence, gross negligence and civil conspiracy. The complaint filed with respect to Messrs. Walkenhorst and Johnson alleged gross negligence and civil conspiracy. The Company believes that the allegations in each of the complaints are without merit and that the workers' compensation statutes provide the exclusive remedy to the plaintiffs for the deaths and injuries that occurred as a result of the Des Moines accident. The Company intends to vigorously defend the actions. Each complaint sought unspecified damages, including punitive damages.

In December 2003, Environmental Infrastructure Group, L.P. ("EIG") filed suit in the district court of Harris County, Texas, against several defendants, including Kinsel Industries, Inc., a wholly-owned

54

I 00495

subsidiary of the Company, seeking unspecified damages. The suit alleges, among other things, that Kinsel failed to pay EIG monies due under a subcontractor agreement. In February 2004, Kinsel filed an answer, generally denying all claims, and also filed a counter-claim against EIG based upon EIG's failure to perform work required of it under the subcontract. In June 2004, EIG amended its complaint to add the Company as an additional defendant and include a claim for lost opportunity damages. The Company believes that the factual allegations and legal claims made against it and Kinsel are without merit and intends to vigorously defend them.

*Boston Installation*

In August 2003, the Company began an Insituform CIPP Process installation in Boston. The $1 million project required the Company to line 5,400 feet of a 109-year-old, 36- to 41-inch diameter unusually shaped hand-laid rough brick pipe. Many aspects of this project were atypical of the Company's normal Insituform CIPP Process installations. Following installation, the owner rejected approximately 4,500 feet of the liner and all proposed repair methods. All rejected liner was removed and re-installed, and the Company recorded a loss of $5.1 million on this project in the year ended December 31, 2003. The lines are now back in service and the contract is now in a warranty period. The Company will be required to inspect the lines in early 2005 to determine if any problems exist. The Company believes that it has adequately reserved for potential warranty costs at December 31, 2004.

The Company has a "Contractor Rework" special endorsement to its primary comprehensive general liability insurance policy. The Company filed a claim with its primary insurance carrier relative to rework of the Boston project. The carrier has paid the Company the primary coverage of $1 million, less a $250,000 deductible, in satisfaction of its obligations under the policy.

The Company has excess comprehensive general liability insurance coverage. The excess insurance coverage is in an amount far greater than the estimated costs associated with the liner removal and re-installation. The Company believes the "Contractor Rework" special endorsement applies to the excess insurance coverage; it has already incurred costs in excess of the primary coverage and it has put its excess carrier on notice. The excess insurance carrier denied coverage in writing without referencing the "Contractor Rework" special endorsement, and subsequently indicated that it does not believe that the "Contractor Rework" special endorsement applies to the excess insurance coverage.

On March 10, 2004, the Company filed a lawsuit in Massachusetts against its excess insurance carrier for its failure to acknowledge coverage and to indemnify the Company for the entire loss in excess of the primary coverage. The excess insurance carrier filed an answer in response. In early 2005, the court heard separate motions for summary judgment filed by the Company and by the excess insurance carrier. The Company is vigorously pursuing a full recovery of the loss. The Company did not recognize any of the potential excess carrier insurance recovery at December 31, 2004.

*Other Litigation*

The Company is involved in certain other litigation incidental to the conduct of its business and affairs. Management, after consultation with legal counsel, does not believe that the outcome of any such other litigation will have a material adverse effect on its consolidated financial condition, results of operations or cash flows.

Retirement Plans

Substantially all of the Company's employees are eligible to participate in the Company sponsored defined contribution savings plan, which is a qualified plan under the requirements of Section 401(k) of the Internal Revenue Code. Total Company contributions to the domestic plan were $1.9 million, $1.6 million and $1.7 million for the years ended December 31, 2004, 2003 and 2002, respectively.

I 00496

In addition, certain foreign subsidiaries maintain various other defined contribution retirement plans. Company contributions to such plans for the years ended December 31, 2004, 2003 and 2002 were $1.0 million, $0.6 million and $0.2 million, respectively.

Guarantees

The Company has entered into several contractual joint ventures in order to develop joint bids on contracts for its installation business and for tunneling operations. In these cases, the Company could be required to complete the joint venture partner's portion of the contract if the partner were unable to complete its portion. The Company would be liable for any amounts for which the Company itself could not complete the work and for which a third party contractor could not be located to complete the work for the amount awarded in the contract. While the Company would be liable for additional costs, these costs would be offset by any related revenues due under that portion of the contract. The Company has not experienced material adverse results from such arrangements. Based on these facts, while there can be no assurances, the Company currently does not anticipate any future material adverse impact on its consolidated financial position, results of operations or cash flows.

The Company also has many contracts that require the Company to indemnify the other party against loss from claims of patent or trademark infringement. The Company also indemnifies its surety against losses from third party claims of subcontractors. The Company has not experienced material losses under these provisions and, while there can be no assurances, currently does not anticipate any future material adverse impact on its consolidated financial position, results of operations or cash flows.

The Company regularly reviews its exposure under all its engagements, including performance guarantees by contractual joint ventures and indemnification of its surety. As a result of the most recent review, the Company has determined that the risk of material loss is remote under these arrangements and has not recorded a liability for these risks at December 31, 2004 on its consolidated balance sheet.

15.    SEGMENT AND GEOGRAPHIC INFORMATION:

The Company has principally three operating segments: rehabilitation; tunneling; and Tite Liner. The segments were determined based upon the types of products sold by each segment and each is regularly reviewed and evaluated separately. The rehabilitation segment provides trenchless methods of rehabilitating sewers, pipelines and other conduits using a variety of technologies including the Insituform CIPP Process, pipebursting, microtunneling and sliplining. The tunneling segment engages in tunneling used in the installation of new underground services, large diameter microtunneling and sliplining. The Tite Liner segment provides a method of lining new and existing pipe with a corrosion and abrasion resistant polyethylene pipe. These operating segments represent strategic business units that offer distinct products and services and serve different markets.

