# EXHIBIT 1

1

2      IN THE UNITED STATES DISTRICT COURT

       FOR THE DISTRICT OF MASSACHUSETTS

3          Case No. 04 10487 GAO

   -------------------------------------)

4  INSITUFORM TECHNOLOGIES, INC.,

5                    Plaintiff,

6          vs.

7

   AMERICAN HOME ASSURANCE COMPANY,

8

                   Defendant.

9  -------------------------------------)

10

11

12

13      DEPOSITION OF CHRIS CAMPOS, CPA

14           New York, New York

15         Friday, May 11, 2007

16

17

18

19

20

21

22

23 Reported by:

   Toni Allegrucci

24 JOB NO. 194114/9968

25

Page 2

```
1
2            May 11, 2007
3             9:34 a.m.
4
5        Deposition of CHRIS CAMPOS, held at
6   the offices of Nixon Peabody, LLP, 437
7   Madison Avenue, New York, New York,
8   pursuant to Notice and Federal Rules of
9   Civil Procedure, before Toni Allegrucci,
10  a Notary Public of the State of New
11  York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1
2 A P P E A R A N C E S:
3
4   HOLLAND & KNIGHT, LLP
5   Attorneys for Plaintiff
6       131 S. Dearborn Street  30th Flr.
7       Chicago, Illinois 60603
8   BY:  CHARLES L. PHILBRICK, ESQ.
9
10  NIXON PEABODY, LLP
11  Attorneys for Defendant
12      100 Summer Street
13      Boston, Massachusetts 02110
14  BY:  GREGORY P. DESCHENES, ESQ.
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1              CAMPOS
2 C H R I S  C A M P O S, called as a witness,
3 having been duly sworn by a Notary Public,
4 was examined and testified as follows:
5 EXAMINATION BY
6 MR. DESCHENES:
7      Q.  State your name for the record,
8 please.
9      A.  Chris Campos.
10     Q.  State your business address,
11 please.
12     A.  310 Cedar Lane, Teaneck, New Jersey
13 07666.
14     Q.  Good morning, Mr. Campos.
15     A.  Good morning, sir.
16     Q.  My name is Greg Deschenes, we just
17 briefly met out in the lobby.  I represent
18 the defendant in this case, American Home
19 Assurance Company.
20         Thank you for coming in today.
21     A.  Okay.  You are welcome.
22     Q.  Appreciate it.  Could you please
23 state your full legal name for the record.
24     A.  Chris Campos.
25     Q.  What is your date of birth?
```

Page 5

```
1              CAMPOS
2      A.  August 17, 1929.
3      Q.  Where do you live?
4      A.  121 Chestnut Street,
5 Englewood Cliffs, New Jersey.
6      Q.  Are you currently employed?
7      A.  Yes.
8      Q.  By whom?
9      A.  The firm of Campos and Stratis,
10 Professional Association.
11     Q.  Are you a principal of that firm?
12     A.  Yes, sir.
13     Q.  Are there any other principals of
14 that firm?
15     A.  There are three other shareholders.
16     Q.  How many employees are in the firm?
17     A.  In the New Jersey office,
18 approximately eight.
19     Q.  And firm wide?
20     A.  Oh, another dozen maybe.
21     Q.  Where are your other locations
22 besides New Jersey?
23     A.  Salt Lake City and Los Angeles.
24     Q.  Have you ever been deposed before,
25 sir?
```

2 (Pages 2 to 5)

Page 6

```
          CAMPOS
 1
 2    A.  Yes, I have.
 3    Q.  Approximately how many times?
 4    A.  Over 200, over the years.
 5    Q.  So you are a very experienced
 6  witness, correct?
 7    A.  Well, all right, you put it that
 8  way, yes.
 9    Q.  And what types of different cases,
10  generally speaking, have you given deposition
11  testimony?
12    A.  It's involving insurance claims or
13  litigation between corporations in which I've
14  testified, okay.
15    Q.  Yes.  Let me just give you a brief
16  review of the deposition ground rules.
17    A.  Yes, sir.
18    Q.  We are here today to get your
19  testimony and find out the opinions you have
20  in connection with this case.  I'm going to
21  ask you a series of questions.  As the Court
22  Reporter indicated before we went on the
23  record, please let me finish the question
24  before you answer; in order for the Court
25  Reporter to accurately transcribe my
```

Page 7

```
          CAMPOS
 1
 2  questions and your answers, we must try not
 3  to talk over each other.
 4      Is that okay with you?
 5    A.  Yes, sir.
 6    Q.  You must give verbal answers, "yes"
 7  or "no," rather than head nods or "um-hum,"
 8  which do not show up on the transcript.
 9      Is that understandable to you?
10    A.  Yes, sir.
11    Q.  If you don't understand a question,
12  please let me know and I'll try to rephrase
13  it, otherwise, if you answer I will assume
14  you understood the question.
15      Is that okay with you?
16    A.  Yes, sir.
17    Q.  You understand that you are under
18  oath, and that my client is relying on the
19  answers you give here today?
20      Do you understand that?
21    A.  Yes, I do.
22    Q.  Is there anything that would affect
23  your ability to testify fully and truthfully
24  here today?
25    A.  No, sir.
```

Page 8

```
          CAMPOS
 1
 2    Q.  Are you on any special medications
 3  that may affect your memory?
 4    A.  No, sir.
 5    Q.  Are you represented by counsel here
 6  today?
 7    A.  No.
 8    Q.  Mr. Philbrick, who represents the
 9  plaintiff Insituform, may make objections
10  from time to time, he looks shocked, but he
11  may, and you understand because you are an
12  experienced witness and deponent that just
13  because he makes an objection, you are
14  supposed to answer the question if you
15  understand it.
16      Is that okay with you?
17    A.  Yes.
18    Q.  Unless he instructs you not to
19  answer.  Is that okay?
20    A.  Yes, yes, sir.
21    Q.  Let me ask you a couple general
22  questions about your educational background.
23  Did you attend college?
24    A.  Yes.
25    Q.  Where?
```

Page 9

```
          CAMPOS
 1
 2    A.  Rutgers University in New Jersey.
 3    Q.  Did you graduate?
 4    A.  Yes, sir.
 5    Q.  When?
 6    A.  1951.
 7    Q.  What was your major or degree in?
 8    A.  Bachelor of Science in Accounting.
 9    Q.  Have you taken any post-graduate
10  courses?
11    A.  Yes, I did.
12    Q.  Where?
13    A.  Both at Rutgers and New York
14  University.
15    Q.  When?
16    A.  Shortly after I graduated
17  undergraduate school.
18    Q.  In 1951?
19    A.  Yes.
20    Q.  In what area of studies did you
21  take postgraduate level courses?
22    A.  In accounting.
23    Q.  Did you graduate from any of those
24  graduate programs?
25    A.  No, I did not.  My courses were
```

3 (Pages 6 to 9)

Page 10

1          CAMPOS
2 interrupted for service in the Army, and I
3 never went back.
4    **Q.   So you have no advanced degrees; is**
5 **that correct?**
6    A.  That's correct.
7    **Q.   Have you taken any other**
8 **professional continuing education type**
9 **courses?**
10   A.  Yes, I do.
11   **Q.   Can you describe just generally**
12 **what those courses entailed?**
13   A.  A variety of continuing
14 professional education courses that are
15 required to maintain my license, both
16 sponsored by either the American Institute of
17 CPAs, New York Society of CPAs or the
18 New Jersey Society of CPAs.
19       I took one last week on fraud,
20 okay.  Whatever, I take them on business
21 valuations, I take them on litigation
22 support.  When I see them, if they are of
23 interest to me or if they are things that
24 would benefit me and my practice, I sign up
25 for them.

Page 11

1          CAMPOS
2    **Q.   You mentioned that you have to take**
3 **these courses in order to maintain your**
4 **license; is that correct?**
5    A.  Yes.
6    **Q.   Can you tell me what the**
7 **requirements are for maintaining your license**
8 **in New Jersey?**
9    A.  It's X number of hours over a three
10 year period, it varies by state.  My
11 secretary keeps a record of them, when I came
12 back last week I gave her the certificate
13 with the four hours and, you know, when it
14 gets close to the deadline I, you know,
15 several months before the deadline I look to
16 see to make sure I comply.
17   **Q.   Understood.  Have you taken any**
18 **continuing education courses in the area of**
19 **accounting for pipe rehabilitation companies?**
20   A.  I have not.  I don't recall ever
21 seeing one.
22   **Q.   Have you ever taken any continuing**
23 **education courses on costs related to pipe**
24 **rehabilitation or trenchless technology?**
25   A.  No, again, I have not taken one in

Page 12

1          CAMPOS
2 that specific field, nor have I ever seen one
3 of those offered specifically for pipe.
4    **Q.   Okay.  What is your current**
5 **occupation?**
6    A.  Well, I'm a Certified Public
7 Accountant and I'm president of Campos and
8 Stratis, a Professional Association.
9    **Q.   How long have you been a Certified**
10 **Public Accountant?**
11   A.  Five years.
12   **Q.   Since 1957?**
13   A.  Actually since in 1956 I think, a
14 few more years.
15   **Q.   Beginning after you left, was it**
16 **the Army?**
17   A.  Yes.
18   **Q.   After you left the Army and you**
19 **graduated from college, could you please tell**
20 **me generally about your employment history?**
21   A.  Actually I was employed by a firm
22 then known as Ernst & Ernst.
23   **Q.   Is that after you left the Army?**
24   A.  No.  I was working for them upon
25 graduation, even in an internship program

Page 13

1          CAMPOS
2 during my senior year.
3    **Q.   Can I just stop you and ask you**
4 **when that was?**
5    A.  1951.  And then I was taking the
6 graduate courses at night, I was interrupt --
7 my work for Ernst & Ernst was interrupted in
8 April of '52 to go to the Army, for two
9 years, where I was in the Army Audit Agency,
10 and I returned to Ernst & Ernst in 1954.
11   **Q.   And after you returned to**
12 **Ernst & Ernst in 1954, what was your position**
13 **then?**
14   A.  I was a staff accountant, and
15 worked my way up to the point where I was a
16 partner when I left in 19-- late 1968, early
17 1969.
18   **Q.   And where did you work for**
19 **Ernst & Ernst, was it in New York City?**
20   A.  At first it was New York City and
21 then it was the Newark office.  I was one of
22 a group of six that opened the Newark office
23 for Ernst.
24   **Q.   And when was that?**
25   A.  '56, something like that.

4 (Pages 10 to 13)

CAMPOS

Page 14

1
2    Q.   You mentioned that you started out
3 as a staff accountant and worked your way up
4 to partner; is that correct?
5    A.   Yes.
6    Q.   At Ernst & Ernst?
7    A.   Yes, sir.
8    Q.   When did you become partner at
9 Ernst & Ernst?
10    A.   In 1968.
11    Q.   While you were at Ernst & Ernst,
12 what were your duties and responsibilities?
13    A.   I was on the audit staff, so I
14 conducted and supervised audits of
15 corporations and, at the same time, I was one
16 of a few who were involved in business
17 interruption insurance claims on behalf of
18 our clients, and defensive product liability
19 claims.
20    Q.   While you were with Ernst & Ernst,
21 did you specialize in any one industry or
22 another?
23    A.   No.  I worked on a variety of
24 industries.
25    Q.   So for instance, you did not

CAMPOS

Page 15

1
2 specialize in the area of construction, the
3 construction industry; is that correct?
4    A.   First of all, if I may put it on
5 the record, we accountants cannot claim we
6 "specialize" in anything because otherwise it
7 would be a self-proclamation of a specialty.
8 We don't have specialties like doctors do,
9 okay.
10        So basically you might say, did I
11 limit my practice to, and the answer is no, I
12 did not, but I did work on construction
13 claims, okay.
14    Q.   Okay.  Let me take a step back.  I
15 didn't mean by using the term "specialized"
16 as a term of art, like a doctor.
17    A.   Okay.  Right.
18    Q.   I meant "focused" by "specialized,"
19 but let me just rephrase it.
20        Did you focus your practice on
21 construction industry claims?
22    A.   No, but construction was part of my
23 practice.
24    Q.   Okay.
25    A.   And just, I just wanted the record,

CAMPOS

Page 16

1
2 I don't want to say that I "specialize"
3 because the profession frowns on it.
4    Q.   I understand your concern.  You
5 mentioned conducting and supervising audits
6 of corporations, you also mentioned working
7 on business interruption insurance claims and
8 defensive products liability claims.
9    A.   Yes, sir.
10    Q.   Can you tell me what involvement,
11 while you were at Ernst & Ernst, did you have
12 in working on business interruption insurance
13 claims?
14    A.   Well, insurance companies would
15 hire us, and specifically a partner that I
16 worked for at the time, and me, as opposed to
17 the rest of the people in the firm, to
18 represent them in analyzing insurance claims
19 presented by insureds for property damage and
20 business interruption.
21    Q.   So did that work involve working as
22 an expert consultant in evaluating damages
23 claims?
24    A.   It really involved, in most
25 instances, being a consultant.  In very few

CAMPOS

Page 17

1
2 cases did it go to court, okay.
3    Q.   I was going to ask.  You were
4 anticipating what I was going to ask.
5    A.   No, I'm sorry, I wasn't.  In other
6 words, in the majority of cases it didn't go
7 to court, okay, it was resolved between the
8 two parties, okay.
9    Q.   Right.  So you were retained in
10 these cases by insurance companies?
11    A.   Yes, sir.
12    Q.   For the most part?
13    A.   Yes, sir.
14    Q.   Did you do any work while you were
15 in Ernst & Ernst in the business interruption
16 insurance area for policyholders or insureds?
17    A.   No, sir.
18    Q.   And you also mentioned defense of
19 products liability claims?
20    A.   Yes, sir.
21    Q.   What was your involvement in the
22 defense of products liability claims while
23 you were at Ernst & Ernst?
24    A.   An insurance company hired me in
25 particular, as a matter of reference from

5 (Pages 14 to 17)

Page 18

1    CAMPOS
2 some other office referred them to me, to
3 defend them in cases where they were involved
4 in litigation in a products liability claim.
5    **Q.  What kind of services would you**
6 **provide in the defense of a products**
7 **liability claim?**
8    A.  Review and analyze the claim made.
9 Most of those cases were involving defending
10 Westinghouse, who was an insured of the
11 insurance company, not solely, but many of
12 them, okay.
13    **Q.  And what were you analyzing in**
14 **those cases?**
15    A.  The claim that was made by the
16 electric utility or whoever was involved.
17 There are a lot of electric utility cases
18 where they were claiming that they bought a
19 generating unit that was supposed to generate
20 800 megawatts, and was only generating 600,
21 they would be making a claim for damages for
22 the difference between the two, and I would
23 be involved in analyzing those claims, okay.
24    **Q.  Understood.  So your involvement in**
25 **analyzing those claims was analyzing the**

Page 19

1    CAMPOS
2 **damages of those claims; is that correct,**
3 **sir?**
4    A.  The damages, yes.
5    **Q.  And you mentioned, I believe, that**
6 **you left Ernst & Ernst in 1969; is that**
7 **correct?**
8    A.  Early 1969, yes.
9    **Q.  Okay.  Before you left**
10 **Ernst & Ernst you became a Certified Public**
11 **Accountant; is that correct?**
12    A.  Yeah, sometime before, yeah.
13    **Q.  What year did you become a CPA?**
14    A.  I think in 1956.
15    **Q.  Can you tell me what you had to do**
16 **in order to become a CPA?**
17    A.  Well, you had to, before you could
18 sit before the CPA exam, in those days you
19 had to have certain courses, college courses,
20 in auditing, accounting, commercial law,
21 etc., as a foundation for your sitting, and
22 you would sit for a two and a half day
23 examination, four parts, and you'd have
24 successfully passed those four parts and then
25 you also needed to have two or three years, I

Page 20

1    CAMPOS
2 can't recall exactly, of experience with an
3 accounting firm before you could become a CPA.
4       MR. DESCHENES:  Off the record.
5    (Off-the-record discussion held.)
6    **Q.  You left Ernst & Ernst in 1969 and,**
7 **at that time, what did you do then?**
8    A.  I started an accounting firm called
9 Chris Campos CPA.
10    **Q.  And is that the same firm that you**
11 **are president of and shareholder of today?**
12    A.  Yes.  It's the predecessor to, yes.
13    **Q.  Today do you specialize in any**
14 **area -- strike that, because I know you don't**
15 **like the word "specialize."**
16       **Do you focus today on any area of**
17 **accounting?**
18    A.  Well, first, we do not do
19 conventional accounting; we do not do audits,
20 do not do taxes.  We are involved only in
21 insurance claims or litigation support or
22 involved in lawsuits on behalf of
23 corporations or individuals.
24       So all of our work is what they now
25 call "forensic accounting," which we were

Page 21

1    CAMPOS
2 doing before they coined the term.
3    **Q.  Why did you leave Ernst & Ernst in**
4 **1969?**
5    A.  Two opportunities presented
6 themselves to me, I was not seeking them, but
7 they were proposed to me, and also Ernst, in
8 those days, was not interested in the
9 insurance claims and I was the only one who
10 was willing to extend himself and put the
11 extra time and effort into the insurance
12 claim.
13       At the beginning of the year each
14 of us had a list of clients with an estimated
15 number of hours that you'd spend with each
16 client, then you'd have the insurance company
17 with a question mark, so you never knew how
18 many hours it was going to be, when it was
19 going to be, I was the only one willing to do
20 that, they weren't interested in that and
21 then when these two opportunities presented
22 themselves I embarked on my own.
23    **Q.  And you mentioned in one of your**
24 **previous answers that your firm, the Campos**
25 **firm, does not focus on traditional areas of**

6 (Pages 18 to 21)

Page 22

CAMPOS

2 accounting, but focuses instead in forensic
3 accounting or consulting work in the
4 litigation area, has that always been true
5 from 1969 to the present day?
6    A.  Yes, sir.
7    Q.  And is "forensic accounting" also
8 referred to sometimes as "investigative
9 accounting"?
10    A.  We used to call it "investigative
11 accounting" before they coined the term, yes.
12    Q.  Well, I noticed in your written
13 materials it refers to it as "investigating
14 accounting," so I may use that term; is that
15 fair?
16    A.  Yes, sir.
17    Q.  So you have been working in the
18 field of investigative accounting for 30 --
19 at least in your own firm, for about 38
20 years; is that correct?
21    A.  My own firm.
22    Q.  Before that, at Ernst & Ernst, part
23 of your practice was also in the field of
24 investigative accounting; is that correct?
25    A.  Yes, sir.

Page 23

CAMPOS

2    Q.  Could you briefly describe, and I
3 think you've done this probably a little bit
4 in previous answers but let me ask you again,
5 what generally your firm does in the field of
6 investigative accounting, what kind of work
7 do you do?
8        MR. PHILBRICK:  Currently?
9        MR. DESCHENES:  Currently.
10    A.  We're engaged in all cases to
11 evaluate damages.  If we're working for the
12 defendant, evaluate damages that have been
13 presented to determine whether they are
14 reasonable; or if we're working for a
15 plaintiff, in most instances we're called
16 upon to prepare a claim and to assert the
17 damages, okay.
18        So basically that's our
19 involvement, it's in the quantification of
20 the claim.
21    Q.  You mentioned preparing a damages
22 claim in your answer.  Do you do work in any
23 other area involving insurance claims; in
24 other words, do you ever provide any expert
25 services in issues involving liability?

Page 24

CAMPOS

2    A.  You mean --
3    Q.  Do you understand what I mean by
4 that question?
5    A.  I want to make sure I understand
6 it.
7    Q.  All right.
8    A.  In other words, in every issue
9 there's a question of liability and a
10 question of quantum.
11    Q.  Correct.
12    A.  We rarely get involved in the
13 liability unless it's accountants malpractice
14 or something along those lines, okay.
15    Q.  Let me just ask a follow-up
16 question and make it crystal clear.  When I
17 referred to "liability," I mean does your
18 firm ever get involved in analyzing whether
19 there is coverage under a policy?
20    A.  No, sir.
21    Q.  Your firm's role is strictly in
22 the, as you called it, the quantification of
23 damages; is that correct, sir?
24    A.  Yes, sir.
25    Q.  And you mentioned in one of your

Page 25

CAMPOS

2 previous answers that when you are retained
3 by a defendant often times you will be asked
4 to determine whether the damages of costs are
5 reasonable; is that correct, sir?
6    A.  Yes, sir.
7    Q.  And when you are retained by a
8 plaintiff you will prepare a damages claim
9 for the plaintiff; is that correct, sir?
10    A.  In most cases, yes.
11    Q.  Is part of your role when you are
12 retained by a plaintiff in an insurance claim
13 to determine whether their damages are
14 reasonable?
15    A.  Well, when we present a claim we
16 present it objectively and determine that it
17 is reasonable stated in order to present it,
18 yes, when we prepare it, yes.
19    Q.  So when you prepare a damages claim
20 for a plaintiff, you typically will look at
21 whether the damages are reasonable in the
22 claim; is that correct, sir?
23    A.  That's right.
24    Q.  And do you do that in all cases?
25    A.  Yes, sir.

7 (Pages 22 to 25)

Page 26

CAMPOS

1
2    Q.  Now, I won't use the term
3  "specialty" again because I know that causes
4  problems but, as I understand it, the focus
5  on your practice today is on the evaluation
6  of insurance claims; is that correct, sir?
7      A.  And litigation.
8    Q.  And other types of litigation?
9      A.  Oh, yeah.
10    Q.  Can you tell me what other types of
11 litigation, and I'm talking about currently,
12 I'm not going back in ancient history?
13     A.  Sure, sure.  Currently, although
14 there may be insurance involved, presently
15 hired by the defense in a subrogation action.
16 Again, involved in its a four-year
17 anniversary the other day of a case involving
18 a shareholder dispute, between a former
19 president of a company, who is a minority
20 shareholder, and the corporation that he
21 worked for, okay.
22      Get involved in, got one pending
23 case that's involved with an architect
24 malpractice case, so those are cases, the
25 kind of cases that I get involved in, and

Page 27

CAMPOS

1
2  occasionally marital disputes, not too many
3  but occasionally.  In other cases where loss
4  of profits are being claimed by a corporation
5  because of some action of the alleged
6  wrongdoing, we get involved in that kind of
7  thing, okay.
8    Q.  Today what percentage of your cases
9  involve insurance claims versus non-insurance
10 matters?
11     A.  Today, as we sit here today, the
12 insurance is a minor part of it, you go back
13 a year ago, Hurricane Katrina or whatever, it
14 was a big part of it, okay.  Who knows, after
15 hurricane season starts, it may be a bigger
16 percentage again.
17    Q.  Hopefully not, or maybe in your
18 case hopefully yes.
19      MR. PHILBRICK:  Hopefully not.
20      We're all in the same boat there.
21    Q.  Today, as we sit here today, it's
22 not a big percentage of your practice, but
23 what you are saying, in years past, depending
24 what you are doing it might be a larger
25 percentage; is that fair?

