# EXHIBIT 4

Page 1

1      IN THE UNITED STATES DISTRICT COURT FOR THE

                    DISTRICT OF MASSACHUSETTS

2                 CASE NO.  04-10487 GAO

3  INSITUFORM TECHNOLOGIES, INC.,

4          Plaintiff,                        :

5                                            :

       vs.

6                                            :

7  AMERICAN HOME ASSURANCE COMPANY,

                                             :

8          Defendants.

9

10   ----------------------------------------

11        DEPOSITION UNDER ORAL EXAMINATION OF:

                    CHRIS CAMPOS, CPA

12                January 21, 2008

13                -----------

14    REPORTED BY:  JENNIFER L. REALMUTO, CSR

15                -----------

16

17

18

             ESQUIRE DEPOSITION SERVICES

19           90 Woodbridge Center Drive

            Woodbridge, New Jersey 07095

20       (732) 283-1008 or (800) 247-8366

21

22  JOB #  64505/12327

23

24

25

Page 2

1       TRANSCRIPT of the deposition of the
2 above-named witness, called for Oral Examination in
3 the above-entitled matter, said deposition being
4 taken pursuant to Superior Court Rules of Practice
5 and Procedure, by and before JENNIFER REALMUTO,
6 Certified Shorthand Reporter and Notary Public of the
7 State of New Jersey, License No. XI01916, at the
8 office of CAMPOS & STRATIS, 310 Cedar Lane, Teaneck,
9 New Jersey, on Monday, January 21, 2008, commencing
10 at 1:30 in the afternoon.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1               I N D E X
2
    WITNESS      DIRECT    CROSS   REDIRECT
3
4 Testimony of:
5
  CHRIS CAMPOS, CPA
6
  By Mr. Deschenes      6
7
8
9       E X H I B I T S
10
  NUMBER       DESCRIPTION         PAGE
11
    14   Summary of Claim Pre- and Post-
12       December 31, 2003 Costs        12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1 A P P E A R A N C E S:
2
  HOLLAND & KNIGHT, LLP
3 131 S. Dearborn Street, 30th Floor
  Chicago, Illinois 60603
4 BY:  CHARLES L. PHILBRICK, ESQ.
  Attorneys for the Plaintiffs
5
  NIXON PEABODY, LLP
6 100 Summer Street
  Boston, Massachusetts, 02110
7 BY:  GREGORY P. DESCHENES, ESQ.
  Attorney for the Defendant
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1         DEPOSITION SUPPORT INDEX
2      DIRECTION TO WITNESS NOT TO ANSWER
3
   Page   Line    Page   Line   Page Line
4         (None)
5
        REQUEST FOR PRODUCTION OF DOCUMENTS
6
7   Page   Line   Page   Line    Page  Line
8         (None)
9       STIPULATIONS
10 Page   Line    Page   Line   Page   Line
11         (None)
12     QUESTION MARKED
13
14 Page   Line    Page Line      Page   Line
15         (None)
16
17
18
19
20
21
22
23
24
25

2 (Pages 2 to 5)

**Esquire Deposition Services**
**1-866-619-3925**

Page 6

1 CHRIS CAMPOS, CPA,

2 310 Cedar Lane, Teaneck, New Jersey, having been

3 first duly sworn, testifies as follows:

4

5 DIRECT EXAMINATION BY MR. DESCHENES:

6    Q.    Good afternoon, Mr. Campos.

7    A.    Good afternoon.

8    Q.    Nice to talk to you again. I want to

9 thank you for making yourself available on such short

10 notice and on a holiday.

11    A.    Good afternoon.

12    Q.    Besides the court reporter, is there

13 anyone else present in the room with you?

14    A.    No, sir.

15    Q.    Do you understand that you are still

16 under oath today?

17    A.    Yes, sir.

18    Q.    All of the previous instructions that

19 I gave you in our previous deposition session in May

20 of 2007 apply today, but I think, as we mentioned

21 before we went on the record, we have to be very

22 careful not to try to speak over each other today

23 because we're doing this by telephone.

24        So I will try very hard not to

25 interrupt you when you are answering a question, and

Page 7

1 if you could try also to allow me to get out my

2 question before responding, I think that would be

3 very useful, and to give, obviously, Charlie an

4 opportunity to object if he feels it's appropriate to

5 object.

6        So there may be some pregnant pauses

7 here today, but I think we have to all kind of work

8 together to do that.

9        Is that okay with everybody?

10    A.    Yes, sir.

11    Q.    And I have not done a telephone

12 deposition in a while, so I'll have to keep that in

13 mind.

14        Since our last deposition in May of

15 2007, how many cases have you been deposed in, sir?

16    A.    I don't recall off the top of my

17 head. I did send you an update of the cases I've

18 testified, and I don't know whether since that date

19 I've testified again. I don't believe so, but I

20 don't recall.

21    Q.    And have you testified at trial since

22 May 2007?

23    A.    I do not believe so.

24    Q.    Have you been precluded from offering

25 an opinion in any of those cases, sir?

Page 8

1    A.    No.

2    Q.    Has your testimony been limited by a

3 Court in any way? And I'm talking about since May of

4 2007.

5    A.    No, sir.

6    Q.    How much has your firm earned in

7 connection with this retention by Insituform in this

8 case?

9    A.    I don't know, sir. I -- it's not

10 something I keep a record of mentally.

11    Q.    Are you still charging Insituform

12 $300 per hour for your time in this case?

13    A.    Yes, sir.

14    Q.    And I believe it was your partner,

15 Ms. Callen, is she still charging $150 to $175 per

16 hour for her work on this case?

17    A.    Yes, sir.

18    Q.    Do you know approximately how many

19 hours you've worked on this case?

20    A.    No, I do not, sir.

21    Q.    Do you have any approximation or

22 estimate of those hours, sir?

23    A.    No, I do not. I'd be guessing and I

24 wouldn't want to guess.

25    Q.    Absolutely not. And how -- do you

Page 9

1 have any approximation or estimation for how many

2 hours your partner, Ms. Callen, has put into the

3 case?

4    A.    No, I do not.

5    Q.    Sir, do you bill this engagement to

6 Insituform?

7    A.    Either Insituform or Mr. Philbrick,

8 I'm not sure precisely which one, but Insituform

9 ultimately pays the bill.

10    Q.    What I was asking, I guess, is: Are

11 you the person at your firm who's responsible for

12 preparing and sending out bills in this matter?

13    A.    I am. The bills are prepared and I

14 review them and finalize them and okay them. But

15 they're prepared by someone else, okay?

16    Q.    And you review them?

17    A.    Yes.

18    Q.    And finalize them before they're sent

19 out; is that correct?

20    A.    Yes.

21    Q.    Do you recall when the last time was

22 that you sent out a bill in this case?

23    A.    No, I do not, sir.

24    Q.    And sitting there today, you have no

25 memory at all about how much you may have charged

3 (Pages 6 to 9)

Page 10

1 Insituform in this case; is that correct?

2    A.    That's correct, yes.

3    Q.    Have you been retained by
4 Mr. Philbrick or Holland & Knight to work on any
5 other cases?

6    A.    No, sir.

7    Q.    Since our last session, Mr. Campos, I
8 understand that you have completed your analysis of
9 the costs incurred prior to December 31, 2003; is
10 that correct?

11    A.    Yes, sir.

12    Q.    Did you conduct a quantitative
13 analysis of those costs?

14    A.    Yes.

15    Q.    And can you describe for me what that
16 quantitative analysis entailed?

17    A.    It entailed reviewing all of the
18 categories of the claim and going back to the
19 detailed source documents from which those totals
20 were derived to determine whether or not the work was
21 performed prior -- or through December 31, 2003 or
22 thereafter.

23    Q.    And who conducted this analysis, sir?

24    A.    Ms. Siri Callen did, under my
25 direction, and periodically I would be reviewing as

Page 11

1 she did the work.

2    Q.    Was there anyone else involved in
3 performing this analysis?

4    A.    No, sir.

5    Q.    So is it fair to say that this
6 analysis is based on when the costs were actually
7 incurred; in other words, when the service or product
8 was delivered, as opposed to when an invoice was sent
9 or paid for?

10    A.    Yes, that's fair to say.

11    Q.    Besides looking at the source
12 documents that you mentioned in your last answer, did
13 you rely on any other documents in order to perform
14 this analysis?