The following disaggregated financial results have been prepared using a management approach, which is consistent with the basis and manner with which management internally disaggregates financial information for the purpose of assisting in making internal operating decisions. The Company evaluates performance based on stand-alone operating income.

There were no customers which accounted for more than 10% of the Company's revenues during each of the three years ended December 31, 2004, 2003 and 2002.

I 00497

Financial information by segment was as follows at December 31 (in thousands):

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Revenues: | | | |
| Rehabilitation | $409,408 | $366,690 | $377,674 |
| Tunneling | 108,729 | 100,020 | 86,297 |
| Tite Liner | 24,461 | 20,562 | 16,387 |
| Total revenues | $542,598 | $487,272 | $480,358 |
| Operating income (loss): | | | |
| Rehabilitation | $ 17,132 | $ 14,465 | $ 35,208 |
| Tunneling | (13,208) | 3,956 | 12,165 |
| Tite Liner | 4,254 | 3,170 | 2,810 |
| Total operating income | $ 8,178 | $ 21,591 | $ 50,183 |
| Total assets: | | | |
| Rehabilitation | $301,006 | $300,198 | $315,377 |
| Tunneling | 73,822 | 68,494 | 63,218 |
| Tite Liner | 9,349 | 4,906 | 6,204 |
| Corporate | 124,644 | 133,499 | 80,305 |
| Discontinued | – | 1,263 | 7,909 |
| Total assets | $508,821 | $508,360 | $473,013 |
| Capital expenditures: | | | |
| Rehabilitation | $ 22,002 | $ 10,482 | $ 6,093 |
| Tunneling | 8,549 | 7,005 | 12,941 |
| Tite Liner | 1,322 | 1,051 | 353 |
| Corporate | 3,322 | 1,391 | 2,395 |
| Total capital expenditures | $ 35,195 | $ 19,929 | $ 21,782 |
| Depreciation and amortization: | | | |
| Rehabilitation | $ 12,278 | $ 10,146 | $ 10,035 |
| Tunneling | 4,099 | 3,811 | 2,570 |
| Tite Liner | 797 | 1,280 | 880 |
| Corporate | 2,264 | 1,879 | 2,345 |
| Total depreciation and amortization | $ 19,438 | $ 17,116 | $ 15,830 |

During 2004, the tunneling segment experienced significant negative gross margin adjustments on one large tunneling project in the amount of $11.0 million, $7.3 million of which occurred in the fourth quarter. During the third quarter of 2004, the Company recorded a downward adjustment to the gross margin on this project of $3.7 million.

I 00498

Financial information by geographic area was as follows at December 31 (in thousands):

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| Revenues: |  |  |  |
| United States | $439,618 | $401,174 | $408,218 |
| Canada | 25,595 | 22,767 | 19,339 |
| Other foreign | 77,385 | 63,331 | 52,801 |
| Total revenues | $542,598 | $487,272 | $480,358 |
| Operating income: |  |  |  |
| United States | $    946 | $ 13,525 | $ 43,502 |
| Canada | 4,005 | 3,327 | 2,616 |
| Other foreign | 3,227 | 4,739 | 4,065 |
| Total operating income | $   8,178 | $ 21,591 | $ 50,183 |
| Long-lived assets: |  |  |  |
| United States | $ 88,442 | $ 80,641 | $ 70,924 |
| Canada | 2,066 | 2,330 | 2,772 |
| Other foreign | 17,905 | 16,503 | 15,634 |
| Total long-lived assets | $108,413 | $ 99,474 | $ 89,330 |

16.    <u>SUBSEQUENT EVENTS:</u>

As a result of the net loss incurred in the fourth quarter of 2004, the Company was out of compliance with the fixed charges coverage ratio under its Series A Senior Notes as of December 31, 2004. The actual fixed charges coverage ratio at December 31, 2004 was 1.64 to 1.0 as compared with the required minimum fixed charges coverage ratio under the Series A Senior Notes of 1.7 to 1.0 at December 31, 2004. The default under the Series A Senior Notes resulted in a cross-default under the Series 2003-A Senior Notes and the bank line of credit facility with Bank of America. On March 16, 2005, the Series A Senior Note holders and the Series 2003-A Senior Note holders waived the default and cross-default as of December 31, 2004, and amended the debt covenants under the Series A and the Series 2003-A Senior Notes. The bank also waived the cross-default as of December 31, 2004 and agreed to incorporate the amended debt covenants of the Series A Senior Notes and the Series 2003-A Senior Notes into its credit facility. The Company expects to maintain covenant compliance with respect to the amended covenants throughout 2005 and beyond.

Effective March 16, 2005, the Company agreed to increase the interest rate on the Series A Senior Notes from 7.88% per annum to 8.88% per annum and to increase the interest rate on the Series 2003-A Senior Notes from 5.29% per annum to 6.54% per annum, to obtain the default and cross-default waivers and the less restrictive financial covenants. The Company also paid its creditors approximately $240,000 in fees to obtain the waivers and amendments. The Company will expense financing costs of $0.5 million in the first quarter of 2005 related to these amendments. The table below sets forth the new covenants, which were effective on March 16, 2005:

I 00499

| Description of Covenant | Fiscal Quarter | Amended Covenant[2,3] |
|---|---|---|
| **$110 million 8.88% Senior Notes, Series A, due February 14, 2007 and $65 million 6.54% Senior Notes, Series 2003-A, due April 24, 2013** | | |
| Fixed charge coverage ratio[1] | First quarter 2005 | No less than 1.25 to 1.0 |
| | Second quarter 2005 | No less than 1.25 to 1.0 |
| | Third quarter 2005 | No less than 1.50 to 1.0 |
| | Fourth quarter 2005 | No less than 1.75 to 1.0 |
| | First quarter 2006 | No less than 2.00 to 1.0 |
| Ratio of consolidated indebtedness to EBITDA[1] | First quarter 2005 | No greater than 4.25 to 1.0 |
| | Second quarter 2005 | No greater than 4.00 to 1.0 |
| | Third quarter 2005 | No greater than 4.00 to 1.0 |
| | Fourth quarter 2005 | No greater than 3.00 to 1.0 |
| | First quarter 2006 | No greater than 3.00 to 1.0 |
| Consolidated net worth[1] | First quarter 2005 and each quarter thereafter | No less than $260 million plus 50% of net income after December 31, 2004 on a cumulative basis |
| Consolidated indebtedness to consolidated capitalization[1] | First quarter 2005 and each quarter thereafter | No greater than 0.45 to 1.0 |

---

(1)    The ratios are calculated as defined in the Note Purchase Agreements, as amended, which have been incorporated into the Company's Annual Report on Form 10-K for the year ended December 31, 2004 as exhibits 10.2 and 10.3.