Page 28

CAMPOS

1
2      A.  Over the years it was a larger
3  percentage, yes.
4    Q.  Okay.  Do you currently belong to
5  any professional societies or associations?
6      A.  Yes, sir.
7    Q.  Can you tell me what professional
8  societies or associations you belong to?
9      A.  The American Institute of CPAs, the
10 New York State Society of CPAs and the
11 New Jersey Society of CPAs.  There may be one
12 or two other.  I think Pennsylvania at one
13 point, but I may have dropped out, I don't
14 know, but New York and the New Jersey are the
15 two that I'm involved in.
16    Q.  Are you a member of any other
17 professional groups or associations?
18     A.  Not actively.  Over the years I
19 have been, but not -- I was a member of the
20 Certified Fraud Examiners for a while, but I
21 dropped out; as a condition of continued
22 membership you had to write articles for them
23 so they could publish them for a profit, and
24 I decided I didn't want any part of that,
25 okay.

Page 29

CAMPOS

1
2    Q.  Understood.  Any other professional
3  memberships that you can think of?
4      A.  There were several others over the
5  years, but I'm not active in them anymore,
6  okay.
7    Q.  Can you remember what those were?
8      A.  Not off the top of my head.  I know
9  that some of them were involved with some
10 publications that on the editorial advisory
11 board on those, but again, I'm not active
12 with those anymore.
13    Q.  Do you currently hold any
14 professional licenses or designations?
15     A.  Yes.  Certified Public Accountant,
16 yes.
17    Q.  In what states are you a Certified
18 Public Accountant?
19     A.  New York, New Jersey, Pennsylvania,
20 Florida, Illinois.  I was certified in a few
21 other states, but I think over the years I've
22 dropped out, like Texas, Puerto Rico and a
23 few others, okay.  Louisiana for sure.
24    Q.  You are currently licensed there,
25 sir?

8 (Pages 26 to 29)

**CAMPOS**                                          Page 30

1
2    A.  Yes, sir.
3    Q.  Do you have any other professional
4 licenses or designations, other than what
5 you've testified to?
6    A.  No, sir.
7    Q.  Have you published any articles or
8 papers in your professional area?
9    A.  Yes, I have.
10    Q.  Have you authored any articles on
11 topics related to the pipe rehabilitation
12 industry?
13    A.  Not that specific, no, sir.
14    Q.  Have you ever authored any articles
15 on topics related to damages claims in the
16 construction industry?
17    A.  Did you say "profits"?
18    Q.  No.  I said "damages claims in the
19 construction industry."
20    A.  Oh, I thought -- okay.  Maybe get
21 the whole sentence again, please.
22       (Record read.)
23    Q.  Have you ever authored any articles
24 related to topics to damages claims in the
25 construction industry?

**CAMPOS**                                          Page 31

1
2    A.  I may have, but I don't recall.
3 I've done a lot of work in the construction
4 industry, I'd have to do some research to
5 answer that question.
6    Q.  Okay.  Maybe you can take a look at
7 your CV at the break, and we can turn back to
8 that at some point.
9    MR. DESCHENES:  Let's mark this as
10    the first exhibit.
11       (Campos Exhibit 1, document, marked
12    for identification, as of this date.)
13    A.  Sir, my year and a half working for
14 the Army Audit Agency, I was doing, I was
15 auditing cost plus fixed fee contracts, for
16 construction contractor and for an architect
17 engineer, that was all I was doing at the
18 time.
19    Q.  Okay.  Did you just get that on the
20 record, that answer, okay.  The Court
21 Reporter has marked Exhibit 1, which I've
22 handed to you, I ask you to take a moment to
23 review it and then I'll ask you a question.
24    A.  Yes, sir.
25    Q.  Is that exhibit in front of you

**CAMPOS**                                          Page 32

1
2 your curriculum vitae?
3    A.  Yes.
4    Q.  Does it accurately reflect your
5 education, training and professional
6 experience that you've previously testified
7 about?
8    A.  Yes, sir.
9    Q.  Is there anything in here that you
10 would like to update or change?
11    A.  With respect to the publications,
12 as it sets forth in the first sentence, these
13 are the publications preceding ten years, and
14 says prior.
15    Q.  Right.
16    A.  This is I do not believe a complete
17 list of what I've done over the years, okay.
18 And these were the articles that were
19 published in magazines or mainly outside
20 publications.  In addition to that I authored
21 articles that were given at seminars that
22 either my firm conducted or I was part of
23 that some organization conducted.
24    Q.  With those qualifications in mind,
25 is this Exhibit 1 true and complete today?

**CAMPOS**                                          Page 33

1
2    A.  Yes.
3    Q.  Mr. Campos, is it fair to say that
4 your area of expertise is primarily in the
5 area of accounting?
6    A.  Yes.
7    Q.  Is it fair to say that your area of
8 expertise is limited to accounting?
9    A.  I think no.  I think it's business
10 in general, accounting and specific.  I've
11 had experience in the business world, it's
12 not just limited to the accounting aspects.
13    Q.  Are there any other areas where you
14 would consider yourself qualified as an
15 expert to testify?
16    A.  There may be, but I can't off the
17 top of my head come up with one right now.
18    Q.  Do you consider yourself qualified
19 as an expert on trenchless or cured in place
20 pipe technology?
21    A.  No, sir.  Not that specific, no.
22    Q.  Do you consider yourself an expert
23 on costs associated with trenchless
24 technology?
25    A.  With respect to costs in general,

9 (Pages 30 to 33)

Page 34

CAMPOS

1
2 which would include trenchless technology and
3 other technologies.
4    **Q.   So is the answer to that question**
5 **"yes" --**
6    A.   Yes.
7    **Q.   -- you do consider yourself an**
8 **expert in the area of cost associated with**
9 **trenchless technology?**
10    A.   Yes, as a subpart of costs, as a
11 general category.
12    **Q.   But you do not consider yourself an**
13 **expert on trenchless or cured in place**
14 **technology; is that correct?**
15    A.   That's right.  I answered that
16 question earlier, I think.
17    **Q.   Right.  Do you consider yourself**
18 **qualified as an expert to testify about the**
19 **repairs made to the pipeliner in this case?**
20    A.   With respect to the out-of-pocket
21 costs involved in this case, whether they
22 were repair or replacement, whatever they
23 might be, yes.
24    **Q.   Okay.  My question was slightly**
25 **different than that, and that is this, do you**

Page 35

CAMPOS

1
2 **consider yourself qualified as an expert to**
3 **testify and give opinions about the kind of**
4 **repairs that were required to be made to the**
5 **pipeliner in this case?**
6    A.   The kind of repairs?
7    **Q.   That's correct.**
8    A.   Not the kind, no; the
9 quantification of such out-of-pocket costs,
10 yes.
11    **Q.   Right.  My question goes to, do you**
12 **consider yourself qualified as an expert to**
13 **talk about the methodology of how they went**
14 **about repairing the pipe in this case?**
15    A.   No, sir.
16    **Q.   And you have no opinion one way or**
17 **the other about whether the methods they used**
18 **in repairing this pipe were good, bad or**
19 **indifferent; is that correct?**
20    A.   The scientific or technical
21 methods, I have no opinion on that, no.
22    **Q.   Do you have any professional**
23 **designations in the field of evaluating**
24 **damages, sir?**
25    A.   No.  I'm not aware that there are

Page 36

CAMPOS

1
2 any specific designations of that sort.
3    **Q.   And you are not a lawyer; is that**
4 **correct?**
5    A.   No, sir, I'm not a lawyer.
6    **Q.   And you don't consider yourself**
7 **qualified to give legal opinions; is that**
8 **correct?**
9    A.   That's correct, and I don't give
10 them.
11    **Q.   Fair enough.  Have you ever been**
12 **disqualified as an expert in any case?**
13    A.   No, sir.
14    **Q.   Have you ever been precluded from**
15 **offering opinion testimony in any case?**
16    A.   No, sir.
17       MR. DESCHENES:  Off the record for
18 a moment.
19       (Recess taken 10:16 until 10:21.)
20    **Q.   Before we took that brief break, I**
21 **was asking you some questions about your**
22 **areas of expertise.  Do you recall that?**
23    A.   Yes, sir.
24    **Q.   And I asked you whether**
25 **specifically your area of expertise was**

Page 37

CAMPOS

1
2 **limited to accounting, and I believe you**
3 **answered that it was not, that you also**
4 **consider yourself an expert in business, as**
5 **well; is that correct?**
6    A.   Yes.
7    **Q.   Can you tell me what areas of**
8 **business you feel that you believe that you**
9 **are qualified as an expert in?**
10    A.   Well, I think the best way I can
11 answer that is depending on the specific
12 circumstance as it arises, I can determine
13 that, okay.
14       When I first left Ernst I worked
15 for four, five year period as a chief
16 financial officer of American Stock Exchange
17 Company and had my accounting practice at the
18 time, so I was involved in the business
19 world, and while I was with Ernst & Ernst in
20 the business world, so I got to know and get
21 involved in things that I'm, you know,
22 familiar with and, I would say, in certain
23 areas would be an expert in, but I would want
24 to see the facts and circumstances behind
25 each one before I say that I'm able to opine

10 (Pages 34 to 37)

Page 38

CAMPOS

1
2 on something, okay. I won't do that in the
3 broad sense, okay.
4    **Q. Understood. So by your previous**
5 **answer you didn't mean to say that you**
6 **consider yourself an expert in the business**
7 **of any field; is that correct, sir?**
8    A. Of a particular industry you mean?
9    **Q. Yes.**
10    A. No. Although I have, as I said,
11 done a lot of work in many industries and I
12 would consider myself an expert in certain
13 facets of the industry, okay, of that
14 particular industry, okay.
15    **Q. Okay. Fair enough. You mentioned**
16 **just something in your answer that I didn't**
17 **get in previous questions, and that is, any**
18 **other jobs that you may have had; you**
19 **mentioned you were a chief financial officer**
20 **for a company, for five years, for a company**
21 **after you left Ernst & Ernst, when was that?**
22    A. At the same time I was doing my
23 accounting practice. It was in Teaneck,
24 New Jersey.
25    **Q. What was the name of the company?**

Page 39

CAMPOS

1
2    A. It was called The Garcia Company,
3 G-A-R-C-I-A, Corporation, Sporting Goods
4 company that was a distributor and
5 manufacturer, fishing tackle, skis, rifles,
6 tennis equipment, you name it, okay.
7    **Q. And you were the chief financial**
8 **officer of that company from 1969 to 1947; is**
9 **that correct?**
10    A. Not the entire time. I was
11 assistant treasurer and then became
12 treasurer. I was on the board of directors.
13    **Q. So you were employed by this**
14 **company, the Garcia Corporation, from 1969 to**
15 **1974, in the capacities that you just**
16 **testified to?**
17    A. 1975, yeah. And when I said
18 earlier about "opportunities," I was asked by
19 them to join them and help them go public.
20 They were an Ernst client, that was one of
21 the opportunities that presented itself.
22    **Q. Okay. Are there any other --**
23 **strike that. I asked you questions about**
24 **your employment history. Are there any other**
25 **jobs that you've had from 1969 on, that you**

Page 40

CAMPOS

1
2 **have not testified to today?**
3    A. No, sir.
4    **Q. How frequently have you testified**
5 **as an expert witness?**
6    A. It varies. I don't recall when the
7 last one was, it was a couple months ago.
8 More in the past than now, you know, but I
9 have scheduled a deposition next week
10 sometime -- next month sometime. There may
11 be others, it will come up as the cases
12 approach trial.
13    **Q. You've testified more in the past**
14 **than now as an expert witness; is that**
15 **correct?**
16    A. On a more frequent basis.
17    **Q. "On a more frequent basis." How**
18 **much of your revenue is derived from being**
19 **retained as an expert in litigation?**
20    A. It's less than 50 percent. I don't
21 know percentage-wise, but it's less than 50
22 percent.
23    **Q. Was it more in the past?**
24    A. No. It wasn't more in the past, it
25 was just there were more, more cases you

Page 41

CAMPOS

1
2 know.
3    **Q. Do you typically testify as an**
4 **expert for one side, for only one side?**
5    A. No, sir.
6    **Q. And by that, you understand I'm**
7 **talking about plaintiff or defendant?**
8    A. I understand. I do not typically
9 testify for either the defendant or the
10 plaintiff.
11    **Q. Or let me rephrase that. In the**
12 **context of an insurance claim, which is what**
13 **we are talking about here today, do you only**
14 **testify for policyholders?**
15    A. No, sir.
16    **Q. You also testify on behalf of**
17 **insurance companies; is that correct?**
18    A. Yes, sir.
19    **Q. In the context of insurance**
20 **litigation; is that correct, sir?**
21    A. That's correct. Just last year,
22 testified two or three times in connection
23 with first-party property claims, yes,
24 resulting from 9/11 and resulting from
25 hurricanes.

11 (Pages 38 to 41)

Page 42

CAMPOS

1
2    Q.  Do you recall what insurance
3  companies retained you in the 9/11 and
4  hurricane claim cases?
5     A.  It was Hartford I believe, okay,
6  and Sorema was another one.
7    Q.  How do you spell that?
8     A.  S-O-R-E-M-A.  Hartford on a couple
9  occasions.
10    Q.  For both 9/11 and hurricane claims?
11     A.  Yes.  I guess years ago, when I was
12  in college my professor told me that don't
13  try to remember everything, but just know
14  where to go to get the information, so I
15  don't try to cram my mind with all these
16  facts, but I know where to go to get it, but
17  those are the two that that come to mind, but
18  there's others, okay.
19    Q.  That's fair enough.  I'm just
20  asking for your best memory here today.
21          Have you ever turned down a
22  proposed engagement, sir?
23     A.  Yes.
24    Q.  When was the last time you turned
25  down a proposed engagement?

Page 43

CAMPOS

1
2     A.  About two weeks ago, I was asked to
3  do something by an insurance consultant and I
4  didn't want to do it, okay, and I referred it
5  to someone else, okay.
6    Q.  Is the reason why you didn't want
7  to do it is because you felt you could not
8  give the opinion that they were seeking in
9  that case?
10     A.  No, no.  It was he was representing
11  a policyholder and I didn't want to represent
12  the policyholder, okay.
13    Q.  All right.  Understood.  The 9/11
14  claims and hurricane claims that you
15  testified about involving first-party
16  property damage, in both categories were you
17  retained to testify about damages?
18     A.  Yes, principally.  Also profits,
19  business interruption.
20    Q.  So in both categories, "both
21  categories," 9/11 claims and hurricane
22  claims, they were business interruption
23  cases; is that correct?
24     A.  Business interruption, but there
25  were elements of property damage also now

Page 44

CAMPOS

1
2  that I recall, okay, and I get involved in
3  both.
4    Q.  And who was your client in this
5  case?
6     A.  Mr. Philbrick through Insituform.
7    Q.  How are you being compensated in
8  this case?
9     A.  On an hourly basis.
10    Q.  Is your arrangement in writing?
11     A.  I believe so.
12    Q.  Do you recall whether it was
13  reduced to some sort of written engagement,
14  sir?
15     A.  I said I believe it was.
16    Q.  Okay.  And you are charging an
17  hourly rate; is that correct, sir?
18     A.  Yes, sir.
19    Q.  Do you charge a different hourly
20  rate depending on the kind of work that you
21  are doing?
22     A.  Either on the kind -- not the kind
23  of work, but where a particular client might
24  charge slightly different rates, okay.
25    Q.  Well, what I was driving at before

Page 45

CAMPOS

1
2  is, do you charge a different rate for
3  testifying versus doing document review?
4     A.  No, sir.
5    Q.  You charge the same rate for both
6  activities, sir?
7     A.  My activity, yes.
8    Q.  What rate are you charging
9  Insituform in this case?
10     A.  I believe it's 300 an hour.
11    Q.  Is anybody else from your firm also
12  involved in this engagement?
13     A.  Yes.
14    Q.  Who is that?
15     A.  A young woman by the name of
16  Meghan, M-E-G-H-A-N, Siri, S-I-R-I, Callen,
17  C-A-L-L-E-N, the middle name is her maiden
18  name and she was married in the past year,
19  so.
20    Q.  Her last name is, again, I'm sorry?
21     A.  Callen, C-A-L-L-E-N.
22    Q.  Is she also a CPA?
23     A.  Yes, sir.
24    Q.  How long has she been with your
25  firm?

12 (Pages 42 to 45)

Page 46

CAMPOS
2   A.   Ten years, eleven years, something
3 like that.
4      Q.   Is she a partner?
5   A.   Yes.
6      Q.   And what rate is she charging
7 Insituform for her work?
8   A.   I do not recall. It's in the $150,
9 $175 rate.
10     Q.   Do you charge a different rate for
11 testifying at trial than depositions?
12   A.   No, sir.
13     Q.   Do you know how much you've charged
14 for your fees to date in this case?
15   A.   No, I do not.
16     Q.   Do you know what your projected
17 fees and work will be in this case going
18 forward?
19   A.   No, no, I do not, okay.
20     Q.   And are you being paid for your
21 testimony here today?
22   A.   I'm being paid for my time.
23     Q.   Okay. What are you being paid?
24   A.   At the hourly rate that I just
25 testified to.

Page 47

CAMPOS
2      Q.   Do you have any interest in the
3 outcome of this litigation?
4   A.   No, sir.
5      Q.   Are you being paid or compensated
6 in any other way for your time here today,
7 other than what you previously testified to?
8   A.   Just my time, that's all.
9      Q.   At $300 an hour?
10   A.   Yes, sir.
11     Q.   Approximately how often have you
12 been deposed in the last five years?
13   A.   Either deposed or testified at
14 trial, I'd say maybe 30 times or so, maybe
15 more.
16     Q.   And the 30 times would include both
17 deposition testimony and trial testimony,
18 sir?
19   A.   Yes, sir.
20     Q.   Do you have any understanding today
21 of the breakdown between trial testimony and
22 deposition testimony in the last five years?
23   A.   No, I don't. Most of it is
24 deposition testimony.
25     Q.   And of those cases, do any of them

Page 48

CAMPOS
2 involve insurance?
3   A.   Oh, yes.
4      Q.   Approximately how many cases
5 involve insurance?
6   A.   Well, either directly or
7 indirectly, the majority of the cases would
8 involve insurance.
9      Q.   And in the last five years, have
10 you testified in any cases that involved
11 issues similar to the issues in this case?
12   A.   Well, when I say -- when you say
13 "issues in this case," I look at the issues
14 I'm involved in as the quantification itself
15 and, yes, I have testified as to the
16 quantification of what I will call
17 "out-of-pocket expenditures."
18     Q.   Did any of the cases in the last
19 five years involve a claim involving pipe
20 rehabilitation like this case?
21   A.   I don't recall any, no. I can't
22 recall.
23     Q.   Did any of the cases that you've
24 testified in the last five years involve
25 quantification of out-of-pocket expenditures

Page 49

CAMPOS
2 in a construction claim?
3   A.   I'm trying to recall, I was
4 involved in a construction, in a corporation
5 that was in a construction business, trying
6 to recall whether it was out-of-pocket costs
7 or not, I don't recall. I have one case
8 that's pending, the one that I told you about
9 that was a malpractice case, that one of the
10 qualifications they were seeking was someone
11 who had construction experience, and I met
12 that qualification and I was engaged by three
13 defendants in that case.
14     Q.   You said the malpractice case, is
15 that the architectural malpractice case you
16 testified to previously?
17   A.   Yeah, the case is just starting,
18 okay.
19     Q.   Do you remember the name of it?
20   A.   Well, the plaintiff is
21 David Anthony Construction Company, okay,
22 it's venued in New Jersey.
23     Q.   New Jersey Superior Court?
24   A.   As I said, the case is started, I
25 assume it's the Superior Court.

13 (Pages 46 to 49)

Page 50

CAMPOS

1
2  Q.  And you've been recently engaged in
3 testify in this case?
4    A.  Yes.
5    Q.  And in part you were engaged, you
6 believe, because of your construction
7 industry experience?
8    A.  It was definitely a condition.  The
9 one attorney who recommended me asked me
10 questions, and I gave him -- I sent him a
11 letter, I believe, telling him my experience,
12 starting back in the Army audit Agency days,
13 and other construction cases that I've worked
14 on over the years.
15    Q.  Have you produced a report in that
16 case yet, sir?
17    A.  No.  It hasn't even started yet.
18    Q.  So I assume you haven't testified
19 in that case yet?
20    A.  Oh, no.
21    Q.  Of the 30 some-odd cases that
22 you've testified in, in the last five years,
23 what percentage of those cases did you
24 testify on behalf of an insurance company?
25    A.  I don't really quantify my cases

Page 51

CAMPOS

1
2 that way, but I would estimate that it would
3 be somewhere between 30 and 50 percent, okay.
4    Q.  The same question, what percentage
5 of cases in the last five years have you
6 testified on behalf of policyholders in an
7 insurance claim or litigation?
8    A.  I would say maybe 15, 20 percent.
9    Q.  You mentioned your partner
10 Ms. Callen was involved in this particular
11 case; is that correct?
12    A.  Yes, sir.
13    Q.  Can you tell me what her role has
14 been in this particular case?
15    A.  She assisted me in all aspects of
16 the case and worked under my direct
17 supervision.
18    Q.  Does she also testify from time to
19 time as an expert witness in cases?
20    A.  On a few instances, yes.
21    Q.  Do you know how many hours she's
22 put into this engagement?
23    A.  No, sir.
24    Q.  Is there any way you could
25 determine that?

Page 52

CAMPOS

1
2    A.  My records in my office, yeah.
3    Q.  And relatively speaking, you may
4 not know the answers, but has she put in more
5 time into this matter than you or less time?
6    A.  She would most likely more time
7 than me.
8       MR. DESCHENES:  Let's mark this
9 next.
10      (Campos Exhibit 2, document, marked
11 for identification, as of this date.)
12    Q.  Mr. Campos, could I direct your
13 attention to what has been marked as Campos
14 Exhibit 2, and just ask you to take a moment
15 to review that document, and I'll ask you
16 some questions, sir.
17    A.  Yes, sir.
18    Q.  Do you recognize that document?
19    A.  Yes, I do.
20    Q.  What is it?
21    A.  It's the cases in which I've
22 testified at trial or been deposed in the
23 last four years.
24    Q.  Was this list accurate and complete
25 at the time it was created?

Page 53

CAMPOS

1
2    A.  Yes, sir, to the best of my
3 knowledge.
4    Q.  I believe this list was a part of a
5 production in May of 2006.  Has this been
6 updated since May of 2006?
7    A.  It should have been, yes.  May
8 2006?
9    Q.  Well, that's the date of your
10 report.
11    A.  Okay.  I believe there have been
12 depositions since then but, if are not here,
13 they should be updated in the office.
14      MR. DESCHENES:  Okay.  Charlie, if
15 it's not too much trouble, could I get
16 an updated list from Mr. Campos.
17      MR. PHILBRICK:  Sure.
18      MR. DESCHENES:  And also, I would
19 like to request the agreement that he's
20 made in his written engagement with your
21 firm.
22      MR. PHILBRICK:  I will take that
23 under advisement.  I would assume it's
24 already in the production that you have.
25      MR. DESCHENES:  It's not.  I don't

14 (Pages 50 to 53)

CAMPOS

think it is. I went through his -- we don't need to have a prolonged discussion on the record, but I didn't find it in the documents produced to us.