15    A.    In order to perform my entire
16 analysis, in addition to looking at the source
17 documents, I referred to Mr. Porzio's deposition
18 transcript.

19    Q.    Was that part of your quantitative
20 analysis, sir?

21    A.    No. It was part of my qualitative
22 analysis.

23    Q.    Okay. Let me just try to limit it
24 now to the quantitative analysis now if we can and
25 ask you again, were there any other documents that

Page 12

1 you referred to, besides the source documents you
2 mentioned, in order to perform the quantitative
3 analysis?

4    A.    I don't believe so.

5    Q.    Do you have available, sir, the
6 spreadsheet that Mr. Philbrick was good enough to
7 provide to me last week, which is C&S 0138 through
8 0153?

9    A.    Yes.

10    Q.    The top of that document has a title.
11 It says "Summary of Claim Pre- and Post-December 31,
12 2003 Costs"?

13    A.    Yes, I do have it.

14         MR. DESCHENES: Jennifer, could we
15 mark that as an exhibit, please?

16         (Exhibit 14, Summary of Claim Pre and
17 Post December 31, 2003, was marked for Identification
18 by the court reporter.)

19         MR. DESCHENES: Could you please hand
20 that to the witness?

21         THE WITNESS: She has.

22 BY MR. DESCHENES:

23    Q.    Great. Sir, could you please
24 describe what this document is.

25    A.    Well, the first page of that

Page 13

1 document, C&S 0138, is as you mentioned earlier the
2 summary of claim pre- and post-December 31, 2003
3 costs. And it breaks out the various categories as
4 to the dollar amount based on my analysis that was
5 through December 31, 2003 and that portion that was
6 after December 31, 2003, along with showing the
7 original Phase II amounts setting forth the total
8 amount of the claim.

9    Q.    Did you prepare this document,
10 Exhibit 14?

11    A.    As I said earlier, it was prepared by
12 Ms. Siri under my direction.

13    Q.    Was anyone else involved in the
14 preparation of this document?

15    A.    No, sir.

16    Q.    Are there any prior drafts of this
17 document?

18    A.    There are no -- if there are any
19 drafts, it were a typo or whatever, but no drafts
20 were maintained. As a matter of policy, I don't
21 retain drafts. Otherwise, I'd need a warehouse to
22 store things.

23    Q.    And the numbers on these pages,
24 particularly the first page, where do these numbers
25 come from?

4 (Pages 10 to 13)

1   A.   The dollar amounts?

2   Q.   Yes, sir.

3   A.   The dollar amounts on the summary,
4 with respect to payroll and burden and equipment
5 burden come from Page 11 of 11, which is C&S 0149.
6 The remaining amounts, subcontractor and third-party
7 invoices, those amounts come from C&S 0150.

8   Q.   And do those numbers originally come
9 from the source documents you described earlier?

10   A.   The amounts set forth on Pages -- on
11 the 11 pages --

12   Q.   Yes, sir.

13   A.   -- of the -- that's entitled "2003
14 Employee Payroll Breakdown, Phase I Direct Labor,"
15 all of that came from the binders that I have in my
16 office, that Section A-1 and A-4.

17   Q.   Did you create any other worksheets
18 or notes or other papers in preparing this document?

19   A.   No.  This document was prepared
20 directly from the source data summarized and brought
21 forth onto the summary.

22   Q.   On the first page in front of you of
23 Exhibit 14, under Phase I, I would like to focus on
24 the column entitled "Through 12/31/03."  Do you see
25 that?

1   A.   Yes, sir.

2   Q.   And I'd like to go through each of
3 these categories of costs individually.  This column
4 represents your calculation of pre-December 31, 2003
5 costs, does it not?

6   A.   Pre-December 31, 2003, yes.

7   Q.   It does.  And let's just take the
8 first number.

9   A.   Yes, sir.

10   Q.   It's described, I believe, in the
11 left-hand side of the page as field growth payroll
12 report.

13        Do you see that?

14   A.   Yes.

15   Q.   What does this category represent?

16   A.   The field payroll, the total payroll
17 for the field payroll.  It's the same category that
18 was in my original report on Schedule 1 of my report,
19 the exact same category.

20   Q.   Okay.  Can you explain to me how you
21 arrived at this figure, $96,172.41?

22   A.   I reference to the binder and the
23 Section A-1, looked at the individual payroll
24 records, the payroll summaries for all of the
25 employees from October 2, 2003 through December 31,

1 2003, summarized those -- that gross -- the gross pay
2 dollars by day on the 11 pages, and added that up to
3 come up with the total of $96,172.41.

4   Q.   And the backup or support for that
5 calculation is the next 11 pages of this Exhibit 14?
6 I think you've described it's 139 through 49; is that
7 correct, sir?

8   A.   Through 149, yes.

9   Q.   So with respect to field gross labor
10 payroll reports, based on your calculation, sir, the
11 total amount of costs incurred prior to December 31,
12 2003 is 96,172.41; is that correct?

13   A.   Based on the data that appears in the
14 book for the daily payroll for each of these
15 employees, for all of the employees, that's what it
16 amounts to, yes, sir.

17   Q.   The next item, sir, if you could go
18 down to labor, burden and benefits.  Do you see that?

19   A.   Yes, sir.

20   Q.   And under the column through
21 12/31/03, there's a number there, $28,452.40.  Do you
22 see that?

23   A.   Yes, sir.

24   Q.   And what does this category
25 represent?

1   A.   It represents the total payroll
2 burden, which is composed of four separate
3 subcategories:  General liability, worker's
4 compensation insurance, employer payroll tax and
5 fringe benefits.  All of those four elements are the
6 total of the payroll burden.

7   Q.   And how did you arrive at this
8 figure, sir?

9   A.   By the same process I arrived at the
10 gross pay figure, by referring to the binder, A-1 and
11 A-4, and employee by employee, for the 11 pages,
12 entered each of the categories that I just mentioned
13 and totaled them up.  And the total categories
14 equaled the 28,452.40.

15   Q.   And the backup or support for that
16 calculation, sir, is it the same 11 pages that
17 follow?

18   A.   Yes, sir.

19   Q.   C&S 0139 through 0149?

20   A.   Yes, sir.

21   Q.   So with respect to labor, burden and
22 benefits, based on your calculations, the total
23 amount of costs incurred prior to December 31, 2003
24 is $28,452.40; is that correct, sir?

25   A.   For the labor, burden and benefits,

**Esquire Deposition Services**
**1-866-619-3925**

Page 18

1 yes.

2    Q.    Now, just scrolling down to the next
3 line, it says "Equipment Burden." Do you see that?

4    A.    Yes, sir.

5    Q.    And there is a number again for
6 equipment burden of $63,633.50. Do you see that?

7    A.    Yes, sir.

8    Q.    And can you tell me what this
9 category represents?

10    A.    It represents a compilation of the
11 equipment burden charges for each of the employees,
12 and I went back to the same source data, day by day,
13 and entered it on the 11 pages and summarized it and
14 totaled it, to arrive at the 63,633.50.

15    Q.    So you used the same process here for
16 equipment burden to determine this figure as the
17 process that you used for field gross payroll report
18 and labor, burden and benefits, sir?

19    A.    Same process and same source data,
20 yeah.

21    Q.    And the source data, again -- or the
22 backup and support for your calculation are the 11
23 pages that follow this summary page, sir?

24    A.    Well, the 11 pages are where it's
25 summarized. But the source data is the three -- the

Page 19

1 four binders that I have in my office that represent
2 the details of the claim.

3    Q.    Okay. So with respect to equipment
4 burden, based on your calculations, the total amount
5 of costs incurred prior to December 31, 2003 is
6 $63,633.50; is that correct, sir?

7    A.    Yes, sir.

8    Q.    Now, scrolling down to the next item
9 under -- it says, "Subcontractor and Third-Party
10 Invoices." Do you see that?

11    A.    Yes, I do.

12    Q.    And under the item "Per Diem and
13 Lodging," do you see that, sir?

14    A.    Yes.

15    Q.    And can you tell me -- there's an
16 amount for per diem and lodging, $4,138.27. Do you
17 see that?

18    A.    Yes, sir.

19    Q.    And what does this category
20 represent?

21    A.    The per diem and lodging charges in
22 connection with this project through December 31,
23 2003.

24    Q.    And how did you arrive at this
25 figure, sir?

Page 20

1    A.    By looking at the source data, which
2 is the binder D-2. And the binders that I'm talking
3 about are -- originally were marked Exhibits 6A, 6B,
4 6C and 6D --

5    Q.    That's correct, sir.

6    A.    -- at my deposition, just so it's
7 clear what I'm talking about.

8    Q.    I appreciate that. Thank you.

9    A.    And by reference to the category or
10 the section under the Tab D-2, I tallied up eight
11 items that totaled the 4,138.27, and they appear on
12 C&S 0151 and summarized on C&S 0152 and brought forth
13 onto C&S 0150.