(2)    The ratios for each quarter are based on rolling four-quarter calculations of profitability. The loss in the fourth quarter of 2004 will have a negative impact on the ratios through the third quarter of 2005.

(3)    The line of credit facility with Bank of America has incorporated the amended covenants for the Series A Senior Notes and the Series 2003-A Senior Notes into the line of credit agreement. See Note 9 for additional information regarding the credit facility.

I 00500

17.    SELECTED QUARTERLY FINANCIAL DATA (UNAUDITED):

(In thousands, except per share data)

| | First | Second | Third | Fourth[1,2] |
|---|---|---|---|---|
| Year ended December 31, 2004: | | | | |
| Revenues | $127,914 | $142,434 | $144,821 | $127,429 |
| Gross profit | 25,367 | 30,564 | 30,276 | 13,292 |
| Operating income (loss) | 3,375 | 7,590 | 8,075 | (10,862) |
| Net income (loss) | 502 | 3,156 | 3,526 | (6,587) |
| Basic earnings per share: | | | | |
| Income (loss) from continuing operations | 0.02 | 0.12 | 0.13 | (0.25) |
| Diluted earnings per share: | | | | |
| Net income (loss) | 0.02 | 0.12 | 0.13 | (0.25) |
| | | | | |
| Year ended December 31, 2003: | | | | |
| Revenues | $123,348 | $124,778 | $117,360 | $121,786 |
| Gross profit | 28,269 | 29,267 | 27,419 | 17,703 |
| Operating income (loss) | 11,186 | 10,285 | 7,771 | (7,651) |
| Income (loss) from continuing operations | 6,351 | 4,877 | 3,500 | (10,100) |
| Income (loss) from discontinued operations | 276 | (292) | (215) | (872) |
| Net income (loss) | 6,627 | 4,585 | 3,285 | (10,972) |
| Basic earnings (loss) per share: | | | | |
| Income (loss) from continuing operations | 0.24 | 0.18 | 0.13 | (0.38) |
| Income (loss) from discontinued operations | 0.01 | (0.01) | (0.01) | (0.03) |
| Net income (loss) | 0.25 | 0.17 | 0.12 | (0.41) |
| Diluted earnings (loss) per share: | | | | |
| Income (loss) from continuing operations | 0.24 | 0.18 | 0.13 | (0.38) |
| Income (loss) from discontinued operations | 0.01 | (0.01) | (0.01) | (0.03) |
| Net income (loss) | 0.25 | 0.17 | 0.12 | (0.41) |

---

(1)    See Note 15 for a description of issues experienced in the tunneling segment in 2004.

(2)    See Notes 7, 11 and 12 for discussion of certain fourth quarter 2003 items.

I 00501

Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure

     Not applicable.

Item 9A. Controls and Procedures

     The Company's Chief Executive Officer and Chief Financial Officer carried out an evaluation of the effectiveness of the Company's disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) as of December 31, 2004. Based on their evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls were effective at December 31, 2004.

     The Company maintains internal controls and procedures designed to ensure that it is able to collect the information subject to required disclosure in reports it files with the United States Securities and Exchange Commission (the "SEC"), and to process, summarize and disclose this information within the time specified by the rules set forth by the SEC.

     Pursuant to Section 404 of the Sarbanes-Oxley Act, the Company has included a report that provides management's assessment of the Company's internal control over financial reporting as part of this Annual Report on Form 10-K for the year ended December 31, 2004. The Company's independent registered public accounting firm attested to, and reported on, this report. Their attestation report, along with management's report, are included in Item 8 of this report under the captions entitled "Report of Independent Registered Public Accounting Firm" and "Management's Report on Internal Control Over Financial Reporting," respectively, and are incorporated herein by reference.

     There were changes in the Company's internal control over financial reporting that occurred during the Company's quarter ended December 31, 2004 that materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

     During the fourth quarter of 2004, and during the period leading up to the filing of the Company's Annual Report on Form 10-K for the year ended December 31, 2004, enhancements of internal control took place, specifically in the tunneling segment, as follows:

- enhanced monthly project status review procedures and reporting;
- increased supervisory and management reviews of project risks and controls; and
- improved procedures concerning bid selection and risk mitigation processes.

Item 9B. Other Information

     Not applicable.

I 00502

**PART III**

<u>Item 10</u>. <u>Directors and Executive Officers of the Registrant</u>

For information concerning this item, see "Item 4A. Executive Officers of the Registrant" and the proxy statement to be filed with respect to the 2005 Annual Meeting of Stockholders (the "2005 Proxy Statement"), which information is incorporated herein by reference.

<u>Item 11</u>. <u>Executive Compensation</u>

For information concerning this item, see the 2005 Proxy Statement, which information is incorporated herein by reference.

<u>Item 12</u>. <u>Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters</u>

For information concerning this item, see the 2005 Proxy Statement, which information is incorporated herein by reference.

<u>Item 13</u>. <u>Certain Relationships and Related Transactions</u>

For information concerning this item, see the 2005 Proxy Statement, which information is incorporated herein by reference.

<u>Item 14</u>. <u>Principal Accountant Fees and Services</u>

For information concerning this item, see the 2005 Proxy Statement, which information is incorporated herein by reference.

**PART IV**

<u>Item 15</u>. <u>Exhibits and Financial Statement Schedules</u>

(a)    1.    Financial Statements:

The consolidated financial statements filed in this Annual Report on Form 10-K are listed in the Index to Consolidated Financial Statements included in "Item 8. Financial Statements and Supplementary Data," which information is incorporated herein by reference.