A. I said I believe so. If it is, I'll get it.

**Q. Sure. That's up to your counsel, he's taken it under advisement. I just want to make the request on the record.**

**Do you have transcripts of your testimony in all of these cases that are listed here?**

A. I would have or should have with respect to the depositions, not necessarily with respect to trial testimony.

**Q. Okay. It appears to list about 30 cases here. Can you tell me what cases involve trial testimony?**

A. Well, I believe Weiss versus Ferro, PSG versus SKW Real Estate.

**Q. You are just reading from the first page, right?**

A. From the caption.

**Q. The caption on the first --**



CAMPOS

A. On the first column.

**Q. We're on the first page though, right?**

A. Yes, sir.

**Q. Okay.**

A. Egber versus Egber.

**Q. All three of those cases involve trial testimony, sir?**

A. Yes, sir. To the best of my recollection, yes. I'm not sure about the other two on the first page.

**Q. Okay. Moving on to the second page.**

A. Second page, when you get down -- I'm not sure of the ones preceding the one I'm going to testify as to now, RSR Corporation versus AIU Insurance was trial testimony. Estate of James Bastek was trial testimony. Swan International, I think was trial.

**Q. Before you go on to the next page, sir.**

A. Yes, sir.

**Q. You mentioned the "RSR Corporation"**



CAMPOS

**case.**

A. Yes.

**Q. And in that case there's an insurance company mentioned.**

A. Yes.

**Q. "AIU Insurance Company"?**

A. Yes.

**Q. Did you testify in that case on behalf of the insurance company or policyholder?**

A. Insurance company.

**Q. And what was the nature of that case?**

A. It was a claim for environmental cleanup and my role was evaluating the damages.

**Q. It was a super fund type case?**

A. In a sense, yes.

**Q. Your role was evaluating the remediation cost claim by the policyholder?**

A. Yes, on behalf of AIU. Next page.

**Q. One more question about the AIU case. Was part of your role in evaluating whether the remediation costs were reasonable**



CAMPOS

**and necessary?**

A. Well, reasonable yes, necessary, yes. There's another one of those cases for that particular attorney, that's pending right now.

**Q. You are talking about another case for Robert E. Rider at Jackson and Campbell, sir?**

A. Yes, he was representing insurance companies and I believe including an AIG company, okay.

**Q. Okay.**

A. I don't recall the first two, whether I testified at trial or not, but I know --

**Q. We're on to the third page, are we not, sir?**

A. Third page, where it says "Solution F" on top?

**Q. Yes. I just want the record to be clear.**

A. Yes. The Liverpool Club Corp. Versus Wausau.

**Q. You believe that case involved**

Page 58

CAMPOS

1
2 trial testimony?
3    A.  Yes, sir.
4    Q.  And in that case did you testify on
5 behalf of --
6    A.  Liverpool.
7    Q.  Let me back up, ask you what was
8 the nature of that case, if you recall?
9    A.  I don't recall the specifics of the
10 case, but I did testify on behalf of
11 Liverpool Club, okay.
12    Q.  Against Wausau Insurance Company?
13    A.  Yes, sir, in a limited role, okay.
14    Q.  Anything else in terms of trial
15 testimony on that page?
16    A.  I'm trying to recall, sir.  I don't
17 believe any more trial testimony.
18    Q.  On page three?
19    A.  On page three, on the last page,
20 the only other trial testimony that I can
21 recall being trial testimony was the
22 Mount Nittany Inn case, next to the last one.
23    Q.  What did that case involve?
24    A.  It involved the Hotel Mount Nittany
25 Inn making a claim against, I think it was a

Page 59

CAMPOS

1
2 subrogation claim, and I was representing the
3 defendant.
4    Q.  Who was the defendant in that case?
5    A.  Well, Swartz Fire and Safety and
6 possibly Richard Benner, but I definitely
7 represented the defendant.
8    Q.  Do you remember what the case was
9 about?
10    A.  It was a fire that occurred, and
11 they were suing to recover the loss of
12 profits and some of the out-of-pocket
13 expenditures.
14    Q.  Were they suing a defendant they
15 believe that was responsible for causing the
16 fire?
17    A.  That was their claim, yes.
18    Q.  And your engagement involved
19 quantifying the alleged damages in the case?
20    A.  Yes, sir.
21    Q.  In that case you were
22 representing -- you were retained by
23 defendant; is that correct?
24    A.  Yes, sir.
25    Q.  And what was your role in

Page 60

CAMPOS

1
2 quantifying the damages in that case?
3    MR. PHILBRICK:  Object to form.
4    The witness may answer if he can.
5    A.  Looking at, analyzing the damages
6 that were claimed to determine if they were
7 reasonable.
8    Q.  Anything else?
9    A.  Reasonable and necessary.
10    Q.  Okay.
11    A.  That's essentially it, okay.
12    Q.  Did the remaining cases, we've been
13 through this entire list, involve your
14 deposition testimony only?
15    A.  To the best of my recollection,
16 sir, yes.
17    Q.  Of these cases listed on Exhibit 2,
18 which cases involved insurance coverage
19 claims?
20    A.  Page two, the RSR Corporation case
21 was definitely insurance.
22    Q.  Okay.
23    A.  Swan International was, I believe,
24 a captive insurance company.
25    Q.  And that's on page two, as well?

Page 61

CAMPOS

1
2    A.  The bottom of page two, yes, sir.
3 The Liverpool case on page three, the AJM
4 Meat Packing case on page three, the
5 Traveler's case on page three, Double O Meat
6 Market case on page four, St. Paul case on
7 page four, Lava Trading on page four,
8 Mount Nittany Inn and the Landec Corporation
9 versus Sorema on page four.
10    Q.  There's Sorema.  On page four, at
11 the top, you mention the All American
12 Insurance Company case?
13    A.  Yes.
14    Q.  In that case were you retained by
15 the insurance company or the policyholder?
16    A.  Insurance company.
17    Q.  And in the Lava Trading case, were
18 you retained by the insurance company or the
19 policyholder to testify?
20    A.  The insurance company, by Hartford.
21    Q.  And in the Landec Corporation
22 versus Sorema, you were retained there also
23 by Sorema; is that correct?
24    A.  Yes, sir.
25    Q.  Did any of the cases listed here

16 (Pages 58 to 61)

Page 62

CAMPOS

1
2 involve the valuation of damages for
3 construction cost?
4    A.   Solely construction costs or
5 construction company, none that I can recall,
6 but there would be in several of these cases,
7 there would be property damage, out-of-pocket
8 expenditures that would have been incurred,
9 that I was involved in quantifying.
10    Q.   Okay. And by "property damage
11 expenditures," are you talking about costs to
12 repair property damage, sir?
13    A.   Repair or replace, yes.
14    Q.   Did any of the cases listed here
15 involve costs related to repair and
16 replacement of a pipeliner?
17    A.   I don't believe so.
18    Q.   Have you ever testified before in
19 any case at any time about the costs related
20 to repair and replacement of a pipeliner?
21    A.   I don't recall, sir.
22    Q.   Approximately do you know how many
23 damages reports you've produced in the last
24 five years?
25    A.   I would estimate in the last five

Page 63

CAMPOS

1
2 years over 80, over 100, somewhere in there.
3    Q.   Okay.
4    A.   That I was involved in personally,
5 okay.
6    Q.   Understood. When were you first
7 contacted about this case?
8    A.   I believe in either late May or
9 early June of 2005.
10    Q.   Who contacted you?
11    A.   Mr. Philbrick.
12    Q.   Do you recall what he said in the
13 first conversation with you?
14    A.   Well, he asked me to -- that he had
15 a case that he wondered whether I could
16 assist him in, in which his client had
17 prepared a claim, and that my job was to
18 analyze and review the claim from the point
19 of view of an accountant experienced in
20 working on behalf of insurance companies, to
21 see whether it was reasonable, reasonably
22 stated.
23    Q.   Do you recall what he told you
24 about the case at that time, and I'm talking
25 about the initial contact?

Page 64

CAMPOS

1
2    A.   Well, I think he described the
3 background of the case and that it would
4 involve out-of-pocket costs, you know.
5    Q.   What did he tell you about the
6 factual background of the case?
7    A.   You know, involving the pipe in
8 Massachusetts and so forth, what was set
9 forth in the first couple of paragraphs of my
10 report.
11    Q.   Did he explain any of the legal
12 issues in the case?
13    A.   Not that I can recall, no.
14    Q.   Do you recall whether he said
15 anything else to you about the case in your
16 initial conversation with him?
17    A.   I don't recall.
18    Q.   And what did you say in response in
19 terms of being retained in the case?
20    A.   That I believe I could assist him.
21    Q.   Did you make any notes of your
22 conversation with Mr. Philbrick?
23    A.   I don't believe I did, no.
24    Q.   In your practice do you typically
25 make notes of telephone conversations, sir?

Page 65

CAMPOS

1
2    A.   Not normally other than, you know,
3 the name of the person who might call and the
4 telephone number, not any substantive notes,
5 no.
6    Q.   I take it from your answer, it's
7 not your practice to do memos to the file of
8 telephone conversations?
9    A.   No, sir, it's not my practice.
10    Q.   As a result of this initial
11 contact, were you retained as an expert
12 witness in this case?
13    A.   Yes, sir.
14    Q.   By whom were you retained?
15    A.   By Insituform, Mr. Philbrick.
16       MR. DESCHENES:  Let's mark this
17 next, Exhibit 3.
18       (Campos Exhibit 3, document, marked
19    for identification, as of this date.)
20    Q.   Sir, you've been handed what has
21 been marked as Campos Exhibit 3, and I ask
22 you to take a moment to review the document
23 and then I'll ask you questions.
24    A.   Yes, sir.
25    Q.   Do you recognize this document,

17 (Pages 62 to 65)

CAMPOS

1
2 sir?
3    A.   Yes.
4    **Q.   What is it?**
5    A.   It's a letter from Mr. Philbrick to
6 me, dated June 7, 2005, thanking me for
7 returning his call, and confirming that he
8 has retained me as a consulting expert in
9 connection with the above captioned lawsuit.
10   **Q.   Do you recall receiving this**
11 **letter, sir?**
12   A.   Yes, sir.
13   **Q.   And is this among the documents**
14 **from your file produced in this case?**
15   A.   It appears as though it is, yes.
16   **Q.   And you know that from looking at**
17 **the Bate Stamp No. down in the bottom**
18 **right-hand corner, sir?**
19   A.   Yes, sir.
20   **Q.   And this letter is dated June 7,**
21 **2005, and Mr. Philbrick says to you, in the**
22 **first line, "thank you for returning my call**
23 **this morning."**
24       **Was this on or about the first**
25 **conversation -- strike that.**

CAMPOS

1
2       **Does this letter memorialize when**
3 **you had your first conversation with**
4 **Mr. Philbrick?**
5    A.   Well, this, I believe this is the
6 first, but it could have been the second, I
7 don't know. I believe I opened the file the
8 next day, okay.
9    **Q.   And after being retained as an**
10 **expert what, if anything, were you asked to**
11 **do?**
12   A.   Well, I was provided with
13 Insituform's claim submission, which were
14 several three or four binders, maybe only two
15 binders, something like that, of the claim
16 submission, voluminous documents, and I was
17 asked to review them.
18   **Q.   Were you asked to review the claim**
19 **documents to ensure that the claim costs were**
20 **adequately supported by documentation?**
21   A.   By documentation and/or reasonable
22 in the context of an insurance claim and from
23 the viewpoint of an accountant who normally
24 represents insurance companies.
25   **Q.   Were you asked to determine what**

CAMPOS

1
2 **costs would be recoverable under the**
3 **American Home policy?**
4    A.   I don't know specifically whether
5 the word "recoverable" was part of the
6 conversation, but by inference, yes.
7    **Q.   And you mentioned that you were**
8 **provided with Insituform's claim submission**
9 **which was two to four binders of documents,**
10 **sir?**
11   A.   Yes, I believe it was a couple of
12 binders of documents, yes.
13   **Q.   And did you have any understanding**
14 **about where those documents came from?**
15   A.   I understood they came from
16 Insituform, that Insituform personnel had
17 prepared them.
18   **Q.   Did you have any understanding that**
19 **Insituform had prepared those documents for**
20 **submission to another insurance company?**
21   A.   To, when you say "another"?
22   **Q.   Other than my client, American Home**
23 **Assurance Company.**
24   A.   I understood that they had prepared
25 it for submission to both insurance

CAMPOS

1
2 companies, as I understood it.
3    **Q.   And I asked you about whether you**
4 **were asked to look at whether the costs were**
5 **recoverable under the American Home policy,**
6 **and you said that those words weren't used,**
7 **but by inference that's what you were asked**
8 **to do; is that correct, sir?**
9    A.   I wasn't sure whether that specific
10 word was used, but by inference that's what I
11 was asked to do, yes.
12   **Q.   How did you go about determining**
13 **whether the costs were recoverable under the**
14 **American Home policy?**
15   A.   By reviewing the documentation that
16 was submitted in a manner that I would do if
17 I were representing a carrier.
18   **Q.   Were you asked to look at the**
19 **specific policy language, sir?**
20   A.   No, I was not asked to look at the
21 specific policy language, other than the
22 reference to actual costs that appears in the
23 policy.
24   **Q.   And in what policy does that**
25 **language appear, sir?**

18 (Pages 66 to 69)

Page 70

CAMPOS

1
2    A.  I think I looked at the Liberty
3 policy but, again, I don't interpret
4 policies, you've got to be licensed to do
5 that and I'm not licensed to interpret
6 policies, but by custom and practice I know
7 what's to be included in a claim of this
8 sort, okay.
9    Q.  But you would agree that as part of
10 your retention here, you were not asked to
11 look at whether there was coverage under the
12 policy; is that correct?
13    A.  I was not asked to determine
14 whether there was any coverage under the
15 policy.  If I were asked to do that, I would
16 decline to do it because I'm not qualified to
17 do that.  I'm not licensed to do that.
18    Q.  Understood.  And you testified you
19 looked at the words "actual cost" in the
20 Liberty Policy, you remember looking at that;
21 is that correct, sir?
22    A.  Yes.
23    Q.  Do you recall focusing in on any
24 other language in either the Liberty Mutual
25 policy at issue in this case or the

Page 71

CAMPOS

1
2 American Home policy involved in this case?
3    A.  Later on my attention was focused
4 to the reference to the Liberty policy when I
5 read, I believe, one of your memoranda or
6 cross motion, or whatever, where you refer to
7 policy language, and at that point when I
8 read that I referred to the policy.
9    Q.  Okay.  And do you recall
10 specifically what policy language you were
11 referred to?
12    A.  It was where the insureds are
13 entitled to recover the lesser of two
14 specific repairs.  I don't know the specific
15 language off the top of my head, but it
16 referred to the policy with respect to the
17 memorandum that you prepared and I was
18 focused in, in that instance, to the policy,
19 okay.
20    Q.  You are referring to the Liberty
21 policy, once again, are you not, sir?
22    A.  Yes, I believe.  Yes, I believe
23 that was the memoranda that referred to that
24 policy, yes.
25    Q.  Okay.  Then is it fair to say as

Page 72

CAMPOS

1
2 part of your engagement in this case, you
3 have not focused at all on any of the
4 language in the American Home policy?
5    A.  No.  I looked at the American Home
6 policy but, again, I don't interpret the
7 policies.  My focus is on quantifying and my
8 custom and practice, I know what should be
9 included in a claim of this sort without
10 reference to the specific wording, okay.
11    Q.  So it's your testimony that based
12 on your 45 years of experience and your
13 knowledge of custom and practice, that you
14 can determine what claim should be
15 recoverable under a policy without regard to
16 the policy language?
17    A.  In general the liability policies
18 and property policies, once I know the type
19 of policy that's involved, I can tell what
20 elements of expense are recoverable or not
21 recoverable, when you are trying to indemnify
22 someone for their out-of-pocket expenditures,
23 okay, and that's what I focus in on when I
24 look at this particular claim, I focused in
25 on that area.

Page 73

CAMPOS

1
2    Q.  All I'm asking you, sir, though is
3 that you can do that without regard to the
4 specific policy language; is that correct?
5    A.  Without the specific policy
6 language, as long as, as I testified, I know
7 the type of policy that's involved, and
8 unless there's some specific wording in the
9 policy that negates whatever I've learned in
10 the past 45 years, then that's what should be
11 recoverable.
12    Q.  Okay.  And I think you mentioned a
13 couple times in your previous responses that
14 you were looking at this claim from the
15 viewpoint of someone who represents insurance
16 companies; is that correct?
17    A.  Yes.
18    Q.  And you've also testified about
19 custom and practice and what's to be included
20 in a claim and what's not to be included in a
21 claim; is that correct, sir?
22    A.  Yes, sir.
23    Q.  And is that in any kind of written
24 document?
25    A.  No, sir.  It's been part of my

19 (Pages 70 to 73)

Page 74

CAMPOS

1
2 practice, I'm asked many times to, at a
3 deposition or trial, to interpret the policy,
4 I do not interpret the policy, that's left to
5 either a licensed adjuster or to an attorney
6 who are licensed to interpret the policies.
7      But when I, over the years, when
8 I've worked with the policies, I know from
9 dealing with adjusters and insurance
10 companies and attorneys what's to be included
11 and not included based on custom and
12 practice.
13     Q.  Okay. Can you tell me based on
14 your experience of working with adjusters and
15 attorneys, what is to be included in a claim
16 such as this in terms of custom and practice
17 then?
18     A.  The direct out-of-pocket
19 expenditures, to properly indemnify the
20 claimant and to exclude any overhead factors
21 that include fixed expenditures and, in
22 essence, recovering the actual costs
23 incurred.  And when I said that I was hired
24 to look at it from the point of view of an
25 accountant that's worked on behalf of

Page 75

CAMPOS

1
2 insurance companies, I did not put the claim
3 together, the claim was put together and I
4 was analyzing the claim that had already been
5 compiled.
6      Q.  Thank you for the clarification.
7 The four things that you just mentioned, the
8 elements being "direct out-of-pocket
9 expenses," I think you also testified to
10 "properly indemnify the claimant," "exclude
11 any overhead factors that include fixed
12 expenditures," and then the fourth thing you
13 testified to was "recovering the actual costs
14 incurred."
15     Can you think of anything else that
16 should be included in a claim like this, or
17 excluded, based on custom and practice in the
18 industry as you understand it?
19     A.  Not off the top of my head as I sit
20 here today.  That's essentially it.  That's
21 the majority of the elements that should be
22 included.
23     Q.  Just talking generally now, not
24 about the specific facts of this case, when
25 you are talking about, you testified about

Page 76

CAMPOS

1
2 recovering the actual costs incurred, do you
3 typically look at whether those costs are
4 reasonable and necessary?
5     A.  I look at them, I look at the
6 documentation.  I don't determine and can't
7 determine whether they are, let's say,
8 whether somebody could have saved $0.10 by
9 going someplace else, that's not the focus of
10 my attention, whether I'm representing an
11 insurance company or, in this particular
12 case, critiquing a claim prepared by a
13 policyholder.  That's not part of my
14 assignment, okay.
15     Q.  So it is not part -- strike that.
16     We're just talking generally, not
17 about the specific facts of this case.
18     A.  I understand.
19     Q.  In an engagement it is not part of
20 your assignment to determine whether costs
21 could have been saved by using a cheaper
22 alternative method; is that correct, sir?
23     A.  That's correct, or whether as you
24 asked the question earlier, whether they are
25 necessary, that is usually not something that

Page 77

CAMPOS

1
2 I get involved in as to whether they are
3 necessary or not necessary.  That's not part
4 of my assignment.
5     Q.  Okay. Is it fair to say, sir, that
6 it's not part of your assignment to look at
7 whether the costs are reasonable or not?
8     A.  It is -- no. Part of my assignment
9 is to determine whether they were reasonable
10 vis-a-vis indemnifying a person for their
11 out-of-pocket expenditures, that part of it
12 is part of my assignment.
13     And the reasonableness is what I
14 testified earlier, the things that you just
15 mentioned, make sure it doesn't include items
16 that are not part of the actual expenditures.
17     Q.  But as part of your assignment, you
18 already testified that you don't look at
19 whether something could be done in a less
20 expensive way; is that correct, sir?
21     A.  Whether or not they could save
22 $0.10 by going someplace else, yes.
23     Q.  Or $0.50?
24     A.  Yes.
25     Q.  On the dollar; is that correct,

20 (Pages 74 to 77)

Page 78

CAMPOS

1
2 sir?
3    A.  Well, your presumption is that
4 someone could save $0.50 on a dollar.  No,
5 I'm saying that's not part of my assignment,
6 but what I did say was, in answer to the
7 question of reasonableness, as to whether the
8 claim is reasonable, I look at it from the
9 point of whether it's reasonable or not, in
10 connection with determining whether or not
11 the claimed items represent actual costs
12 incurred, not whether they could save some
13 money by going someplace else.
14    Q.  So is it fair to say that you
15 simply take those numbers that are given to
16 you by the insured and look at those numbers,
17 but you do not ask whether those numbers
18 could have been lower or higher, sir?
19    A.  By using some other vendor, no.
20    Q.  Correct.
21    A.  That's not part of my assignment no
22 matter who I'm representing, insurance
23 company or in this particular case.
24    Q.  Once again, talking generally, not
25 specifically about the facts of this case, is

Page 79

CAMPOS

1
2 it part of your assignment to look at whether
3 a party could have mitigated its costs in any
4 particular way?
5    A.  Part of my assignment in general
6 covers mitigation depending on the facts and
7 circumstances in the case, yes.
8    Q.  So you do look at whether a party
9 has made efforts to mitigate its loss; is
10 that correct, sir?
11    A.  In certain instances that's part of
12 my assignment and/or measuring the mitigation
13 dollars.
14    Q.  Did you do that with respect to
15 this particular claim?
16    A.  No, sir.  That wasn't part of my
17 assignment.
18    Q.  You were not asked to look at
19 whether Insituform had mitigated its loss in
20 this particular case; is that correct?
21    A.  That's correct, or whether it could
22 have.
23    Q.  That was not part of your
24 assignment in this particular case; is that
25 correct, sir?