14    Q.    And for this item, in arriving at
15 this figure, your methodology was to include things
16 based on when the costs were incurred as opposed to
17 when they were paid; is that correct, sir?

18    A.    Yes.

19    Q.    So with respect to per diem
20 lodging -- I'm sorry, per diem and lodging, based on
21 your calculations, the total amount of costs incurred
22 prior to December 31, 2003 is $4,138.27; is that
23 correct?

24    A.    Yes, sir.

25    Q.    Okay. The next category down is

Page 21

1 expendable and supplies. Do you see that, sir?

2    A.    Yes, I do.

3    Q.    And can you tell me what this
4 category represents?

5    A.    Again, a category that was collected
6 by Insituform in -- and it represents the -- as it
7 says, the expendable items and the various supplies
8 incurred in connection with this project through
9 December 31, 2003.

10    Q.    And how did you arrive at this
11 figure, sir?

12    A.    By reference to the -- the binders,
13 the category under the type D-3. I identified four
14 items that were incurred prior to December 31, 2003.
15 Listed them on C&S 0151. Summarized them on C&S
16 0152, which totaled $18,636.60, and they were brought
17 forth onto C&S 0150.

18    Q.    So with respect to expendable and
19 supplies, based on your calculations, the total
20 amount of costs incurred prior to December 31, 2003
21 is $18,636.60; is that correct?

22    A.    Yes, sir.

23    Q.    And the next item is miscellaneous
24 expenses. Do you see that, sir?

25    A.    Yes, I do.

6 (Pages 18 to 21)

Page 22

1    Q.    Can you tell me what this category
2 represents?
3    A.    It represents, again, a category
4 entitled "Miscellaneous Expenses" that Insituform
5 collected relating to this project. And I identified
6 these items through -- that were incurred through
7 December 31, 2003.
8    Q.    Can you tell me the process for
9 arriving at that figure?
10    A.    By referring to the binders under
11 Tab D-4, which is the source data for the claim, and
12 identifying the miscellaneous expenses incurred
13 through December 31, 2003. Tabulating them on
14 C&S 0151 and 0152 and summarizing those to arrive at
15 the 13,968.02.
16    Q.    Which appears on C&S 0150; is that
17 correct?
18    A.    And carried over onto -- yes, onto
19 C&S-0150.
20    Q.    So with regard to miscellaneous
21 expenses, based on your calculations, the total
22 amount of costs incurred prior to December 31, 2003
23 is $13,968.02; is that correct?
24    A.    That's the charges incurred -- the
25 actual charges incurred through December 31, 2003 as

Page 23

1 tabulated by me.
2    Q.    The next item down states
3 "Independent Testing Services." Do you see that,
4 sir?
5    A.    Yes, I do.
6    Q.    And can you tell me what this
7 category represents?
8    A.    Again, a category identified by
9 Insituform during the course of this project, which
10 they entitled "Independent Testing Services." And
11 that is a category that I used in the -- my original
12 Schedule 1 of my report, and that same category is
13 broken out here in this analysis.
14    Q.    And how did you arrive at that
15 figure, sir?
16    A.    By referring to the binder under
17 Tab D-5, I looked at the documents and looked to
18 determine what was incurred through December 31,
19 2003. There were three items totaling $3,475 which
20 are set forth on C&S 0151 and 0152 and brought forth
21 onto C&S 0150.
22    Q.    So with respect to independent
23 testing services, based on your calculations, the
24 total amount of costs incurred prior to December 31,
25 2003 is $3,475; is that correct?

Page 24

1    A.    Based on my analysis, that's what
2 I've tabulated and totaled it to be, yes.
3    Q.    Okay. The next item, two items down,
4 is air travel. Do you see that, sir?
5    A.    Yes, sir.
6    Q.    And can you tell me what this
7 category represents?
8    A.    It represents air travel expense
9 incurred by Insituform in connection with this
10 project as they originally collected in their
11 original claim. And I'm utilizing that same category
12 for purposes of this analysis, and that's what I've
13 done.
14    Q.    Okay. And can you describe for me,
15 sir, how you arrived at that figure?
16    A.    By referring to the binders, Tab D-7,
17 I identified three items that were incurred prior to
18 December 31, 2003. Those items -- amounts are set
19 forth on C&S 0151 and 015 -- summarized on C&S 0152
20 in the total amount of $2,544.40 and brought forth
21 onto C&S 0150.
22    Q.    So with respect to air travel, based
23 on your calculations, the total amount of costs
24 incurred prior to December 31, 2003 is $2,544.40; is
25 that correct, sir?

Page 25

1    A.    Yes, based on my analysis of the
2 underlying documents, that's what that amount totals,
3 yes.
4    Q.    And then the next-to-last item is
5 meals? Do you see that, sir?
6    A.    Yes, sir.
7    Q.    And what does that category
8 represent?
9    A.    That incurs meals -- that represents
10 meals incurred by Insituform in connection with this
11 project, and it's a category that was in their
12 original claim and I've utilized that same category
13 in this analysis.
14    Q.    And how did you arrive at that
15 figure, sir?
16    A.    By reference to the Tab D-8 in the
17 binders, I identified two items totaling $130.40,
18 which are set forth on C&S 0151 and summarized on
19 C&S 0152 and brought forward onto C&S 0150.
20    Q.    So with respect to meals, based on
21 your calculations, the total amount of costs incurred
22 prior to December 31, 2003 is $130.40; is that
23 correct?
24    A.    Based on my analysis, that's what
25 that -- those amounts total, yes, sir.

7 (Pages 22 to 25)

Page 26

1  Q.    Okay. And the last item,
2 subcontractor and consultants, do you see that, sir?
3   A.    Yes, I do.
4   Q.    And can you tell me what that
5 category represents?
6   A.    It represents subcontractor and
7 consultant charges incurred by Insituform in
8 connection with this project.
9   Q.    And the number there is
10 $1,001,125.88; is that correct?
11   A.    That's correct.
12   Q.    And how did you arrive at that
13 figure?
14   A.    By reference to Tab D-9 in the
15 binders and referring to the underlying invoices that
16 are included therein and identifying those items that
17 were incurred -- or through December 31, 2003.
18 And I've summarized those on C&S 0151 and 0152 and
19 brought forth that total of the seven items of
20 $1,001,125.88 onto C&S 0150.
21   Q.    And like the other items you've
22 testified to, this is based on when the costs were
23 incurred, not when the services were actually paid
24 for; is that correct?
25   A.    That's correct. Either incurred, not

Page 27

1 paid for or billed, but when they were incurred.
2   Q.    So, in other words, when the service
3 or product was delivered or provided; is that
4 correct?
5   A.    Or rendered, yes.
6   Q.    Or rendered?
7   A.    Yes.
8   Q.    So with respect to subcontractor and
9 consultants, based on your calculations, the total
10 amount of costs incurred prior to December 31, 2003
11 is $1,001,125.88?
12        (A discussion was held off the
13 record.)
14   A.    Based on my analysis, those items
15 total the 1,001,125.88.
16 BY MR. DESCHENES:
17   Q.    And then the next line down, sir, it
18 says "Subtotal." Do you see that?
19   A.    You referring to -- which page, sir?
20   Q.    I'm referring to Page 1. After
21 "Subcontractor and Consultants," there's the next
22 line, it says "Subtotal"?
23   A.    Oh you're talking about on C&S 0138?
24 Yes, okay.
25   Q.    The first page of Exhibit 14.