2.    Financial Statement Schedules:

No financial statement schedules are included herein because of the absence of conditions under which they are required or because the required information is contained in the consolidated financial statements or notes thereto contained in this report.

3.    Exhibits:

The exhibits required to be filed as part of this Annual Report on Form 10-K are listed in the Index to Exhibits attached hereto.

I 00503

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Dated: March 16, 2005                  INSITUFORM TECHNOLOGIES, INC.

By: /s/ Christian G. Farman
  Christian G. Farman
  Senior Vice President and
  Chief Financial Officer

## POWER OF ATTORNEY

The registrant and each person whose signature appears below hereby appoint Thomas S. Rooney, Jr. and Christian G. Farman as attorneys-in-fact with full power of substitution, severally, to execute in the name and on behalf of the registrant and each such person, individually and in each capacity stated below, one or more amendments to the annual report which amendments may make such changes in the report as the attorney-in-fact acting deems appropriate and to file any such amendment to the report with the Securities and Exchange Commission.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Thomas S. Rooney, Jr. <br> Thomas S. Rooney, Jr. | Principal Executive Officer and Director | March 16, 2005 |
| /s/ Christian G. Farman <br> Christian G. Farman | Principal Financial and Accounting Officer | March 16, 2005 |
| /s/ Alfred L. Woods <br> Alfred L. Woods | Director | March 16, 2005 |
| /s/ Robert W. Affholder <br> Robert W. Affholder | Director | March 16, 2005 |
| /s/ Paul A. Biddelman <br> Paul A. Biddelman | Director | March 16, 2005 |
| /s/ Stephen P. Cortinovis <br> Stephen P. Cortinovis | Director | March 16, 2005 |

I 00504

| | | |
|---|---|---|
| /s/ John P. Dubinsky | Director | March 16, 2005 |
| John P. Dubinsky | | |
| /s/ Juanita H. Hinshaw | Director | March 16, 2005 |
| Juanita H. Hinshaw | | |
| | Director | March 16, 2005 |
| Thomas Kalishman | | |
| /s/ Alfred T. McNeill | Director | March 16, 2005 |
| Alfred T. McNeill | | |
| /s/ Sheldon Weinig | Director | March 16, 2005 |
| Sheldon Weinig | | |

64

I 00505

**Index to Exhibits** (1,2)

3.1    Restated Certificate of Incorporation, as amended, of the Company (incorporated by reference to Exhibit 3.1 to the quarterly report on Form 10-Q for the quarter ended June 30, 2000), and Certificate of Designation, Preferences and Rights of Series A Junior Participating Preferred Stock (incorporated by reference to Exhibit 3.1 to the annual report on Form 10-K for the year ended December 31, 2001).

3.2    Amended and Restated By-Laws of the Company, as amended through July 22, 2003 (incorporated by reference to Exhibit 3.1 to the quarterly report on Form 10-Q for the quarter ended June 30, 2003).

4    Rights Agreement dated as of February 26, 2002 between Insituform Technologies, Inc. and American Stock Transfer & Trust Company (incorporated by reference to Exhibit 1 to the Registration Statement on Form 8-A dated March 8, 2002).

10.1    Credit Agreement (the "Credit Agreement") dated as of March 27, 2003 among the Company, Bank of America, N.A. as Administrative Agent, and Letter of Credit Issuing Lender and the other Financial Institutions party thereto (incorporated by reference to Exhibit 10.1 to the annual report on Form 10-K for the year ended December 31, 2002), as amended by First Amendment to Credit Agreement dated as of November 26, 2003 (incorporated by reference to Exhibit 10.1 to the current report on Form 8-K dated and filed December 1, 2003), as amended and superseded by Amended and Restated Credit Agreement dated as of March 12, 2004 (incorporated by reference to Exhibit 10.1 to the annual report on Form 10-K for the year ended December 31, 2003), as further amended by First Amendment to Credit Agreement dated as of March 16, 2005, filed herewith.

10.2    Note Purchase Agreements (the "Note Purchase Agreements") dated as of February 14, 1997 among the Company and, respectively, each of the lenders (the "Noteholders") listed therein (incorporated by reference to Exhibit 10.6 to the annual report on Form 10-K for the year ended December 31, 1996), as amended by First Amendment to the Note Purchase Agreements dated as of August 20, 1997 (incorporated by reference to Exhibit 10(a) to the quarterly report on Form 10-Q for the quarter ended September 30, 1997), as further amended by Second Amendment dated as of March 30, 2000 to Note Purchase Agreements (incorporated by reference to Exhibit 10.3 to the quarterly report on Form 10-Q for the quarter ended March 31, 2000), as further amended by Third Amendment dated as of February 28, 2003 to Note Purchase Agreements (incorporated by reference to Exhibit 10.2 to the annual report on Form 10-K for the year ended December 31, 2002), as further amended by Fourth Amendment dated as of March 12, 2004 (incorporated by reference to Exhibit 10.2 to the annual report on Form 10-K for the year ended December 31, 2003), as further amended by Fifth Amendment dated as of March 16, 2005, filed herewith.

10.3    Note Purchase Agreement (the "Note Purchase Agreement") dated as of April 24, 2003 among the Company and each of the lenders listed therein (incorporated by reference to Exhibit 10.1 to the quarterly report on Form 10-Q for the quarter ended March 31, 2003), as further amended by First Amendment dated as of March 12, 2004 (incorporated by reference to Exhibit 10.3 to the annual report on Form 10-K for the year ended December 31, 2003), as further amended by Second Amendment dated as of March 16, 2005, filed herewith.

10.4    Master Guaranty dated as of March 27, 2003 by the Company and those subsidiaries of the Company named therein (incorporated by reference to Exhibit 10.3 to the annual report on Form 10-K for the year ended December 31, 2002).

I 00506

10.5    Amended and Restated Intercreditor Agreement dated as of April 24, 2003 among Bank of America, N.A. and the Noteholders (incorporated by reference to Exhibit 10.2 to the quarterly report on Form 10-Q for the quarter ended March 31, 2003).