Page 80

CAMPOS

1
2    A.  That's correct.
3    Q.  Is that something you were capable
4 of doing in this case?
5    A.  I don't -- I'd have to understand
6 the facts and circumstances before I could
7 answer that question, I don't know.
8    Q.  The facts and circumstances
9 surrounding the claim, sir?
10    A.  Surrounding any potential
11 mitigation efforts, okay.
12    Q.  Okay.
13    A.  I'd have to understand the facts
14 and circumstances relative to what the
15 potential mitigation is to determine whether
16 I would be capable of doing that, okay.
17    Q.  But just to be clear, you were not
18 asked to look at any areas in which
19 Insituform could have mitigated its damages
20 in this case; is that correct, sir?
21    A.  That's what I testified to,
22 correct.
23        (Campos Exhibit 4, document, marked
24    for identification, as of this date.)
25    Q.  I've handed to you what's been

Page 81

CAMPOS

1
2 marked as Campos Exhibit No. 4.
3        Do you recognize this document?
4    A.  I recognize the document as being a
5 letter that was apparently sent to me on
6 June 16, 2005, that was part of my file, from
7 Mr. Kelley of Insituform.
8    Q.  Do you recall receiving this
9 letter?
10    A.  Specifically no.
11    Q.  And is this letter among the
12 documents from your file that have been
13 produced in this case?
14    A.  Yes.
15    Q.  Who is Mr. Kelley?
16    A.  He was general counsel of
17 Insituform.
18    Q.  Did you have any conversations with
19 Mr. Kelley prior to your receipt of this
20 letter?
21    A.  I don't recall, sir.
22    Q.  And at the last sentence of the
23 third paragraph, do you see where it says "as
24 we will be asking you to detail your findings
25 for Monday this week to assist in documenting

21 (Pages 78 to 81)

Page 82

CAMPOS

1
2 the recoverable, but not yet adequately
3 documented costs. I" -- it says -- "I though
4 this package would be useful."
5        I think he meant "I thought," but
6 it says "I though."
7        Do you see that sentence sir?
8    A.  Yes.
9    Q.  Did I read it correctly?
10   A.  Yes, you did read it as "though."
11   Q.  As of June 16, 2005, which is the
12 date of this letter, were some costs not
13 adequately documented?
14   A.  Yes.
15   Q.  Do you recall generally what those
16 costs were?
17   A.  Well, when I first received the
18 claim, and the June 16th date may be before
19 or after, but I do recall the claim being as
20 high as $9 million, and it may not have been
21 the one that I got in June of '05, but
22 included in those costs were some corporate
23 overhead and some other factors that I
24 indicated would not be recoverable, and to
25 the extent that I wanted further

Page 83

CAMPOS

1
2 documentation on certain things, I requested
3 it at that point.
4    Q.  Is your memory that at that time,
5 June 2005, the claim may have been as high as
6 $9 million; is that correct, sir?
7    A.  No, that's not what my testimony
8 was.  It was at some point in time it was as
9 high as 9 million.  It may not have been in
10 June of '05 because it wouldn't have maybe
11 all of Phase II included at that point, but
12 what was submitted to Liberty did have, or
13 what I saw included corporate overhead of
14 over a million dollars.
15        That was one of the factors that I
16 indicated would not be recoverable under this
17 type of policy in my experience.
18   Q.  Do you recall what other costs were
19 not adequately documented at that time.
20   A.  Not off the top of my head, but
21 most of it was overhead or corporate overhead
22 of some type, and there were other
23 expenditures that, and I don't recall which
24 they were, that I wanted to see documentation
25 on rather than just the claim amount, okay.

Page 84

CAMPOS

1
2    Q.  Do you recall approximately how
3 much of those costs that, in your view, at
4 this time were not adequately documented?
5    A.  No, sir.
6    Q.  And focusing, again, on the last
7 sentence of the third paragraph, do you know
8 what Mr. Kelley means by "recoverable"?
9    A.  Well, what I thought he meant was
10 not recoverable under the terms of the policy
11 or under normal circumstances in the
12 insurance world, okay.
13   Q.  And by "policy," do you mean the
14 American Home policy?
15   A.  Yes, sir.
16   Q.  Did you play any role in
17 determining what costs were recoverable under
18 the American Home policy?
19   A.  That was the purpose of my review,
20 my critique was to determine what would be
21 recoverable, yes.
22   Q.  But you don't recall looking at any
23 specific policy language in the American Home
24 policy; isn't that correct?
25   A.  I do recall looking at the policy,

Page 85

CAMPOS

1
2 I don't recall the specifics, what page or
3 paragraph, but I do recall looking at the
4 policy, yes.
5    Q.  Do you recall anything about the
6 language of the policy at this time?
7    A.  It was a typical insurance
8 liability policy that I'm accustomed to
9 seeing in my practice.
10   Q.  What were the sources of
11 information you considered regarding this
12 case, sir?
13   A.  Well, the foundation to it was the
14 claim that was prepared by Insituform, and
15 based on the specific elements of the claim
16 there was underlying documentation that was
17 included in the binders that supported that,
18 the amounts that appeared in the summary, and
19 beyond that, to the extent that there wasn't
20 or to the extent that I had a question about
21 the recoverability of an item, I raised the
22 question to the personnel at Insituform.
23   Q.  Were you provided these documents
24 by Insituform?
25   A.  I believe they came directly from

22 (Pages 82 to 85)

Page 86

CAMPOS

1
2 Insituform, yes.
3    Q.  Okay.  And it's your testimony that
4 you received at or around the time of your
5 engagement two to four binders of material,
6 sir?
7    A.  I received several.  I received two
8 to four on a couple of occasions.  I believe
9 the first one I received only included
10 Phase I, then later on it included Phase I
11 and Phase II, but it included some things
12 that I felt were not recoverable and changes
13 were made to the claim from the 9 million
14 down to the 7 million that's part of, that's
15 referred to in my report.
16       And most of that reduction was due
17 to the comments that I made with respect to
18 recoverability of elements of the claim.
19    Q.  Do you know whether the material
20 that was provided to you was identical to the
21 material that was provided to Liberty Mutual?
22    A.  I do not know whether it was
23 identical.  It was represented to me that it
24 was, at the early stages, what was provided
25 to Liberty Mutual, and I believe that the

Page 87

CAMPOS

1
2 dollars that I saw, the total dollars matched
3 the total dollars referred to in some Liberty
4 communications.
5    Q.  Do you understand that Insituform
6 has also submitted an insurance claim to
7 Liberty Mutual with regard to this claim?
8    A.  I'm sorry, I didn't hear the
9 question.
10    Q.  Let me repeat it.  Do you
11 understand that Insituform has also submitted
12 an insurance claim to Liberty Mutual
13 concerning the MWRA claim?
14    A.  I thought that's what -- I'm
15 confused, I thought that's what we were
16 talking about.
17    Q.  We are.
18    A.  They submitted the claim to
19 Liberty Mutual in an amount, I don't recall,
20 but it's in my work, in my file, about
21 $6 million or something like that, but I
22 think it only included Phase I.
23    Q.  And you understand when I say the
24 "MWRA claim," we're talking about the
25 Massachusetts Water Resources Authority?

Page 88

CAMPOS

1
2    A.  Yes.  But since you inserted that,
3 I thought maybe you had some other -- I
4 wanted to make sure I got the record
5 straight.
6    Q.  Right.  And I may use that term
7 "MWRA claim" throughout this deposition, I
8 just want to make sure we understand we're
9 talking about the same thing?
10    A.  Agreed.
11    Q.  Okay.  Did you understand that
12 Liberty Mutual provided the primary coverage
13 in this case?
14    A.  The underlying coverage, yes.
15    Q.  And do you understand that
16 American Home provided excess coverage?
17    A.  Yes, sir.
18    Q.  Did you have any personal
19 involvement in submitting the claim to
20 Liberty Mutual?
21    A.  No, sir.
22    Q.  Were you provided with a summary of
23 the costs submitted to Liberty Mutual?
24    A.  I was given binders and I was told
25 it represented what was provided to

Page 89

CAMPOS

1
2 Liberty Mutual, and the total tied in to what
3 Liberty Mutual referred to.
4    Q.  Did you have any issues or concerns
5 with the costs that were submitted to
6 Liberty Mutual?
7       MR. PHILBRICK:  Objection, asked
8       and answered.  The witness may answer
9       again.
10    A.  I did, yes.
11    Q.  Can you tell me what your issues
12 and concerns were?
13    A.  There was corporate overhead
14 included in there that, I commented on, would
15 not be recoverable.
16    Q.  Can you think of any other issues
17 or concerns that you had with the costs that
18 were submitted to Liberty Mutual?
19    A.  Well, there were some fixed
20 expenses that were included in certain
21 categories of the claim that I felt would not
22 be recoverable.  Essentially it would be the
23 same comments I have in my report and as they
24 apply to the Liberty Mutual claim, they would
25 be the same.

23 (Pages 86 to 89)

Page 90

CAMPOS

1
2    Q.  You mentioned the same comments
3  that you made in your report, are you
4  referring to the report that you prepared in
5  this case with regard to the claim against
6  American Home?
7    A.  Yes, sir.
8    Q.  Can you tell me what documents you
9  considered in this case in formulating your
10  opinions?
11      MR. PHILBRICK:  Objection, asked
12      and answered.  The witness may answer
13      again.
14    A.  I reviewed ultimately the four
15  large binders that had the claim and
16  supporting documentation to it that I
17  reviewed, along with the two policies.  I
18  looked at, I believe, an affidavit from
19  Mr. Kelley relative to the Liberty Mutual
20  policy or settlement.
21      I looked at a motion that was
22  prepared by yourself, I think, or your firm
23  relative to the issues in this case.  I
24  requested certain information from
25  Insituform, and obtained it.

Page 91

CAMPOS

1
2    Q.  What kind of information did you
3  request from Insituform?
4    A.  Information with respect to
5  attempting to analyze the elements of the
6  burden or overhead to determine fixed versus
7  variable.  There was an ongoing process.
8      As I said, I looked at a couple of
9  other binders before and my critique was
10  ongoing, and as I was critiquing Insituform
11  I was making changes, majority of them
12  downward, in arriving at the four ultimate
13  binders that were produced in this case.
14    Q.  Okay.  Do you have copies in your
15  office of the binders that were originally
16  given to you in this case?
17    A.  I may have, yeah.
18    Q.  Do those binders include costs as
19  you've testified to that were excluded from
20  the claim that was ultimately presented in
21  this case?
22    A.  Claim costs, yeah.
23    Q.  Okay.  You've testified about a
24  bunch of different categories of materials
25  and documents that you considered in

Page 92

CAMPOS

1
2  formulating your opinion in this case.  Can
3  you think of any other documents or materials
4  that you considered in formulating your
5  opinions in this case?
6    A.  Deposition transcripts of
7  Mr. Mangels and Mr. Porzio and related
8  exhibits.  I can't recall anything else off
9  the top of my head as I sit here today.
10    Q.  Did you review the deposition
11  transcripts of Mr. Mangels and Mr. Porzio?
12    A.  Yes, sir.
13    Q.  As well as the related exhibits?
14    A.  Yes.
15    Q.  Did Insituform ever fail to provide
16  you with any documents or information that
17  you requested?
18    A.  I wouldn't say they "failed to
19  provide me."  What happened was, I guess I
20  was dealing with Mr. Campanile who left the
21  firm, left Insituform, and he was the person
22  who was my contact to get information,
23  there's only one area that, very minor area
24  of where there may be some fixed expense
25  included in the claim that I didn't get

Page 93

CAMPOS

1
2  information on, that sort of fell through the
3  cracks, but not that it was a refusal to give
4  me the information, okay, as time passed it
5  just didn't happen, okay.
6    Q.  Okay.  Is your investigation now
7  complete?
8    A.  No, it's still ongoing.  There's
9  still some areas that we're working on right
10  now.
11    Q.  If it's not complete, what else do
12  you plan to do?
13    A.  Well, with respect to the closeout
14  costs, for example, I'm expecting Mr. Mangels
15  to provide me with underlying documentation
16  for the estimates that are included in the
17  claim, and I expect I might have that within
18  a week, and preliminary indications are that
19  the estimated claim closeout costs of, I
20  believe, were 240,000, might come down to
21  slightly over 200,000.
22      Another area we're working on is
23  trying to determine the costs before
24  December 31st and after December 31st, and do
25  a quantitative analysis and then do a

24 (Pages 90 to 93)

Page 94

CAMPOS

1
2 qualitative analysis, from an operational
3 point of view, to determine what costs were
4 incurred prior to this date and after this
5 date for Phase I.
6    Q.   Are you talking about December 31st
7 of 2003, sir?
8    A.  Yes, sir.  Sorry.
9    Q.   So you are trying to go back and
10 look at what costs were incurred prior to
11 December 31st, 2003 and what costs were
12 incurred after that date with respect to
13 Phase I repairs; is that correct, sir?
14    A.  Yes.
15    Q.   Why are you doing that?
16    A.  At the request of counsel, based on
17 some of the written documentation that I've
18 seen in this case, okay.  We're in the
19 process of doing that quantitatively and then
20 from a qualitative point of view, operational
21 point of view to determine, to answer
22 counsel's question, okay.
23    Q.   Sure.  Sir, did you request to do
24 that analysis of looking at the costs prior
25 to and after December 31, 2005?

Page 95

CAMPOS

1
2    A.  You mean me as opposed counsel?
3    Q.   Yes.  Did that come from your
4 initiative or did they ask you to do that?
5    A.  It was a conversation that was
6 held, me and counsel, with respect to I think
7 it was one of your motions, and reading that,
8 what evolved was a joint effort of doing this
9 together, okay.
10    Q.   I see.  You mentioned in your
11 answer in analyzing the costs prior to and
12 after December 31, 2003, doing both a
13 quantitative analysis and a qualitative
14 analysis from an operational point of view;
15 is that correct, sir?
16    A.  Yes.
17    Q.   Can you tell me what it means to do
18 a quantitative analysis?
19    A.  Just adding up the numbers of the
20 invoices before and after, looking at the
21 invoices themselves, not the date it was
22 paid, not the date of the invoice, but the
23 date that the service was performed or the
24 product was received or whatever, and then
25 discuss this with operational personnel

Page 96

CAMPOS

1
2 becomes the qualitative analysis, and those
3 are just terms that I thought of as I sit
4 here today.
5    Q.   Okay.  Well, you anticipated my
6 next question which is, what is a
7 "qualitative" analysis?
8    A.  Looking, talking to the operational
9 people and getting their opinions as to the
10 type of expenditure.
11    Q.   Getting their opinions about what?
12    A.  The type of expenditure and how it
13 fits into the policy terminology, along with
14 interpretation from counsel.
15    Q.   In other words, to examine the type
16 of expenditure and why it was incurred?
17    A.  I guess --
18    Q.   Is that a fair statement?
19    A.  From that point of view, yeah.
20    Q.   Up until this day, has a
21 qualitative analysis ever been done on this
22 claim by you?
23    A.  I'm not doing the qualitative
24 analysis on this.  I'm doing this -- someone
25 else -- from an operational point of view of

Page 97

CAMPOS

1
2 the company would be doing this, okay.  The
3 quantitative analysis I've done, and I've
4 done a qualitative analysis from the point of
5 view that I've determined what's recoverable
6 or not recoverable, even though I may capture
7 certain amounts, I may qualitatively decide
8 that it's not recoverable, and I've critiqued
9 that and commented on that in my report.
10    Q.   Let me just make sure I understand.
11 Prior to going back and doing this analysis
12 concerning the December 31, 2003 date, okay,
13 my question is, when you put together your
14 report in this case did you personally, not
15 Insituform, did you personally go and
16 interview personnel to determine why certain
17 costs were incurred?
18    A.  Interview which personnel?
19    Q.   Any personnel at Insituform?
20    A.  Well, I interviewed Insituform
21 personnel not to determine why they were
22 incurred -- well, it's in a sense why they
23 were incurred, but also how they were
24 incurred and how they were captured.
25    Q.   So is the answer to my question

25 (Pages 94 to 97)

Page 98

CAMPOS

1
2 "yes," you did perform that analysis --
3    A.  Yes, yes.
4    Q.  -- prior to looking at updating the
5 damages figure based on the December 31, 2003
6 date?
7    A.  Prior to issuing my report?
8    Q.  Prior to issuing your report?
9    A.  Yes, sir.  And there's one further
10 aspect that one of the comments in my report
11 was with respect to some fixed expense that's
12 included in there, I've quantified that and
13 identified a dollar amount for that.
14    Q.  And it's your testimony that work
15 is completed, sir?
16    A.  With respect to?
17    Q.  Fixed costs?
18    A.  For one element of it, of the
19 claim.  There's another element of it that
20 has not been complete that could include some
21 fixed costs, I don't know how much, if any,
22 okay.
23    Q.  And you testified that you've
24 quantified that with regard to one of the
25 elements --

Page 99

CAMPOS

1
2    A.  Yes.
3    Q.  -- is that correct, sir?
4    A.  Yes.
5    Q.  Is there in any kind of
6 documentation?
7    A.  Yes.
8    Q.  What kind?
9    A.  One piece of paper that I have in
10 my bag.
11    Q.  Okay.
12       MR. PHILBRICK:  Do you want me to
13 get it?
14       MR. DESCHENES:  Yeah, at a break.
15 You don't need to do it now.
16       MR. PHILBRICK:  Okay.
17    Q.  Is that the area that you testified
18 to previously about fixed costs falling
19 through the cracks?
20    A.  No, not really, not that area.
21 There's another area that I just testified to
22 that is a small amount, that could include
23 some fixed cost.  That is a total universe of
24 fringe benefits, that may include some fixed
25 costs, I don't know.

Page 100

CAMPOS

1
2    Q.  What area is that, sir?
3    A.  Fringe benefits.
4    Q.  "Fringe benefits"?
5    A.  Yes.
6    Q.  And is that a part of the labor
7 burden or equipment burden or both?
8    A.  Payroll burden.
9    Q.  "Payroll burden."
10    A.  It is an insignificant part of the
11 claim.
12    Q.  Is that the part that has been
13 already quantified by you, the payroll
14 burden, fringe benefits?
15    A.  I've quantified the universe of
16 what could be, could include fixed, yes, I've
17 quantified that.  But what I testified
18 earlier that says on a piece of paper, that's
19 the fixed burden that I've quantified and
20 identified as part of the equipment burden.
21    Q.  Okay.
22    A.  And in that instance I'm -- that
23 would reduce the claim by a certain dollar
24 amount.
25    Q.  Understood.  So just to clarify,

Page 101

CAMPOS

1
2 the part that you've quantified, and we can
3 look at this document at some point, if
4 counsel wants to provide it, but the part
5 that you've already quantified is the fixed
6 cost related to equipment burden; is that
7 correct?
8    A.  I believe that's it, yes.
9    Q.  And are you still working on the
10 fixed costs with respect to the payroll
11 burden?
12    A.  No, I'm not.
13    Q.  You are not?
14    A.  The total amount is as we
15 accountants would look at it, an
16 insignificant amount, and as an insurance
17 adjuster would look at it, it's an
18 insignificant amount relating to the total
19 claim.
20    Q.  And for that reason you are not
21 still working on that figure; is that
22 correct, sir?
23    A.  No, that's right.
24    Q.  Okay.  What is your understanding,
25 sir, as to why you are going back and

26 (Pages 98 to 101)

Page 102

CAMPOS

1
2 analyzing the costs prior to and after
3 December 31, 2003?
4    A.  Based on as I said earlier, a
5 motion that you had submitted to the court
6 and discussions with Mr. Philbrick,
7 subsequent to my reviewing that.
8    Q.  And what did Mr. Philbrick tell you
9 about that issue?
10    A.  He requested that we attempt to
11 quantify.
12    Q.  Did he tell you why?
13    A.  Other than the motion -- he didn't
14 tell me why, no.
15    Q.  Okay.  And you referred to the
16 "motion," what is it about the motion is your
17 understanding about the costs prior to
18 December 31, 2003?
19    A.  Your motion referred to certain
20 conditions, and I don't want to testify to
21 them and use terminology that may conflict
22 with the specifics of your motion, but that
23 motion referred to policy language, if I
24 remember correctly, and with respect to I'll
25 use the term loosely, don't hold me to this,

Page 103

CAMPOS

1
2 "repair costs," "replacement," so forth, and
3 it was based on that motion, that my reading
4 of it and discussions with Mr. Philbrick led
5 us jointly to conclude that we should do
6 this, okay, and that's what I've done.
7    Q.  And by doing this, doing this
8 analysis of the costs incurred prior to
9 December 31, 2003, are you looking at whether
10 those costs are not recoverable, in other
11 words, under the policy?
12    A.  I'd have to look.  I'm at the point
13 where I don't know the answer to that
14 question until there's an operational review
15 of it, okay.
16    Q.  Okay.  But is that the reason why
17 you are looking at it?
18    A.  It could be, I don't know.  I don't
19 know the legalities of it.
20    MR. DESCHENES:  Off the record.
21    (Lunch recess taken 11:58.)
22    A F T E R N O O N   S E S S I O N
23    (Time noted: 12:49 p.m.)
24 C H R I S  C A M P O S,  resumed and
25 testified as follows:

Page 104

CAMPOS

1
2 EXAMINATION BY (Cont'd.)
3 MR. DESCHENES:
4    Q.  I think where we were before we
5 broke was, I was asking you questions about
6 what further investigation you planned to do
7 in this case, and you testified about a few
8 things.
9        Is there anything else you can
10 recall that you plan to do in terms of
11 further investigation in order to testify as
12 an expert in this case?
13    A.  Nothing further than what I
14 testified before the break.
15    Q.  And you testified before the break
16 about performing both a quantitative and
17 qualitative analysis of costs incurred prior
18 to December 31, 2003; is that correct?
19    A.  Having performed the quantitative
20 analysis, the qualitative analysis is going
21 to follow with the operational people.
22    Q.  Okay.  My question was, have you
23 completed the quantitative part of the
24 analysis?
25    A.  I think it's been done, yes.

Page 105

CAMPOS

1
2    Q.  Okay.  And do you have any
3 knowledge or information about the amount of
4 costs that were incurred prior to
5 December 31, 2003?
6    A.  No.  My partner was doing this
7 under my direction, as late as yesterday, and
8 I did not review it, I do not know.
9    Q.  Besides the things that you've
10 testified to prior to the break, have you now
11 done everything you need to do in order to
12 formulate your opinions in this case?
13    A.  Yes, I believe so.
14    Q.  And subject to the things that you
15 mentioned prior to the break, are your
16 opinions now complete and final?
17    A.  Yes.
18    Q.  Did you review any treatises or
19 journals in formulating your opinions in this
20 case?
21    A.  No, I did not.
22    Q.  Did you review the MWRA contract
23 documents in formulating your opinions in
24 this case?
25    A.  I reviewed the contract, but I

27 (Pages 102 to 105)

Page 106

CAMPOS

1
2 wouldn't say that I did it to formulate my
3 opinions. I reviewed the contract to
4 understand it, that's all.
5    **Q. So I understand, you are not**
6 **relying on the contract for any of your**
7 **opinions in this case; is that correct?**
8    A. Not that I can recall, no, sir.
9    **Q. Okay. But you looked at the MWRA**
10 **contract; is that your testimony?**
11    A. Yes.
12    **Q. And did you interview any**
13 **Insituform personnel in order to formulate**
14 **your opinions in this case?**
15    A. Yes.
16    **Q. Can you tell me who you**
17 **interviewed?**
18    A. Mr. Nick Campanile.
19    **Q. Can you spell his last name?**
20    A. C-A-M-P-A-N-I-L-E.
21    **Q. And my understanding is he is no**
22 **longer with the company; is that correct?**
23    A. That's my understanding.
24    **Q. When did you interview**
25 **Mr. Campanile?**

Page 107

CAMPOS

1
2    A. Before I issued my report and
3 during the course of my work.
4    **Q. Was he your primary contact with**
5 **Insituform when you were working on your**
6 **engagement?**
7    A. Yes, sir.
8    **Q. Did you interview anybody else from**
9 **Insituform in formulating your opinions?**
10    A. Well, during the course of my work,
11 I believe I had a conference call with
12 Mr. Campanile, and other personnel at
13 Insituform, I don't recall specifically their
14 names, okay.
15    **Q. And this was a conference call**
16 **with, I take it, more than Mr. Campanile on**
17 **the line; is that correct?**
18    A. Yes, sir.
19    **Q. And at this time you cannot**
20 **remember who else participated in that call;**
21 **is that correct?**
22    A. That's correct.
23    **Q. And was this before or after your**
24 **report was issued?**
25    A. I believe it was before.