Page 28

1   A.    Got you.
2   Q.    On the first page?
3   A.    Yes.
4   Q.    After all those items, there's a
5 category and it says "subtotal." Do you see that?
6   A.    Yes, I do.
7   Q.    And under "Subtotal," the total
8 amount of costs incurred prior to December 31, 2003
9 is $1,232,276.88; is that correct?
10   A.    It's through December 31, 2003, yes,
11 that's the number.
12   Q.    And did you arrive at this figure by
13 simply adding up the numbers in the column above?
14   A.    By adding up the amounts set forth in
15 that column that says "Through December 31, 2003,"
16 yes, I did.
17   Q.    And did you also conduct a
18 qualitative analysis of the costs incurred prior to
19 December 31, 2003?
20   A.    As I testified a little earlier, yes,
21 I did.
22   Q.    And can you tell me what the
23 qualitative analysis entailed?
24   A.    Reading the deposition transcript of
25 Mr. Porzio to determine what was done during this

Page 29

1 period of time and why.
2   Q.    Did anyone else assist you in
3 performing this qualitative analysis?
4   A.    No, sir.
5   Q.    Other than reading Mr. Porzio's
6 deposition, did you do anything else to perform your
7 qualitative analysis?
8   A.    Not that I can recall.
9   Q.    In other words, did you ever speak to
10 Mr. Porzio directly?
11   A.    I may have spoken to him directly,
12 but I don't think it was about this specific issue.
13 Maybe I did. I don't recall.
14   Q.    By "this specific issue," you mean
15 the qualitative analysis, sir?
16   A.    Yes, sir.
17   Q.    Did the analysis include talking to
18 any other people about these costs?
19   A.    I don't believe so.
20   Q.    In other words, did the analysis
21 include getting opinions from operational people as
22 to the type of expenditure?
23   A.    Other than through what I just
24 testified of the -- in reference to the deposition
25 transcript, I don't recall any other communications.

8 (Pages 26 to 29)

Page 30

1    Q.    So the qualitative part of your
2 analysis consisted of, in its entirety, reading
3 Mr. Porzio's deposition; is that correct?
4    A.    Well, in its entirety and to the
5 extent that there may have been other communications
6 that I can't recall, once you narrow it down to its
7 entirety, I have to qualify that way. Okay?
8    Q.    Well, I hear you and understand you,
9 sir, but I'm asking for your best memory today as to
10 what you did to perform your qualitative analysis.
11 And so far I think you've testified that you read
12 Mr. Porzio's deposition, and what I'm asking you is
13 did you do anything else to perform your qualitative
14 analysis?
15    A.    And I believe, sir, that I have
16 answered you by saying nothing that I can recall.
17 And I also answered that -- when you said 100 percent
18 of it represented the deposition transcript reading,
19 I qualified that, to be honest with you, by saying
20 that it could have been other items that I can't
21 recall.
22    Q.    But sitting there today, you cannot
23 recall doing anything else to perform your
24 qualitative analysis besides reading Mr. Porzio's
25 deposition transcript; is that correct?

Page 31

1    A.    For about the third time, sir, that's
2 correct.
3    Q.    As part of your qualitative analysis,
4 sir, did you ask to speak to any Insituform
5 personnel?
6    A.    I think you asked me that earlier,
7 and I said I don't recall. I still do not recall
8 whether I asked for any -- to speak to anyone or
9 whether I did speak to anyone. I think essentially
10 it was the deposition transcript.
11    Q.    And in light of your qualitative
12 analysis, sir, can you tell me what conclusions, if
13 any, you reached?
14    A.    I reached the conclusion that these
15 expenses were incurred through December 31, 2003 for
16 testing and investigating whether or not Insituform
17 could repair or replace.
18    Q.    Did you come to any other
19 conclusions, sir?
20    A.    That these were the appropriate
21 amounts to be recognized as incurred through
22 December 31, 2003.
23    Q.    What do you mean by "appropriate
24 amounts"?
25    A.    They were the correct amounts, by

Page 32

1 reference to the underlying documents and separating
2 those out before and after, that's what I concluded.
3    Q.    Oh. I'm not trying to be difficult.
4 I'm just -- what you mean is you confirmed that these
5 numbers were the actual numbers?
6    A.    Yes.
7    Q.    Did your analysis of the
8 pre-December 31, 2003 costs affect or change any of
9 your opinions in this case?
10    A.    No.
11    Q.    Your analysis did not include any
12 coverage interpretation; is that correct, sir?
13    A.    My analysis -- that's correct. I do
14 not give an opinion with respect to coverage.
15    Q.    And that is because you're not
16 qualified to give an opinion about policy
17 interpretation; is that correct, sir?
18    A.    I'm not licensed to do that and I
19 don't normally do that, other than by reference to
20 the custom and practice of what actually goes on on a
21 day-to-day basis in the industry.
22    Q.    And is it fair to say that, in your
23 analysis, you categorized costs into different
24 buckets: Those incurred prior to December 31, 2003
25 and those incurred after December 31, 2003?

Page 33

1    A.    Yes.
2    Q.    And would you agree, sir, that
3 whether those costs are recoverable under the Liberty
4 Mutual policy language is a coverage issue?
5    A.    Yes, as between Liberty and
6 Insituform, it's a coverage issue, yes.
7    Q.    And it's a coverage issue as between
8 American Home and Insituform, is it not, sir?
9    A.    Okay, let me clarify. When you say
10 "coverage issue," first I'm assuming there is
11 coverage under -- as I go through my career, and I
12 understand what transpires in the adjustment of a
13 loss, there's two phases: Liability and quantum.
14        I'm assuming, in the case of Liberty
15 and in the case of American Home, that there is
16 liability under the policy. And then the quantum is
17 where people like me that come in and measure the
18 amount of the damages, and if you call that coverage
19 or not, that's another issue, but I'm saying that
20 what I've done and how I've analyzed it is normally
21 what is done in an adjustment of this type of a
22 claim.
23    Q.    I appreciate what you're talking
24 about, making the distinction between quantum and
25 liability, sir, but my question is slightly

9 (Pages 30 to 33)

Page 34

1 different. And that is: What is recoverable under
2 the policy here -- strike that. That's not a
3 question.
4     Do you agree, sir, that ultimately
5 the issue of what is recoverable under the policy
6 language here is a coverage issue?
7     A.     Well, I'll agree that the carriers
8 normally would use that interpretation and rely on
9 their interpretation of coverage as to what's
10 included and what's recoverable or not, yes.
11     Q.     And you would agree, sir, that you
12 are not qualified to give an opinion in that regard,
13 sir?
14     A.     I'm qualified to give an opinion as
15 to what is covered under custom and practice. I do
16 this all the time.
17     Q.     Well, we'll get to custom and
18 practice, sir, but --
19     A.     I'm asking your question. You asked
20 me a question and I'm answering it.
21     Q.     Okay. But you had testified before,
22 sir, that you are not qualified to give opinions
23 about coverage; is that correct?
24     A.     I -- what I testified before was that
25 I don't interpret the policy because I'm not licensed

Page 35

1 to do that. You either need to be a licensed
2 adjustor, as I understand it, or an attorney to
3 interpret the policy, and I don't interpret policies,
4 legally or illegally.
5     Q.     Now, as I understand it, sir -- you
6 mentioned custom and practice. I understand your
7 opinions in this case about what is recoverable under
8 American Home policy is based on custom and practice
9 and not policy language; is that correct?
10     A.     Custom and practice as it relates to
11 policy language, not divorced from policy language.
12 The custom and practice that transpires in connection
13 with policies.
14     Q.     Understood. But in connection with
15 policy language and interpretation, you are not here
16 to give opinions about that; isn't that correct?
17     A.     I'm not here to give an opinion as to
18 interpreting the policy.
19     Q.     And when you talk about custom and
20 practice, you're talking about insurance industry
21 custom and practice; is that correct?
22     A.     Insurance industry custom and
23 practice, yes.
24     Q.     And what methods do forensic
25 accountants use, like yourself, to value liability

Page 36

1 claims?
2     MR. PHILBRICK: I'm going to object
3 to the form of the question. The witness can answer
4 if he can.
5     A.     When you say "to value liability
6 claims," we don't value them. We evaluate them,
7 analyze them and report upon them, and this
8 particular -- it's a liability policy, but as I
9 understand this policy, this basically is first-party
10 property policy within the liability policy.
11     Q.     And my question, sir, is just what
12 methods do forensic accountants like you to evaluate,
13 as opposed to -- you don't like the word "value" --
14 to evaluate claims?
15     A.     By analyzing the claim, looking at
16 supporting documentation. Depending on the way the
17 claim is put together, it's an analysis of the claim,
18 a review of the claim, an audit of the claim to probe
19 and test to see whether the claim stands up.
20     Q.     And what methodology did you use to
21 determine custom and practice?
22     A.     I'm sorry. I don't understand that
23 question.
24     Q.     Let me ask it more directly. How did
25 you go about determining insurance industry custom