10.6    Employment Letter dated March 7, 2003 between the Company and Thomas S. Rooney, Jr. (incorporated by reference to Exhibit 10.3 to the quarterly report on Form 10-Q for the quarter ended March 31, 2003), as amended by Amendment dated March 1, 2004 (incorporated by reference to Exhibit 10.6 to the annual report on Form 10-K for the year ended December 31, 2003). (3)

10.7    Executive Separation Agreement and Release effective as of June 18, 2004 by and between the registrant and Thomas A. A. Cook (incorporated by reference to Exhibit 10.1 to the quarterly report on Form 10-Q for the quarter ended June 30, 2004). (3)

10.8    Employment Letter dated August 25, 2004 between the Company and Thomas W. Vaughn (incorporated by reference to Exhibit 10.1 to the current report on Form 8-K dated and filed September 3, 2004). (3)

10.9    Employment Letter dated December 23, 2004 between the Company and David F. Morris, filed herewith. (3)

10.10    Executive Separation Agreement and Release effective as of July 22, 2003 by and between the registrant and Anthony W. Hooper (incorporated by reference to Exhibit 10.1 to the quarterly report on Form 10-Q for the quarter ended June 30, 2003). (3)

10.11    Employment Letter dated December 1, 2003 between the Company and Christian G. Farman (incorporated by reference to Exhibit 10.1 to the current report on Form 8-K dated and filed December 4, 2003). (3)

10.12    Employment Separation Agreement and Release effective as of December 4, 2003 by and between the Company and Joseph A. White (incorporated by reference to Exhibit 10.13 to the annual report on Form 10-K for the year ended December 31, 2003). (3)

10.13    Employee Separation Agreement and Release effective as of July 1, 2003 by and between the Company and Carroll W. Slusher (incorporated by reference to Exhibit 10.2 to the quarterly report on Form 10-Q for the quarter ended June 30, 2003). (3)

10.14    Employment Agreement dated October 25, 1995 between the Company and Robert W. Affholder (incorporated by reference to Exhibit 2(d) to the Current Report on Form 8-K dated October 25, 1995), as amended by Amendment No. 1 dated as of October 25, 1998 to Employment Agreement (incorporated by reference to Exhibit 10.9 to the annual report on Form 10-K for the year ended December 31, 1998), and as amended by Amendment No. 2 dated as of December 31, 1999 to Employment Agreement, and as amended by Amendment No. 3 dated as of December 31, 2000 to Employment Agreement (incorporated by reference to Exhibit 10.1 to the quarterly report on Form 10-Q for the quarter ended March 31, 2001), and as amended by Amendment No. 4 dated as of December 31, 2001 to Employment Agreement (incorporated by reference to Exhibit 10.6 to the annual report on Form 10-K for the year ended December 31, 2001), and as amended by Amendment No. 5 dated as of December 31, 2002 to Employment Agreement (incorporated by reference to Exhibit 10.8 to the annual report on Form 10-K for the year ended December 31, 2002), and as amended by Letter Agreement dated March 1, 2004 (incorporated by reference to Exhibit 10.15 to the annual report on Form 10-K for the year ended December 31, 2003). (3)

10.15   Equipment Lease for 125 Ton American Crane [1] dated as of January 1, 2005 between A-Y-K-E Partnership and Affholder, Inc., filed herewith.

10.16   Equipment Lease for 100 Ton Link Belt Crane dated as of January 1, 2005 between A-Y-K-E Partnership and Affholder, Inc., filed herewith.

10.17   Equipment Lease for 125 Ton American Crane [2] dated as of January 1, 2005 between A-Y-K-E Partnership and Affholder, Inc., filed herewith.

10.18   Equipment Lease for 110 Ton American Crane dated as of January 1, 2005 between A-Y-K-E Partnership and Affholder, Inc., filed herewith.

10.19   Equipment Lease for Lovat 121" Tunnel Boring Machine dated as of January 1, 2005 between A-Y-K-E Partnership and Affholder, Inc., filed herewith.

10.20   1992 Employee Stock Option Plan of the Company (incorporated by reference to Exhibit 10.11 to the annual report on Form 10-K for the year ended December 31, 1999). (3)

10.21   1992 Director Stock Option Plan of the Company (incorporated by reference to Exhibit 10.12 to the annual report on Form 10-K for the year ended December 31, 1999). (3)

10.22   Amended and Restated 2001 Employee Equity Incentive Plan (incorporated by reference to Appendix C to the definitive proxy statement on Schedule 14A filed on April 16, 2003 in connection with the 2003 annual meeting of stockholders). (3)

10.23   Amended and Restated 2001 Non-Employee Director Equity Incentive Plan (incorporated by reference to Appendix B to the definitive proxy statement on Schedule 14A filed on April 16, 2003 in connection with the 2003 annual meeting of stockholders). (3)

10.24   Long-Term Incentive Plan (incorporated by reference to Exhibit 10.3 to the quarterly report on Form 10-Q for the quarter ended June 30, 2001). (3)

10.25   Insituform Mid-America, Inc. Stock Option Plan, as amended (incorporated by reference to Exhibit 4(i) to the Registration Statement on Form S-8 No. 33-63953). (3)

10.26   Senior Management Voluntary Deferred Compensation Plan of the Company (incorporated by reference to Exhibit 10.19 to the annual report on Form 10-K for the year ended December 31, 1998), as amended by First Amendment thereto dated as of October 25, 2000 (incorporated by reference to Exhibit 10.15 to the annual report on Form 10-K for the year ended December 31, 2000). (3)

10.27   Form of Directors' Indemnification Agreement (incorporated by reference to Exhibit 10.3 to the quarterly report on Form 10-Q for the quarter ended June 30, 2002). (3)

21      Subsidiaries of the Company, filed herewith.

23      Consent of PricewaterhouseCoopers LLP, filed herewith.

24      Power of Attorney (set forth on signature page).

31.1    Certification of Thomas S. Rooney, Jr. pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, filed herewith.

31.2    Certification of Christian G. Farman pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, filed herewith.

32.1    Certification of Thomas S. Rooney, Jr. pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, filed herewith.

32.2    Certification of Christian G. Farman pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, filed herewith.

---

(1)    The Company's current, quarterly and annual reports are filed with the Securities and Exchange Commission under file no. 0-10786.