Page 108

CAMPOS

1
2    **Q. Did you interview any other**
3 **personnel from Insituform in order to**
4 **formulate your opinions in this case?**
5    A. I had some conversations with
6 Mr. Kelley, but they weren't in connection
7 with necessarily with my opinion, maybe some
8 clarifications or some questions that I had,
9 but essentially most of the substantive
10 questions were with Campanile.
11    **Q. Do you recall what you discussed**
12 **with Mr. Kelley in your conversations with**
13 **him?**
14    A. No, I do not.
15    **Q. Did you take any notes of those**
16 **conversations?**
17    A. No.
18    **Q. And Mr. Campanile was your primary**
19 **contact at Insituform, when you had**
20 **conversations with him and interviewed him,**
21 **what kind of questions did you ask him?**
22    A. In most instances it was to get
23 behind the claim amounts to support them, and
24 to question their includibility in the claim,
25 these questions along the lines of the fixed

Page 109

CAMPOS

1
2 versus the variable type of expenses, to get
3 the actual costs incurred.
4    **Q. As part of your engagement, did you**
5 **investigate Insituform's efforts to mitigate**
6 **its damages?**
7    A. I think you asked me that question
8 earlier, the answer is no.
9    **Q. Okay. Did you make any inquiry of**
10 **anybody at Insituform in that regard?**
11    A. No.
12    **Q. According to your report, the data**
13 **on the schedules was downloaded from**
14 **Insituform's JD Edwards System; is that**
15 **correct?**
16    A. That's my understanding.
17    **Q. What is the "JD Edwards System"?**
18    A. It's a software system.
19    **Q. Is it a software system for**
20 **accounting specifically?**
21    A. Accounting for costs is what I
22 understand.
23    **Q. Sir, in formulating your opinions,**
24 **were you ever given direct access to this**
25 **internal software program?**

28 (Pages 106 to 109)

Page 110

CAMPOS

1
2    A.  No.  I was given access to the
3 output.
4    Q.  Okay.  Did you ever ask for
5 internal access to the software program?
6    A.  I don't believe I did.
7    Q.  Is it fair to say that the numbers
8 from the JD Edwards System are only as good
9 as the numbers that are put into the system
10 initially?
11    A.  That's I guess a fair statement
12 with respect to any computer software system.
13    Q.  And before the break I think you
14 testified that Insituform itself was
15 responsible for putting together the package
16 of costs initially; is that correct?
17    A.  Yes, sir.
18    Q.  And do you have any understanding
19 as to who put that package together
20 initially?
21       MR. PHILBRICK:  I'm going to
22    object, asked and answered.  The witness
23    may answer again.
24    A.  I believe it was Mr. Campanile or
25 people under his direction.

Page 111

CAMPOS

1
2    Q.  Okay.
3    A.  Or possibly even Mr. Kelley under
4 his direction.
5    Q.  Sure.  So you got the package of
6 materials from Insituform, did you have any
7 direct involvement in putting that package
8 together initially?
9    A.  No, sir.  I think I've testified to
10 that, I did not put it together.
11    Q.  Right.  In other cases, do you ever
12 go in and put together the damages documents
13 right from the beginning?
14    A.  Yes.  You know, it's part of my
15 assignment to do that, yes.
16    Q.  Okay.  And in this particular case
17 with regard to Insituform, did you ever
18 perform any audit of the numbers that were
19 given to you by Insituform?
20    A.  Well, the use of the word "audit"
21 can be misconstrued.  I did a review and
22 analysis, and you might in the generic sense
23 refer to it as an "audit" of the
24 documentation, to satisfy myself as to the
25 reasonableness of the data, the accuracy of

Page 112

CAMPOS

1
2 the data and its includibility.
3    Q.  Okay.  Did you ever go on-site and
4 look at their numbers on-site and look at
5 their documentation on-site to verify that
6 the numbers are the same?
7    A.  When you say "on-site"?
8    Q.  At their place of business?
9    A.  Well, they have a couple places of
10 business.  I did not go to any of the
11 locations, no.
12    Q.  Is it fair to say then that you
13 relied on the documents that were provided to
14 you from Insituform in formulating your
15 opinions?
16    A.  I used those documents as a
17 foundation for my audit and review, I didn't
18 rely on them blindly.  I audited them, made
19 changes to them.
20       As I testified to earlier, there
21 were substantial changes to the documents
22 before the claim was finally submitted, and
23 even that which was submitted I critiqued and
24 questioned the includibility of some items as
25 set forth in my report.

Page 113

CAMPOS

1
2    Q.  Do you know whether anybody besides
3 Nick Campanile was involved in assembling the
4 costs that were given to you?
5    A.  As I testified earlier, it could
6 have been other people under his direction.
7    Q.  Do you know?  I guess I'm asking if
8 you have any knowledge about the identity?
9    A.  I believe there were, but I don't
10 know who, okay.
11    Q.  Did you work with Larry Mangels at
12 all in terms of your engagement?
13    A.  I believe he may have been in a
14 conference call that I had with, and recently
15 with him in connection with documenting the
16 closeout costs.
17    Q.  Did you consult at all with
18 Tom Porzio?
19    A.  No, not that I can recall.  Unless
20 he was on a conference call.
21    Q.  Did you consult with anybody else
22 at Insituform in formulating your opinions in
23 this case?
24       MR. PHILBRICK:  Objection, asked
25    and answered.  The witness may answer

29 (Pages 110 to 113)

Page 114

CAMPOS

1
2 again.
3    A.    Other than Mr. Campanile and
4 possibly Mr. Mangels and what I may have
5 testified to, none that I can recall.
6        MR. DESCHENES:  Let's mark this as
7    the next.
8        (Campos Exhibit 5, document, marked
9    for identification, as of this date.)
10    Q.   Are you ready to go?
11    A.   Yes, sir.
12    Q.   Okay.  I would like to refer you to
13 what has been marked as Exhibit No. 5.
14        Do you recognize this document?
15    A.   The basic document, yes, I
16 recognize it.
17    Q.   And what is it?
18    A.   It's my report of May 22nd to
19 Mr. Philbrick on this matter.
20    Q.   And is that your signature on
21 page eight of the report?
22    A.   Yes, it is.
23    Q.   Did you draft this report, sir?
24    A.   The initial draft may have been by
25 Ms. Siri, with my changes or we did it

Page 115

CAMPOS

1
2 together, I don't recall.
3    Q.   Was anybody else involved in the
4 preparation of the report?
5    A.   No, sir.
6    Q.   Were there any prior drafts of this
7 report, Exhibit No. 5?
8    A.   Well, there would be working drafts
9 leading to this that may have had
10 typographical errors or changes that had to
11 be made for clarification purposes, this is
12 the final version.
13    Q.   Do you know how many previous
14 drafts there were?
15    A.   No, I do not.  And I do not
16 maintain drafts, otherwise I'd need a
17 warehouse.
18    Q.   Well, you anticipated what I was
19 going to ask you.  Do you still have those
20 drafts today?
21    A.   No, sir, and it's the policy for
22 the reason I stated, otherwise I would need a
23 warehouse to store everything.
24    Q.   Sure.  So it's your practice and
25 procedure to destroy prior drafts of a

Page 116

CAMPOS

1
2 report; is that correct?
3    A.   That's correct, sir.
4    Q.   And that's not something counsel
5 told you to do; is that correct?
6    A.   That's not something counsel or
7 anyone told me to do, that's our firm policy.
8    Q.   Okay.  According to page one of
9 your report, it states that, and I'm at the
10 last sentence of the fifth paragraph, it says
11 that your opinions are based on two things,
12 four claim binders, your review of the four
13 claim binders, and discussions with
14 Insituform's management.
15        Do you see that?
16    A.   Yes, sir.
17    Q.   Is that correct?
18    A.   Yes, sir.
19    Q.   On the table in front of us here
20 are four binders.  I will represent to you
21 they are copies of binders that were produced
22 to us by counsel, Mr. Philbrick, in this case
23 and I just ask you to study a moment, I'm not
24 going to ask you to study these binders
25 because it would take too much time, but if

Page 117

CAMPOS

1
2 you could take a look at the binders and
3 identify for me, after looking at the
4 binders, whether these are the four claim
5 binders that are referenced in your report?
6    A.   By a quick review of the beginning
7 and ending pages of the binders, it appears
8 to be the four claim binders that I reviewed
9 and are the basis for my opinion.
10    Q.   And the four claim binders that are
11 referenced in your report; is that correct,
12 sir?
13    A.   Yes, sir.
14        MR. DESCHENES:  Why don't we do
15    this, Charlie, and mark these as 6A, B,
16    C and D, does that make sense?
17        MR. PHILBRICK:  That would be fine.
18        MR. DESCHENES:  Okay.  Can we do
19    that, Court Reporter?
20        (Campos Exhibits 6A through 6D,
21    documents, marked for identification, as
22    of this date.)
23    Q.   Okay.  We've now marked the four
24 claim binders 6A, 6B, 6C and 6D,
25 corresponding with binders 1, 2, 3 and 4

30 (Pages 114 to 117)

Page 118

CAMPOS

1 respectively.
2
3        Did you rely on any other documents
4 that you reviewed in order to formulate your
5 opinions, besides 6A through 6D?
6    A.  Yes.  There were documents in my
7 claim -- in my working paper file that were
8 produced and Bates numbered, that were
9 produced to you, I relied on some of those.
10    Q.  Okay.  Can you identify based on
11 your memory right now what those documents
12 are, sir?
13    A.  The specific documents?
14    Q.  Yes, the specific documents that
15 you relied upon in reaching your opinions in
16 this case?
17    A.  There were some claim summaries,
18 there were some budgeted expenses that were
19 used to establish standard rates, among other
20 documents that I cannot recall the specifics
21 of, but they're part of the production.
22    Q.  Now, turning to Exhibit 5, which I
23 think is still in front of you, sir, which is
24 your report in this case.
25    A.  Yes, sir.

Page 119

CAMPOS

1
2    Q.  Do you intend to offer any expert
3 opinions in this case beyond what is
4 described in this report?
5    A.  Not that I'm aware of, I don't plan
6 to, no, sir.
7    Q.  So all of the opinions that you
8 plan to give in this case are contained in
9 Exhibit 5, which is your May 22nd report; is
10 that correct?
11    A.  With the one caveat of the
12 adjustment that I guess was referred to just
13 before lunch, where I've calculated the fixed
14 expense and the material burden, that would
15 be in my opinion a reduction of the claim and
16 as I look at it, the finalization of the
17 closeout costs.
18    Q.  Okay.  With those two pieces in
19 mind, which I think you testified to is the
20 equipment burden and the reduction of the
21 claim as a result of the equipment burden,
22 and the finalization of the closeout costs,
23 do you plan to offer any other opinions in
24 this case other than what is contained in
25 your report?

Page 120

CAMPOS

1
2    A.  No, not that as I sit here today
3 I'm aware of.
4    Q.  Do you plan to make any further
5 reductions to the claim in this case?
6    A.  I do not plan to make any further
7 reductions or any other changes up or down.
8    Q.  Okay.
9        MR. DESCHENES:  Let's mark this
10 next one 7.
11        (Campos Exhibit 7, document, marked
12 for identification, as of this date.)
13    Q.  Are you all set, sir?
14    A.  Yes, sir.
15    Q.  Mr. Campos, I would like you to
16 refer to what's opinion marked as Campos
17 Exhibit No. 7.
18        Do you recognize that document?
19    A.  Yes, I do.
20    Q.  What is it?
21    A.  It's my affidavit in this case,
22 dated September 6, 2006.
23    Q.  Is that your signature on the
24 second page?
25    A.  Yes, sir.

Page 121

CAMPOS

1
2    Q.  Who prepared this affidavit, sir?
3    A.  I don't recall, but whoever
4 prepared it, I read it and satisfied myself
5 as to its accuracy and executed it.
6    Q.  Well, let me ask you it
7 differently.  Did you prepare this affidavit?
8    A.  I don't recall, sir.
9    Q.  But you reviewed the affidavit for
10 its accuracy before signing it; is that
11 correct?
12    A.  Obviously I did, yes, sir.
13    Q.  And did you make any changes to the
14 affidavit before signing it?
15    A.  I don't recall.
16    Q.  And you signed this affidavit under
17 the pains and penalties of perjury.
18        Do you see that?
19    A.  Yes, sir.
20    Q.  Can you turn to paragraph four?
21    A.  Yes, sir.
22    Q.  Let me just read it into the
23 record.  It says "assuming that the
24 American Home policy provides coverage for
25 the MWRA claim, and as explained and

31 (Pages 118 to 121)

CAMPOS

1
2 qualified in my report, the total amount of
3 recoverable loss is $7,398,299.05, which is
4 Insituform's actual cost to remove and
5 replace the installed pipe; American Home's
6 share of the recoverable loss is
7 $6,398,299.05 as explained and qualified in
8 my report. The opinions in my report are
9 based on a reasonable degree of accounting
10 certainty."
11       Did I read that correctly, sir?
12    A.  Yes.
13    Q.  Do you still believe, sir, that the
14 statement in paragraph four is true and
15 accurate today?
16    A.  It's the basis of it is true and
17 accurate.  As I said, subject to the comments
18 in my report and subject to the adjustment
19 that I mentioned prior to the lunch break,
20 which would reduce the claim by that amount
21 of that adjustment.
22    Q.  Okay.  That is not still your
23 opinion today that Insituform is entitled to
24 recover $6,399,299.05 from American Home in
25 this case and not a penny less; is that

CAMPOS

1
2 correct, sir?
3    A.  Not 6.398 million, but 6.398
4 minus -- you have my schedule -- I think it's
5 $380,000, and minus an adjustment for the
6 closeout cost of some 60 some thousand
7 dollars.
8    Q.  And are there any other adjustments
9 you would like to make to the total cost that
10 Insituform is claiming in this case?
11    A.  No, sir, there's nothing of any
12 significant nature that has to be adjusted.
13    Q.  And I think you testified before
14 that in connection with your opinion, you
15 made no analysis about whether the
16 American Home policy provide any coverage in
17 this case; is that correct?
18    A.  That is not my area of expertise,
19 coverage.
20    Q.  Right.
21    A.  Nor am I qualified or licensed to
22 do that.
23    Q.  So in reaching your conclusions,
24 you just assumed that the policy would
25 provide coverage; is that correct?

CAMPOS

1
2    A.  That's correct, and I've so stated,
3 I believe as you read in my affidavit, that's
4 what I stated.
5    Q.  Well, let me ask you something else
6 about your affidavit.  You say "as explained
7 and qualified in my report."
8       Do you see that?
9    A.  Yes.
10    Q.  What did you mean by that
11 statement?
12    A.  As to that, that modifies the
13 recoverable loss.  In my report I indicated
14 there was some fixed expense in there and, as
15 I testified earlier, I believe now that has
16 to be adjusted downward, and I also said in
17 my report that the estimates, that the
18 closing costs are estimates of future costs,
19 and I have not reviewed any supporting
20 documentation to date.
21    Q.  Well, sir, when you signed the
22 affidavit, you believed that those fixed
23 costs were not properly includable in the
24 claim at that time, didn't you?
25    A.  Yes, and I was in the process of

CAMPOS

1
2 analyzing those at the time, okay.
3    Q.  Yeah, I understand.  So at the time
4 you signed the affidavit, isn't it true, sir,
5 that you did not believe that Insituform was
6 entitled to the full amount of the
7 $6,398,299.05 that's listed in your
8 affidavit?
9       MR. PHILBRICK:  Well, his affidavit
10    doesn't say --
11       MR. DESCHENES:  You can object.
12       MR. PHILBRICK:  No, you are arguing
13    with the witness.  His affidavit doesn't
14    say that, I object to form.
15       MR. DESCHENES:  Off the record.
16       (Off-the-record discussion held.)
17       (Record read.)
18    A.  When I signed the affidavit, as I
19 said in my affidavit, it was that amount as
20 explained and qualified in my report and I
21 explained and qualified that there was
22 amounts that had to come out, and I have
23 brought those amounts forward voluntarily
24 myself and reduced the claim this morning, so
25 yes, they are entitled to 3 million --

32 (Pages 122 to 125)

Page 126

CAMPOS

1
2  6.398 million minus the areas that were
3  explained in my report.
4      Q.  Well, let me ask you this.  In your
5  report, does it quantify the amount of money
6  for fixed expenses that you think are not
7  includable in this claim?
8      A.  It doesn't quantify it, it
9  identifies the area and I put that in my
10 report, that some adjustment has to be made
11 is what my report says.
12     Q.  I understand.
13     A.  Any reasonable person would look at
14 the two and understand that it's that minus
15 any adjustment that's necessary.
16     Q.  All right.  My question is just
17 simply this, your report does not quantify
18 that adjustment; is that correct, sir?
19     A.  And I responded and testified that
20 it did not quantify it at the time.
21     Q.  Okay.
22     A.  But it identified the issue.
23     Q.  The category?
24     A.  Of fixed expense.
25     Q.  Okay.  Do you want to qualify your

Page 127

CAMPOS

1
2  opinions in this case in any other way?
3      A.  In any other way other than the
4  fixed amount of the burden and the adjustment
5  that's necessary to finalize the closeout
6  costs, that is it.  I also have said in my
7  report that there's the possibility of some
8  fixed in the payroll burden, the total
9  universe of which is $117,000, with in my
10 opinion is insignificant as an accountant,
11 and as someone involved in insurance
12 adjustments, it's insignificant in a
13 $7 million claim.
14        And I do not know whether what
15 part, if any, of the 117,000 would be fixed,
16 okay, unless a detailed analysis was made of
17 that.
18     Q.  And that has not been done to date;
19 is that correct, sir?
20     A.  It has not been done and is not
21 intended to be done based on the
22 immateriality of the amount.
23     Q.  Do you plan to qualify your opinion
24 at all based on the other analysis you
25 testified about this morning, which is the

Page 128

CAMPOS

1
2  analysis of the costs that were incurred
3  prior to December 31, 2003?
4      A.  My report will not, the total
5  dollars will not change, they would be just
6  categorized in different areas, that becomes
7  a coverage issue that I am not going to be
8  involved in a coverage area, okay.
9      Q.  So is the answer to my question
10 that "no," you don't plan, you, do not plan
11 to change the numbers based on your analysis
12 of what costs were incurred prior to
13 December 31, 2003; is that correct?
14     A.  As I sit here today, I do not plan.
15     Q.  Sir, you have no personal knowledge
16 about how and why the repair and remediation
17 costs were incurred in this case; is that
18 correct?
19     A.  Other than what I've read in the
20 documentation, I have no personal knowledge,
21 no.  I wasn't involved, I wasn't there at the
22 time.
23     Q.  And you were not asked as part of
24 your engagement to investigate that; is that
25 correct?

Page 129

CAMPOS

1
2      A.  That's correct, that's not part of
3  my assignment to investigate the causes.
4      Q.  Now, you were also not asked to
5  analyze whether the costs are reasonably
6  related to the remediation; is that correct?
7          MR. PHILBRICK:  Object to form.
8      The witness may answer if he can.
9      A.  I think you asked me that question
10 before.  I was not asked to do that in my
11 assignment.
12     Q.  Okay.  That's what I'm trying to
13 establish.  And so in this case you have no
14 opinion about whether the costs are
15 reasonably related to the remediation; is
16 that correct?
17         MR. PHILBRICK:  Objection to form.
18     The witness may answer if he can.
19     A.  I have no opinion as to whether
20 they are reasonably related other than the
21 collection of the data under a work order
22 that was related to the remediation, and that
23 it was put together and collected under a
24 work order, which the procedures of
25 Insituform were that once you set up a work

33 (Pages 126 to 129)

Page 130

1          CAMPOS
2 order, that everything should be charged to
3 that work order, or a "job number" let me
4 call it, instead of a "work order."
5    Q.  But as part of your charge, you
6 weren't asked to do that analysis; is that
7 correct, sir?
8    A.  To do which analysis?
9    Q.  Whether the costs are reasonably
10 related to the remediation?
11       MR. PHILBRICK:  Objection to form.
12   The witness may answer.
13   A.  I think I answered that question,
14 yes, it was not part of my assignment.
15   Q.  And you were also not asked to
16 analyze whether the costs are reasonable and
17 necessary; is that correct, sir?
18   A.  That's correct.  Reasonable from
19 the point of view of an insurance claim, yes,
20 but not that they were necessary or not.
21 There was an assumption on my part, as I
22 testified several times, that the costs were
23 collected under a job number and once the job
24 number was created, in connection with this
25 job, that the costs would be collected

Page 131

1          CAMPOS
2 accordingly.
3    Q.  You were not asked to make any kind
4 of independent evaluation about whether such
5 damage figures are too high or too low; is
6 that correct, sir?
7    A.  I think you've asked me that
8 question before, I was not asked to make that
9 kind of determination, no, sir.
10       Again, I saw no incentive for
11 someone to charge more money into the claim
12 and pay it out to someone else, there's no
13 incentive for that.
14   Q.  Now, how do you know whether
15 something is reasonable if you do not look at
16 whether it could have been done in a cheaper,
17 less costly way from the perspective of an
18 insurance company, which is I think how you
19 qualified that?
20   A.  The work that's done, if for some
21 reason somebody blindly accepted an
22 overcharge from a vendor in a claim against
23 American Home, for purposes of just putting
24 it into the American Home claim, then the
25 next time they deal with the same vendor they

Page 132

1          CAMPOS
2 are going to get overcharged.  There's no
3 incentive in the real business world to do
4 that.
5       Someone may question it from the
6 point of view of second guessing, but in the
7 real world and in the course of trying to get
8 an assignment and this project done as
9 quickly as possible, you do not blindly just
10 say -- you use people that you are used to
11 working with, that you are used to knowing
12 that their numbers are accurate; I own a
13 building, I get a call from my secretary two
14 days ago, we have something to do, who should
15 I talk to, talk to so and so, they are
16 reasonable.  I don't get five quotes on it.
17   Q.  All right.  Well, let me ask you
18 the question a different way.  When you use
19 the term "reasonable," let me ask you this,
20 "reasonable" as compared to what?
21   A.  Consists of what?
22   Q.  No.  When you use the term
23 "reasonable" --
24   A.  Yes.
25   Q.  -- "reasonable" as compared to

Page 133

1          CAMPOS
2 what?
3    A.  They are "reasonable" with respect
4 to out-of-pocket costs that were incurred in
5 connection with the work that was done.  To
6 me, once you've done that and it's
7 reasonable, the Insituform incurs the
8 expense, pays it to a third-party and doesn't
9 benefit, if there's a $0.10 overcharge they
10 don't benefit from it, they would not want
11 the $0.10 overcharge or $0.50 overcharge
12 because they are going to get stuck with that
13 when they are dealing with that vendor in the
14 future.
15       So it's reasonable when you are
16 dealing with vendors that you've dealt with
17 before, to incur a charge and pay that charge
18 and continue that relationship.
19   Q.  I didn't mean to interrupt you.  As
20 part of your engagement in this case, you did
21 not go out and make any comparisons of costs
22 with other vendors; is that correct, sir?
23   A.  I did not make a comparison with
24 other vendors, if such a comparison was able
25 to be made retroactively.