Page 37

1 and practice?
2     A.     How did I come about developing that?
3     Q.     No. How did you go about determining
4 insurance industry custom and practice?
5     A.     Through my experience, through
6 sitting in on thousands of claims of this sort.
7     Q.     And what did you rely upon to
8 determine custom and practice here?
9     A.     The activities that transpired
10 between the insurance company and the insured and the
11 ultimate adjustment of the losses.
12     Q.     Did you rely on any treatises to
13 determine custom and practice?
14     A.     I did not refer to any treatises.
15 Sir, I've used my experience in the custom and
16 practice in a field that I have spent decades on and
17 done a couple thousand cases. I didn't have to look
18 at a book to determine what I knew from my experience
19 and working with adjustors, mostly on behalf of
20 insurance companies, and sitting in on the adjustment
21 of the losses and sitting in on settlement
22 conferences and very, very few litigation cases.
23     Q.     Let me -- I assume from your answer,
24 just so we can cut to the chase, then, in determining
25 what your understanding of custom and practice is,

10 (Pages 34 to 37)

Page 38

1 you didn't rely on anything in writing, journals,
2 articles, literature or treatises; is that correct,
3 sir?
4     A.     I did not specifically go to any
5 treaties in connection with the work that I did on
6 this engagement.
7     Q.     And you did not rely on anything in
8 writing to determine custom and practice; is that
9 correct?
10    A.     That was my answer.
11    Q.     Okay.  Do forensic accountants like
12 yourself use written guidelines in order to evaluate
13 liability claims?
14           MR. PHILBRICK:  I'm going to object
15 to the form.
16           The witness may answer if he can.
17    A.     I don't know whether -- what other
18 forensic accountants do, but I don't go to a written
19 guideline.  I look at each claim and each claim is
20 prepared in a unique fashion.  It's not like you're
21 looking at a tax return or a financial statement
22 that's put together in a standardized type of format.
23           All the claims are put together in
24 different formats, different approaches, and you have
25 to use different approaches and different evaluations

Page 39

1 to properly evaluate that claim.  You cannot go to a
2 written standardized guideline.  Otherwise, you're
3 not doing your job properly.
4     Q.     Just to close the loop here, from
5 your answer, I take it you did not rely on any
6 written guidelines to evaluate this particular claim,
7 correct?
8     A.     You've asked me that question I think
9 before, maybe in a slightly different form.  The
10 answer is yes, correct, I did not refer to any
11 written guidelines to determine how I should approach
12 my analysis of this claim.
13    Q.     Now, your knowledge of custom and
14 practice is based on working with claims adjustors
15 and insurance companies; is that correct?
16    A.     Yes, sir.
17    Q.     But you are not a licensed claims
18 adjustor yourself; is that correct?
19    A.     That's correct.
20    Q.     And you never have been a licensed
21 claims adjustor; is that correct?
22    A.     Never have and never claimed to be
23 one.
24    Q.     And you are -- you have never been an
25 insurance professional; is that correct?

Page 40

1     A.     What do you mean by "an insurance
2 professional"?
3     Q.     Working in the insurance industry, in
4 the claims capacity.
5     A.     Working for an insurance company?
6     Q.     Yes.
7     A.     As an employee in a claims capacity?
8     Q.     Right.
9     A.     No, I have not.
10    Q.     In fact, you've never worked in the
11 insurance industry; isn't that correct?
12    A.     No.  I consider the work that I do
13 working in the insurance industry, and so would many
14 of my peers.  Okay?
15    Q.     But you've never been an employee of
16 an insurance company, correct?
17    A.     That's correct.  That's what I
18 testified to a minute ago.  I've never been an
19 employee of an insurance company.  I've been an
20 advisor and a consultant to the insurance companies,
21 but not one of their employees.
22    Q.     And what education do you have that
23 would qualify you to testify about insurance industry
24 custom and practice?
25    A.     Other than some continuing education

Page 41

1 courses that I've taken in connection with insurance
2 claim matters, the vast majority of my basis for this
3 is my experience in 3,000 or so claims that I've
4 worked on over the last 40 some years.
5     Q.     We'll get to experience.  Right now
6 my question is what education do you have?
7     A.     And I answered that.
8     Q.     And what is it?
9     A.     Continuing education courses that
10 I've taken.
11    Q.     Can you describe those for me?
12    A.     They've been courses at American
13 Institute of CPAs.  They have annual sessions that
14 I've gone to, and the topics include, among other
15 things, insurance claims, business interruption
16 claims, property damage claims, things of that
17 nature.  Okay?
18           I've attended those.  And I've given
19 many seminars to insurance company personnel, to
20 their employees, to the insurance company
21 organizations, covering these same topics.
22    Q.     Did any of these seminars or
23 continuing education courses have, as a topic, custom
24 and practice in the insurance industry?
25    A.     I don't believe they teach custom and

11 (Pages 38 to 41)

**Page 42**

1 practice, no. I think that's something that you get
2 by experience.
3    Q.    And with respect to training, sir,
4 what particular training do you have that would
5 qualify you to testify about insurance industry
6 customs and practice?
7    A.    As I -- I just -- as I just
8 testified, I don't believe I have ever, ever, ever
9 seen a course in insurance company customs and
10 practices. So I couldn't take a training course,
11 per se.
12        If you mean by educational type
13 courses, custom and practice, as I understand it is
14 the result of the experience you gain in the custom
15 and practices used in the field, in the firing line,
16 and gathering that information.
17    Q.    Is there general acceptance in the
18 accounting community for using custom and practice as
19 a basis for opinions in evaluating insurance claims?
20    A.    It's generally accepted by the people
21 who work on the claims -- on insurance claims, yes.
22    Q.    And are you aware of any articles or
23 treatises discussing that topic, sir?
24    A.    I believe you've asked that question
25 before. I am not aware, nor have I looked for, if I

**Page 43**

1 articles on custom and practice. The custom and
2 practice aspects of what I have learned has been in
3 the firing line, in the adjustment process, sitting
4 in on adjustment meetings and settlement meetings.
5    Q.    And do you know, sir, whether this
6 methodology has been subject to any peer review and
7 publications?
8    A.    It's been subject to peer review by
9 usage throughout the forensic accounting profession.
10    Q.    Can you give me some specific
11 examples of publications?
12    A.    I didn't say publications. Usage.
13 The usage in the field by public accountants on both
14 sides, representing insureds, representing insurance
15 companies. They understand the custom and practice
16 in connection with the policies and the custom and
17 practice interpretation of those policies.
18    Q.    Are you aware, sir, of any specific
19 examples where that methodology has been subject to
20 peer review and publication?
21    A.    In publications?
22    Q.    Yep, peer review and publications.
23    A.    I'm aware of the peer review as I've
24 testified in actual practice. I'm not aware of any
25 publications that discuss custom and practice in

**Page 44**

1 connection with insurance claims.
2    Q.    Now, you would agree, sir, that the
3 specific policy language will govern what is
4 recoverable under a policy, would you not?
5    A.    In a literal sense, yes.
6    Q.    And you would agree that not all
7 liability policies are written the same?
8    A.    That's correct. And as I said in a
9 literal sense, yes, but in a real world, there are
10 variations. Okay?
11    Q.    Right. And in terms of variations,
12 you would also agree that if there is special or
13 unique policy language, it would trump your
14 understanding of custom and practice, would it not?
15    A.    Not necessarily, no.
16    Q.    And why is that, sir?
17    A.    It's -- it still would entail the
18 custom and practice in connection with that unique
19 language. And it all depends on --
20    Q.    How would you go about defining what
21 the custom and practice is of that unique practice
22 is?
23    A.    If I may back up, I was going to
24 finish.
25    Q.    Sure.