(2)    Pursuant to Reg. Section 229.601, does not include certain instruments with respect to long-term debt of the Company and its consolidated subsidiaries not exceeding 10% of the total assets of the Company and its subsidiaries on a consolidated basis.  The Company undertakes to furnish to the Securities and Exchange Commission, upon request, a copy of all long-term debt instruments not filed herewith.

(3)    Management contract or compensatory plan or arrangement.

*       *       *

Documents listed in this Index to Exhibits will be made available upon written request.

Sumamry of AIG Impact

| | Original Interest to Maturity | Projected Interst to Maturity | Variance | Waiver Fees | Other Fees | Total AIG Impact |
|---|---|---|---|---|---|---|
| 1997 Series A Note | 4,186,913 | 4,598,263 | 411,350 | - | | 411,350 |
| 2003 Series Note | 32,698,740 | 35,338,808 | 2,640,068 | 497,500 | | 3,137,568 |
| Total | 36,885,653 | 39,937,071 | 3,051,419 | 497,500 | - | 3,548,919 |

Incremental Costs vs. Original Coupon

| | 2/2/2008 | To Maturity |
|---|---|---|
| Interest Costs | 1,348,954 | 3,051,419 |
| Waiver fees | 497,500 | 497,500 |
| **Total** | **1,846,454** | **3,548,919** |

I 00511

## 2007 Debt

| | Date | Principal | Days | Coupon |
|---|---|---|---|---|
| Starting Principal | 12/31/2004 | 47,283,000 | | 7.88% |
| Principal Balance 02/14/05 | 2/14/2005 | 31,536,000 | 45 | 7.88% |
| 1st Amendment - Aig Claim Impact 100bps bump | 3/16/2005 | 31,536,000 | 30 | 8.80% |
| Principal Balance 02/14/06 | 2/14/2006 | 15,768,000 | 335 | 8.80% |
| Principal Balance 02/14/07 | 2/14/2007 | - | 365 | 8.80% |

**Incremental Coupon**

| | |
|---|---|
| Starting Principal | 459,358 |
| Principal Balance 02/14/05 | 204,250 |
| 1st Amendment - Aig Claim Impact | 2,547,072 |
| Principal Balance 02/14/06 | 1,387,584 |
| **Total Interest** | **4,598,263** |

## Incremental Interest and Waiver Fees Paid from Issuance to Maturity

| | Interest | Waivers Paid | Total Interest and Waivers Paid |
|---|---|---|---|
| Interest Costs to Maturity 7.88% debt | 4,186,913 | | |
| 1st Amendment - Aig Claim Impact | 4,598,263 | Included on 2013 debt summary | |
| Total | | | |
| **Variance** | **$ 411,350** | | |

I 00512

## 2013 Debt

Principal $ 65,000,000

| | Date | Days | Coupon |
|---|---|---|---|
| Start date | 12/31/2004 | | 6.04% |
| 1st Amendment - Aig Claim Impact - 50bps bump | 3/16/2005 | 75 | 6.54% |
| 2nd amendment - Closure Announcement | 3/28/2007 | 742 | 6.54% |
| Remaining Term | 4/28/2013 | 2,223 | 6.54% |

**Incremental Coupon**

| | |
|---|---|
| 1st Amendment - Aig Claim Impact | 806,712.33 |
| 2nd amendment - Closure Announcement | 8,641,758.90 |
| Remaining Term | 25,890,336.99 |
| **Total Interest** | **35,338,808** |

**Waiver Fees**

| | |
|---|---|
| 1st Amendment - Aig Claim Impact | $ 260,000.00 |
| 2nd amendment - Closure Announcement | $ 237,500.00 |
| **Total Fees/Amendments** | **$ 497,500** |

## Incremental Interest and Waiver Fees Paid from Issuance to Maturity

| | Interest | Waivers Paid | Total Interest and Waivers Paid |
|---|---|---|---|
| Interest Costs to Maturity 6.04% debt | 32,698,740 | 0 | |
| | | | |
| 1st Amendment - Aig Claim Impact | | $ 260,000 | Need legal fees incl admin fees |
| 2nd amendment - Closure Announcement | | $ 237,500 | |
| Total | 35,338,808 | $ 497,500 | 35,836,308 |
| | | | |
| Variance | $ 2,640,068 | $ 497,500 | 3,137,568 |

I 00513

Principal    $   65,000,000.00

| | Date | Days | Coupon |
|---|---|---|---|
| Start date | 4/24/2003 | | 5.29% |
| 1st amendment date | 3/12/2004 | 323 | 6.04% |
| 2nd amendment | 3/16/2005 | 369 | 6.54% |
| 3rd Amendment | 1/1/2008 | 1,021 | 8.04% |
| Remaining Term | 4/24/2013 | 1,940 | 8.04% |

**Incremental Coupon**

| | |
|---|---|
| Pre-amendment to 1st amendment Coupon Term | 3,042,836.99 |
| 1st Coupon amendment Term | 3,969,024.66 |
| 2nd Coupon amendment Term | 11,891,153.42 |
| 3 rd Coupon amendment to TermTerm | 28,966,971.43 |
| **Total Interest** | **47,869,986.50** |

**Waiver Fees**

| | |
|---|---|
| 1st Waiver 2004 | $ 139,000.00 |
| 2nd waiver 2005 | $ 170,651.00 |
| 3rd Amendend 2007 - altholder | $ 34,200.00 |
| 4th amendment 2008 | $ 325,000.00 |
| **Total fees/Amendments** | **$ 668,851.00** |