34 (Pages 130 to 133)

Page 134

CAMPOS

1
2  Q.  Well, I'm simply inquiring
3 as to what you did and didn't do in
4 formulating your opinion in this case?
5    A.  And I've responded that I believe.
6    Q.  That you did not do that; is that
7 correct, sir?
8    A.  I did not do that and I qualified
9 by saying if such an analysis would be
10 possible on a retroactive basis and be
11 accurate on a retroactive basis.
12   Q.  Okay.
13   A.  You go to a vendor and you say, can
14 you do something for me and the job is done,
15 he'll lowball it.
16   Q.  Well, are you saying that such an
17 analysis couldn't be done?
18   A.  Realistic, in retrospect?
19   Q.  Yeah.
20   A.  In retrospect it couldn't be done
21 and be accurate and be reasonable to rely on
22 it.  If I tell somebody, give me an estimate,
23 the job's been done already, give me an
24 estimate as to what you would have charged me
25 for, what is he going to do, he is going to

Page 135

CAMPOS

1
2 give me a lowball estimate, that lowball
3 estimate isn't really what he could have
4 charged two years earlier when the case was
5 going on.
6     It's not something that's worth
7 while engaging in.
8    Q.  I understand your opinion about
9 incentives, but let me ask you a different
10 question.  From the perspective of an
11 insurance company, okay, that has to pay a
12 claim, based on your testimony, if someone
13 went out, just hypothetically, and accepted
14 the first bid proposal, and ended up paying
15 an exorbitant amount for that work, is the
16 insurance company required to pay that claim?
17   A.  It all depends on was the insurance
18 company able to come in and assist in getting
19 it done cheaper or not, or whether they just
20 sat back and relied on somebody to do this,
21 and assuming there was an exorbitant amount
22 paid as to how someone would define that in
23 retrospect, okay, second guessing.  It's not
24 as simple as all that.
25   Q.  I'm just probing to find out, you

Page 136

CAMPOS

1
2 understand.
3    MR. DESCHENES:  Let me turn to the
4 next exhibit.
5    A.  Situations like that, the insurance
6 company quite often is involved in the
7 adjustment and in reviewing the costs that
8 are incurred, and why American Home, if they
9 didn't do that, why they didn't do that, I
10 don't know.
11   Q.  Are you saying, sir, that if
12 American Home was not involved, as you said,
13 in the adjustment of the claim, it has no
14 right to come in and analyze whether the
15 costs are reasonable or not?
16   A.  I didn't say that, but at that
17 point your question, their right to second
18 guess something that they could have taken
19 care of had they adjusted the loss in an
20 ongoing basis, okay, normally they go in and
21 attempt to try to assist the insured in
22 mitigating the loss.  That's what the
23 adjustment process is all about.
24   MR. DESCHENES:  Let's turn to the
25 next exhibit, Exhibit 8.

Page 137

CAMPOS

1
2    (Campos Exhibit 8, document, marked
3 for identification, as of this date.)
4    A.  Yes, sir.
5    Q.  You've probably never seen the
6 cover page, which is a letter to Kurt Mullen
7 who is an associate in my office, from
8 Charles Philbrick, but attached to this are
9 some notes, also you probably haven't seen,
10 but let me ask you, have you ever seen these
11 notes before that are attached to the cover
12 letter?
13   A.  No, sir, I don't believe I have.
14   Q.  Do you recall this conference call
15 that is identified in the notes on July 25,
16 2006?
17   A.  I recall a conference call, the
18 specific date of which I do not recall, but I
19 do recall a conference call with the parties.
20   Q.  Do you recall who participated in
21 the call?
22   A.  Well, I see --
23   MR. PHILBRICK:  Wait a second.
24 Objection.  You need to answer the
25 question without regard to the document.

35 (Pages 134 to 137)

Page 138

CAMPOS

1
2    A.  I do not recall all of the people
3 who were in the conference call.  I know
4 Nick Campanile was, I was and Mangels was.  I
5 don't recall of any others, okay.
6    **Q.  Okay.  And as counsel instructed,**
7 **looking at this document, does that refresh**
8 **your recollection as to who participated in**
9 **the call?**
10    A.  Well, it says Mr. Philbrick and
11 Mr. Kelley participated in the call along
12 with Mehgan Siri.  I do not recall their
13 participating in the call, but they may have.
14    **Q.  Do you recall what the purpose of**
15 **the call was?**
16    A.  No, sir.
17    **Q.  On the second page of the document,**
18 **of the notes which is Bate stamp IOO 159.**
19       **Do you see that at the bottom?**
20    A.  Yes.
21    **Q.  It states under "Campos," do you**
22 **see where I am, about midway down the page?**
23    A.  Yes.
24    **Q.  It states "AIG will have issues**
25 **with payroll burden and equipment burden,**

Page 139

CAMPOS

1
2 **fixed costs is included in the calculation."**
3       **Do you see that?**
4    A.  Yes.
5    **Q.  Do you recall making that statement**
6 **during the conference call?**
7    A.  No, but I did make this statement
8 in my report which preceded the conference
9 call.
10    **Q.  Do you recall raising concerns**
11 **about fixed costs in this conference call?**
12    A.  Not specifically the conference
13 call, but I do recall raising the issue of
14 fixed costs at different times to
15 Mr. Campanile.
16    **Q.  This conference call took place, as**
17 **you mentioned, after your report was issued;**
18 **is that correct, sir?**
19    A.  Based on the date of the letter to
20 your associate, and the date of the notes, it
21 is after my -- it's two months after my
22 report.
23    **Q.  Okay.  Do you recall stating that**
24 **some of the costs in this claim should not be**
25 **included?**

Page 140

CAMPOS

1
2    MR. PHILBRICK:  Could you read the
3 question back, please.
4    (Record read.)
5    MR. PHILBRICK:  Objection to form.
6    A.  I do not recall that as a matter of
7 the -- as part of the conference call, but as
8 I testified a few minutes ago, I had raised
9 that issue in my report and at different
10 times to Mr. Campanile.
11    **Q.  Understood.  We've been throwing**
12 **around some terms like "fixed costs."  Can**
13 **you tell me what a "fixed cost" is from an**
14 **accountant's perspective?**
15    A.  "Fixed cost" is a cost that you
16 would incur regardless of the activity that's
17 involved.
18    **Q.  Or regardless of the claim which we**
19 **have at issue in this case; is that correct?**
20    A.  Well, the claim or the activity
21 underlying the claim.
22    **Q.  What is considered a "variable**
23 **cost"?**
24    A.  One that would vary according to
25 the activity, according to the volume.

Page 141

CAMPOS

1
2    **Q.  And in the context of this claim**
3 **what would be an example of a "variable**
4 **cost"?**
5    A.  Could be supplies.  In the event
6 you had depreciation, it was based on hours
7 of usage, that would be a variable cost.
8 Materials, if they were part of the overhead.
9    **Q.  In the context of this claim, what**
10 **would be an example of a fixed cost?**
11    A.  Rent.  Insurance that doesn't vary
12 with activity.  Salaries of foremen or
13 supervisors.  Again, an expense that does not
14 vary with activity.
15    **Q.  Now, according to these notes where**
16 **you say that "AIG will have issues with**
17 **payroll burden be and equipment burden," do**
18 **you see that?**
19    A.  That is what the author of these
20 notes interpreted of the conference, yes.
21    **Q.  Do you recall making that**
22 **statement?**
23    MR. PHILBRICK:  Objection, asked
24    and answered.
25    A.  I don't recall making the specific

36 (Pages 138 to 141)

Page 142

```
            CAMPOS
 1
 2 statement that AIG will have issues with, I
 3 most likely indicated that shouldn't be part
 4 of the claim. I wouldn't have referred to
 5 AIG per se because AIG is the parent company,
 6 as I understand, of American Home. That's
 7 someone else's interpretation, okay.
 8     Q. Why shouldn't it be part of the
 9 claim in your opinion?
10     A. Parts of the payroll burden and
11 parts of the equipment burden, the fixed
12 portion of it as set forth in my report I say
13 should not be part of the claim, which is the
14 second bullet point under my name, well, part
15 if you count the bullet points as being
16 asterisked as part of the first.
17         And I note that the person who
18 signed, made these notes, says he needs to
19 get a copy of my report, my report would have
20 spelled those out.
21     Q. Do you know what happened as a
22 result of raising this concern with
23 Insituform?
24         MR. PHILBRICK: Object to form.
25     The witness may answer if he can.
```

Page 143

```
            CAMPOS
 1
 2     A. Well, as I testified earlier, what
 3 happened was sometime after this
 4 Mr. Campanile resigned or was no longer with
 5 Insituform, my primary contact, this appeared
 6 my report had already gone out, nothing else
 7 was done until recently in preparation for my
 8 deposition where I quantified the judgment
 9 that I testified earlier.
10     Q. On the same page there's also a
11 comment, that says "material cost that's
12 standard, what is difference between actual
13 and standard?"
14         Do you see that?
15     A. Yes.
16     Q. Do you recall making that statement
17 during the conference call?
18         MR. PHILBRICK: Objection to form.
19     The witness may answer if he can.
20     A. Not specifically that statement per
21 se, but reference to the fact that standards
22 were used and that there could be, that there
23 would be a difference between actual and
24 standard either up or down.
25     Q. Did Insituform ever provide you
```

Page 144

```
            CAMPOS
 1
 2 with that information, the difference between
 3 actual and standard?
 4     A. Some of that was provided and
 5 adjustments were made prior to this meeting
 6 in my May 22nd report, okay. With respect to
 7 the material, it's the actual material is in
 8 the claim, the actual labor hours are in the
 9 claim at a standard rate per hour or per unit
10 of material.
11         That could vary from actual. My
12 experience is when the standards are set they
13 are set to bring them within a percentage or
14 two plus or minus of the actual so, again,
15 it's an immaterial item.
16         Nothing was done, but it's not
17 material in my opinion. We're talking about
18 actual units of material use and actual hours
19 and the rates are standard.
20     Q. Do you know whether actual costs
21 are higher or lower than standard costs?
22         MR. PHILBRICK: Objection to form.
23     The witness may answer if he can.
24     A. They could be in either direction
25 but, as I testified, when they are set they
```

Page 145

```
            CAMPOS
 1
 2 are set to approximate each other. And the
 3 standards are universally used by many, many
 4 companies in order to charge items during the
 5 year rather than trying to figure out what
 6 the actual cost is, and they are set with a
 7 view toward being as close to actual as
 8 possible.
 9     Q. Well, in this particular case, have
10 you done any analysis of actual costs versus
11 standard accounts?
12     A. For certain elements of the claim,
13 not for the material costs, material section
14 here.
15     Q. Okay. Which elements of the claim
16 did you do that analysis for, sir?
17     A. Set forth in my report.
18     Q. Can you take a look at your report,
19 and let me know?
20     A. Well, in connection with the
21 equipment burden, the burden itself was put
22 in and adjusted Phase I by 2.25 percent and
23 Phase II by 8.82 percent downward, $10,000
24 adjustment for Phase II and a $9,600
25 adjustment for Phase I.
```

37 (Pages 142 to 145)

Page 146

CAMPOS

1
2     Q.   What page are you reading from,
3 sir?
4     A.   Page four of eight, in the second
5 paragraph under Phase I and the second
6 paragraph under Phase II.
7     Q.   This is under the subsection of
8 "equipment," sir?
9     A.   Yes, sir.
10        MR. PHILBRICK:  Have you answered
11    the question?
12        THE WITNESS:  Yes.
13        MR. PHILBRICK:  You are reading
14    your report as if you were going to say
15    something more.
16        MR. DESCHENES:  I didn't want to
17    interrupt him.
18        MR. PHILBRICK:  When you are done
19    would you just close up the report so
20    that we all understand.
21    A.   That's it.
22    Q.   So just so I'm clear then, that
23 sort of analysis was done for, the analysis
24 of actual versus standard cost was done for
25 the equipment burden, but was not done for

Page 147

CAMPOS

1
2 materials; is that correct?
3    A.   For the rate in the materials.
4    Q.   Right.
5    A.   For the burden it was done, okay.
6    Q.   Okay.
7    A.   So we understand each other, the
8 materials and the labor are actual units.
9 The only thing that's a standard is the rate
10 itself.
11    Q.   Understood.
12        MR. DESCHENES:  Let's mark this
13    next as Exhibit 9.
14        (Campos Exhibit 9, document, marked
15    for identification, as of this date.)
16    A.   Yes, sir.
17    Q.   Sir, you've been handed what's been
18 marked as Campos Exhibit No. 9.
19        Do you recognize this document?
20    A.   It's a letter, yes.
21    Q.   What is it?
22    A.   It's a letter I sent to
23 Mr. Philbrick, dated July 22, 2005.
24    Q.   And is that your signature on the
25 second page?

Page 148

CAMPOS

1
2    A.   Yes, it is.
3    Q.   And do you recall sending this
4 letter to Mr. Philbrick?
5    A.   Yes.
6    Q.   According to this letter, you were
7 asked to identify which areas of the claim
8 that have been supported and which require
9 further documentation, correct?
10    A.   Yes.
11    Q.   And as of this date, according to
12 your letter there were incurred costs
13 totaling $6,654,922; is that correct?
14    A.   Yes.
15    Q.   And as of this date, you found that
16 the claim components that were adequately
17 supported totaled $4,664,820.
18        Do you see that?
19    A.   Yes.
20    Q.   Meaning that you found
21 approximately $2 million of costs that were
22 unsupported at this time; is that correct?
23    A.   Yes, sir.
24    Q.   And on the second page, if you will
25 turn to the second page.

Page 149

CAMPOS

1
2    A.   Yes.
3    Q.   Where it states, "I understand that
4 the $434,907 of ITI labor includes both
5 direct labor and overhead, I have not been
6 provided with the details of the overhead
7 calculation, however, it is the fixed portion
8 of the overhead that will not be
9 recoverable."
10        Did I read that correctly?
11    A.   Okay.  I didn't know where you
12 were.  You are in the last full paragraph,
13 right?
14    Q.   I am in the last full paragraph.  I
15 apologize for not letting you know where I
16 was.
17        Do you see that statement in your
18 letter?
19    A.   Yes.
20    Q.   Were you ever provided with the
21 details of the overhead calculation?
22    A.   Well, this was an ongoing exercise
23 and this letter was dated July, which is ten
24 months before my final report and I was
25 provided with the details of the Insituform

38 (Pages 146 to 149)

CAMPOS

1
2 labor that might have totaled some other
3 number as time went on, you know.
4    Q.  As a result of receiving that
5 information, did you make a reduction for the
6 fixed portion of the overhead, sir?
7    A.  Of the labor?
8    Q.  Yes.
9    A.  No.  Only as set forth in my May
10 report of 2006.  I think the only thing that
11 still remained open was the area that I
12 testified earlier, which was what amounted to
13 $117,000 in the final claim.
14    Q.  Which was the fringe benefits; is
15 that correct, sir?
16    A.  Yes, yes.  Potentially 117.
17    Q.  But that amount has not been
18 adjusted down because I think it's
19 inconsequential; is that correct, sir?
20    A.  It's an immaterial amount, yes.
21       MR. DESCHENES:  Let's mark this
22 next.
23       (Campos Exhibit 10, document,
24    marked for identification, as of this
25    date.)

CAMPOS

1
2    A.  It's about one and a half percent
3 of the claim, something like that.
4       Yes, sir.
5    Q.  Have you had an opportunity to
6 review Exhibit No. 10?
7    A.  Yes.
8    Q.  Do you recognize this document?
9    A.  Yes.
10    Q.  What is it?
11    A.  It's an e-mail From Mr. Kelley to
12 me, dated February 22, 2006 which was part of
13 my production to you.
14    Q.  And do you recall receiving this
15 e-mail from Mr. Kelley?
16    A.  Yes.
17    Q.  And this is among the documents you
18 produced in this case; is that correct?
19    A.  Yes.
20    Q.  In the fourth paragraph of the
21 e-mail, Mr. Kelley states that "we believe
22 that with your tutelage from the last year
23 the claim is now both better organized and
24 justifiable than the last time around."
25       Do you see that?

CAMPOS

1
2    A.  Yes.
3    Q.  Do you know what Mr. Kelley is
4 referring to here when he says "the last time
5 around"?
6    A.  It was an ongoing process of
7 looking at binders like this and my comments
8 and recommendations that certain items be
9 removed and, as I testified earlier, I think
10 I saw a claim of 9 million that ultimately
11 got down to 7 million, and that includes both
12 phases, but the elements were included in
13 Phase I and Phase II, so those are the
14 elements that were taken out by them based on
15 my comments.
16    Q.  By using the term "last time
17 around," he is referring to your last review
18 of the cost documentation, sir?
19    A.  Yes.
20       MR. PHILBRICK:  Objection to form,
21 foundation.
22    Q.  I'm trying to find out if he has
23 any understanding of what he means by "last
24 time around"?
25       MR. PHILBRICK:  His understanding.

CAMPOS

1
2       MR. DESCHENES:  Right.
3    A.  My understanding would be the last
4 time I looked at the binders that were given
5 to me, that preceded the binders that were
6 now going to be sent to me.
7    Q.  What were the problems with whether
8 the claim was justifiable in the past?
9    A.  As I indicated, the significant
10 problems were the inclusion of different
11 overheads in the claim that I told them were
12 not properly includable in the claim and
13 which they took out, which was part of the
14 $9 million that I talked about.
15    Q.  Also included among the problems,
16 was fixed costs one of the items?
17    A.  Let me clarify something.  There
18 were certain line items that were the entire
19 items should come out.
20    Q.  Understood.
21    A.  There were other items that I
22 commented upon and said that included in that
23 line item, a portion of this should come out,
24 and the initial stages of taking the
25 9 million down were the line items that were

39 (Pages 150 to 153)

Page 154

CAMPOS

1
2 100 percent should come out, they didn't
3 include some of the items that a portion of
4 the line items should be taken out.
5       That required an additional
6 analysis to be made which had not been done,
7 and as I set forth in my report that neither
8 I nor Insituform had performed that.
9    Q.  Okay.  When you are talking about
10 an "additional analysis," are you talking
11 about the fixed versus variable analysis for
12 equipment burden and payroll burden, sir?
13    A.  Yes.
14    Q.  Okay.  We're done with that.
15       MR. DESCHENES:  All right.  Let's
16    take a quick break.
17       (Recess taken 1:59 until 2:06.)
18    Q.  I'm going to ask you some questions
19 about your report itself, sir.  Do you have
20 that handy in that pile there, to your right?
21 It's Exhibit No. 5.
22    A.  Yes, sir.
23    Q.  First, turning to page three which
24 is under the section "payroll."
25    A.  Yes.

Page 155

CAMPOS

1
2    Q.  On page three.  Second full
3 paragraph indicates that you were unable to
4 verify mobilization, demobilization hours for
5 weeks during which Insituform's employees
6 worked on more than one job.
7       Do you see that?
8    A.  Yes.
9    Q.  That is correct, sir?
10    A.  Yes.
11    Q.  Can you explain to me why you could
12 not confirm those hours?
13    A.  I did not have available to me the
14 time sheets and that would have taken an
15 inordinate amount of time to look at various
16 time sheets for all the individuals, the time
17 sheets of which were prepared by the
18 supervisors, that is why I did not do that,
19 okay.
20    Q.  Can you tell me what efforts were
21 made to document those hours?
22    A.  What I --
23       MR. PHILBRICK:  Objection to form.
24    By whom?
25       MR. DESCHENES:  Anybody.

Page 156

CAMPOS

1
2       MR. PHILBRICK:  I'm going to object
3 to form.  You've got to specify what
4 efforts by Insituform, what efforts by
5 Campos.  You can't just say anybody.
6       MR. DESCHENES:  I think you can say
7    "objection," Charlie, and that's it.
8    Q.  Do you understand the question,
9 sir?
10    A.  Let me have the question again.
11    Q.  Sure.  Do you know what efforts
12 were made by anyone to verify the hours spent
13 on mobilization and demobilization?
14       MR. PHILBRICK:  Objection to form,
15    compound, vague.
16    A.  I don't believe anyone took an
17 effort to verify them, but the gathering
18 process of the information was such that, in
19 my opinion, substantiated the hours, they
20 were based on the certified payroll
21 registers, the supervisors review, creation
22 of the time sheets, and the fact that the
23 hours charged to this job were less than the
24 total hours paid to the employees.  That was
25 in my opinion reasonably stated.

Page 157

CAMPOS

1
2    Q.  Have you made any efforts since
3 your report to verify hours spent on
4 mobilization and demobilization, sir?
5    A.  No, I did not, for the reasons I
6 cited; I would have had to go back to a
7 multitude of time sheets and I don't think it
8 would have been worth the effort.
9    Q.  Was it possible to calculate the
10 hours that were specifically spent mobilizing
11 or demobilization?
12    A.  They were already calculated.
13    Q.  And to verify that?
14    A.  Now, to verify it, if someone
15 thought that the collection of the data was
16 incorrect, you would have to go back to
17 various time sheets in order to do that.
18    Q.  Do you know approximately how many
19 hours are involved for a mobilization and
20 demobilization?
21    A.  Not off the top of my head, I do
22 not know.
23    Q.  Do you know what the total cost is
24 at issue, sir?
25    A.  Well, the total payroll costs.

40 (Pages 154 to 157)

CAMPOS                                          Page 158

2   Q.  No, I mean with respect to just
3 mobilization and demobilization hours?
4     A.  I thought that's the same question
5 as the one before, I don't know the total
6 amount, but it would be some small part of
7 $800,000.
8     Q.  Which was --
9     A.  $730,000.
10    Q.  Okay.  Let me just make sure I
11 understand where you are reading from.  What
12 page are you on?
13    A.  Page two of eight.
14    Q.  "Two of eight."  You just read
15 from?
16    A.  The field-gross pay total of
17 704,845 and the wet-out gross pay of 24,997
18 would be something shy of $730,000 and that's
19 once a small part of that would be
20 mobilization, demobilization for working on
21 more than one job.
22    Q.  Okay.  Turning to page three.  On
23 page three this is where, and you've
24 testified about this previously, where you
25 state that certain categories of claim costs

CAMPOS                                          Page 159

2 were fixed in nature, and that the
3 remediation project would not have resulted
4 in any incremental change in fixed costs.
5        Do you see that on page three?
6     A.  I remember the statement, but what
7 paragraph are you on, sir.
8     Q.  It's the fourth full paragraph at
9 the end?
10       MR. PHILBRICK:  What page?
11       MR. DESCHENES:  Page three of
12 eight.
13    A.  Yes.  It's next to the last
14 sentence of the fourth paragraph.
15    Q.  Do you see that?
16    A.  Yes.
17    Q.  You also state here that neither
18 Insituform nor yourself formed a fixed
19 variable analysis of the payroll or equipment
20 burden.
21       Do you see that?
22    A.  Yes, sir.
23    Q.  Then when you turn to the summary
24 of your opinion on page eight, you also flag
25 this as an issue?