**Page 45**

1    A.    The literal interpretation depends on
2 the parties. I could work on one week the same
3 policy, exact same wording, and if for some reason
4 somebody wants to be hard-nosed and interpret it one
5 way or another, you have a difference of opinion,
6 even with the same policy.
7        So the policy interpretation is
8 important, but it's also who interprets that policy
9 that ultimately causes the disagreements that occur.
10    Q.    Are you finished, sir?
11    A.    Yes, sir.
12    Q.    Just going back to if there is
13 special or unique policy language, how would you go
14 about determining custom and practice?
15    A.    By looking at the unique language and
16 determining what occurs in the real world when that
17 language occurs. I'd have to look at the facts and
18 circumstances about this unique policy.
19    Q.    Well, if you were dealing with
20 language that was special or unique in order to
21 determine custom and practice, you would look at what
22 goes on in the real world? Is that what you said?
23        MR. PHILBRICK: I'm going to object
24 to the form. It mischaracterizes his testimony.
25    A.    If there is this so-called unique

12 (Pages 42 to 45)

Page 46

1 language that you referred to, I would talk to the
2 adjustor. I would look at and determine whether
3 there were circumstances similar to this in other
4 unique languages -- unique policies and make a
5 determination as to what would occur in the real
6 world in custom and practice.
7 BY MR. DESCHENES:
8    Q.    In this case, is there any language
9 in the Liberty Mutual or American Home policies that
10 would cause you to deviate from your understanding of
11 custom and practice?
12    A.    Not that I'm aware of.
13    Q.    Mr. Campos, I don't know if you have
14 available to you the Liberty mutual policy?
15    A.    It's somewhere here.
16    Q.    If you could pull that out, I'd
17 appreciate it. I'm going to ask you a couple of
18 questions.
19    A.    Yes, sir.
20    Q.    Do you have it available?
21    A.    Yes, sir.
22    Q.    If I could direct your attention to
23 the pages Bates-stamped I00087 through 88.
24    A.    Yes, sir.
25    Q.    And this -- those two pages, the

Page 47

1 first page should say "Contractor Rework Coverage
2 Amendment." Do you see that, sir?
3    A.    Yes, sir.
4    Q.    And the first question I have for you
5 is have you ever read this endorsement?
6    A.    Yes, sir.
7    Q.    And in connection with your opinions
8 in this case, do you rely at all on your analysis of
9 this endorsement?
10    A.    Well, I read it, reviewed it,
11 reviewed Liberty's letter explaining their
12 interpretation of this letter and their ultimate
13 decision to pay their limit of liability minus the --
14 above the deductible, and yes, I've looked at this,
15 yes.
16    Q.    Well, my question went further than
17 did you look at it. My question is, did you rely at
18 all --
19    A.    I answered that, that I did rely on
20 it. Okay?
21    Q.    You do rely on your analysis of this
22 endorsement to reach your opinions in this case?
23    A.    It's part of what I relied on to
24 reach my conclusions, yes.
25    Q.    And does this involve your

Page 48

1 interpretation of the language on these two pages?
2    A.    My interpretation of the language on
3 the two pages, yes, sir.
4    Q.    It does?
5    A.    And -- and Liberty's letter, I think
6 of December 10 -- if my memory serves me correctly,
7 that date, December 10, 2004, I think.
8    Q.    Now, in your 45 years of -- maybe
9 it's more than 45 years of experience --
10         Let me ask you:  Have you ever seen
11 an endorsement like this one, the contractor rework
12 coverage amendment?
13    A.    Yes, I believe I have.
14    Q.    Can you tell me specifically in what
15 other cases that you've seen -- and I'm talking about
16 this exact language, sir.
17    A.    Well, if you're talking -- now, in
18 the second question you said "exact language."
19    Q.    All right.  Let me clarify.  Have you
20 seen an endorsement before in your career with
21 language just like this?
22    A.    Precisely like this?
23    Q.    Yep.
24    A.    I cannot answer that question
25 honestly, truthfully, which I'm doing here today,

Page 49

1 unless I went back to my old files and made a
2 comparison to see if it was precisely and exactly the
3 same wording.
4         It could be a word or two different.
5 I don't know, sir. And you wouldn't want me to
6 guess.
7    Q.    No. Now, let me back up and ask the
8 question a little more generally that you were going
9 to answer. Have you ever encountered anything
10 similar to this endorsement before?
11    A.    I believe I have.
12    Q.    And can you tell me specifically when
13 you've encountered an endorsement like this, in what
14 other case?
15    A.    Sir, I have to relate back to my
16 college days where my professor told me not to cram
17 my mind with details, but just know where to go get
18 the information. I don't recall. I'd have to do
19 some research to see whether that file still exists
20 in my firm here, to answer your question truthfully.
21    Q.    And if you could just go down the
22 page of I00087 about a third of the way, sir, there's
23 some language that appears, and I'll read it for the
24 record. It says, "The amount we will pay under this
25 coverage shall be limited to the lesser of: 1, your

13 (Pages 46 to 49)

Page 50

1 actual cost of removing and replacing any of the
2 above items; or 2, your actual cost of remedial
3 action taken to avoid removal or replacement of such
4 products."
5        Do you see that language, sir?
6    A.    Yes.
7    Q.    And did I read that correctly?
8    A.    Yes.
9    Q.    And in your experience, have you ever
10 encountered language like this?
11   A.    Like that, I believe I have.
12   Q.    And can you tell me in what other
13 context you have seen language like this?
14   A.    I cannot recall the specific case.
15   Q.    Can you tell me generally?
16   A.    Generally I've seen it. I can't tell
17 you it's XYZ Corporation or what it was, okay? Or
18 the circumstances, or whether it was a 40-inch pipe
19 or whether it was a 22-inch pipe, okay? I'm sorry,
20 but I can't tell you.
21   Q.    Well, I'm just asking generally if
22 you can recall in any other context in which you've
23 seen language like this?
24   A.    And I testified that I believe I
25 have.

Page 51

1    Q.    And I'm asking for the example of
2 that.
3    A.    And I testified I can't recall the
4 specific example.
5    Q.    And as part of your opinions in this
6 case, are you relying upon your interpretation of
7 that language which I just read?
8    A.    I'm relying on the language. I'm
9 relying on other documents that I've read, the
10 deposition testimony. I'm relying on Liberty's
11 letter and my understanding of what the custom and
12 practice would be in a situation like this.
13   Q.    And is part of your opinion in this
14 case based on your interpretation of this provision
15 which I just read?
16   A.    My interpretation of custom and
17 practice in connection with this provision.
18   Q.    Your interpretation of custom and
19 practice as opposed to --
20   A.    The custom and practice in connection
21 with this provision, this terminology.
22   Q.    I may be splitting hairs here, but
23 you're talking about custom and practice as opposed
24 to your interpretation of the language itself, sir?
25   A.    Well, I'm reading the language. I

Page 52

1 can read the language, and then I use, in the custom
2 and practice of the insurance industry, how would
3 such a claim be adjusted. That's what I mean, sir.
4    Q.    Well, can you tell me what your
5 understanding of insurance industry custom and
6 practice is for dealing with a provision like this?
7    A.    Well, it's -- they will pay the
8 lesser of the two items, one or two.
9    Q.    But not both, sir?
10   A.    Well, my understanding would be the
11 lesser of the two. It's a question of what would be
12 included in one and what would be included in two.
13 Okay?
14        One of the issues in this case,
15 according to Porzio's testimony, is the cost of
16 investigating and testing, and one of the issues
17 seems to be your client raising this issue or you
18 raising it.
19        And, sir, in my years of experience,
20 you need to test and investigate in order to come to
21 the crossroads of whether you repair or whether you
22 replace. You cannot abide by the terms of the policy
23 as to should you repair or should you replace unless
24 you spend some time and effort testing and
25 investigating which route to take.

Page 53

1        If you don't do that, you're not
2 abiding properly by the terms of the policy. And in
3 the real world, those investigation and testing costs
4 are covered. And in the real world, the insurance
5 company gets involved -- instead of sitting on the
6 sidelines, gets involved in the testing and
7 investigating, along with the insured, to determine
8 which way to go.
9        (A brief recess was taken.)
10 BY MR. DESCHENES:
11   Q.    We were focusing, Mr. Campos, on this
12 contractor rework coverage amendment before we
13 broke --
14   A.    Right.
15   Q.    -- and you mentioned based on custom
16 and practice -- based on your understanding of custom
17 and practice, that the cost of investigating would
18 ordinarily be covered under on a policy, correct?
19   A.    Testing and investigating, yeah.
20   Q.    Testing and investigating. And in
21 this particular endorsement, is there any provision
22 that you rely upon for that opinion?
23   A.    Not with the specific wording. What
24 I'm saying, custom and practice, even with wording
25 such as this, you don't get to that crossroads --

14 (Pages 50 to 53)

Page 54

1 when you get to that crossroads of deciding where to
2 go, repair or replace, how do you make that decision
3 unless you test and investigate?
4          It's not like you have a broken chair
5 or a broken table. This is a very complex pipeline,
6 almost a mile long. It's not something that you just
7 take a quick look at and say, Well, we can repair or
8 we have to replace it. Okay? So it's some
9 investigation and testing of a considerable amount is
10 necessary in order to make that decision. Otherwise,
11 you're not abiding by the terms of the policy.
12     Q.    Are you done? I just don't want to
13 cut you off.
14     A.    Yes, sir.
15     Q.    I appreciate your response. But let
16 me go back to my question, which is: Are you relying
17 on any specific language in the endorsement for that
18 opinion?
19     A.    I believe, if I didn't, what I meant
20 to say, I read the language and I'm saying, yes, that
21 language and as it is handled or as it's done in the
22 normal course of an adjustment in the custom and
23 practice, I'm -- even with this language, I'm saying
24 testing and investigating is included. It has to be
25 included, logically.