### Incremental Interest and Waiver Fees Paid from Issuance to Maturity

| | Interest | Waivers Paid | Total Interest and Waivers | Dolts to Original Coupon* | |
|---|---|---|---|---|---|
| Current Coupon 6.54% | $ 42,465,701 | $ 343,851 | $ 42,809,552 | $ 8,396,290 | |
| Best Case - Coupon Bump 100bps - 7.54% | $ 46,068,558 | $ 506,351 | $ 46,574,909 | $ 12,161,647 | |
| Worst Case - Coupon Bump 150bps - 8.04% | $ 47,869,986 | $ 668,851 | $ 48,538,837 | $ 14,125,576 | $ 5,404,285 |
| * Interest on Original Coupon 5.29% | $ 34,413,262 | | | | 325,000 |
| | | | | | $ 5,729,285 |

Payments through 10/24/07    $   2,872,021

# CODE OF PROFESSIONAL CONDUCT

### As Adopted January 12, 1988, amended January 14, 1992 and October 28, 1997

## INTRODUCTION

## Composition, Applicability, and Compliance

The Code of Professional Conduct of the American Institute of Certified Public Accountants consists of two sections—(1) the Principles and (2) the Rules. The Principles provide the framework for the Rules, which govern the performance of professional services by members. The Council of the American Institute of Certified Public Accountants is authorized to designate bodies to promulgate technical standards under the Rules, and the bylaws require adherence to those Rules and standards.

The Code of Professional Conduct was adopted by the membership to provide guidance and rules to all members—those in public practice, in industry, in government, and in education—in the performance of their professional responsibilities.

Compliance with the Code of Professional Conduct, as with all standards in an open society, depends primarily on members' understanding and voluntary actions, secondarily on reinforcement by peers and public opinion, and ultimately on disciplinary proceedings, when necessary, against members who fail to comply with the Rules.

## Other Guidance

*Interpretations of Rules of Conduct* consist of interpretations which have been adopted, after exposure to state societies, state boards, practice units and other interested parties, by the professional ethics division's executive committee to provide guidelines as to the scope and application of the Rules but are not intended to limit such scope or application. A member who departs from such guidelines shall have the burden of justifying such departure in any disciplinary hearing. *Interpretations* which existed before the adoption of the Code of Professional Conduct on January 12, 1988, will remain in effect until further action is deemed necessary by the appropriate senior technical committee.

*Ethics Rulings* consist of formal rulings made by the professional ethics division's executive committee after exposure to state societies, state boards, practice units and other interested parties. These rulings summarize the application of Rules of Conduct and Interpretations to a particular set of factual circumstances. Members who depart from such rulings in similar circumstances will be requested to justify such departures. *Ethics Rulings* which existed before the adoption of the Code of Professional Conduct on January 12, 1988, will remain in effect until further action is deemed necessary by the appropriate senior technical committee.

*Introduction*

C&S 0128
432636.00014

**4270**                        Code of Professional Conduct

Publication of an Interpretation or Ethics Ruling in *The Journal of Accountancy* constitutes notice to members. Hence, the effective date of the pronouncement is the last day of the month in which the pronouncement is published in *The Journal of Accountancy*. The professional ethics division will take into consideration the time that would have been reasonable for the member to comply with the pronouncement.

A member should also consult, if applicable, the ethical standards of his state CPA society, state board of accountancy, the Securities and Exchange Commission, and any other governmental agency which may regulate his client's business or use his report to evaluate the client's compliance with applicable laws and related regulations.

———————————

[The next page is 4275.]

**Introduction**

C&S 0129
432636.00014

# Section 50

# PRINCIPLES OF PROFESSIONAL CONDUCT

## TABLE OF CONTENTS

| Section | | Paragraph |
|---|---|---|
| 51 | Preamble | .01-.02 |
| 52 | Article I—Responsibilities | .01 |
| 53 | Article II—The Public Interest | .01-.04 |
| 54 | Article III—Integrity | .01-.04 |
| 55 | Article IV—Objectivity and Independence | .01-.04 |
| 56 | Article V—Due Care | .01-.05 |
| 57 | Article VI—Scope and Nature of Services [Revised] | .01-.03 |

**[The next page is 4281.]**

**Contents**

**C&S 0130**
432636.00014

# ET Section 51

## *Preamble*

.01  Membership in the American Institute of Certified Public Accountants is voluntary. By accepting membership, a certified public accountant assumes an obligation of self-discipline above and beyond the requirements of laws and regulations.

.02  These Principles of the Code of Professional Conduct of the American Institute of Certified Public Accountants express the profession's recognition of its responsibilities to the public, to clients, and to colleagues. They guide members in the performance of their professional responsibilities and express the basic tenets of ethical and professional conduct. The Principles call for an unswerving commitment to honorable behavior, even at the sacrifice of personal advantage.

---

[The next page is 4291.]

ET §51.02

C&S 0131
432636.00014

# ET Section 52

## *Article I—Responsibilities*

> *In carrying out their responsibilities as professionals, members should exercise sensitive professional and moral judgments in all their activities.*

**.01**  As professionals, certified public accountants perform an essential role in society. Consistent with that role, members of the American Institute of Certified Public Accountants have responsibilities to all those who use their professional services. Members also have a continuing responsibility to cooperate with each other to improve the art of accounting, maintain the public's confidence, and carry out the profession's special responsibilities for self-governance. The collective efforts of all members are required to maintain and enhance the traditions of the profession.

---

[The next page is 4301.]

ET §52.01

C&S 0132
432636.00014

# ET Section 53

## *Article II—The Public Interest*

> *Members should accept the obligation to act in a way that
> will serve the public interest, honor the public trust, and
> demonstrate commitment to professionalism.*

**.01** A distinguishing mark of a profession is acceptance of its responsibility to the public. The accounting profession's public consists of clients, credit grantors, governments, employers, investors, the business and financial community, and others who rely on the objectivity and integrity of certified public accountants to maintain the orderly functioning of commerce. This reliance imposes a public interest responsibility on certified public accountants. The public interest is defined as the collective well-being of the community of people and institutions the profession serves.

**.02** In discharging their professional responsibilities, members may encounter conflicting pressures from among each of those groups. In resolving those conflicts, members should act with integrity, guided by the precept that when members fulfill their responsibility to the public, clients' and employers' interests are best served.