CAMPOS                                          Page 160

2     A.  That's right, and I identified the
3 total universe in one of the schedules that I
4 gave you just before lunch, totaling
5 $117,000.
6     Q.  We'll get to the specifics of if,
7 but I'm just trying to lay a foundation here.
8     A.  Well, I just want to identify it
9 for the record.
10    Q.  We'll get to it, sir.  On the
11 summary page of the last page, you also
12 flagged this as an issue.
13    A.  Yes, sir.
14    Q.  In the first full paragraph of your
15 summary, last two sentences you say,
16 "however, as stated above there's some claim
17 costs which appear to be fixed in nature.
18 The reparation project would not result in
19 any incremental charges for the fixed costs."
20       Did I read that correctly?
21    A.  Yes.
22    Q.  Now, is it your opinion that these
23 fixed costs are not probably chargeable to
24 American Home in this lawsuit?
25    A.  Or to any claim, yes.

CAMPOS                                          Page 161

2     Q.  Okay.  So the fixed portion of the
3 claim will not be recoverable in this case;
4 is that correct, sir?
5     A.  Yes, and I've quantified that
6 earlier today, yes.
7     Q.  Turning to payroll burden itself,
8 on page two.
9     A.  Yes.
10    Q.  I had some questions about that.
11 Which categories of payroll burden would you
12 consider to be fixed in nature?
13    A.  The category of fringe benefits
14 would possibly include certain fixed items,
15 not all, all of the others are variable.
16    Q.  So of the categories listed on this
17 table, or these tables I should say, because
18 there's both a table for field-payroll and
19 wet-out payroll, correct?
20    A.  Yes.
21    Q.  The only category which in your
22 opinion is fixed is the fringe benefits; is
23 that correct?
24    A.  That has a portion of that category
25 that could be fixed.

41 (Pages 158 to 161)

Page 162

CAMPOS

1
2   Q.   Okay.
3   A.   Not all fixed.
4   Q.   What about let me ask you
5 specifically about "general liability."
6       Do you see that, sir?
7   A.   Yes.
8   Q.   As apart of its labor costs
9 Insituform has included costs on general
10 liability in Workers' Compensation Insurance;
11 is that correct?
12  A.   Yes.
13  Q.   And what does "general liability"
14 refer to?
15  A.   The general liability policy.
16  Q.   And that's a general liability
17 policy that covers the entire company; isn't
18 that correct?
19  A.   Yes.
20  Q.   For all regions?
21  A.   I assume so.
22  Q.   For all projects?
23  A.   For all work they do, yeah.
24  Q.   Do you consider that to be a fixed
25 cost?

Page 163

CAMPOS

1
2   A.   No, sir.
3   Q.   Why don't you consider that to be a
4 fixed cost?
5   A.   Because the premium is based on
6 payroll, so it's an incremental cost.
7   Q.   How is the premium based on
8 payroll, by the number of hours worked or the
9 amount of employees that the company has?
10  A.   By the dollar payroll.
11  Q.   "Dollar payroll." And the Workers'
12 Compensation policy, that also covers the
13 entire company; is that correct?
14  A.   Yes, sir.
15  Q.   And it covers all the employees of
16 the company; is that correct?
17  A.   Yes, sir.
18  Q.   Again, do you consider that to be a
19 fixed cost or variable cost?
20  A.   Variable cost.
21  Q.   Why do you consider that to be a
22 variable cost, sir?
23  A.   Because Workers' Compensation
24 insurance is always predicated on payroll.
25  Q.   And in both instances in this case,

Page 164

CAMPOS

1
2 did you go and check and verify that the
3 premiums were based on the total amount of
4 payroll dollars?
5   A.   On the general liability I looked
6 at the policy and on Workers' Comp. it's my
7 experience, my understanding that it's based
8 on payroll, and every policy that I've seen
9 in my 40 plus years, it's always based on
10 payroll.
11  Q.   Do you have any knowledge as to who
12 has the Workers' Compensation?
13  A.   What's that?
14  Q.   Strike that, bad question.
15      Do you know who the Workers' Comp.
16 carrier is, sir?
17  A.   No, sir.
18  Q.   Turning to equipment burden, which
19 is on page three.
20  A.   Yes, sir.
21  Q.   Which categories of equipment
22 burden, in your opinion, are fixed in nature,
23 sir?
24  A.   Which are "fixed" you said?
25  Q.   Yes.

Page 165

CAMPOS

1
2   A.   Leasing, depreciation and leased
3 vehicles.
4   Q.   What about on the last bullet
5 there, taxes?
6   A.   Taxes and licenses.
7   Q.   Are also considered fixed, sir?
8   A.   Yes, and yes.
9   Q.   What is "equipment depreciation,"
10 sir?
11  A.   Depreciation taken on equipment.
12  Q.   And you'd consider that to be in
13 the fixed cost category; is that correct,
14 sir?
15  A.   In this instance, yes, based on
16 testimony that it is straight line
17 depreciation, which is the depreciation is
18 written off over specific number of years.
19 Not all equipment depreciation is fixed.
20  Q.   Sometimes equipment depreciation
21 can be done on a variable basis?
22  A.   Yes.
23  Q.   As opposed to fixed?
24  A.   Yes, it can.
25  Q.   But in this case it was done

42 (Pages 162 to 165)

Page 166

CAMPOS

1
2 straight line over five to seven years?
3    A.   Yes, that's my understanding.
4 That's what I considered "fixed."
5    Q.   And that's because the claim
6 doesn't affect the equipment depreciation one
7 way or the other; is that correct?
8    A.   The use of the equipment doesn't
9 affect it, that's just the life of the
10 equipment.
11    Q.   Right.  And you also mentioned
12 taxes and licenses as a fixed cost; is that
13 correct?
14    A.   Yes.
15    Q.   I think you testified that leasing
16 and maintaining the warehouse would also be
17 considered a fixed cost, sir?
18    A.   Yes.
19    Q.   And is it because Insituform would
20 have to pay for the rent regardless of
21 whether the MWR claim existed?
22    A.   Yes.
23    Q.   Now, turning to the analysis that
24 you've provided to me today -- we should just
25 mark this as an exhibit, if that's okay with

Page 167

CAMPOS

1
2 counsel?
3        MR. PHILBRICK:  Absolutely.  Did
4 you make copies?
5        MR. DESCHENES:  Yeah, I did.
6        MR. PHILBRICK:  Great.
7        (Campos Exhibit 11, document,
8    marked for identification, as of this
9    date.)
10    Q.   Have you had a chance to look at
11 Exhibit No. 11?
12    A.   Yes, sir.
13    Q.   Now, at the top of the page there's
14 title to the document, "Equipment Burden."
15        Do you see that, sir?
16    A.   Yes.
17    Q.   "Re: Insituform."
18        Did you prepare this document, sir?
19    A.   It was prepared by Ms. Siri under
20 my direction.
21    Q.   Okay.  And at the top of the
22 document there are a series of numbers for
23 parts and supplies, depreciation, equipment
24 lease rental, taxes, licenses and insurance,
25 other costs and then a total.

Page 168

CAMPOS

1
2        Do you see those numbers?
3    A.   Yes.
4    Q.   Can you tell me where those
5 numbers, where they came from?
6    A.   From the budget for that area, I
7 believe for the year 2003 or 4, the total
8 budget.
9    Q.   I'm sorry, are you finished?
10    A.   Yes.
11    Q.   Oh, I'm sorry.  It came from a
12 total budget, were those actual costs
13 incurred or?
14    A.   Budgeted costs for the year is my
15 recollection.
16    Q.   Did you ever see whether the
17 budgeted costs matched up with the actual
18 costs?
19    A.   Not for this specific exercise.
20    Q.   Okay.  And can you describe for me
21 what it is that you are attempting to
22 calculate on this sheet?
23    A.   The percentage of the total
24 expenditures for equipment burden that were
25 fixed as opposed to variable.

Page 169

CAMPOS

1
2    Q.   So at the top, all of those numbers
3 are the total costs for equipment burden?
4    A.   Yes.
5    Q.   Based on a budgeted number for 2003
6 or 2004?
7    A.   Yes, sir.
8    Q.   And then there's a subcategory
9 called "fixed;" is that correct?
10    A.   Yes, yes.
11    Q.   And there are three categories
12 listed there, one for depreciation, another
13 for equipment, lease rental and then taxes,
14 licenses and insurance; is that correct, sir?
15    A.   Yes.
16    Q.   And then a total for fixed.
17        Do you see that?
18    A.   Yes.
19    Q.   Then one line down it says "fixed
20 as a percentage of total."  How did you
21 arrive at that percentage, 53.26?
22    A.   By taking the $796,649 and dividing
23 it by the 1,495,762.
24    Q.   The one number doesn't match up
25 perfectly and that's the number for equipment

43 (Pages 166 to 169)

Page 170

CAMPOS

1    CAMPOS
2 lease rental. Do you see how the numbers at
3 the top, it's $414,410 and then under fixed
4 it's $393,626?
5    A.  Yes.
6    Q.  Can you explain for me why there
7 are different numbers used there?
8    A.  There were certain subcategories
9 within the general category of equipment,
10 lease rental, one of which was a category for
11 about $21,000 that was a variable expense and
12 that's why it wasn't included among the
13 fixed.
14    Q.  Okay.  And then once you arrive at
15 your percentage, explain to me how you
16 calculated the number at the bottom there,
17 $280,846.10?
18    A.  I took the total equipment burden
19 that's included in the summary of my report,
20 the last page, of $527,311.49 and multiplied
21 it by --
22    Q.  You are referring now to the
23 summary on page nine of your report, right,
24 that's where you got that number?
25    A.  Of schedule one, which would be the

Page 171

1    CAMPOS
2 ninth page, yes, and that's where I got the
3 number, multiplied it by the 53 percent to
4 arrive at $280,846.10, which I believe is the
5 fixed portion of the equipment burden.
6    Q.  And is it your opinion that the
7 claim that has been made against
8 American Home in this case of, I'm just going
9 to use round numbers here because it's a
10 little bit easier, of $6.4 million should be
11 reduced by this amount $280,846.10?
12    A.  Yes, sir.
13    Q.  Under the category "equipment lease
14 rental," on Exhibit No. 11.
15    A.  Yes.
16    Q.  Does that include the amount of
17 rent for the warehouse, as well?
18    A.  If I recall correctly, there was no
19 amount in the budget for the warehouse, okay,
20 or for any warehouse.
21    Q.  No amount in what budget, sir?
22    A.  The budget from which this
23 information was derived that I testified to
24 earlier.
25    Q.  Okay.  Do you have that document,

Page 172

CAMPOS

1    CAMPOS
2 the budget?
3    A.  It's part of the production.
4       MR. PHILBRICK:  That would be a
5    "yes."
6    A.  It would be part of the documents
7 that were produced with a CNS Bate stamp.
8       MR. DESCHENES:  Off the record for
9    a moment.
10       (Off-the-record discussion held.)
11    Q.  Can you show me among the documents
12 what you are referring to when you say
13 "budget"?
14    A.  Yes, sir.  It's CNS 103.
15    Q.  Do you mind if I walk over and just
16 look over your shoulder?
17    A.  No, sir.
18    Q.  And it's your testimony that the
19 amount of money spent on renting the
20 warehouse is not part of this budget; is that
21 correct, sir?
22    A.  There's a category for this.  It
23 talks about facility costs and so forth, zero
24 in here.  So if it's not in the burden, it's
25 not in the claim the way I would look at it,

Page 173

1    CAMPOS
2 okay, unless somebody shows me differently
3 okay.
4    Q.  So it's your testimony that the
5 amount of rent for the warehouse facility in
6 Charlton, Massachusetts is not part of the
7 claim presently; is that correct?
8    A.  Not part of the equipment burden
9 calculation, right.
10    Q.  And, therefore, not part of the
11 claim of costs that Insituform is seeking
12 against American Home; is that correct?
13    A.  That's my understanding, yes.
14    Q.  Easy enough.  Let's turn to the
15 other document that you were good enough to
16 provide me before the break, and mark it as
17 Exhibit 12.
18       (Campos Exhibit 12, document,
19       marked for identification, as of this
20       date.)
21    A.  Yes, sir.
22    Q.  Have you had a chance to look at
23 Exhibit 12?
24    A.  Yes, sir.
25    Q.  Can you describe what Exhibit 12 is

44 (Pages 170 to 173)

Page 174

CAMPOS

1
2 for me, sir?
3    A.    It is the various elements of
4 fringe benefit, fringe benefits that are part
5 of a claim that are summarized on page two of
6 eight of my report, under field payroll,
7 110,199 total, and under wet-out payroll of
8 7,118, the total of those two equals the
9 117,317 -- 316.78 that's on Exhibit 12.
10    Q.    So this document, Exhibit No. 12,
11 just provides much more detail for those
12 numbers; is that correct, sir?
13    A.    It's the detail that's part of the
14 claim, that the numbers that appear on
15 Exhibit 12 came from the four binders here.
16    Q.    Okay. And it is your -- well, let
17 me ask it, is it your opinion that some of
18 these costs would be considered fixed in
19 nature?
20    A.    Some of them may be considered
21 fixed. The auto for company car would be
22 considered fixed, but there's no dollar
23 amount there.
24    Q.    Okay.
25    A.    With respect to the others, without

Page 175

CAMPOS

1
2 knowing exactly how the expenditure is
3 incurred and without making an assumption, it
4 would be unfair to say it's either fixed or
5 variable. For example, the 401K matching to
6 me would be a variable. The contribution to
7 the union --
8    Q.    Can I just stop you and ask why you
9 would consider that to be a variable?
10    A.    Based on payroll.
11    Q.    "Based on payroll"?
12    A.    Right.
13    Q.    You are assuming that these people
14 wouldn't be working in some other capacity,
15 the same level of hours?
16    A.    Well, the company would match their
17 contribution based on a salary that they
18 made, they may be not working or they may not
19 be making this kind of money, but it's a
20 variable expense no matter what, just like
21 payroll taxes would be variable.
22       With regard to contribution of a
23 union pension and welfare, if that's
24 predicated on a dollar amount per hour, that
25 would be a variable. When you get to the

Page 176

CAMPOS

1
2 medical plans and life insurance plans, if
3 you are talking about what happens in firms
4 like a firm or an accounting firm, that would
5 be fixed, but when you are talking about
6 union workers, it could be based on hours
7 worked.
8       And it would be unfair for me to
9 just assume one way or another without
10 getting into all of the details, and the same
11 would be true with vacation holiday pay,
12 etc., but when I step back and look at it,
13 and look at the entire amount and say it's a
14 little over 1 percent of the claim, is it
15 worth the effort of going through this and
16 analyzing it, in my opinion, no.
17    Q.    Okay. And I understand you don't
18 think it's worth the effort and why you think
19 that but, just so the record is clear, no
20 analysis has been done to date of variable
21 versus fixed costs for the items on
22 Exhibit 12; is that correct?
23    A.    That's correct.
24    Q.    Okay. Going back to your report,
25 turning to -- let me just ask one other

Page 177

CAMPOS

1
2 cleanup question. Are there any other items
3 in the claim that you would consider to be
4 fixed in nature and, therefore, not
5 recoverable in this lawsuit, other than what
6 you've previously testified to?
7    A.    Potentially fixed would be the
8 fringe benefits, a portion of which could be
9 potentially fixed, there are no other items
10 in the claim that are of a fixed nature.
11    Q.    Okay. Page four of your report,
12 there is a table at the top.
13       Do you see that, sir?
14    A.    Yes, sir.
15    Q.    It's a table of different hourly
16 rates for equipment.
17       Do you see that?
18    A.    Equipment burden?
19    Q.    Yes.
20    A.    Yes.
21    Q.    And there appears to be an $8
22 difference in the hourly rates used for
23 New England and California after March 1st of
24 '04.
25       Do you see that?

45 (Pages 174 to 177)

Page 178

CAMPOS

2    A. Yes.
3    Q. Then you state on page four, a few
4 paragraphs down, "I tested the equipment
5 burden and determined that the rates were
6 correctly applied to the hours worked."
7        Do you see that statement?
8    A. Yes.
9    Q. Where did these rates come from?
10    A. The claim documentation.
11    Q. Okay. Did they come from
12 Insituform?
13    A. They were part of the work order,
14 part of the job order that had the rates were
15 charged to the job order based on the
16 accounting system in place at the time.
17    Q. Understood. I'm just trying to
18 find out whether these numbers came from
19 Insituform?
20    A. Yeah, yes.
21    Q. "Yes," okay. And do you understand
22 why there is that difference between
23 New England and California of $8?
24    A. There was some testimony on that by
25 I think Mr. Porzio on why there's a

Page 179

CAMPOS

2 difference between the rates and bringing in
3 people to get the work done, okay.
4    Q. I understand. I'm asking your
5 understanding of it though. Do you --
6    A. Go ahead.
7    Q. Go ahead.
8    A. I understand it's predicated on the
9 deposition testimony.
10    Q. As part of your retention and
11 engagement in this case, did you test or
12 evaluate the rates themselves?
13    A. These aren't rates paid to people,
14 these are hourly rates to apply to equipment
15 burden.
16    Q. I understand.
17    A. And whatever I've done is set forth
18 in these paragraphs below, okay, and what
19 happens is I've done the testing that appears
20 in the paragraphs on page four of my report.
21    Q. Well, I guess what I'm asking is,
22 did you form any opinion as to whether these
23 rates are too high or too low or have any
24 opinion about that?
25    A. They are what they were, and they

Page 180

CAMPOS

2 were charged to the claim. I see the
3 New England crew's, the labor rate went --
4 the burden rate went down $9 after March 1st
5 of '04. They were what they were.
6    Q. Separate and apart from
7 Mr. Porzio's testimony, do you have any
8 understanding as to why the California crew
9 was used on this job?
10    A. In situations like this, it's my
11 experience you mobilize the people using the
12 term not in the sense of mobilization and
13 demobilization, but you bring in people to
14 get the work done as expeditiously as
15 possible from wherever you can, based on
16 where they are.
17        It may be you find yourself in a
18 situation where you have someone that's ten,
19 twenty miles away or a couple hundred miles
20 away, but they are occupied on a different
21 project, you can't pull them off the project
22 to get the work done, so you bring them from
23 wherever they are available, and that's what
24 I assume happened here.
25    Q. Okay. Do you have any opinion

Page 181

CAMPOS

2 about whether it was proper in this
3 particular claim to charge California rates
4 as opposed to New England rates after
5 March 1st of 2004?
6    A. It was not part of my assignment to
7 look at that, and I have no opinion.
8    Q. You have no opinion one way or the
9 other on that?
10    A. Those, these are the rates that
11 were in effect. The burden rates were in
12 effect by the corporation and they are what
13 they are. I have no opinion as to whether
14 they are too high or too low.
15    Q. Okay. Turning to page three of
16 your report, sir.
17    A. Yes.
18    Q. It says in the second full
19 paragraph that -- I'm sorry, strike that.
20        On the third paragraph it says that
21 "different rates were used for the same
22 employee."
23        Do you see that?
24    A. Yes.
25    Q. And in terms of payroll rates

46 (Pages 178 to 181)

Page 182

CAMPOS

1
2 Insituform used different rates depending on
3 whether the work was yard work, on-site work
4 or mobilization, demobilization; is that
5 correct?
6    A.   Yes.
7    Q.   Do you know why Insituform uses
8 different rates for those activities?
9    A.   They were set forth in tab A.  When
10 I questioned this, I was given the
11 explanation that they were using different
12 rates based on the work that they did and I
13 was referred to tab A, and there's where
14 these differences are addressed by
15 Insituform.
16    Q.   And are those rates, rates that
17 they pay their employees in salary?
18    A.   It's my understanding.
19    Q.   They are not the rates that they
20 charge their customers?
21    A.   They don't charge their customer on
22 a cost plus basis, most of the work that they
23 do for their customers are on a fixed price.
24    Q.   That's what I'm asking.
25    A.   Well, it's a fixed price so they

Page 183

CAMPOS

1
2 charge their customer based on an estimate of
3 what it would cost them to do the work, and
4 add to it overhead and profit in the billing.
5 But they don't say that, or like I would or
6 you would, so many hours at a billing rate,
7 that's not the way they operate normally.
8    Q.   That's what I'm trying to find out
9 by asking the question.  What I'm trying to
10 determine is this is the amount they actually
11 had to pay their employees in payroll?
12    A.   Yes.
13    Q.   As opposed to an amount they
14 charged their customer?
15    A.   That's correct.
16    Q.   From the binders it also seems
17 there's a page ITI AIG 000003 in the cost
18 binders, that refers to paying employees
19 premiums of 100 or $50 a day.
20        Do you recall that, sir?
21    A.   The payment of a premium, yes.
22    Q.   From the documents it looks like
23 this amount amounted to about $36,000 and
24 some change.  Did you make any inquiries,
25 sir, as to why Insituform paid a premium to

Page 184

CAMPOS

1
2 its employees?
3    A.   I understood from only what I
4 gathered from deposition testimony, okay, and
5 discussions with Insituform personnel.
6    Q.   Well, did you have any
7 understanding as to why this premium was
8 necessary prior to reviewing the deposition
9 transcripts in this case?
10    A.   In discussions with Nick, yes.
11    Q.   Okay.  What did he tell you about
12 why it was necessary to pay a premium?
13    A.   If I remember correctly, we're
14 talking about the work being done 30 feet
15 below ground and so forth, okay.
16    Q.   Do you know whether Insituform
17 ordinarily charges its customers such
18 premiums?
19    A.   It's built into their pricing
20 structure.
21    Q.   I'm asking in other jobs, do you
22 know whether Insituform customarily pays such
23 premiums and passes that cost along to its
24 customers?
25    A.   Well, again, they don't -- they do

Page 185

CAMPOS

1
2 it on a fixed price so, therefore, it's
3 included in their estimated fixed price, they
4 pay their employees that, but it's built into
5 their costs.
6    Q.   Well, let me ask you it differently
7 then.  Do you know whether Insituform has
8 paid premiums such as 100,000 -- $100 or $50
9 per day to its employees on other jobs?
10    A.   It's my understanding that they
11 did.
12    Q.   That they customarily do that?
13    A.   That's my understanding on similar
14 jobs, what I might call my own terminology,
15 "hazard duty pay," okay.
16    Q.   And who told you that?
17    A.   Told me what?
18    Q.   That they customarily pay premiums
19 to their employees on other jobs?
20    A.   Nick Campanile.
21    Q.   Okay.  Now, in looking at the cost
22 documentation, it looks like D'Allessandro,
23 it looks like D'Allessandro charged
24 approximately $900,000 on its labor for
25 Phases I and II?

47 (Pages 182 to 185)

Page 186

CAMPOS

1
2    A.  When you say "pages one and two"?
3    Q.  "Phases I and II."
4    A.  Oh, "Phases I and II."  What was
5 the amount of money, sir?
6    Q.  $900,000?
7    A.  Okay.
8    Q.  And it also appears that Insituform
9 had agreed to pay D'Allessandro a cost plus
10 15 percent for Phase I, and costs plus 9
11 percent for Phase II.
12    A.  Yes, sir.
13    Q.  Is that correct?
14    A.  That's my understanding, my
15 recollection.
16    Q.  Do you know why Insituform didn't
17 negotiate that lower rate for Phase I work?
18    A.  No, I do not know it, but normally
19 you end up paying costs plus ten and ten,
20 which would be more than 15 percent or more
21 than 9.
22    Q.  Well, did you make any inquiry of
23 Insituform as to why they didn't get the
24 lower rate for Phase II?
25    A.  What lower rates?