Page 55

1     Q.    And where we talked about the
2 either/or before in that provision -- strike that.
3          The provision that I read to you
4 before the break that starts out, "The amount we will
5 pay under this coverage shall be limited to the
6 lesser of" language; do you see that?
7     A.    Yes, sir.
8     Q.    Do you agree this language has an
9 impact on what is recoverable under the policy?
10     A.    Yes.
11     Q.    And do you agree, sir, that
12 determining what amounts fall into each category
13 involves a coverage issue?
14     A.    I'm sorry. I missed that sentence --
15 that question.
16     Q.    Sure. Let me repeat it. Do you
17 agree that determining what amounts fall into each
18 category involves a coverage issue?
19     A.    Well, it's a -- it's a question of
20 coverage, yes. And that paragraph that you read --
21 or part of a paragraph that you read has to be taken
22 in the context of the rest of that endorsement --
23 okay -- amendment, not just taking it out of context.
24     Q.    Turning to a different topic, sir, do
25 you intend to offer any opinions at trial on

Page 56

1 Insituform's consequential damages claim in this
2 case?
3     A.    No, sir.
4     Q.    Insituform has not retained you to
5 offer any opinions on its consequential damages
6 claim?
7     A.    I just want to make sure you identify
8 what you mean or what whoever means by "consequential
9 damages" in this claim.
10     Q.    Do you have any understanding for
11 what that term means, "consequential damages"?
12     A.    Generally, yes.
13     Q.    Well, let me try to be a little more
14 specific for you in this case.
15          MR. PHILBRICK: Sorry about that.
16          THE WITNESS: What happened?
17          MR. PHILBRICK: My phone rang and you
18 all heard it so I just killed it. And please
19 proceed. I apologize.
20          MR. DESCHENES: Not a problem.
21          THE WITNESS: If it's your wife,
22 answer it.
23 BY MR. DESCHENES:
24     Q.    Are you aware of a consequential
25 damages claim related to a default of a debt

Page 57

1 instrument in December of '04 and a debt refinancing
2 in '05 and Insituform claiming cost as a result of
3 that refinancing?
4     A.    Yes.
5     Q.    And my question to you is, do you
6 intend to offer any opinions at trial on that issue?
7     A.    At this point in time, I have not
8 been asked and I don't intend to.
9     Q.    And do you intend to offer any
10 opinions at trial on Insituform's business
11 interruption damages claim?
12     A.    I wasn't aware there was one. Okay?
13 So therefore I do not intend to perform -- to testify
14 in connection with the business interruption claim.
15     Q.    So until my asking that question, you
16 weren't aware that Insituform was pressing a business
17 interruption claim in this case?
18     A.    I don't recall of one, sir.
19     Q.    You have experience valuing business
20 interruption claims for other clients, do you not?
21     A.    Yes.
22     Q.    And you have experience testifying in
23 business interruption cases?
24     A.    Yes, sir.
25     Q.    And you have published articles on

15 (Pages 54 to 57)

Page 58

1 business interruption; isn't that correct?

2    A.    Yes, sir.

3    Q.    But Insituform has not asked you to
4 give any opinions on that in this case; is that
5 correct, sir?

6    A.    Not as of this date, no, sir.

7    Q.    Since our last deposition session in
8 May, have you done anything else to investigate
9 Insituform's claim?

10    A.    Well, what I've done is what I set
11 forth in Defendant's Exhibit 14 and with respect to
12 the costs through December 31, 2003 and after. I
13 have also looked at the closeout costs that in my --
14 Schedule 1 of my report were estimated at $264,000.

15        And I've since looked at the actual
16 closeout costs, and I believe I testified at the time
17 that I knew or I understood there were going to be
18 less than the 264,000. And I understand that -- by
19 copy of a letter that I've seen from Mr. Philbrick to
20 you dated June 8, that the actual costs were set
21 forth in those documents. And I received a carbon
22 copy of that letter.

23        Those costs were decreased from the
24 264,000 estimate to 201,446.73. And I guess to
25 complete my answer, I've summarized the original

Page 59

1 claim that I've calculated on my Schedule 1.

2    Q.    Yes, sir.

3    A.    And I adjusted it for the closeout
4 cost, the actual -- based -- as compared to the
5 estimate that I just mentioned now. And then I also
6 took the equipment burden -- the fixed portion of the
7 equipment burden, which I believe I testified to in
8 May, and deducted that from the claim.

9        All of that is set forth on C&S 0153,
10 and I come up with a revised total of the claim of
11 7,054,899.68.

12    Q.    But just to confirm, it is your
13 opinion that the amount of actual cost for this claim
14 is $7,054,899.68; is that correct?

15    A.    Yes. And I had testified in my
16 deposition that I was in the process of analyzing
17 that, and that those adjustments would have to be
18 made, and they have now been made.

19    Q.    So that amount includes reductions
20 for the claim for actual closeout costs versus
21 estimated closeout costs, and the second part is the
22 fixed cost portion of equipment burden; is that
23 correct?

24    A.    Yes, sir.

25    Q.    Are there any other changes that you

Page 60

1 intend to make to your opinion changes from your
2 earlier report or deposition?

3    A.    No, sir.

4    Q.    Since our deposition in May, have you
5 looked into whether -- and I asked you about this in
6 your deposition -- whether Insituform was paid an
7 additional $79,000 by the MWRA in June of '04?

8    A.    I have not looked into that, and I
9 don't recall that question, sir.

10    Q.    Okay. Well, I don't have it in front
11 of me, but there was a piece of correspondence in
12 which Insituform was seeking compensation. And my
13 questions for you then were: Do you know whether the
14 MWRA paid this amount, and do you know whether those
15 costs are included in Insituform's claim against
16 American Home?

17        And at the time I think you answered
18 you did not. And so my question is: Have you
19 investigated that at all?

20    A.    And I think I have answered that. I
21 have not.

22    Q.    Okay. And do you recall, sir,
23 whether the cost of leasing and maintaining the
24 warehouse and yard space are included as part of
25 equipment burden?

Page 61

1    A.    I'd have to take a look -- to answer
2 your question properly, I'd have to take a look at --
3 sir, I believe I answered that question at my
4 deposition. I don't recall, as I sit here today,
5 whether they were included in total or in part,
6 without doing some research.

7    Q.    Okay. Well, you'll have to do your
8 research. My question the last time -- I think you
9 answered in response to my question the last time was
10 that your belief was they were not included, and
11 that's the reason for my follow-up.

12    A.    That the warehouse costs were not
13 included?

14    Q.    As a part of equipment burden.

15    A.    Okay.

16    Q.    Do you know one way or the other,
17 sir?

18    A.    I don't recall as I sit here today.

19    Q.    You would agree that such costs would
20 be considered a fixed cost, would it not?

21    A.    Depending on the underlying nature of
22 them. Not necessarily -- they would tend to be, but
23 I would have to look at the details and the facts and
24 circumstances behind the specific warehouse costs.
25 Okay?