**.03** Those who rely on certified public accountants expect them to discharge their responsibilities with integrity, objectivity, due professional care, and a genuine interest in serving the public. They are expected to provide quality services, enter into fee arrangements, and offer a range of services—all in a manner that demonstrates a level of professionalism consistent with these Principles of the Code of Professional Conduct.

**.04** All who accept membership in the American Institute of Certified Public Accountants commit themselves to honor the public trust. In return for the faith that the public reposes in them, members should seek continually to demonstrate their dedication to professional excellence.

---

**[The next page is 4311.]**

ET §53.04

C&S 0133
432636.00014

# ET Section 54

# *Article III—Integrity*

*To maintain and broaden public confidence, members should perform all professional responsibilities with the highest sense of integrity.*

.01  Integrity is an element of character fundamental to professional recognition. It is the quality from which the public trust derives and the benchmark against which a member must ultimately test all decisions.

.02  Integrity requires a member to be, among other things, honest and candid within the constraints of client confidentiality. Service and the public trust should not be subordinated to personal gain and advantage. Integrity can accommodate the inadvertent error and the honest difference of opinion; it cannot accommodate deceit or subordination of principle.

.03  Integrity is measured in terms of what is right and just. In the absence of specific rules, standards, or guidance, or in the face of conflicting opinions, a member should test decisions and deeds by asking: "Am I doing what a person of integrity would do? Have I retained my integrity?" Integrity requires a member to observe both the form and the spirit of technical and ethical standards; circumvention of those standards constitutes subordination of judgment.

.04  Integrity also requires a member to observe the principles of objectivity and independence and of due care.

---

[The next page is 4321.]

ET §54.04

C&S 0134
432636.00014

# ET Section 55

# *Article IV—Objectivity and Independence*

> *A member should maintain objectivity and be free of conflicts of interest in discharging professional responsibilities. A member in public practice should be independent in fact and appearance when providing auditing and other attestation services.*

**.01**  Objectivity is a state of mind, a quality that lends value to a member's services. It is a distinguishing feature of the profession. The principle of objectivity imposes the obligation to be impartial, intellectually honest, and free of conflicts of interest. Independence precludes relationships that may appear to impair a member's objectivity in rendering attestation services.

**.02**  Members often serve multiple interests in many different capacities and must demonstrate their objectivity in varying circumstances. Members in public practice render attest, tax, and management advisory services. Other members prepare financial statements in the employment of others, perform internal auditing services, and serve in financial and management capacities in industry, education, and government. They also educate and train those who aspire to admission into the profession. Regardless of service or capacity, members should protect the integrity of their work, maintain objectivity, and avoid any subordination of their judgment.

**.03**  For a member in public practice, the maintenance of objectivity and independence requires a continuing assessment of client relationships and public responsibility. Such a member who provides auditing and other attestation services should be independent in fact and appearance. In providing all other services, a member should maintain objectivity and avoid conflicts of interest.

**.04**  Although members not in public practice cannot maintain the appearance of independence, they nevertheless have the responsibility to maintain objectivity in rendering professional services. Members employed by others to prepare financial statements or to perform auditing, tax, or consulting services are charged with the same responsibility for objectivity as members in public practice and must be scrupulous in their application of generally accepted accounting principles and candid in all their dealings with members in public practice.

---

[The next page is 4331.]

ET §55.04

**C&S 0135**
432636.00014

## ET Section 56

# Article V—Due Care

*A member should observe the profession's technical and ethical standards, strive continually to improve competence and the quality of services, and discharge professional responsibility to the best of the member's ability.*

.01   The quest for excellence is the essence of due care. Due care requires a member to discharge professional responsibilities with competence and diligence. It imposes the obligation to perform professional services to the best of a member's ability with concern for the best interest of those for whom the services are performed and consistent with the profession's responsibility to the public.

.02   Competence is derived from a synthesis of education and experience. It begins with a mastery of the common body of knowledge required for designation as a certified public accountant. The maintenance of competence requires a commitment to learning and professional improvement that must continue throughout a member's professional life. It is a member's individual responsibility. In all engagements and in all responsibilities, each member should undertake to achieve a level of competence that will assure that the quality of the member's services meets the high level of professionalism required by these Principles.

.03   Competence represents the attainment and maintenance of a level of understanding and knowledge that enables a member to render services with facility and acumen. It also establishes the limitations of a member's capabilities by dictating that consultation or referral may be required when a professional engagement exceeds the personal competence of a member or a member's firm. Each member is responsible for assessing his or her own competence—of evaluating whether education, experience, and judgment are adequate for the responsibility to be assumed.

.04   Members should be diligent in discharging responsibilities to clients, employers, and the public. Diligence imposes the responsibility to render services promptly and carefully, to be thorough, and to observe applicable technical and ethical standards.

.05   Due care requires a member to plan and supervise adequately any professional activity for which he or she is responsible.

---

**[The next page is 4341.]**

ET §56.05

C&S 0136
432636.00014

## ET Section 57

# Article VI—Scope and Nature of Services

*A member in public practice should observe the Principles of the Code of Professional Conduct in determining the scope and nature of services to be provided.*

.01   The public interest aspect of certified public accountants' services requires that such services be consistent with acceptable professional behavior for certified public accountants. Integrity requires that service and the public trust not be subordinated to personal gain and advantage. Objectivity and independence require that members be free from conflicts of interest in discharging professional responsibilities. Due care requires that services be provided with competence and diligence.

.02   Each of these Principles should be considered by members in determining whether or not to provide specific services in individual circumstances. In some instances, they may represent an overall constraint on the nonaudit services that might be offered to a specific client. No hard-and-fast rules can be developed to help members reach these judgments, but they must be satisfied that they are meeting the spirit of the Principles in this regard.

.03   In order to accomplish this, members should

- Practice in firms that have in place internal quality-control procedures to ensure that services are competently delivered and adequately supervised.

- Determine, in their individual judgments, whether the scope and nature of other services provided to an audit client would create a conflict of interest in the performance of the audit function for that client.

- Assess, in their individual judgments, whether an activity is consistent with their role as professionals.

[Revised May 15, 2000.]

———————————

[The next page is 4361.]

ET §57.03

C&S 0137
432636.00014