Page 187

CAMPOS

1
2    Q.  For Phase I?  Excuse me, I
3 misspoke.
4    A.  No, I do not.
5    Q.  Okay.
6    A.  But as I said earlier, it's lower
7 than the normal rate of 10 for overhead and
8 10 for profit.  That's what's normally
9 charged by a contractor, 10 plus 10.
10    Q.  Do you know what other efforts were
11 made to reduce D'Allessandro's labor costs in
12 this case?
13    A.  No, sir.
14    Q.  Did you make any inquiry in that
15 regard?
16    A.  No, sir.
17    Q.  Do you know what tasks
18 D'Allessandro performed in the reparation
19 project?
20    A.  Without specific reference to the
21 documents, I don't recall.
22    Q.  Do you know whether Insituform
23 could have used some of its own employees to
24 perform some of this labor at a reduced rate?
25    A.  I understand there was an issue

Page 188

CAMPOS

1
2 about that that was raised by, but they
3 didn't have the personnel available and
4 borrowed personnel from other geographic
5 areas, plus the fact that D'Allessandro was
6 accustomed to doing this, and was right up
7 their alley, and on the one hand you might
8 have saved the dollar and cost you 10
9 somewhere else.
10    Q.  In formulating your opinions in
11 this case, did you make any inquiry in that
12 regard?
13    A.  No, I did not, sir.
14    Q.  Okay.  In your report there's
15 mention of future estimated costs of
16 $264,000, which is on page, it's toward the
17 end, "closeout costs," on page seven?
18    A.  Yes, sir.
19    Q.  At the time that your report was
20 prepared, there was no supporting
21 documentation for these costs; is that
22 correct, sir?
23    A.  That's correct, they were
24 estimates.
25    Q.  And do you know what the basis of

Page 189

CAMPOS

1
2 those estimates were?
3    A.  No, I do not.
4    Q.  Do you have any opinions about
5 whether this number is supportable or not?
6    A.  This is a number that I understand
7 from Mr. Mangels, he will be furnishing
8 underlying documents to support this sometime
9 within the next week.
10    Q.  And do you have any knowledge, I
11 think you might have given a number earlier
12 today, do you have any knowledge as to what
13 the costs actually were for closeout?
14    A.  His ballpark number totaled
15 261,000 -- I'm sorry, $201,000.
16    Q.  Okay.  So the actual closeout
17 costs, based on your understanding, are
18 somewhat less than the projected costs; is
19 that correct, sir?
20    A.  Yes, sir.
21    Q.  It also appears from the cost
22 documentation that a lot of money was spent
23 on bypass pumping costs.  Do you recall that?
24    A.  I recall references to that, yes.
25    Q.  Based on my calculations, you may

48 (Pages 186 to 189)

CAMPOS

1
2 not agree with me, it was somewhere around
3 the neighborhood of 1.4 million for Phase I
4 and about $300,000 for Phase II; is that
5 correct?
6    A.  I don't know, sir.  I don't recall,
7 nor did I identify that in my report as being
8 bypass costs.
9    Q.  Okay.  You made no effort to try to
10 just track that one individual cost?
11    A.  To identify bypass itself, no, sir.
12    Q.  Okay.  Do you know what efforts
13 were made by Insituform to mitigate those
14 costs?
15    A.  Which costs?
16    Q.  The bypass costs?
17    A.  No, sir.
18    Q.  Do you know whether Insituform
19 explored buying the pumps outright rather
20 than just leasing them?
21    A.  I don't believe they did, but I
22 don't recall specifically, okay.
23    Q.  Now, it appears that Phase II
24 pumping was less expensive than Phase I
25 pumping; is that correct, sir?

CAMPOS

1
2    A.  Pumping.
3    Q.  Yes, the bypass pumping costs were
4 less for Phase II than Phase I?
5    A.  Again, I didn't identify the bypass
6 as a separate lineup.  In the documents that
7 I have, it wasn't identified that way so I
8 can't answer you off the top of my head or by
9 reference to my report.
10    Q.  And as part of your engagement in
11 this case, did you make any inquiry as to
12 Insituform's efforts to reduce the costs of
13 bypassing pumps?
14    MR. PHILBRICK:  Objection, asked
15    and answered.  The witness may answer it
16    again.
17    A.  I think you asked that earlier, but
18 you used the word "mitigate" instead, and the
19 answer is still the same, no.
20    MR. DESCHENES:  Exhibit 13.
21    (Campos Exhibit 13, document,
22    marked for identification, as of this
23    date.)
24    A.  Yes, sir.
25    Q.  I've handed to you what's opinion

CAMPOS

1
2 marked as Campos Exhibit No. 13.
3    Q.  Do you recognize this document,
4 sir?
5    A.  I recognize what it is.
6    Q.  What is it?
7    A.  It's a letter from Mr. Kelley to
8 Mr. Philbrick, Mr. Martin and myself.
9    Q.  Do you recall receiving this
10 letter?
11    A.  No.
12    Q.  It appears to be among the
13 documents that are produced from your file in
14 this case?
15    A.  It was.
16    Q.  In the second paragraph it states,
17 "I will call Chris Campos to explain a couple
18 of details which did not address some of his
19 concerns."
20    Do you see that?
21    A.  Yes.
22    Q.  What were those concerns, sir?
23    A.  I don't recall, I don't know what
24 he is talking about.
25    Q.  Okay.  Do you recall whether

CAMPOS

1
2 Mr. Kelley called you to explain why
3 Insituform did not address your concerns?
4    MR. PHILBRICK:  Object to form.
5    The witness may answer if he can.
6    A.  I don't recall, sir.
7    Q.  Do you recall any discussions at
8 any time with Mr. Kelley about the fact that
9 some of your concerns were not addressed?
10    A.  No, I don't recall any
11 conversations, but the fact that some of the
12 comments that I made with respect to fixed
13 versus variable and some of the comments I
14 had made earlier, and ultimately in my
15 May 22, 2006 report were not taken care of.
16    I presume this may be what he was
17 talking about, I don't know.
18    Q.  Do you know whether Insituform was
19 paid the full contract price for its original
20 work on this project?
21    A.  I recall some reference to that,
22 but I don't recall whether they were or not.
23    Q.  And would that fact whether they
24 were paid full contract price or not have any
25 affect on your opinions in this case?

49 (Pages 190 to 193)

Page 194

```
1           CAMPOS
2    A.  No, sir.
3    Q.  Now, do you recall when the Phase I
4  repairs began?
5    A.  I believe as set forth in my
6  report, I didn't memorize it, but the work
7  was performed from October 2003, beginning
8  then.
9    Q.  Do you know how long the Phase I
10  repairs took to complete?
11   A.  According to the reference in my
12  report, it's through June 2004.
13   Q.  Between October 2003 and
14  January 2004, had Insituform removed and
15  replaced any of the liner?
16   A.  I don't recall whether they removed
17  and replaced any of the liner specifically by
18  that date.
19   Q.  During that three-month period,
20  sir?
21   A.  I don't recall, sir.
22   Q.  Are you aware of the amount of
23  costs that were incurred between October 2003
24  and January 2004?
25   A.  No, sir.
```

Page 195

```
1           CAMPOS
2    Q.  Is that the inquiry that you
3  mentioned that you were doing earlier --
4  strike that.
5        Is that the inquiry, the analysis
6  you are performing that you testified to
7  earlier today?
8    A.  It would be through December 31,
9  2003.
10   Q.  Trying to figure out and quantify
11  the amount of costs that were incurred prior
12  to December 31, 2003?
13   A.  Through that date, yes.
14   Q.  Do you know whether that relates to
15  the fact that the pipe was not actually
16  removed and replaced until after that date?
17   A.  I don't recall the specifics, sir,
18  okay.
19   Q.  Do you recall any explanation for
20  why you were asked to perform that analysis?
21   A.  I think as I testified earlier,
22  there was some reference here --
23       MR. PHILBRICK:  Before you go to
24  it, give him your best recollection.  If
25  he wants to ask you to look at it that's
```

Page 196

```
1           CAMPOS
2  another story.
3    A.  The motion that you had filed is
4  what I testified earlier, and I think that's
5  my understanding of a discussion regarding
6  that with Mr. Philbrick led to this.
7    Q.  Okay.  You are referring to
8  American Home's motion for summary judgment,
9  sir?
10   A.  American Home's motion supplemental
11  memorandum in the support of its opposition
12  to Insituform's cross motion for summary
13  judgment.
14   Q.  Okay.  As a result of that did
15  Mr. Philbrick ask you to form this analysis
16  of costs that were incurred prior to
17  December 31, 2003?
18   A.  I believe that it was a joint
19  understanding, yes.
20   Q.  Okay.
21       MR. DESCHENES:  I'm not going to
22  mark this because it's already been
23  marked in Porzio, I'm just going to ask
24  him a couple questions about it.
25       MR. PHILBRICK:  Fine.
```

Page 197

```
1           CAMPOS
2    Q.  Have you ever seen this document
3  before, sir?
4    A.  I don't recall, sir.
5    Q.  Just for the record, it's a letter
6  dated May 11, 2004 from Thomas Porzio to
7  John D'Allessandro and the subject matter of
8  the letter is "notice of completion of ITI
9  work," and it's been previously marked in
10  Mr. Porzio's deposition as Exhibit No. 15.
11   A.  To supplement my answer, I notice
12  before you even said it that it was Porzio's
13  exhibit and I may have seen it in reading his
14  deposition.
15   Q.  Okay.  According to this letter,
16  the Phase I repairs were completed on May 11,
17  2004.  Do you see that?
18   A.  That's what the first paragraph
19  says, yes.
20   Q.  And do you know whether after the
21  Phase I repairs were completed whether the
22  bypass was removed and the pipe was put into
23  use?
24   A.  No, sir.
25   Q.  Did you make any inquiry in terms
```

50 (Pages 194 to 197)

Page 198

CAMPOS

1
2 of whether the pipe was used in calculating
3 the damages in this case?
4    A.  No, sir.
5    Q.  Do you know whether Insituform made
6 any delay cost request in connection with its
7 Phase I work?
8    A.  To D'Allessandro or to whom?
9    Q.  To the MWRA through D'Allessandro?
10    A.  I don't recall.
11    Q.  Let me just show you a couple of
12 documents that have also been previously
13 marked Porzio Exhibit 16 and 17.
14    A.  Yes, sir.
15    Q.  Have you had a chance to look at
16 Porzio Exhibit 16 and Porzio Exhibit 17?
17    A.  I've looked at 16, the letter,
18 which is DO 8812 Bates No'd.
19    Q.  That's the letter dated June 4,
20 2004?
21    A.  Yes, from Insituform.
22    Q.  From Tom Porzio to
23 John D'Allessandro.
24    A.  Correct.
25    Q.  Concerning the delay cost request?

Page 199

CAMPOS

1
2    A.  I'm sorry?
3    Q.  Do you see the reference there to,
4 the subject matter is "delay cost request"?
5    A.  Yes, I see that.  And with respect
6 to 17, essentially a one-page document which
7 is a letter from D'Allessandro to the
8 construction coordinator at MWRA, dated
9 June 8, 2004, four days after Exhibit 16.
10    Q.  And that's a letter, looks like
11 from Brian Albert of D'Allessandro to
12 Michael DelPrete of the MWRA; is that
13 correct?
14    A.  Yes.
15    Q.  It's been previously marked as
16 Porzio Exhibit No. 17.  With respect to both
17 of these documents, sir, Porzio Exhibit
18 No. 16 and Porzio Exhibit No. 17, have you
19 ever seen these documents before?
20    A.  I believe I may have seen them in
21 reading Porzio's exhibit, yes -- Porzio's
22 deposition transcript, yes.
23    Q.  Did you see these documents before
24 preparing your report, dated May 22, 2006?
25    A.  No.  I think the depositions were

Page 200

CAMPOS

1
2 taken before that date.
3    Q.  They were?
4    A.  Yeah, so I couldn't have seen it
5 before I wrote my report.
6    Q.  Well, I was just asking whether --
7    A.  No.
8    Q.  -- you might have reviewed these
9 documents in connection with preparing your
10 report?
11    A.  No.
12       MR. PHILBRICK:  Objection to form.
13    Q.  Based on the June 4th letter, which
14 is part of Exhibit No. 16, it appears that
15 Insituform requests that additional
16 compensation.
17       Do you see that?
18    A.  Yes.
19    Q.  In the amount of approximately
20 $79,000 roughly.
21       Do you see that?
22    A.  Yes, sir.
23    Q.  Do you know whether the MWRA
24 granted this request, sir?
25    A.  No, I do not.

Page 201

CAMPOS

1
2    Q.  Do you know whether these costs are
3 included in the costs Insituform is seeking
4 in this lawsuit against American Home?
5    A.  I would have to, in order to answer
6 that question properly, I would have to
7 analyze Exhibit 1 which is attached to the
8 June 4th letter and trace those amounts to
9 the claim documentation before I could
10 honestly answer that question.
11    Q.  Now, if Insituform received
12 additional compensation in the amount of
13 $79,000, would that affect any of your
14 opinions in terms of the amount recoverable
15 against American Home in this case?
16    A.  Only if the elements that comprise
17 the additional compensation are in the claim
18 and they weren't reduced for some reason or
19 another, it might have an affect.
20    Q.  If, in other words, the costs of
21 $79,000 are included in the claim that's been
22 presented to American Home and they have
23 received additional, Insituform had received
24 additional compensation in that amount, it
25 may have an affect on your opinions in this

51 (Pages 198 to 201)

Page 202

CAMPOS

1
2 case; is that correct?
3    A.  May have, yes.
4    **Q.  How would it affect your opinions?**
5    A.  How may it affect my opinion, as I
6 said earlier, if these amounts are in the
7 claim, and as I look at Exhibit 1, which is
8 marked Exhibit 1 which is part of Porzio's
9 Exhibit 16, I see a 10 percent factor added,
10 that's not a factor that's in the claim.
11       In order to answer that correctly I
12 would have to trace these amounts to the
13 claim documentation to see, number one, that
14 they are in there; and, number two, that
15 there was in fact a reimbursement that was
16 made by MWRA directly to Insituform or
17 indirectly to Insituform.
18    **Q.  But you would agree, if it's**
19 **Insituform was already paid by MWRA for this**
20 **work, it would not be appropriate for**
21 **Insituform to seek compensation from**
22 **American Home in this amount; is that**
23 **correct?**
24    A.  If as I said earlier, if these
25 amounts are in fact in the claim in their

Page 203

CAMPOS

1
2 entirety.
3    **Q.  Okay.  Fair enough.  Let's turn to**
4 **the next document that was also marked in**
5 **Mr. Porzio's deposition and in Mr. Mangels**
6 **deposition, so I won't mark it again unless**
7 **necessary.  I suspect you've never seen this**
8 **before.**
9       **For the record, this is a letter**
10 **dated March 31, 2006, from Thomas Porzio to**
11 **T.J. Shea, D'Alessandro Corp., "Re: Change**
12 **of Order Request," and it's been previously**
13 **marked in the Porzio deposition as Exhibit 21**
14 **and in the Mangels deposition as Exhibit 5.**
15       MR. PHILBRICK:  Do you have a copy
16    that shows the Bate stamp at the bottom
17    of the page, mine cuts it off?
18       MR. DESCHENES:  It's kind of cut
19    off generally, but it say it was
20    ITI AIG 1 believe 009840.
21       Does that correspond with yours?
22       MR. PHILBRICK:  That just tells me
23    where.  It's fine.  Mine the code is cut
24    off, I can't see.
25    A.  Yes, sir.

Page 204

CAMPOS

1
2    **Q.  Have you had a chance to look at**
3 **this document that has been marked as Porzio**
4 **Exhibit 21 and Mangels Exhibit 5?**
5    A.  Yes.
6    **Q.  Do you recognize this document,**
7 **sir?**
8    A.  Not specifically, no, other than
9 most likely saw it as part of the exhibit to
10 the transcripts.
11    **Q.  Under the subject line, it says**
12 **"change order request."**
13       **Do you see that?**
14    A.  Yes.
15    **Q.  Do you know what happened as a**
16 **result of this request?**
17    A.  No.
18    **Q.  Do you have any information about**
19 **how much money was spent on this repair**
20 **that's described in this letter?**
21    A.  No, there's no quantification in
22 the letter.
23    **Q.  No.**
24    A.  And I'm not aware of what was
25 spent, if any, okay.

Page 205

CAMPOS

1
2    **Q.  And I assume you don't know whether**
3 **this amount was included in the cost**
4 **Insituform is seeking in this lawsuit against**
5 **American Home; is that correct?**
6    A.  That's correct.  This is dated
7 March 31, 2006.  That's correct.
8    **Q.  Did anyone at Insituform bring this**
9 **to your attention?**
10    A.  Not that I can recall.
11    **Q.  If Insituform had received**
12 **additional compensation in response to this**
13 **request, would that fact affect any of your**
14 **opinions in this case?**
15    A.  Insituform was looking for a change
16 order under the contract.  Again, if these
17 amounts were in the claim and if they
18 received compensation for it then it could
19 possibly affect my opinion.
20    **Q.  How would it affect your opinion?**
21    A.  If the item was in the claim and
22 they got paid for it, it may reduce the
23 claim, I don't know without looking at all
24 the facts, all the circumstances behind this,
25 okay.

52 (Pages 202 to 205)

Page 206

CAMPOS

1
2  Q.  Okay.  Done with that.  What did
3  you do to prepare for your deposition today?
4     A.  I met with Mr. Philbrick yesterday,
5  spoke with Mr. Mangels over the phone, and
6  included in part of the meeting with
7  Mr. Philbrick was my partner Mehgan Siri, who
8  was sitting in on parts of it, only parts of
9  it, not all of it, and reviewed some of the
10 documents and my report.
11    Q.  Do you recall which documents you
12 reviewed?
13    A.  I recall reviewing the production,
14 CNS production and basically my report.
15    Q.  And do you recall how long you met
16 with Mr. Philbrick?
17    A.  Four, five hours.
18    Q.  And that was yesterday?
19    A.  Yesterday.  And I think I also
20 looked at Mr. Kelley's affidavit and
21 American Home's motion.
22    Q.  Do you recall looking at any other
23 documents in preparation for your deposition?
24    A.  I don't believe there were any
25 others.  On the table were the deposition

Page 207

CAMPOS

1
2  transcripts, but I'm not sure I referred to
3  them yesterday.
4     Q.  And did you have any other prior
5  meetings with Mr. Philbrick prior to your
6  deposition?
7     A.  I think we may have met several
8  weeks ago in anticipation of my then
9  deposition, looking at the similar documents.
10    Q.  Okay.  Do you recall what it is you
11 discussed?
12    A.  You know, just preparation for the
13 deposition, you know, tell the truth, nothing
14 but the truth, period.
15    Q.  You mentioned a conversation with
16 Mr. Mangels.  What is it that you discussed
17 with Mr. Mangels?
18    A.  When he might come up with the
19 actual costs and documentation underlying the
20 closeout costs that we referred to earlier.
21    Q.  Did you discuss with him any other
22 issues related to the case?
23    A.  No, sir.
24    Q.  Did you discuss with him the issues
25 related to fixed versus variable costs?

Page 208

CAMPOS

1
2     A.  No, sir, no other issues is what I
3  answered.
4     Q.  Okay.
5        MR. DESCHENES:  Let me just take a
6  few moments and see if I have any
7  follow-up questions, Charlie, but I
8  think I'm about done.
9        (Recess taken 3:16 until 3:21.)
10       MR. DESCHENES:  From the witness's
11 testimony it appears that Mr. Campos was
12 provided with some binders early on in
13 which he ferreted out certain cost items
14 he testified about, you know, going from
15 $9 million to $7 million.
16       What I don't think we have,
17 Charlie, is the original cost
18 information that he had in doing his
19 analysis and ferreted out certain cost
20 items and I would request that on the
21 record.  I can follow-up in a letter to
22 you, as well.
23       The other piece of information I'd
24 request on the record is if there is a
25 written agreement, engagement letter of

Page 209

CAMPOS

1
2  any kind between either Insituform and
3  Mr. Campos, or your office and
4  Mr. Campos, I'd ask for a copy of that.
5        MR. PHILBRICK:  You already asked
6  for that.
7        MR. DESCHENES:  I know, I know.
8        MR. PHILBRICK:  And you also asked
9  for an update of his been deposed stuff,
10 as well.
11       MR. DESCHENES:  Yeah, I asked for
12 that, his list of cases, I asked for an
13 update on that, as well.  And obviously
14 to the extent Mr. Campos is going to
15 supplement his opinion, it sounds like
16 he is going to supplement his opinion in
17 some fashion, we reserve the right to
18 call him back and ask questions about
19 supplemental aspects of his opinion.
20       With that, I am done.
21       MR. PHILBRICK:  I have no
22 questions.
23          -oOo-
24       (Whereupon, the deposition of
25 CHRIS CAMPOS, CPA, was concluded at

53 (Pages 206 to 209)

Page 210

```
1         CAMPOS
2    3:23 p.m.)
3
4    _____
5       CHRIS CAMPOS, CPA
6
7 Subscribed and sworn to before me
8 this ___ day of _____, 2007.
9
10 _____
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 212

```
1
2 -------------- I N D E X -------------------
3 WITNESS      EXAMINATION BY    PAGE
4 CHRIS CAMPOS      MR. DESCHENES      4
5
6 -------- INFORMATION REQUESTS -------------
7 DIRECTIONS:
8 RULINGS:
9 TO BE FURNISHED:
10 REQUESTS: 53, 108, 209
11 MOTIONS:
12 -------------- EXHIBITS ------------------
13 CAMPOS EXHIBITS  DESCRIPTION  FOR ID.
14 Exhibit 1       Document    31
15 Exhibit 2       Document    52
16 Exhibit 3       Document    65
17 Exhibit 4       Document    80
18 Exhibit 5       Document    114
19 Exhibit 6A - 6D Document    117
20 Exhibit 7       Document    120
21 Exhibit 8       Document    136
22 Exhibit 9       Document    147
23 Exhibit 10      Document    150
24 Exhibit 11      Document    167
25
```

Page 211

```
1
2      C E R T I F I C A T E
3 STATE OF NEW YORK   )
4               : ss.
5 COUNTY OF NEW YORK  )
6
7     I, Toni Allegrucci, a Notary Public
8 within and for the State of New York, do
9 hereby certify:
10     That CHRIS CAMPOS, the witness
11 whose deposition is hereinbefore set
12 forth, was duly sworn by me and that
13 such deposition is a true record of the
14 testimony given by the witness.
15     I further certify that I am not
16 related to any of the parties to this
17 action by blood or marriage, and that I
18 am in no way interested in the outcome
19 of this matter.
20     IN WITNESS WHEREOF, I have hereunto
21 set my hand this 23rd day of May, 2007.
22    _____
23       TONI ALLEGRUCCI
24
25
```

Page 213

```
1
2 EXHIBITS CONT'D:
3
4 CAMPOS EXHIBITS  DESCRIPTION  FOR ID.
5 Exhibit 12      Document    173
6 Exhibit 13      Document    191
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

54 (Pages 210 to 213)