16 (Pages 58 to 61)

Page 62

1    Q.    Okay.
2        MR. DESCHENES: Charlie?
3        MR. PHILBRICK: Yes, sir.
4        MR. DESCHENES: I think I'm done.
5 I'm looking at my notes.
6        MR. PHILBRICK: Take your time. I'm
7 doing the same thing.
8        MR. DESCHENES: Okay. I am done,
9 sir. Thank you.
10        THE WITNESS: You're welcome.
11        MR. DESCHENES: Thanks for making
12 yourself available.
13 CROSS-EXAMINATION BY MR. PHILBRICK:
14    Q.    Mr. Campos, this is Charlie
15 Philbrick. I just have a couple of questions I'd
16 like to ask you.
17        You indicated, during the questions
18 that Mr. Deschenes asked you, that you had reviewed
19 the Liberty Mutual contractor's rework coverage
20 amendment endorsement as well as Liberty Mutual's
21 December 10, 2004 letter; is that correct?
22    A.    Yes, sir.
23    Q.    And are those the kinds of things
24 that an expert in the field of forensic accounting
25 and evaluating and insurance loss would typically

Page 63

1 rely upon in performing his or her analysis?
2        MR. DESCHENES: Objection.
3    A.    Where you have a situation where
4 there are layered policies, an underlying policy and
5 an excess carrier, yes, because this would be no need
6 to be looking at another company's policy unless it
7 had a bearing on this particular claim.
8        MR. DESCHENES: I'm having a little
9 difficulty hearing you, Mr. Campos. If you could
10 speak up.
11        THE WITNESS: I'm sorry.
12    A.    What I said was that I would only be
13 looking at it in a situation where there's an
14 underlying policy and an excess policy. You would
15 only look at the underlying policy when you have that
16 kind of a situation, and that's why I did that in
17 this particular case.
18        I looked at the policy and the letter
19 from Liberty Mutual where they transmitted their
20 final check in connection with the payment of the
21 limit of liability of their policy.
22 BY MR. PHILBRICK:
23    Q.    And you also made reference during
24 the questions that were asked you to the binders or
25 the source material, and I think at one point you

Page 64

1 indicated that those references all pertained to
2 Deposition Exhibit 6 A, B, C and D; is that correct?
3    A.    Yes, sir.
4    Q.    And are those materials and the
5 information contained in Exhibit 6 A, B, C and D the
6 kind of information that an expert or forensic
7 accountant would typically rely upon in performing a
8 loss evaluation as the kind that you have done here?
9        MR. DESCHENES: Objection.
10    A.    The data -- the documents in
11 Exhibits 6 A, B, C and D represent the underlying
12 source data for the claim/ and it's obviously the
13 kind of data that a forensic accountant would and
14 should look at in connection with an evaluation of
15 the claim.
16 BY MR. PHILBRICK:
17    Q.    You were also asked questions about
18 evaluating a liability claim.
19        Do you recall that?
20    A.    I think the question was originally
21 about valuing a liability claim, and I mentioned that
22 I evaluate them and analyze them, yes.
23    Q.    And do you consider the claim to
24 be -- that's at issue in this litigation to be a
25 liability claim?

Page 65

1        MR. DESCHENES: Objection.
2    A.    I think I testified earlier that my
3 understanding of this claim is that even though it's
4 written in connection with a liability policy, that
5 the aspects of this claim and the endorsement that
6 applies are, in effect, the first-party property
7 claim.
8 BY MR. PHILBRICK:
9    Q.    And in the context of adjusting or
10 evaluating the quantum of a first-party property
11 claim, is it common in your experience to address the
12 question of repair versus replacement?
13    A.    In my role I don't, as I said, adjust
14 the loss. But as a consultant sitting in in the
15 adjustment process of the loss, yes, it is common to
16 see the testing and investigation as being part of
17 the cost of the claim and recoverable on the claim.
18        Because as I testified earlier,
19 unless you do so, you're not properly following the
20 terms of the policy to determine which avenue to
21 take.
22        MR. DESCHENES: Excuse me. Charlie.
23        MR. PHILBRICK: Yes, sir.
24        MR. DESCHENES: Did we reserve
25 motions to strike? I think we did, but --

17 (Pages 62 to 65)

Page 66

1          MR. PHILBRICK:  That's fine.
2          MR. DESCHENES:  Otherwise, I would
3 move to strike it, but --
4          MR. PHILBRICK:  Do you have a
5 grounds?
6          MR. DESCHENES:  Yeah, nonresponsive.
7          MR. PHILBRICK:  It's not your motion.
8 BY MR. PHILBRICK:
9     Q.    Mr. Campos, in your experience as a
10 forensic accountant evaluating first-party property
11 losses, is it common for a property policy to provide
12 either indemnification for a replacement or repair?
13     A.    Where -- where the policy has a
14 replacement provision, yes.
15     Q.    Are there occasions when it doesn't?
16          MR. DESCHENES:  Objection.
17     A.    Yes, there are occasions where a
18 property policy does not have a provision for
19 replacement.
20 BY MR. PHILBRICK:
21     Q.    What is your understanding with
22 respect to who typically bears the costs of
23 determining which is cheaper, repair or replacement?
24          MR. DESCHENES:  Objection.
25     A.    My experience is that the cost of

Page 67

1 determining which road to take, which avenue to take,
2 repair or replacement, is part of the -- is
3 reimbursed by the insurance carrier in connection
4 with that type of loss.
5          And as I said earlier, it's not like
6 you're looking at a table or a chair like we have in
7 this conference room that I'm in now.  You're looking
8 at a complex piece of property that's almost a mile
9 long, 40 -- 30 feet underground.
10 BY MR. PHILBRICK:
11     Q.    During the questioning, you had
12 commented on distinguishing between liability on one
13 hand and quantum on the other.  Do you recall that?
14     A.    Yes.
15     Q.    Do you consider the issues that you
16 address in evaluating quantum to be coverage issues?
17          MR. DESCHENES:  Objection.
18     A.    If you talk about coverage being --
19 coming under the category of liability as opposed to
20 quantum, no.  I get involved in the quantum aspects
21 of the claim using the custom and practice under the
22 policy to determine what is reimbursable under the
23 policy.
24 BY MR. PHILBRICK:
25     Q.    And I think you had indicated a

Page 68

1 number of how many losses that you have evaluated
2 over the years.  What was that number?
3     A.    It's over 3,000.
4     Q.    And for -- you had also indicated
5 that you had done this forensic accounting work for
6 insurance companies; is that right?
7     A.    Most of my work in the insurance
8 industry is on behalf of insurance companies.  The
9 vast majority of it.
10     Q.    And did you do your work in this case
11 any differently because -- in light of the fact that
12 you've been retained by Insituform?
13     A.    No, sir.  I used the same standards
14 and same approach no matter what.  Okay?  No matter
15 who my client is.  That's what my profession dictates
16 that I do, and I have always followed that.
17          MR. PHILBRICK:  Thank you,
18 Mr. Campos.  I don't have any other questions.
19          MR. DESCHENES:  I just have one
20 follow-up from what Mr. Philbrick asked you.
21 REDIRECT EXAMINATION BY MR. DESCHENES:
22     Q.    He asked you about liability versus
23 quantum just now.
24     A.    Yes.
25     Q.    And you would agree, sir, that the

Page 69

1 quantum aspects of the claim sometimes involves
2 coverage issues as well, would you not?
3     A.    Yes.  And as I testified, I get
4 involved with the quantum.  And with respect to the
5 coverage issues of the quantum, my involvement is the
6 custom and practice used in adjusting and evaluating
7 that loss in the real world.
8     Q.    As opposed to giving your opinions
9 about policy interpretation; is that correct, sir?
10     A.    Or trying to interpret the policy,
11 yes.
12          MR. DESCHENES:  Okay.  That's all I
13 have.
14          MR. PHILBRICK:  That's all I have.
15          MR. DESCHENES:  We'd like it -- at
16 least I'd like it within a week, if possible.
17          (The deposition was concluded at 3:30
18     p.m.)
19
20
21
22
23
24
25

18 (Pages 66 to 69)

Page 70

```
1         C E R T I F I C A T E
2         I, JENNIFER REALMUTO a Notary Public
3    and Certified Shorthand Reporter, do hereby
4    state that prior to the commencement of the
5    examination
6         CHRIS CAMPOS, CPA
7     was duly sworn by me to testify to the
8    truth, the whole truth and nothing but the
9    truth.
10        I do further state that the foregoing
11   is a true and accurate transcript of the
12   testimony as taken stenographically by and
13   before me at the time, place and on the date
14   hereinbefore set forth.
15        I do further state that I am neither
16   a relative nor employee nor attorney nor
17   counsel of any of the parties to this
18   action, and that I am neither a relative nor
19   employee of such attorney or counsel and
20   that I am not financially interested in this
21   action.
22   _____
          JENNIFER REALMUTO
23        License No. 30X100191600
24
25
```

19 (Page 70)